# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, : : : | |
| Plaintiff, : : | |
| v. : : | Civil Action No. |
| OFFICE OF ADMINISTRATION, : : | |
| Defendant. : : | |

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, plaintiff Citizens for Responsibility and Ethics in Washington respectfully moves for entry of a preliminary injunction to enjoin defendant Office of Administration's unlawful attempts to impede plaintiff's efforts to obtain agency records concerning the loss of millions of email records of the Executive Office of the President ("EOP") from EOP-managed email systems and environments. Plaintiff seeks an order requiring defendant to immediately process plaintiff's Freedom of Information Act request and disclose the requested records within 10 days.

The grounds for this motion are set forth in the accompanying memorandum of points and authorities. Plaintiff asks the Court, pursuant to Local Rule 65.1(d), to schedule a hearing on this application for a preliminary injunction at the Court's earliest convenience.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Kimberly D. Perkins

(D.C. Bar No. 481460)
Citizens for Responsibility and Ethics
 in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (20) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: May 22, 2007

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————
CITIZENS FOR RESPONSIBILITY AND : 
ETHICS IN WASHINGTON,                    :
                                                              :
          Plaintiff,                                  :
                                                              :
     v.                                                     :          Civil Action No.
                                                              :
OFFICE OF ADMINISTRATION,          :
                                                              :
          Defendant.                              :
———————————————————:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**STATEMENT**

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for

expedited processing and release of agency records concerning the loss of over five million

email from the email systems and environments of the Executive Office of the President

("EOP").  Defendant Office of Administration ("OA"), a component of the EOP, has

acknowledged that the requested information fits squarely within the narrow category for which

Congress has mandated expedited processing and, on April 27, 2007, purported to grant the

request of plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") for

expedited treatment of its FOIA requests.  Nevertheless, in clear violation of the FOIA, the OA

has refused to process CREW's requests even within the 20-working-day time-frame for

processing a standard FOIA request not entitled to expedition.

The OA's failure to process CREW's requests, or to even identify a date by which it

expects to complete its processing, is in clear violation of the FOIA and in conflict with the very

purpose of expedition.  By granting expedition the OA rightfully recognized the compelling and

urgent need to inform the public about the record-keeping practices of the White House and the degree to which it knowingly ignored, if not outright violated, federal laws. By failing to honor the commitment to expedition, however, the OA has deprived the public of vital information and undermined the purposes of the FOIA. Accordingly, plaintiff seeks the Court's expedited consideration of this matter and entry of an order compelling the OA to process and disclose the requested records within 10 days.

### FACTUAL BACKGROUND

In the wake of email problems that plagued the previous administration, the Bush administration announced early on its intention to create a White House chief information officer position to oversee the EOP email system. See Tony Lee Orr, White House CIO Will Monitor, Manage E-mail, *Government Computer News*, June 4, 2001 (attached as Exhibit 1). According to White House officials, they had "plans for improving electronic records management," that reportedly included "developing and updating the executive office's policies for maintaining federal and presidential records." Id. To date, however, the Bush administration has refused to make public its record-keeping policies on the ground that "we don't share internal White House memos." Alexis Simendinger, The E-Mail Trail, *The National Journal*, April 9, 2007 (attached as Exhibit 2).

Recently it has come to light that at least some high-level White House officials, including Karl Rove, use outside email accounts to conduct official business even though by such use they are evading their responsibilities under federal records statutes. See, e.g., Alexis Simendinger, Whose E-Mail Is It?, *The National Journal*, March 24, 2007 (attached as Exhibit 3) (reporting on Karl Rove's use of an outside email account maintained by the Republican

2

National Committee ("RNC") for "about 95 percent" of his e-mail); John D. McKinnon,

Congress Follows Email Trail, *Wall Street Journal*, April 10, 2007 (attached as Exhibit 4)

(reporting on use by Susan Ralston, a top aide to Karl Rove, of at least four outside email

accounts). Three congressional investigations into these practices have confirmed that "White

House officials used nongovernmental e-mail accounts to conduct official business or

communicate with agency officials." Letter from Chairman Henry A. Waxman, House

Committee on Oversight and Government Reform, to Eric A. Kuwana, May 1, 2007 (attached as

Exhibit 5).

Following press reports of these practices, some White House aides stopped using the

White House email system altogether to avoid public or congressional scrutiny of their actions,

and substituted private email systems such as those available on cellular phones or blackberries.

Peter Cary, Sorry, You're Not Reading My E-mail, *U.S. News & World Report*, April 9, 2007

(attached as Exhibit 6); Separate White House E-mail Accounts Draw New Criticism, *U.S. News

& World Report Blog*, March 29, 2007 (attached as Exhibit 7).

Press reports have also revealed that prior to 2004, emails sent from RNC accounts were

automatically deleted every 30 days. White House Admits Misuse of Republican Party-

Sponsored E-Mail, *Associated Press*, April 12, 2007 (attached as Exhibit 8). Even when the

RNC excluded White House staff from its automatic deletion policy in 2004, individual White

House aides -- including Karl Rove -- were still able to delete their files and avoid preservation

of their emails. Id. As the White House now admits, emails from White House staff, including

those transmitting official business, have been lost. Michael Abramowitz and Dan Eggan, White

House E-Mail Lost in Private Accounts, *The Washington Post*, April 12, 2007 (attached as

3

Exhibit 9).

The White House has also admitted that over five million email generated between March 2003 and October 2005 are missing from the EOP servers. <u>See</u>, <u>e.g.</u>, Patience Wait, <u>The Case of the Missing E-mails</u>, *Government Computer News*, May 1, 2007 (attached as Exhibit 10). This admission was made in the face of a report that CREW issued, based on confidential sources, exposing the fact that the EOP currently has no effective email records management system in place. <u>See Without a Trace: The story Behind the Missing White House E-Mails and the Violations of the Presidential Records Act</u>, available at http://www.citizensforethics.org/files/04207WithoutATraceFullReport.pdf. In October 2005, the OA discovered a problem with its email retention process that it later confirmed included hundreds of days for which emails were missing for one or more EOP components. <u>Id.</u> at 11-12. The White House rejected a proposal by the OA to recover the missing email, continuing to use a grossly inadequate electronic record-keeping system that had proven to be ineffective in preventing the loss of a massive amount of presidential records. <u>Id.</u> at 12.

Based on information provided it by confidential sources, CREW sent by facsimile and first-class mail a FOIA request to the OA on April 17, 2007, seeking records relating to the potential loss of email records of the EOP associated with any and all EOP-managed email systems and environments. <u>Letter from Anne L. Weismann to Office of Administration FOIA Officer</u>, April 17, 2007 (Exhibit A to Complaint).

The following day, CREW sent another FOIA request to the OA, also by facsimile and first-class mail, that clarified and supplemented its April 17, 2007 FOIA. <u>Letter from Anne L. Weismann to Office of Administration FOIA Officer</u>, April 18, 2007 (Exhibit B to Complaint).

4

Specifically, CREW's clarifying FOIA sought the following:

> (1) copies of all analyses prepared by the OA and its offices, directorates and branches between January 21, 2001 and April 13, 2007, that identify potential technical, procedural and process problems related to the potential loss of email records of the Executive Office of the President ("EOP") associated with any and all EOP-managed email systems and environments;
>
> (2) copies of all documents, databases, spreadsheets and inventories prepared between January 21, 2001 and April 13, 2007, that provide a detailed accounting (daily, weekly and/or monthly) of actual email messages retained or that identify potential missing email messages within the scope of all EOP-managed email records management environments;
>
> (3) copies of all system requirements specifications, risk assessments, project implementation documents, project concepts and other documents related to all planned, incomplete or completed implementation of any EOP email records management systems since January 21, 2001; and
>
> (4) copies of all statement of work ("SOW"), requests for proposal ("RFP") and requests for quote ("RFQ") issued by the OA or other government offices or agencies on behalf of the OA related to the analysis, design, implementation and support of EOP email systems implementation and migration and email records management system analysis, implementation, support and services.

Id.

CREW's clarifying FOIA also explained that CREW is not seeking "any system security, system configuration, or internal system network configuration information." Id. In addition, CREW is seeking specific documents that it has been advised were in existence at least as of July 2006, and that were either created by individuals within the OA or are in the possession of the OA. Id.

CREW also sought a waiver of fees associated with processing its request given that the request concerns the operations of the federal government, the disclosures will likely contribute

to a better understanding of relevant government procedures, and the request is primarily and fundamentally for non-commercial purposes. <u>See</u> Exhibits A and B to Complaint. The requested records are likely to shed light on the extent to which the White House's practices deviate from the requirements of the Presidential Records Act, 44 U.S.C. §§ 2201 <u>et seq.</u>, as well as any White House record-keeping guidance and policies, and the extent to which the White House had prior knowledge that its practices violate federal law. <u>Id.</u>

For both of its FOIA requests, CREW sought expedition for the express purpose of disseminating any responsive documents to the public based on the widespread and exceptional media interest in the White House emails, the revelations about the use by high-ranking EOP officials of outside email accounts and the fact that the White House has known since the fall of 2005, that at least five million emails have been missing from its records management system. Exhibits A and B to Complaint. CREW's website contains numerous examples of its efforts in this regard, including a report it issued concerning missing White House email and the implications under the Presidential Records Act. <u>Id.</u>

By letter dated April 27, 2007, the OA acknowledged receipt of CREW's FOIA requests of April 17 and 18, 2007, and granted CREW's request for expedited processing. <u>Letter from Carol Ehrlich to Anne Weismann</u>, April 27, 2007 (Exhibit C to Complaint). Notwithstanding this determination, the OA further stated that "unusual circumstances described in 5 U.S.C. § 552(a)(6)(A)(B)(iii)(II) exist" and that "[a]s a result of these unusual circumstances, OA cannot meet the time limits prescribed in 5 U.S.C. § 552(a)(6)(A)." <u>Id.</u> The OA based its finding of unusual circumstances on what it characterized as "an extensive list of records that span more than a six-year period" that CREW was seeking as well as "the day-to-day responsibilities" of

the employees within the OA tasked with processing the requests. <u>Id.</u> The OA did not inform CREW of an anticipated date for completing its processing of CREW's FOIA requests.

On April 30, 2007, CREW sent a letter to the OA by facsimile and first-class mail responding to the inaccuracies in the OA's letter of April 27, 2007. <u>Letter from Anne L. Weismann to Carol Ehrlich</u>, April 30, 2007 (Exhibit D to Complaint). As CREW explained, it is not seeking an "extensive list of records," but rather "four discrete categories of records that are described with great particularity" and that relate to one discrete issue -- "the White House's loss of over five million email from its email system." <u>Id.</u> And, contrary to the OA's characterization of its FOIA requests, CREW is not seeking records that span a six-year period. Rather, two of CREW's requested categories seek records that were prepared over a one-year period and the remaining two categories span only two years. <u>Id.</u>

The OA has never responded to this letter. Moreover, notwithstanding the OA's purported decision to expedite the processing of plaintiff's FOIA requests, to date the OA has neither produced a single document to CREW nor withheld or otherwise accounted for any responsive documents. In addition, the OA has failed to inform CREW of an anticipated date for completing the processing of plaintiff's FOIA requests and has never afforded CREW any administrative appeal rights.

**ARGUMENT**

**I. THE COURT HAS JURISDICTION TO GRANT THE REQUESTED RELIEF.**

**A. Plaintiff's FOIA Claim is Ripe For Adjudication.**

The FOIA confers jurisdiction on this Court, upon the filing of a complaint, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld . . ." 5 U.S.C. § 552(a)(4)(B).  A requester is deemed to have exhausted its administrative remedies "if the agency fails to comply with the applicable time limit provisions of this paragraph."  5 U.S.C. § 552(a)(6)(C).  See Oglesby v. Dep't of the Army, 920 F.2d 57, 62 (D.C. Cir. 1990) ("If the agency has not responded within the statutory time limits, then . . . the requester may bring suit.").

In this case, although the OA agreed to "expedite" the processing of CREW's requests, it failed to respond within even the generally applicable 20-working-day time limit for non-expedited requests mandated by 5 U.S.C. § 552(a)(6)(A).  Accordingly, plaintiff's claim is ripe for adjudication.

