**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

CITIZENS FOR RESPONSIBILITY AND     :
ETHICS IN WASHINGTON,               :
                                    :
            Plaintiff,              :
                                    :
      v.                            :        Civil Action No. 07-0964 (CKK)
                                    :
OFFICE OF ADMINISTRATION,           :
                                    :
            Defendant.              :
_____:

**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S
MOTION TO MODIFY ORDER**

CREW's motion to modify the Court's Orders is premised on the fact that, to date, the

response of the Office of Administration ("OA") has been so singularly unenlightening as to

offer no meaningful clue about the universe of responsive documents and why any particular

document has been withheld.  Without additional information, CREW cannot satisfy its

remaining obligations under the Court's Orders and, of equal significance, the OA's response to

date does little to advance either CREW's Freedom of Information Act ("FOIA") request or this

litigation.

The OA's response, while long on legal citations, fails to come to terms with these

inescapable facts and misapprehends the foundation for CREW's motion.  Whether or not, as an

abstract legal principle, a party should be required to produce a Vaughn index or its equivalent is

not dispositive of whether here -- as a factual matter -- the Court should require the OA to

provide additional information that will permit the parties to fulfill their obligations under both

the FOIA and this Court's Orders.  In the context of this case in which CREW has requested

documents that will shed light on a record-keeping problem of major importance that, left

unchecked, will deprive this Court, Congress and the public of a huge swath of vital historical

evidence, the modest amount of information CREW seeks is amply justified.

The OA's opposition rests on its contention that the FOIA does not require an agency to

provide any justification for its withholdings until it files a dispositive motion. From this, the

OA argues that because it is a long way from filing a dispositive motion, there is no legal basis to

impose on it a requirement to provide any justification beyond what it has stated in its initial

response of June 21, 2007.

What the OA ignores, however, is the posture of this case which, far from the ordinary

FOIA litigation, is proceeding on an expedited basis because of the critical public need for the

information CREW has requested. Quite simply, time is of the essence. As Congress

recognized when it enacted the FOIA, "delay in complying with FOIA requests is 'tantamount to

denial.'" H.R. Rep. No. 93-876 at 6 (1974). This concern is heightened when expedition is

sought, as the value of stale information diminishes significantly with the passage of time.

Electronic Privacy Info. Ctr. v. Dep't of Justice, 416 F.Supp. 2d 30, 41 (D.D.C. 2006).

The nature of this request presents a particularly compelling case for advancing this

litigation in the quickest way possible. CREW seeks records that document the loss of well over

five million email from the email systems and environments of the Executive Office of the

President. It is CREW's understanding -- and the White House has yet to deny it -- that the

electronic record-keeping system that was in place between March of 2003 and October of 2006

when the emails went missing remains in place today. In other words, the nation is still at risk of

losing a massive amount of important historical evidence that the White House is required to

preserve under both the Presidential Records Act and the Federal Records Act and that belongs

to the public, not the individual occupants of the White House.

In addition, time truly is of the essence if there is any hope of restoring the missing emails. It is CREW's understanding that the original recovery plan that the OA developed when it discovered the problem -- and that the EOP refused to implement -- called for restoring the missing email from backup tapes. This would have been an enormous undertaking when first proposed; it is all the more so today given the additional numbers of backup tapes that have been created in the interim and that would have to be searched.

Against this backdrop, the OA's minimal FOIA response of June 21 is particularly troubling. CREW agreed to the negotiated time-table after hearing that the OA had "already gone through" the vast majority of documents CREW was seeking. June 1, 2007 Conference Call Transcript ("June 1 Tr."), 7:2.[1] Indeed, the OA represented that a significant portion of the potentially responsive documents had been gathered a year ago in response to a request for documents of the White House's failure to archive and the missing email, id. at 13:13, and that universe included, for example, the histograms CREW has requested. Id. at 10:13. With that level of familiarity even before it re-reviewed the documents to respond to CREW's request it is simply unacceptable that the OA advised CREW only that it had located "potentially responsive documents" that "include emails, spreadsheets, procurement-related documents, and internal guidance." Letter from Carol Erlich, FOIA Office, OA, to Anne L. Weismann, June 21, 2007 (Exhibit 1 to CREW's Motion to Modify Order). Completely missing from this description is any information about the nature of the emails, spreadsheets and internal guidance; it is not possible even to confirm that the OA has accounted for the requested histograms that OA

---

[1] For the Court's convenience, a full copy of this transcript is attached as Exhibit A).

representative Keith Roberts has admitted are in the possession of the OA.  See June 1 Tr. at 16:18.

In sum, the facts here provide ample justification for CREW's request that the Court order the OA to provide the plaintiff sufficient information to ascertain the nature of the withheld documents, as well as the reasons for the withholdings.  Without this information there is no way for CREW to comply with its court-ordered obligations (1) to determine whether the OA's productions are "fully responsive" to the first four categories of requested documents for purposes of determining whether an additional search is required and (2) to "craft a list of search terms that CREW believes will lead to the identification of documents responsive to Category 4 . . ."  Order of June 4, 2007 at ¶¶ 3, 4.

The OA's only response is that it is up to CREW "as the requestor" "to describe to OA the records it is seeking."  Defendant's Opposition to Plaintiff's Motion to Modify Order, p. 9.  As the Court recognized at the June 1 conference, however, CREW would likely need to "look at what [it] get[s]" before proposing search terms for the Category 4 material.  June 1 Tr. at 37:22-25.  The Court expressed the common-sense proposition that "what search terms you [CREW] would use would be informed by the documents you get in response to the first four categories."  Id. at 38:2-4.  The OA, however, provided CREW with virtually no documents (save for a few contract-related documents seemingly unrelated to the missing email problem).  Nor did the OA give CREW information from which to ascertain the nature of the withheld documents.  In the face of the OA's woefully deficient response, CREW cannot reasonably be expected to now come up with search terms and determine whether the OA should conduct an additional search for documents.

Congress enacted the FOIA based on a presumption of disclosure and transparency "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978). Those goals are no less important today and are best served here by the relief CREW is seeking. CREW's request is not about imposing new and unwarranted obligations on the OA, but ensuring that the government lives up to the obligations and objectives that the FOIA already imposes.

## CONCLUSION

For the foregoing reasons and those set forth in plaintiff's motion to modify, the Court should grant CREW its requested relief and modify the Orders of June 4 and June 7, 2007.

Respectfully submitted,


_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone: (202 408-5565
Fax: (202) 588-5020

Attorneys for Plaintiff

Dated: July 25, 2007

# EXHIBIT A

```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3
      CITIZENS FOR RESPONSIBILITY AND
 4    ETHICS IN WASHINGTON,

 5                      Plaintiff,

 6         v

 7    OFFICE OF ADMINISTRATION,

 8            Defendant.        Civil Action No. 1:07-cv-00964

 9                              June 1, 2007

10                              10:00 a.m.
      . . . . . . . . . . . . . . . . . . . . . . . . .
11
                      TRANSCRIPT OF CONFERENCE CALL
12           BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                      UNITED STATES DISTRICT JUDGE
13

14    APPEARANCES:

15    For the Plaintiffs:        ANNE L. WEISSMAN, ESQ.
                                 1400 Eye Street, N.W.
16                               Suite 450
                                 Washington, D.C.  20005
17                               (202) 408-5565

18    For the Defendants:        JEAN LIN, ESQ.
                                 U.S. Department of Justice
19                               20 Massachusetts Avenue, N.W.
                                 Suite 7218
20                               Washington, D.C.  20530
                                 (202) 514-3716
21
      For the Defendants:        KEITH ROBERTS, ESQ.
22                               Office of Administration
                                 Executive Office of the
23                                President
                                 1800 G Street
24                               Washington, D.C.

25
```

