**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>)<br>Plaintiff, )<br><br>)<br>v. )<br><br>)<br>OFFICE OF ADMINISTRATION, )<br><br>)<br>Defendant. )<br><br>)<br>)<br>) | Civil Action No: 1:07-CV-00964 (CKK) |

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION
FOR JUDGMENT ON THE PLEADINGS**

<u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     OA'S GOVERNING EXECUTIVE ORDER ESTABLISHES
         THAT OA DOES NOT FALL WITHIN THE DEFINITION
         OF "AGENCY" UNDER FOIA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    OA'S PAST CONDUCT DOES NOT PRECLUDE THIS COURT
         FROM HOLDING THAT OA DOES NOT COME WITHIN THE
         DEFINITION OF "AGENCY" UNDER FOIA. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    III.   CREW IS NOT ENTITLED TO DISCOVERY BECAUSE OA'S
         CHARTER DOCUMENTS LEAVE NO DOUBT THAT IT HAS
         NO SUBSTANTIAL INDEPENDENT AUTHORITY. . . . . . . . . . . . . . . . . . . . 12

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## TABLE OF AUTHORITIES

CASES                                                                                                  PAGE(S)

Armstrong v. EOP,
    1 F.3d 1274 (D.C. Cir. 1993). ................................................................. passim

Armstrong v. EOP,
    90 F. 3d 553 (D.C. Cir. 1996). ................................................................. passim

Davis County Solid Waste Management v. E.P.A.,
    101 F.3d 1395 (D.C. Cir. 1996). .............................................................. 6

Electronic Privacy Information Center v. Office of Homeland Security,
    Civil Action No. 02-620 (D.D.C. Dec. 26, 2002). .......................................... 12

Judicial Watch v. Department of Justice,
    365 F.3d 1108 (D.C. Cir. 2004). .............................................................. 9

Jung v. Association of American Medical Colleges,
    339 F. Supp. 2d 26 (D.D.C. 2004). ........................................................... 11

Kissinger v. Reporters Comm. for Freedom of the Press,
    445 U.S. 136 (1980). ........................................................................... 9, 10

Lenox Hill Hospital v. Shalala,
    131 F. Supp. 2d 136 (D.D.C. 2000). .......................................................... 11

Meyer v. Bush,
    981 F.2d 1288 (D.C. Cir. 1993). .......................................................... 7, 12, 14

National Security Archives v. Archivist,
    909 F.2d 541 (D.C. Cir. 1990). .............................................................. 9

Pacific Legal Foundation v. Council on Environmental quality,
    636 F.2d 1259 (D.C. Cir. 1980). ............................................................. 8, 13

In re Sealed Case,
    121 F.3d, 729 (D.C. Cir. 1997). .............................................................. 9

Sierra Club v. Andrus,
    581 F.2d 895 (D.C. Cir. 1978). .............................................................. 8, 13

Soucie v. David,
    448 F.2d 1067 (D.C. Cir. 1971). ............................................................. 6, 8, 14

Sweetland v. Walters,
    60 F.3d 852 (D.C. Cir. 1996). .................................................. passim

Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,
    537 U.S. 371 (2003). ............................................................................. 5


STATUTES

Freedom of Information Act, 5 U.S.C. § 552 ...............................................................1

MISCELLANEOUS

*Exec. Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977). .......................... passim

*Exec. Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979). ............................... 4, 6

Exec. Order No. 13228, 66 Fed. Reg. 51812 (Oct. 8, 2001)................................. 14, 15

Fed. R. Civ. P. 12(b). ................................................................................. 11

Fed. R. Civ. P. 12(c). ................................................................................. 11

*Reorganization Plan No. 1 of 1977, 42 Fed. Reg. 56101, 91 Stat. 1633 . ......................... passim

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| OFFICE OF ADMINISTRATION, | ) ) |
| Defendant. | ) ) ) ) ) |

Civil Action No: 1:07-CV-00964 (CKK)

---

## DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION
## FOR JUDGMENT ON THE PLEADINGS

Defendant, the Office of Administration ("OA"), the Executive Office of the President ("EOP"), respectfully submits this reply in support of its motion for judgment on the pleadings.

### PRELIMINARY STATEMENT

In its opening brief, OA established that it is not an "agency" within the meaning of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, because its sole function is to assist and advise the President and because it has no substantial authority independent of the President.  In response, plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") argues that OA's governing Executive Order suggests otherwise, and thus, at a minimum, CREW is entitled to discovery.  However, OA's charter documents give no hint that it has any authority to direct or supervise others in the Executive Branch, which is the touchstone for requiring discovery on the agency question.  Such authority is also a necessary, although not sufficient, condition for finding that an EOP unit, like OA, is subject to FOIA.  OA has no such authority; it has no role outside

the EOP, and its functions relate purely to administrative matters.  Because there is, and can be,

no dispute about these facts, no discovery is warranted and this Court should grant OA's motion

for judgment on the pleadings.

**ARGUMENT**

I.     **OA'S GOVERNING EXECUTIVE ORDER ESTABLISHES THAT OA DOES NOT FALL WITHIN THE DEFINITION OF "AGENCY" UNDER FOIA**

In its opening brief, OA demonstrated that the Reorganization Plan creating it

(Reorganization Plan No. 1 of 1977, 42 Fed. Reg. 56101, 91 Stat. 1633), and OA's governing

Presidential directive (Executive Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977), *as*

*amended by* Executive Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979)) unambiguously

establish that OA exists solely to advise and assist the President because OA's administrative

functions are confined to the EOP, and because OA has no substantial independent authority

either within the EOP or the Executive Branch.

CREW's primary response is that OA's governing Executive Order actually shows that

OA's primary mission is to advise and assist all *other* components of the EOP, except for the

President.  *See* Pl. Opp. at 14, 21.  CREW's reading of the Executive Order, however, is wrong.

Section 3(a) of Executive Order No. 12028 provides:

> The Office of Administration shall provide common administrative
> support and services to all units within the Executive Office of the
> President, except for such services provided primarily in direct
> support of the President.  *The Office of Administration shall, upon*
> *request, assist the White House Office in performing its role of*
> *providing those administrative services which are primarily in*
> *direct support of the President.*

*Id.* (emphasis added).  Thus, as the express terms of the Executive Order make clear, OA is

directed, when requested, to provide "administrative services" in direct support of the President. It also supports all other units within the EOP. Put differently, the Executive Order demonstrates that OA provides those administrative services to the President that the White House Office ("WHO") asks OA to provide, even as the WHO retains *its own* administrative functions in direct support of the President. *See also id.* § 5 (establishing that the transfer of administrative service functions to OA does not divest the WHO of responsibility to directly support the President).

