**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZEN FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No: 1:07-CV-00964 (CKK) |
| OFFICE OF ADMINISTRATION, | ) ) ) |
| Defendant. | ) ) ) |

**PLAINTIFF'S MOTION FOR IMMEDIATE STATUS CONFERENCE
AND SUPPORTING MEMORANDUM**

CREW[1] hereby requests that this Court hold a status conference in the above-captioned

matter as soon as possible to address the impact on this case of recent developments in related

litigation as well as the renewed urgency of CREW's Freedom of Information Act ("FOIA")

requests.  As grounds for this motion, CREW states as follows.

**1.  Procedural Background of This Case.**

This case concerns a FOIA request that CREW submitted to the Office of Administration

("OA") on April 16, 2007, seeking documents OA had assembled and prepared related to the

White House's loss of many millions of email records,  see Exhibit A to Complaint, as well as a

second clarifying request of April 18, 2007, delineating four categories of records CREW is

seeking.  Exhibit B to Complaint.  Both requests relate to the loss of email and proposals OA

developed -- but never implemented -- to restore the deleted email and implement a new

electronic record-keeping system that would ensure proper preservation of records.  Id.

---

[1] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in Washington.

In both requests CREW sought expedition for the express purpose of disseminating any responsive documents to the public based on the widespread and exceptional media interest in the White House emails, the revelations about the use by high-ranking Executive Office of the President ("EOP") officials of outside email accounts and the fact that the White House has known since the fall of 2005 that many millions of emails are missing from its records management system. Exhibits A and B to Complaint. By letter dated April 27, 2007, OA acknowledged receipt of CREW's two FOIA requests and granted CREW's request for expedited processing. See Exhibit C to Complaint. OA failed, however, to provide CREW with an anticipated date for completing processing. Id.

Accordingly, CREW filed the complaint in this matter on May 23, 2007, along with a motion for a preliminary injunction. CREW's motion was based on its "compelling need" for the requested documents, a need OA conceded when it granted expedition. See 5 U.S.C. § 552(a)(6)(E). As CREW explained in its accompanying memorandum of law, "[t]he very essence of the right plaintiff seeks to vindicate through this action -- expedited processing -- depends upon the agency's timeliness." Memorandum of Points and Authorities in Support of Plaintiff's Motion for a Preliminary Injunction (Document 3-2) at 13. "The essence of plaintiff's statutory entitlement to expedition will be lost '[u]nless the requests are processed without delay.'" Id. at 14, *citing* Electronic Privacy Info. Ctr. v. U.S. Dep't of Justice, 416 F.Supp.2d 30, 41 (D.D.C. 2006).

In lieu of deciding CREW's motion for a preliminary injunction on the merits the parties, at the direction and with the assistance of the Court, negotiated a time-table for OA to process CREW's requests. See Order of June 4, 2007, as modified by Order of June 7, 2007. The

Court's June 4 Order was based on a prioritized list of documents CREW provided.  This includes, *inter alia*, "histograms" that provide a "day-to-day detailed numeric count of the archived e-mails"and the approximately "14-18 different versions" of "spreadsheets summarizing the data by EOP component" as well as "the workbook or workbooks containing this documentation and assessment of the missing email [which] include color-coded spreadsheets."  Order of June 4 at pp. 1-2.

This Order was the result of court-supervised discussions that included OA's then-Deputy General Counsel Keith Roberts.  During a conference call on June 1, 2007, Mr. Roberts discussed the "30,000 plus e-mails" that OA had already culled out as potentially responsive to CREW's request.  See Transcript of Conference Call Before the Honorable Colleen Kollar-Kotelly, June 1, 2007 at pp. 6-8 (attached as Exhibit 1).  Mr. Roberts explained that with respect to the missing email, "all of the discussion and the analysis and everything was pretty much done electronically," but to the extent there were paper documents, "for example, the histogram . . . we can simply print them out or we have copies of them."  Id. at 16.

Under the Court-ordered time-table, OA was to make its first response on June 21, 2007, and a second by August 24, 2007.  Id.  Based on the lack of meaningful information in OA's first response, CREW requested that the Court modify its orders (Document 12) to require OA to provide additional information, including a description of the withheld documents and an identification of the exemption claimed for each withheld document.  OA opposed CREW's motion.

Thereafter, in a court-ordered Joint Proposed Schedule (Document 17) filed on July 27, 2007, OA represented that it would move to dismiss this action on the ground that OA is not an

agency subject to the FOIA, proposed a briefing schedule that would have the issues briefed by September 21, 2007, and requested that its processing obligations be held in abeyance after August 24, 2007, until that motion is resolved.  Joint Proposed Schedule at ¶ 6.  CREW, for its part, objected to defendant's efforts to delay satisfying its obligations under the FOIA and proposed a shorter briefing schedule that would better accommodate the emergency nature of CREW's FOIA requests.  Id. at ¶¶ 9, 10.

In response, the Court issued an Order on August 7, 2007 (Document 18), directing OA to file its brief by August 21, 2007, with CREW's opposition due September 4, 2007, and OA's reply due September 11, 2007.  The Court held in abeyance CREW's motion to modify pending resolution of OA's motion to dismiss.

Briefing was completed on defendant's motion for judgment on the pleadings on September 11, 2007.  Prior to that date, on August 24, 2007, OA sent its second response to CREW's FOIA requests, consisting of a one-page letter stating that OA had located "approximately 3,470 pages that may be responsive," including "spreadsheets and related documents."  Exhibit 5 to Plaintiff's Opposition to Defendant's Motion for Judgment on the Pleadings (Document 23).  OA claimed that all 3,470 pages are exempt in their entirety pursuant to FOIA exemptions 5 and 6.  Id.

**2.  Developments in Related Litigation.**

This lawsuit does not exist in a vacuum; CREW and the National Security Archive have also filed  lawsuits against the EOP, OA and the archivist based on (1) the failure of the White House to restore the millions of missing emails subject to the Federal Records Act ("FRA"); (2) the failure of the White House to have adequate policies and procedures for preserving federal

records on an ongoing basis; and (3) the failure of the defendants to use the administrative and statutory scheme Congress imposed, which requires them to request that the attorney general initiate action to restore the missing federal records.  See CREW v. EOP, et al., Civil No. 07-1707 (HHK/JMF).

On October 19, 2007, in response to CREW's motion for a temporary restraining order, Magistrate Judge John Facciola issued a Report and Recommendation in CREW v. EOP (attached as Exhibit 2) recommending that the Court issue the requested relief to prevent the destruction of back-up copies of the deleted emails.  In so ruling, Judge Facciola rejected the government's proffer of a declaration in lieu of a court order, noting "[u]nlike a court order, a declaration is not punishable by contempt."  In addition, Judge Facciola found that "there is a public interest" in the preservation of the backup copies "since the e-mails at issue may have historical and public importance."  Id. at 3.  Finally, in concluding that CREW has a likelihood of success on the merits, Judge Facciola noted the pendency of the issue in this case on the status of OA as an agency under the FOIA and stated:  "I certainly cannot say that CREW has no likelihood of prevailing on that issue."  Id. at 4.

On November 12, 2007, Judge Henry Kennedy entered an order in CREW v. EOP pursuant to this Report and Recommendation that required the defendants to "preserve media, no matter how described, presently in their possess[ion] or under their custody or control, that were created with the intention of preserving data in the event of its inadvertent destruction." (Attached as Exhibit 3).

Subsequently, both CREW and the National Security Archive requested leave to conduct expedited discovery.  As grounds for its request, CREW explained that expedited discovery is

necessary and appropriate to ensure the greatest possible preservation of the important, historical records of the Bush presidency.  See Memorandum in Support of Plaintiff's Motion for Leave to Conduct Expedited Discovery and Motion to Compel Rule 26(f) Conference ("P's Discovery Mem.") (attached as Exhibit 4) at pp. 5-11.  Moreover, the requested information "is also very time-sensitive" giving the upcoming transition to a new president.  Id. at 7-8.  See also Bush v. Armstrong, 807 F.Supp. 816, 820 (D.D.C. 1992) ("[I]f records are erased at the end of the Bush administration, the public's right to access the subject records will be irreparably lost and harmed.").  Included within the discovery CREW seeks is the documentation the OA assembled when it first discovered the missing email problem in October 2005, P's Discovery Mem. at 9, documentation that CREW also requested in the two FOIA requests at issue here.

While the Court in CREW v. EOP has yet to rule on these discovery requests, Magistrate Judge Facciola issued an order on January 8, 2008 (attached as Exhibit 5) that required the defendants in that case to answer four questions concerning the back-up copies of the missing emails.  In so ruling, Judge Facciola noted that while there is no reason to expedite discovery "[t]o the extent that the missing emails are contained on the back-ups preserved pursuant to Judge Kennedy's order," if they are not contained in those back-up copies any corresponding relief  will be "time-sensitive:  emails that might now be retrievable from email account folders or 'slack space' on individual workstations are increasingly likely to be deleted or overwritten with the passage of time."  Order at 3.

On January 15, 2008, pursuant to this order, the defendants in CREW v. EOP filed a Notice of Filing that included the declaration of Theresa Payton, OA's chief information officer ("Payton Decl.") (attached as Exhibit 6).  Among other things, Ms. Payton states that the

"detailed analysis" of the missing emails that OA created consists of "a chart created by a former

employee within the OCIO [Office of the Chief Information Officer] that purports to identify

certain dates and EOP components for which the chart's creator appears to have concluded that

certain EOP components were missing emails on certain dates in the 2003-2005 time period."

Payton Decl. at ¶ 10.  With the exception of this chart, Ms. Payton claimed there was an

"apparent lack of supporting documentation . . ." Id. at ¶ 11.

**3.  Congressional Developments.**

Outside of litigation, several additional documents recently have come to light that bear

on the issues before this Court.  On behalf of the House Committee on Oversight and

Government Reform, Chairman Henry A. Waxman sent letters to Fred F. Fielding, counsel to the

president, and Archivist Allen Weinstein on December 20, 2007, requesting that each provide

the committee with information and documents related to the upcoming presidential transition

(letters attached as Exhibit 7).  In each letter, Chairman Waxman noted as follows:

> According to information received by the Committee, the White
> House has not implemented a robust system for archiving e-mails
> and other electronic records despite several efforts to do so.  In
> addition, in briefings with White House officials, Committee
> staff have been informed that during a 2005 review of White
> House servers, the White House found numerous days with few or
> no e-mails for certain White House components.  Nevertheless,
> even today, *more than two years after this problem was first*
> *discovered by White House staff, the White House still has not*
> *identified the cause of the problem, determined the volume of*
> *e-mails lost, or developed a plan for restoring those e-mails that*
> *were lost.*

(emphasis added).

On January 17, 2008, Chairman Waxman sent another letter to Mr. Fielding (attached as

Exhibit 8) that was prompted by White House Deputy Press Secretary Tony Fratto's statement

that 'we have absolutely no reason to believe that any e-mails are missing." <u>Id.</u> at p. 1.  Mr. Waxman explained that this statement "is contrary to information that the White House provided to the Committee staff in a briefing on September 19, 2007." <u>Id.</u>  Specifically, committee staff were shown a chart that detailed the White House components that had no archived email and the precise dates for which the email was missing, information that Chairman Waxman laid out in his letter to Mr. Fielding.  <u>Id.</u>

### 4.  Why A Status Conference Is Necessary Here.

CREW's FOIA requests at issue here were based on the fact that after OA discovered the problem of the missing emails, the agency "conducted a detailed analysis of the problem," Complaint at ¶ 19, and "prepared multiple estimates of the volume of missing email, which ranged from a low of roughly five million missing email to much higher numbers." <u>Id.</u> at ¶ 20. In addition, OA prepared "a detailed accounting of both actual email messages retained and those email messages missing from EOP's records management system, including the dates for which the email are missing." <u>Id.</u> at ¶ 22.  Further, then White House Counsel Harriet Miers "was provided a detailed briefing of the missing email problem and a plan of action to recover the missing email." <u>Id.</u> at ¶ 21.[2]

Moreover, as outlined above, the parties here -- with the direct participation of then OA Deputy General Counsel Keith Roberts -- discussed the particulars of this documentation in order to reach an agreed time-table for processing CREW's request.  That discussion included OA's explicit acknowledgment that there were thousands of potentially responsive documents, including histograms and the like.  Indeed, in its August 24, 2007 response to CREW, OA stated

---

[2] Defendant has never disputed these facts here.

it had located "approximately 3,470 pages that may be responsive," including "spreadsheets and related documents."

This wealth of documentation for the missing email problem simply cannot be reconciled with the public statements of White House spokesperson Tony Fratto that the White House has "absolutely no reason to believe that any e-mails are missing" as well as Theresa Payton's declaration in which she suggests the existence of only a lone chart. Accordingly, either the White House has not been truthful with the American public or the White House no longer has records that document the volume of lost emails and the recovery plan that OA developed. The possibility that the White House destroyed records that are directly responsive to CREW's FOIA requests raises serious questions for this case as well as <u>CREW v. EOP</u>, where CREW is challenging the EOP's failure to comply with its record-keeping obligations under the FRA, obligations that include the requirement that the White House preserve the documentation OA developed in response to its discovery of the missing emails.

Time clearly is of the essence. In just 12 months the transition from the Bush presidency to the next presidency will be completed, including a transfer of records to the National Archives and Records Administration ("NARA"). Given this time-table and the significant volume of missing records, it is imperative that all steps be taken to ensure the restoration and preservation of valuable historical documents that belong to the American public.

Notwithstanding this imperative, the White House has refused to confirm even the most basic information about the missing emails. Just as troubling, it is attempting to avoid the statutory directive OA is under to produce to the public all non-exempt documents, including documents that would shed light on the volume of missing email and how it can be recovered, by

raising the newly minted argument that the OA is not an agency. Moreover, its actions here and in related litigation make clear that the White House is trying to run out the clock, secure in the knowledge that once the transition occurs it will avoid all accountability for its unlawful actions.

As explained above, in related litigation both Judge Facciola and Judge Kennedy have recognized the urgency of the situation; this Court should do likewise. Without a prompt resolution of the pending legal issue, CREW will be denied a meaningful opportunity to obtain the relief to which it is entitled under the FOIA, expedited processing of its request, and will continue to suffer the very kind of irreparable harm that it sought to protect against through its motion for a preliminary injunction. And the harm to the American public cannot be overstated; at risk is the very real possibility that a huge volume of significant historical evidence of this presidency will not be preserved. Absent effective intervention, there is nothing to stop the White House from destroying publicly owned documents, or at least passively permitting them to be destroyed.

This is not mere hyperbole. The Bush administration has demonstrated repeatedly its commitment to secrecy notwithstanding countervailing statutory directives. For example, in CREW v. Dep't of Homeland Security, Civil No. 06-1912 (RCL), the White House attempted to claim as its own Secret Service records of White House visitors and thereby prevent the public from access to these records under the FOIA. In ruling that the White House visitor records are agency records subject to the FOIA, Judge Royce Lamberth rejected, among other manufactured evidence, a memorandum of understanding between the White House and the Secret Service that purported to memorialize a longstanding agreement that the records at issue are at all times presidential records. See CREW v. U.S. Dep't of Homeland Security, 2007 U.S. Dist. LEXIS

10

91927, *14-16 (D.D.C. Dec. 17, 2007). Judge Lamberth properly treated this agreement with "skepticism," given that it "was executed <u>after</u> the Secret Service created many of the records and <u>after</u> the Secret Service was sued for the records." <u>Id.</u> at *44 n.22 (emphasis in original). His opinion -- which is now on appeal -- deals a blow to the White House's efforts to maintain the secrecy of everything that happens at the White House by officials doing the business of the people. Moreover, the fact that many millions of emails are missing, that the White House has known about the situation for years but has done nothing and that to date the White House has failed to implement an effective electronic records management system, speaks volumes about the lengths to which this administration will go to prevent public disclosure of its actions.

    In short, the instant litigation is another effort by the White House to maintain secrecy for its actions and run out the clock, here by claiming that OA is not an agency and that, accordingly, documentation regarding the millions of deleted emails is beyond the reach of the public. This Court should follow Judge Lamberth's lead and rule promptly on the pending motion for judgment on the pleadings.