**B. Preliminary Injunctive Relief to Compel Defendant's Expedited Processing of Plaintiff's FOIA Request is Appropriate and Well Within the Court's Jurisdiction.**

Numerous courts in this district have recognized the general availability of injunctive relief to compel expedited processing of FOIA requests.  Long v. Dep't of Homeland Security, 436 F.Supp. 2d 38 (D.D.C. 2006) (denying injunctive relief in FOIA case after considering request under four-factor preliminary injunction test); Electronic Privacy Info. Ctr. v. U.S. Dep't of Justice, 416 F.Supp. 2d 30, 35 (D.D.C. 2006) ("EPIC") (granting preliminary injunction); Al-Fayed v. CIA, 2000 WL 34342564, at *6 (D.D.C.) (denying injunction after considering request

8

under four-factor preliminary injunction test), *aff'd* 254 F.3d 300 (D.C. Cir. 2001); Aguilera v.

FBI, 941 F.Supp. 144, 152-53 (D.D.C. 1996) (granting preliminary injunction and ordering

expedited release of documents).

    In those cases, as here, the plaintiff was asserting a statutory entitlement to expedited

review of its FOIA request based on the statutory prerequisite that the plaintiff had a

"compelling need" for the information.  5 U.S.C. § 552(a)(6)(E).  In considering the requests for

preliminary injunctive relief, the courts determined that it was well within their inherently broad

equitable powers "to prevent agency delay, even when exercise of such authority is preliminary

in nature." EPIC, 416 F.Supp. 2d at 36 n.4.  Indeed, in the context of a non-expedited FOIA

request, the D.C. Circuit has recognized that "unreasonable delays in disclosing non-exempt

documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent

[such] abuses." Payne Enters. v. U.S., 837 F.2d 486, 494 (D.C. Cir. 1988), *quoted in* EPIC, 416

F.Supp. 2d at 35.  Where, as here, a plaintiff is claiming entitlement to expedited treatment the

words of the Payne court have even greater force.

    That preliminary injunctive relief is an appropriate form of relief in a FOIA case is

highlighted by the language of the FOIA itself, which mandates that FOIA cases "take

precedence on the docket over all other causes and shall be assigned for hearing and trial at the

earliest practicable date and expedited in every way." 5 U.S.C. § 552(a)(3).  See also

Renegotiation Bd. v. Bannercraft Clothing Co., Inc., 415 U.S. 1, 13 (1974) (acknowledging that

under section 552 "the FOIA suit generally is to take precedence on the court's docket and is to

be expedited on the calendar").

    Under this clear statutory and judicial authority, this Court has jurisdiction to consider

9

CREW's request for a preliminary injunction.

## II. CREW IS ENTITLED TO A PRELIMINARY INJUNCTION.

### A. Standards for Preliminary Injunctive Relief

This Circuit employs a four-part test to determine whether preliminary injunctive relief is warranted: (1) the plaintiff's likelihood of success on the merits; (2) irreparable injury to the plaintiff absent the requested relief; (3) harm to other interested parties; and (4) the public interest. Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998), *quoting* CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); see also EPIC, 416 F.Supp. 2d at 35-36; Bancoult v. McNamara, 227 F.Supp. 2d 144, 150 (D.C. Cir. 2002). These factors are balanced against each other on a sliding scale and a stronger showing on one factor can compensate for a weaker showing on another. CSX Transp., Inc. v. Williams, 406 F.3d 667 (D.C. Cir. 2005). "An injunction may be justified, for example, where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." CityFed. Fin. Corp., 58 F.3d at 747.

### B. CREW Has a Likelihood of Success on the Merits

There is no legitimate dispute here that CREW is entitled to expedited processing of its FOIA requests to the OA; the OA has already concluded administratively that CREW's requests meet the prerequisites for expedition. The only issue is whether, having granted CREW's request for expedition, the OA has in fact processed the requests in an expedited manner within the time-frame mandated by the FOIA. On this issue plaintiff is likely to prevail.

Amendments to the FOIA, enacted in 1996 as the Electronic Freedom of Information Act Amendments, require among other things that agencies provide for expedited processing of

FOIA requests in certain cases. 5 U.S.C. § 552(a)(6)(E). When an agency grants a request for expedited processing, it is statutorily obligated to process the request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).

The legislative history to these amendments makes clear that while Congress did not impose a specific deadline on agencies to complete expedited processing, "its intent was to 'give the request priority for processing *more quickly than otherwise would occur*.'" EPIC, 416 F.Supp. 2d at 38 (emphasis in original), *quoting* S. Rep. No. 104-272 at 17 (1996).

Although the OA has never promulgated regulations implementing the expedited processing requirements of the FOIA, its regulations provide that non-expedited FOIA requests are to be processed within 10 working days from receipt of the request. 5 C.F.R. § 2502.8. OA regulations permit the agency to take additional time where, *inter alia*, "[i]t is necessary to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request . . ." Id. at § 2502.8(a)(1). In such cases, however, the extended deadline "may not exceed 10 additional workdays." Id. at § 2502.8(b).

When read together with FOIA's expedited processing provisions, OA regulations make clear that any delay beyond 20 working days does not satisfy FOIA's command that expedited requests be processed "as soon as practicable." As the court reasoned in EPIC, "[i]nterpreting FOIA to allow the agency *more* time than that provided in situations involving standard FOIA requests neither hastens the release of information nor does it allow for processing 'more quickly than otherwise would occur.'" 416 F.Supp. 2d at 39 (emphasis in original). Having failed to process CREW's request within the processing time OA regulations mandate for non-expedited requests, the OA clearly violated FOIA's command that expedited requests be processed "as

11

soon as practicable."

That the OA has failed to expedite its processing of CREW's requests is also evident in the excuses it offered for not meeting its normal 10-day processing time. The OA characterized CREW's request as seeking "an extensive list of records that span more than a six-year period." Exhibit C to Complaint. As CREW pointed out in its responsive letter, however, this description is not accurate. CREW is not seeking "an 'extensive list of records,' but rather four discrete categories of records that are described with great particularity." Exhibit D to Complaint. Equally fallacious is the OA's description of the request as spanning a six-year period. To the contrary, two of CREW's requested categories of documents "were prepared over a one-year period and the remaining two categories span only two years." Id. Finally, the subject of the request is the discrete issue of "the White House's loss of over five million email from its email system." Id. Mischaracterizing the nature of CREW's requests will not excuse the OA's failure to process those requests as soon as practicable.

The OA also failed to comply with its own regulations that require the agency, when exceeding the 10-day processing time, to indicate "the date by which a determination will be forthcoming" (but not to exceed "10 additional workdays"). 5 C.F.R. § 2502.8(b). The OA gave no such time and, instead, demanded that CREW either limit the scope of its request or "arrange an alternate time frame to process these records." Exhibit C to Complaint. This unauthorized approach is more likely the product of a reluctant agency fearful of releasing documents that will cast it and the administration in a poor light and subject it to even greater congressional and public scrutiny. This, however, is not an acceptable reason for failing to fulfill its promise of expedition.

The government may argue, as it has in the past, that by granting plaintiff's request for expedition and prioritizing its request over all others it has already fulfilled its obligations under the FOIA. See EPIC, 416 F.Supp. 2d at 41. As the court in EPIC properly found, "[t]his argument stretches the limits of plausibility." Id. Here, as in EPIC, what matters to CREW "is not how the requests are labeled by the agency, but rather when the documents are actually released." Id.

On the basis of this record it is clear that plaintiff has a substantial likelihood, if not a certainty, of prevailing on the merits of its claim that the defendant has failed to expedite CREW's FOIA request.

## C. Plaintiff Will Suffer Irreparable Injury Absent the Requested Injunctive Relief

Unless the Court immediately enjoins the OA from failing to comply with its obligations to expedite its processing of plaintiff's FOIA requests, plaintiff will suffer irreparable injury. The very essence of the right plaintiff seeks to vindicate through this action -- expedited processing -- depends upon the agency's timeliness. As the courts have recognized, where "time is of the essence" preliminary injunctive relief is appropriate. See, e.g., U.S. v. BNS, Inc., 838 F.2d 456, 465 (9th Cir. 1988); Martin-Marietta Corp. v. Bendix Corp., 690 F.2d 558, 568 (6th Cir. 1982).

There can be no question that time is of the essence here, where plaintiff is seeking expedited processing based on the "urgency to inform the public concerning actual or alleged Federal Government activity," 5 U.S.C. § 552(a)(6)(D)(v)(II,) and the OA has already concluded that CREW's request satisfies this requirement and accordingly merits expedition. See also EPIC, 416 F.Supp.2d at 40. As Congress recognized in enacting the FOIA, "delay in complying

13

with FOIA requests is 'tantamount to denial.'" EPIC, supra at 40, *quoting* H.R. Rep. No. 93-876 at 6 (1974). These concerns are heightened where expedition is being sought, as the value of stale information diminishes significantly with the passage of time. EPIC, 416 F.Supp. 2d at 41.

The very reason that CREW sought expedition is because of the significant public interest in the unfolding story of the White House's record-keeping practices and the degree to which it ignored, if not outright violated, federal records laws. The public, as well as the congressional committees considering these matters, need to learn the true facts underlying the five million or more missing email from the EOP record-keeping systems that span a critical two and one-half year period, particularly when viewed against the use by top White House officials of outside email accounts to avoid creating records subject to preservation laws. Through these practices the public is being deprived of a significant body of historical evidence that belongs ultimately to the public.

Under these circumstances, there can be no question that without a preliminary injunction directing the OA to process plaintiff's FOIA request on an expedited basis, plaintiff will lose altogether its statutory rights on a time-sensitive issue of great public interest. The essence of plaintiff's statutory entitlement to expedition will be lost "[u]nless the requests are processed without delay." EPIC, 416 F.Supp. 2d at 41.

**D.  An Injunction Will Not Harm the Interests of Others**

Requiring the OA to comply with the law will not impose a burden on the government. The injunctive relief CREW seeks requires nothing more than that the OA fulfill its obligation to expedite its processing of CREW's FOIA requests.

Moreover, given the relatively small FOIA caseload of the OA and the fact that it handles

few, if any expedited requests, the requested injunction will not impose an undue burden on the OA. The OA's statistics indicate that for Fiscal Year 2006 it processed only four requests on an expedited basis, and in two of the last six years it processed no requests on an expedited basis.[1] As the court in EPIC recognized under similar circumstances, requiring expedition "should not be unduly burdensome to [the agency] and should not cause any delay to other expedited FOIA requests." 416 F.Supp. 2d at 41.

### E.  The Public Interest Favors the Requested Relief

As the D.C. Circuit has recognized, "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." Jacksonville Port Auth. v. Adams, 556 F.2d 52, 59 (D.C. Cir. 1977), quoted in EPIC, 416 F.Supp. 2d at 42. This is no more important than in the context of the FOIA, which has as one of its core purposes "shedding light on an agency's performance of its statutory duties." Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 733 (1989), quoted in EPIC, supra. And here, where there is great public and media interest in the record-keeping practices of the White House, the public interest is "particularly well-served by the timely release of the requested documents." EPIC, supra. In short, the public interest favors the issuance of an order directing defendant OA to immediately process and release the requested information.

---

[1] See Office of Administration FOIA Annual Reports (Fiscal Years 2006, 2004, 2001). These statistics, submitted annually, are available at http://www.whitehouse.gov/oa/foia/index.html. For the Court's convenience, copies are attached as Exhibit 11.

### III.  THE COURT SHOULD ORDER THE OA TO PROCESS PLAINTIFF'S FOIA REQUESTS IMMEDIATELY.

Although preliminary injunctive relief is not the norm in FOIA cases, it is plainly appropriate and necessary here to give meaning to the statute's expedited processing provisions. Through the FOIA Congress required agencies to act on requests for expedited processing within 10 calendar days, 5 U.S.C. § 552(a)(6)(E)(ii)(I), and provided for immediate judicial review of adverse determinations, 5 U.S.C. § 552(a)(6)(E)(iii).  Courts have recognized the corresponding need to act quickly to vindicate the right to expedition.  See, e.g., American Civil Liberties Union v. Dep't of Justice, 321 F.Supp. 2d 24, 28-29 (D.D.C. 2004) (exhaustion of administrative remedies not a prerequisite to judicial review of agency expedition decision).