Jacqueline Sullivan, RPR
Official Court Reporter

```
 1    Court Reporter:                JACQUELINE M. SULLIVAN, RPR
                                     Official Court Reporter
 2                                   Room 6818, U.S Courthouse
                                     Washington, D.C.  20001
 3                                   (202) 354-3187

 4    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2
       WITNESSES:
 3
       None.
 4

 5

 6

 7

 8                  E X H I B I T S

 9     None.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    Washington, D.C.

2                    Friday, June 1, 2007

3                    At about 10:05 a.m.

4                    - - -

5            THE COURT:  Let me try this.  I'm in the courtroom

6    with the court reporter because I just finished a matter and it

7    seemed to be more efficient to do it this way, but if we have

8    trouble hearing you I may just stop it and have us call from our

9    end, but this is the Citizens For Responsibility Ethics in

10   Washington, which I'm just going to use the acronym CREW,

11   against the Office of Administration.

12           Now, I believe we have Ms. Anne Weismann for the

13   plaintiffs; is that correct?

14           MS. WEISMANN:  Yes, your Honor.

15           THE COURT:  If I can just say to the court reporter --

16   and Ms. Lin for the defendant, and do we have a program person?

17           MS. LIN:  Yes, your Honor.  Unfortunately I can barely

18   hear you.  I do have Mr. Keith Roberts with me.

19           THE COURT:  I think what we'll do is why don't we get

20   the numbers and call, because if you're having trouble hearing

21   us, your voice is fairly light as well.  If you could just give

22   us the phone numbers, Ms. Weismann, if you can give us your

23   phone number.

24           MS. WEISMANN:  202-408-5565.

25           MS. LIN:  Ours is 202-395-5152.

```
 1                    COURT CLERK:  Okay.  I'm going to hang up and redial.

 2                    MS. WEISMANN:  Thank you.

 3                    Hi.  This is Anne Weismann.

 4                    THE COURT:  Okay.  Now we can hear you.  Can you hear

 5         us?

 6                    MS. LIN:  Jean Lin and Keith Roberts.

 7                    COURT CLERK:  Ms. Weismann?

 8                    MS. WEISMANN:  Yes.

 9                    THE COURT:  Okay.  Hopefully we can now hear.  For the

10         plaintiffs we have Ms. Weismann; is that correct?

11                    MS. WEISMANN:  Yes, it is, your Honor.

12                    THE COURT:  All right.  And for the Office of

13         Administration we have Jean Lin.  It appears we have John

14         Taylor.

15                    MS. LIN:  No, Mr. Taylor is not here today, your

16         Honor.

17                    THE COURT:  Okay.  And the program person then is?

18                    MS. LIN:  Mr. Steve Roberts.  He is the deputy general

19         counsel at the Office of Administration.

20                    THE COURT:  All right.  Mr. Roberts, if I could just

21         ask, have you had an opportunity to look at the May 29 letter

22         from CREW which set out six categories of information that they

23         were focusing on for this temporary restraining order?

24                    MR. ROBERTS:  Yes, I have.

25                    THE COURT:  If I can ask, we've been discussing the
```

1    first four categories of information, and my question initially

2    to you is which would be quicker to respond to and would provide

3    a response of -- would respond to the request that CREW has

4    made?  Going through the 30,000 plus e-mails that evidently

5    having culled out that cover the period of January 2001 to I

6    believe it's February 3rd of 2006, or to do a new, a new search

7    that would cover the more limited time period, which is what

8    CREW is interested in, which is September of 2005.  Let's start

9    with through February the 3rd of 2006 or what they wanted, which

10   was the end of February.  Which process would be the quickest

11   process and also responsive to their request?

12            MR. ROBERTS:  If we can through the documents that we

13   already have assembled we could -- it would be quicker than

14   doing a search, doing an electronic search.  However, if we

15   still have to do an electronic search for February 2006 it's not

16   going to save us much time.  In fact, it's kind of a duplication

17   of effort if we have to manually go back through what we have

18   and then wait for service to be done as well.

19            THE COURT:  Let me see if I understand.  I'm not quite

20   sure I understand whether going through what you've already

21   pulled out looking for these dates is quicker or actually doing

22   a new search.

23            MR. ROBERTS:  Well, going through what we currently

24   have would be quicker through the 3rd of February of 2006.

25            THE COURT:  Okay.  And can you explain to me why it

1    would be quicker?

2            MR. ROBERTS:  Because we've already gone through those

3    documents -- we've already gone to individuals who we believe

4    would have information relative to these requests, to this

5    request last year, and so it's the universe of those records is

6    already compiled and we just need to go back through them and

7    look for documents that CREW wants as opposed to what we looked

8    for before.

9            THE COURT:  Okay.  So I take it then that these

10   individuals you contacted have had their own databases and

11   that's what you've been looking at?

12           MR. ROBERTS:  That is correct.

13           THE COURT:  And so what you would have culled out of

14   these databases is this 30,000 plus e-mails covering the January

15   2001 up to February 3rd, is it, am I correct in that?

16           MR. ROBERTS:  That's correct.

17           THE COURT:  So at this point your view is that it

18   would be faster to use what you've got and do the search on the

19   documents you've already pulled as opposed to initiating a new

20   one, is that accurate?

21           MR. ROBERTS:  That's correct.

22           THE COURT:  And I take it if I've understood your

23   explanation is because you have to start, go back to the

24   individuals and look at their databases to do the narrower

25   search?

1          MR. ROBERTS:  If we have to do the narrower search

2     about half to two-thirds of those people are no longer here so

3     we're going to have to do an electronic search and that's where

4     we get into other ongoing searches with higher priority, the

5     priority established outside this office that it's going to take

6     a while to do.

7          THE COURT:  All right.  And as I understand it, in

8     terms of culling through or going through the 30,000 plus

9     e-mails and whatever paper documents you have, you would be able

10    to do that by June 21st?

11         MR. ROBERTS:  That's correct, ma'am.

12         THE COURT:  Now, the CREW has also requested that if

13    documents are completed in terms of the review, whether their

14    complete review is -- whether the Office of Administration would

15    release them at that point as opposed to waiting until they're

16    all collected at the end and then release them in one, you know,

17    large group, are you willing to -- and understanding that you

18    would be able to do whatever review you need to do to figure out

19    that this is a document that has been completely considered and

20    is ready to be released, but are you willing to do that on a

21    rolling basis under those circumstance?