The fact that OA and the WHO both provide administrative services to the President obviously does not mean that OA has the substantial independent authority necessary to make it an agency. Indeed, CREW effectively admits that OA provides administrative services in support of the President, such as retention of emails and operation of the information technology infrastructure for the entire EOP, including the WHO. *See* Compl. ¶¶ 18-24; *also* OA's FY 2008 Budget (Ex. 1 to Def. Opening Br.) at 5 (listing approximately $12 million for the support and development of "EOP information technology infrastructure"). The Complaint also alleges that OA is responsible for assessing the EOP "missing email problem" and for proposing "a plan of action" for the recovery efforts to senior White House officials, among other things, *see* Compl. ¶¶ 18-24, which allegations must be accepted as true for purposes of this Rule 12(c) motion only.

Ultimately the only relevant fact is that OA was created, and exists, for the sole purpose of advising and assisting the President in his operation of the EOP. As explained in President Carter's message accompanying the Reorganization Plan that established OA (attached hereto as Exhibit A), the reorganization was "based on the premise that *the EOP exists to serve the President and should be structured to meet his needs*." Exhibit A at 3 (emphasis added). To that

end, the President proposed, among other things, to "combine administrative support operations

into a Central Administrative Unit in EOP," which would exist as "a separate EOP entity because

of the need to assure equal access by all other units." *Id.* at 8.  This consolidation was intended

to provide monetary savings, improved and more innovative services, "a focus for monitoring the

efficiency and responsibility of administrative services," and "a base for an effective EOP

budget/planning system *through which the President can manage an integrated EOP rather than

a collection of disparate units*." *Id.* (emphasis added).  In other words, OA was created precisely

in order to "advise and assist" the President in his efficient management and operation of the

EOP.

    CREW argues that OA wields substantial authority independently of the President

because section 4(a) of Executive Order 12122 authorizes the Director of OA to "organize the

Office of Administration, contract for supplies and services, and do all other things that the

President, as head of the Office of Administration, might do."  Exec. Order No. 12122, § 4(a);

*see also* Exec. Order No. 12028, § 4(a) (similar language).[1]  CREW also cites the government's

statement in its opposition to petition for *certiorari* in *Armstrong v. EOP* that, by Executive

Order No. 12,122, "the President has effected a broad delegation of authority over the OA to its

Director."  *Armstrong*, No. 96-1242 (S. Ct. 1996), respondents' cert. opp. at 18 n. 5.  According

to CREW, OA's "governing executive orders – the 'most important indication' of OA's role –

---

[1]  Executive Order No. 12122 amended only section 4 of Executive Order No. 12028 and only in minor respects.  Specifically, section 4(a) previously provided that, in addition to organizing OA and contracting for supplies or services, the OA director shall also "employ personnel."  Exec. Order 12028, §4(a).  The amendment deleted the reference to "employ personnel" in section 4(a), but added a new subsection (c), which governs the OA Director's authority to appoint and fix the pay of employees.  *See* Exec. Order No. 12122, § 4(c).

place OA on the same footing as other EOP entities found to be agencies for FOIA purposes."
Pl. Opp. at 21 (quoting *Meyer v. Bush*, 981 F.2d 1288, 1294 ("D.C. Cir. 1993)).

CREW's arguments fail for several reasons. To begin with, an interpretation that the OA
Director has *carte blanche* in his operation of OA would be contrary to section 2 of the
governing Executive Order, which provides that the OA Director "*shall report* to the President."
Exec. Order 12028 § 2. *Cf. Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of
Keffeler,* 537 U.S. 371, 385 n. 7 (2003) (it is a "cardinal rule that a statute is to be read as a
whole," in order not to render portions of it inconsistent or devoid of meaning). It would also be
inconsistent with the Reorganization Plan establishing OA, which requires OA to be subject to
the President's direction. *See* Reorganization Plan § 2 ("The Office of Administration shall
provide components of the Executive Office of the President with such administrative services *as
the President shall from time to time direct*."). The President remains the head of OA, and while
the President may decide not to personally supervise every decision the OA Director makes –
which would defeat the purpose of having a "chief administrative officer" of OA, Reorganization
Plan, § 2 – it by no means suggests that the OA Director has substantial authority *independent* of
the President.

In any event, while the OA Director, like the Chief Usher of the Executive Residence in
*Sweetland v. Walters*, 60 F.3d 852 (D.C. Cir. 1996), may have broad authority over the day-to-
day operation *of OA*, the exercise of that authority is not independent of the President, but is
"[s]ubject to such direction or approval as the President may provide or require." Exec. Order
No. 12,122, § 4(a). CREW contends that the use of the word "may" means that there could a
total absence of direction or approval. CREW then leaps to the conclusion that, "[i]n other

5

words, OA's Director is authorized to act as the President might, and need not wait for direction, guidance, or orders from the President." Pl. Opp. at 15. But that interpretation is illogical and would render this language superfluous. The purpose of this language is to place a limitation on the OA Director's authority to act; otherwise, section 4(a) would have the same meaning without the phrase. *Cf. Davis County Solid Waste Management v. E.P.A.*, 101 F.3d 1395, 1404 (D.C. Cir. 1996) ("it is of course a well-established maxim of statutory construction that courts should avoid interpretations that render a statutory provision superfluous") (citing *Pennsylvania Dep't of Pub. Welfare v. Davenport,* 495 U.S. 552, 562 (1990); *Alabama Power Co. v. EPA,* 40 F.3d 450, 455 (D.C. Cir. 1994)).

More importantly, even assuming that the OA Director need not consult with the President every time he contracts for supplies and services, makes personnel or procurement decisions, or determines what information technology infrastructure should be implemented for the EOP, that says nothing about whether OA has the type of "substantial independent authority" that would render it a FOIA agency. *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971). CREW's argument conflates the authority the OA Director exercises in operating OA with any authority OA may have over others in the Executive Branch. Only the latter is relevant to determining OA's agency status. Under D.C. Circuit precedent, the authority "wielded" by those EOP units found to be FOIA agencies is the authority of the EOP unit to supervise and direct others in the executive branch, and not the authority of any EOP unit head to operate the unit at issue as he or she sees fit. *Sweetland*, 60 F.3d at 854.