<u>**CONCLUSION**</u>

    Accordingly, CREW respectfully requests that this motion be granted and the Court schedule a status conference at the earliest possible date to discuss these developments and ensure protection for CREW's statutory rights at issue.

11

Pursuant to LCvR 7(m) undersigned counsel contacted Jean Lin, counsel for defendant, who stated that defendant opposes this motion.

Respectfully submitted,

_____/s/_____

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C. 20005
Phone: (202 408-5565
Fax: (202) 588-5020

Dated:  January 18, 2008                    Attorneys for Plaintiff

**EXHIBIT 1**

```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3
        CITIZENS FOR RESPONSIBILITY AND
 4      ETHICS IN WASHINGTON,

 5                          Plaintiff,

 6            v

 7      OFFICE OF ADMINISTRATION,

 8                 Defendant.       Civil Action No. 1:07-cv-00964

 9                                  June 1, 2007

10                                  10:00 a.m.
        .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .
11                    TRANSCRIPT OF CONFERENCE CALL
12         BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                     UNITED STATES DISTRICT JUDGE
13

14      APPEARANCES:

15      For the Plaintiffs:       ANNE L. WEISSMAN, ESQ.
                                  1400 Eye Street, N.W.
16                                Suite 450
                                  Washington, D.C.  20005
17                                (202) 408-5565

18      For the Defendants:       JEAN LIN, ESQ.
                                  U.S. Department of Justice
19                                20 Massachusetts Avenue, N.W.
                                  Suite 7218
20                                Washington, D.C.  20530
                                  (202) 514-3716
21
        For the Defendants:       KEITH ROBERTS, ESQ.
22                                Office of Administration
                                  Executive Office of the
23                                 President
                                  1800 G Street
24                                Washington, D.C.

25
```

```
 1     Court Reporter:              JACQUELINE M. SULLIVAN, RPR
                                    Official Court Reporter
 2                                  Room 6818, U.S Courthouse
                                    Washington, D.C.  20001
 3                                  (202) 354-3187

 4     Proceedings reported by machine shorthand, transcript produced
       by computer-aided transcription.
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2
    WITNESSES:
3
    None.
4

5

6

7

8                      E X H I B I T S

9   None.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Washington, D.C.

 2                    Friday, June 1, 2007

 3                    At about 10:05 a.m.

 4                    - - -

 5          THE COURT:  Let me try this.  I'm in the courtroom

 6   with the court reporter because I just finished a matter and it

 7   seemed to be more efficient to do it this way, but if we have

 8   trouble hearing you I may just stop it and have us call from our

 9   end, but this is the Citizens For Responsibility Ethics in

10   Washington, which I'm just going to use the acronym CREW,

11   against the Office of Administration.

12          Now, I believe we have Ms. Anne Weismann for the

13   plaintiffs; is that correct?

14          MS. WEISMANN:  Yes, your Honor.

15          THE COURT:  If I can just say to the court reporter --

16   and Ms. Lin for the defendant, and do we have a program person?

17          MS. LIN:  Yes, your Honor.  Unfortunately I can barely

18   hear you.  I do have Mr. Keith Roberts with me.

19          THE COURT:  I think what we'll do is why don't we get

20   the numbers and call, because if you're having trouble hearing

21   us, your voice is fairly light as well.  If you could just give

22   us the phone numbers, Ms. Weismann, if you can give us your

23   phone number.

24          MS. WEISMANN:  202-408-5565.

25          MS. LIN:  Ours is 202-395-5152.
```

1            COURT CLERK:  Okay.  I'm going to hang up and redial.

2            MS. WEISMANN:  Thank you.

3            Hi.  This is Anne Weismann.

4            THE COURT:  Okay.  Now we can hear you.  Can you hear

5     us?

6            MS. LIN:  Jean Lin and Keith Roberts.

7            COURT CLERK:  Ms. Weismann?

8            MS. WEISMANN:  Yes.

9            THE COURT:  Okay.  Hopefully we can now hear.  For the

10    plaintiffs we have Ms. Weismann; is that correct?

11           MS. WEISMANN:  Yes, it is, your Honor.

12           THE COURT:  All right.  And for the Office of

13    Administration we have Jean Lin.  It appears we have John

14    Taylor.

15           MS. LIN:  No, Mr. Taylor is not here today, your

16    Honor.

17           THE COURT:  Okay.  And the program person then is?

18           MS. LIN:  Mr. Steve Roberts.  He is the deputy general

19    counsel at the Office of Administration.

20           THE COURT:  All right.  Mr. Roberts, if I could just

21    ask, have you had an opportunity to look at the May 29 letter

22    from CREW which set out six categories of information that they

23    were focusing on for this temporary restraining order?

24           MR. ROBERTS:  Yes, I have.

25           THE COURT:  If I can ask, we've been discussing the

1    first four categories of information, and my question initially

2    to you is which would be quicker to respond to and would provide

3    a response of -- would respond to the request that CREW has

4    made?  Going through the 30,000 plus e-mails that evidently

5    having culled out that cover the period of January 2001 to I

6    believe it's February 3rd of 2006, or to do a new, a new search

7    that would cover the more limited time period, which is what

8    CREW is interested in, which is September of 2005.  Let's start

9    with through February the 3rd of 2006 or what they wanted, which

10   was the end of February.  Which process would be the quickest

11   process and also responsive to their request?

12            MR. ROBERTS:  If we can through the documents that we

13   already have assembled we could -- it would be quicker than

14   doing a search, doing an electronic search.  However, if we

15   still have to do an electronic search for February 2006 it's not

16   going to save us much time.  In fact, it's kind of a duplication

17   of effort if we have to manually go back through what we have

18   and then wait for service to be done as well.

19            THE COURT:  Let me see if I understand.  I'm not quite

20   sure I understand whether going through what you've already

21   pulled out looking for these dates is quicker or actually doing

22   a new search.

23            MR. ROBERTS:  Well, going through what we currently

24   have would be quicker through the 3rd of February of 2006.

25            THE COURT:  Okay.  And can you explain to me why it

1    would be quicker?

2         MR. ROBERTS:  Because we've already gone through those

3    documents -- we've already gone to individuals who we believe

4    would have information relative to these requests, to this

5    request last year, and so it's the universe of those records is

6    already compiled and we just need to go back through them and

7    look for documents that CREW wants as opposed to what we looked

8    for before.

9         THE COURT:  Okay.  So I take it then that these

10   individuals you contacted have had their own databases and

11   that's what you've been looking at?

12        MR. ROBERTS:  That is correct.

13        THE COURT:  And so what you would have culled out of

14   these databases is this 30,000 plus e-mails covering the January

15   2001 up to February 3rd, is it, am I correct in that?

16        MR. ROBERTS:  That's correct.

17        THE COURT:  So at this point your view is that it

18   would be faster to use what you've got and do the search on the

19   documents you've already pulled as opposed to initiating a new

20   one, is that accurate?

21        MR. ROBERTS:  That's correct.

22        THE COURT:  And I take it if I've understood your

23   explanation is because you have to start, go back to the

24   individuals and look at their databases to do the narrower

25   search?

1          MR. ROBERTS:  If we have to do the narrower search

2     about half to two-thirds of those people are no longer here so

3     we're going to have to do an electronic search and that's where

4     we get into other ongoing searches with higher priority, the

5     priority established outside this office that it's going to take

6     a while to do.

7          THE COURT:  All right.  And as I understand it, in

8     terms of culling through or going through the 30,000 plus

9     e-mails and whatever paper documents you have, you would be able

10    to do that by June 21st?

11         MR. ROBERTS:  That's correct, ma'am.

12         THE COURT:  Now, the CREW has also requested that if

13    documents are completed in terms of the review, whether their

14    complete review is -- whether the Office of Administration would

15    release them at that point as opposed to waiting until they're

16    all collected at the end and then release them in one, you know,

17    large group, are you willing to -- and understanding that you

18    would be able to do whatever review you need to do to figure out

19    that this is a document that has been completely considered and

20    is ready to be released, but are you willing to do that on a

21    rolling basis under those circumstance?

22         MR. ROBERTS:  Your Honor, our preference is to do the

23    June 21st, the reason being that we're a small office and it's

24    just more efficient use of we have one employee officer and then

25    I review them from a practical standpoint.  It's just more

1    efficient for us to review the whole universe of the records

2    than to review them at one time that we could have done by June

3    21st.

4          THE COURT:  All right.  Then let me ask the next

5    question.  In terms of the, they have requested, CREW have

6    requested that it be done through the end of February of 2006.

7    To add that additional, from February 3rd to the 28th.  What is

8    involved in that?

9          MR. ROBERTS:  We have to do, the Office of

10   Administration, our mission is to provide a common

11   administration throughout the deputy office of the president

12   complex so part of that involves we own all the information

13   technology system and we do -- we maintain all electronic

14   databases, all the e-mails, and we also do all the searches from

15   the complex.  The priority for those searches we do not

16   establish and there are ongoing searches, I'm not sure you read

17   the numbers, and lots of the things that are going on relative

18   to people that we serve, offices that we serve, and right now

19   because of priority has been established we would not be able to

20   complete a new search until around the 24th of August to do that

21   four-month period.

22         THE COURT:  All right.  In terms of looking, I take it

23   you're familiar with, relatively familiar with the 30,000

24   e-mails in the sense of what it is that's being collected from

25   the databases; is that correct?

1          MR. ROBERTS:  Yes, ma'am.

2          THE COURT:  In terms of the four categories that have

3    been looked at did you think that there is material that after

4    February 3rd, 2006, in other words, why did you stop?  Maybe I'm

5    asking two questions, but let me ask the first one.  In terms of

6    through from the 3rd to the end of February do you know whether

7    there would be likely to be anything responsive to these four

8    categories, or can you answer that?

9          MR. ROBERTS:  I can, and I do not believe there would

10   be.  Based upon what CREW's asking for the universe of those

11   records existed in early February of last year.  Anything after

12   that would have been, for example, they're asking about

13   histograms and stuff, I mean, they were already, they were

14   already done by that point.  I personally don't think that

15   search and taking an effort through the 24th of August is going

16   to produce anything more responsive.

17         THE COURT:  Was there a particular reason why the

18   search that was done for the 30,000 plus from January 2001, you

19   stopped it February 3rd of 2006, was that cutoff date

20   significant in some way?

21         MR. ROBERTS:  We had some other requests for

22   information and that was the date of the request, which is what

23   we use for the cutoff date.

24         THE COURT:  And is the request generally in the same

25   type of request that CREW is making in terms of what you would

1    have looked at?

2         MR. ROBERTS:  Yes, ma'am.

3         THE COURT:  Okay.  Ms. Weismann, is there anything

4    else that you want the Court to request?  It seemed to me these

5    are the areas that we wanted to have some information on, at

6    least as to the first four.

7         MS. WEISMANN:  Yes, your Honor.  There are two.  And

8    one is an issue that I flagged for Ms. Lin yesterday morning in

9    a letter.  I had not understood until our conference call the

10   other day that the vast majority of documents they were talking

11   about were electronic documents, and that was because, as you

12   can see from our request, most of the documents we're asking for

13   were originally created as paper documents, and so the issue I

14   flagged is what search terms did they view to locate these

15   documents, because it is my understanding that the e-mail system

16   they have requires very precise search terms and there's no

17   flexibility.  It's not like a Google, for example, where there's

18   a certain latitude, and so it seems critical to know what search

19   terms they use, especially because if I'm understanding it also,

20   this was the third step that was performed in response to

21   another request and I don't know the precise parameters of that

22   request, but as you can see from our March -- our May 29 letter,

23   you know, we gave a fair amount of specificity, so that's my

24   first rather long-winded request, and the other --

25        THE COURT:  Let's deal with the first one for a

Official Court Reporter

1    second.  Mr. Roberts, can you shed any light on the issue of

2    what parameters, I think the issue, and we discussed it a little

3    bit at some of the earlier conference calls, was whether, in

4    addition to the e-mails there were also paper documents.  Let me

5    start with that.  Are there paper documents responsive to this?

6              MR. ROBERTS:  There were paper documents that were

7    gathered up.  What we did last year was we took the information

8    from the two requests and the essence of it had to do with

9    failure to archive and match e-mail, which is very similar to

10    what CREW has asked for, so we went to the individuals who we

11    knew were involved in the review of that process and asked them

12    to search their e-mail because they were all here at the time so

13    we had them search their records and their e-mail and then

14    produce those.  We did not do the type of search that Ms.

15    Weismann is talking about by doing a term-type search of the

16    electronic database.

17              THE COURT:  So the 30,000 represents what, all of

18    their e-mails?

19              MR. ROBERTS:  Yes, ma'am, e-mail records, and then

20    there are some paper documents as well, but those are roughly

21    the e-mails that they went through their e-mails and culled out

22    documents that they thought might have been responsive to our

23    request and then sent that to our office.

24              THE COURT:  So was it in terms of -- who made the

25    decision of what to send you, I guess is my question?

 1              MR. ROBERTS:  The owners, if you recall the members of

 2       the Office of Administration employees and there may have been

 3       some contract or employees as well who worked on this particular

 4       project.

 5              THE COURT:  Okay.  And what direction were they given

 6       in terms of what kind of things to send to you?

 7              MR. ROBERTS:  Well, they were told to send records

 8       that they might have that related to what we were looking for.

 9              THE COURT:  I know, but what is it you were looking

10       for?

11              MR. ROBERTS:  For example, the failure to archive.

12       The letter I don't have right in front of me, but it had to do

13       with failure to archive and the missing e-mail.  Essentially the

14       request essentially came from Mr. Fitzgerald's letter that was

15       in the press that may have been referenced in one of the CREW

16       reports.

17              THE COURT:  Can I ask you to slow down a little bit so

18       my court reporter can take this down?

19              MR. ROBERTS:  Yes, ma'am.

20              THE COURT:  Go ahead.

21              MR. ROBERTS:  Was a request that came in that had to

22       do with missing e-mail and failure to archive and documents

23       related to that, and that's what we asked people to look for and

24       send us.

25              THE COURT:  Okay.  Is that responsive, Ms. Weismann?

1          MS. WEISMANN:  Yes, except that there seems -- I see a

2    hole, and maybe I misunderstood something.  I understood Mr.

3    Roberts to describe a process where they went back to all the

4    then-current employees of OA, but it's also my understanding

5    that there are any number of people who were here during this

6    relevant time period but are no longer there and I don't know

7    whether or not there's been an effort to search the files of

8    former employees who were involved in creating these records or

9    have knowledge about the records.

10          THE COURT:  I guess what time period are you talking

11    about, Ms. Weismann?

12          MS. WEISMANN:  Well, I don't know the time period, but

13    they did this earlier search.

14          THE COURT:  That's what I'm trying to ask.  I mean,

15    are you asking presumably the Office of Administration has had

16    employees come and go?

17          MS. WEISMANN:  My understanding is they've actually

18    had quite a bit of turnover over the last few years, so what Mr.

19    Roberts described when they did the search, and I'm not clear

20    exactly when it was done, he describes going to employees who

21    were then at the Office of Administration.  I don't know if

22    they've attempted to search the files of the departed employees.

23          THE COURT:  I know, but my question to you before I

24    asked him, departed employees how far back?

25          MS. WEISMANN:  Well, certainly it would be departed

1    employees from September 2005 on, because anybody who left

2    before that period wouldn't have been involved at least as far

3    as our point of request is concerned.

4            THE COURT:  So from your perspective it would have

5    been from, any employees, whether presently there or departed,

6    from 2005 to February 2006; is that what you're saying?

7            MS. WEISMANN:  Yes.

8            THE COURT:  Mr. Roberts, do you understand her

9    question in terms of when you did the search would you have

10   asked employees or collected this information from not only who

11   was there but if people had left?

12           MR. ROBERTS:  They were asked of employees who were

13   here because it was a pretty narrow period of time.  It was from

14   roughly October, I think the time frame that CREW has is

15   September 2005 through roughly February 2006.  All the employees

16   who were involved in that project were here in February and

17   March of 2006 when we went to them and asked them to look for

18   their records, so it was not necessary to go back and search

19   electronic records from departed employees because they were all

20   here.