Given this context, the entry of a preliminary injunction here compelling the OA to process CREW's FOIA requests immediately is both necessary and appropriate.  CREW satisfies the four prerequisites for the entry of a preliminary injunction.  First, because the OA has not even satisfied the time restrictions that apply to standard FOIA requests, CREW has a likelihood of success on the merits.  Second, CREW will lose forever its right to timely release of the requested documents if its FOIA requests are not processed immediately.  Third, the entry of injunctive relief would serve the public's compelling interest in and need for the requested documents, while doing no harm to any interest of the government.

Finally, the requested documents will shed light on a serious question of possible government malfeasance and illegality.  It is troubling to say the least that the OA has not only failed to satisfy its legal mandate to expedite CREW's requests, but has attempted to justify its delay by gross mischaracterizations of those requests.  Through the entry of a preliminary injunction this Court can hold the OA responsible for fulfilling its obligations to CREW and the

public.

Under these circumstances, the Court should direct the agency to immediately process CREW's requests and to produce all non-exempt, responsive records within 10 days.

## **CONCLUSION**

For the foregoing reasons, CREW's request for a preliminary injunction should be granted. CREW also requests that, pursuant to Local Rule 65.1(d), the Court schedule a hearing on this motion at the Court's earliest convenience.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Kimberly D. Perkins
(D.C. Bar No. 481460)
Citizens for Responsibility and Ethics
 in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (20) 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: May 22, 2007

# EXHIBIT 1



GOVERNMENT COMPUTER NEWS

# White House CIO will monitor, manage e-mail

June 4, 2001

**BY TONY LEE ORR** | GCN STAFF

President Bush intends to create a White House chief
information officer position to oversee the executive
office's systems, the General Accounting Office has
reported.





A special assistant to the president,
the director of the Office of
Administration and other staff
members met with GAO officials to
discuss ways to avoid the e-mail
problems that beset the previous
administration. During the meetings,
the White House officials revealed
plans for improving electronic records management.

The new administration is developing and updating the executive office's policies for maintaining
federal and presidential records, GAO said in a recent report.

Poor contractor oversight by the office staffs of President Clinton and Vice President Gore led to
problems with archiving e-mail and left officials scrambling to recover years' worth of electronic
documents.

The problems surfaced after congressional committees investigating potential campaign finance
irregularities subpoenaed White House e-mail records.

Ineffective records management procedures compounded the problem by increasing the cost of the
search, GAO said.

Some of the former administration's e-mail messages could be lost because of programming errors and
miscommunications, GAO officials noted in *Electronic Records: Clinton Administration's Management
of Executive Office of the President E-Mail System.*

"The office of vice president did not implement adequate records management practices to ensure that
all e-mail records generated or received were preserved in accordance with applicable law and best
practices," the report said.

The office staff never intentionally withheld information or purposely lost the e-mail records, said
Gore's attorney, Andrew M. Wright. "Considering the nature of some of the allegations that have been
made … the interests of fairness dictate that this fact should be made explicit," he said.

Gore's staff stopped making copies and saving e-mail messages on tape backup some time after May
1993 because it assumed the White House's Automated Record Management System, which was not

actually installed until 1994, was archiving the messages, GAO said.

ARMS, a keyword-searchable database, worked with a legacy e-mail system until 1996, when it began archiving e-mail generated using Lotus Notes. The Office of Administration maintained four Lotus Notes e-mail servers, one remote server and one ARMS interface server, which transferred e-mail records from the e-mail servers to ARMS.

Clinton's office did not effectively monitor the management of e-mail records, GAO said. Although the former president's staff was aware of ARMS malfunctions that prevented e-mail capture from October 1996 to mid-May 1999, White House officials said they did not understand the scope of the problem until February 2000.

GAO concluded that White House staff members had failed in their legal responsibility to comply with federal records law by not properly maintaining and archiving e-mail.

Between October 1996 and May 1999, configuration errors prevented Internet e-mail from being properly archived [GCN, April 3, 2000, Page 1]."Because the ARMS interface program did not recognize the uppercase spelling of the mail server name, it was unable to locate and capture new incoming e-mail messages for [some] user accounts," GAO said.

**Too little, too late**

Even though the malfunctions were discovered in June 1998 and fixed in November 1998, the White House said it did not realize until February 2000 that the glitch "had affected the integrity of White House document productions," GAO reported.

A configuration error made by the White House's contractor, Northrop Grumman Corp., during the MAIL2 repair caused another malfunction that prevented the capture of incoming Internet e-mail to users with first names starting with the letter "D."

Documentation was created for the capture process when the White House began using Notes. But both the system documentation and the source code were missing by 1997, GAO found. Until the source code was located in 1998 and another contractor recreated the system documentation in 1999, officials couldn't change the code or develop automated programs to monitor the interface, GAO said.

*Free-lance writer Dennis Blank contributed to this report.*

© 1996-2007 1105 Media, Inc. All Rights Reserved.

**EXHIBIT 2**

# GOV**EXEC**.COM

**OUTLOOK
April 9, 2007**

## The E-mail Trail

**By Alexis Simendinger, National Journal**

On his second day as White House counsel in January, Fred Fielding said little when representatives of the National Archives and Records Administration suggested during a courtesy meeting that he might want to reissue guidance to President Bush's aides about how they should preserve e-mail messages as presidential records.

Such reviews are supposed to come frequently, to keep pace with staff turnover in the Executive Office of the President; especially during an administration's second term, comings and goings prompt refreshers on everything from ethics requirements to security practices.

In terms of fresh faces and added muscle, the counsel's office is itself a good example: Fielding is a newcomer, and Bush now has 17 in-house attorneys, up from 14.

Fielding is Bush's third White House lawyer, following in the footsteps of Texas loyalists Harriet Miers and Alberto Gonzales. Gonzales issued Bush's first e-mail policies as a records advisory in 2001, taking cues from guidelines used during the Clinton administration and set out in a 17-page pamphlet that the Archives compiled in 2000 for use by the incoming administration.

Deputy White House press secretary Scott Stanzel explained recently, "Employees are informed of the policy when they start work at the White House." And how is the policy described? "As you probably know, we don't share internal White House memos."

But sharing memos is exactly what House Oversight and Government Reform Committee Chairman Henry Waxman, D-Calif., has asked the White House to do. In a March 29 letter, Waxman told the president's counsel that the committee wants to see "all policies, guidance, and other communications provided to White House officials regarding the obligation to preserve e-mail records."

On April 4, Waxman asked the Republican National Committee to turn over e-mails sent to or received by White House Deputy Chief of Staff Karl Rove or other White House officials relating to the use of federal agencies or resources to help GOP candidates.

House Judiciary Committee Chairman John Conyers, D-Mich., has requested that the White House and the RNC produce materials, including e-mails, relevant to Congress's examination of the dismissal of eight U.S. attorneys.

*National Journal* previously reported that Rove and other officials frequently use RNC e-mail accounts instead of the White House system.

Asked on April 3 when he expected Fielding to respond to Congress, Joshua Bolten, Bush's chief of staff, told *NJ* that he did not know.

Waxman, Conyers, and Senate Judiciary Committee Chairman Patrick Leahy, D-Vt., want to

learn more about White House and RNC e-mail records in connection with a host of ongoing and potential investigations.

RNC spokeswoman Tracey Schmitt said on April 4, "We are in contact with the committee and are in the process of responding." A meeting between RNC representatives and congressional investigators is expected next week.

The RNC's policy, Stanzel said, is to delete e-mails every 30 days, except for the e-mails of White House aides "who use the political e-mail accounts the RNC has provided them." David Almacy, White House Internet and e-communications director, told *Computerworld* in March that the RNC's archive exception for White House e-mails began in 2004.

Almacy said that White House computers block access to personal or other e-mail accounts to provide security and to preserve records deemed by law to be presidential. That policy does not address the use of BlackBerrys or other portable electronic devices, whether they are personally owned or provided to White House officials by the RNC or others.

One former White House political aide said he vaguely recalled receiving guidance about sending e-mail on an RNC-provided BlackBerry and using a gwb43.com e-mail account, but he had clearer memories of getting "a billion and one" White House ethics briefings.

The e-mail instructions, from Sara Taylor, director of White House political affairs, were meant to help aides juggle dual sets of communications devices to comply with the Hatch Act and the Presidential Records Act, and to use the RNC equipment and accounts "only for political activity."

The aide said that much of the work in his office was by definition more political than official, including coordination with White House advance teams about presidential travel; use of White House equipment for events; and communication with Republican campaign committees and candidates.

*This document is located at http://www.govexec.com/dailyfed/0407/040907ol.htm*

©2007 by National Journal Group Inc. All rights reserved.

**EXHIBIT 3**

1 of 14 DOCUMENTS

THE NATIONAL JOURNAL

March 24, 2007

# Whose E-Mail Is It?

**BYLINE:** Alexis Simendinger

**SECTION:** ADMINISTRATION

**LENGTH:** 815 words

**HIGHLIGHT:** Can the White House claim executive privilege to protect Karl Rove's e-mails sent on a Republican National Committee account?

White House Deputy Chief of Staff Karl Rove may have forfeited potential claims of executive privilege over the dismissals of eight U.S. attorneys -- if he communicated about the matter outside the White House e-mail system, using his Republican National Committee e-mail account or RNC equipment. Or at least that's a legal possibility posed by rapidly advancing electronic technology and the evolving work habits of busy White House officials.

The precise question has not been tested in court, said Chris Lehane, a former White House lawyer who helped defend President Clinton and Vice President Gore against subpoena-wielding Republican lawmakers.

"Do you really have a privilege argument if you use the RNC's e-mail system? This is not government-to-government conversation," said Lehane, now a Democratic consultant in San Francisco. "No one has ever raised the question as far as I know."

According to one former White House official familiar with Rove's work habits, the president's top political adviser does "about 95 percent" of his e-mailing using his RNC-based account. Many White House officials, including aides in the Political Affairs Office, use the RNC account as an alternative to their official government e-mail addresses to help keep their official and political duties separate. Although some White House officials use dual sets of electronic devices for that purpose, Rove prefers to use his RNC-provided BlackBerry for convenience, the former official said.

No original e-mails or documents created by Rove have emerged among the more than 3,000 pages of communications offered to Congress in its probe of the attorney firings, although several e-mails from other White House and Justice Department officials containing references to him were among the

documents provided.

Some White House officials, including Rove, use the RNC's
gwb43.com e-mail domain (an abbreviation for George W. Bush 43).
Communications originating from that RNC domain written by White
House political affairs aide Scott Jennings to officials in the
Justice Department appeared in the first batch of e-mails given
to the House and Senate Judiciary committees last week. The
Jennings e-mails stamped with the RNC domain, as well as e-mails
from then-White House Counsel Harriet Miers and her deputy sent
through the official White House system, were captured on
Justice Department servers. Presidential privilege extends
throughout the government, according to one expert with the
National Archives and Records Administration who asked to remain
anonymous, but the administration did not claim privilege for
e-mails released to date between White House aides and Justice
Department officials.

President Bush pledged this week to "release all White
House documents and e-mails involving direct communications with
the Justice Department or any other outside person, including
members of Congress and their staff, related to this issue." The
president, echoed by White House Counsel Fred Fielding in a
March 20 letter to lawmakers, said that any congressional
interviews with White House officials or voluntary surrender of
e-mails and materials by the president will not disclose
communications between or among White House officials. That
would eliminate voluntary disclosure of possible e-mail
discussions between Rove and Miers, and between Rove and
Jennings or other White House aides who frequently use
BlackBerry devices and may have conducted official White House
business using their RNC e-mail accounts. Bush said on Tuesday
that he would go to court, if necessary, to "oppose any attempts
to subpoena White House officials."

If Rove or other White House officials used RNC e-mail to
discuss the prosecutor firings or the subsequent controversy --
and if their discussions went to e-mail recipients who use the
White House servers -- their communications are captured and
would be considered presidential records owned by the American
people for purposes of eventual public disclosure under the
Presidential Records Act, by virtue of both subject matter and
official position, according to the archives expert.