22         MR. ROBERTS:  Your Honor, our preference is to do the

23    June 21st, the reason being that we're a small office and it's

24    just more efficient use of we have one employee officer and then

25    I review them from a practical standpoint.  It's just more

1  efficient for us to review the whole universe of the records

2  than to review them at one time that we could have done by June

3  21st.

4      THE COURT:  All right.  Then let me ask the next

5  question.  In terms of the, they have requested, CREW have

6  requested that it be done through the end of February of 2006.

7  To add that additional, from February 3rd to the 28th.  What is

8  involved in that?

9      MR. ROBERTS:  We have to do, the Office of

10 Administration, our mission is to provide a common

11 administration throughout the deputy office of the president

12 complex so part of that involves we own all the information

13 technology system and we do -- we maintain all electronic

14 databases, all the e-mails, and we also do all the searches from

15 the complex.  The priority for those searches we do not

16 establish and there are ongoing searches, I'm not sure you read

17 the numbers, and lots of the things that are going on relative

18 to people that we serve, offices that we serve, and right now

19 because of priority has been established we would not be able to

20 complete a new search until around the 24th of August to do that

21 four-month period.

22      THE COURT:  All right.  In terms of looking, I take it

23 you're familiar with, relatively familiar with the 30,000

24 e-mails in the sense of what it is that's being collected from

25 the databases; is that correct?

1          MR. ROBERTS:  Yes, ma'am.

2          THE COURT:  In terms of the four categories that have

3     been looked at did you think that there is material that after

4     February 3rd, 2006, in other words, why did you stop?  Maybe I'm

5     asking two questions, but let me ask the first one.  In terms of

6     through from the 3rd to the end of February do you know whether

7     there would be likely to be anything responsive to these four

8     categories, or can you answer that?

9          MR. ROBERTS:  I can, and I do not believe there would

10     be.  Based upon what CREW's asking for the universe of those

11     records existed in early February of last year.  Anything after

12     that would have been, for example, they're asking about

13     histograms and stuff, I mean, they were already, they were

14     already done by that point.  I personally don't think that

15     search and taking an effort through the 24th of August is going

16     to produce anything more responsive.

17          THE COURT:  Was there a particular reason why the

18     search that was done for the 30,000 plus from January 2001, you

19     stopped it February 3rd of 2006, was that cutoff date

20     significant in some way?

21          MR. ROBERTS:  We had some other requests for

22     information and that was the date of the request, which is what

23     we use for the cutoff date.

24          THE COURT:  And is the request generally in the same

25     type of request that CREW is making in terms of what you would

1    have looked at?

2         MR. ROBERTS:  Yes, ma'am.

3         THE COURT:  Okay.  Ms. Weismann, is there anything

4    else that you want the Court to request?  It seemed to me these

5    are the areas that we wanted to have some information on, at

6    least as to the first four.

7         MS. WEISMANN:  Yes, your Honor.  There are two.  And

8    one is an issue that I flagged for Ms. Lin yesterday morning in

9    a letter.  I had not understood until our conference call the

10   other day that the vast majority of documents they were talking

11   about were electronic documents, and that was because, as you

12   can see from our request, most of the documents we're asking for

13   were originally created as paper documents, and so the issue I

14   flagged is what search terms did they view to locate these

15   documents, because it is my understanding that the e-mail system

16   they have requires very precise search terms and there's no

17   flexibility.  It's not like a Google, for example, where there's

18   a certain latitude, and so it seems critical to know what search

19   terms they use, especially because if I'm understanding it also,

20   this was the third step that was performed in response to

21   another request and I don't know the precise parameters of that

22   request, but as you can see from our March -- our May 29 letter,

23   you know, we gave a fair amount of specificity, so that's my

24   first rather long-winded request, and the other --

25        THE COURT:  Let's deal with the first one for a

1    second.  Mr. Roberts, can you shed any light on the issue of

2    what parameters, I think the issue, and we discussed it a little

3    bit at some of the earlier conference calls, was whether, in

4    addition to the e-mails there were also paper documents.  Let me

5    start with that.  Are there paper documents responsive to this?

6        MR. ROBERTS:  There were paper documents that were

7    gathered up.  What we did last year was we took the information

8    from the two requests and the essence of it had to do with

9    failure to archive and match e-mail, which is very similar to

10   what CREW has asked for, so we went to the individuals who we

11   knew were involved in the review of that process and asked them

12   to search their e-mail because they were all here at the time so

13   we had them search their records and their e-mail and then

14   produce those.  We did not do the type of search that Ms.

15   Weismann is talking about by doing a term-type search of the

16   electronic database.

17        THE COURT:  So the 30,000 represents what, all of

18   their e-mails?

19        MR. ROBERTS:  Yes, ma'am, e-mail records, and then

20   there are some paper documents as well, but those are roughly

21   the e-mails that they went through their e-mails and culled out

22   documents that they thought might have been responsive to our

23   request and then sent that to our office.

24        THE COURT:  So was it in terms of -- who made the

25   decision of what to send you, I guess is my question?

1          MR. ROBERTS:  The owners, if you recall the members of

2    the Office of Administration employees and there may have been

3    some contract or employees as well who worked on this particular

4    project.

5          THE COURT:  Okay.  And what direction were they given

6    in terms of what kind of things to send to you?

7          MR. ROBERTS:  Well, they were told to send records

8    that they might have that related to what we were looking for.

9          THE COURT:  I know, but what is it you were looking

10   for?

11         MR. ROBERTS:  For example, the failure to archive.

12   The letter I don't have right in front of me, but it had to do

13   with failure to archive and the missing e-mail.  Essentially the

14   request essentially came from Mr. Fitzgerald's letter that was

15   in the press that may have been referenced in one of the CREW

16   reports.

17         THE COURT:  Can I ask you to slow down a little bit so

18   my court reporter can take this down?

19         MR. ROBERTS:  Yes, ma'am.

20         THE COURT:  Go ahead.

21         MR. ROBERTS:  Was a request that came in that had to

22   do with missing e-mail and failure to archive and documents

23   related to that, and that's what we asked people to look for and

24   send us.

25         THE COURT:  Okay.  Is that responsive, Ms. Weismann?