For example, the D.C. Circuit held that the President's Task Force on Regulatory Relief was not a FOIA agency because it lacked "substantial independent authority *to direct executive*

6

branch officials." *Meyer v. Bush*, 981 F.2d 1288, 1298 (D.C. Cir. 1993) (emphasis added); *see also id.* at 1292 ("The core of the dispute . . . turns on the degree of independence from the President the Task Force exercised *in its relations with the rest of the executive branch*.") (emphasis added). Similarly, the Council of Economic Advisers was not a FOIA agency because it "did not possess any delegated regulatory authority to *supervise agencies*," *id.* at 1293 (emphasis added), and had "no [] power to issue formal legally authoritative commands to entities or persons within or without the executive branch," *id.* at 1292. The National Security Council was not a FOIA agency because it did not exercise "meaningful non-advisory authority" in coordinating the activities of the various agencies with national security responsibilities. *Armstrong v. EOP*, 90 F. 3d 553, 561, 565 (D.C. Cir. 1996). And the Executive Residence is exempt from FOIA because it is exclusively dedicated to assisting the President in maintaining his home and carrying out his various ceremonial duties, and "does not oversee and coordinate federal programs . . . or promulgate binding regulations." *Sweetland*, 60 F.3d at 854.

As the D.C. Circuit explained in *Sweetland*, "FOIA was intended to enlighten citizens as to how they are governed." *Id.* at 855. Consistent with this principle, those EOP units held by the D.C. Circuit to be FOIA agencies have "wielded substantial authority independently of the President" over matters of public or regulatory policy. The D.C. Circuit thus held that the Office of Science and Technology Policy was a FOIA agency because it had "the independent function of evaluating federal programs." *Soucie*, 448 F. 2d at 1075. The Council on Environmental Quality ("CEQ") was a FOIA agency because it had power to coordinate federal environmental programs and issue binding guidelines and regulations to federal agencies. *See Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259 (D.C. Cir. 1980). The Office

of Management and Budget was subject to FOIA's disclosure requirements because it had a statutory duty to prepare the Budget – which is "an aid to Congress," *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978) – and had the authority to "assemble, correlate, revise, reduce, or increase the requests for appropriations of the several departments or establishments." *Id.* at 902 n. 25 (quoting 31 U.S.C. § 16 (1976)).

OA's governing documents make clear that far from being "on the same footing" as those EOP entities found to be agencies for FOIA purposes, Pl. Opp. at 21, OA does not direct or supervise others in the Executive Branch. It does not wield any power independently of the President – much less substantial authority over regulatory and/or public policy matters. OA's administrative functions are limited to the EOP, and even then, "[t]he [OA] Director shall not be accountable for the program and management responsibilities of units within the [EOP]; the head of each unit shall remain responsible for those functions." Exec. Order 12,028, § 4(b); *see also* OA Fiscal Year 2006 Budget (providing that OA's mission is to provide the necessary administrative support for the staff of the EOP "so that policy-making staff elsewhere in the EOP can focus on national policy decisions without having the distractions caused by routine administrative services").

In sum, because it exists solely to advise and assist the President, OA is not a FOIA agency.[2]

---

[2] In its *amicus curiae* brief in support of CREW, Judicial Watch argues that the D.C. Circuit supposedly has warned against "gratuitous expansion of the category of persons who qualify as members of the President's immediate personal staff." *Amicus* Br. at 4. According to Judicial Watch, because OA has not and cannot show that all documents it produces were solicited and received by either the President or his immediate White House advisers who have broad and significant responsibility for investigating and formulating the advice to be given to

(continued...)

## II.    OA'S PAST CONDUCT DOES NOT PRECLUDE THIS COURT FROM HOLDING THAT OA DOES NOT COME WITHIN THE DEFINITION OF "AGENCY" UNDER FOIA

In its opposition brief, CREW devotes significant energy to a discussion of OA's past conduct, which, CREW argues, establishes OA's agency status under FOIA. *See* Pl. Opp. at 22-26. This discussion does not change the fact that "the issue has never been definitively resolved," and is now ripe for this Court's determination. *Armstrong v. EOP*, 1 F.3d 1274, 1296 (D.C. Cir. 1993). OA will not repeat its prior arguments on this issue. Def. Br. at 19-20. It will, however, address three points raised by CREW that merit discussion.

First, CREW is wrong that the D.C. Circuit implicitly found OA to be an "agency" subject to FOIA in *National Security Archives v. Archivist*, 909 F.2d 541 (D.C. Cir. 1990). *See* Pl. Opp. at 22. OA's agency status was not at issue in that case, nor in any of the prior cases involving OA that CREW cites. That the D.C. Circuit might have assumed OA to be an agency under FOIA is irrelevant to the inquiry now. Indeed, that was also true of the National Security

---

[2](...continued)

the President, *see Judicial Watch v. Department of Justice*, 365 F.3d 1108, 1117 (D.C. Cir. 2004), OA is a FOIA agency. *Id.* This argument substantially misreads that case, which concerned whether information falls within the presidential communications privilege. The D.C. Circuit has never used that standard to determine whether an EOP unit is a FOIA agency. While the D.C. Circuit did warn against the expansion of the presidential communications privilege, *see id.* at 1116-17 ("'the presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected'") (quoting *In re Sealed Case,* 121 F.3d, 729, 752 (D.C. Cir. 1997)), OA does not argue that all of its records fit within the presidential communications privilege, nor is that argument relevant to determining whether OA comes within the definition of "agency" under FOIA. In any event, the argument about expanding the President's "immediate personal staff" is misplaced because the issue here is not whether OA is the "President's immediate personal staff," *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980), which the D.C. Circuit has held, is the White House Office, *see Meyer v. Bush*, 981 F.2d 1288, 1293 n.3 (D.C. Cir. 1993), but rather, whether OA is one of the "units in the Executive Office whose sole function is to advise and assist the President." *Kissinger*, 445 U.S. at 156.

9

Council. In one of the earlier *Armstrong* cases, the D.C. Circuit observed that not only had the NSC "routinely conceded its status as an 'agency'" in FOIA litigation, but in *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980), "[t]he Supreme Court also appears to have assumed, without deciding the issue, that the NSC is a FOIA agency." *Armstrong*, 1 F.3d at 1296. But the D.C. Circuit ultimately held that the NSC was not an agency subject to FOIA, notwithstanding NSC's prior concession of its agency status. *Armstrong*, 90 F.3d at 566. CREW's reliance on prior FOIA litigation involving OA is therefore misplaced.