21           THE COURT:  All right.  That answers that question.

22   What's your second question, Ms. Weismann?

23           MS. WEISMANN:  It was unclear to me, Mr. Roberts

24   described a process initially where he said something to the

25   effect that it would be very involved to do an electronic

1    search.  I just wanted again clarification as to the nature of

2    the search that has already been done.

3             THE COURT:  Are you talking about collecting the

4    30,000 e-mails?

5             MS. WEISMANN:  Yes.

6             THE COURT:  All right.  As I understood it, Mr.

7    Roberts, when you went in response to an earlier request, which

8    is when you collected these 30,000 plus e-mails, and they were

9    generally related to the failure to archive or missing e-mails,

10   in terms of searching that material, was everything electronic

11   or was it paper and electronic?  I mean, why do you have -- do

12   you have some paper documents as well as electronic, or is

13   everything, if there is some paper documents, also electronic?

14            MR. ROBERTS:  It's a combination, your Honor.  Most of

15   it is electronic because again, the individuals who were

16   involved in that, it was all of the discussion and the analysis

17   and everything was pretty much done electronically.  To the

18   extent that there were, for example, the histogram, a charge to

19   the extent that any of those were produced in a paper document,

20   we can simply print them out or we have copies of them.

21            THE COURT:  Okay.

22            MR. ROBERTS:  This wasn't necessary to do an

23   electronic search because all the employees involved in it were

24   here.

25            THE COURT:  So in essence they did their own search

1    and culled out all these e-mails together, is that correct, from

2    their individual computers or databases; is that correct?

3         MR. ROBERTS:  That's correct, your Honor.

4         THE COURT:  All right.  Ms. Weismann, that seems to

5    answer that.

6         MS. WEISMANN:  Yes, I believe it does.  I mean, the

7    only sort of residual concern I have is again I'm relying on a

8    search that was done in response to another record request and

9    without seeing it and knowing exactly what it sought, you know,

10   I don't have yet I would say sufficient information to know that

11   there's an exact parallel between that search, that request and

12   mine.

13        THE COURT:  Well, it sounds like what you're looking

14   at in the broad category is the failure to archive and missing

15   e-mails.  I mean, that's generally what you're getting and that

16   seems to have been with the search that they did.

17        MS. WEISMANN:  I guess I won't know until I see the

18   responses.  If there seems like there's a big hole then that

19   might raise the question as to whether or not, you know, I'm

20   just saying, you know, I know what I asked for and all I have is

21   a very generic description.  You're right, on its face the

22   generic description is given, appears, but does at least a

23   significant overlap.  I don't know if that overlap is one

24   hundred percent or something less.

25        THE COURT:  Is there any way of giving any other kind

1    of assurance, Mr. Roberts, or I take it that since you worked on

2    the original request, Mr. Roberts, can you indicate whether you

3    think it appears that it would cover the CREW request since you

4    had an opportunity to look at both the original request as well

5    as theirs?

6            MR. ROBERTS:  Your Honor, what I can offer is that the

7    representations that will come from this office when we reply to

8    the request will be that we believe that the effort that we did

9    before complies with what CREW is looking for.  For example, the

10   charge, the analysis, for example, some of the work perks and

11   stuff that CREW has referenced, I'm not familiar with those, but

12   it's my personal opinion and my professional opinion that the

13   previous effort substantially complies and in fact does comply

14   with the universe of records that CREW has requested.

15           THE COURT:  And I take it the June 21st date would

16   include any kind of paper documents as well as the electronic?

17           MR. ROBERTS:  Yes, ma'am, that's correct.

18           THE COURT:  Okay.  Anything else, Ms. Weismann?  If

19   not I'll move on to a couple of other things.

20           MS. WEISMANN:  The only issue I have again is I still

21   don't understand why at least the paper documents can't be

22   segregated and processed and released, without having to wait

23   for the review of the 36,000 other documents.  That's my

24   continuing concern here.

25           THE COURT:  I can guess at it, but instead of doing

1    that, Mr. Roberts, can you respond as to why you would want to

2    wait on not handing the paper documents up front?

3         MR. ROBERTS:  We need to make sure from a continuity

4    standpoint, for example, some documents standing by themselves

5    may or may not be exempt, and when we put the whole universe of

6    the records together one may reference others.  I mean, these

7    documents are not necessarily related only to the Office of

8    Administration.  Other offices within the complex that we

9    support may have some equities in these, and so we just need, we

10   feel like we need to make sure that we review everything at once

11   to be able to consider whether or not they're releasable and

12   responsive.

13        THE COURT:  All right.  Which is generally is not that

14   unusual, Ms. Weismann, as you know, in terms of their wanting to

15   make sure that in context, you know, what there's some

16   consistency in terms of what they're releasing, not releasing,

17   if they're claiming any exemption.

18        Let me move on then.  Those are the four categories

19   that we talked about.  The fifth category, there was an issue of

20   trying to find, Ms. Lin, contact had been made to some people to

21   see whether they could indicate where this material was located.

22   Have you been able to get together any response, Ms. Lin or Mr.

23   Roberts?

24        MS. LIN:  Yes, your Honor.  This is Jean Lin.  We, Mr.

25   Roberts was able to contact people that might have better

1    information about that and they were able to pinpoint certain

2    paper files which Mr. Roberts and/or the Office of

3    Administration has gone through in the last 24 hours, and there

4    may be some responsive documents after the initial review, so

5    from those paper files we will be able to provide the responsive

6    documents or provide a response to CREW's FOIA request by June

7    21st.  The complication of course is that they may also require

8    to be, I mean, currently we believe that an electronic search is

9    also necessary to capture the other documents that might exist

10   because this request asks for variations of the assessment or

11   copies of the assessment.  It's all iterations, so an electronic

12   search is what is causing a problem because, as Mr. Roberts

13   mentioned earlier, the search that is done by the technicians,

14   they are already backed up, and those are the priorities, not

15   only relating to the Office of Administration but the entire

16   White House complex, so that's the part where we have problems,

17   so in order to complete that search it has to happen after,

18   assuming we still are going to search the February documents, it

19   wouldn't be able to start until sometime after July 20th because

20   that's currently that's what the schedule is like, and it's

21   starting from that point on it takes at least a day or two to

22   set up the search and at least three days to run, another three

23   to four days to evaluate, and then the review process begins

24   from there, so the best estimate that the agency is able to

25   provide at this point is that by August 24th they would be able

1    to respond to the FOIA request as to category five.  And by the

2    way, that would be the same as well as to February, the February

3    2006 search if that's to be conducted.

4              THE COURT:  If I could just simply ask, in terms of

5    you've I take it through that paper, the paper documents, you

6    could get out to them by June 21st, it's only the additional

7    electronic search.

8              MS. LIN:  That's correct, your Honor.

9              THE COURT:  And the February one you were talking

10    about, because that is an electronic search.

11              MS. LIN:  Yes.

12              THE COURT:  All right.  And the last category, which

13    was a fairly broad one, and I believe, Ms. Weismann, it

14    indicated that there might be a way of narrowing what that

15    category is.  You had, Ms. Lin had talked about sixty to ninety

16    days.  Mr. Roberts, is there something that you could suggest in

17    terms of how that category might be narrowed or you see why it's

18    going to take that long?  Let me start with you.

19              MR. ROBERTS:  If the Court could ask Ms. Weismann if

20    that's the ECRMS project that she's referring to.

21              THE COURT:  Is that what you're referring to, Ms.

22    Weismann?

23              MS. WEISMANN:  I don't know what that project is, so

24    from my perspective what might help is if we got a list of

25    contracts, you know, maybe we could at least prioritize PI, but

1    there's a project, there's an ECRMS project that relates to

2    that.

3             THE COURT:  If you could spell that for the court

4    reporter.

5             MR. ROBERTS:  E-C-R-M-S.

6             THE COURT:  And what is it?

7             MR. ROBERTS:  That stands for Electronics Records

8    Management.  My understanding from the discussions the other day

9    was that if CREW only wants statements of work and requests for

10   proposals and requests for quote that the Office of

11   Administration generated, then we can do that more quickly than

12   if it gets into contract documents with information backed from

13   contractors.  There of course is a requirement under the FOIA

14   and the federal acquisition regulation that we then have to go

15   to contractors and get their input on anything that might be

16   releasable.

17            THE COURT:  All right.  So Ms. Weismann, do you want

18   to narrow it down?

19            MS. WEISMANN:  Well, I had already narrowed it.  I

20   told them that if we could get just generically the categories

21   of proprietary information such as price quotes, that's what I'm

22   talking about when I say generically, but it was likely that we

23   would have no interest in that information and could avoid that

24   process altogether.

25            THE COURT:  Well, I think what he's suggesting is that

1    they can give you requests for proposals, and I missed the other

2    one.  A statement of work.

3         MS. WEISMANN:  Right, but as I understood from what he

4    was saying, the biggest impediment to giving the actual contract

5    documents was the need to check with submitters on proprietary

6    information.

7         THE COURT:  Do you want statements of work and

8    requests for proposals?

9         MS. WEISMANN:  Yes, we do.  It's within our request.

10         THE COURT:  So how quickly can you produce that, Mr.

11    Roberts?

12         MR. ROBERTS:  By June 21st.

13         THE COURT:  Okay.  And then in terms of the contracts

14    themselves, I take it what you're talking about, what are you

15    asking for, Ms. Weismann?  It's not clear to me what you want

16    them to do in terms of the contracts.

17         MS. WEISMANN:  Well, what I was suggesting is a way to

18    short-circuit it is if they could give me a listing of all the

19    contracts it may be that we're not interested in all of them.  I

20    don't know.

21         THE COURT:  I mean in terms of who the contractors

22    are.

23         MS. WEISMANN:  Right, and what the contract is for.  I

24    mean, otherwise, I mean, what we're asking for is the actual

25    contract documents, but this is where we have said we're not

1    interested in the proprietary information, and rather than delay

2    and have them go back to the submitters and ask for their views

3    as they're required to do we're proposing that, you know, if

4    they tell us the kinds of proprietary information we will likely

5    agree that we don't want it and they don't have to worry about

6    getting the final offer or the objection of the submitter.

7           THE COURT:  Ms. Weismann, I'm still having trouble

8    figuring it out so I assume they are.  What you're asking is a

9    list of contracts by contract or presumably, and if you already

10   have the statement of work presumably, you know, these would be

11   the contractors that were actually given these specific

12   contracts, that seems to be the first step; is that correct?

13          MS. WEISMANN:  Yes, but I want to be clear, that's not

14   what the entirety of our FOIA request here seeks.  I was just

15   proposing that --

16          THE COURT:  I understand that, Ms. Weismann.  Just

17   answer my questions, please, Ms. Weismann.  All I'm asking is,

18   is the first time we get you the statements of work, the request

19   for proposals, you're then asking for any contracts that were

20   actually let?

21          MS. WEISMANN:  Correct.

22          THE COURT:  You would want the names of the

23   contractors matched up with the requests for proposals so that

24   you could figure out, or the statement of work so that you would

25   know, you know, which contract was let relating to which

1     statement of work and requests for proposals; is that correct?

2          MS. WEISMANN:  Yes.

3          THE COURT:  Okay.  And Mr. Roberts, can you do that?

4          MS. LIN:  Your Honor, this is Jean Lin.  I'm sorry to

5     interject, but there seems to be some confusion here, because

6     the face of category six, we don't read it, at least until now

7     we don't read it to encompass also contracts that were submitted

8     or bids that were submitted by the contractors.  On its face

9     it's asking for statements of work, requests for proposals, and

10    requests for quotes that OA issued or issued on behalf of OA so

11    on its face it doesn't talk about the contract, and in our last

12    discussion with Ms. Weismann we tried to clarify that our

13    writing was correct, is that it doesn't include contractual

14    terms or pricing information submitted by the contractors, so we

15    felt that was entirely out of the scope, so any listing of

16    contractors is not even within the scope, and as to what's being

17    requested here, the confusion here is not, or the problem we

18    have now is not that we have to go back to the bidders to get

19    their approval but the fact that the physical copies of the

20    statements of work we have.  We can produce them by July 21st.

21    The problem is that there were some other statements of work or

22    requests for proposals issued by the Department of Interior and

23    that's a process that's currently beyond our control, but we'll

24    make our very best effort to contact the Department of Interior

25    to gather those statements of work and requests for proposals

1    that they issued on behalf of the Office of Administration.

2         THE COURT:  Okay.  Let me, Ms. Weismann, I've got the

3    letter in front of me.  What it talks about is we see copies of

4    all statements of work, requests for proposals and requests for

5    quote that OA issued or that were issued on behalf of OA, the

6    analysis design implementation and support of EOP e-mail systems

7    implementation, migration and e-mail records management.  And

8    then you set out the priority for dates.  So it doesn't say

9    anything about contracts.

10        MS. WEISMANN:  I apologize, your Honor.  That was an

11   inadvertent mistake on my part, inadvertent in that you're

12   absolutely correct.

13        THE COURT:  Let's get back to this again for a minute.

14   Then the statements, as I understand it from what Mr. Roberts

15   had said and Ms. Lin is saying, is that statements of work or

16   requests for proposals, and I don't know about the request for

17   quotes, that OA has themselves in their files, they can produce

18   by January 21st.  Is that correct, Mr. Roberts?

19        MR. ROBERTS:  Yes, ma'am, it is.  June 21st.

20        THE COURT:  June 21st.  I'm sorry.  And does that

21   include the request for quote as well?

22        MR. ROBERTS:  I don't recall whether -- I know there

23   are statements of work because of the nature of the contracting

24   that was done.  I'm not sure if there were actually requests for

25   proposals and requests for quotes, but to the extent that we

1    have any of those we will look for them.  I am familiar with

2    statements of work that were issued and that would include

3    those, yes.

4          THE COURT:  All right.  So those you could produce by

5    June 21st, the question is, in the Department of Interior who

6    would have been I take it doing it on your behalf?

7          MR. ROBERTS:  Yes, ma'am.  There's an organization

8    called Gov Works.  It's a fee-for-service organization that we

9    do a fair amount of contracting through and they belong to the

10   Interior department, and if CREW wants complete contract files

11   we have to go to them and ask for copies from them because they

12   are our contracting officer and contracting office for this

13   work.

14         THE COURT:  All right.  So in the context, Ms.

15   Weismann, of this TRO, is it sufficient to produce what OA has

16   and you can wait for a later date, have them ask for the

17   Department of Interior, but it obviously isn't going to be done

18   that quickly?

19         MS. WEISMANN:  I'm willing to take it the first step,

20   the first wave of production, the ones that OA have.  I'm not --

21   I guess I would ask them to initiate the process of securing the

22   others.

23         THE COURT:  I don't have a problem with that.  I'm

24   trying to narrow this.

25         MS. WEISMANN:  For your Honor's purposes of the June

Official Court Reporter

1    21st date I'm willing to accept their offer of providing what

2    they are within the OA and I would ask that they contact the

3    Department of Interior, and it would be helpful to find out, get

4    a sense of time from them, from Interior, how long it will take.

5         THE COURT:  So let's go through this again.  It seems

6    to me as I understand it then in terms of resolving the TRO that

7    categories one through four, that you would get by June 21st,

8    you would have culled through the 30,000 plus e-mails and

9    whatever paper documents there are and produce it in response to

10   the four categories that OA has, and is that correct, Mr.

11   Roberts?

12        MR. ROBERTS:  Yes, your Honor.

13        MS. LIN:  Your Honor, may I be heard?

14        THE COURT:  If you don't identify yourself I can't

15   tell who it is.  I'd prefer to call on people.  If this is Ms.

16   Weismann, is that correct from your perspective?

17        MS. WEISMANN:  Your Honor, I realize there's one

18   aspect of category four that we haven't talked about at all, and

19   that is the e-mails from the time periods September 2005 to the

20   present, which if you look at my March 29 letter it's how we

21   described it, so what we've talked about is the time frame

22   producing to February 3rd, 2006, and for now I'm willing to

23   accept Mr. Roberts' representation that as far as paper

24   documents, you know, that there is unlikely to be anything

25   through the end of February, but the fourth category goes beyond

1    that.