White House and RNC spokespeople did not respond to
National Journal questions about Rove's use of the RNC e-mail
system and the preservation of communications he created on its
equipment. The former White House official, speaking on
background, said that although the RNC had a policy to purge
e-mails after a short period of time, Rove's e-mails on its
system and those of a few other White House aides in sensitive
positions were preserved by the RNC "to protect Karl." Even with
a policy of deleting e-mails from servers,
information-technology experts say, organizations rarely erase
data entirely.

Congressional investigators, who authorized subpoenas this week, could demand that the RNC turn over all documents and materials that reference the prosecutors, including electronic records.

**LOAD-DATE:** March 23, 2007

**LANGUAGE:** ENGLISH

**PUBLICATION-TYPE:** Newsletter

Copyright 2007 National Journal Group, Inc.

**EXHIBIT 4**

 

**WSJ.com THE WALL STREET JOURNAL.**
ONLINE

FORMAT FOR
PRINTING
· sponsored by

TOSHIBA
Don't copy. Lead.*

April 10, 2007

## Congress Follows Email Trail

**White House Faces
Queries Over Use
Of Private Accounts**

By JOHN D. MCKINNON
*April 10, 2007; Page A4*

**DOW JONES REPRINTS**

(R) This copy is for your personal non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit:
www.djreprints.com.

· See a sample reprint in PDF format.
· Order a reprint of this article now.

WASHINGTON -- The widespread use of private email accounts by some top White House officials is sparking a congressional probe into the practice and whether it violates a post-Nixon law requiring that White House deliberations be documented.

A top Democratic lawmaker says outside email accounts were used in an attempt to avoid scrutiny; the White House says their purpose was to avoid using government resources for political activities, although they were used to discuss the firing of U.S. attorneys.

Last year, Scott Jennings, an aide in the White House political affairs office, used an account he had set up at the Republican National Committee instead of his official White House account to help plan the firings of eight U.S. attorneys who had run afoul of the administration. A copy of that email[1], among others, has surfaced in the subsequent flap over those firings.



**Wrong Notes?**
White House aides have been using email accounts run by the Republican National Committee to transact official-sounding business, such as discussions about the firing of eight U.S. attorneys. Democrats are investigating whether they violated presidential records rules.

From:    Goodling, Monica
Sent:    Tuesday, June 20, 2006 11:45 AM
**To:**     'SJennings@gwb43.com'
Subject:  RE: USATTY meeting

"Jocelyn Webster"
<jwebster@gwb43.com>
01/19/2007 02:39 PM

Some emails that have surfaced so far suggest conscious efforts to keep information out of the official White House email system.

Dammit. It was sent to Susan on her rnc pager and was not supposed to go into the WH system.
E-mail from **Jack Abramoff**

In January, White House officials used another RNC email account to send Bush appointees a PowerPoint presentation on Democrats they were targeting for defeat in the 2008 elections. The presentation "is a close hold and we're not supposed to be emailing it around," an official wrote in the email.

Susan Ralston, until recently presidential adviser Karl Rove's assistant at the White House, appears to have used at least four outside email accounts: a "gwb" domain account, a "georgewbush.com" account, and an "rnchq.org" account -- all run by the RNC -- plus an AOL account. She once emailed two associates of lobbyist Jack Abramoff, "I now have an RNC blackberry which you can use to e-mail me at any time. No security issues like my WH email."

Now Democratic lawmakers and other critics of the administration want to know more about the Bush White House's policy on using outside accounts. Some officials relied on laptop computers and portable email devices provided by the RNC to keep political, nongovernment activities separate from official government activities.

Rep. Henry Waxman (D., Calif.), chairman of the House Committee on Oversight and Government Reform, has requested documents and other data from the White House and the RNC as part of a congressional investigation into the use of outside accounts. In at least some cases, it appears that "White House officials were using the nongovernmental accounts specifically to avoid creating a record of the communications," Mr. Waxman said in a letter to the RNC.

The proliferation of outside email accounts for White House officials in some ways reflects a problem that many other

employers also face: how to keep track of employees' electronic messages as strict, new record-retention policies become commonplace.

Organizations can install software to track employees' use of personal email accounts on a work device like a company laptop or BlackBerry -- but such software isn't widely deployed. Employers also can easily search for and find private emails stored on company-owned devices. But outside email accounts can foster a false sense of security among users, even when rules governing how work-related documents are tracked still apply.

Under the 1978 Presidential Records Act, the White House must ensure that decisions and deliberations are "adequately documented" and that the resulting records are preserved for posterity. Critics of the administration are questioning whether administration officials' use of outside email accounts violates this law.

Officials used outside accounts because "they don't want anyone ever to be able to come back and see what was going on behind the scenes," said Melanie Sloan, executive director of Citizens for Responsibility and Ethics in Washington, a watchdog group.

White House officials dispute the criticisms, saying the purpose of the RNC accounts has been to avoid running afoul of another federal law, the Hatch Act. It prohibits many federal officials from engaging in political activity on government time or with government resources.

**INSIDE THE CASE**

2

**OUTSIDE ADDRESS:** Emails released by the Department of Justice include one sent by Scott Jennings, a White House aide, using a "gwb43.com" email account. Read the PDF[3].



• See the full set of documents[4].

**MORE**

[5] • **Graphic:** Read more about Scott Jennings and other key players[6]



• **Email Highlights:** Plans for replacing U.S. attorneys[7]

"These accounts are for political purposes, and they're for staff who might regularly interface with political organizations" such as the RNC, said White House spokesman Scott Stanzel. "It's entirely appropriate for them to have these." The Presidential Records Act has a specific exception for purely political matters that don't relate to official duties.

The scrutiny follows several recent investigations that have disclosed use of alternative email accounts, including the current uproar over the fired U.S. attorneys, a House probe into the PowerPoint presentation on the targeted Democratic lawmakers, and the Abramoff investigation. Mr. Abramoff, who is now in prison, was at the center of a congressional corruption scandal that contributed to Republicans' defeat in the 2006 elections. The White House provided the emails to Congress, which made them public.

The official White House email system uses the domain "who.eop.gov" (for White House, Executive Office of the President), with some variations. Many of the unofficial domains at the center of the controversy trace back to different political campaigns. The 2000 presidential campaign left a legacy of "georgewbush.com" accounts, for example. The "rnchq.org" accounts were created for White House officials who spend a lot of time talking to RNC headquarters.

The Clinton administration generally barred the use of outside email accounts by White House officials, according to its internal policy manuals. It did allow the Democratic National Committee to install computer equipment inside the White House for political emails and related work, but not government work, said Ms. Sloan and others.

The outside accounts used by Bush administration officials tend to be maintained on computers based off White House premises, such as at RNC headquarters.

Critics also allege that Bush White House officials have been using outside accounts to conduct what amounts to government business. "Replacement of U.S. attorneys would be a traditional function of the White House," said Ms. Sloan. "It's pretty clear that's a presidential function, so it's not a Hatch Act function -- it's not political."

"At the end of the day, it looks like they were trying to avoid the records act ... by operating official business off the official systems," said John Podesta, who worked in the White House for the entire Clinton presidency, including a stint as chief of staff.

In his letter to the RNC, Mr. Waxman cited an email in which an Abramoff associate said a White House official had warned him not to send requests for help through the official system because "to put this stuff in writing in their e-mail system ... might actually limit what they can do to help us."

Democrats said such emails should be going through the official White House system, so they can be archived in compliance with the law. The White House and RNC said the RNC is preserving the emails generated by White House officials on the RNC's computers, and that they are exempt from the RNC's normal policy of erasing emails after 30 days.

Enforcing the law might be difficult. When Congress adopted the Presidential Records Act, it didn't give any agency much authority to police the White House's handling of official records. A federal appeals court in 1991 held that the courts don't have the ability to enforce the law, either.

Congress also has had trouble obtaining many internal records from the political parties in the past. That means that the White House and its Republican allies likely have wide latitude when it comes to protecting records kept outside the White House computer system.

--Vauhini Vara contributed to this article

**Write to** John D. McKinnon at john.mckinnon@wsj.com[8]

**URL for this article:**
http://online.wsj.com/article/SB117615846511864432.html

**Hyperlinks in this Article:**
(1) http://online.wsj.com/public/resources/documents/WSJ_3DOJ20070313_p26-27.pdf
(2) http://online.wsj.com/public/resources/documents/WSJ_3DOJ20070313_p26-27.pdf
(3) http://online.wsj.com/public/resources/documents/WSJ_3DOJ20070313_p26-27.pdf
(4) http://online.wsj.com/article/SB117441617325343055.html
(5) http://online.wsj.com/public/resources/documents/info-retro_DOJemails_070319.html
(6)
OpenWin('http://online.wsj.com/public/resources/documents/info-keyplayers0703-26.html?openAt=JScottJennings','keyplayers0703','800','640','off','true',30,30);retur
false;
(7) http://online.wsj.com/public/resources/documents/info-retro_DOJemails_070319.html
(8) mailto:john.mckinnon@wsj.com
(9) http://wsj.com/washwire
(10) http://wsj.com/washwire

**Copyright 2007 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our
**Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones
Reprints at 1-800-843-0008 or visit www.djreprints.com.

**EXHIBIT 5**

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5051
FACSIMILE (202) 225–4784
MINORITY (202) 225–5074
TTY (202) 225–6852

http://oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
— —

May 1, 2007

Mr. Eric A. Kuwana
1025 Thomas Jefferson Street, NW
East Lobby, Suite 700
Washington, DC 20007-5201

Dear Mr. Kuwana:

Thank you for meeting with Committee staff yesterday regarding White House officials' use of Bush Cheney '04 e-mail accounts. I am writing to request additional information regarding these accounts.

Since March, the Committee has been investigating the use of nongovernmental e-mail accounts by White House officials and possible Presidential Records Act and Hatch Act violations that may have arisen from that use. Three congressional investigations have found that White House officials used nongovernmental e-mail accounts to conduct official business or communicate with agency officials.

At the briefing, you estimated that between 8 and 12 White House officials had e-mail accounts provided to them by the Bush Cheney '04 campaign. You said that starting in May 2003 and continuing through the 2004 election, these officials were provided with equipment — such as laptops, blackberries, or other devices — that enabled them to log into their campaign accounts from within the White House complex. You also said that in October 2003, the campaign established a policy of deleting e-mails from campaign servers after 30 days. For at least three White House officials, however, you indicated that this 30-day deletion policy was either suspended or was not in place and that the servers currently have more than 30 days worth of e-mails.

To further the Committee's understanding of White House officials' use of accounts maintained by the Bush Cheney '04 campaign, I request that you provide the following information by May 15, 2007:

1.    Copies of policies, guidance, and procedures governing the use and preservation of the e-mail accounts maintained by the Bush Cheney '04 campaign that have been used by White House officials, including the October 2003 memorandum describing a 30-day

Eric A. Kuwana
May 1, 2007
Page 2

deletion policy for all e-mails and any directions provided to the campaign's outside vendor regarding storage and preservation of campaign e-mails;

2.  Copies of communications between the campaign and any government entity regarding the use of campaign e-mail accounts by White House officials, including communications about the preservation, storage, or destruction of communications transmitted using these accounts;

3.  The identity of all White House officials who held Bush Cheney '04 e-mail accounts;

4.  The date range for which each of these accounts was active and maintained on a campaign server;

5.  The total number of e-mails sent by each White House official through a Bush Cheney '04 e-mail account during each calendar year;

6.  The total number of e-mails received by each White House official through a Bush Cheney '04 e-mail account during each calendar year;

7.  The total number of e-mails sent by each White House official through a Bush Cheney '04 e-mail account to a ".gov" e-mail account during each calendar year; and

8.  The total number of e-mails received by each White House official through a Bush Cheney '04 e-mail account from a ".gov" e-mail account during each calendar year.

In addition, I request that you provide to the Committee by May 29, 2007, all electronic communications sent or received by White House officials using accounts maintained by the Bush Cheney '04 campaign that relate to (1) any briefing regarding a past or future federal or state election that was given at a federal agency or to a group of federal employees assembled during the work day by a federal employee, or (2) the use or proposed use of federal agencies or resources to assist a Republican candidate for federal or state office.