```
1              MS. WEISMANN:  Yes, except that there seems -- I see a
2       hole, and maybe I misunderstood something.  I understood Mr.
3       Roberts to describe a process where they went back to all the
4       then-current employees of OA, but it's also my understanding
5       that there are any number of people who were here during this
6       relevant time period but are no longer there and I don't know
7       whether or not there's been an effort to search the files of
8       former employees who were involved in creating these records or
9       have knowledge about the records.
10             THE COURT:  I guess what time period are you talking
11      about, Ms. Weismann?
12             MS. WEISMANN:  Well, I don't know the time period, but
13      they did this earlier search.
14             THE COURT:  That's what I'm trying to ask.  I mean,
15      are you asking presumably the Office of Administration has had
16      employees come and go?
17             MS. WEISMANN:  My understanding is they've actually
18      had quite a bit of turnover over the last few years, so what Mr.
19      Roberts described when they did the search, and I'm not clear
20      exactly when it was done, he describes going to employees who
21      were then at the Office of Administration.  I don't know if
22      they've attempted to search the files of the departed employees.
23             THE COURT:  I know, but my question to you before I
24      asked him, departed employees how far back?
25             MS. WEISMANN:  Well, certainly it would be departed
```

1    employees from September 2005 on, because anybody who left

2    before that period wouldn't have been involved at least as far

3    as our point of request is concerned.

4         THE COURT:  So from your perspective it would have

5    been from, any employees, whether presently there or departed,

6    from 2005 to February 2006; is that what you're saying?

7         MS. WEISMANN:  Yes.

8         THE COURT:  Mr. Roberts, do you understand her

9    question in terms of when you did the search would you have

10   asked employees or collected this information from not only who

11   was there but if people had left?

12        MR. ROBERTS:  They were asked of employees who were

13   here because it was a pretty narrow period of time.  It was from

14   roughly October, I think the time frame that CREW has is

15   September 2005 through roughly February 2006.  All the employees

16   who were involved in that project were here in February and

17   March of 2006 when we went to them and asked them to look for

18   their records, so it was not necessary to go back and search

19   electronic records from departed employees because they were all

20   here.

21        THE COURT:  All right.  That answers that question.

22   What's your second question, Ms. Weismann?

23        MS. WEISMANN:  It was unclear to me, Mr. Roberts

24   described a process initially where he said something to the

25   effect that it would be very involved to do an electronic

1    search.  I just wanted again clarification as to the nature of

2    the search that has already been done.

3            THE COURT:  Are you talking about collecting the

4    30,000 e-mails?

5            MS. WEISMANN:  Yes.

6            THE COURT:  All right.  As I understood it, Mr.

7    Roberts, when you went in response to an earlier request, which

8    is when you collected these 30,000 plus e-mails, and they were

9    generally related to the failure to archive or missing e-mails,

10    in terms of searching that material, was everything electronic

11    or was it paper and electronic?  I mean, why do you have -- do

12    you have some paper documents as well as electronic, or is

13    everything, if there is some paper documents, also electronic?

14            MR. ROBERTS:  It's a combination, your Honor.  Most of

15    it is electronic because again, the individuals who were

16    involved in that, it was all of the discussion and the analysis

17    and everything was pretty much done electronically.  To the

18    extent that there were, for example, the histogram, a charge to

19    the extent that any of those were produced in a paper document,

20    we can simply print them out or we have copies of them.

21            THE COURT:  Okay.

22            MR. ROBERTS:  This wasn't necessary to do an

23    electronic search because all the employees involved in it were

24    here.

25            THE COURT:  So in essence they did their own search

1    and culled out all these e-mails together, is that correct, from

2    their individual computers or databases; is that correct?

3              MR. ROBERTS:  That's correct, your Honor.

4              THE COURT:  All right.  Ms. Weismann, that seems to

5    answer that.

6              MS. WEISMANN:  Yes, I believe it does.  I mean, the

7    only sort of residual concern I have is again I'm relying on a

8    search that was done in response to another record request and

9    without seeing it and knowing exactly what it sought, you know,

10   I don't have yet I would say sufficient information to know that

11   there's an exact parallel between that search, that request and

12   mine.

13             THE COURT:  Well, it sounds like what you're looking

14   at in the broad category is the failure to archive and missing

15   e-mails.  I mean, that's generally what you're getting and that

16   seems to have been with the search that they did.

17             MS. WEISMANN:  I guess I won't know until I see the

18   responses.  If there seems like there's a big hole then that

19   might raise the question as to whether or not, you know, I'm

20   just saying, you know, I know what I asked for and all I have is

21   a very generic description.  You're right, on its face the

22   generic description is given, appears, but does at least a

23   significant overlap.  I don't know if that overlap is one

24   hundred percent or something less.

25             THE COURT:  Is there any way of giving any other kind

1    of assurance, Mr. Roberts, or I take it that since you worked on

2    the original request, Mr. Roberts, can you indicate whether you

3    think it appears that it would cover the CREW request since you

4    had an opportunity to look at both the original request as well

5    as theirs?

6         MR. ROBERTS:  Your Honor, what I can offer is that the

7    representations that will come from this office when we reply to

8    the request will be that we believe that the effort that we did

9    before complies with what CREW is looking for.  For example, the

10   charge, the analysis, for example, some of the work perks and

11   stuff that CREW has referenced, I'm not familiar with those, but

12   it's my personal opinion and my professional opinion that the

13   previous effort substantially complies and in fact does comply

14   with the universe of records that CREW has requested.

15        THE COURT:  And I take it the June 21st date would

16   include any kind of paper documents as well as the electronic?

17        MR. ROBERTS:  Yes, ma'am, that's correct.

18        THE COURT:  Okay.  Anything else, Ms. Weismann?  If

19   not I'll move on to a couple of other things.

20        MS. WEISMANN:  The only issue I have again is I still

21   don't understand why at least the paper documents can't be

22   segregated and processed and released, without having to wait

23   for the review of the 36,000 other documents.  That's my

24   continuing concern here.

25        THE COURT:  I can guess at it, but instead of doing

1    that, Mr. Roberts, can you respond as to why you would want to

2    wait on not handing the paper documents up front?

3            MR. ROBERTS:  We need to make sure from a continuity

4    standpoint, for example, some documents standing by themselves

5    may or may not be exempt, and when we put the whole universe of

6    the records together one may reference others.  I mean, these

7    documents are not necessarily related only to the Office of

8    Administration.  Other offices within the complex that we

9    support may have some equities in these, and so we just need, we

10   feel like we need to make sure that we review everything at once

11   to be able to consider whether or not they're releasable and

12   responsive.

13           THE COURT:  All right.  Which is generally is not that

14   unusual, Ms. Weismann, as you know, in terms of their wanting to

15   make sure that in context, you know, what there's some

16   consistency in terms of what they're releasing, not releasing,

17   if they're claiming any exemption.

18           Let me move on then.  Those are the four categories

19   that we talked about.  The fifth category, there was an issue of

20   trying to find, Ms. Lin, contact had been made to some people to

21   see whether they could indicate where this material was located.

22   Have you been able to get together any response, Ms. Lin or Mr.

23   Roberts?

24           MS. LIN:  Yes, your Honor.  This is Jean Lin.  We, Mr.

25   Roberts was able to contact people that might have better

1    information about that and they were able to pinpoint certain
2    paper files which Mr. Roberts and/or the Office of
3    Administration has gone through in the last 24 hours, and there
4    may be some responsive documents after the initial review, so
5    from those paper files we will be able to provide the responsive
6    documents or provide a response to CREW's FOIA request by June
7    21st.  The complication of course is that they may also require
8    to be, I mean, currently we believe that an electronic search is
9    also necessary to capture the other documents that might exist
10   because this request asks for variations of the assessment or
11   copies of the assessment.  It's all iterations, so an electronic
12   search is what is causing a problem because, as Mr. Roberts
13   mentioned earlier, the search that is done by the technicians,
14   they are already backed up, and those are the priorities, not
15   only relating to the Office of Administration but the entire
16   White House complex, so that's the part where we have problems,