Also unavailing is CREW's attempt to distinguish *Armstrong* on the ground that the NSC's prior conduct of subjecting itself to FOIA was merely voluntary in the interest of permitting public access. The NSC promulgated FOIA regulations and subjected some of its records to the disclosure requirements of FOIA because it believed that it was a FOIA agency. As the D.C. Circuit noted in *Armstrong*, the Office of Legal Counsel of the Department of Justice had rendered an opinion in 1978 concluding that the NSC was an agency for purposes of FOIA. *See Armstrong*, 90 F.3d at 557. In 1993, during the *Armstrong* litigation, the Office of Legal Counsel reversed its prior opinion in light of development in FOIA jurisprudence. *See id.* As was the case with the NSC in *Armstrong*, the Executive Branch originally regarded OA as subject to FOIA and acted accordingly. Upon review of OA's status, however, the Executive Branch has determined that OA does not fall within the definition of "agency" under FOIA for the reasons provided in this motion. OA's change in status is consistent with the change in the NSC's status recognized and upheld in *Armstrong.*

Finally, CREW accuses OA of failing to assert its "non-agency" defense in the Answer. CREW argues that "[c]ompletely missing from OA's answer was any suggestion that OA is not

10

subject to the FOIA . . . ," Pl. Opp. at 24, and that OA's affirmative defense regarding this

Court's lack of subject matter jurisdiction states only that no records have been improperly

withheld.  *Id.*  But OA expressly denied in its Answer that it is an agency subject to FOIA.  *See*

Answer, ¶ 7.  Moreover, because the D.C. Circuit has held that the issue whether an EOP

component is a FOIA agency goes to whether the plaintiff has stated a claim upon which relief

can be granted, and not the court's subject matter jurisdiction, *see Sweetland*, 60 F.3d at 855; *see*

*also* Def. Br. at 7 n.2, OA's assertion in the Answer that the complaint fails to state a claim upon

which relief can be granted also constituted a denial of OA's agency status.[3]  *See* Answer, at 7.

---

[3]  CREW further faults OA for filing a motion for judgment on the pleadings instead of a motion to dismiss, calling it "a transparent attempt to foreclose any factual inquiry beyond what the government chose to put before the Court."  Pl. Opp. at 20; *see also id.* at 8, 10.  CREW's objection has no merit.  Consistent with OA's prior representation that it would seek the dismissal of this action on the ground that it is not an agency, *see* Joint Proposed Schedule ¶ 6, OA filed a dispositive motion under Rule 12(c).  A Rule 12(b)(6) motion would have been inappropriate because such a motion "shall be made before pleading if a further pleading is permitted," Fed. R. Civ. P. 12(b), and OA had already filed its answer in this case.  *See Lenox Hill Hospital v. Shalala*, 131 F. Supp. 2d 136, 139-140 (D.D.C. 2000) (treating defendant's Rule 12(b) motion to dismiss as Rule 12(c) motion because defendant "has already filed an answer"); *cf. Jung v. Association of American Medical Colleges*, 339 F. Supp. 2d 26, 35 (D.D.C. 2004) ("if a party files a Rule 12(c) motion before its answer, the Court may treat it as a motion to dismiss under Rule 12(b)(6) for failure to state a claim").

In any event, there is no prejudice to CREW because the standard of review is essentially the same for both types of motions.  *See* Def. Br. at 6; *cf. Jung*, 339 F. Supp. at 35 ("No prejudice to any party results from treating a Rule 12(c) motion as a Rule 12(b)(6) motion because the standard of review for motions for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is essentially the same as that for motions to dismiss under Rule 12(b)(6).").  Moreover, the fact that OA has presented a pure question of law in its Rule 12(c) motion is not an improper attempt to "avoid discovery and prevent the court from considering a full and complete record," Pl Opp. at 10, any more than any defendant's motion to dismiss a case for failure to state a claim is regarded as an attempt to avoid discovery.

III.    **CREW IS NOT ENTITLED TO DISCOVERY BECAUSE OA'S CHARTER DOCUMENTS LEAVE NO DOUBT THAT IT HAS NO SUBSTANTIAL INDEPENDENT AUTHORITY**

CREW argues that it is entitled to discovery because the pleadings allegedly do not foreclose the possibility that OA is an agency, and because both this Court and the D.C. Circuit allegedly have "sanctioned as necessary for resolving the agency issue" that there be factual development. Pl. Opp. at 1, 13. CREW cites as support the D.C. Circuit's decision in *Armstrong*, 90 F.3d 553, as well as this Court's decision in *Electronic Privacy Information Center v. Office of Homeland Security*, Civil Action No. 02-620 (D.D.C. Dec. 26, 2002) (CKK) ("*EPIC*" Memo. Op.), in which this Court ordered limited discovery on the agency question. CREW thus proposes to conduct discovery regarding OA's organizational structure, its proximity to the President, and the nature of OA's delegated authority, which correlate to the three-factor test identified in *Meyer v. Bush* for determining agency status.[4]

As an initial matter, there is no merit to CREW's argument that the question before the Court – whether a unit within the EOP is a FOIA agency – necessarily gives rise to a factual issue requiring discovery. In *Sweetland*, for example, the D.C. Circuit held that the plaintiff's complaint failed to state a claim upon which relief can be granted because the Executive Residence is not a FOIA agency. The court made that determination based on the description of the staff of the Executive Residence found in a report prepared by the Senate Appropriations

---

[4] For example, CREW argues that it needs discovery on the "staffing and organizational structure of OA" because OA allegedly failed to provide "adequate factual evidence on this critical factual issue." Pl. Opp. at 19. This is a curious request because OA has acknowledged that it has a self-contained structure such that it would be in a position to exercise substantial independent authority if it were delegated that authority. *See* Def. Br. at 16. Of course, as OA has established elsewhere, it has not been delegated such authority.

12

Committee.  *See Sweetland*, 60 F.3d at 854.  The court also examined the statutory provisions charging the Executive Residence with certain duties and responsibilities with respect to the public property and furniture in the White House.  *Id.* at 855.  There was no discovery, and none was necessary to determine whether the staff of the Executive Residence wielded substantial independent authority over other executive branch officials.  Similarly, the D.C. Circuit determined the agency status of the Council on Environmental Quality and the Office of Management and Budget without discovery on the question.  *See Pacific Legal Foundation*, 636 F.2d at 1262-64; *Andrus*, 581 F.2d at 902-903.