2            THE COURT:  Okay.  So then let's deal with it in the

3    context you set out in the context of this, the dates we've been

4    talking about, and that's why I'm focused on them, is September

5    of 2005 to early February, we'll say February 3rd at this point

6    of 2006.  And, you know, I grant you the letter says that, but

7    I've been going by our discussions.

8            MS. WEISMANN:  Correct.

9            THE COURT:  So they will go through the 30,000 plus

10   e-mails to cull out the responsive in the four categories at

11   this point, September 2005 through February 3rd of 2006, and

12   that will be done by June 21st; is that correct, Mr. Roberts?

13           MR. ROBERTS:  Yes, your Honor.

14           THE COURT:  Okay.  Then let's do the ones that we've

15   actually been able to do something with.  As I understand it,

16   the category five, you would be able to produce -- let me look

17   at this for a minute.  Category five you could produce by June

18   21st all the paper documents that are responsive, but to do an

19   electronic search you wouldn't be able to get anything done

20   until August 24th; is that correct, Mr. Roberts?

21           MR. ROBERTS:  Yes, ma'am.

22           THE COURT:  Okay.  Is that acceptable to you, Ms.

23   Weismann?

24           MS. WEISMANN:  August 24th isn't, but the paper copies

25   by June 21st is.

1          THE COURT:  Well, then let me see what, the June 21st

2     paper copies, but you're not willing to wait until August 24th

3     for the electronic search?

4          MS. WEISMANN:  No, your Honor, because as they

5     described, it is a question of how they prioritize and we

6     believe as an expedited request we're entitled to greater

7     priority than that.

8          THE COURT:  Okay.  Well, I'm not sure that I'm going

9     to bump the White House for you, Ms. Weismann, but if we want to

10    leave that as a separate issue then I'll have briefing in terms

11    of who has priority over you.  We'll leave that as a side issue

12    then in terms of the electronic search.  But in terms of the

13    June 21st date, we've got the four categories out of the 30,000

14    plus e-mails and we have the category five in terms of paper

15    responses, and in category six you will produce everything that

16    you have for that by June 21st, but only what the Office of

17    Administration has, not the Department of Interior, although we

18    would ask that you would initiate that.

19         MR. ROBERTS:  And may I clarify on the Department of

20    the Interior, are we expected then to proceed with going to the

21    contract or as we're required to do under the FOIA and the

22    Federal Acquisition Regulation?

23         THE COURT:  It would seem to me that I'm not

24    suggesting that you not follow your procedures --

25         MR. ROBERTS:  Okay.

1              THE COURT:  -- in terms of doing it.

2              MR. ROBERTS:  I understand.

3              THE COURT:  All right.

4              MS. LIN:  But as --

5              THE COURT:  Don't interrupt, please.

6              MS. LIN:  I'm so sorry.  I really thought you were

7    done.

8              THE COURT:  If you want to ask a question I'm going to

9    call on you on each of these.

10             MS. LIN:  I apologize, your Honor.

11             THE COURT:  All right.  So that we have a record of

12   what it is people are agreeing to and what they're not agreeing

13   to.

14             Now, in terms, as I understand, Ms. Weismann, that you

15   on the category six to the extent that OA had just for the TRO

16   since you asked to have all of this produced in ten days, that

17   what they have, you would agree to that by June 21st, they would

18   get their own and then they would initiate as part of the

19   lawsuit in general the request through the Department of

20   Interior.  Is that acceptable to you?

21             MS. WEISMANN:  Yes.  And I apologize.  The only thing

22   I was going to ask is when Mr. Roberts made reference to their

23   procedures as requiring the consultation with the submitters, if

24   that is proprietary information.  There's one piece still we're

25   willing to agree to is most likely if we know the categories,

1    waive that and we're not interested to expedite the back piece

2    of it.

3            THE COURT:  If, I'm not sure what the purpose is,

4    perhaps you could clarify, Mr. Roberts, what the purpose would

5    be in terms of, is it the proprietary information or something

6    else?  Mr. Roberts?

7            MR. ROBERTS:  Ma'am, I know that there is proprietary

8    information associated with these contracts that has to do with

9    labor rates and things like that for this particular contract or

10   based upon previous FOIA requests, so I -- there is proprietary

11   information, and I believe, as Ms. Weismann suggested, we could

12   redact that information.

13           MS. LIN:  Your Honor, this is Jean Lin.  I apologize

14   for interrupting again.  As we previously had discussed the

15   contracts and the contract or out of the scope of this FOIA

16   request, so there's some confusion on our part here, so

17   essentially we are still talking about statements of work that

18   we request for proposal?

19           THE COURT:  Yes.

20           MS. LIN:  So there will be no contract for terms

21   proposed by the bidders.  So sorry, there was confusion on our

22   end.

23           THE COURT:  So as I understand it, looking at category

24   six, it doesn't involve the contracts, so Mr. Roberts, there

25   shouldn't be an issue of proprietary information.  It should be

1    statements of work, requests for proposals, and request for

2    quote, so this is generated from Interior on your behalf, I

3    assume; is that correct, Mr. Roberts?

4         MR. ROBERTS:  Yes, ma'am.  I understand the nature of

5    the request now.

6         THE COURT:  Okay.  And you initiate that request as

7    part of this?

8         MR. ROBERTS:  Yes, ma'am.

9         THE COURT:  Okay.  So the only thing then, two things

10   that we have left, besides the electronic search for category

11   five, which the government has indicated they could not get done

12   before August 24th, and the other one is the February -- hold on

13   one second -- the February 3rd to February 28th of 2006, you

14   also didn't think you could get done before August 24th; is that

15   correct?

16        MR. ROBERTS:  Yes, ma'am.

17        THE COURT:  All right.  Is that acceptable or not

18   acceptable, Ms. Weismann?

19        MS. WEISMANN:  Well, I am willing to see what we get

20   on the 21st before asking them to initiate that based on Mr.

21   Roberts' representation that he's familiar with the subject

22   matter of our request and the responsive documents and there's

23   unlikely to be any in that time period and I'm willing to leave

24   it that on the 21st if we see that if it appears that there are

25   documents that we think should have been produced and are not

1     then we, you know, we reserve the right to go back and ask that

2     that search be initiated.

3          THE COURT:  Then we'll leave it at that as a practical

4     matter in terms of resolving the TRO only, which is what I'm

5     focused on at this point.  We'll leave it that the expectation

6     is that the search through February 3rd would be responsive and

7     that if for some reason it isn't and you would be proceeding

8     with the August 24th date then you would come back indicating

9     it's not responsive according to whatever agreement we reach

10    here.  Is that an accurate way of putting it, Ms. Weismann?

11         MS. WEISMANN:  Yes.

12         MS. LIN:  Your Honor, I'm sorry, this is Jean Lin.

13         THE COURT:  Ms. Lin, Ms. Lin, Ms. Lin.  Just wait one

14    second.  Okay?

15         Now, and there's one other point that I wanted to

16    bring up that's outside of the June 21st date.  The only ones

17    that we have for the August 24th is this February 3rd through

18    February 28th of '06, which at this point the plaintiff will,

19    you know, will accept contingent on the -- on the search, the

20    search through the February period as being responsive.  The

21    other one, just so that I have this down, the other one is

22    category five, because the one I just talked about in terms of

23    the August 24th at -- February 3rd to the 28th relates to

24    categories one through four.  Category five, the only thing we

25    have outside that is if we have to do an electronic search as

1  opposed to what they already have then they're indicating it

2  would be August 24th, and plaintiff doesn't agree to that.

3       Now, the only other thing that I think is sort of

4  sitting out there is what you have brought up, Ms. Weismann,

5  which is on number four, the fourth category, apart from through

6  the February 3rd and then the request of February 3rd to the

7  28th which you had originally focused on, you've also asked for

8  e-mails relating from September 5th to the present; is that

9  correct?

10       MS. WEISMANN:  Yes.

11       THE COURT:  And is that in the categories one through

12  three that you're then expanding it beyond that?

13       MS. WEISMANN:  I'm not sure I understand the question,

14  your Honor.

15       THE COURT:  Well, category four I thought when we

16  originally talked about it I asked you to set out the time

17  frames that you wanted things, and you told me one through four

18  you wanted September 2005 to end of February 2006.  Looking at

19  the fourth category it seems to have a different time period.

20       MS. WEISMANN:  I'm sorry if I wasn't clear.  The event

21  that, the subject matter of category four are the events and

22  documents that were created between September 2005 and February

23  2006, but what category four seeks is any e-mail discussions of

24  those documents and events through the present, so the time

25  period is still the project as the subject matter of category

1    four, but we're seeking any discussions of that subject matter

2    through the present.

3              THE COURT:  All right.  Mr. Roberts, do you understand

4    what she's asking, what she's requesting?

5              MR. ROBERTS:  Yes, I do, your Honor.

6              THE COURT:  And what is the time frame for that?

7              MR. ROBERTS:  I don't know.  That's going to be a

8    14-month search.  What I will have to do is go back to the

9    search technicians and ask them how long it would take to do a

10   14-month search of all Office of Administration e-mail for some,

11   it's not clear to me what terms Ms. Weismann is looking for.

12             THE COURT:  It sounded as if the subject matter would

13   be these e-mails in one, two, three categories, one, two and

14   three, which would be the September 2005 to the end of February

15   of 2006, but a discussion about those e-mails.

16             MR. ROBERTS:  Yes, ma'am.  I understand, your Honor.

17   But that kind of goes back to one of Ms. Weismann's points that

18   for us to do an electronic search then we have to have some

19   definitive terms, so if I'm searching for a term, for example,

20   missing e-mails, I need to know what specific term I would ask

21   the technicians to search for.  The more terms I have to search

22   for the longer the search takes and the more complicated it is

23   and the longer the review process.

24             THE COURT:  Ms. Weismann, what are you asking for?

25             MS. WEISMANN:  I think that that's the kind of

```
 1    category I would need to work with someone from OA that
 2    understands, you know, because I would need their assistance in
 3    drafting.  I'd be happy to come up with a list of search terms.
 4    I think I would need some understanding from them on how the
 5    search, you know, process works in order to draft the most
 6    effective terms, so I'm willing to work with the agency on that.
 7             THE COURT:  Ms. Weismann, what I'm trying to do
 8    frankly is to resolve the TRO.  Your TRO asks that all of these
 9    four categories, six categories, be provided to you in ten days.
10    Now it seems to me we've worked down to a number of categories
11    to be provided by June 21st, which appear to be satisfactory to
12    you.  The only one, and the August 24th one which covers
13    categories one through four you'll accept, you'll accept if it
14    looks like the documents you get on the 21st are actually
15    responsive.  The only one you haven't agreed to is the
16    electronic search of category five.  In terms of this one, which
17    is category four in this new search term, could we not resolve
18    the TRO to the extent as we've gone so far, if you want to
19    litigate this category five and the electronic search and why
20    they should get it to you faster than August 24th and bump a
21    bunch of other people I'll be happy to have you litigate it, but
22    it seems to me that it may be useful to get the June 21st
23    material and in the meantime work on the search terms, but you
24    may want to look at what you get before you do the search terms
25    to get the category four material you're talking about.  I mean,
```

1    I'm listening.  I mean, I don't know how this is going to work,

2    but in listening to the discussion here it seems to me that what

3    search terms you would use would be informed by the documents

4    you get in response to the first four categories.  Ms. Weismann?

5         MS. WEISMANN:  I think that may very well be true, and

6    it's not my interest in litigating.  I would rather have a

7    process in place so that I could work this out with the agency,

8    and so if I can get a commitment, and it may be that it makes

9    sense to await June 21st and see what I get then, but a

10    commitment from the agency to help work with me to craft search

11    terms, then I'm happy to receive and that that can happen, you

12    know, along with all these other searches going on, then I'm

13    happy not to litigate that at this point.

14         THE COURT:  All right.  Mr. Roberts, are you willing

15    to work with her?  What I'm trying to do is resolve the narrower

16    issue in the TRO.  There's obviously a request that's a broader

17    request, but it seemed to me the issue of category four and what

18    you're asking for in coming up with search terms.  If you're

19    willing to work with her it seems to me maybe you can narrow

20    this down.  Are you willing to do that?

21         MR. ROBERTS:  Your Honor, the way we normally do, the

22    way we do this is that the request for proposals, what they want

23    and we look for it, we don't know what the requester wants.

24    They need to tell us.  I mean, I don't know what she's looking

25    for other than for example when we did the failure to archive in

1    the missing e-mail before.

2            MS. LIN:  Your Honor, this is Jean Lin.  If I may just

3    jump in to clarify this.  For the search to be conducted there

4    is difficulty in defining the terms, so clearly we welcome

5    suggestions by CREW as to what search terms to use, but

6    understanding that for each term to be done it takes about three

7    days to run it and another three, four days to validate.

8            THE COURT:  I understand that.  Ms. Lin, as I

9    understand what Ms. Weismann is willing to do is if she can come

10   up through a discussion or otherwise with the search terms then

11   what she wants is that if she provides some search terms that

12   they be, you know, the Office of Administration will work and

13   start looking for them, so is there that commitment at this

14   point you won't know until you get search terms to figure out

15   how long it's going to be, and I understand that and I think Ms.

16   Weismann does.  She's asking for a commitment from the Office of

17   Administration that you will do that.  So I'm asking you, are

18   you willing, when she comes up with these search terms, to

19   figure out how long it's going to take and then, you know, work

20   through getting them?

21           MS. LIN:  Yes, we are, your Honor, just understanding

22   that it's not a perpetual process of going through search terms

23   over and over and over again when, and also understanding that

24   this search would have to be put in the que after the February

25   -- after the category five.

1          And just one thing:  There was one confusion earlier,

2    was that the August 24th date, I think Ms. Weismann has been

3    referring to August 21st, and I don't want there to be any

4    confusion about that.

5          THE COURT:  It's June 21st and August 24th.

6          MS. LIN:  That's right.

7          THE COURT:  All right.  All right.  So I think we've

8    discussed this as far as we can, so the question, Ms. Weismann,

9    is whether you're satisfied at this point that we don't need to

10   litigate.  This needs to be put in writing in some form, but

11   whether you're satisfied in terms of not having briefing,

12   etcetera, but putting into writing, and obviously one issue will

13   be is if it's responsive, but we would have the four categories,

14   all the things that we've talked about, which I won't repeat,

15   that will be due by June 21st, you will get those.  In the

16   meantime they would start working on the February 1, they would

17   start working on the Department of Interior, and they would

18   start working on when you provide them a time frame for the

19   search terms for the category four.  Is that acceptable as a

20   resolution, Ms. Weismann?

21         MS. WEISMANN:  Yes, it is.  I understood that the one

22   understanding was in the category five beyond the paper copies,

23   the electronic records, and I was not happy with the August 24th

24   date.

25         THE COURT:  Right.

1          MS. WEISMANN:  If the agency were able to get to me

2     sooner than June 21st the paper documents just in that category

3     it may be that I will be satisfied and it will be not necessary

4     to do an electronic search.

5          THE COURT:  All right.  Mr. Roberts, since it's work

6     on your end, is that possible or not?  Look at category five.

7     You had indicated I believe that they were paper files and that

8     you could produce.  It was the electronic search that would take

9     some time.  Can you get those paper files faster than the 21st?

10          MR. ROBERTS:  No, ma'am.  The consistency, the

11     consistency position that we have is the same for those as it is

12     with all the rest of the documents related to the request.

13          THE COURT:  All right.  Ms. Weismann?

14          MS. WEISMANN:  I think it's a very segregable

15     category.  It actually covers a very different period of time.

16     If you look at my request it's October 2002, so I don't find

17     that to be a reasonable response and so, no, I mean, I'm not

18     willing.