The Committee on Oversight and Government Reform is the principal oversight committee in the House of Representatives and has broad oversight jurisdiction as set forth in House Rule X. An attachment to this letter provides additional information about how to respond to the Committee's request.

Eric A. Kuwana
May 1, 2007
Page 3

     If you have any questions regarding this request, please contact David Rapallo or Anna Laitin with the Committee staff at (202) 225-5420.

Sincerely,

Henry A. Waxman
Chairman

Enclosure

cc:    Tom Davis
      Ranking Minority Member

**EXHIBIT 6**

9 of 82 DOCUMENTS

U.S. News & World Report

April 9, 2007 Monday

# In Congress, Spring Break Is Tagged as 'Spring Broke';
# Sorry, You're Not Reading My E-mail;
# What Happened to the Immigration Prez?;
# Sounds as if Everyone Distrusts Iran;
# PHOTO OP: 9:22 p.m., March 28, the Washington Hilton Hotel

**BYLINE:** Edited by Peter Cary

**SECTION:** WHITE HOUSE WEEK

**LENGTH:** 628 words

In Congress, Spring Break Is Tagged as 'Spring Broke'

Republicans plan to use Congress's spring break to hammer Democrats for jeopardizing war funding and pushing a fiscal 2008 budget that, they claim, would end the Bush tax cuts. The dual approach opened last week when the Republican National Committee started a time clock on its Web page counting the days until funding cuts hit the troops in Iraq. It says spending could start to dry up as early as April 15 if emergency funding isn't approved fast. Hill Republicans and the RNC are also planning to slam the Democratic budget, claiming that by not extending the Bush tax cuts, it will give the average family a tax increase of $1,100. Those talking points are titled: "Spring Broke: Dems Go on Vacation After Voting for $400 Billion Tax Hike." Democrats, meanwhile, dispute the April 15 drop-dead date, noting that the formerly Republican Congress passed war supplementals later than that last year.

Sorry, You're Not Reading *My* E-mail

More fallout from the U.S. attorneys case: Several White House aides say they have stopped using the White House E-mail system except for purely professional correspondence. "We knew E-mails could be subpoenaed," said one aide, "... but I don't think anybody saw that we were doing anything wrong." But the release to the Democrats of White House E-mails and the request for more have iced the practice. At least two aides said they have bought their own private E-mail system through a cellular phone or BlackBerry server; one said he is now cellphone "texting." However, Citizens for Responsibility and Ethics in Washington says the work-around practice could be illegal. It has asked the White House to explain how it is complying with the Presidential Records Act.

What Happened to the Immigration Prez?

After heavily promoting immigration reform that is friendly to families, a path to citizenship for illegal immigrants, and a guest-worker program to fill jobs "no American will do," President Bush appeared to shift dramatically to the right last week. A working proposal for an immigration bill that White House officials drafted behind closed doors with Senate Republicans leaked: It included a proposal to charge the nation's 12 million illegal aliens $10,000 each to obtain a green card, as well as another that would have guest workers come to the United States for two years without families, then go home for six months without gaining any visa advantage. "It's just a clear departure," said Kevin Appleby of the U.S. Conference of Catholic Bishops, "from what the president said in his Oval Office speech last year."

Sounds as if Everyone Distrusts Iran

A senior State Department official says that Iran figured prominently in discussions last weekend in Aswan, Egypt, between Secretary of State Condoleezza Rice and four Arab foreign ministers and their Arab intelligence chiefs. Iranian influence, including suspected training and funding of militia forces from the radical Islamist movement Hamas, was covered in the confidential talks with officials from Egypt, Jordan, Saudi Arabia, and the United Arab Emirates. "There's a very high level of concern with Iranian intelligence activities in Iraq, Lebanon, and the Palestinian territories," said the State official. As for the intelligence chiefs, "They call Iran at or near the top of their list," the official said.

PHOTO OP: 9:22 p.m., March 28, the Washington Hilton Hotel

"Speaking of subpoenas, it's good to see Speaker [Nancy] Pelosi tonight," quipped President Bush at the Radio and Television Correspondents' Association dinner. "Well, some have wondered how the two of us would get along. Some say she's bossy; she's opinionated; she's not to be crossed." He paused, then: "Hey, I get along with my mother."

LOAD-DATE: April 2, 2007

LANGUAGE: ENGLISH

GRAPHIC: Picture, PHOTO OP: 9:22 p.m., March 28, the Washington Hilton Hotel, BRENDAN SMIALOWSKI-AFP/GETTY IMAGES

PUBLICATION-TYPE: Magazine

Copyright 2007 U.S. News & World Report
All Rights Reserved

EXHIBIT 7



# Separate White House E-mail Accounts Draw New Criticism

March 29, 2007 | 5:29 PM ET | Permanent Link

News that administration officials are buying separate private E-mail accounts to avoid using the internal system, coupled with reports that aides have often used GOP E-mail accounts, is drawing heat from public interest groups. One, the Citizens for Responsibility and Ethics in Washington, or CREW, claims the practice could be illegal.

According to CREW, the Presidential Records Act appears to require that internal documentation be kept and that it should be handled in official channels. The separate accounts are outside those channels.

"It appears that White House staff members routinely violated the law by using RNC E-mail accounts for official business," said CREW's Melanie Sloan.

One popular series of Republican National Committee-sponsored E-mail addresses are hosted at "gwb43.com." And as the News Desk reported this week, some administration members are using private phone and BlackBerry accounts now so that their E-mails, especially private E-mails to friends and staffers, aren't subpoenaed.

The issue arose when the administration turned over 3,000 documents, many including internal E-mails, to Hill probers looking into the firing of federal prosecutors. CREW has sent a letter to the White House office of administration asking them to explain how the administration is complying with the Public Records Act.

**EXHIBIT 8**



# White House Admits Misuse of Republican Party-Sponsored E-Mail Accounts

**Thursday , April 12, 2007**

Associated Press

WASHINGTON —

White House said Wednesday it had mishandled Republican Party-sponsored e-mail accounts used by nearly two dozen presidential aides, resulting in the loss of an undetermined number of e-mails concerning official White House business.

Congressional investigators looking into the administration's firing of eight federal prosecutors already had the nongovernmental e-mail accounts in their sights because some White House aides used them to help plan the U.S. attorneys' ouster. Democrats were questioning whether the use of the GOP-provided e-mail accounts was proof that the firings were political.

Democrats also have been asking if White House officials are purposely conducting sensitive official presidential business via nongovernmental accounts to get around a law requiring preservation — and eventual disclosure — of presidential records. The announcement of the lost e-mails — a rare admission of error from the Bush White House at a delicate time for the administration's relations with Democratically controlled Capitol Hill — gave new fodder for inquiry on this front.

"This sounds like the administration's version of the dog ate my homework," said Senate Judiciary Committee Chairman Patrick Leahy, D-Vt. "I am deeply disturbed that just when this administration is finally subjected to meaningful oversight, it cannot produce the necessary information."

The Republican National Committee set up the accounts for about 20 Bush aides, such as Karl Rove and his deputies, who get involved in politics, spokesman Scott Stanzel said. Having the GOP create non-White House addresses and provide separate BlackBerries, laptops and other communications gear was designed to avoid running afoul of Hatch Act rules barring federal employees from engaging in political activities with government resources or on government time, he said.

Under President Clinton, White House aides used separate equipment for political spadework but did not have separate accounts.

"This is entirely appropriate," Stanzel said of the Bush White House practice.

He said staffers used their RNC accounts instead of White House accounts to discuss the prosecutor issue or conduct other official business for several reasons, including extra caution about complying with the Hatch Act as well as the convenience of using one account instead of several. Stanzel said he could not speak to whether anyone was intentionally trying to avoid White House archiving because he had not spoken to all those involved.

Stanzel said some e-mails have been lost because the White House lacked clear policies on complying with Presidential Records Act requirements.

Before 2004, for instance, e-mails to and from the accounts were typically automatically deleted every 30 days along with all other RNC e-mails. Even though that was changed in 2004, so that the White House staffers with those accounts were

excluded from the RNC's automatic deletion policy, some of their e-mails were lost anyway when individual aides deleted their own files, Stanzel said.

He could not say what had been lost, and said the White House is working to recover as many as they can. The White House has now shut off employees' ability to delete e-mails on the separate accounts, and is briefing staffers on how to better make determinations about when — and when not — to use them, Stanzel said.

The disclosure could complicate a standoff between the White House and congressional Democrats over the fired prosecutors.

The White House had promised to look through its staffers' e-mails for anything relevant to the prosecutors' dismissal. No matter the domain name, it said it would provide documents to the Senate and House Judiciary committees as long as they are not internal communications, but exchanges with people outside the White House.

But the White House also had insisted that this offer of documents be accepted, all-or-nothing, along with its insistence that aides would talk to Congress about the firings, but not under oath. So far, Democrats have refused.

Democrats have begun highlighting the separate accounts because they say their use appears to go beyond the strictly political.

"We have become increasingly sensitized over the last several days to the White House staff wearing several 'hats' and using Republican National Committee and campaign e-mail addresses," said a letter from the Senate and House Judiciary chairmen to White House counsel Fred Fielding on March 28. "We hope you agree that such sleight of hand should not be used to circumvent and compromise the comprehensiveness of our investigation."

The nongovernmental accounts were accidentally discovered by Democrats when the Justice Department released hundreds of documents related to the prosecutor firings.

One exchange showed deputy White House political director J. Scott Jennings sending an e-mail titled "USATTY" to Attorney General Alberto Gonzales' then-chief of staff, Kyle Sampson, from an address with a gwb43.com domain name.

"Does a list of all vacant, or about to be vacant, US Attorney slots exist anywhere?" Jennings wrote on Dec. 3 from his political account. Replied Sampson, a few minutes later: "My office. Want me to send to you tomorrow?"

Jennings had also communicated with Sampson and other Justice Department officials in August from his RNC-supplied address about how to install the administration's preferred replacement, onetime Rove aide Tim Griffin, for Arkansas U.S. Attorney Bud Cummins.

In one, Jennings passed on a strategy he said was suggested by Cummins, to have Griffin come on as an attorney in the Little Rock office until Cummins finalized his post-government plans. Jennings said the plan would "alleviate pressure/implication that Tim forced Bud out."

Sampson's e-mails all appeared to be from his official usdoj.gov account.

The separate e-mail accounts also have become an issue in the case of disgraced lobbyist Jack Abramoff, who was convicted on bribery charges and is in prison for fraud.

Abramoff had several exchanges with Susan Ralston, then a Rove assistant, via nongovernment e-mail addresses with domain names like rnchq.org and georgewbush.com, to discuss issues in the Interior Department affecting the lobbyist's Indian clients.

**EXHIBIT 9**

# washingtonpost.com

# White House E-Mail Lost in Private Accounts

### Messages May Have Included Discussions About Firing of Eight Prosecutors

By Michael Abramowitz and Dan Eggen
Washington Post Staff Writers
Thursday, April 12, 2007; A04

The White House acknowledged yesterday that e-mails dealing with official government business may have been lost because they were improperly sent through private accounts intended to be used for political activities. Democrats have been seeking such missives as part of an investigation into the firing of eight U.S. attorneys.

Administration officials said they could offer no estimate of how many e-mails were lost but indicated that some may involve messages from White House senior adviser Karl Rove, whose role in the firings has been under scrutiny by congressional Democrats.

Democrats have charged that Rove and other officials may have used the private accounts, set up through the Republican National Committee, in an effort to avoid normal review. Under federal law, the White House is required to maintain records, including e-mails, involving presidential decision-making and deliberations. White House aides' use of their political e-mail accounts to discuss the prosecutor firings has also fanned Democratic accusations that the actions were politically motivated.

Briefing reporters yesterday about an initial review of the private e-mail system, White House spokesman Scott Stanzel declined to discuss whether the political aides were driven by a desire to conduct business outside of potential review. "I can't speak to people's individual e-mail practices," he said.

Stanzel conceded that the White House had done a poor job of instructing staff members how to save politically oriented e-mail and said that it has developed new guidance for the more than 20 staffers who have official as well as political e-mail addresses. He also said that the White House is trying to recover the lost e-mails.