17   so in order to complete that search it has to happen after,
18   assuming we still are going to search the February documents, it
19   wouldn't be able to start until sometime after July 20th because
20   that's currently that's what the schedule is like, and it's
21   starting from that point on it takes at least a day or two to
22   set up the search and at least three days to run, another three
23   to four days to evaluate, and then the review process begins
24   from there, so the best estimate that the agency is able to
25   provide at this point is that by August 24th they would be able

1    to respond to the FOIA request as to category five.  And by the
2    way, that would be the same as well as to February, the February
3    2006 search if that's to be conducted.
4         THE COURT:  If I could just simply ask, in terms of
5    you've I take it through that paper, the paper documents, you
6    could get out to them by June 21st, it's only the additional
7    electronic search.
8         MS. LIN:  That's correct, your Honor.
9         THE COURT:  And the February one you were talking
10   about, because that is an electronic search.
11        MS. LIN:  Yes.
12        THE COURT:  All right.  And the last category, which
13   was a fairly broad one, and I believe, Ms. Weismann, it
14   indicated that there might be a way of narrowing what that
15   category is.  You had, Ms. Lin had talked about sixty to ninety
16   days.  Mr. Roberts, is there something that you could suggest in
17   terms of how that category might be narrowed or you see why it's
18   going to take that long?  Let me start with you.
19        MR. ROBERTS:  If the Court could ask Ms. Weismann if
20   that's the ECRMS project that she's referring to.
21        THE COURT:  Is that what you're referring to, Ms.
22   Weismann?
23        MS. WEISMANN:  I don't know what that project is, so
24   from my perspective what might help is if we got a list of
25   contracts, you know, maybe we could at least prioritize PI, but

1    there's a project, there's an ECRMS project that relates to

2    that.

3            THE COURT:  If you could spell that for the court

4    reporter.

5            MR. ROBERTS:  E-C-R-M-S.

6            THE COURT:  And what is it?

7            MR. ROBERTS:  That stands for Electronics Records

8    Management.  My understanding from the discussions the other day

9    was that if CREW only wants statements of work and requests for

10   proposals and requests for quote that the Office of

11   Administration generated, then we can do that more quickly than

12   if it gets into contract documents with information backed from

13   contractors.  There of course is a requirement under the FOIA

14   and the federal acquisition regulation that we then have to go

15   to contractors and get their input on anything that might be

16   releasable.

17           THE COURT:  All right.  So Ms. Weismann, do you want

18   to narrow it down?

19           MS. WEISMANN:  Well, I had already narrowed it.  I

20   told them that if we could get just generically the categories

21   of proprietary information such as price quotes, that's what I'm

22   talking about when I say generically, but it was likely that we

23   would have no interest in that information and could avoid that

24   process altogether.

25           THE COURT:  Well, I think what he's suggesting is that

1    they can give you requests for proposals, and I missed the other

2    one.  A statement of work.

3         MS. WEISMANN:  Right, but as I understood from what he

4    was saying, the biggest impediment to giving the actual contract

5    documents was the need to check with submitters on proprietary

6    information.

7         THE COURT:  Do you want statements of work and

8    requests for proposals?

9         MS. WEISMANN:  Yes, we do.  It's within our request.

10        THE COURT:  So how quickly can you produce that, Mr.

11   Roberts?

12        MR. ROBERTS:  By June 21st.

13        THE COURT:  Okay.  And then in terms of the contracts

14   themselves, I take it what you're talking about, what are you

15   asking for, Ms. Weismann?  It's not clear to me what you want

16   them to do in terms of the contracts.

17        MS. WEISMANN:  Well, what I was suggesting is a way to

18   short-circuit it is if they could give me a listing of all the

19   contracts it may be that we're not interested in all of them.  I

20   don't know.

21        THE COURT:  I mean in terms of who the contractors

22   are.

23        MS. WEISMANN:  Right, and what the contract is for.  I

24   mean, otherwise, I mean, what we're asking for is the actual

25   contract documents, but this is where we have said we're not

1    interested in the proprietary information, and rather than delay

2    and have them go back to the submitters and ask for their views

3    as they're required to do we're proposing that, you know, if

4    they tell us the kinds of proprietary information we will likely

5    agree that we don't want it and they don't have to worry about

6    getting the final offer or the objection of the submitter.

7         THE COURT:  Ms. Weismann, I'm still having trouble

8    figuring it out so I assume they are.  What you're asking is a

9    list of contracts by contract or presumably, and if you already

10   have the statement of work presumably, you know, these would be

11   the contractors that were actually given these specific

12   contracts, that seems to be the first step; is that correct?

13        MS. WEISMANN:  Yes, but I want to be clear, that's not

14   what the entirety of our FOIA request here seeks.  I was just

15   proposing that --

16        THE COURT:  I understand that, Ms. Weismann.  Just

17   answer my questions, please, Ms. Weismann.  All I'm asking is,

18   is the first time we get you the statements of work, the request

19   for proposals, you're then asking for any contracts that were

20   actually let?

21        MS. WEISMANN:  Correct.

22        THE COURT:  You would want the names of the

23   contractors matched up with the requests for proposals so that

24   you could figure out, or the statement of work so that you would

25   know, you know, which contract was let relating to which

1    statement of work and requests for proposals; is that correct?

2         MS. WEISMANN:  Yes.

3         THE COURT:  Okay.  And Mr. Roberts, can you do that?

4         MS. LIN:  Your Honor, this is Jean Lin.  I'm sorry to

5    interject, but there seems to be some confusion here, because

6    the face of category six, we don't read it, at least until now

7    we don't read it to encompass also contracts that were submitted

8    or bids that were submitted by the contractors.  On its face

9    it's asking for statements of work, requests for proposals, and

10   requests for quotes that OA issued or issued on behalf of OA so

11   on its face it doesn't talk about the contract, and in our last

12   discussion with Ms. Weismann we tried to clarify that our

13   writing was correct, is that it doesn't include contractual

14   terms or pricing information submitted by the contractors, so we

15   felt that was entirely out of the scope, so any listing of

16   contractors is not even within the scope, and as to what's being

17   requested here, the confusion here is not, or the problem we

18   have now is not that we have to go back to the bidders to get

19   their approval but the fact that the physical copies of the

20   statements of work we have.  We can produce them by July 21st.

21   The problem is that there were some other statements of work or

22   requests for proposals issued by the Department of Interior and

23   that's a process that's currently beyond our control, but we'll

24   make our very best effort to contact the Department of Interior

25   to gather those statements of work and requests for proposals

1    that they issued on behalf of the Office of Administration.

2        THE COURT:  Okay.  Let me, Ms. Weismann, I've got the

3    letter in front of me.  What it talks about is we see copies of

4    all statements of work, requests for proposals and requests for

5    quote that OA issued or that were issued on behalf of OA, the

6    analysis design implementation and support of EOP e-mail systems

7    implementation, migration and e-mail records management.  And

8    then you set out the priority for dates.  So it doesn't say

9    anything about contracts.

10        MS. WEISMANN:  I apologize, your Honor.  That was an

11    inadvertent mistake on my part, inadvertent in that you're

12    absolutely correct.

13        THE COURT:  Let's get back to this again for a minute.

14    Then the statements, as I understand it from what Mr. Roberts

15    had said and Ms. Lin is saying, is that statements of work or

16    requests for proposals, and I don't know about the request for

17    quotes, that OA has themselves in their files, they can produce

18    by January 21st.  Is that correct, Mr. Roberts?

19        MR. ROBERTS:  Yes, ma'am, it is.  June 21st.

20        THE COURT:  June 21st.  I'm sorry.  And does that

21    include the request for quote as well?

22        MR. ROBERTS:  I don't recall whether -- I know there

23    are statements of work because of the nature of the contracting

24    that was done.  I'm not sure if there were actually requests for

25    proposals and requests for quotes, but to the extent that we

1    have any of those we will look for them.  I am familiar with

2    statements of work that were issued and that would include

3    those, yes.

4            THE COURT:  All right.  So those you could produce by

5    June 21st, the question is, in the Department of Interior who

6    would have been I take it doing it on your behalf?

7            MR. ROBERTS:  Yes, ma'am.  There's an organization

8    called Gov Works.  It's a fee-for-service organization that we

9    do a fair amount of contracting through and they belong to the

10   Interior department, and if CREW wants complete contract files

11   we have to go to them and ask for copies from them because they

12   are our contracting officer and contracting office for this