To be sure, as this Court noted in *EPIC*, there was some factual development in *Armstrong* regarding the NSC's agency status.  But that does not demonstrate that *this* case requires anything more to resolve the present motion.  The plaintiffs in *Armstrong* put at issue multiple policy areas in which they alleged the NSC exercised independent authority – ranging from intelligence policy oversight, telecommunications policy, emergency preparedness, public diplomacy, classification review to arms control.  *See Armstrong*, 90 F.3d at 560-65.  The present case is much narrower and involves an entity that, unlike the scope of the NSC's coordination activities among Executive Branch departments and agencies on the President's behalf, performs purely administrative functions for the EOP.[5]  OA's governing Executive Order – which CREW

---

[5] Indeed, as the *Meyer* court explained, in determining whether an EOP unit's sole function is to advise and assist the President, "the line cannot be drawn to include all those who direct others in the executive branch" because "under that approach, the White House staff would be an agency."  981 F.2d at 1293.  Thus, "when we apply *Soucie* to those who help the President *supervise others in the executive branch*, we think it is necessary to focus on three interrelated factors."  *Id.* (emphasis added); *see also Armstrong*, 90 F.3d at 558 (the three-factor test is "relevant to determining whether those who both advise the President *and supervise others in the Executive Branch* exercise 'substantial independent authority' and hence should be deemed an

(continued...)

concedes is "the 'most important indication' of OA's role," Pl. Opp. at 21 (quoting *Meyer*, 981 F. 2d 1294) – gives no hint of any potential supervisory authority by OA. The Executive Order does not authorize OA, or its Director, to direct or supervise others in the Executive Branch. And OA's charter documents (*i.e.,* the governing Executive Order, as amended, and the Reorganization Plan establishing OA) are nothing like the executive orders that, as CREW itself characterized them, "expanded the [Council on Environmental Quality]'s functions to include oversight of the activities of federal agencies and regulatory authority," and on which "the [D.C. Circuit] placed great weight" in concluding that the CEQ is a FOIA agency. Pl. Opp. at 21. Instead, these governing documents make clear that OA's functions relate purely to administrative matters within the EOP. Like the Executive Residence at issue in *Sweetland*, OA does not have any authority to make policy or supervise other units of the Executive Branch. Thus, no discovery is warranted.

This Court's decision in *EPIC* does not compel a different result. At issue in *EPIC* was the agency status of the then Office of Homeland Security ("OHS"). This Court determined that the record before it did not foreclose the possibility that OHS exercised independent authority because "the language establishing the entity's power is broad and lacking in firm parameters." *EPIC Memo. Op.* at 12. Specifically, this Court quoted OHS's charter document, Executive Order, 13228, § 2, 66 Fed. Reg. 51812 (Oct. 8, 2001), which provided that OHS's "mission" was

---

[5](...continued)
agency subject to the FOIA") (emphasis added); *accord EPIC*, Memo. Op. at 7 (quoting *Armstrong*). It follows, then, that in situations where the EOP entity does not "supervise others in the executive branch," there is no need to apply the *Meyer* three-factor test, nor is it necessary for there to be factual development regarding those three *Meyer* factors before the Court can rule on the agency question. *Sweetland*, decided after *Meyer*, is such an example.

14

to "develop and coordinate the implementation of a comprehensive national strategy to secure the United States from terrorist threats or attacks," and directed OHS to "perform the functions necessary to carry out this mission, including the functions specified in section 3 of this order." *Id.* Moreover, as was also noted in the memorandum opinion, while the Executive Order, which also established the Homeland Security Council, stated that the Homeland Security Council "shall be responsible for advising and assisting the President with respect to all aspects of homeland security," there was no similar language in the description of the OHS. *EPIC*, 8-9 (citing Exec. Order 13228 §§ 1-3, 5). Thus, the Court reasoned that "OHS's charter document provides the Office, at least on paper, with the authority to do whatever is 'necessary' to meet its mission." *EPIC*, Memo. Op. at 10. The Court also noted, *inter alia*, that affidavits had been submitted in *Armstrong*, and some depositions had also occurred, which further delineated the NSC's presidential function. *See id.* at 11. Accordingly, the Court permitted some limited discovery on whether OHS functioned solely to advise and assist the President.

Again, however, this case involves an entity that does not purport to play a coordinating role across Executive Branch agencies like the NSC or OHS, where the need for additional facts may be relevant. To the contrary, OA is indisputably an office within the EOP that advises and assists the President on internal administrative matters, and its charter documents set forth firm parameters as to OA's functions by listing the types of administrative support services OA is to provide, leaving only room for additional administrative duties and functions as the President shall from time to time direct. There is no justification granting CREW's proposed discovery, which would amount to nothing more than a fishing expedition to determine whether OA nevertheless might be acting *ultra vires* and wielding substantial power while carrying out its

15

administrative mission.[6]

## CONCLUSION

For all the foregoing reasons, this Court should grant OA's motion for judgment on the pleadings in this action.

Dated: September 11, 2007                    Respectfully submitted,

                                             PETER D. KEISLER
                                             Assistant Attorney General

                                             JEFFREY A. TAYLOR
                                             United States Attorney

                                             JOHN R. TYLER
                                             Senior Trial Counsel

                                             _____/s/ Jean Lin_____
                                             JEAN LIN  (NY#4074530)
                                             Federal Programs Branch, Civil Division
                                             United States Department of Justice
                                             20 Massachusetts Ave., N.W.
                                             Washington, D.C.  20530
                                             Tel: (202) 514-3716
                                             Fax: (202) 616-8407

                                             Attorneys for Defendant

---

[6]  Should this Court nevertheless find that factual development of the issue of OA's functions and authority is necessary, OA respectfully requests that rather than proceeding to discovery, it be given an opportunity to submit a declaration setting forth those facts.

16

**EXHIBIT A**

Westlaw.