19          THE COURT:  Okay, fine.  Then let's suggest this,

20     then:  You write up, I think what we need to do is, maybe what

21     I'll do is to propose an order on our end that would set out

22     what the commitments are in terms of what, you know, what

23     generally has been committed to here in terms of the date.  I

24     think that might be faster than frankly trying to ask the two of

25     you to do it, and on the category five, which is the electronic

1    search, since the August 24th date is not acceptable to you, I

2    frankly think that, you know, I'm not sure what irreparable

3    damage there would be to you frankly for waiting until August

4    24th as long as you get the paper documents that they have on

5    June 21st, but I'd be happy to have you brief it and tell me,

6    because I'm viewing this as a TRO.  I'm not rolling it into a PI

7    in terms of the time frame that you have set out.  Ten days,

8    that's not PI land, so that's a TRO which the focus generally is

9    on irreparable damage, so I'll give you a time frame within

10    which how quickly do you wish to brief and tell me what your

11    irreparable damage or whatever else you want to say on the TRO

12    for that category, and then I'll ask the government's response?

13            MS. WEISMANN:  Yes, your Honor.  This is a point of

14    clarification.  The ten days, it comes from the Freedom of

15    Information Act itself.

16            THE COURT:  That's fine, but that's what you've asked

17    for.

18            MS. WEISMANN:  Right, because that's the time period

19    for expeditious use.

20            THE COURT:  That's fine, but let me just say, Ms.

21    Weismann, however you chose the time frame, ten days to me is a

22    TRO so you have filed it as I think a TRO slash PI so as a TRO

23    which is the same standard frankly between that and a PI but

24    certainly there's more of a focus on irreparable damage.

25            MS. WEISMANN:  Yes.

1          THE COURT:  So in terms of category five I'm not sure

2     they've suggested August 24th.  What time frame are you asking

3     for?

4          MS. WEISMANN:  I wanted it as soon as possible and

5     towards that end I believe that our request should be given

6     greater priority than it appears to be given.

7          THE COURT:  That's fine.  Let me just say to you that

8     when can you get in your brief?  It's going to be very narrow,

9     as to this category five, indicating whatever the TRO said, ten

10    days.  Whatever it is that you want, you think is your

11    irreparable damage in not getting it earlier I'll set a date for

12    the government to respond as to what priorities they have in

13    front of it, what the White House or whomever it is that's

14    making other requests or requested expedited before, and I'm

15    assuming, Ms. Lin, when you talk about people ahead of CREW

16    you're talking about a line of people that are agencies that are

17    all on an expedited track; is that correct?

18         MS. LIN:  Your Honor, in terms of FOIA requests we

19    have put CREW at the very beginning of the FOIA processing que,

20    but there were, and this office, however, the technicians

21    respond to offices besides Office of Administration, and that

22    would include searches for grand jury subpoenas, congressional

23    inquiries, and all other searches that need to be done

24    concerning the White House conflict and that's eleven

25    components, and OA does not control the technicians in terms of

 1    who goes into the que first.  In terms of FOIA ques, CREW is at
 2    the very, very front right now.
 3             THE COURT:  Ms. Weismann, is this reasonable to
 4    litigate this at this point?  I mean, it doesn't sound like they
 5    have any choice on this matter.  This isn't something that they
 6    control, so my feeling is, is that it's not an unreasonable time
 7    frame for it, and frankly in terms of, if you're at the top of
 8    the que for the FOIA request these are other requests that I, I
 9    mean, I'm not sure how the Court would order them not to do it.
10    I don't think, you know, they don't set those priorities and I'm
11    certainly not going to be one to do it either so I'm not sure
12    how you're going to get this any faster.
13             MS. WEISMANN:  Your Honor, can I have until the close
14    of business today to get back to the Court on this issue?
15             THE COURT:  I am not going to be around this
16    afternoon.
17             MS. WEISMANN:  All right.  Well, so Monday morning?  I
18    mean, back whether there still existed to litigate this or not.
19             THE COURT:  Litigating this particular issue.
20             MS. WEISMANN:  Correct.  Litigating in the context of
21    a TRO.
22             THE COURT:  And I'm not suggesting that you're in any
23    way not requesting it as the usual process and August 24th would
24    be when they would produce it anyway.  I'm not suggesting they
25    not produce it.  My question is in the context of a TRO, whether

1    you want to litigate that particular category.

2              MS. WEISMANN:  Right.

3              THE COURT:  We can wait until Monday for you to decide

4    this.  But I do need to know at that point because you're going

5    to have to get -- if you're going to do it on Monday then I

6    think you should produce something Monday.  I need to turn this

7    around.  You're not the only TRO I've got.

8              MS. WEISMANN:  I understand, your Honor, and I will do

9    that.  I will, I would suggest that I advise the Court if we are

10   not interested in litigating it by Monday morning and if we are

11   interested that I file a brief on the issue by close of business

12   Monday.

13             THE COURT:  All right.  And then what I would do, you

14   know, what I would need to hear if we get into that in

15   litigating, Ms. Lin, is frankly something in writing that sets

16   out how you came up with the August 24th date and, you know,

17   what it is that you don't control that has priorities over what

18   the Office of Administration can do.

19             MS. LIN:  Your Honor, you want that also by Monday?

20             THE COURT:  No.  I don't see any reason for you to do

21   the work until we find out CREW is actually going to litigate

22   it.

23             MS. LIN:  How much time do you, your Honor, are you

24   going to give us for responding to a brief for TRO?

25             THE COURT:  Let me just look at my calendar for a

1    second.

2              I think this is the better way to do this, Ms.

3    Weismann.  You had suggested this afternoon.  Whether I'm here

4    or not really doesn't make any difference in terms of if you

5    decide you're going to do it.  Then I would ask that you file

6    something this afternoon.  It's around a very specific category,

7    and I get something from the government on Monday if you file

8    it.

9              MS. WEISMANN:  You're asking me to file my brief this

10    afternoon?

11              THE COURT:  Yes.  Short.  It's one very discrete

12    issue.

13              MS. WEISMANN:  Right, I understand.

14              THE COURT:  You know, by the close of business.  It's

15    one very discrete issue relating to it.  You know, we've had a

16    discussion about it and the government can come back on Monday

17    with whatever response.  I mean, it's basically the date so

18    nobody's disputing in terms of I don't know whether you've got

19    any other additional questions, but it sounds to me as if they

20    don't control, you know, some of the other requests that are

21    made of that office in terms of prioritizing to the extent that

22    they can control it they have put you at the head of the que.