"The White House has not at this point done a good enough job at overseeing the practices of staff with political e-mail accounts," Stanzel said. "Some officials' e-mails have potentially been lost and that is a mistake that the White House is aggressively working to fix."

Rep. Henry A. Waxman (D-Calif.), chairman of the House Committee on Oversight and Government Reform, which is investigating the use of outside accounts, issued a statement saying that the White House disclosure is "a remarkable admission that raises serious legal and security issues," adding: "The White House has an obligation to disclose all the information it has."

The controversy over the outside e-mail accounts is a byproduct of the ongoing showdown over the prosecutor firings, emerging after the administration recently provided to Congress e-mails from some White House officials that had been sent from their RNC accounts. Scott Jennings, the White House deputy director of political affairs, used a "gwb43.com" e-mail account last August to discuss the replacement of Bud Cummins, who was dismissed as the U.S. attorney for Arkansas, according to one e-mail.

In another e-mail exchange revealed during the investigation of disgraced lobbyist Jack Abramoff, a White House official was described as warning that "it is better to not put this stuff in writing in [the White House] . . .

email system because it might actually limit what they can do to help us, especially since there could be lawsuits, etc." Abramoff responded in an e-mail that the message in question "was not supposed to go into the WH system."

The heads of the House and Senate judiciary committees, which are investigating the prosecutor firings, wrote White House counsel Fred F. Fielding on March 28 asking that he preserve any e-mails written by White House employees from non-government e-mail addresses.

Stanzel said in the telephone briefing yesterday that there was a good reason for providing officials such as Rove and his deputies with political e-mail accounts: to help them avoid violations of the Hatch Act, which bars government officials from carrying out political business by using government resources.

The problem, White House officials said, is that the staffers did not receive proper guidance about what to do about e-mails that fall into a gray area between official and political business.

One White House lawyer, who spoke on the condition of anonymity under the ground rules of the briefing, said staffers are now being advised that if they have any questions about whether an e-mail is political or official, they should use their private accounts but preserve a copy for review by White House lawyers to see whether it needs to be saved under the Presidential Records Act.

© 2007 The Washington Post Company

**EXHIBIT 10**

# The case of the missing e-mails

**By Patience Wait, Government Computer News, May 1, 2007**

1 May 2007 // The search for missing White House e-mails amid increased congressional scrutiny of the Justice Department's dismissal of eight U.S. attorneys spilled over this month into a sweeping request for 17 agencies to turn over e-mail records. In the process, the matter has raised questions about record-keeping, archiving and the use of commercial services for government work.

The congressional inquiry expanded to the Republican National Committee and federal agencies in large part because of the discovery that about 50 past and current employees of the Bush administration used e-mail accounts hosted on an RNC server, domains such as "gwb43.com" and "rnchq.org." By using these accounts, they effectively bypassed the White House archiving system.

Henry Waxman, chairman of the House Oversight and Government Reform Committee, sent letters April 12 to 17 major departments and independent agencies, requesting that they take an inventory of their e-mail archives and prepare summaries of any e-mails from or to White House employees using such addresses.

Also on April 12, an advocacy group, Citizens for Responsibility and Ethics in Washington, announced its sources had revealed that 5 million e-mails, generated between March 2003 and October 2005, were missing from the White House archives. White House acting spokeswoman Dana Perino, at a press briefing the next day, didn't dispute that figure.

An earlier scandal over missing e-mails, involving Vice President Gore's office in 2000, prompted the Bush administration in 2001 to announce plans for extensive changes in how the e-mail and archiving system worked.

An information technology systems review conducted by the Bush administration resulted in an extensive modernization effort that began in 2001 and included modernizing the e-mail and archiving system.

"President Bush intends to create a White House chief information officer position to oversee the executive office's systems, the General Accounting Office has reported," GCN reported in June 2001. "The new administration is developing and updating the executive office's policies for maintaining federal and presidential records."

A former executive branch official with knowledge of the IT infrastructure at the White House said the process to modernize the systems began in President Bush's first term. In the interim, the White House continued to use the e-mail system that was in place during the Clinton administration.

"The system still was maintaining record-keeping requirements, but it was in need of modernization," the former official said.

The White House e-mail system actually is a combination of systems that together fulfill the

requirements for e-mail processing and records-keeping. According to the former official, the White House network operates as a sensitive-but-unclassified network. Classified information is processed by a separate, limited-access network.

There are few other details available concerning the e-mail or archiving infrastructure in place at the White House. Northrop Grumman held a managed services contract for e-mail and archive systems for a number of years but lost the business in 2002 to Unisys. Lisa Meyer, a Unisys spokeswoman, declined to answer any questions about the contract.

Sen. Patrick Leahy (D-Vt.), chairman of the Senate Judiciary Committee, disputed the White House claim that the e-mails were lost. "This sounds like the administration's version of 'the dog ate my homework,' " he said on the Senate floor. "They say they have not been preserved. I don't believe that.... You can't erase e-mails, not today. They've gone through too many servers."

Waxman's committee apparently agrees. Committee and White House staff members have been conferring to choose a third-party computer forensics expert who will look at the executive branch system and figure out what needs to be done to locate or recover the missing data.

Technologically speaking, many experts also agree to a large degree with Leahy's statement.

"I'm pretty confident…those e-mails are not lost," said Matt Smith, president of LiveOffice, a company specializing in message archiving and compliance solutions. A GAO report in 2001 found that the Clinton White House made use of backup tapes to archive records, which led to the e-mail recovery problems.

If the White House is still using tape backups for its archiving, Smith said, that could be some of the problem with the 5 million missing e-mails. "Backup tapes are notorious for being unreliable," he said. For example, after an employee of a trust company in Oregon accidentally wiped out the firm's database, Smith said, the company found that its backup tapes were useless.

Bill Lyons, chief executive officer of AXS-One, a records compliance management company, agreed that a backup tape archiving system is problematic. "It is costly and time-consuming" to find information, he said. "If that is what the White House has, you'll probably get the vast majority [of records] but never know for certain that you got all of them."

The even bigger challenge is to craft an archiving system that captures all the various forms of electronic data, while creating a real-time index of all the information to make it easier to locate in the future, Lyons said.

Text messages on cell phones and personal digital assistants, instant messages on desktop computers, e-mail on Web-based systems — all of those could also fall under the provisions of the Presidential Records Act, he said, but few archiving systems are set up to capture them. "The White House needs a policy [that is] a combination of very strict policies on what you can and can't do," he said.

Maintaining, identifying and retrieving e-mails is not an insignificant project. And the workload may grow larger, as electronic records continue to grow exponentially and Congress, with a new zeal for oversight, requests more of those records from the executive branch.

"Getting your arms around e-mails and official records is a huge issue," said a former agency CIO, now in the private sector, who asked not to be named. "People confuse federal records with e-mails in general. Less than 5 percent of e-mails fall under the definition of a federal record [a decision, action or direction] that needs to be preserved," the former CIO said. Much of the challenge is training workers to know what to save; so is getting people to clean out overloaded e-mail boxes of unneeded correspondence. But the bigger burden, many agree, isn't so much on IT staffs in gathering e-mails as it is on agency legal teams to review the documents.

**Source URL:**
http://www.citizensforethics.org/node/28065

**EXHIBIT 11**

# OFFICE OF ADMINISTRATION
# FOIA ANNUAL REPORT (FY2006)
### FOR
10/01/2005
THROUGH
09/30/2006

The following **Annual Freedom of Information Act** report covers the Period 10/01/2005, through 09/30/2006, as required by 5 U.S.C. 552.

## I. Basic Information Regarding Report

    A. Name, Title, Address, and Telephone Number
       Carol Ehrlich
       FOIA Officer
       Office of Administration
       725 17th Street, NW
       Washington, DC  20503
       (202) 395-2273

       Our FOIA Reference Guide includes information regarding how to make a FOIA request.

    B. Electronic Address for report on World Wide Web
       http://www.whitehouse.gov/oa/foia/index.html

    C. How to obtain copy in paper form
       Request a copy from the above address.

## II. How to make a FOIA Request

    A request made under the FOIA must be submitted in writing, by mail, or fax, to the following address:
    FOIA Officer
    Office of Administration
    725 17th Street, NW
    Washington, DC  20503
    Phone:  (202) 395-2273
    Fax:      (202) 456-7921

## III. Definitions of Terms and Acronyms Used in the Report

Basic terms, expressed in common terminology

    I. FOIA/PA request - Freedom of Information Act/Privacy Act request. A FOIA request is generally a request for access to records concerning a third party, an organization, or a particular topic of interest. A Privacy Act request is a

request for records concerning oneself; such requests are also treated as FOIA requests. (All requests for access to records, regardless of which law is cited by the requester, are included in this report.)

2.  Initial request - a request to a federal agency for access to records under the Freedom of Information Act.

3.  Appeal - a request to a federal agency asking that it review at a higher administrative level a full denial or partial denial of access to records under Freedom of Information Act, or any other FOIA determination such as a matter pertaining to fees.

4.  Processed Request or Appeal - a request or appeal for which an agency has taken a final action on the request or the appeal in all respects.

5.  Multi-track processing - a system in which simple requests requiring relatively minimal review are placed in one processing track and more voluminous and complex requests are placed in one or more other tracks. Requests in each track are processed on a first-in/first-out basis. A requester who has an urgent need for records may request expedited processing (see below).

6.  Expedited processing - an agency will process a FOIA request on an expedited basis when a requester has shown an exceptional need or urgency for the records which warrants prioritization of his or her request over other requests that were made earlier.

7.  Simple request - a FOIA request that an agency using multi-track processing places in its fastest (non-expedited) track based on the volume and/or simplicity of records requested.

8.  Complex request - a FOIA request that an agency using multi-track processing places in a slower track based on the volume and/or complexity of records requested.

9.  Grant - an agency decision to disclose all records in full response to a FOIA request.

10. Partial grant - an agency decision to disclose a record in part in response to a FOIA request, deleting information determined to be exempt under one or more of the FOIA's exemptions; or a decision to disclose some records in their entireties, but to withhold others in whole or in part.

11. Denial - an agency decision not to release any part of a record or records in response to a FOIA request because all the information in the requested records is determined by the agency to be exempt under one or more of the FOIA's exemptions, or for some procedural reason (such as because no record is located in response to a FOIA request).

12. Time limits - the time period in the Freedom of Information Act for an agency to respond to a FOIA request (ordinarily 20 working days from proper receipt of a Perfected FOIA request).

13. Perfected request - a FOIA request for records that adequately describes the records sought, which has been received by the FOIA office of each agency or agency component in possession of the records, and for which there is no remaining question about the payment of applicable fees.

14. Exemption 3 statute - a separate federal statute prohibiting the disclosure of a certain type of information and authorizing its withholding under FOIA subsection (b) (3).

15. Median number - the middle, not average number. For example, of 3, 7, and 14, the median number is 7.

16. Average number - the number obtained by dividing the sum of a group of numbers by the quantity of numbers in the group. For example, of 3, 7, and 14, the average number is 8.