13   work.

14           THE COURT:  All right.  So in the context, Ms.

15   Weismann, of this TRO, is it sufficient to produce what OA has

16   and you can wait for a later date, have them ask for the

17   Department of Interior, but it obviously isn't going to be done

18   that quickly?

19           MS. WEISMANN:  I'm willing to take it the first step,

20   the first wave of production, the ones that OA have.  I'm not --

21   I guess I would ask them to initiate the process of securing the

22   others.

23           THE COURT:  I don't have a problem with that.  I'm

24   trying to narrow this.

25           MS. WEISMANN:  For your Honor's purposes of the June

1    21st date I'm willing to accept their offer of providing what

2    they are within the OA and I would ask that they contact the

3    Department of Interior, and it would be helpful to find out, get

4    a sense of time from them, from Interior, how long it will take.

5            THE COURT:  So let's go through this again.  It seems

6    to me as I understand it then in terms of resolving the TRO that

7    categories one through four, that you would get by June 21st,

8    you would have culled through the 30,000 plus e-mails and

9    whatever paper documents there are and produce it in response to

10   the four categories that OA has, and is that correct, Mr.

11   Roberts?

12           MR. ROBERTS:  Yes, your Honor.

13           MS. LIN:  Your Honor, may I be heard?

14           THE COURT:  If you don't identify yourself I can't

15   tell who it is.  I'd prefer to call on people.  If this is Ms.

16   Weismann, is that correct from your perspective?

17           MS. WEISMANN:  Your Honor, I realize there's one

18   aspect of category four that we haven't talked about at all, and

19   that is the e-mails from the time periods September 2005 to the

20   present, which if you look at my March 29 letter it's how we

21   described it, so what we've talked about is the time frame

22   producing to February 3rd, 2006, and for now I'm willing to

23   accept Mr. Roberts' representation that as far as paper

24   documents, you know, that there is unlikely to be anything

25   through the end of February, but the fourth category goes beyond

1    that.

2            THE COURT:  Okay.  So then let's deal with it in the

3    context you set out in the context of this, the dates we've been

4    talking about, and that's why I'm focused on them, is September

5    of 2005 to early February, we'll say February 3rd at this point

6    of 2006.  And, you know, I grant you the letter says that, but

7    I've been going by our discussions.

8            MS. WEISMANN:  Correct.

9            THE COURT:  So they will go through the 30,000 plus

10   e-mails to cull out the responsive in the four categories at

11   this point, September 2005 through February 3rd of 2006, and

12   that will be done by June 21st; is that correct, Mr. Roberts?

13           MR. ROBERTS:  Yes, your Honor.

14           THE COURT:  Okay.  Then let's do the ones that we've

15   actually been able to do something with.  As I understand it,

16   the category five, you would be able to produce -- let me look

17   at this for a minute.  Category five you could produce by June

18   21st all the paper documents that are responsive, but to do an

19   electronic search you wouldn't be able to get anything done

20   until August 24th; is that correct, Mr. Roberts?

21           MR. ROBERTS:  Yes, ma'am.

22           THE COURT:  Okay.  Is that acceptable to you, Ms.

23   Weismann?

24           MS. WEISMANN:  August 24th isn't, but the paper copies

25   by June 21st is.

1          THE COURT:  Well, then let me see what, the June 21st

2     paper copies, but you're not willing to wait until August 24th

3     for the electronic search?

4          MS. WEISMANN:  No, your Honor, because as they

5     described, it is a question of how they prioritize and we

6     believe as an expedited request we're entitled to greater

7     priority than that.

8          THE COURT:  Okay.  Well, I'm not sure that I'm going

9     to bump the White House for you, Ms. Weismann, but if we want to

10    leave that as a separate issue then I'll have briefing in terms

11    of who has priority over you.  We'll leave that as a side issue

12    then in terms of the electronic search.  But in terms of the

13    June 21st date, we've got the four categories out of the 30,000

14    plus e-mails and we have the category five in terms of paper

15    responses, and in category six you will produce everything that

16    you have for that by June 21st, but only what the Office of

17    Administration has, not the Department of Interior, although we

18    would ask that you would initiate that.

19         MR. ROBERTS:  And may I clarify on the Department of

20    the Interior, are we expected then to proceed with going to the

21    contract or as we're required to do under the FOIA and the

22    Federal Acquisition Regulation?

23         THE COURT:  It would seem to me that I'm not

24    suggesting that you not follow your procedures --

25         MR. ROBERTS:  Okay.

 1                THE COURT:  -- in terms of doing it.

 2                MR. ROBERTS:  I understand.

 3                THE COURT:  All right.

 4                MS. LIN:  But as --

 5                THE COURT:  Don't interrupt, please.

 6                MS. LIN:  I'm so sorry.  I really thought you were

 7      done.

 8                THE COURT:  If you want to ask a question I'm going to

 9      call on you on each of these.

10                MS. LIN:  I apologize, your Honor.

11                THE COURT:  All right.  So that we have a record of

12      what it is people are agreeing to and what they're not agreeing

13      to.

14                Now, in terms, as I understand, Ms. Weismann, that you

15      on the category six to the extent that OA had just for the TRO

16      since you asked to have all of this produced in ten days, that

17      what they have, you would agree to that by June 21st, they would

18      get their own and then they would initiate as part of the

19      lawsuit in general the request through the Department of

20      Interior.  Is that acceptable to you?

21                MS. WEISMANN:  Yes.  And I apologize.  The only thing

22      I was going to ask is when Mr. Roberts made reference to their

23      procedures as requiring the consultation with the submitters, if

24      that is proprietary information.  There's one piece still we're

25      willing to agree to is most likely if we know the categories,

1    waive that and we're not interested to expedite the back piece

2    of it.

3         THE COURT:  If, I'm not sure what the purpose is,

4    perhaps you could clarify, Mr. Roberts, what the purpose would

5    be in terms of, is it the proprietary information or something

6    else?  Mr. Roberts?

7         MR. ROBERTS:  Ma'am, I know that there is proprietary

8    information associated with these contracts that has to do with

9    labor rates and things like that for this particular contract or

10   based upon previous FOIA requests, so I -- there is proprietary

11   information, and I believe, as Ms. Weismann suggested, we could

12   redact that information.

13        MS. LIN:  Your Honor, this is Jean Lin.  I apologize

14   for interrupting again.  As we previously had discussed the

15   contracts and the contract or out of the scope of this FOIA

16   request, so there's some confusion on our part here, so

17   essentially we are still talking about statements of work that

18   we request for proposal?

19        THE COURT:  Yes.

20        MS. LIN:  So there will be no contract for terms

21   proposed by the bidders.  So sorry, there was confusion on our

22   end.

23        THE COURT:  So as I understand it, looking at category

24   six, it doesn't involve the contracts, so Mr. Roberts, there

25   shouldn't be an issue of proprietary information.  It should be

1    statements of work, requests for proposals, and request for

2    quote, so this is generated from Interior on your behalf, I

3    assume; is that correct, Mr. Roberts?

4         MR. ROBERTS:  Yes, ma'am.  I understand the nature of

5    the request now.

6         THE COURT:  Okay.  And you initiate that request as

7    part of this?

8         MR. ROBERTS:  Yes, ma'am.

9         THE COURT:  Okay.  So the only thing then, two things

10   that we have left, besides the electronic search for category

11   five, which the government has indicated they could not get done

12   before August 24th, and the other one is the February -- hold on

13   one second -- the February 3rd to February 28th of 2006, you

14   also didn't think you could get done before August 24th; is that

15   correct?

16        MR. ROBERTS:  Yes, ma'am.

17        THE COURT:  All right.  Is that acceptable or not

18   acceptable, Ms. Weismann?

19        MS. WEISMANN:  Well, I am willing to see what we get

20   on the 21st before asking them to initiate that based on Mr.

21   Roberts' representation that he's familiar with the subject

22   matter of our request and the responsive documents and there's

23   unlikely to be any in that time period and I'm willing to leave

24   it that on the 21st if we see that if it appears that there are

25   documents that we think should have been produced and are not

1    then we, you know, we reserve the right to go back and ask that

2    that search be initiated.

3              THE COURT:  Then we'll leave it at that as a practical

4    matter in terms of resolving the TRO only, which is what I'm

5    focused on at this point.  We'll leave it that the expectation

6    is that the search through February 3rd would be responsive and

7    that if for some reason it isn't and you would be proceeding

8    with the August 24th date then you would come back indicating

9    it's not responsive according to whatever agreement we reach

10   here.  Is that an accurate way of putting it, Ms. Weismann?

11             MS. WEISMANN:  Yes.

12             MS. LIN:  Your Honor, I'm sorry, this is Jean Lin.

13             THE COURT:  Ms. Lin, Ms. Lin, Ms. Lin.  Just wait one