**U.S.C.A. REORG. PLAN 1 1977**

United States Code Annotated Currentness
   Title 5. Government Organization and Employees (Refs & Annos)
     Appendix 1. Reorganization Plans   [FN1]

→ **REORGANIZATION PLAN NO. 1 OF 1977**

<42 F.R. 56101, 91 Stat. 1633, as amended Pub.L. 97-195, § 1(c)(5),
June 16, 1982, 96 Stat. 115>

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, July 15, 1977, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code. [FN1]

### EXECUTIVE OFFICE OF THE PRESIDENT

**Section 1. Redesignation of Domestic Council Staff**

The Domestic Council staff is hereby designated the Domestic Policy Staff and shall consist of such staff personnel as are determined by the President to be necessary to assure that the needs of the President for prompt and comprehensive advice are met with respect to matters of economic and domestic policy. The staff shall continue to be headed by an Executive Director who shall be an Assistant to the President, designated by the President, as provided in Section 203 of Reorganization Plan No. 2 of 1970. The Executive Director shall perform such functions as the President may from time to time direct.

**Section 2. Establishment of an Office of Administration**

There is hereby established in the Executive Office of the President the Office of Administration which shall be headed by the President. There shall be a Director of the Office of Administration. The Director shall be appointed by the President and shall serve as chief administrative officer of the Office of Administration. The President is authorized to fix the compensation and duties of the Director.

The Office of Administration shall provide components of the Executive Office of the President with such administrative services as the President shall from time to time direct.

**Section 3. Abolition of components**

The following components of the Executive Office of the President are hereby abolished:

   **A.** The Domestic Council;

   **B.** The Office of Drug Abuse Policy;

   **C.** The Office of Telecommunications Policy; and

   **D.** The Economic Opportunity Council.

**Section 4. Appointment of the Assistant Secretary of Commerce for Communications and Information**

There shall be in the Department of Commerce an Assistant Secretary for Communications and Information who shall be appointed by the President, by and with the advice and consent of the Senate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

### Section 5. Transfers of functions

The following functions shall be transferred:

**A.** All functions vested in the Director of the Office of Science and Technology Policy and in the Office of Science and Technology Policy pursuant to sections 205(a)(2), 206 and 209 of the National Science and Technology Policy, Organization, and Priorities Act of 1976 (Public Law 94-282; 90 Stat. 459) [sections 6614(a)(2), 6615 and 6618 of Title 42, The Public Health and Welfare], are hereby transferred to the Director of the National Science Foundation. The Intergovernmental Science, Engineering, and Technology Advisory Panel, the President's Committee on Science and Technology, and the Federal Coordinating Council for Science, Engineering and Technology, established in accordance with the provisions of Titles II, III, IV of the National Science and Technology Policy, Organization, and Priorities Act of 1976 [sections 6611 et seq., 6631 et seq., and 6651 et seq. of Title 42], are hereby abolished, and their functions transferred to the President.

**B.** Those functions of the Office of Telecommunications Policy and of its Director relating to:

**(1)** the preparation of Presidential telecommunications policy options including, but not limited to those related to the procurement and management of Federal telecommunications systems, national security, and emergency matters; and

**(2)** disposition of appeals from assignments of radio frequencies to stations of the United States Government;

are hereby transferred to the President who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable. All other functions of the Office of Telecommunications Policy and of its Director are hereby transferred to the Secretary of Commerce who shall provide for the performance of such functions.

**C.** The functions of the Office of Drug Abuse Policy and its Director are hereby transferred to the President, who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable.

**D.** The functions of the Domestic Council are hereby transferred to the President, who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable.

**E.** Those functions of the Council on Environmental Quality and the Office of Environmental Quality relating to the evaluation provided for by Section 11 of the Federal Nonnuclear Energy Research and Development Act of 1974 (Public Law 93-577, 88 Stat. 1878) [section 5910 of Title 42], are hereby transferred to the Administrator of the Environmental Protection Agency.

**F.** Those functions of the Office of Management and Budget and its Director relating to the Committee Management Secretariat (Public Law 92-463, 86 Stat. 770, as amended by Public Law 94-409, 90 Stat. 1247) [see section 7 of the Federal Advisory Committee Act, Pub.L. 92-463, Oct. 6, 1972, 86 Stat. 770, set out in Appendix 2 of this title] are hereby transferred to the Administrator of General Services.

**G.** The functions of the Economic Opportunity Council are hereby transferred to the President, who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

**Section 6. Incidental transfers**

So much of the personnel, property, records, and unexpended balances of appropriations, allocations and other funds employed, used, held, available, or to be made available in connection with the functions transferred under this Plan, as the Director of the Office of Management and Budget shall determine, shall be transferred to the appropriate department, agency, or component at such time or times as the Director of the Office of Management and Budget shall provide, except that no such unexpended balances transferred shall be used for purposes other than those for which the appropriation was originally made. The Director of the Office of Management and Budget shall provide for terminating the affairs of all agencies abolished herein and for such further measures and dispositions as such Director deems necessary to effectuate the purposes of this Reorganization Plan.

**Section 7. Effective date**

This Reorganization Plan shall become effective at such time or times on or before April 1, 1978, as the President shall specify, but not sooner than the earliest time allowable under Section 906 of Title 5 of the United States Code.

[For Executive Orders setting effective dates of various provisions of Reorg. Plan No. 1 of 1977 pursuant to section 7 thereof, and further implementing such Reorg. Plan, see notes set out preceding section 101 of Title 3, The President.]

[FN1] As amended Sept. 15, 1977.

MESSAGE OF THE PRESIDENT

To the Congress of the United States:

I herewith transmit my plan for the Reorganization of the Executive Office of the President (EOP), Reorganization Plan No. 1 of 1977. This plan is the first of a series I intend to submit under the reorganization authority vested in me by the Reorganization Act of 1977 (Public Law 95-17) [sections 901 to 912 of this title]. It adheres to the purposes set forth in Section 901(a) of the Act [section 901(a) of this title].

This plan in conjunction with the other steps I am taking will:

Eliminate seven of the seventeen units now within the EOP and modify the rest. There were 19 units when I took office; the President's Foreign Intelligence Advisory Board and the Economic Policy Board have already been abolished. Thus with this plan I will have eliminated nine of 19 EOP units.

Reduce EOP staffing by about 250 which includes the White House staff reduction of 134 or 28 percent which I have already ordered.

Improve efficiency by centralizing administrative functions; and

Improve the process by which information is provided for Presidential decisionmaking.

These recommendations arise from a careful, systematic study of the EOP. They are based on the premise that the EOP exists to serve the President and should be structured to meet his needs. They will reduce waste and cost while improving the service the President, and the nation, receive from the EOP.