23    Ms. Weismann?

24              MS. WEISMANN:  Yes, your Honor.  I will either file

25    something by this afternoon, or if we're not interested in

```
 1   pursuing this issue how do you want me to handle that?
 2           THE COURT:  I would just simply do a notice on ECF
 3   that just simply says you're not pursuing it and that way
 4   everybody gets it and it's just easier than trying to call
 5   people on the phone.
 6           MS. WEISMANN:  Very well.
 7           THE COURT:  And we'll try to put something together.
 8   I'm not sure it's going to get -- what I probably would do is do
 9   the order on Monday.  I probably will.  We'll do the order on
10   Monday and see whether you're actually litigating this part or
11   not in terms of setting out the rest of what we have come to as
12   an agreement, but start working, assume that we've reached this
13   agreement for June 21st as we've talked about it, but instead of
14   issuing two orders it might be easier to frankly just do one
15   that has what's agreed to and what's litigated and my resolution
16   of the litigated one, because it's all related to one, you know,
17   one TRO.  Is that acceptable, Ms. Weismann?
18           MS. WEISMANN:  Yes, your Honor.
19           THE COURT:  Okay.  Ms. Lin, does that work for you?
20           MS. LIN:  Yes.  And I just want to understand that we
21   have until -- if Ms. Weismann doesn't decide to litigate we have
22   until close of business on Monday to file our opposition to the
23   TRO.
24           THE COURT:  Yes.
25           MS. LIN:  Okay.
```

```
1              THE COURT:  All right.  Is there anything else that
2    anybody else needs to comment about or raise any issues?  Ms.
3    Weismann?
4              MS. WEISMANN:  No, your Honor.
5              THE COURT:  Ms. Lin?
6              MS. LIN:  No, your Honor.
7              THE COURT:  Mr. Roberts?
8              MR. ROBERTS:  No, ma'am.
9              THE COURT:  Okay.  Then the parties are excused.
10   Thank you.
11             (Proceedings concluded at about 11:15 a.m.)
12                     - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4              I, Jacqueline M. Sullivan, Official United

 5     States Court Reporter in and for the District of Columbia, do

 6     hereby certify that the foregoing proceedings were taken down by

 7     me in shorthand at the time and place aforesaid, transcribed

 8     under my personal direction and supervision, and that the

 9     preceding pages represent a true and correct transcription, to

10     the best of my ability and understanding.

11

12

13                        Jacqueline M Sullivan

14                        Jacqueline M. Sullivan, RPR

15                        Official U.S. Court Reporter

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON,

      Plaintiff,

      v.                             07-1707 (HHK/JMF)

EXECUTIVE OFFICE OF THE
PRESIDENT *et al.*,

      Defendants.

## REPORT AND RECOMMENDATION

    This matter has been referred to me for a Report and Recommendation concerning Plaintiff's Motion for a Temporary Restraining Order.[1]

I.    Plaintiff's Complaint

    Plaintiff, Citizens for Responsibility and Ethics in Washington ("CREW"), describes itself as a "non-profit, non-partisan corporation." Complaint, ¶5. CREW files many requests for records pursuant to the Freedom of Information Act, 5 U.S.C. §552.[2] It therefore claims a "direct interest in ensuring that these records are maintained, preserved and made accessible to the public in accordance with federal law." Id., ¶6.

II.    Plaintiff's Concerns About the Backup Tapes

    To "backup" a computer or a network is "to create a copy of data as a precaution against the loss or damage of the original data. Many users backup their files, and most

---

[1] Since notice has been given and a hearing been held, plaintiff's motion will be deemed one for a preliminary injunction. The Federal Rules of Civil Procedure that will take effect on December 1, 2007 make this distinction clear. See Proposed Amendment of Fed. R. Civ. P. 65 (Effective December 1, 2007).

[2] All references to the United States Code are to the electronic version that appears in Westlaw or Lexis.

computer networks utilize automatic backup software to make regular copies of some or all of the data on the network."[3] CREW, complaining that the White House has deleted millions of e-mails that it was supposed to keep, seeks a temporary restraining order requiring the White House to keep all back up tapes or similar media which may contain the e-mails that have been, according to CREW, improperly deleted.

III.    The Narrow Dispute Presented

The dispute among the parties about preserving backup media while this case is litigated is now extremely narrow. The government,[4] without conceding that it is under any obligation to do so, insists that it will preserve the backup media that it has, but balks at entering into any stipulation that would in effect serve as the premise of an order requiring that it do so. The government also insists that CREW should instead accept a declaration from an authorized official expressing the defendants' intention to preserve all the backup media it has in its possession.

IV.    An Order Should Issue

While stipulations entered into between parties can save time and money, there is no obligation upon a party to accept one. See United States v. Caldwell, 543 F.2d 1333, 1359 n.134 (D.C. Cir. 1975). While the government insists that a declaration would eliminate any concern that backup media will be recycled and destroyed while this matter is pending, a declaration does not have the force of an order. Unlike a court order, a declaration is not punishable by contempt. In other words, without such an order, destruction of the backup media would be without consequence. As a result, CREW

---

[3] **The Sedona Conference Glossary For E-Discovery and Digital Information Management (May 2005 Version), available at http://www.thesedonaconference.org/dltForm?did=tsglossarymay05.pdf**

[4] "The government" is a shorthand reference to all defendants.

would remain threatened with irreparable harm. I therefore conclude that the order

should issue, despite the government's proposed declaration.

V.     Standards for the Relief Sought

The Court of Appeals for the D.C. Circuit has recently stated the familiar standard

for the award of a preliminary injunction:

> When deciding whether to grant a preliminary injunction,
> the district court must examine whether "(1) there is a
> substantial likelihood plaintiff will succeed on the merits;
> (2) plaintiff will be irreparably injured if an injunction is
> not granted; (3) an injunction will substantially injure the
> other party; and (4) the public interest will be furthered by
> the injunction." Id. at 1317-18 (citing Wash. Metro. Area
> Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843
> (D.C. Cir. 1977)). A court must balance these factors, and
> "[i]f the arguments for one factor are particularly strong, an
> injunction may issue even if the arguments in other areas
> are rather weak." Id. at 1318 (quoting City Fed Fin. Corp.
> v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.
> Cir.1995)).

Ellipso, Inc. v. Mann, 480 F.3d 1153, 1157 (D.C. Cir. 2007).

First, if, as CREW contends, the e-mails have been deleted, then the backup

media are the only place where they may be and the obliteration of this backup media

obviously threatens CREW with irreparable harm. Indeed, the threat of such obliteration

is a text book example of irreparable harm. Second, issuing the injunction will not injure

the government or burden it in any way. Indeed, the government insists that it is already

doing and will continue to do what an injunction would require it to do—preserve the

backup media until the court can rule on the substantive issues before it. Third, there is

no public interest in the destruction of the backup media. To the contrary, there is a

public interest in their preservation, at least until this Court rules, since the e-mails at

issue may have historical and public importance.

3

Finally, there are several legal issues that divide the parties and, in my view, these

issues are substantial and warrant careful consideration.  In what one authoritative

treatise[5] describes as the most often-quoted statement of the principle that the likelihood

of success must be weighed against the likelihood of harm to the movant if the court does

not act, the Second Circuit has stated:

> To justify a temporary injunction it is not necessary that the
> plaintiff's right to a final decision, after a trial, be
> absolutely certain, wholly without doubt; if the other
> elements are present (i.e., the balance of hardships tips
> decidedly toward plaintiff), it will ordinarily be enough that
> the plaintiff has raised questions going to the merits so
> serious, substantial, difficult and doubtful, as to make them
> a fair ground for litigation and thus for more deliberate
> investigation.

Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953) (Frank. J.)

In the instant action, one of the several legal issues separating the parties is

whether one of the defendants, the "Executive Office of the President, Office of

Administration," is an agency and therefore subject to the Federal Records Act.  See 44

U.S.C. § 2901 (14).  The parties explained to me that this precise issue awaits resolution

in a case pending before Judge Kollar-Kotelly.[6]  I have now reviewed the briefs on that

issue in that case and am certain that the issue is substantial and complicated.  I certainly

cannot say that CREW has no likelihood of prevailing on that issue.

Instead, I must say that weighing the substantiality of the legal questions

presented against the irreparable harm that CREW may suffer and the clear absence of

any harm to the government justifies the order I am recommending the Court issue to

---

[5] 11 CHARLES ALAN WRIGHT, ARTHUR MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE
§ 2948.3 (2d ed. 1995).
[6] Citizens for Responsibility and Ethics in Washington v. Office of Admin., No. 07-964 (D.D.C. filed May
23, 2007).

4

prevent the destruction of the backup media.  A proposed order accompanies this Report and Recommendation.

Failure to file timely objections to the findings and recommendations set forth in this report may waive your right to appeal from an order of the District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140 (1985).


                                            _/S/_____

October 19, 2007                               JOHN M. FACCIOLA
                                            UNITED STATES MAGISTRATE JUDGE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY
AND ETHICS IN WASHINGTON,

     Plaintiff,

     v.                                  07-1707 (HHK/JMF)

EXECUTIVE OFFICE OF THE
PRESIDENT *et al.*,

     Defendants.

### PROPOSED ORDER

     Having considered Plaintiff's Motion for a Temporary Restraining Order [#4], the opposition thereto, and the entire record herein, it is **ORDERED** that the motion is granted, and that defendants will preserve media, no matter how described, presently in their possession or under their custody or control, that were created with the intention of preserving data in the event of its inadvertent destruction. Defendants shall preserve the media under conditions that will permit their eventual use, if necessary, and shall not transfer said media out of their custody or control without leave of this Court.

     **SO ORDERED.**

 

                                   _____

October 19, 2007                  **HENRY H. KENNEDY**
                                   **UNITED STATES DISTRICT JUDGE**

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** <br><br> **Plaintiff,** <br><br> **v.** <br><br> **EXECUTIVE OFFICE OF THE PRESIDENT, et al.,** <br> **Defendants.** | **Civil Action 07-01707 (HHK)** |
| **THE NATIONAL SECURITY ARCHIVE** <br> **Plaintiff,** <br><br> **v.** <br><br> **EXECUTIVE OFFICE OF THE PRESIDENT, et al.,** <br> **Defendants.** | **Civil Action 07-01577 (HHK)** |

ORDER

Before the court is the motion of Citizens for Responsibility and Ethics in Washington for

a temporary restraining order [#4]. The motion was referred to United Sates Magistrate Judge

John Facciola for his Report and Recommendation pursuant LCvR 72.3(a).

Having considered the motion, the opposition thereto, the Report and Recommendation

of Magistrate Judge Facciola, the objections to the Report and Recommendation, the response to

the objections, and the record of this case, including the transcript of the proceedings before the

Magistrate Judge, the court, upon *de novo* review, adopts the Magistrate Judge's Report and

Recommendation.

Accordingly, it is this 12th day of November 2007, hereby

**ORDERED** that defendants shall preserve media , no matter how described, presently in their possess or under their custody or control, that were created with the intention of preserving data in the event of its inadvertent destruction. Defendants shall preserve the media under conditions that will permit their eventual use, if necessary, and shall not transfer said media out of their custody or control without leave of this court.

Henry H. Kennedy, Jr.
United States District Judge

Dated: November 12, 2007

2

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>EXECUTIVE OFFICE OF THE PRESIDENT, et al., )<br><br>Defendants. ) | Civil No. 1:07cv1707 (HHK) (JMF) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO CONDUCT EXPEDITED DISCOVERY[1] AND MOTION TO COMPEL RULE 26(f) CONFERENCE**

**STATEMENT**

Through this lawsuit CREW[2] seeks to preserve for history the records of the Bush

presidency. The historical importance of a president's records cannot be gainsaid; they offer

invaluable insight into the decisions of a president and his administration and remain relevant

long after a president leaves office. Books about our earliest presidents continue to be best-

sellers and often are based on treasure troves of information mined from their letters and papers.

With a year left in the Bush presidency and great uncertainty about the status of his

---

[1] On this same date the National Security Archive will also be filing a motion for leave to serve expedited discovery requests in a lawsuit virtually identical to this one, The National Security Archive v. Executive Office of the President, Civil No. 07-1577 (HHK). The discovery that the National Security Archive will seek is identical to the discovery CREW is seeking here. Given the pending unopposed motion to consolidate the two cases, CREW requests that the Court consider the two motions together and grant both CREW and the National Security Archive leave to conduct expedited discovery of the defendants.

[2] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in Washington.

records, CREW hereby requests leave to conduct expedited targeted discovery while there is still time to take action to prevent further record destruction and ensure that the greatest number of records are preserved. Specifically, CREW seeks to ascertain with more precision the universe of email records deleted from White House servers, the universe of still-existing back-up copies that could be used to restore the deleted records and to obtain documents created by defendant Office of Administration when it discovered the missing emails, which would assist the Court in determining what needs to be preserved on an interim basis. All this discovery has one goal: preserving the records of this presidency for their rightful owner, the American people.

Plaintiff had hoped, through the vehicle of a Rule 26(f) conference, to work with the defendants to, among other requirements of the rule, develop a proposed discovery schedule an discuss further issues related to preserving discoverable information. While this would not have eliminated the need for the expedited discovery requested here, it may have helped narrow the issues for discovery and any discovery disputes. Defendants, however, have refused to meet as Rule 26(f) requires.

## BACKGROUND

On September 25, 2007, CREW filed its eight-claim complaint in this action against the Executive Office of the President ("EOP"), the Office of Administration ("OA") and its director, the National Archives and Records Administration ("NARA") and the archivist. The complaint challenges as contrary to law the knowing failure of the defendants to recover, restore and preserve millions of email records created and/or received within the White House and the failure of the archivist and head of OA to take enforcement action to ensure adequate preservation of all federal records. Complaint, ¶ 1. Plaintiff also seeks an order compelling the

2

defendants to implement an adequate electronic records management system in compliance with federal law. Id. at ¶ 2. This complaint is nearly identical to a complaint filed on September 5, 2007, by the National Security Archive against the same defendants, The National Security Archive v. Executive Office of the President, Civil No. 07-1577 (HKK) (D.D.C.).

The factual background to the complaint includes the OA's discovery in October 2005 that millions of email records covering a two and one-half year period were missing from White House servers where they had been dumped for archival storage, id. at ¶¶ 32-34, a discovery the White House has not denied. After analyzing the problem and determining the extent of the missing emails, the periods of time covered by the missing emails and the Executive Office of the President ("EOP") components from which the missing emails originated, the OA developed a recovery plan that called for restoring the deleted emails from then-existing back-up tapes. Id. at ¶ 36. The White House, however, never implemented this plan or any other; to date, the White House has failed to restore any of the deleted emails. Id. at ¶¶ 36, 39. As a result, the back-up copies created by the White House are the only repository for the deleted emails. Id. at ¶ 41. Those tapes contain both presidential and federal records in a commingled form. Id.

The deleted emails had been stored on White House servers as a substitute for the previous electronic record-keeping system in place, ARMS ("Automated Records Management System"). Complaint, ¶ 32. There were and continue to be no controls in place to protect against anyone with access to the servers altering or destroying the electronic records stored on these servers. Id. Despite the expenditure of significant sums of money and the development of several electronic record-keeping management systems to replace ARMS, the White House has

3

to date failed to implement an appropriate and effective electronic records management system. Id. at ¶¶ 36-40.

Contemporaneously with filing this lawsuit CREW sent a letter to the OA seeking assurances that all back-up copies of the deleted records would be preserved pending the resolution of this litigation. When the OA's counsel refused to provide those assurances,[3] CREW sought a temporary restraining order ("TRO") to compel the defendants to preserve all back-up copies.

On October 17, 2007, the matter was heard by United States Magistrate Judge John Facciola, who issued a report and recommendation on October 19, 2007, recommending that this Court enter the requested TRO. Judge Facciola concluded that absent this relief, CREW will suffer irreparable harm; as he noted, the threat that back-up media would be destroyed "is a text book example of irreparable harm." Report and Recommendation, October 19, 2007, p. 2. He further found that the public interest favored preservation "since the e-mails at issue may have historical and public importance." Id. Finally, Judge Facciola weighed the irreparable harm to CREW, the absence of harm to the defendants and the "substantiality of the legal questions presented" to conclude that the TRO should be issued. Id. at 4-5. In particular on the merits of the defendants' claim that the OA is not an agency and therefore not subject to the requirements of the Federal Records Act, Judge Facciola found that after reviewing the briefs presented in another case on this issue, "I certainly cannot say that CREW has no likelihood of prevailing on

---

[3] Among other things, the White House defendants refused to explain what they meant by "disaster recovery tapes," to what extent they included back-up copies stored on other mediums such as CD ROMs and disks, the time-frame covered by the disaster recovery tapes they were agreeing to preserve, and whether or not they had already transferred custody, possession or control of any back-up copies to other non-EOP entities.

4

that issue." Id. at 4.  On October 23, 2007, the defendants filed objections to this report and

recommendation.

On October 18, 2007, CREW sent a letter to defendants' counsel requesting that,

pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, counsel provide CREW with

dates and times on which she is available to confer.  Letter to Helen H. Hong from Anne L.

Weismann, October 18, 2007 (attached as Exhibit 1).  The letter noted that Rule 26(f) directs the

parties to confer "as soon as practicable" and suggested any time during the entire week of

October 22 through 26 for holding such a conference.  Id.

On the evening of October 22, 2007, defendants' counsel sent an email response to this

letter which stated in pertinent part: "we are currently considering your request[] and we will be

in touch soon." Email from Helen Hong to Anne Weismann, October 22, 2007 (attached as

Exhibit 2).  The following day CREW sent an email to defendants' counsel requesting, pursuant

to Rule 26(f), that counsel advise CREW by close of business October 25 "whether you will be

able to meet either this week or next . . " Email from Anne Weismann to Helen Hong, October

23, 2007 (attached as Exhibit 3).  Defendants's counsel never responded to this email or

otherwise advised CREW of her availability to meet.

## ARGUMENT

### I.  EXPEDITED DISCOVERY IS NECESSARY AND APPROPRIATE TO ENSURE THE GREATEST POSSIBLE PRESERVATION OF THE RECORDS OF THE BUSH PRESIDENCY.

As with any civil litigation, this Court has broad discretion on whether and particularly

what discovery CREW should be granted.  See, e.g., SafeCard Servs., Inc. v. Securities and

Exchange Commission, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  That discretion includes the

ability to expedite discovery. Ellsworth Associates, Inc. v. U.S., 917 F.Supp. 841, 844 (D.D.C. 1996). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." Id. Moreover, where, as here, "one party has an effective monopoly on the relevant information" the need for discovery is especially acute. Founding Church of Scientology v. National Security Agency, 610 F.2d 824, 833 (D.C. Cir. 1979).

While the courts are split as to the standard that a party seeking expedited discovery must satisfy,[4] the courts in this district generally apply a good cause standard. See, e.g., Ellsworth Associates, Inc., 917 F.Supp. at 844. Under that standard, a litigant is entitled to expedited discovery unless the opposing party can show good cause for why discovery should be denied. Id. Moreover, a party's need for timely information constitutes good cause to grant a request for expedited discovery. Whitkop v. Baldwin, 1 F.R.D. 169 (D. Mass. 1939); Optic-Electronic Corp. v. U.S., 683 F.Supp. 269, 271 (D.D.C. 1987).

Here, expedited discovery is warranted under either standard based on the compelling and urgent need to ensure the greatest possible preservation of the records of President Bush. As even the White House admits, at least five million email records generated over at least a two and one-half year period from multiple components of the EOP are missing. The missing electronic records span critical years of the Bush presidency, from the United States' invasion of Iraq to Hurricane Katrina and the administration's formulation of a position on global warming.