## IV. Exemption 3 Statutes
### A. For Initial Requests

| Statute Code | Number of Instances | Court Upheld | Concise Description of material withheld |
|---|---|---|---|

None

### B. For Appeals

| Statute Code | Number of Instances | Court Upheld | Concise Description of material withheld |
|---|---|---|---|

None

## V. Initial FOIA Requests

| A. Number of Initial Requests | |
|---|---|
| 1. Requests pending as of end of preceding year | 0 |
| 2. Requests received during current FY | 67 |
| 3. Requests processed during current FY | 65 |
| 4. Requests pending as of end of current FY | 2 |

| B. Disposition of Initial Requests | |
|---|---|
| 1. Number of total grants | 1 |
| 2. Number of partial grants | 3 |
| 3. Number of denials | 2 |
| 4. Number of other | 59 |

| C. Number of times each FOIA exemption used | |
|---|---|
| **(b)(1)** -(Permits withholding information that is classified for national security purposes.) | 0 |
| **(b)(2)** -(Permits withholding of records related solely to internal rules and practices (low) or internal matters, where the disclosure may risk circumvention of agency regulation | 4 |

| | |
|---|---|
| (high).) | |
| **(b)(3)** -(Permits withholding of records or information if a law specifically exempts the material from disclosure. ) | 0 |
| **(b)(4)** -(Permits withholding of records related to trade secrets and other confidential business information furnished to OA from outside the Government.) | 0 |
| **(b)(5)** -(Permits withholding information under the deliberative process privilege, including the pre-decisional documents, or information that could be withheld under civil discovery, attorney-client, or attorney-work product privileges.) | 2 |
| **(b)(6)** -(Permits withholding of records and information about individuals when disclosure would be a clearly unwarranted invasion of personal privacy.) | 1 |
| **(b)(7)(A)** -(Permits withholding of records when interference with law enforcement proceedings can be reasonably expected.) | 0 |
| **(b)(7)(B)** -(Permits withholding of records when a person would be deprived of a fair trial or an impartial adjudication.) | 0 |
| **(b)(7)(C)** -(Permits withholding of records when an unwarranted invasion of personal privacy could reasonably be expected.) | 2 |
| **(b)(7)(D)** -(Permits withholding of records when revealing a confidential source or information provided by a confidential source could reasonably be expected.) | 0 |
| **(b)(7)(E)** -(Permits withholding of records when techniques and procedures for law enforcement investigations or process would be disclosed or provided such disclosure could reasonably be expected to risk circumvention of law.) | 2 |
| **(b)(7)(F)** -(Permits withholding of records when endangering the safety or life of any individual could reasonably be expected.) | 0 |
| **(b)(8)** -(Permits withholding of records relating to the examination of banks and other financial institutions by agencies that regulate or supervise them.) | 0 |
| **(b)(9)** -(Permits withholding of records relating to geological and geophysical information and data, including maps, concerning wells.) | 0 |

| D. Other reasons for non disclosure | |
|---|---|
| No records | 39 |
| Referrals | 0 |
| Request withdrawn | 8 |

| | |
|---|---|
| Fee-related reason | 0 |
| Records not reasonably described | 0 |
| Not a proper FOIA request for some other reason | 0 |
| Not an agency record | 9 |
| Duplicate request | 3 |
| Other | 0 |

## VI. Appeals of Initial Denials of FOIA Requests

| A. Number of Appeals | |
|---|---|
| 1. Number of appeals received during FY | 5 |
| 2. Number of appeals processed during FY | 5 |

| B. Disposition of Appeals | |
|---|---|
| 1. Number completely upheld | 0 |
| 2. Number partially reversed | 0 |
| 3. Number completely reversed | 0 |
| 4. Number of other | 5 |

| C. Number of times each FOIA exemption used | |
|---|---|
| **(b)(1)** -(Permits withholding information that is classified for national security purposes.) | 0 |
| **(b)(2)** -(Permits withholding of records related solely to internal rules and practices (low) or internal matters, where the disclosure may risk circumvention of agency regulation (high).) | 0 |
| **(b)(3)** -(Permits withholding of records or information if a law specifically exempts the material from disclosure. ) | 0 |
| **(b)(4)** -(Permits withholding of records related to trade secrets and other confidential business information furnished to OA from outside the Government.) | 0 |
| **(b)(5)** -(Permits withholding information under the deliberative process privilege, including the pre-decisional documents, or information that could be withheld under civil discovery, attorney-client, or attorney-work product privileges.) | 0 |
| **(b)(6)** -(Permits withholding of records and information about individuals when disclosure would be a clearly unwarranted invasion of personal privacy.) | 0 |
| **(b)(7)(A)** -(Permits withholding of records when interference with law enforcement proceedings can be reasonably expected.) | 0 |
| **(b)(7)(B)** -(Permits withholding of records when a person would be deprived of a fair trial or an impartial adjudication.) | 0 |

| | |
|---|---|
| **(b)(7)(C)** -(Permits withholding of records when an unwarranted invasion of personal privacy could reasonably be expected.) | 0 |
| **(b)(7)(D)** -(Permits withholding of records when revealing a confidential source or information provided by a confidential source could reasonably be expected.) | 0 |
| **(b)(7)(E)** -(Permits withholding of records when techniques and procedures for law enforcement investigations or process would be disclosed or provided such disclosure could reasonably be expected to risk circumvention of law.) | 0 |
| **(b)(7)(F)** -(Permits withholding of records when endangering the safety or life of any individual could reasonably be expected.) | 0 |
| **(b)(8)** -(Permits withholding of records relating to the examination of banks and other financial institutions by agencies that regulate or supervise them.) | 0 |
| **(b)(9)** -(Permits withholding of records relating to geological and geophysical information and data, including maps, concerning wells.) | 0 |

| D. Other reasons for non disclosure | |
|---|---|
| No records | 5 |
| Referrals | 0 |
| Request withdrawn | 0 |
| Fee-related reason | 0 |
| Records not reasonably described | 0 |
| Not a proper FOIA request for some other reason | 0 |
| Not an agency record | 0 |
| Duplicate request | 0 |
| Other | 0 |

## VII. Compliance with Time Limits/Status of Pending Requests

| A. Median Processing Time for Requests Processed during the Year | |
|---|---|
| 1. Simple Requests | |
| a. Number of requests processed | 61 |
| b. Median number of days to process | 1 |
| 2. Complex Requests | |
| a. Number of requests processed | 0 |
| b. Median number of days to process | 0 |
| 3. Requests accorded expedited processing | |
| b. Number of requests processed | 4 |
| c. Median number of days to process | 3 |

| B. Status of Pending Requests | |
|---|---|
| 1. Number of requests pending as of the end of FY | 2 |
| 2. Median number of days that such requests were pending as of that date | 166 |

## VIII. Comparisons With Previous Year(s)

| A. Comparison of numbers of requests received |
|---|
| FY 2005:68 |
| FY 2006:67 |

| B. Comparison of numbers of requests processed |
|---|
| FY2005:70 |
| FY2006:65 |

| C. Comparison of median numbers of days requests were pending as of end of fiscal year |
|---|
| FY2005:0 |
| FY2006:166 |

| D. Other statistics significant to agency |
|---|
| **Requests received for expedited processing** |
| FY2005:8 |
| FY2006:10 |
| **Requests for expedited processing granted** |
| FY2005:7 |
| FY2006:5 |

## IX. Costs/FOIA Staffing

| A. Staffing levels | |
|---|---|
| 1. Number of full-time FOIA personnel | 1.00 |
| 2. Number of personnel with part-time or occasional FOIA duties (in total work-years) | 0.00 |
| 3. Total number of personnel (in work-years) | 1.00 |

| B. Total costs (including staff and all resources) | |
|---|---|
| 1. FOIA processing (including appeals) | $87772.00 |
| 2. Litigation-related activities (estimated) | $0.00 |
| 3. Total costs | $87772.00 |

## X. Fees

| | |
|---|---|
| A. Total amount of fees collected by agency for processing requests | $108.07 |
| B. Percentage of total costs | 0.123% |

## XI. FOIA Regulations (including Fee Schedule)
http://www.whitehouse.gov/oa/foia/index.html

## XII. Reports on Executive Order 13,392

The Office of Administration (OA) is in the process of reviewing its FOIA Regulations.  OA is reviewing the requests received to determine if there is a need to create a "Complex" tier.



# THE WHITE HOUSE

PRESIDENT GEORGE W. BUSH

THE WHITE HOUSE
WASHINGTON

🏛 IN FOCUS

Home > Government > Office of Administration > Freedom of Information Act

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues ›⊷|

News

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news ›⊷|

Interact

Ask the White House
White House Interactive

Your Government

President's Cabinet
USA Freedom Corps
Faith-Based & Community Initiatives
Office of Management and Budget
National Security Council

Appointments

Nominations
Applications

FOIA ANNUAL REPORT FISCAL YEAR – 2004

I.  In case of questions concerning the annual FOIA Report,
    please contact:
    *Carol Ehrlich*
    *FOIA Officer*
    *Office of Administration*
    *725 17th Street, NW*
    *Washington, D.C. 20503*
    *(202) 395-2273*

II.  Electronic address for report on the World Wide Web:

    http://www.whitehouse.gov/oa/foia/index.html

    How to Make a FOIA Request:
    A request made under the FOIA must be submitted in writing,
    by mail or fax, to the following address:

    *Office of Administration*
    *FOIA Officer*
    *725 17th Street NW*
    *Washington, DC 20503*
    *Phone: (202) 395 2273*
    *Fax: (202) 456 7921*

III.  Basic Terms Used in this Report

    1.  FOIA/PA request -- Freedom of Information Act/Privacy
        Act request. A FOIA request is generally a request for
        access to records concerning a third party, an
        organization, or a particular topic of interest. A Privacy Act
        request is a request for records concerning oneself; such
        requests are also treated as FOIA requests. (All requests
        for access to records, regardless of which law is cited by
        the requester, are included in this report.)

    2.  Initial Request -- a request to a federal agency for access
        to records under the Freedom of Information Act.

    3.  Appeal -- a request to a federal agency asking that it
        review at a higher administrative level a full denial or
        partial denial of access to records under the Freedom of
        Information Act, or any other FOIA determination such as
        a matter pertaining to fees.

4.  Processed Request or Appeal -- a request or appeal for which an agency has taken a final action on the request or the appeal in all respects.

5.  Expedited processing -- an agency will process a FOIA request on an expedited basis when a requester has shown an exceptional need or urgency for the records which warrants prioritization of his or her request over other requests that were made earlier.

6.  Grant -- an agency decision to disclose all records in full in response to a FOIA request.

7.  Partial grant -- an agency decision to disclose a record in part in response to a FOIA request, deleting information determined to be exempt under one or more of the FOIA's exemptions; or a decision to disclose some records in their entireties, but to withhold others in whole or in part.

8.  Denial -- an agency decision not to release any part of a record or records in response to a FOIA request because all the information in the requested records is determined by the agency to be exempt under one or more of the FOIA's exemptions, or for some procedural reason.

9.  Time limits -- the time period in the Freedom of Information Act for an agency to respond to a FOIA request (OA calculations are based on 20 calendar days from proper receipt of a "perfected" FOIA request rather than 20 working days from proper receipt of a "perfected" request)

10. "Perfected" request -- a FOIA request for records which adequately describes the records sought, which has been received by the FOIA office of the agency or agency component in possession of the records, and for which there is no remaining question about the payment of applicable fees.

11. Exemption 3 statute -- a separate federal statute prohibiting the disclosure of a certain type of information and authorizing its withholding under FOIA subsection (b) (3). 12. Median number -- the middle, not average, number. For example, of 3, 7, and 14, the median number

is 7.

12. Median number -- the middle, not average, number. For example, of 3, 7, and 14, the median number is 7.

13. Average number -- the number obtained by dividing the sum of a group of numbers by the quantity of numbers in the group. For example, of 3, 7, and 14, the average number is 8.

14. Days -- the number of calendar days used to compute calculations.

IV. Exemption 3 Statutes

A. List of Exemption 3 statues relied on by agency during current fiscal year: Not applicable.
   1. Brief description of type(s) of information withheld under each statute. N/A
   2. Statement of whether a court has upheld the use of each statute. N/A

V. Initial FOIA/PA Access Requests:

All access requests, whether first-party or third-party are included.

A. Numbers of initial requests:
   ▪ Number of requests pending as of end of preceding fiscal year: 5
   ▪ Number of requests received during current fiscal year: 127
   ▪ Number of requests processed during current fiscal year: 130
   ▪ Number of requests pending as of end of current fiscal year: 2

B. Disposition of initial requests.
   ▪ Number of total grants: 8
   ▪ Number of partial grants: 3
   ▪ Number of denials: 0
     a. number of times each FOIA exemption used (counting each exemption once per request)
     (1) Exemption 1: 0
     (2) Exemption 2: 2
     (3) Exemption 3: 0
     (4) Exemption 4: 0
     (5) Exemption 5: 0
     (6) Exemption 6: 2
     (7) Exemption 7(A): 0
     (8) Exemption 7(B): 0

(9) Exemption 7(C): 0
(10) Exemption 7(D): 0
(11) Exemption 7(E): 0
(12) Exemption 7(F): 0
(13) Exemption 8: 0
(14) Exemption 9: 0

- Other reasons for nondisclosure (total): 119
  a. no records: 82
  b. referrals: 0
  c. request withdrawn: 14
  d. fee-related reason: 0
  e. records not reasonably described: 1
  f. not a proper FOIA request for some other
  reason: 3
  g. not an agency record: 4
  h. duplicate request: 15
  i. other (specify): 0

VI.  Appeals of Initial Denials of FOIA/PA Requests

   Again, all access requests, whether first party or third party,
   are included.