14   second.  Okay?

15             Now, and there's one other point that I wanted to

16   bring up that's outside of the June 21st date.  The only ones

17   that we have for the August 24th is this February 3rd through

18   February 28th of '06, which at this point the plaintiff will,

19   you know, will accept contingent on the -- on the search, the

20   search through the February period as being responsive.  The

21   other one, just so that I have this down, the other one is

22   category five, because the one I just talked about in terms of

23   the August 24th at -- February 3rd to the 28th relates to

24   categories one through four.  Category five, the only thing we

25   have outside that is if we have to do an electronic search as

1    opposed to what they already have then they're indicating it

2    would be August 24th, and plaintiff doesn't agree to that.

3         Now, the only other thing that I think is sort of

4    sitting out there is what you have brought up, Ms. Weismann,

5    which is on number four, the fourth category, apart from through

6    the February 3rd and then the request of February 3rd to the

7    28th which you had originally focused on, you've also asked for

8    e-mails relating from September 5th to the present; is that

9    correct?

10        MS. WEISMANN:  Yes.

11        THE COURT:  And is that in the categories one through

12   three that you're then expanding it beyond that?

13        MS. WEISMANN:  I'm not sure I understand the question,

14   your Honor.

15        THE COURT:  Well, category four I thought when we

16   originally talked about it I asked you to set out the time

17   frames that you wanted things, and you told me one through four

18   you wanted September 2005 to end of February 2006.  Looking at

19   the fourth category it seems to have a different time period.

20        MS. WEISMANN:  I'm sorry if I wasn't clear.  The event

21   that, the subject matter of category four are the events and

22   documents that were created between September 2005 and February

23   2006, but what category four seeks is any e-mail discussions of

24   those documents and events through the present, so the time

25   period is still the project as the subject matter of category

1    four, but we're seeking any discussions of that subject matter

2    through the present.

3            THE COURT:  All right.  Mr. Roberts, do you understand

4    what she's asking, what she's requesting?

5            MR. ROBERTS:  Yes, I do, your Honor.

6            THE COURT:  And what is the time frame for that?

7            MR. ROBERTS:  I don't know.  That's going to be a

8    14-month search.  What I will have to do is go back to the

9    search technicians and ask them how long it would take to do a

10   14-month search of all Office of Administration e-mail for some,

11   it's not clear to me what terms Ms. Weismann is looking for.

12           THE COURT:  It sounded as if the subject matter would

13   be these e-mails in one, two, three categories, one, two and

14   three, which would be the September 2005 to the end of February

15   of 2006, but a discussion about those e-mails.

16           MR. ROBERTS:  Yes, ma'am.  I understand, your Honor.

17   But that kind of goes back to one of Ms. Weismann's points that

18   for us to do an electronic search then we have to have some

19   definitive terms, so if I'm searching for a term, for example,

20   missing e-mails, I need to know what specific term I would ask

21   the technicians to search for.  The more terms I have to search

22   for the longer the search takes and the more complicated it is

23   and the longer the review process.

24           THE COURT:  Ms. Weismann, what are you asking for?

25           MS. WEISMANN:  I think that that's the kind of

1    category I would need to work with someone from OA that

2    understands, you know, because I would need their assistance in

3    drafting.  I'd be happy to come up with a list of search terms.

4    I think I would need some understanding from them on how the

5    search, you know, process works in order to draft the most

6    effective terms, so I'm willing to work with the agency on that.

7            THE COURT:  Ms. Weismann, what I'm trying to do

8    frankly is to resolve the TRO.  Your TRO asks that all of these

9    four categories, six categories, be provided to you in ten days.

10   Now it seems to me we've worked down to a number of categories

11   to be provided by June 21st, which appear to be satisfactory to

12   you.  The only one, and the August 24th one which covers

13   categories one through four you'll accept, you'll accept if it

14   looks like the documents you get on the 21st are actually

15   responsive.  The only one you haven't agreed to is the

16   electronic search of category five.  In terms of this one, which

17   is category four in this new search term, could we not resolve

18   the TRO to the extent as we've gone so far, if you want to

19   litigate this category five and the electronic search and why

20   they should get it to you faster than August 24th and bump a

21   bunch of other people I'll be happy to have you litigate it, but

22   it seems to me that it may be useful to get the June 21st

23   material and in the meantime work on the search terms, but you

24   may want to look at what you get before you do the search terms

25   to get the category four material you're talking about.  I mean,

1    I'm listening.  I mean, I don't know how this is going to work,

2    but in listening to the discussion here it seems to me that what

3    search terms you would use would be informed by the documents

4    you get in response to the first four categories.  Ms. Weismann?

5         MS. WEISMANN:  I think that may very well be true, and

6    it's not my interest in litigating.  I would rather have a

7    process in place so that I could work this out with the agency,

8    and so if I can get a commitment, and it may be that it makes

9    sense to await June 21st and see what I get then, but a

10    commitment from the agency to help work with me to craft search

11    terms, then I'm happy to receive and that that can happen, you

12    know, along with all these other searches going on, then I'm

13    happy not to litigate that at this point.

14         THE COURT:  All right.  Mr. Roberts, are you willing

15    to work with her?  What I'm trying to do is resolve the narrower

16    issue in the TRO.  There's obviously a request that's a broader

17    request, but it seemed to me the issue of category four and what

18    you're asking for in coming up with search terms.  If you're

19    willing to work with her it seems to me maybe you can narrow

20    this down.  Are you willing to do that?

21         MR. ROBERTS:  Your Honor, the way we normally do, the

22    way we do this is that the request for proposals, what they want

23    and we look for it, we don't know what the requester wants.

24    They need to tell us.  I mean, I don't know what she's looking

25    for other than for example when we did the failure to archive in

1    the missing e-mail before.

2         MS. LIN:  Your Honor, this is Jean Lin.  If I may just

3    jump in to clarify this.  For the search to be conducted there

4    is difficulty in defining the terms, so clearly we welcome

5    suggestions by CREW as to what search terms to use, but

6    understanding that for each term to be done it takes about three

7    days to run it and another three, four days to validate.

8         THE COURT:  I understand that.  Ms. Lin, as I

9    understand what Ms. Weismann is willing to do is if she can come

10   up through a discussion or otherwise with the search terms then

11   what she wants is that if she provides some search terms that

12   they be, you know, the Office of Administration will work and

13   start looking for them, so is there that commitment at this

14   point you won't know until you get search terms to figure out

15   how long it's going to be, and I understand that and I think Ms.

16   Weismann does.  She's asking for a commitment from the Office of

17   Administration that you will do that.  So I'm asking you, are

18   you willing, when she comes up with these search terms, to

19   figure out how long it's going to take and then, you know, work

20   through getting them?

21        MS. LIN:  Yes, we are, your Honor, just understanding

22   that it's not a perpetual process of going through search terms

23   over and over and over again when, and also understanding that

24   this search would have to be put in the que after the February

25   -- after the category five.

1          And just one thing:  There was one confusion earlier,

2     was that the August 24th date, I think Ms. Weismann has been

3     referring to August 21st, and I don't want there to be any

4     confusion about that.

5          THE COURT:  It's June 21st and August 24th.

6          MS. LIN:  That's right.

7          THE COURT:  All right.  All right.  So I think we've

8     discussed this as far as we can, so the question, Ms. Weismann,

9     is whether you're satisfied at this point that we don't need to

10    litigate.  This needs to be put in writing in some form, but

11    whether you're satisfied in terms of not having briefing,

12    etcetera, but putting into writing, and obviously one issue will

13    be is if it's responsive, but we would have the four categories,

14    all the things that we've talked about, which I won't repeat,

15    that will be due by June 21st, you will get those.  In the

16    meantime they would start working on the February 1, they would

17    start working on the Department of Interior, and they would

18    start working on when you provide them a time frame for the

19    search terms for the category four.  Is that acceptable as a

20    resolution, Ms. Weismann?

21         MS. WEISMANN:  Yes, it is.  I understood that the one

22    understanding was in the category five beyond the paper copies,

23    the electronic records, and I was not happy with the August 24th

24    date.

25         THE COURT:  Right.