The EOP now consists of the immediate White House Office, the Vice President's Office, the Office of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

Management and Budget, and fourteen other agencies. The EOP has a budget authority of about $80,000,000 and 1,712 full time employees.

The White House Office concentrates on close personal support including policy and political advice and administrative and operational services. The Office of the Vice President provides similar support to him. OMB's primary mission is to develop and implement the budget; it also carries out a number of management and reorganization activities.

Three EOP units have responsibility for policy development:

　　National Security Council.

　　Domestic Council.

　　Council on International Economic Policy.

The other 11 are more specialized offices that offer analysis and advice, help develop policy in certain areas, or carry out special projects. These are:

　　Council of Economic Advisers.

　　Council on Wage and Price Stability.

　　Office of the Special Representative for Trade Negotiations.

　　Council on Environmental Quality.

　　Office of Science and Technology Policy.

　　Office of Drug Abuse Policy.

　　Office of Telecommunications Policy.

　　Intelligence Oversight Board.

　　Federal Property Council.

　　Energy Resources Council.

　　Economic Opportunity Council.

To make the EOP more effective, four steps are necessary:

　　**I.** Strengthen management of policy issues.

　　**II.** Limit the EOP, wherever possible, to functions directly related to the President's work.

　　**III.** Centralize administrative services.

　　**IV.** Reduce size of White House and EOP staffs.

I. STRENGTHEN PROCESS MANAGEMENT OF POLICY ISSUES

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C.A. REORG. PLAN 1 1977

Perhaps the most important function of the President's staff is to make sure he has the wide variety of views and facts he needs to make decisions. By building a more orderly system for collecting information and advice, the President can make sure that he will hear all the views he should--and hear them in time. To better insure that this happens, I am taking the following actions to:

Institute for domestic and economic issues, a system similar to the Presidential Review Memorandum process currently used for National Security issues.

Create a committee of Presidential advisers, chaired by the Vice President, to set priorities among issues and oversee their staffing.

Assure that Presidential decision memoranda on policy issues are coordinated with Cabinet and EOP advisers most involved with the issue.

Consolidate under the Staff Secretary the two current White House paper circulation systems.

Appoint a group of advisers to review the decisionmaking process periodically.

Give the Assistant to the President for Domestic Affairs and Policy clear responsibility for managing the way in which domestic and most economic policy issues are prepared for Presidential decision.

Assign follow-up responsibility for Presidential decisions as follows: immediate follow-up will be handled by the NSC or Domestic Policy Staff most directly involved in the issue; long term follow-up on selected issues will be handled by the Assistant to the President for Intergovernmental Relations.

These actions recognize that the White House and Executive Office staff must use their proximity to the President to insure that the full resources of the government and the public are brought to bear on Presidential decisions in a timely fashion. It is my purpose in instituting these changes to strengthen Cabinet participation in Presidential decisions.

## II. RATIONALIZE EOP STRUCTURE BY LIMITING EOP, WHEREVER POSSIBLE, TO FUNCTIONS WHICH BEAR A CLOSE RELATIONSHIP TO THE WORK OF THE PRESIDENT

As the President's principal staff institution, there are several major things the EOP must do:

Provide day-to-day operational support (e.g. scheduling, appointments) and help the President communicate with the public, the Congress, and the press.

Manage the budget and coordinate Administration positions on matters before the Congress.

Manage the Presidential decisionmaking processes efficiently and fairly, and bring the President the widest possible range of opinions.

Help the President: plan and set priorities; monitor and evaluate progress toward achieving the President's objectives; understand and resolve major conflicts among line subordinates; manage crises, especially in national security matters.

In order to restructure the EOP around these basic functions, the functions of seven units should be discontinued or transferred, and ten units, including the White House Office, should be retained but modified.

Seven units should be discontinued or their functions transferred. These are:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C.A. REORG. PLAN 1 1977

**1.** Office of Drug Abuse Policy.

**2.** Office of Telecommunications Policy.

**3.** Council on International Economic Policy.

**4.** Federal Property Council.

**5.** Energy Resources Council.

**6.** Economic Opportunity Council.

**7.** Domestic Council.

The functions of the Office of Drug Abuse Policy (ODAP) can be performed by a smaller staff reporting to a Presidential adviser in the EOP. The Office itself will be discontinued.

Much of the work done by the Office of Telecommunications Policy (OTP) can be more effectively performed outside the EOP. It is important that the EOP have the capacity to resolve differences and that the President have immediate advice on telecommunications and information policy, especially on national security, emergency preparedness and privacy issues. This only requires a small staff within EOP. The Office of Management and Budget would take responsibility for Federal telecommunications procurement and management policy and arbitration of interagency disputes about frequency allocation. All other functions except developing Presidential policy options would be transferred to a new office within the Department of Commerce, headed by a new Assistant Secretary for Communications and Information, who will perform many of the functions previously performed by the head of the OTP.

I propose that the Economic Opportunity Council be discontinued; it is dormant and its only active function (preparation of the Catalogue of Federal Domestic Assistance) is being performed by OMB. Three other units are also inactive and should be discontinued: Council on International Economic Policy, the Federal Property Council, and the Energy Resources Council.

The Domestic Council should be abolished. It has rarely functioned as a Council, because it is too large and its membership too diverse to make decisions efficiently. Its functions have been performed entirely by its staff. This Domestic Policy Staff should report to the Assistant to the President for Domestic Affairs and Policy. Under the policy process system described earlier, they should manage the process which coordinates the making of domestic and most economic policy. They should work closely with the Cabinet departments and agencies to insure that the views of the Cabinet and agency heads are brought to the President before decisions are made.

The ten EOP units which will continue with some modification are:

**1.** White House Office.

**2.** Office of the Vice President.

**3.** Office of Management and Budget.

**4.** Council on Environmental Quality.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

**5.** Council of Economic Advisers.

**6.** Office of Science and Technology Policy.

**7.** Office of the Special Representative for Trade Negotiations.

**8.** National Security Council.

**9.** Intelligence Oversight Board.

**10.** Council on Wage and Price Stability.

The operations of the Office of the Vice President reflect the combination of constitutional, statutory, and Presidentially assigned duties that make it unique among EOP units. Because his interests and assignments cover the same range as the President's, the Vice President requires a staff with expertise in diverse areas. Its basic functions should not be changed. However, I propose that certain support functions--involving accounting, personnel services, and supply--be transferred to a centralized EOP Administrative Unit.