---

[4] Some courts apply the same standard as that required to obtain a preliminary injunction, see, e.g., Notaro v. Koch, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), while other courts apply a "reasonableness" or "good cause" standard. See Special Situations Cayman Fund v. Dot Com Entertainment Group, Inc., 2003 U.S. Dist. LEXIS 25083 *5 (W.D.N.Y. 2003).

Plaintiff's request for a TRO was premised on the urgent need to ensure preservation of all back-up copies of the deleted emails pending resolution of this lawsuit because without this assurance, plaintiff and the public risk losing access to this important body of historical documents. As Judge Facciola recognized, if the only remaining copies of these records are not preserved this lawsuit becomes essentially an academic exercise. Transcript of Motions Hearing Before the Honorable John M. Facciola, October 17, 2007, p. 6 (attached as Exhibit 4).

While the preservation order recommended by Judge Facciola protects against the loss of valuable historical records, it leaves unanswered critical questions that cannot be answered without additional factual inquiry. Most fundamentally, the White House defendants have refused to identify anything about the still-existing body of back-up copies, including what time period they cover, the extent to which they contain any of the missing emails and whether there are other copies beyond what the defendants have referred to as "[d]isaster recovery tapes relating to the official, unclassified Executive Office of the President email system."[5] Nor have the White House defendants identified the precise number of deleted emails and the extent to which back-up copies of the deleted emails were destroyed prior to September 2007. This missing information is crucial in determining the extent to which the missing email records can be reconstructed and therefore the extent to which the plaintiff can be afforded full and effective relief.

This information is also very time-sensitive. In just 14 months there will be a new administration and there is no assurance that in the ensuing transition copies of deleted emails

---

[5] Defendants' Local Rule 72.3(b) Objections to Report and Recommendations on Plaintiff's Motion for a Temporary Restraining Order ("Ds' Objections"), p. 2 n.1.

and other documents necessary or useful to restoration will be preserved.[6]  These same concerns

led the court in <u>Bush v. Armstrong</u> to enter a TRO at the end of the Reagan administration as

well as a TRO at the close of the Bush administration in 1992.  <u>See</u> 807 F.Supp. 816, 820

(D.D.C. 1992) ("[I]f records are erased at the end of the Bush Administration, the public's right

to access the subject records will be irreparably lost and harmed.").  <u>See also</u> <u>Express One Int'l,</u>

<u>Inc. v. U.S. Postal Service</u>, 814 F.Supp. 87, 92 (D.D.C. 1992) (recognizing need for quick

discovery in light of upcoming transition to new contractor).

 Accordingly, it is critical to ascertain what time period is covered by the presently

existing back-up copies and, in particular, the "disaster recovery tapes relating to the official,

unclassified [EOP] email system."  To the extent this particular set of tapes does not encompass

all of the missing emails, it is essential that other copies are preserved, whether or not they were

created specifically for disaster recovery efforts and whether or not they are currently in the

OA's possession, custody or control.

 This information may also reveal the extent to which any of the defendants has already

destroyed any back-up copies of the deleted email records or transferred them out of the OA's

possession, custody or control.[7]  Separate and apart from the illegality of any such action, it is

---

 [6] If defendants have their way, any preservation order will require them to preserve only disaster recovery tapes for the "official, unclassified [EOP] email system" currently in the OA's possession, custody or control, Ds' Objections at pp. 2 n.1, 8, leaving them free to destroy other copies that may exist, including what may be the only remaining copies of deleted emails.

 [7] The likelihood that such destruction has already occurred may be inferred from the defendants' opposition to plaintiff's motion for a TRO ("Ds' Oppos."), in which they attach a single exhibit:  a November 5, 1995 schedule authorizing the destruction of backup tapes which contain "records that are duplicated elsewhere for preservation and disposition."  Ds' Oppos., Exhibit 1, p. 4, ¶ 8.  From this the White House defendants argue that the OA "was permitted under the FRA [Federal Records Act] to recycle, or delete, backup tapes 'when 90 days old.'"

critical to ascertain what back-up copies may have been destroyed to determine what additional steps can and should be taken to replicate those copies before the end of President Bush's term in office. These other copies, however, whether in hard drives or other repositories, are only accessible for the duration of President Bush's term, after which they will be cleaned out for the incoming president. Accordingly, it is critical to pinpoint what back-up copies are presently available and what back-up copies have been destroyed to explore, in the short time that remains, alternative methods of restoring the millions of deleted email records.

It is also essential to secure the documentation assembled by the OA when it first discovered the missing email problem in October 2005. This documentation will shed light on the scope of the missing email problem and how it can be redressed. In particular, the recovery plan that the OA developed after it discovered the deleted emails, which called for restoring the deleted emails from then-existing back-up tapes, will confirm what back-up copies must presently be preserved for a successful restoration effort. Given the current dispute between the parties as to precisely what should be preserved to prevent irreparable injury, this document would streamline the court's processes, would limit or eliminate altogether lengthy satellite litigation over threshold preservation issues, and would present no hardship for the White House defendants to produce.

CREW has sought this information under the Freedom of Information Act ("FOIA") and its FOIA request is the subject of a separate lawsuit, CREW v. OA, Civil No. 07-0964 (CKK) (D.D.C.), in which the White House has argued that the OA is not an agency and therefore is not

Ds' Oppos. at 11.

9

subject to the FOIA.[8]  The status of these documents as agency or non-agency records for

purposes of the FOIA, however, does not place them beyond CREW's reach in this litigation,

where they are clearly fair game for discovery.  As highly relevant evidence of the scope of the

email problem and what needs to be preserved to ensure the Court's ability to award plaintiff full

and effective relief, these documents should be disclosed at the outset of this litigation.

Finally, documents about the architecture of the email storage system that the EOP used

between March 2003 and October 2005, the period during which the millions of emails were

deleted, and the email storage system currently in use by the EOP (to the extent, if any that it

differs) would be enormously useful in sharpening the focus of this litigation, especially as the

Court grapples with what preservation obligations it should impose on the defendants.  The

White House defendants have made it clear that absent discovery, they will not provide answers

to even the most basic questions.  See, e.g., Defendants' Opposition to Plaintiff's Motion for a

Temporary Restraining Order, p. 17.  Yet basic information about how the email storage system

works will go a long way towards assessing what must currently be preserved and why.  And, as

with the recovery plan developed by the OA, production of these documents will not be a

hardship for the defendants.

In sum, the backdrop of this case presents compelling reasons why expedited discovery is

warranted.  Under this administration's watch, millions of email have gone missing and the

White House has done nothing to reconstruct those historically important federal records or take

-------------------

[8] In arguing that it is not an agency subject to the FOIA, the OA reversed the course it has
followed since its inception of holding itself out as an agency and complying with all of the
FOIA's requirements, including the promulgation of FOIA regulations (found at 5 C.F.R. Part
2502).

steps to prevent further document destruction. When confronted with requests for information about the missing email problem, the White House has unilaterally removed itself from the public arena altogether by declaring that the OA is no longer an agency subject to government sunshine laws. In the short life of this lawsuit the White House defendants have refused to give adequate assurances of document preservation, refused to provide basic information and refused to meet with plaintiff's counsel to plan for discovery. Most recently, in their objections to Judge Facciola's report and recommendation, the defendants have objected to preserving back-up copies under conditions that will permit their eventual use. Defendants' Objections, p. 7. Clearly the defendants do not share the plaintiff's goal of preserving these documents for future public access. The defendants' conduct coupled with the risk that critical evidence will not be preserved provide ample support for the limited discovery plaintiff seeks to conduct at this juncture.

## II. THE COURT SHOULD COMPEL THE DEFENDANTS IMMEDIATELY TO MEET AND CONFER AS RULE 26(f) REQUIRES.

Rule 26(f) of the Federal Rules of Civil Procedure states in clear, unambiguous terms that the parties to a civil lawsuit "must, as soon as practicable" confer on a number of issues, including "the nature and basis of their claims and defenses," to arrange for the initial disclosures that Rule 26(a)(1) requires of the parties, "to discuss any issues relating to preserving discoverable information, and to develop a proposed discovery plan . . ." The Rule further provides that "[t]he attorneys of record . . . are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan." Fed. R. Civ. P. 26(f)(6).

Courts interpreting this rule have emphasized that "[t] responsibility for arranging this conference and initiating discovery is placed squarely on the shoulders of the attorneys of record and not on the district court." Scott v. Graphic Communications Internat'l Union, 2004 U.S. App. LEXIS 4979 *3 (3d Cir. 2004). Moreover, "[w]hile Rule 26(f) does not state with precision when such a conference between the parties must occur, it does provide that it should take place 'as soon as practicable' . . ." OMG Fidelity, Inc. v. Sirius Technologies, Inc., 239 F.R.D. 300, 303 (N.D.N.Y. 2006).

Pursuant to this mandatory obligation, CREW has attempted more than once to arrange for a conference, proposing complete availability within a two-week window of time. To date, however, defendants' counsel has refused to respond substantively to this request, refused to identify her availability to meet and refused to provide alternative dates. This conduct is a complete abrogation of the responsibilities that defendants' counsel shares with plaintiff's counsel under Rule 26(f).

It may be that defendants are attempting to avoid discovery, given the prohibition in Rule 26(d) on conducting discovery prior to the Rule 26(f) conference, absent agreement of the parties or court order. This, of course, would be highly improper, particularly given that one of the purposes that the Rule 26(f) conference is intended to serve is to identify the parties' positions on discovery.

Under these circumstances and particularly in view of the pressing need for discovery and the time-sensitive nature of this lawsuit, as discussed herein, defendants should be ordered to meet and confer immediately with plaintiff pursuant to Rule 26(f), whether or not the Court also grants plaintiff leave to conduct expedited discovery.

12

**CONCLUSION**

For the foregoing reasons, plaintiff respectfully requests that its motion for expedited

discovery be granted.  Plaintiff further requests that defendants be ordered to immediately meet

with plaintiff pursuant to Rule 26(f) of the Federal Rules of Civil Procedure.

Respectfully submitted,

_____/s/_____

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
   in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Phone:  (202) 408-5565
Fax:  (202) 588-5020

Attorneys for Plaintiff

Dated:  October 26, 2007

13

# EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NATIONAL SECURITY
ARCHIVE,

         Plaintiff,

         v.

EXECUTIVE OFFICE OF THE
PRESIDENT, et al.,

         Defendants.

Civil Action No. 07-1577 (HHK/JMF)

MEMORANDUM ORDER

Before the court is <u>Plaintiff's Motion for Leave to Serve Expedited Discovery Requests and to Compel Rule 26(f) Conference</u> ("Motion"), which was referred to me for resolution by Judge Henry H. Kennedy, Jr. on November 28, 2007.

**a. Background**

This case involves a claim by plaintiff, the National Security Archive ("the Archive"), that several million email messages have been improperly deleted from White House computer servers. <u>Complaint for Declaratory, Injunctive, and Mandamus Relief</u> ("Complaint") at 13-14. In its Complaint, filed on September 5, 2007, the Archive seeks "an order requiring the defendants to recover and restore certain electronic communications created and/or received within the White House." <u>Id.</u> at 1.

On October 18, 2007, the Archive requested a meeting with defendants pursuant to Rule 26(f)[1] of the Federal Rules of Civil Procedure. <u>Memorandum in Support of</u>

---

[1] All references to the Federal Rules of Civil Procedure are to the version that became effective December 1, 2007.

<u>Plaintiff's Motion for Leave to Serve Expedited Discovery Requests and to Compel Rule</u> <u>26(f) Conference</u> ("NSA Mem.") at 4.  That rule requires the parties to meet and confer "as soon as practicable" to:

> consider the nature and basis of their claims and defenses and the possibilities for promptly settling or resolving the case; make or arrange for the disclosures required by Rule 26(a)(1); discuss any issues about preserving discoverable information; and develop a proposed discovery plan.

Fed. R. Civ. P. 26(f)(1), (2).  Six days later, the Archive filed the instant Motion seeking "an order expediting the commencement of discovery and compelling the parties to meet pursuant to Rule 26(f) as soon as possible."  Motion at 1.

### b. The Motion

The Archive is primarily focused on obtaining answers to "what back-ups of EOP emails still exist and how their preservation is ensured."  NSA Mem. at 7.  Judge Kennedy answered the latter question when, in a related case, he ordered defendants to preserve all back-ups in the "possess[ion of EOP] or under their custody or control." <u>Citizens for Responsibility and Ethics in Washington ("CREW") v. Exec. Office of the</u> <u>President</u>, Civil Action No. 07-1707, Order at 2 (Nov. 12, 2007).  Pursuant to that order, defendants must "preserve the media under conditions that will permit their eventual use, if necessary, and shall not transfer said media out of their custody or control without leave of this court." <u>Id.</u>

As to the question of "what back-ups of EOP emails still exist," the Archive seeks to determine whether the back-ups now being preserved pursuant to Judge Kennedy's order contain the several million email messages it alleges have been improperly deleted from White House computer servers.  NSA Mem. at 7-9.  If the back-ups do not contain this information, the Archive would likely seek to "recover the missing records from

other sources, including individual workstations, or through other forensic means." NSA
Mem. at 9. That would not come without a fight, however. Defendants have vigorously
challenged the standing of the Archive to seek, and the jurisdiction of this court to
compel, restoration of electronic records.[2] Defendants' Consolidated Opposition To
Plaintiffs' Motions For Leave To Conduct Expedited Discovery And Motion To Compel
Rule 26(F) Conference ("Opp.") at 3 ("[w]hether and how restoration efforts will be
undertaken is action committed to the administrative scheme"); Defendants'
Consolidated Motion to Dismiss Plaintiffs' Complaints ("Mot. to Dismiss") at 8-14.

### c. Conclusion

To the extent that the missing emails are contained on the back-ups preserved
pursuant to Judge Kennedy's order, there is simply no convincing reason to expedite
discovery – particularly where, as here, there is a pending motion to dismiss. If the
missing emails are not on those back-ups, however, the relief likely to be requested by
the Archive will be beyond the scope of the present Motion – and, indeed, beyond the
scope of this referral. The request for that relief will also be time-sensitive: emails that
might now be retrievable from email account folders or "slack space"[3] on individual
workstations are increasingly likely to be deleted or overwritten with the passage of time.

It is thus possible that a small amount of information not currently in the record
may have a large affect on the resolution of this Motion and the direction of this lawsuit.

---

[2] This argument is not without merit, as evidenced by a recent decision in which Judge Richard J. Leon
dismissed a similar case after holding that the court lacked jurisdiction to prevent the unlawful removal or
destruction of records protected by the Federal Records Act. CREW v. U.S. Dep't. of Homeland Sec., No.
06-883, Slip. Op. at 17-18 (D.D.C. Dec. 17, 2007).

[3] See United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 46 n.7-8 (D. Conn. 2002) ("'Slack
space' is the unused space at the logical end of an active file's data and the physical end of the cluster or
clusters that are assigned to an active file. Deleted data, or remnants of deleted data can be found in the
slack space . . . until it is overwritten by new data.").

With that understanding, the court will order the defendants to provide answers[4] to the following questions:

      1.    Are the back-ups[5] catalogued, labeled or otherwise identified to indicate the period of time they cover?

      2.    Are the back-ups catalogued, labeled or otherwise identified to indicate the data contained therein?

      3.    Do the back-ups contain emails written and received between 2003-2005?

      4.    Do the back-ups contain the emails said to be missing[6] that are the subject of this lawsuit?

      I will proceed to resolve the Motion after receipt of the defendants' answers.

**SO ORDERED.**

Date:   January 8, 2008                    /s/
                                      JOHN M. FACCIOLA
                                      UNITED STATES MAGISTRATE JUDGE

---

[4] The answers are to be provided by counsel in a sworn declaration within the next five business days.

[5] For purposes of these questions, the word "back-up" refers to media, no matter how described, presently in their possession or under their custody or control, that were created with the intention of preserving data in the event of its inadvertent destruction, and that are being preserved in accordance with Judge Kennedy's order.

[6] See NSA Mem. at 2 ("The White House acknowledged in two April 2007 press conferences that as many as 5 million emails may be missing."). Id. at 2 n.2 ("Press Release, White House Office of the Press Secretary, Press Gaggle by Dana Perino and Dr. Ali Al-Dabbagh, Spokesman for the Government of Iraq (April 13, 2007) (White House spokesperson quoted as saying, 'I wouldn't rule out that there were a potential 5 million emails lost'); Press Release, White House Office of the Press Secretary, Press Briefing by Dana Perino (April 16, 2007) (White House spokesperson quoted as saying, 'we are aware that there could have been some emails that were not automatically archived because of a technical issue').").

# EXHIBIT 6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No: 1:07-cv-01707 (HHK/JMF) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) |  |
| Defendants. | ) ) |  |
| NATIONAL SECURITY ARCHIVE, | ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | Civil Action No: 1:07-cv-01577 (HHK/JMF) |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) ) ) |  |
| Defendants. | ) ) ) |  |

## DECLARATION OF THERESA PAYTON

I, Theresa Payton, declare as follows:

1.     My name is Theresa Payton and I currently hold the position of Chief Information

Officer (CIO) in the Office of Administration (OA), Executive Office of the President (EOP).  In

this capacity, I am responsible for providing strategic and operational leadership within the

Office of the Chief Information Officer (OCIO).  I have held the position of CIO in OA since

May 2006.

2.     I submit this Declaration on behalf of the Defendant OA pursuant to the Order of

Magistrate Judge John M. Facciola dated January 8, 2008.  The statements contained in this

Declaration are based on my personal knowledge and on information provided to me by members of my staff in the performance of my official duties.

**A.    *OA and the OCIO***

3.    OA was created by Reorganization Plan No. 1 of 1977 and Executive Order 12028. Its primary functions include providing common administrative and support services for the EOP components.

4.    The OCIO, which is an operating unit of OA, provides around-the-clock customer service for all EOP components and the Office of the Vice President, consisting of more than 3000 users and customers, in excess of 200 servers, and over 100 applications. Specifically, the OCIO is responsible for providing EOP components with unified enterprise services such as production support, application development and support, office automation, e-mail, disaster recovery back-up information, Continuity of Operations (COOP) support, and intranet capabilities. It also provides coordination of compliance programs for Federal Records, Federal Enterprise Architecture, and Information Assurance. The OCIO is also charged with protecting and safeguarding the complex, sensitive but unclassified EOP network (EOP Network) (including the infrastructure, web sites, remote access, and data).

5.    As part of its email record-keeping responsibilities, the OCIO employs an archiving process. Since the phased deployment of Microsoft Exchange as the email system for the EOP Network, that process has entailed saving journaled emails to .pst files that are then maintained on the EOP Network.

**B.    *The EOP's Disaster Recovery System***

6.    As a matter of good business practices, the EOP Network has been and continues to be regularly "backed-up" onto disaster recovery back-up tape media as part of the EOP's

2

disaster recovery system. The back-ups occur as a protective measure for purposes of restoring EOP operations in the event of a disaster or catastrophic incident resulting in the partial or total loss of operating systems and data. OA's process for creating disaster recovery back-up tapes ("tapes" or "back-up tapes") has changed over time, undergoing periodic upgrades, enhancements and improvements. The data-types contained on the tapes include the server software, such as operating systems and applications. The data-types also include files saved on the server such as, for example, email databases and/or email environment information.