   A.  Numbers of appeals.

      - Number of appeals received during fiscal year: 2
      - Number of appeals processed during fiscal year: 2

   B.  Disposition of appeals.

      - Number completely upheld: 0
      - Number partially reversed: 0
      - Number completely reversed: 0
        (counting each exemption once per appeal)
        (1) Exemption 1: 0
        (2) Exemption 2: 0
        (3) Exemption 3: 0
        (4) Exemption 4: 0
        (5) Exemption 5: 0
        (6) Exemption 6: 0
        (7) Exemption 7(A): 0
        (8) Exemption 7(B): 0
        (9) Exemption 7(C): 0
        (10) Exemption 7(D): 0
        (11) Exemption 7(E): 0
        (12) Exemption 7(F): 0
        (13) Exemption 8: 0
        (14) Exemption 9: 0

      - Other reasons for nondisclosure (total): 2
        a. no records: 2
        b. referrals: 0
        c. request withdrawn: 0
        d. fee-related reason: 0
        e. records not reasonably described: 0
        f. not a proper FOIA request for some other reason:
        0
        g. not an agency record: 0
        h. duplicate request: 0

i . other (specify): 0

VII.  Compliance with Time Limits/Status of Pending Requests:

Requests are counted from the time at which a request is
"perfected."

A.  Median processing time for requests processed during the
year.
1.  Request(s).
a. number of requests processed: 130
b. median number of days to process (including
weekends and holidays): 8 calendar days
2.  Requests accorded expedited processing.
a. Number of requests processed: 0
b. Median number of days to process: 0
B.  Status of pending requests.
1.  Number of requests pending as of end of current
fiscal year: 2
2.  Median number of days that such requests were
pending as of that date process (including
weekends and holidays): 74 calendar days

VIII.  Comparisons with Previous Year (s) (Optional):

A.  Comparison of numbers of request received. 38(FY2003)
& 127(FY2004)
B.  Comparison of numbers of request processed. 35
(FY2003) & 130(FY2004)
C.  Requests granted expedited processing
1.  Expedited processing requested. 0
2.  Expedited processing granted. 0

IX.  Costs/FOIA Staffing:

A.  Staffing levels.
1.  Number of full-time FOIA personnel: 1
2.  Number of personnel with part-time or occasional
FOIA duties (in total work-years): 0
3.  Total number of personnel (in work-years): 1
B.  Total costs (including staff and all resources):
1.  FOIA processing (including appeals):
$79,000 (estimated)
2.  Litigation related activities (estimated): 0
3.  Total costs: $79,000 (estimated)

Search and review time/fees are tracked when the
requester is to incur processing fees. Search and
review time is not tracked if charges are to be waived.

X.  Fees:

A.  Total amount of fees collected by agency for processing
requests: $0.00
B.  Percentage of total costs: (Note: Search and review time
is not tracked if charges are to be waived. The cost of
processing FOIA's is much higher than shown.)

XI.   FOIA Regulations (Including Fee Schedule)

http://www.whitehouse.gov/oa/foia/index.html

President | Vice President | First Lady | Mrs. Cheney | News & Policies

History & Tours | Kids | Your Government | Appointments | Jobs | Contact | Text only

Accessibility | Search | Privacy Policy | Help | Site Map



PRESIDENT | VICE PRE
Your Governmer

**THE WHITE HOUSE**

PRESIDENT GEORGE W. BUSH

🔍 **IN FOCUS**

Home > Government > Office of Administration > Freedom of Information Act

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues ▸

**News**

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news ▸

**Interact**

Ask the White House
White House Interactive

**Your Government**

President's Cabinet
USA Freedom Corps
Faith-Based & Community Initiatives
Office of Management and Budget
National Security Council

**Appointments**

Nominations
Applications

## FOIA ANNUAL REPORT FISCAL YEAR – 2001

2001 Annual FOIA Report: **PDF** (92 kb)

I.   In case of questions concerning the annual FOIA Report,
     please contact:
     *Carol Ehrlich*
     *FOIA Officer*
     *Office of Administration*
     *725 17th Street, NW Room 5001*
     *Washington, D.C. 20503*
     *(202) 395-2273*

II.  Electronic address for report on the World Wide Web:

     http://www.whitehouse.gov/oa/foia/index.html

     How to Make a FOIA Request:
     A request made under the FOIA must be submitted in writing, by
     mail or fax, to the following address:
     *Office of Administration*
     *FOIA Officer*
     *725 17th Street NW*
     *Washington, DC 20503*
     *Phone: (202) 395-2273*
     *Fax: (202) 456-7921*

III.  Basic Terms Used in this Report

      1.  FOIA/PA request -- Freedom of Information Act/Privacy
          Act request. A FOIA request is generally a request for
          access to records concerning a third party, an
          organization, or a particular topic of interest. A Privacy Act
          request is a request for records concerning oneself; such
          requests are also treated as FOIA requests. (All requests
          for access to records, regardless of which law is cited by
          the requester, are included in this report.)

      2.  Initial Request -- a request to a federal agency for access
          to records under the Freedom of Information Act.

      3.  Appeal -- a request to a federal agency asking that it
          review at a higher administrative level a full denial or
          partial denial of access to records under the Freedom of

Information Act, or any other FOIA determination such as a matter pertaining to fees.

4. Processed Request or Appeal -- a request or appeal for which an agency has taken a final action on the request or the appeal in all respects.

5. Expedited processing -- an agency will process a FOIA request on an expedited basis when a requester has shown an exceptional need or urgency for the records which warrants prioritization of his or her request over other requests that were made earlier.

6. Grant -- an agency decision to disclose all records in full in response to a FOIA request.

7. Partial grant -- an agency decision to disclose a record in part in response to a FOIA request, deleting information determined to be exempt under one or more of the FOIA's exemptions; or a decision to disclose some records in their entireties, but to withhold others in whole or in part.

8. Denial -- an agency decision not to release any part of a record or records in response to a FOIA request because all the information in the requested records is determined by the agency to be exempt under one or more of the FOIA's exemptions, or for some procedural reason.

9. Time limits -- the time period in the Freedom of Information Act for an agency to respond to a FOIA request (OA calculations are based on 20 calendar days from proper receipt of a "perfected" FOIA request rather than 20 working days from proper receipt of a "perfected" request)

10. "Perfected" request -- a FOIA request for records which adequately describes the records sought, which has been received by the FOIA office of the agency or agency component in possession of the records, and for which there is no remaining question about the payment of applicable fees.

11. Exemption 3 statute -- a separate federal statute prohibiting the disclosure of a certain type of information and authorizing its withholding under FOIA subsection (b)(3).

12. Median number -- the middle, not average, number. For example, of 3, 7, and 14, the median number is 7.

13. Average number -- the number obtained by dividing the sum of a group of numbers by the quantity of numbers in the group. For example, of 3, 7, and 14, the average number is 8.

14. Days -- the number of calendar days used to compute calculations.

IV. Exemption 3 Statutes

The Office of Administration has not relied on the Exemption 3 statutes during the past fiscal year.

V.  Initial FOIA/PA Access Requests:

All access requests, whether first-party or third-party are included.

A.  Numbers of initial requests:
- Number of requests pending as of end of preceding fiscal year: 5
- Number of requests received during current fiscal year: 91
- Number of requests processed during current fiscal year: 94
- Number of requests pending as of end of current fiscal year: 2

B.  Disposition of initial requests.
- Number of total grants: 20
- Number of partial grants: 8
- Number of denials:
  a.  number of times each FOIA exemption used (counting each exemption once per request)
  (1) Exemption 1: 0
  (2) Exemption 2: 2
  (3) Exemption 3: 0
  (4) Exemption 4: 4
  (5) Exemption 5: 0
  (6) Exemption 6: 1
  (7) Exemption 7(A): 0
  (8) Exemption 7(B): 0
  (9) Exemption 7(C): 0
  (10) Exemption 7(D): 0
  (11) Exemption 7(E): 1
  (12) Exemption 7(F): 0
  (13) Exemption 8: 0
  (14) Exemption 9: 0
- Other reasons for nondisclosure (total): 66
  a.  no records: 53
  b.  referrals: 0
  c.  request withdrawn: 12
  d.  fee-related reason: 0
  e.  records not reasonably described: 0
  f.  not a proper FOIA request for some other reason: 1
  g.  not an agency record: 0
  h.  duplicate request: 0
  i.  other (specify): 0

VI.  Appeals of Initial Denials of FOIA/PA Requests

Again, all access requests, whether first-party or third-party, are

included.
    A.   Numbers of appeals.
- Number of appeals received during fiscal year: 1
- Number of appeals processed during fiscal year: 1

    B.   Disposition of appeals.
- Number completely upheld: 1
- Number partially reversed: 0
- Number completely reversed: 0
  - a. number of times each FOIA exemption used (counting each exemption once per appeal)
    - (1) Exemption 1: 0
    - (2) Exemption 2: 0
    - (3) Exemption 3: 0
    - (4) Exemption 4: 0
    - (5) Exemption 5: 0
    - (6) Exemption 6: 0
    - (7) Exemption 7(A): 0
    - (8) Exemption 7(B): 0
    - (9) Exemption 7(C): 0
    - (10) Exemption 7(D): 0
    - (11) Exemption 7(E): 0
    - (12) Exemption 7(F): 0
    - (13) Exemption 8: 0
    - (14) Exemption 9: 0
- Other reasons for nondisclosure (total): 1
  - a. no records: 1
  - b. referrals: 0
  - c. request withdrawn: 0
  - d. fee-related reason: 0
  - e. records not reasonably described: 0
  - f. not a proper FOIA request for some other reason: 0
  - g. not an agency record: 0
  - h. duplicate request: 0
  - i. other (specify): 0

    VII.   Compliance with Time Limits/Status of Pending Requests:

Requests are counted from the time at which a request is "perfected."
    A.   Median processing time for requests processed during the year.
1. number of requests processed: 94
2. median number of days to process (including weekends and holidays): 16 calendar days

No requests were afforded expedited processing.

    B.   Status of pending requests.
1. Number of requests pending as of end of current fiscal year: 2
2. Median number of days that such requests were

pending as of that date process (including weekends and holidays): 128 calendar days

VIII.   Costs/FOIA Staffing:

A.   Staffing levels.
1.   Number of full-time FOIA personnel: 0
2.   Number of personnel with part-time or occasional FOIA duties (in total work-years): .50
3.   Total number of personnel (in work-years): .50
Note: The employees performing the search of records in each division varies depending upon the type and scope of search being conducted. Therefore, we have only included the personnel performing the review in the FOIA Office.

B.   Total costs (including staff and all resources).
Search and review time/fees are tracked when the requester is to incur processing fees. Search and review time is not tracked if charges are to be waived.

Litigation fees are not tracked.

IX.   Fees:

A.   Total amount of fees collected by agency for processing requests: $214.80
B.   Percentage of total costs: (Note: Search and review time is not tracked if charges are to be waived. The cost of processing FOIA's is much higher than shown.)

X.   FOIA Regulations (Including Fee Schedule)

http://www.whitehouse.gov/oa/foia/index.html

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND   :
ETHICS IN WASHINGTON,   :
   :
     Plaintiff,   :
   :
   v.   :   Civil Action No.
   :
OFFICE OF ADMINISTRATION,   :
   :
     Defendant.   :
   :

## [PROPOSED] ORDER

Upon consideration of plaintiff's motion for a preliminary injunction, defendant's response, and the entire record herein, it is hereby

ORDERED that plaintiff's motion is granted, and it is further

ORDERED that defendant Office of Administration shall complete the processing of plaintiff's April 17, 2007 and April 18, 2007 Freedom of Information Act requests and produce or identify all responsive records on a rolling basis to be completed no later than 10 days from the date of this order.

_____
Date

_____
United States District Judge