```
 1              MS. WEISMANN:  If the agency were able to get to me
 2    sooner than June 21st the paper documents just in that category
 3    it may be that I will be satisfied and it will be not necessary
 4    to do an electronic search.
 5              THE COURT:  All right.  Mr. Roberts, since it's work
 6    on your end, is that possible or not?  Look at category five.
 7    You had indicated I believe that they were paper files and that
 8    you could produce.  It was the electronic search that would take
 9    some time.  Can you get those paper files faster than the 21st?
10              MR. ROBERTS:  No, ma'am.  The consistency, the
11    consistency position that we have is the same for those as it is
12    with all the rest of the documents related to the request.
13              THE COURT:  All right.  Ms. Weismann?
14              MS. WEISMANN:  I think it's a very segregable
15    category.  It actually covers a very different period of time.
16    If you look at my request it's October 2002, so I don't find
17    that to be a reasonable response and so, no, I mean, I'm not
18    willing.
19              THE COURT:  Okay, fine.  Then let's suggest this,
20    then:  You write up, I think what we need to do is, maybe what
21    I'll do is to propose an order on our end that would set out
22    what the commitments are in terms of what, you know, what
23    generally has been committed to here in terms of the date.  I
24    think that might be faster than frankly trying to ask the two of
25    you to do it, and on the category five, which is the electronic
```

1    search, since the August 24th date is not acceptable to you, I

2    frankly think that, you know, I'm not sure what irreparable

3    damage there would be to you frankly for waiting until August

4    24th as long as you get the paper documents that they have on

5    June 21st, but I'd be happy to have you brief it and tell me,

6    because I'm viewing this as a TRO.  I'm not rolling it into a PI

7    in terms of the time frame that you have set out.  Ten days,

8    that's not PI land, so that's a TRO which the focus generally is

9    on irreparable damage, so I'll give you a time frame within

10   which how quickly do you wish to brief and tell me what your

11   irreparable damage or whatever else you want to say on the TRO

12   for that category, and then I'll ask the government's response?

13            MS. WEISMANN:  Yes, your Honor.  This is a point of

14   clarification.  The ten days, it comes from the Freedom of

15   Information Act itself.

16            THE COURT:  That's fine, but that's what you've asked

17   for.

18            MS. WEISMANN:  Right, because that's the time period

19   for expeditious use.

20            THE COURT:  That's fine, but let me just say, Ms.

21   Weismann, however you chose the time frame, ten days to me is a

22   TRO so you have filed it as I think a TRO slash PI so as a TRO

23   which is the same standard frankly between that and a PI but

24   certainly there's more of a focus on irreparable damage.

25            MS. WEISMANN:  Yes.

 1          THE COURT:  So in terms of category five I'm not sure

 2     they've suggested August 24th.  What time frame are you asking

 3     for?

 4          MS. WEISMANN:  I wanted it as soon as possible and

 5     towards that end I believe that our request should be given

 6     greater priority than it appears to be given.

 7          THE COURT:  That's fine.  Let me just say to you that

 8     when can you get in your brief?  It's going to be very narrow,

 9     as to this category five, indicating whatever the TRO said, ten

10     days.  Whatever it is that you want, you think is your

11     irreparable damage in not getting it earlier I'll set a date for

12     the government to respond as to what priorities they have in

13     front of it, what the White House or whomever it is that's

14     making other requests or requested expedited before, and I'm

15     assuming, Ms. Lin, when you talk about people ahead of CREW

16     you're talking about a line of people that are agencies that are

17     all on an expedited track; is that correct?

18          MS. LIN:  Your Honor, in terms of FOIA requests we

19     have put CREW at the very beginning of the FOIA processing que,

20     but there were, and this office, however, the technicians

21     respond to offices besides Office of Administration, and that

22     would include searches for grand jury subpoenas, congressional

23     inquiries, and all other searches that need to be done

24     concerning the White House conflict and that's eleven

25     components, and OA does not control the technicians in terms of

1    who goes into the que first.  In terms of FOIA ques, CREW is at

2    the very, very front right now.

3            THE COURT:  Ms. Weismann, is this reasonable to

4    litigate this at this point?  I mean, it doesn't sound like they

5    have any choice on this matter.  This isn't something that they

6    control, so my feeling is, is that it's not an unreasonable time

7    frame for it, and frankly in terms of, if you're at the top of

8    the que for the FOIA request these are other requests that I, I

9    mean, I'm not sure how the Court would order them not to do it.

10   I don't think, you know, they don't set those priorities and I'm

11   certainly not going to be one to do it either so I'm not sure

12   how you're going to get this any faster.

13           MS. WEISMANN:  Your Honor, can I have until the close

14   of business today to get back to the Court on this issue?

15           THE COURT:  I am not going to be around this

16   afternoon.

17           MS. WEISMANN:  All right.  Well, so Monday morning?  I

18   mean, back whether there still existed to litigate this or not.

19           THE COURT:  Litigating this particular issue.

20           MS. WEISMANN:  Correct.  Litigating in the context of

21   a TRO.

22           THE COURT:  And I'm not suggesting that you're in any

23   way not requesting it as the usual process and August 24th would

24   be when they would produce it anyway.  I'm not suggesting they

25   not produce it.  My question is in the context of a TRO, whether

1    you want to litigate that particular category.

2           MS. WEISMANN:  Right.

3           THE COURT:  We can wait until Monday for you to decide

4    this.  But I do need to know at that point because you're going

5    to have to get -- if you're going to do it on Monday then I

6    think you should produce something Monday.  I need to turn this

7    around.  You're not the only TRO I've got.

8           MS. WEISMANN:  I understand, your Honor, and I will do

9    that.  I will, I would suggest that I advise the Court if we are

10   not interested in litigating it by Monday morning and if we are

11   interested that I file a brief on the issue by close of business

12   Monday.

13          THE COURT:  All right.  And then what I would do, you

14   know, what I would need to hear if we get into that in

15   litigating, Ms. Lin, is frankly something in writing that sets

16   out how you came up with the August 24th date and, you know,

17   what it is that you don't control that has priorities over what

18   the Office of Administration can do.

19          MS. LIN:  Your Honor, you want that also by Monday?

20          THE COURT:  No.  I don't see any reason for you to do

21   the work until we find out CREW is actually going to litigate

22   it.

23          MS. LIN:  How much time do you, your Honor, are you

24   going to give us for responding to a brief for TRO?

25          THE COURT:  Let me just look at my calendar for a

1    second.

2              I think this is the better way to do this, Ms.

3    Weismann.  You had suggested this afternoon.  Whether I'm here

4    or not really doesn't make any difference in terms of if you

5    decide you're going to do it.  Then I would ask that you file

6    something this afternoon.  It's around a very specific category,

7    and I get something from the government on Monday if you file

8    it.

9              MS. WEISMANN:  You're asking me to file my brief this

10   afternoon?

11             THE COURT:  Yes.  Short.  It's one very discrete

12   issue.

13             MS. WEISMANN:  Right, I understand.

14             THE COURT:  You know, by the close of business.  It's

15   one very discrete issue relating to it.  You know, we've had a

16   discussion about it and the government can come back on Monday

17   with whatever response.  I mean, it's basically the date so

18   nobody's disputing in terms of I don't know whether you've got

19   any other additional questions, but it sounds to me as if they

20   don't control, you know, some of the other requests that are

21   made of that office in terms of prioritizing to the extent that

22   they can control it they have put you at the head of the que.

23   Ms. Weismann?

24             MS. WEISMANN:  Yes, your Honor.  I will either file

25   something by this afternoon, or if we're not interested in

1    pursuing this issue how do you want me to handle that?

2              THE COURT:  I would just simply do a notice on ECF

3    that just simply says you're not pursuing it and that way

4    everybody gets it and it's just easier than trying to call

5    people on the phone.

6              MS. WEISMANN:  Very well.

7              THE COURT:  And we'll try to put something together.

8    I'm not sure it's going to get -- what I probably would do is do

9    the order on Monday.  I probably will.  We'll do the order on

10   Monday and see whether you're actually litigating this part or

11   not in terms of setting out the rest of what we have come to as

12   an agreement, but start working, assume that we've reached this

13   agreement for June 21st as we've talked about it, but instead of

14   issuing two orders it might be easier to frankly just do one

15   that has what's agreed to and what's litigated and my resolution

16   of the litigated one, because it's all related to one, you know,

17   one TRO.  Is that acceptable, Ms. Weismann?

18             MS. WEISMANN:  Yes, your Honor.

19             THE COURT:  Okay.  Ms. Lin, does that work for you?

20             MS. LIN:  Yes.  And I just want to understand that we

21   have until -- if Ms. Weismann doesn't decide to litigate we have

22   until close of business on Monday to file our opposition to the

23   TRO.

24             THE COURT:  Yes.

25             MS. LIN:  Okay.

Official Court Reporter

```
1              THE COURT:  All right.  Is there anything else that
2      anybody else needs to comment about or raise any issues?  Ms.
3      Weismann?
4              MS. WEISMANN:  No, your Honor.
5              THE COURT:  Ms. Lin?
6              MS. LIN:  No, your Honor.
7              THE COURT:  Mr. Roberts?
8              MR. ROBERTS:  No, ma'am.
9              THE COURT:  Okay.  Then the parties are excused.
10     Thank you.
11             (Proceedings concluded at about 11:15 a.m.)
12                    - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

4              I, Jacqueline M. Sullivan, Official United

5    States Court Reporter in and for the District of Columbia, do

6    hereby certify that the foregoing proceedings were taken down by

7    me in shorthand at the time and place aforesaid, transcribed

8    under my personal direction and supervision, and that the

9    preceding pages represent a true and correct transcription, to

10   the best of my ability and understanding.

11

12

13              _____

14              Jacqueline M. Sullivan, RPR

15              Official U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25