The Office of Management and Budget would remain as a separate entity in the EOP, but some functional changes should be made. Four functions should be transferred from OMB to other parts of the government:

Administration to the new EOP Central Administrative Unit;

Executive Department/Labor Relations (except for Pay Agent, Executive Level Pools, and Legislative Analysis) to the Civil Service Commission;

Advisory Committee Management Secretariat to the General Services Administration;

Statistical Policy (except Forms Clearance) to the Department of Commerce.

I have asked the OMB to reorganize its management arm to emphasize major Presidential initiatives, such as reorganization, program evaluation, paperwork reduction, and regulatory reform.

The Council on Environmental Quality (CEQ) should remain in the EOP as an environmental adviser to the President. The CEQ's major purpose is to provide an independent assessment of our policies for improving the environment. Toward this end, it will analyze long term trends and conditions in the environment. It will advise OMB on the reorganization of natural resources functions within the Federal government. The Council will retain the functions it now has under NEPA and Executive Order No. 11514 with the exception of routine review of the adequacy of impact statements and the administrative aspects of their receipt and handling. The EPA will take over CEQ's evaluation responsibility under the Federal Nonnuclear Energy Research Development Act of 1974 [section 5901 et seq. of Title 42, The Public Health and Welfare]. The CEQ will continue to review and publish the Annual Report on Environmental Quality.

The strength of the Council of Economic Advisers (CEA) lies in its economic analysis of current policy choices. It also presents objective economic data, makes macroeconomic forecasts, and analyzes economic trends and their impact on the national economy. It will continue with a small reduction in staff.

The Office of Science and Technology Policy (OSTP) should retain those science, engineering, and technology functions which can be so useful in helping the President and his advisers make decisions about policy and budget issues. Instead of the Intergovernmental Science, Engineering, and Technology Advisory Panels, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

President should rely on an intergovernmental relations working group, chaired by the Science Adviser. The Federal Coordinating Council on Science and Technology should operate as a sub-Cabinet working group chaired by the Science Adviser. The reorganization work of the President's Committee on Science and Technology would be part of the overall reorganization effort. The responsibility for preparing certain reports should be transferred to the National Science Foundation.

The proposal places manageable limits on OSTP's broad mandate while emphasizing functions that support the President.

The Office of the Special Representative for Trade Negotiations (STR) is now operating effectively and will be retained essentially as is. With the difficult negotiations now underway in Geneva, the benefits of transferring the STR to another agency are outweighed by the potential reduction in its effectiveness as an international negotiator.

The National Security Council (NSC) will be retained in its present form and its staff slightly reduced.

Intelligence Oversight Board (IOB) should be retained to insure that abuses of the past are not repeated and to emphasize Presidential concerns regarding intelligence issues.

The Council of Wage and Price Stability (COWPS) is a necessary weapon in the continuing fight against inflation and will be retained. To be sure that its work is closely coordinated with the economic analyses performed by the Council of Economic Advisers (CEA), COWPS should be directed by the Chairman of CEA.

### III. CENTRALIZE ADMINISTRATIVE FUNCTIONS

About 380 (22 percent) of the full-time, permanent EOP personnel perform administrative support services in EOP units. Most EOP units besides the White House and OMB are too small to provide a full complement of administrative services. They depend on the White House, OMB, GSA, other federal departments, or several of these sources for many of these services. This approach is inefficient; the quality is uneven and the coordination poor. Some services are duplicated, others inconsistently distributed (excess capacity in some units and deficiencies in others), and most too costly.

I propose to combine administrative support operations into a Central Administrative Unit in EOP to provide support in administrative services common to all EOP entities. It should be a separate EOP entity because of the need to assure equal access by all other units.

This consolidation will result in:

Saving of roughly 40 positions and about $1.1 million improved and more innovative services.

A focus for monitoring the efficiency and responsibility of administrative services.

A base for an effective EOP budget/planning system through which the President can manage an integrated EOP rather than a collection of disparate units.

The EOP has never before been organized as a single, unified entity serving the President. It is only by viewing it as a whole that we can improve efficiency through steps like the Central Administrative Unit.

### IV. REDUCE THE SIZE OF WHITE HOUSE AND EOP STAFFS

I am reducing the White House staff by 28 percent, from the 485 I inherited from my predecessor to 351. This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

involves cuts in my policy and administrative staffs as well as transfers to the Central Administrative Unit.

I estimate that this plan and the other steps I am taking will reduce staff levels in the EOP by about 250, from 1,712 full-time permanent positions to about 1,460 and will save the taxpayers at least $6 million.

As in the rest of the government, I will be reluctant to add staff unless necessary to help me do my job better.

I ask that you support me in improving the operations of the Executive Office of the President by approving the attached reorganization plan.

In summary this plan would:

    Abolish the Domestic Council and establish a Domestic Policy Staff.

    Establish within the EOP a Central Administrative Unit.

    Transfer certain functions of the Council on Environmental Quality to the President for redelegation.

    Abolish the Office of Drug Abuse Policy and vest functions in the President for redelegation.

    Abolish the Office of Telecommunications Policy and transfer functions to the Department of Commerce and to the President for redelegation.

    Create an Assistant Secretary of Commerce for Communications and Information.

    Vest some Office of Science and Technology Policy functions in the President for redelegation.

    Abolish the Economic Opportunity Council and vest those functions in the President for redelegation.

    Transfer the Committee Management Secretariat function of the Office of Management and Budget to the President for redelegation.

    Make other incidental transfers attendant to those mentioned above.

Each of the changes set forth in the plan accompanying this message is necessary to accomplish one or more of the purposes set forth in Section 901(a) of Title 5 of the United States Code. I have taken care to determine that all functions abolished by the plan are done so only under statutory authority provided by Section 903(b) of Title 5 of the United States Code. The provisions in the plan for the appointment and pay of any head or officer of any agency have been found by me to be necessary.

As we continue our studies of other parts of the Executive Branch, we will find more ways to improve services in the EOP and elsewhere. This plan is only a beginning, but I am confident that it represents a major step toward a more efficient government that will serve the needs of the people and the President well.

JIMMY CARTER.

THE WHITE HOUSE, July 15, 1977.

    [FN1] Number and order of Appendixes editorially supplied.

**U.S.C.A. REORG. PLAN 1 1977,** 5 USCA APP. 1 REORG. PLAN 1 1977

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

Current through P.L. 110-80 approved 08-13-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.