7.      The purpose of the tapes created and maintained by OA is to create a "snapshot" of the EOP Network, including its operating systems, as well as applications and data thereon, at the point in time of the back-up. For example, the snapshot captures all email information present on the EOP Network in the journals, the .pst archives, and the customer mailboxes at the time the back-up is created. In the event of a disaster or catastrophic incident that results in the partial or total loss of operating systems and data, these tapes could be used to reconstruct the data on the EOP Network as it existed at the time of the last back-up. Thus, any reconstruction following a disaster or catastrophic incident should reflect the EOP Network at the time of the last back-up. Configuration changes, system patches, anti-virus updates and other changes made after the latest back-up but prior to the disaster or catastrophic incident would not be included on tapes and, thus, would not be reflected in a reconstructed system. Similarly, any emails sent or received after the latest back-up but prior to the disaster or catastrophic incident may not be backed up on tapes and, thus, may not be reflected in a reconstructed system. This limitation in the disaster recovery back-up process is consistent with industry standards for these types of disaster recovery systems.

8.    The back-up tapes have been used to restore information that is not otherwise available on the EOP Network. When applied to email recovery, the process is complex, labor intensive and costly. By way of hypothetical example, a request to recover a specific file(s) from a particular date or date range within the period of 2003-2005 would be forwarded to the OCIO. The OCIO would then ordinarily consult a media database, similar to a catalogue or back-up tape index, to identify a range of tapes that correspond to that request. In this process, the OCIO may pull tape sets backed up prior to and/or subsequent to the target date period to ensure they have the full population of potential tape sets that may contain the requested file. Additionally, the OCIO would then restore the data-type environment, applicable software, and/or information, and then conduct a search for the information requested.

### C.    *Plaintiffs' Claims*

9.    As I understand the Complaint, plaintiffs allege that the EOP failed to electronically archive some emails in the period 2003-2005. Plaintiffs allege that OA created a "detailed analysis" of this alleged problem. *See* CREW Comp., ¶ 34; NSA Comp., ¶ 32.

10.    I am aware of a chart created by a former employee within the OCIO that purports to identify certain dates and EOP components for which the chart's creator appears to have concluded that certain EOP components were missing emails on certain dates in the 2003-2005 time period. Specifically, the chart appears to have concluded that some components on some dates had either (i) a lower-than-expected number of emails preserved in the normal electronic archiving process, or (ii) no emails preserved in the normal electronic archiving process. I believe this is what Plaintiffs refer to as the "detailed analysis."

11.    The OCIO has reviewed the chart and has so far been unable to replicate its results or to affirm the correctness of the assumptions underlying it. Accordingly, this office has

4

serious reservations about the reliability of the chart. Given these concerns, and the apparent lack of supporting documentation, this office has undertaken an independent effort to determine whether there may be anomalies in Exchange email counts for any particular days resulting from the potential failure to properly archive emails for the 2003-2005 time period. That process is underway and we expect the independent assessment to be completed in the near term.

**D.**    *Responding to the Court's Questions*

12.    In light of this background, I now turn to the four questions posed by the Court:

a.    **Question No. 1: Are the back-ups catalogued, labeled or otherwise identified to indicate the period of time they cover?**

It is possible to discern an approximate time period of the latest information backed up to a tape set by examining the information in the media database and reviewing the information for the last date on which data was written to an individual back-up tape. The media database does not display information that indicates fixed, identifiable periods of time. However, the tapes are labeled with a barcode, which correlates to an entry in the media database and, in turn, to the information about the last back-up to a particular tape.

b.    **Question No. 2: Are the back-ups catalogued, labeled or otherwise identified to indicate the data contained therein?**

For each back-up tape, the media database contains a field identifying the type of server that is backed up. Although the information in this field does not reveal details about the data itself, it does identify whether a particular back-up tape should contain data relating to Microsoft Exchange emails and/or email environment information.

5

c.   **Question No. 3: Do the back-ups contain emails written and received between 2003-2005?**

Prior to October 2003 and continuing through 2005 and to the present, this office has regularly created back-up tapes for the EOP Network, which includes the system's email servers. Consistent with industry best practices relating to tape media management for disaster recovery back-up systems, these tapes were recycled prior to October 2003. In October 2003, this office began preserving and storing all back-up tapes and continues to do so. For that reason, emails sent or received in the 2003-2005 time period should be contained on existing back-up tapes.

d.   **Question No. 4: Do the back-ups contain the emails said to be missing that are the subject of this lawsuit? [Footnote omitted.]**

As I understand the Complaint, some emails are alleged to be missing from electronic archives in the period 2003-2005. At this stage, this office does not know if any emails were not properly preserved in the archiving process. We are continuing our efforts to determine whether there may be anomalies in Exchange email counts for any particular days in 2003-2005 resulting from the potential failure to properly archive emails. However, in view of this office's practice in the 2003-2005 time period of regularly creating back-up tapes for the EOP Network, which includes servers containing emails, and in view of this office's practice of preserving all such back-up tapes from October 2003 to the present, the back-up tapes should contain substantially all the emails sent or received in the 2003-2005 time period.

6

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, the foregoing to be true

and correct.

Executed the _15_ day of January, 2008.


THERESA PAYTON
Chief Information Officer
Office of Administration, Executive Office
of the President

7

**EXHIBIT 7**

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
   DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY   (202) 225–5051
FACSIMILE  (202) 225–4784
MINORITY   (202) 225–5074

www.oversight.house.gov

TOM DAVIS, VIRGINIA,
   RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

December 20, 2007

Mr. Fred F. Fielding
Counsel to the President
The White House
1600 Pennsylvania Avenue
Washington, DC 20500

Dear Mr. Fielding:

In January 2009, the National Archives will take possession of the presidential records of the Bush Administration. I have concerns about whether the White House has prepared for this process and is preserving records according to its obligations under the Presidential Records Act.

Congress passed the Presidential Records Act in 1978, making clear that a president's records belong to the American public, not to the president or his advisors. The Act defines presidential records as:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.[1]

The Act requires each president to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records."[2]

Serious questions have been raised about whether the White House has sufficient systems in place to preserve presidential records and to prepare for the transition to the next President. In just over one year, the White House will be required to turn over all of its presidential records to

---

[1] 44 U.S.C. §2201.

[2] 44 U.S.C. §2203.

Mr. Fred F. Fielding
December 20, 2007
Page 2

the National Archives for storage, review, and eventual release to the public. According to information received by the Committee, the White House has not implemented a robust system for archiving e-mails and other electronic records despite several efforts to do so. In addition, in briefings with White House officials, Committee staff have been informed that during a 2005 review of White House servers, the White House found numerous days with few or no e-mails for certain White House components. Nevertheless, even today, more than two years after this problem was first discovered by White House staff, the White House still has not identified the cause of the problem, determined the volume of e-mails lost, or developed a plan for restoring those e-mails that were lost.

Moreover, the Committee learned earlier this year that a large number of White House officials, including some of the President's closest advisors, regularly used RNC e-mail accounts. As documented in a majority staff report, many of these e-mails have apparently been destroyed.[3]

The official records of this presidency belong to the American public. The public needs assurances that these records are being properly maintained and will be provided to the National Archives at the end of this administration. For these reasons, the Committee is considering holding hearings next year to examine the White House's past actions relating to compliance with the Presidential Records Act, as well as its plans for the handover in January 2009. In order to prepare for these hearings, I ask that you provide the Committee with the following documents:

1.    Any documents relating to potential failures to archive or maintain Executive Office of the President e-mails during the Bush Administration, including documents discussing options for restoring or recovering lost e-mails;

2.    Information about e-mail back-up tapes maintained by the White House, including the number of back-up tapes holding White House data, the content of those tapes, and a description of how these tapes are labeled, organized, and stored;

3.    Any documents relating to the maintenance or development of existing or proposed electronic records management, e-mail archiving, or e-mail retrieval systems for the Executive Office of the President during the Bush Administration, including internal White House communications, requests for proposals, statements of work, task orders, and other contract documents; and

4.    Any documents relating to the transfer of presidential records to the National Archives at the end of the Bush Administration, including communications with the National

---

[3] Majority Staff, House Committee on Oversight and Government Reform, *Interim Report: Investigation of Possible Presidential Records Act Violations* (June 2007).

Mr. Fred F. Fielding
December 20, 2007
Page 3

Archives on this issue, needs assessments, plans, contract documents, and internal White House communications, such as directives to White House staff regarding preservation of records and other preparation for the transition.

I request that you provide the documents requested above by February 1, 2008. In addition, I request that you provide my staff with a briefing by the same date from the official or officials in charge of preparation for the transition of presidential records from the White House to the National Archives.

The Committee on Oversight and Government Reform is the principal oversight committee in the House of Representatives and has broad oversight jurisdiction as set forth in House Rule X. An attachment to this letter provides additional information about how to respond to the Committee's request.

If you have any questions about this request, please contact Michael Gordon or Anna Laitin with the Committee staff at (202) 225-5420.

Sincerely,

Henry A. Waxman
Chairman

Enclosure

cc:    Tom Davis
       Ranking Minority Member

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
  DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6143

MAJORITY (202) 225-5051
FACSIMILE (202) 225-4784
MINORITY (202) 225-5074
www.oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

December 20, 2007

The Honorable Allen Weinstein
Archivist of the United States
National Archives and Records Administration
700 Pennsylvania Avenue, NW
Washington, DC 20408

Dear Dr. Weinstein:

In January 2009, the National Archives will take possession of the presidential records of the Bush Administration. I have concerns about whether the White House has prepared for this process and is preserving records according to its obligations under the Presidential Records Act.

Congress passed the Presidential Records Act in 1978, making clear that a president's records belong to the American public, not to the president or his advisors. The Act defines presidential records as:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, his immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise and assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.[1]

The Act requires each president to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of his constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records."[2]

Serious questions have been raised about whether the White House has sufficient systems in place to preserve presidential records and to prepare for the transition to the next President. In just over one year, the White House will be required to turn over all of its presidential records to

---

[1] 44 U.S.C. §2201.

[2] 44 U.S.C. §2203.

The Honorable Allen Weinstein
December 20, 2007
Page 2

the National Archives for storage, review, and eventual release to the public. According to information received by the Committee, the White House has not implemented a robust system for archiving e-mails and other electronic records despite several efforts to do so. In addition, in briefings with White House officials, Committee staff have been informed that during a 2005 review of White House servers, the White House found numerous days with few or no e-mails for certain White House components. Nevertheless, even today, more than two years after this problem was first discovered by White House staff, the White House still has not identified the cause of the problem, determined the volume of e-mails lost, or developed a plan for restoring those e-mails that were lost.

Moreover, the Committee learned earlier this year that a large number of White House officials, including some of the President's closest advisors, regularly used RNC e-mail accounts. As documented in a majority staff report, many of these e-mails have apparently been destroyed.[3]

The official records of this presidency belong to the American public. The public needs assurances that these records are being properly maintained and will be provided to the National Archives at the end of this administration. For these reasons, the Committee is considering holding hearings next year to examine the White House's past actions relating to compliance with the Presidential Records Act, as well as its plans for the handover in January 2009. In order to prepare for these hearings, I ask that you provide the Committee with the following documents:

1.   Any documents relating to the transfer of presidential records to the National Archives at the end of the Bush Administration, including communications with the White House on this subject, needs assessments, plans, contract documents, National Archives communications regarding the transfer, and internal White House communications, such as directives to White House staff regarding preservation of records and other preparation for the transition;

2.   Any documents relating to potential failures to archive or maintain Executive Office of the President e-mails during the Bush Administration, including documents discussing options for restoring or recovering lost e-mails; and

3.   Any documents relating to existing or proposed electronic records management, e-mail archiving, or e-mail retrieval systems for the Executive Office of the President during the Bush Administration.

---

[3] Majority Staff, House Committee on Oversight and Government Reform, *Interim Report: Investigation of Possible Presidential Records Act Violations* (June 2007).

The Honorable Allen Weinstein
December 20, 2007
Page 3

     I request that you provide documents requested above by February 1, 2008. In addition, I request that you provide my staff with a briefing by the same date from the official or officials in charge of preparation for the transition of presidential records from the White House to the National Archives.

     The Committee on Oversight and Government Reform is the principal oversight committee in the House of Representatives and has broad oversight jurisdiction as set forth in House Rule X. An attachment to this letter provides additional information about how to respond to the Committee's request.

     If you have any questions about this request, please contact Michael Gordon or Anna Laitin with the Committee staff at (202) 225-5420.

     Sincerely,

     Henry A. Waxman
     Chairman

Enclosure

cc:    Tom Davis
       Ranking Minority Member

**EXHIBIT 8**

HENRY A. WAXMAN, CALIFORNIA,
CHAIRMAN

TOM LANTOS, CALIFORNIA
EDOLPHUS TOWNS, NEW YORK
PAUL E. KANJORSKI, PENNSYLVANIA
CAROLYN B. MALONEY, NEW YORK
ELIJAH E. CUMMINGS, MARYLAND
DENNIS J. KUCINICH, OHIO
DANNY K. DAVIS, ILLINOIS
JOHN F. TIERNEY, MASSACHUSETTS
WM. LACY CLAY, MISSOURI
DIANE E. WATSON, CALIFORNIA
STEPHEN F. LYNCH, MASSACHUSETTS
BRIAN HIGGINS, NEW YORK
JOHN A. YARMUTH, KENTUCKY
BRUCE L. BRALEY, IOWA
ELEANOR HOLMES NORTON,
   DISTRICT OF COLUMBIA
BETTY McCOLLUM, MINNESOTA
JIM COOPER, TENNESSEE
CHRIS VAN HOLLEN, MARYLAND
PAUL W. HODES, NEW HAMPSHIRE
CHRISTOPHER S. MURPHY, CONNECTICUT
JOHN P. SARBANES, MARYLAND
PETER WELCH, VERMONT

ONE HUNDRED TENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON OVERSIGHT AND GOVERNMENT REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY (202) 225–5051
FACSIMILE (202) 225–4784
MINORITY (202) 225–5074

www.oversight.house.gov

TOM DAVIS, VIRGINIA,
RANKING MINORITY MEMBER

DAN BURTON, INDIANA
CHRISTOPHER SHAYS, CONNECTICUT
JOHN M. McHUGH, NEW YORK
JOHN L. MICA, FLORIDA
MARK E. SOUDER, INDIANA
TODD RUSSELL PLATTS, PENNSYLVANIA
CHRIS CANNON, UTAH
JOHN J. DUNCAN, JR., TENNESSEE
MICHAEL R. TURNER, OHIO
DARRELL E. ISSA, CALIFORNIA
KENNY MARCHANT, TEXAS
LYNN A. WESTMORELAND, GEORGIA
PATRICK T. McHENRY, NORTH CAROLINA
VIRGINIA FOXX, NORTH CAROLINA
BRIAN P. BILBRAY, CALIFORNIA
BILL SALI, IDAHO
JIM JORDAN, OHIO

January 17, 2008

Mr. Fred F. Fielding
Counsel to the President
The White House
1600 Pennsylvania Avenue
Washington, DC 20500

Dear Mr. Fielding:

At today's White House press briefing, Deputy Press Secretary Tony Fratto was asked about allegations that White House e-mails have been lost from White House servers. He stated in response: "we have absolutely no reason to believe that any e-mails are missing."

This statement is contrary to information that the White House provided to the Committee staff in a briefing on September 19, 2007. At this briefing, the White House showed staff a chart indicating that there were 473 days for which various entities in the Executive Office of the President had no archived e-mails. According to the chart, the days with no archived e-mails included:

- **For the White House Office:** December 17, 2003, December 20, 2003, December 21, 2003, January 9, 2004, January 10, 2004, January 11, 2004, January 29, 2004, February 1, 2004, February 2, 2004, February 3, 2004, February 7, 2004, and February 8, 2004.

- **For the Office of the Vice President:** September 12, 2003, October 1, 2003, October 2, 2003, October 3, 2003, October 5, 2003, January 29, 2004, January 30, 2004, January 31, 2004, February 7, 2004, February 8, 2004, February 15, 2005, February 16, 2005, February 17, 2005, May 21, 2005, May 22, 2005, May 23, 2005.

- **For the Council on Environmental Quality:** 81 days, including the entire period between November 1, 2003 through January 11, 2004.

- **For the Council of Economic Advisers:** 103 days, including the entire period between November 2, 2003 through January 11, 2004.

Mr. Fred F. Fielding
January 17, 2008
Page 2

- **For the Office of Management and Budget:** 59 days, including the entire period between November 1, 2003 through December 9, 2003.

- **For the U.S. Trade Representative:** 73 days, including the entire period between February 11, 2004 through April 18, 2004.

The White House officials conducting the briefing took this chart with them. They also indicated that the White House was doing an additional analysis to determine whether the information in the chart was accurate. In a letter I sent to you on December 20, 2007, I asked for any new information or analyses about the problem of missing e-mails. I have not received a response to this letter.

Mr. Fratto's statements have added to the considerable confusion that exists regarding the status of White House efforts to preserve e-mails. To help clarify the situation, I request your testimony and the testimony of Alan Swendiman, the Director of the Office of Administration, at a hearing on February 15, 2008, at 10:00 a.m. in 2154 Rayburn House Office Building. At the hearing, I ask that you be prepared to address the issues described in the December 20, 2007, letter and the following questions:

- **Allegations that Executive Office of the President E-mails Were Lost between 2003 and 2005:** When did the White House learn about any such losses, what are the extent of such losses, what steps has the White House taken to respond to any such losses, and who was responsible for ensuring the preservation of White House e-mails during this period?

- **Recycling of Back-up Tapes between 2001 and 2003:** Who had responsibility for ensuring the preservation of e-mails between 2001 and 2003, who was responsible for the decision to recycle back-up tapes during this period, what was the basis of the decision to recycle back-up tapes, who was responsible for the decision to stop this practice in 2003, and why did this change in practice take place?

- **Electronic Records Preservation at the White House:** Have concerns been raised about the adequacy of the e-mail preservation system, and what steps has the White House taken to ensure sufficient electronic records preservation and e-mail archiving?

- **Presidential Transition Planning:** Who is responsible for preparing the White House to transition presidential records to the National Archives, what directives have been issued to White House staff regarding preservation of records and preparation for transition, what plans have been developed for the transition of both paper and electronic records, and what has the White House done to coordinate with the National Archives on transition planning?

Mr. Fred F. Fielding
January 17, 2008
Page 3

     The Committee on Oversight and Government Reform is the principal oversight committee in the House of Representatives and has broad oversight jurisdiction as set forth in House Rule X.  Information for witnesses appearing before the Committee is contained in the enclosed Witness Information Sheet.

                 Sincerely,

                 Henry A. Waxman
                 Chairman

Enclosure

cc:     Tom Davis
         Ranking Minority Member

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZEN FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No: 1:07-CV-00964 (CKK) |
| OFFICE OF ADMINISTRATION, | ) ) ) | |
| Defendant. | ) ) | |

**[PROPOSED] ORDER**

The Court having considered plaintiff's request for an immediate status conference,

defendant's response and the entire record herein, it is hereby

ORDERED that plaintiff's motion is GRANTED and that a status conference in this

matter shall be held on _____.


DATED: _____          _____
                                 COLLEEN KOLLAR-KOTELLY
                                 United States District Judge