# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZEN FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No: 1:07-CV-00964 (CKK) |
| | ) |
| OFFICE OF ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S MOTION AND SUPPORTING MEMORANDUM TO COMPEL PRODUCTION OF DOCUMENTS IN RESPONSE TO PLAINTIFF'S THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS OR ALTERNATIVELY TO AMEND THE COURT'S ORDER OF FEBRUARY 22, 2008 TO REQUIRE DEFENDANTS TO PRODUCE DOCUMENTS RELATING TO THE DATES THAT THE OFFICE OF ADMINISTRATION PURPORTEDLY STOPPED FUNCTIONING AS AN AGENCY**

## STATEMENT

Plaintiff seeks four categories of documents relating directly to the Office of Administration's ("OA") claim of functioning as a non-agency exempt from the Freedom of Information Act ("FOIA"). Defendant has refused to produce these documents, claiming the request is outside of authorized discovery and the date or dates on which OA ceased functioning as an agency under the FOIA, federal record keeping statutes and other statutes governing agencies are not relevant. To the contrary, the requested documents are necessary for the Court to resolve the central issue presented: on which side of the agency divide does OA fall?

This Court authorized the parties to conduct limited discovery that "is probative of whether OA [the Office of Administration] exercises substantial independent authority, i.e., beyond its administrative functions for EOP components." Order of February 22, 2008 at p. 2. Excluded from the scope of permissible discovery is "OA's *prior functioning* under the FOIA

[Freedom of Information Act], the Presidential Records Act, or the Federal Records Act." Id. (emphasis added). By this discovery order the Court recognized that how OA currently and actually functions bears directly on the issue of whether OA is an agency subject to the FOIA.

It is now clear from the deposition testimony of OA Director Alan Swendiman that OA's functions did not change on a date certain that correlates to its claim of non-agency status. In other words, OA did not on a date certain suddenly become a non-agency. For example, while Mr. Swendiman testified that he was told when he began working at OA in November 2006 that OA was not an agency, OA staff continued to function under the Federal Records Act until the fall of 2007. Even today, OA continues to assert statutory authority granted to executive branch agencies, despite its claim here that it is not an agency. As a result, OA cannot claim that there is a date certain on which it ceased functioning as an agency.

This is not a mere issue of semantics; the Court's Order authorizing discovery sets out as a dividing line OA's prior functioning as an agency. Yet to hew to that line requires an understanding of the date or dates on which OA ceased functioning under the FOIA, Federal Records Act, Presidential Records Act or any other statute probative of OA's status here.

Defendant's objection to this discovery cannot be squared with its purpose and the factual analysis in which this Court must engage to determine OA's status under the FOIA. While OA acknowledges that in the past it has functioned as an agency, it now claims that it is functioning as a non-agency. As the emerging facts make clear here, however, at various points in time when OA has declared itself to be a non-agency it still has continued to function as an agency in a variety of ways. Thus, the documents CREW seeks will shed light on a critical issue of whether, when and to what degree OA functions as a non-agency. Accordingly, even if

CREW's latest document requests are not deemed within the scope of this Court's original Order, they should be permitted as clearly relevant and necessary to resolving the issue before the Court.

## **BACKGROUND**

By Order dated February 11, 2008, the Court ruled that very limited discovery, jurisdictional in nature, was appropriate as to OA's agency status. The Court's Order characterizes the question at issue as "limited" to "OA's authority over or responsibilities to any third parties, including federal agencies, or of any functions that OA in fact carries out beyond those specifically delineated in its charter documents." Order of Feb. 11, 2008 at pp. 5-6. Accordingly, the Court directed the parties to file a Joint Discovery Plan, which they submitted on February 22, 2008.

The parties disagreed on what discovery should be conducted under the Court's Order. Plaintiff proposed four depositions and document requests aimed at shedding light on the functions and responsibilities of OA with respect to other EOP components and other third parties. Defendant opposed any depositions and in particular three of the proposed depositions as unnecessary. Defendant also objected to all but two of plaintiff's document requests.

In a subsequent Order dated February 22, 2008, the Court ruled that plaintiff could depose only OA Director Alan Swendiman, reasoning that the testimony of the other three proposed deponents "relate[s] to issues that are either uncontested or are covered by documents in the record." Order of Feb. 22, 2008, p. 3. The Court expressly accorded plaintiff a right to conduct "any additional discovery that it believes is warranted based on Director Swendiman's deposition." Id. at 4. As to plaintiff's proposed document requests, the Court determined that

the vast majority relate to issues "addressed by documents already in the record or issues that are uncontested" id. at 1, which include how OA functions with respect to other EOP components. Also excluded from scope of permissible discovery is "discovery regarding OA's prior functioning under FOIA, the Presidential Records Act, or the Federal Records Act." Id. at 2.

Consistent with this Order, plaintiff served a new set of document requests on the defendant and on March 13, 2008, plaintiff took the deposition of Alan Swendiman.[1]  From Mr. Swendiman's deposition testimony it is now clear that OA's functioning under the FOIA and other record-keeping statutes has been wildly inconsistent and that despite OA's claim here that it is no longer an agency, it continued to function as an agency in a variety of ways well after this litigation was filed.

As a result of these emerging facts, plaintiff served on defendant a third set of document requests ("3rd Doc. Req.") (attached as Exhibit 1), seeking all documents that reflect, evidence, or relate to the date or dates when OA stopped functioning:  (1) as an agency subject to the FOIA, (2) as an agency subject to the Federal Records Act, (3) as an entity subject to the Presidential Records Act, and (4) as an agency under any federal statute not encompassed by the other three cited statutes.  3rd Doc. Req., Nos. 10-13.  Given the discovery cut-off of March 28, 2008, plaintiff requested a response by March 21, 2008.

On March 20, 2008, defendant responded to plaintiff's document requests.  In its response ("D's Doc. Resp.") (attached as Exhibit 2), defendant objected to producing any of the requested documents as outside the scope of permissible discovery.  D's Doc. Resp. at 2. According to defendant, "[i]t is . . . undisputed that there is a point in time when OA ceased

---

[1] There are no issues in dispute with respect to this set of document requests.

functioning under the Federal Records Act and began functioning under the Presidential Records Act." D's Doc Resp. at 4. Yet in defendant's view, "[w]hen that change took place, or what record keeping changes were associated with that change, are not the subject of this litigation . . ." Id.

## ARGUMENT

### THE COURT SHOULD COMPEL DEFENDANT TO PRODUCE PLAINTIFF'S REQUESTED DOCUMENTS, WHICH ARE CLEARLY RELEVANT TO THE ISSUES THE COURT MUST RESOLVE.

Plaintiff requests additional discovery to help resolve the fundamental issue before this Court: does OA function as an agency under the FOIA in determining its obligations to expedite and process plaintiff's FOIA request? Recent discovery has revealed that long after OA proclaimed internally that it is not an agency, it continued to comply with statutes governing executive branch agencies and accepted CREW FOIA request for processing. Just as significantly, discovery has revealed that OA's functions did not change on a date certain. Instead, OA claims it ceased functioning as an agency under the FOIA at a quite different time than it ceased functioning as an agency under the Federal Records Act. To properly evaluate the consequences of these actions, the Court clearly will need to know when each took place, the aim of CREW's requested documents.

The deposition of OA Director Alan Swendiman disclosed the degree of inconsistency in OA's actions. For example, Mr. Swendiman testified that when he came to OA he was "advised" by OA's General Counsel's Office "that the OA was not an agency subject to FOIA," although he could not state on what date OA stopped functioning as an agency. Deposition Transcript of Alan R. Swendiman, pp. 14, 15 ("Swendiman Depo") (attached as Exhibit 3). Yet

5

despite this advice OA continued to assign a staff person to process FOIA requests until some

time in 2007.  Id. at 16-17.  And OA did not even begin its transition from the Federal Records

Act to the Presidential Records Act until some time in the August-September 2007 time-frame.

Id. at 19.

      Mr. Swendiman's testimony also makes clear that even today OA's compliance with the

Presidential Records Act remains unsettled.   Indeed, notwithstanding OA's argument here that it

its not an agency, the National Archives and Records Administration ("NARA") -- the agency

responsible for administering the Federal Records Act -- apparently did not know of this

proclaimed change in OA's status until October 31, 2007, two months after OA filed a brief in

this case arguing it is not an agency.  Sam Watkins, a NARA official, sent Theresa Payton, OA's

Chief Financial Officer, an email on November 6, 2007 (attached as Exhibit 4) noting that

NARA "now ha[s] a better understanding of the systems used by the office of the OA CFO, and

what Presidential records may be generated by those systems *now that OA is a PRA*

*organization*." (emphasis added).

      In a variety of other contexts, OA has continued to function as an agency at the same

time it has declared itself to be a non-agency.  For example, OA continues to enter into

memoranda of understanding with other executive branch agencies to provide or receive services

under the authority of the Economy Act, a statute that by its express terms governs "crediting

payments from purchases *between executive agencies*."  5 U.S.C. § 1536 (emphasis added); see

also Exhibit 2 to Swendiman Depo. (attached as Exhibit 5).  Moreover, these agreements are

entitled "Executive Office of the President -- Interagency Agreement," id., clearly denoting an

agreement between two agencies.

These facts comprise part of the entire picture of how OA actually functions, irrespective of its self-described non-agency status, and will guide the Court in deciding "the side of the 'agency' line on which OA falls."  Order of Feb. 11, 2008, p. 3.  Mr. Swendiman's testimony confirms that at various points in time when OA has claimed non-agency status it has nevertheless continued to comply with statutes governing agencies.  This, in turn, confirms that OA's  functions did not change at a fixed point in time.  Instead, OA repudiated its FOIA obligations on a date different than it repudiated its obligations under the Federal Records Act, and in both cases it continued to act, at least in part, as if it were still subject to both statutes.

The Court's discovery orders recognize that evidence of OA's actual functioning bears directly and possibly conclusively on the legal issue of whether OA has an obligation to complete its processing of plaintiff's FOIA request.  Here OA has argued that even though it functioned as an agency under the FOIA and federal record keeping statutes in the past, at some point in time it no longer did so.  According to defendant, although these changes reflect its new status as a non-agency status, the timing of these changes is irrelevant.  But in resolving OA's legal obligations to CREW here, the Court must place OA's actual functioning in a specific time-frame.  Plaintiff's four document requests aim to do just that.

Accordingly, the Court should compel OA to comply fully with plaintiff's third set of document requests.  Even if those requests are not within the scope of discovery the Court has authorized -- which CREW does not concede -- they are relevant and necessary to resolving the ultimate issue of whether OA is an agency under the FOIA.

Pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure and LCvR 7(m), counsel for plaintiff has conferred in good faith with counsel for defendant but was unable to

7

resolve this issue without court action.

## **CONCLUSION**

For the foregoing reasons, the Court should grant plaintiff's motion to compel and order

defendant to respond fully to plaintiff's third request for production by March 28, 2008.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
Citizens for Responsibility and Ethics
   in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Telephone:  202-408-5565
Fax:  202-508-506

Attorneys for plaintiff

Dated: March 21, 2008

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil No. 07-0964 (CKK) |
| OFFICE OF ADMINISTRATION, | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFF'S THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO DEFENDANT OFFICE OF ADMINISTRATION

Pursuant to Rule 34 of the Federal Rules of Civil Procedure and the Court's Order of February 22, 2008 (Document 36), plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") hereby submits the following Third Set of Requests for Production of Documents and Things to Defendant Office of Administration ("OA").

Defendant shall respond in writing and produce and permit the inspection and copying of the responsive documents and tangible things by 5:00 p.m. on Friday, March 21, 2008. Defendant shall produce the requested documents and things for inspection at the offices of CREW, 1400 Eye Street, N.W., Suite 450, Washington, D.C. 20005.

## INSTRUCTIONS

1. These requests extend to all documents in your possession, custody or control, or of anyone acting on your behalf. A document is in your possession, custody or control if it is in your physical custody or if it is in the physical custody of any other person and you:

(a) own such document in whole or in part;

(b) have a right, by contract, statute or otherwise, to use, inspect, examine, or copy such document on any terms;

(c) have an understanding, express or implied, that you may use, inspect, examine or copy such document on any terms; or

(d) have, as a practical matter, been able to use, inspect, examine, or copy such document when you sought to do so.

2.  The documents produced in response to these requests shall be (I) organized and designated to correspond to the categories in these requests, or (ii) produced as they are maintained in the normal course of business.

3.  If, in answering these requests, you claim that any request, or a definition or instruction applicable thereto, is ambiguous, set forth the matter deemed ambiguous and the construction used in answering.

4.  If a document called for by these requests has been destroyed, lost, discarded, or otherwise disposed of, identify such document as completely as possible including, without limitation, the following information:  author(s), recipient(s), sender(s), subject matter, date prepared or received, date of disposal, manner of disposal, reason for disposal, person(s) authorizing the disposal, person(s) having knowledge of the disposal and person(s) disposing of the document.

5.  In the event that more than one copy of a document exists, produce every copy on which there appears any notation or marking of any sort not appearing on any other copy, or any copy containing attachments different from any other copy.

6.  Produce all documents in their entirety, without abbreviation or redaction, including both front and back thereof and all attachments or other matters affixed thereto.

2

7.  If you claim any form of privilege, whether based on statute or otherwise, as a ground for not responding to a document request or any part thereof, provide the reason for such objection or the ground or the actual basis, if any, on which the privilege or other ground is based, including sufficient facts to permit the Court to make a determination as to whether the claim of privilege is valid.

8.  Whenever used herein, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular; the masculine shall be deemed to include the feminine and the feminine shall be deemed to include the masculine; the disjunctive (or) shall be deemed to include the conjunctive (and) and the conjunctive shall be deemed to include the disjunctive; and each of the functional words "each," "every," "any," and "all" shall be deemed to include each of the other functional words.

9.  These document requests are continuing in nature.  Documents and tangible things sought by these requests that you obtain or discover after you serve your answers must be produced to counsel for plaintiff by supplementary answers or productions.

## DEFINITIONS

1.  "Document(s)" and "documentation" mean the complete original, or a true, correct and complete copy of any written or graphic matter, no matter how produced, recorded, stored, or reproduced, including without limitation writings and communications of whatever type, nature, or description, whether typed, handwritten, printed or otherwise, as well as all tape recordings, computer tapes, disks, CDs and other electronic or mechanical recordings, however produced or reproduced, including information stored in a computer, whether or not ever printed out or displayed, photographs, drawings, graphs, charts, and other data compilations.  The term

"document" also includes both the original and each and every copy of the original that differs in any significant respect from the original. A draft of a non-identical copy is a separate document within the meaning of the term.

2. "Person(s)" includes any individual, alive or deceased, company, association, corporation, governmental entity, organization, partnership, joint venture, sole proprietorship, commission, department, committee, board, or agency.

3. "Writing(s)" means handwriting, typewriting, printing, photostating, photographing, magnetic, mechanical or electronic recording and every other means of recording upon any tangible thing, any form of communication or representation, including letters, words, pictures, numbers, sounds, or symbols, or combinations thereof.

4. Executive Office of the President and EOP refer to each and every office of the Executive Office of the President, including the Council of Economic Advisers, the Counsel on Environmental Quality, the Office of Administration, the Office of Management and Budget, the Office of National Drug Control Policy, the Office of Science and Technology Policy, the President's Foreign Intelligence Advisory Board, the United States Trade Representative and the White House Office.

5. "You" and "your" refer to defendant OA.

6. "Identify" and "describe" mean:

    (a) as to an entity: name, address(es), telephone number, type of entity and the address of its principal place of business and registered agent;

    (b) as to a document: the type of document (letter, memo, email, etc.), the identity of the author or originator, the date authored or originated, the identity of each person to whom the original or copy was addressed or delivered, the identity of such person known or reasonably believed by

you to have present possession, custody, or control thereof, and a brief description of the subject matter thereof, all with sufficient particularity to request its production under Rule 34 of the Federal Rules of Civil Procedure;

(c) as to a communication: the date of the communication, the type of communication (telephone conversation, meeting, etc.), the place where the communication took place, the identity of the person who made the communication, the identity of each person who received the communication, each person present when it was made and the subject matter discussed;

(d) as to a meeting: the date of the meeting, the place of the meeting, each person invited to attend, each person who attended and the subject matter discussed.

7. "Included" means "including but not limited to."

8. Unless words or terms have been given a specific definition, each word or term shall have its usual and customary dictionary definition.

## REQUEST FOR PRODUCTION NO. 10

All documents that reflect, evidence or relate to the date or dates when the Office of Administration stopped functioning as an agency subject to the Freedom of Information Act.

## REQUEST FOR PRODUCTION NO. 11

All documents that reflect, evidence or relate to the date or dates when the Office of Administration stopped functioning as an agency subject to the Federal Records Act.

## REQUEST FOR PRODUCTION NO. 12

All documents that reflect, evidence or relate to the date or dates when the Office of Administration started functioning as an entity subject to the Presidential Records Act.

## REQUEST FOR PRODUCTION NO. 13

All documents that reflect, evidence or relate to the date or dates when the Office of

5

Administration stopped functioning as an agency under any federal statute not encompassed by

Request for Production Nos. 10-12 above.

Respectfully submitted,

Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
William C. Holmes
(D.C. Bar No. 495186)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530
Telephone:  202-408-5565
Fax:  202-508-506

Attorneys for plaintiff

Dated: March 14, 2008

6

## CERTIFICATE OF SERVICE

I hereby certify that copies of Plaintiff's Third Set of Requests for Production of Documents and Things to Defendant Office of Administration were served by email, facsimile and hand delivery this 14th day of March, 2008, on the following:

Jean Lin
U.S. Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C. 20530

ANNE L. WEISMANN

**EXHIBIT 2**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITIZEN FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No: 1:07-CV-00964 (CKK) |
| OFFICE OF ADMINISTRATION, | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S THIRD SET OF
## REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendant the Office of Administration ("OA") responds to plaintiff's Third Set of Requests for Production of Documents and Things as follows:

### GENERAL OBJECTIONS

1.      Defendant objects to the "Instructions" and "Definitions" that accompany plaintiff's Third Set of Requests for Production of Documents and Things to the extent that they attempt to impose obligations outside of the requirements of Rules 26 and 34 of the Federal Rules of Civil Procedure.

2.      Defendant objects to plaintiff's Third Set of Requests for Production of Documents and Things to the extent that they are overly broad or impose obligations on defendant that are unduly burdensome, expensive, and/or oppressive.  In particular, defendant objects to the document requests to the extent that they seek production of electronic records and other things that are not readily accessible.

3.      Defendant objects to plaintiff's Third Set of Requests for Production of Documents and Things as overly broad and unduly burdensome to the extent that the Requests do not specify a time frame for the documents sought.

4.      Defendant objects to plaintiff's Third Set of Requests for Production of Documents and Things to the extent that they seek information and documents protected from discovery by the attorney-client privilege, the law-enforcement privilege, the presidential communications privilege, the deliberative-process privilege, the work-product doctrine, the Privacy Act, and any other applicable privilege, or confidential, restricted or proprietary information.

5.      Defendant reserves the right to amend, supplement, or alter these objections and responses to Plaintiff's Third Set of Requests for Production of Documents and Things at any time.

6.      Defendant objects to all four document requests contained in Plaintiff's Third Set of Requests for Production of Documents and Things as being outside the scope of the discovery permitted by the Court.  In the Court's Order of February 11, 2008, the Court held that the "only question" in this case is whether, in exercising authority delineated by its charter documents, "OA acts with the type of substantial independent authority that has been found sufficient to make the Office of Science and Technology, Council on Environmental Quality, and Office of Management and Budget agencies subject to FOIA."  Order of Feb. 11, 2008 at 5.  The Court permitted "very limited" jurisdictional discovery on that one question and specified that the only probative evidence is "evidence regarding OA's authority over or responsibilities to any third parties, including federal agencies, or of any functions that OA in fact carries out beyond those

2

specifically delineated in its charter documents." *Id.* at 5-6. Based on those parameters, the

Court subsequently rejected several proposed depositions, including that of OA's prior Freedom

of Information Act Officer, from whom plaintiff sought to obtain testimony regarding "how OA

has actually functioned under both the FOIA and the Federal Records Act . . . *both before and*

*after* its self-designation as a non-agency," Joint Discovery Plan at 5 (emphasis added). *See*

Order of Feb. 22, 2008 at 3 ("Based on CREW's proposed areas of inquiry, the Court concludes

that CREW may only take the deposition of OA Director Swendiman."). The Court similarly

rejected as outside the scope of permissible discovery document requests relating to OA's

implementation of the Presidential Records Act, the Federal Records Act, and FOIA. *See*

Plaintiff's First Set of Requests for Production of Documents and Things, Nos. 3 and 8; Order of

Feb. 22, 2008 at 2-3.

Because OA has acknowledged that this is the first litigation in which it has asserted that

it is not an "agency" subject to FOIA, the Court further held that "it is not permitting discovery

regarding OA's prior functioning under FOIA, the Presidential Records Act, or the Federal

Records Act." Order of Feb. 22, 2008 at 2. The Court further specified that "any additional

discovery must relate to OA's provision of services for, authority over, or responsibilities to third

parties outside of EOP units, such as federal agencies and private entities." *Id.* at 2-3.

The four document requests contained in the Third Set of Requests for Production relate

solely to the timing of when OA "stopped functioning as an agency subject to" FOIA, the Federal

Records Act, and any other federal statute, and when it "started functioning as an entity subject to

the Presidential Records Act." They do not in any way relate to OA's provision of services for,

authority over, or responsibilities to third parties outside of EOP units. Likewise, they have

3

nothing to do with any functions that OA in fact carries out beyond those specifically delineated in its charter documents, much less whether OA actually exercises the type of substantial independent authority exercised by those EOP units found to be FOIA agencies. As the Court recognized in its February 22, 2008 Order, it is undisputed that OA has not taken the position in prior litigation that it is not subject to FOIA. Joint Discovery Plan at 5; Order of Feb. 22, 2008 at 2. It is likewise undisputed that there is a point in time when OA ceased functioning under the Federal Records Act and began functioning under the Presidential Records Act. When that change took place, or what record keeping changes were associated with that change, are not the subject of this litigation, and do not fall within the very limited discovery permitted by the Court's February 11 and 22 Orders.

At the March 13, 2008 deposition of OA's then-Director, Alan Swendiman, plaintiff's counsel claimed a need to question Mr. Swendiman as to the date when OA ceased functioning as an agency subject to FOIA. That defense counsel permitted limited questioning in this area has no bearing on the appropriateness of the current document requests. The general time frame of OA's change from functioning under the Federal Records Act to functioning under Presidential Records Act is not in dispute. In any event, the question of timing is not by itself reasonably calculated to lead to "evidence regarding OA's authority over or responsibilities to any third parties, including federal agencies, or of any functions that OA in fact carries out beyond those specifically delineated in its charter documents." Order of Feb. 11, 2008 at 5-6. The four document requests propounded now are no different from what the Court has already ruled is outside the scope of permissible discovery. *See* Joint Discovery Plan at 5; Plaintiff's First Set of Requests for Production of Documents and Things, Nos. 3, 4, and 8; Order of Feb.

4

22, 2008 at 2-3.

    7.     These General Objections apply to each of the responses set forth below.

<b>RESPONSES TO INDIVIDUAL DOCUMENT REQUESTS</b>

**REQUEST FOR PRODUCTION NO. 10**

All documents that reflect, evidence or relate to the date or dates when the Office of Administration stopped functioning as an agency subject to the Freedom of Information Act.

**RESPONSE:**  As explained in full in General Objection 6, defendant objects to this Request as outside the scope of the discovery permitted by the Court's February 11 and 22 Orders.

**REQUEST FOR PRODUCTION NO. 11**

All documents that reflect, evidence or relate to the date or dates when the Office of Administration stopped functioning as an agency subject to the Federal Records Act.

**RESPONSE:**  As explained in full in General Objection 6, defendant objects to this Request as outside the scope of the discovery permitted by the Court's February 11 and 22 Orders.

**REQUEST FOR PRODUCTION NO. 12**

All documents that reflect, evidence or relate to the date or dates when the Office of Administration started functioning as an entity subject to the Presidential Records Act.

**RESPONSE:**  As explained in full in General Objection 6, defendant objects to this Request as outside the scope of the discovery permitted by the Court's February 11 and 22 Orders.

**REQUEST FOR PRODUCTION NO. 13**

All documents that reflect, evidence or relate to the date or dates when the Office of Administration stopped functioning as an agency under any federal statute not encompassed by Request for Production Nos. 10-12 above.

**RESPONSE:**  As explained in full in General Objection 6, defendant objects to this Request as outside the scope of the discovery permitted by the Court's February 11 and 22 Orders.

Dated: March 20, 2008                                      Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

_Jean Lin / kp_

JEAN LIN
Federal Programs Branch, Civil Division
United States Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C.  20530
Tel: (202) 514-3716
Fax: (202) 616-8407

Attorneys for Defendant

6

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document, Defendant's Response to

Plaintiff's Second Set of Requests for Production of Documents and Things, was made this 20th

day of March, 2008 by First Class Mail and by electronic mail to:

>Anne Weismann, Esq.
>Chief Counsel
>Citizens for Responsibility and Ethics in Washington
>1400 Eye Street, NW, Suite 450
>Washington, D.C. 20005

_Jean Lin/tp_
Jean Lin

7

**EXHIBIT 3**

Alan Swendiman 3 13 08
```
0001
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   - - - - - - - - - - - - - - X
     CITIZENS FOR RESPONSIBILITY :
 5   AND ETHICS IN WASHINGTON,   :
                                 :
 6       Plaintiff,              : Civil Action No.
     vs.                         : 07-964 (CKK)
 7                               :
     OFFICE OF ADMINISTRATION,   :
 8                               :
         Defendant.              :
 9   - - - - - - - - - - - - - - X
10                              Washington, D.C.
11                     Thursday, March 13, 2008
12
13   Videotape deposition of:
14                    ALAN R. SWENDIMAN
15   called for oral examination by counsel for
16   Plaintiff, pursuant to notice, at the offices
17   of CREW, 14 Eye Street, Northwest, Suite 450,
18   Washington, D.C., before Jodi Scheffel, a Notary
19   Public in and for the District of Columbia,
20   beginning at 10:00 a.m., when were present on
21   behalf of the parties:
22
0002
 1              A P P E A R A N C E S
 2   On behalf of the Plaintiff:
 3       ANNE L. WEISMANN, ESQUIRE
         CLIFF HOLMES, ESQUIRE
 4       CREW
         1400 Eye Street, N.W.
 5       Suite 450
         Washington, D.C. 20005
 6       (202) 408-5565
 7
 8   On behalf of the Defendant:
 9       ELIZABETH SHAPIRO, ESQUIRE
         JEAN LIN, ESQUIRE
10       U.S. Department of Justice
         Civil Division
11       20 Massachusetts Avenue, N.W.
         Washington, D.C. 20001
12       (202) 514-3716
13
14   Also Present:  M. Elizabeth Medaglia, Esquire
                    Kenneth Nuzzi, Videographer
15
                *   *   *   *   *
16
17
18
19
20
21
22
0003
 1              C O N T E N T S
 2   EXAMINATION BY:                      PAGE
 3   Counsel for Plaintiff                  5
```

Alan Swendiman 3 13 08

```
 4
 5                    E X H I B I T S
 6    PLAINTIFF'S DEPOSITION EXHIBITS:
 7    1 Document Bates Stamped OA0002              14
      2 Document Bates Stamped OA00013             28
 8    3 Excerpt of FOIA Handbook                   34
      4 Document Bates Stamped OA00319             80
 9    5 Document Bates Stamped OA00271             82
      6 Document Bates Stamped OA00320             88
10    7 EOP Interagency Agreement
        Document Bates Stamped OA00335-336         92
11    8 Document Bates Stamped OA00354-359         97
      9 E-mail 11/07/07 RE: Follow-up             104
12
13            (*Exhibits attached to transcript.)
14
15
16
17
18
19
20
21
22
```

```
0004
 1                  P R O C E E D I N G S
 2            THE VIDEOGRAPHER:  This videotape
 3    deposition is being taken pursuant to Federal Rules
 4    of Civil Procedure.  Today's date is March 13th,
 5    2008.  Our starting time is 10:00 a.m.  Our
 6    location is 1400 Eye Street, Northwest, Washington,
 7    D.C.  Our court reporter is Jodi Scheffel with
 8    Capital Reporting Services.  Our videographer is
 9    Ken Nuzzi also with Capital Reporting Services.
10            The caption of this case is in the United
11    States District Court for the District of Columbia,
12    Citizens for Responsibility and Ethics in
13    Washington versus the Office of Administration.
14    This Case Number is CA07-964 (CKK).  The party
15    giving notice of this deposition is the Plaintiff.
16            Will the attorneys please now identify
17    themselves and whom they represent.
18            MS. WEISMANN:  Anne Weismann for the
19    Plaintiff CREW.
20            MR. HOLMES:  Cliff Holmes for the
21    Plaintiff CREW.
22            MS. SHAPIRO:  Elizabeth Shapiro from the
0005
 1    Department of Justice representing the Witness.
 2            MS. LIN:  Jean Lin from the Department of
 3    Justice representing the Witness.
 4            MS. MEDAGLIA:  Elizabeth Medaglia,
 5    General Counsel of the Office of Administration
 6    representing the Witness.
 7            THE VIDEOGRAPHER:  Thank you very much.
 8    Our witness today is Mr. Alan R. Swendiman and will
 9    now be sworn in by our court reporter.
10    Whereupon,
11            ALAN R. SWENDIMAN,
12    called as a witness, and having been first duly
13    sworn, was examined and testified as follows:
14            EXAMINATION BY COUNSEL FOR PLAINTIFF
15    BY MS. WEISMANN:
```

Page 2

Alan Swendiman 3 13 08

16    Q   Mr. Swendiman, my name is Anne Weismann.
17 I'm counsel for the Plaintiff in this case.  Have
18 you ever had your deposition taken before?
19    A   Not in a court proceeding.
20    Q   Okay.  Well, just a reminder, even though
21 we do also have a videographer here, that your
22 responses do need to be oral so that the
0006
1 transcript -- the written transcript will reflect
2 them as well.  If you do not understand a question
3 or don't hear a question, please let me know and I
4 will rephrase it or, you know, reiterate it.  If
5 you don't let me know I will assume that you have
6 heard and understood the question.  Is that okay?
7    A   I understand.
8    Q   All right.  Good enough.  Mr. Swendiman,
9 what is your current position?
10    A   It's Special Assistant to the President
11 Director of Office of Administration.
12    Q   How long have you been in that position?
13    A   I've been in that position since on or
14 about Novemeber 27th, 2006.
15    Q   And what was your employment immediately
16 preceding your work with the Office of
17 Administration?
18    A   I was the general Counsel of the General
19 Services Administration.
20    Q   And what was your period of time in that
21 position?
22    A   I was with the General Services
0007
1 Administration from July 6th, 2005 to
2 November 26th, 2006.
3    Q   So you went right from the GSA to the
4 Office of Administration?
5    A   That is correct.
6    Q   And prior to your employment as General
7 Counsel at GSA what were you doing?
8    A   I was in the private practice of law for
9 approximately 31 years with the law firm of Jackson
10 and Campbell.
11    Q   And did you have a specialty in that
12 practice?
13    A   I worked in real estate, medium and
14 small business nonprofit organizations.
15    Q   And prior to your employment with Jackson
16 & Campbell, did you have any other professional
17 experience?
18    A   I was law clerk to the Honorable Edward
19 S. Northrop, Chief Judge, United States District
20 Court for the District of Maryland.
21    Q   Okay.  And you've never held any other
22 public positions?
0008
1    A   I stand corrected.  I was General Counsel
2 of the Federal Labor Relations Authority from 1992
3 to 1993.
4    Q   Okay.  And prior to that did you have a
5 role with the Legal Services Corporation?
6    A   I was outside counsel to the Legal
7 Services Corporation.  I was not an employee.
8    Q   Okay.  So your first federal experience,
9 employment experience -- professional experience

Alan Swendiman 3 13 08
10  with the Federal Labor Relations Authority; is that
11  correct?
12         A    Well, I would like to think that my
13  professional experience began with His Honor, Judge
14  Northrop.
15         Q    I'm sorry, okay.  Briefly, what is your
16  academic background, your educational background?
17         A    I'm a graduate of the University of North
18  Carolina, Chapel Hill, and I received my law
19  training from Georgetown University Law Center.
20         Q    Okay.  In your current position -- is it
21  okay with you if I refer to you as Director of the
22  Office Administration?  I realize you have a title
0009
1   that's greater than that but just --
2          A    You may do so.
3          Q    Okay.  In your current position as
4   Director, who do you report directly to?
5          A    I report to the Deputy Assistant to the
6   President for Management of Administration.
7          Q    Has that been the consistent reporting
8   chain throughout your tenure at OA?
9          A    It has been consistent throughout my
10  tenure.
11         Q    And who reports to you directly?
12         A    There are a number of people that report
13  to me directly.  There is the CIO, the --
14         Q    The Chief Information Officer?
15         A    -- Chief Information Officer, the Chief
16  Financial Officer, the Chief Procurement and
17  Contract Management Officer, the Chief Operating
18  Officer, the Chief Facilities Management Officer,
19  the General Counsel, the Director for Equal
20  Employment Opportunity.
21         Q    And these are all within a direct chain
22  of authority directly to you?
0010
1          A    That is correct.
2          Q    And then I presume they each have staff
3   under them that report to them?
4          A    They all have staff with the exception of
5   the EEO Director who is an office of one.
6          Q    And how many employees, full-time
7   employees, are within the Office of Administration?
8          A    Well, we have approximately currently 222
9   FTEs.
10         Q    And has that been pretty constant since
11  your tenure there?
12         A    It's actually increased a little bit
13  during my tenure.
14         Q    Okay.  Are you familiar with Executive
15  Order 12122?
16         A    I have read that Executive Order
17         MS. WEISMANN:  And just for your
18  convenience I'm going to hand you a copy of it.  I
19  have extras.
20         (Tenders document witness.)
21  BY MS. WEISMANN:
22         Q    What is your understanding of what this
0011
1   Executive Order does with respect to the Director
2   of the Office of Administration?
3          A    Well, my understanding is, is that I
Page 4

Alan Swendiman 3 13 08

```
 4  report to the President of the United States and
 5  that I'm subject to the President's direction and
 6  approval.
 7       Q     Specifically focussing on Section 4(b),
 8  it says, the Director is designated to perform the
 9  functions of the President under Section 107(b) of
10  Title 3 of the United State Code.  Have I read that
11  correctly?
12       A     That's what it says.
13       Q     And what is your understanding of what
14  this Executive Order -- what authority it gives
15  you, that specific provision?
16       A     My authority, as I understand it, is to
17  report to the President of the United States
18  through a chain of command, and I make
19  recommendations with regards to the operations of
20  the office.
21       Q     Okay.  But, Mr. Swendiman, I'm asking
22  much more specifically to focus just on Subsection
0012
 1  (b) and it's very express reference to Section
 2  107(b) of Title 3 of the United States Code.  Do
 3  you have any other understanding of what is
 4  encompassed by that, this Executive Order and that
 5  reference, beyond what you've stated?
 6       A     Well, if you have a copy of Section
 7  107(b) --
 8       Q     Yes, I do.
 9             (Tenders document to witness.)
10       A     Is there a particular portion of 107(b)
11  to which you're referring?
12       Q     No, because I'm referring primarily to
13  the Executive Order and it just refers generally to
14  Section 107(b).  And I'm just trying to get your
15  understanding of what authorities are conferred on
16  you through this Executive Order 12122.
17       A     Well, it says the President (or his
18  designee) is authorized and then sets forth what
19  can be done with respect to rates of pay for
20  certain enumerated employees.
21       Q     So do you understand Executive Order
22  12122 to be designating you as the designee for
0013
 1  purposes of 107(b)?
 2       A     I would say, yes, that the Director would
 3  be the designee under the Executive Order in
 4  reference to 107(b).
 5       Q     Okay.  Also, looking at 3 USC 107(b),
 6  there is -- 3 USC 107(b)(1)(B), there's a reference
 7  to procure or intermittent services of experts and
 8  consultants.  What is your understanding of what
 9  that authority is?
10       A     To my -- to the best of my knowledge, I
11  would understand it to mean that we would procure
12  services of consultants through our normal
13  procurement process.
14       Q     Okay.  And is that pretty much the
15  entirety of your understanding of that authority?
16       A     That is correct.
17       Q     Okay.  Does James Knodell report to you?
18       A     James Knodell is no longer employed in
19  the Office of Administration.
20       Q     Okay.  What was his tenure in the Office
```

Page 5

                              Alan Swendiman 3 13 08
21   of Administration; do you know?
22        A    Well, he was Chief Security Officer.  I
0014
1    do not know his tenure because he was in office
2    when I arrived --
3         Q    Okay.
4         A    -- so I do not know when he began.
5         Q    But he -- you did overlap with him?
6         A    I did overlap with his tenure.
7         Q    And did he -- when he was at the Office
8    of Administration in that position, did he report
9    directly to you?
10        A    Yes, he did.
11        Q    Was Mr. Knodell considered to be Senior
12   Official of the Intelligence Community or SOIC; do
13   you know?
14             MS. SHAPIRO:  Object to relevance.
15             You can answer the question.
16        A    I don't know whether he was considered
17   that or not.
18             MS. WEISMANN:  Okay.  Can we have this
19   marked as Plaintiff's Exhibit 1.
20             (Plaintiff's Exhibit No. 1
21              was marked for identification.)
22             (Tenders document to witness.)
0015
1    BY MS. WEISMANN:
2         Q    Okay.  I've just handed you a document
3    that has been produced to us by the Office of
4    Administration as part of the document production
5    that was just made.  And I will represent to you
6    that this is a document that Mr. Knodell referred
7    to in his testimony before the House Oversight
8    Committee on Government Reform when he was asked to
9    identify what document provided, I think it was,
10   instructions for conducting an examination.  I'm
11   paraphrasing the question.  Have you ever seen this
12   document before?
13        A    I've seen this document before in
14   connection with production -- requests for
15   production of documents submitted by your
16   organization.
17        Q    And -- but had -- prior to that had you
18   ever seen this document?
19        A    I had not seen the document before.
20        Q    Okay.  The document refers -- uses within
21   it the phrase Senior Official of the Intelligence
22   Community.  Does that refresh your memory in any
0016
1    way whether or not Mr. Knodell would have been
2    considered a senior official of the Intelligence
3    Community?
4             MS. SHAPIRO:  Can you point him to where
5    that appears?
6             MS. WEISMANN:  The first reference is on
7    page one under purpose.  It is about a third of the
8    way down.  It says, this directive emphasizes the
9    responsibilities of Senior Officials of the
10   Intelligence Community (SOICs).
11   BY MS. WEISMANN:
12        Q    Do you see the reference?
13        A    Yes, I do.
14        Q    Okay.  Do you have any understanding of
                                        Page 6

Alan Swendiman 3 13 08
```
15  whether Mr. Knodell was such an SOIC?
16       A    I don't have any direct knowledge.  I
17  have my own opinion.
18       Q    And that would be?
19       A    My opinion is, is that he would not be
20  considered a senior, an SOIC.
21       Q    Okay.  Well, was there anyone within the
22  Office of Administration who carried out any of the
0017
1   functions delineated -- or had responsibility for
2   any of the matters delineated in this document,
3   Plaintiff's Exhibit 1?
4        A    Well, I would need to read through the
5   entire document again in terms of functions.
6   Certainly, the Office of Security and Emergency
7   Preparedness would have functions with regard to
8   security.
9             MS. SHAPIRO:  Do you want him to read
10  this document?
11            MS. WEISMANN:  Well, if I have a pending
12  question and he needs to, absolutely, if he wants
13  to read it.
14            MS. SHAPIRO:  Well, I wasn't sure if that
15  was responsive to your question or if there was a
16  question pending.
17            MS. WEISMANN:  No.
18  BY MS. WEISMANN:
19       Q    If Mr. Knodell identified this document
20  as reflect -- as containing the policy about the
21  initiation of an administrative investigation by
22  the Office of Administration, would he have been
0018
1   correct?
2             MS. SHAPIRO:  Objection to form.
3             You can answer.
4        A    Well I don't know Mr. Knodel's testimony.
5   I haven't read Mr. Knodel's testimony.  So I don't
6   know exactly what he said or the context in which
7   he said it.
8        Q    Well, I would note that in the document
9   request here of production number one, we describe
10  the document as -- and I quote -- it was a
11  document -- in response to a request that he --
12  referring to Mr. Knodell -- identify where the
13  policy concerning the initiation of an
14  administrative investigation by his office was
15  written.  And there was no objection to that
16  description by the Office of Administration.
17            So I am not asking you to be familiar
18  with his testimony.  I'm asking if that statement
19  is correct, that this, in fact, is a document that
20  contains the policy about the initiation of an
21  administration investigation of a security breach
22  by the Office of Administration?
0019
1        A    Well, I do --
2             MS. SHAPIRO:  Objection to form.
3             Go ahead and answer.
4             THE WITNESS:  -- I do know that we've
5   used this document as what I would call best
6   practices and that is that we have -- I've been
7   advised that we've used the aspects that would be
8   relevant to the office in terms of processing.
```
                                        Page 7

Alan Swendiman 3 13 08

```
 9   BY MS. WEISMANN:
10        Q     Does your office consider itself bound by
11   this document?
12        A     To my knowledge I do not believe that
13   we're bound by it, but we do follow best practices.
14        Q     What is your understanding of the
15   authority of the office then to conduct
16   administrative investigations of security breaches?
17        A     Well, my understanding is -- and I
18   believe Mr. Knodell may have testified as to
19   this -- is that security breaches may be brought to
20   our attention in which case we will then -- that
21   office will conduct -- follow up in terms of
22   investigation.  It is not the sole component,
0020
 1   however, that has security functions.
 2        Q     Yes.  My question asked what the
 3   authority for conducting those investigations is?
 4        A     I can't -- I can't speak directly as to
 5   what the written authority is.
 6        Q     What is your understanding of the
 7   responsibility of the Office of Security to conduct
 8   investigations?
 9        A     My understanding is, is that the office
10   initiates investigations upon matters that are
11   brought to its attention.
12        Q     And would you be more specific by what
13   you mean by matters?
14        A     Incidents that may have occurred that
15   require investigation in terms of any potential
16   breach of security.
17        Q     And what is the jurisdiction of the
18   office to conduct investigations?
19        A     Well, that jurisdiction, I -- my
20   understanding is, is in conjunction with other
21   components that may have security officers.
22        Q     When you say "other components", are you
0021
 1   talking about other components of EOP?
 2        A     Yes.  It would be other components of the
 3   Executive Office of the President.
 4        Q     And is it -- does the Office of
 5   Administration Security Office have the authority
 6   to conduct a security investigation anywhere within
 7   the EOP?
 8        A     Well, my understanding is, is that, for
 9   example, the National Security Council has its own
10   security office or officers and so our office may
11   work in conjunction with them.
12        Q     And is that the only limitation that you
13   understand on the -- I use the word jurisdiction.
14   I don't mean to be overly formalistic, but I'm
15   trying to understand the -- the scope of what --
16   geographic scope, if you will, of what the office
17   can investigate.
18        A     Well, in terms of investigation,
19   certainly there is -- there can be potential
20   breach, which would involve the Secret Service.  We
21   don't have any jurisdiction over the Secret
22   Service.  So I'm not able to testify as to the
0022
 1   nature of their operations.
 2        Q     So is it your testimony that if there
```

Page 8

Alan Swendiman 3 13 08

3   were a breach of security that involved the Secret
4   Service, this is something that the Office of
5   Administration could investigate?
6        A     No.  Quite to the contrary.  I believe
7   that the Secret Service handles its own
8   investigations.
9        Q     If there were a breach of security that
10  happened outside of the physical perimeters of the
11  Executive Office of the President, is it something
12  that your office could investigate?
13       A     It could investigate if it involved an
14  EOP employee.
15       Q     And if it involved employees from other
16  agencies or private individuals in addition, would
17  there be any limitations on what that office could
18  investigate?
19       A     Well, my understanding is, is that we
20  don't have any jurisdiction in terms of security
21  investigations as to non -- with regard to third
22  parties, Non-Executive Office of the President
0023
1   entities.
2        Q     If there were a security breach that
3   happened at another security agency but that
4   involved EO -- EOP employees, is that something
5   this office would have at least some jurisdiction
6   over?
7        A     That's a possibility, that it would.  It
8   may very well work in conjunction with the other
9   agency.
10       Q     Okay.  And if this office conducts a
11  security investigation and finds evidence of some
12  kind of comprise to security, is there any
13  obligation to report it to any entity outside of
14  EOP?
15       A     I -- my understanding is, is that it may
16  be an obligation, if it involves a criminal matter,
17  to report it to the appropriate authorities.
18       Q     Okay.  Referring you back to this
19  document that Plaintiff -- that's been identified
20  as Plaintiff's Exhibit 1, on page two of the
21  document, Subsection B, the last sentence, if you'd
22  look at that -- and I'll just read it for you --
0024
1   upon completion of an investigation and in
2   accordance with the guidelines of this DCID, SOICs
3   shall assess the significance of any significant
4   security violation or compromise to assist the DCI
5   in strengthening and refinding -- refining
6   Intelligence Community safeguards.
7             I know you've describes this as best
8   practices, your language, rather than binding
9   guidance on OA.  But does OA, the Office of
10  Security or any office within -- entity within OA
11  consider that it has any obligation to assist the
12  DCI if it finds a security problem or to at least
13  report to the DCI?  And I know that that's a
14  compound question.  So why don't you ask -- answer
15  the assist question and then I'll --
16            MS. SHAPIRO:  I'll object to form.
17            Go ahead and answer.
18       A     It's possible that it may have to assist
19  the DCI depending upon the circumstances.

Page 9

Alan Swendiman 3 13 08
```
20       Q    And do you understand the Office of
21  Administration to have any obligation to advise the
22  DCI of any finding that there has been a security
0025
1   breach?
2        A    I'm not aware of an obligation to report
3   to the DCI.
4        Q    Okay.  Are you aware of any instances in
5   which the Office of Security or the Office of
6   Administration has reported to the DCI any findings
7   or potential findings of security breaches?
8        A    None that has been brought to my
9   attention.
10       Q    And is it something that, if that were
11  found, you would know about it in advance of
12  advising the DCI?
13            MS. SHAPIRO:  Objection to form.
14            You can answer.
15       A    Most likely I would be advised that if
16  there had been a breach that required reporting to
17  a third party.
18       Q    Does the Office of Administration have a
19  role in deciding which -- or whether EOP employees
20  should be granted access to classified information?
21       A    It has a role in -- well, let me stop
22  there.  Could you repeat the question again for me?
0026
1        Q    Does the Office of Administration have a
2   role in deciding which employee should have access
3   to classified information?
4        A    It has a role in deciding whether an
5   employee has access.
6        Q    And what is that role?
7        A    Well, it takes several levels.  First of
8   all, in terms of just access to the premises, we do
9   a name check.  That name check is actually
10  delegated -- or farmed out to the FBI, and that the
11  FBI then advises us as to clearance of the
12  individual, and then that clearance is then
13  forwarded to our office, that is the Office of
14  Security, to the Secret Service, which then reviews
15  whether that individual gains access to the
16  premises.
17       Q    Okay.  My question went not to access to
18  the premises but access to classified information,
19  in other words, whether a particular employee who
20  has a security clearance is cleared to see
21  classified information?
22       A    Well, it certainly will involve the --
0027
1   the FBI.  And then ultimately the request does go
2   through our Security Office and -- at least as to
3   the Office of Administration.  I will then review
4   it and -- review the recommendation as to whether
5   they receive -- should receive clearance or not.
6        Q    And who makes the final decision on
7   clearance?
8        A    As to the Office of Administration, I
9   will review it and, depending on the circumstances,
10  will either grant it or make a recommendation that
11  they be given it.
12       Q    And what about EOP employees outside of
13  the office of Administration; who makes that
```

Alan Swendiman 3 13 08
14  decision?
15       A    I really don't know specifically as to
16  each component of the Executive Office of the
17  President who makes that decision.
18       Q    But it's not you or your office?
19       A    It is not my office nor me that makes a
20  decision as to who gains access to classified
21  information and other components.
22       Q    Do you have a role, though, in the
0028
1   process of granting access to non-OA EOP employees?
2        A    When you say "access" --
3        Q    To classified information.
4        A    To my knowledge, I do not.
5        Q    Okay.  Mr. Swendiman, are you familiar
6   with a Memorandum of Understanding that OA entered
7   into with the Department of Health and Human
8   Services for the processing of grantee requests for
9   funds for the ONDCP?
10       A    I'm aware of the memorandum.
11            MS. WEISMANN:  Can we have this marked as
12  Plaintiff's Exhibit 2, and then give it to the
13  witness, please.  Thank you.
14            (Plaintiff's Exhibit No. 2
15             was marked for identification.)
16  BY MS. WEISMANN:
17       Q    The document I'm showing you is also part
18  of the document production that OA made in this
19  case.  And if you'll look to the second page it's
20  the one that's labeled Memorandum of Understanding.
21            Can you explain for me generally what
22  this Memorandum of Understanding does?
0029
1        A    My understanding is, is that the
2   Memorandum basically, for lack of a better term,
3   outsources the functions of managing the grants
4   made by ONDCP.
5        Q    And when you say managing the accounts,
6   is this a financial transaction?
7        A    It's a financial transaction and a grant
8   review matter, as I understand it.
9        Q    And does HHs actually do reviews of
10  grant proposals?
11       A    My understanding is that ONDCP would do
12  the review of the grant proposals but that
13  basically the -- what I would call the
14  administrative function is handled by HHS.
15       Q    And this MOU, Memorandum of
16  Understanding, is actually entered into between
17  your office and HHS; is it not?
18       A    That is correct.
19       Q    And would you explain why that is the
20  case?
21       A    My understanding is, is that because we
22  do -- we provide the financial management services
0030
1   to ONDCP as we do to other components of the
2   Executive Office of the President.
3        Q    Would you explain what you mean by
4   financial services?
5        A    Well we, for lack of a better term,
6   manage -- we reconcile the accounts.  This is a function that
7        Q    And by this MOU, this is a function that
                              Page 11

Alan Swendiman 3 13 08

```
 8  rather -- that if it were not handled by HHS, would
 9  it be the responsibility of the Office of
10  Administration?
11       A    That -- I think that's a fairly accurate
12  characterization.  If we had a large staff, we
13  would be able to handle it in-house, but we have a
14  limited staff.
15       Q    And do you have any understanding of what
16  the authority is for OA to outsource these kinds of
17  services?
18       A    I can't site the specific authority.
19  This is not unusual.  I think one of the other
20  documents that you may have is -- the Bureau of
21  Public Debt handles our payroll and handles certain
22  financial management systems and government
0031
 1  entities do do that.  When I was at General
 2  Services Administration I believe that our payroll
 3  was handled by one of the DOD units.  It's not
 4  unusual for government entities to contract with
 5  other government entities to handle certain
 6  administrative functions.
 7       Q    And who pays for this service with HSS?
 8       A    Well, we would -- I mean, it would come
 9  out of ONDCP's budget.  They would be paying HHS
10  for the service that HHS renders.
11       Q    Okay.  Would you turn back to the first
12  page of this document.  If you look at it, it's
13  number five, Authority Citation.  Do you see that?
14  It's on the left-hand.  It's above the Period of
15  Performance column.  There's a reference to the
16  Economy Act.  Do you see that reference?
17       A    I do.
18       Q    And what is -- can you tell me what your
19  understanding of the Economy Act is?
20       A    I can't give you, at this juncture, a
21  complete answer with regards to the Economy Act --
22       Q    Okay.  Why don't -- I'm sorry.
0032
 1       A    -- it does involve fiscal matters and use
 2  of dollars, but I can't give you a recitation on
 3  the Economy Act.
 4       Q    I don't have extra copies.  I'm just
 5  going to show this to you.  31 USE 1536 is one of
 6  the sections, is it not, that's referenced on that
 7  document as the authority?
 8       A    Let's see.  Sections 1535 and 1536.
 9       Q    I will hand them both to you.
10            (Tenders documents to witness.)
11            If you'll look at 1536 first, can you
12  read for me what I have highlighted?
13       A    It says, Crediting Payments -- the title
14  of it is called Crediting Payments From Purchases
15  Between Executive Agencies.
16       Q    Okay.  Does OA currently consider itself
17  to be within the scope of that statutory provision?
18       A    I believe that calls for a legal
19  conclusion, and I'm not in a position to make that
20  legal determination.
21       Q    Do you know whether OA is continuing to
22  exercise authority under the Economy Act to enter
0033
 1  into agreements?
```

Page 12

Alan Swendiman 3 13 08

2      A    Well, we enter into Interagency
3   Agreements and I -- and that's what the term is
4   called, an Interagency Agreement, an IA.
5      Q    Right.  And is it your testimony that OA
6   is continuing to enter in such agreements?
7      A    Well, we have an IA Agreement with the
8   Bureau of Public Debt in terms of financial
9   management systems of which I'm aware.
10     Q    And has OA -- at what point did OA stop
11  considering itself to be an agency subject to the
12  Freedom of Information Act?
13         MS. SHAPIRO:  Objection to form and
14  foundation.
15     A    I think that the conclusion that was
16  reached with regards to whether or not OA was an
17  agency for the purposes of FOIA occurred prior to
18  my tenure as OA Director.
19     Q    And would you refresh my memory again
20  when your tenure began.
21     A    I started November -- approximately
22  Novemeber 27th, 2006.
0034
1          MS. WEISMANN:  Can we take a short break?
2          THE VIDEOGRAPHER:  10:38 a.m.; off
3   record.
4          (Recess taken.)
5          THE VIDEOGRAPHER:  Our time now is 10:44
6   a.m.; on record.
7          MS. WEISMANN:  Can we have that last
8   answer read back.
9          (The last answer was read back by the
10  court reporter.)
11         MS. SHAPIRO:  Can we have this marked --
12  is this 3?
13         (Plaintiff's Exhibit No. 3
14          was marked for identification.)
15         MS. SHAPIRO:  Mr. Swendiman, I'm handing
16  you a document that's already in this case that's
17  been admitted as an exhibit, Exhibit 3, to CREW's
18  Memorandum in Opposition to the Motion for Judgment
19  on the Pleadings.
20         (Tenders document to witness.)
21  BY MS. WEISMANN:
22     Q    This is a printout of the Whitehouse.gov
0035
1   website.  And if you'll look at the bottom
2   right-hand corner, the date is 8/31/2007.  And I
3   draw your attention to the paragraph that states
4   the EOP entities subject to the FOIA are:  Do you
5   see that?
6      A    Yes.  On the first page?
7      Q    Yes.
8      A    I do.
9      Q    And the second entity listed is the
10  Office of Administration; is it not?
11     A    It is so listed.
12     Q    And if then this document was printed out
13  on August 31st, 2007, that would be after you began
14  as Director of the Office of Administration?
15         MS. SHAPIRO:  Objection to form.
16     A    That would be correct.
17     Q    Okay.  Have you seen this document either
18  as a paper document or the actual website?

Page 13

Alan Swendiman 3 13 08
19     A     I've seen it as a paper document once
20   before.
21     Q     Okay.  And going back to my prior
22   question to you about when the Office of
0036
1    Administration decided it was no longer subject to
2    the FOIA, it was your testimony that that happened
3    prior to your commencing work as Director; is that
4    correct?
5      A     My understanding is, is that I was
6    advised when I came that the OA was not an agency
7    subject to FOIA.
8      Q     And were you advised that prior to CREW
9    filing its lawsuit in this case?
10     A     If you can refresh my recollection as to
11   when the lawsuit was filed.
12     Q     I believe it was filed in May of 2007.
13     A     I was advised prior to that time.
14     Q     Okay.  And were you advised in writing or
15   orally?
16           MS. SHAPIRO:  Objection to form and to
17   relevance.
18     A     Orally.
19     Q     And who advised you?
20           MS. SHAPIRO:  Objection to relevance.
21   BY MS. WEISMANN:
22     Q     Who advised you?
0037
1      A     I was advised by the OA General Counsel's
2    Office.
3      Q     Were you aware that notwithstanding that
4    advice the website for the White House continued to
5    list OA as subject to the FOIA?
6            MS. SHAPIRO:  I'm going to object.  I'm
7    going to allow him to answer that question, but I'm
8    going to note the Court's Order of February 11th --
9    I'm sorry, February 22nd, which instructs that OA's
10   prior functioning under the FOIA is not disputed
11   and therefore not an issue in discovery.
12           You can answer the question yes or no.
13           THE WITNESS:  Could you repeat the
14   question?
15           MS. WEISMANN:  Could you read it back?
16           (The last question was read back by the
17   court reporter.)
18           THE WITNESS:  I'm aware that this -- that
19   what you've shown me remained on the Website.
20   BY MS. WEISMANN:
21     Q     Is it your testimony that as of the date
22   of this document, August 31st, 2007, the Office of
0038
1    Administration was not functioning a FOIAable
2    entity?
3            MS. SHAPIRO:  I'm going to instruct the
4    witness not to answer that question based on the
5    February 22nd Order, which instructs that the OA's
6    prior functioning under the FOIA is not a disputed
7    issue in this case and is therefore not subject to
8    discovery.
9            MS. WEISMANN:  The whole point of this
10   line of questioning is to pin down exactly when
11   that prior practice stopped.  I'm certainly
12   entitled to find that out because, in order to
                                            Page 14

Alan Swendiman 3 13 08
13  comply with the Court's order, I have to have a
14  time in mind.  And all of these questions are
15  designed to define that period of time.  So are you
16  still going to instruct him not to answer?
17            MS. SHAPIRO:  He testified already as to
18  that date.
19            MS. WEISMANN:  I do not believe that is
20  the case.
21            MS. SHAPIRO:  His testimony --
22            MS. WEISMANN:  Are you going to instruct
0039
1  him not to answer?
2            MS. SHAPIRO:  I am instructing him not to
3  answer.
4            MS. WEISMANN:  Okay.  Then let's take a
5  five-minute break.
6            THE VIDEOGRAPHER:  10:49 a.m; off record.
7            (Recess taken.)
8            THE VIDEOGRAPHER:  Our time now is 11:04
9  a.m; on record.
10            MS. SHAPIRO:  When we were off the
11  record, Ms. Weismann and I had a conversation about
12  my prior objection.  Ms. Weismann explained to me
13  that she wants to establish a cut-off date for OA's
14  functioning as a FOIA entity and that her
15  questions were intended to be designed strictly to
16  that purpose for establishing a date parameter.
17  If, in fact, that is the sole purpose of those
18  questions, I'll allow them to go forward for that
19  purpose.  And if I've mischaracterized anything,
20  Ms. Weismann can correct me.  So if you want to go
21  back and ask the question that I previously
22  objected to, you can ask that question again.
0040
1            MS. WEISMANN:  Can you read back my
2  question?
3            (The last question was read back by the
4  court reporter.)
5            MS. SHAPIRO:  I will interpose an
6  objection to the form and the ambiguity with
7  respect to the word functioning.
8            Go ahead and answer.
9            THE WITNESS:  As of the date that is
10  shown on this document, August 31st, 2007, OA did
11  not consider itself an agency subject to FOIA.
12  BY MS. WEISMANN:
13       Q   My question was specifically to whether
14  it was functioning as an agency subject to the
15  FOIA?
16       A   My understanding is, is that it was not
17  functioning as an agency subject to FOIA.
18       Q   Okay.  Do you know on what dated, if
19  there is a date certain, it stopped functioning as
20  an agency subject to the FOIA?
21            MS. SHAPIRO:  Objection to form.
22       A   I can't state a specific date.  I
0041
1  believe, as I previously said, I was advised that
2  OA did not consider itself an agency subject to
3  FOIA prior to my coming and I was advised of that.
4       Q   And you have since that time not gotten
5  any greater understanding of when it ceased
6  functioning as a FOIA -- FOIAable entity?
                                        Page 15

Alan Swendiman 3 13 08

```
 7        A    I'm not sure I understand your question
 8   as to greater understanding.
 9        Q    Beyond what you were initially advised
10   when you started at OA.
11        A    Well, my understanding is, is that it
12   hasn't changed since I've been Director of OA.
13        Q    Okay.  Let me rephrase the question.
14   You've testified that when you started you were
15   told that it was not an agency subject to the FOIA,
16   correct?
17        A    That is correct.
18        Q    I want to know, since being told that,
19   have you learned any other information that
20   would -- as to when the Office of Administration
21   stopped functioning as a FOIAable entity?
22             MS. SHAPIRO:  Objection to form.
0042
 1             You may answer.
 2        A    Well, there was a deliberative process,
 3   as I understand, that began prior to my tenure as
 4   the Director of the Office of Administration, and
 5   that a conclusion or decision was reached that
 6   reaffirmed that OA was not an agency subject to
 7   FOIA.
 8        Q    And do you -- can you pin down more
 9   precisely when that process took place?
10        A    Well, the process began prior to my
11   arrival as I understand it and as I was informed.
12        Q    Right.  But do you have an understanding
13   about when that process took place?
14        A    I do not.
15        Q    How was it that you know there was a
16   deliberative process?
17        A    I was advised by the OA General Counsel's
18   office.
19        Q    Do you have an understanding of what
20   differences no longer being subject to the FOIA has
21   made to the Office of Administration?
22             MS. SHAPIRO:  Objection to the form.
0043
 1        A    I'm not sure I understand your question.
 2        Q    Okay.  It's your understanding that at
 3   some point -- is this correct; is it your
 4   understanding that at some point in time the Office
 5   of Administration no longer functioned as an agency
 6   subject to the FOIA?
 7        A    That's my understanding.
 8        Q    When that happened, how did the Office of
 9   Administration's functions change?
10        A    Well, as I understand it, the office had
11   a person responsible for FOIA requests and that
12   person is no longer serving in that capacity.
13        Q    Do you know when that change happened?
14        A    I don't recall exactly when.
15        Q    Did it happen after you started as
16   Director?
17        A    It occurred after I started as Director.
18        Q    Okay.  So are you saying then that, at
19   the point in time when you came on as Director,
20   there was still a staff person processing FOIA
21   requests?
22        A    There was a person receiving FOIA
0044
```

Alan Swendiman 3 13 08
1    requests as I understand it.
2        Q    Okay.  And do you know approximately what
3    year it was that that person stopped functioning in
4    that capacity?
5        A    It would have been 2007.
6        Q    And do you know approximately which half
7    of 2007.
8        A    I don't know exactly when she stopped
9    functioning in that capacity.
10        Q    Do you know -- CREW filed it's lawsuit I
11    believe it's May of 2007.  I can confirm if that's
12    wrong.  Do you know if it happened after CREW filed
13    its lawsuit in May of 2007?
14        A    I don't want to speculate.  I don't --
15        Q    Okay.
16        A    -- I can't place the date.
17        Q    In addition to the change in that
18    person's position, are there any other changes that
19    happened when OA no longer functioned as an agency
20    subject to the FOIA?
21            MS. SHAPIRO:  Objection to form.
22        A    Well, I believe that the responses,
0045
1    written responses to the FOIA requests, changed.
2        Q    Okay.  And how has that changed?  What is
3    that change, if you know?
4        A    I can't be specific as to the exact
5    nature of the response.
6        Q    Okay.  But it's your understanding that
7    there has been a change in the nature of the
8    response?
9        A    My understanding is that there's been a
10    change in the nature of the response.
11        Q    Are there any other changes that you're
12    aware of?
13        A    There's none that come to my
14    recollection.
15        Q    Outside of the context of the FOIA, the
16    Freedom of Information Act, have there been any
17    other changes in how OA has functioned since it no
18    longer considers itself to be an agency?
19            MS. SHAPIRO:  Objection to form.
20        A    None that I can specifically point to
21    because the -- OA always deemed itself not an
22    agency.
0046
1        Q    Okay.  Well, that's your understanding?
2        A    That's my understanding.  That's what I
3    was advised when I first came to the position.
4            THE VIDEOGRAPHER:  Off record; ending
5    tape one and are continuing deposition of Mr.
6    Swendiman.
7            (Recess taken.)
8            THE VIDEOGRAPHER:  Time now is 11:14 a.m;
9    on record beginning tape number two and continuing
10    deposition of Mr. Swendiman.
11    BY MS. WEISSMANN:
12        Q    Are you familiar with the Presidential
13    Records Act?
14        A    I generally am familiar with it.
15        Q    And do you also have a general
16    familiarity with the Federal Records Acts?
17        A    A general familiarity.
                                        Page 17

Alan Swendiman 3 13 08

```
18        Q     Just focussing for a moment on the
19   Federal Records Act, did the functioning of the
20   Office of Administration change when it decided it
21   was no longer subject to the Freedom of Information
22   Act?
0047
 1              MS. SHAPIRO:  Objection to form.  In
 2   connection with the FRA?
 3        A     I can't be specific as to whether there
 4   was a change in connection with the impact on the
 5   Federal Records Act.
 6        Q     Do you know if there was a change on the
 7   recordkeeping practices of the Office of
 8   Administration with respect to its own records
 9   only?
10        A     To my knowledge there was no change in
11   the recordkeeping practices of the organization.
12        Q     And what are its current recordkeeping
13   practices?
14        A     It's current recordkeeping practices is
15   to retain all hard copy documents and electronic
16   documents.
17        Q     And do you have an understanding as to
18   the statutory authority or requirements it views
19   itself under for purposes of document retention?
20        A     Well, my understanding is, is that from a
21   standpoint of Presidential Records Act, the Office
22   of Administration is to transfer all records that
0048
 1   it has in its possession to the National Archives
 2   at the end of the term of its administration.
 3        Q     Does the Office of Administration create
 4   any records currently that are subject to the
 5   Federal Records Act?
 6        A     My understanding is that that may be
 7   still an issue to be resolved with the National
 8   Archives.
 9        Q     And what is your understanding of what
10   that specific issue is?
11        A     Well, there are -- there are records, for
12   example, that transcend administration's such as
13   contracts, invoices and the like, which there is an
14   ongoing discussion on how those records will be
15   handled.
16        Q     With the exception of those records, the
17   status of which it sounds like is, as of yet,
18   unresolved, correct?
19        A     My understanding is, it has not been
20   completely resolved yet as to how a new
21   administration would come in and what would be
22   available to it in terms of ongoing operations.
0049
 1        Q     Okay.  So putting aside those records
 2   that fall into this category of what I will just
 3   call unresolved, to your knowledge has there been a
 4   change within the Office of Administration on which
 5   statutes, recordkeeping obligations, it complies
 6   with?
 7        A     Well, the staff has been advised that we
 8   comply with the Presidential Records Act.
 9        Q     Right.  And my question is whether or not
10   that represents a change for the Office of
11   Administration?
```

Page 18

Alan Swendiman 3 13 08

```
12        A    It is a different approach from what, as
13   I understand, the office previously followed.
14        Q    When you say "the office previously
15   followed," could you be more specific?
16        A    I believe in terms of the difference
17   between the Presidential Records Act and the
18   Federal Records Act.
19        Q    But when you say "previously" could you
20   be more specific in time?
21        A    My understanding is, is that previously
22   OA was operating under the Federal Records Act.
0050
1         Q    And do you know when it ceased operating
2    under the Federal Records Act?
3         A    Well, the position is, is that this
4    represents a correction from how it was operating
5    in the past.  Staff was advised to ensure that they
6    preserved all records at the end of August of 2007,
7    the beginning of September of 2007.
8         Q    So is it your testimony that in the
9    August, September 2007 period is when staff was
10   first advised that it's subject to the Presidential
11   Records Act?
12        A    Well, I can't speak to what occurred
13   prior to my tenure.  What I can say is, is that the
14   staff was advised during my tenure of the need to
15   preserve all records, both hard copy and
16   electronic, in August and in September of 2007.
17        Q    And what is your understanding of the
18   statutory obligation that imposed that requirement?
19        A    Well, my understanding is the statutory
20   obligation is the transfer of records to the
21   National Archives at the end of this
22   administration.
0051
1         Q    Right.  I'm sorry, I wasn't clear on my
2    question.  Which statute do you understand imposes
3    that obligation?
4         A    Well, my understanding is, is the
5    Presidential Records Act.
6         Q    Okay.  And prior to August 2007, what is
7    your understanding of the statute that your staff
8    was complying with with respect to recordkeeping
9    obligations?
10        A    Well, my understanding is, is that they
11   believed that they were operating under the Federal
12   Records Act.
13        Q    Okay.  In addition to the guidance that
14   it gave them in August -- in the August,
15   September 2007 period -- well, let me take a
16   step -- is this guidance that you gave them?
17        A    It's a collaborative effort in terms of
18   guidance.  I advised the senior staff of the
19   necessity of preserving records.  The OA General
20   Counsel's Office briefed the staff at mandatory
21   briefings with regards to the obligation to
22   preserve records.
0052
1         Q    And were any of these guidances put in
2    writing -- any of this guidance put in writing?
3         A    Guidance, in my recollection -- the
4    guidance that we do have in writing is guidance
5    from the White House Counsel's Office with regards
```

Page 19

Alan Swendiman 3_13_08

6  to Presidential records and preservation of
7  records.
8        Q     And do you know when that White House
9  Counsel's Office guidance was issued?
10       A     I think there certainly was a memorandum
11 from Harriett Meyers who, at the time, was White
12 House Counsel that issued guidance on the
13 preservation of Presidential records.
14       Q     And was this guidance from the White
15 House Counsel's Office specific to the Office of
16 Administration?
17       A     It was general guidance.
18       Q     Okay.  With the exception of the general
19 guidance you've just described, to your knowledge,
20 since August of 2007, has there been any written
21 guidance to OA employees regarding their
22 obligations under the Presidential Records Act?
0053
1        A     I don't recall whether there is written
2  guidance other than the guidance from the written
3  memorandum from the then White House Counsel.
4        Q     And do you know the date of that
5  memorandum approximately?
6              MS. SHAPIRO:  Objection to form.
7        A     I don't recall the exact date.
8        Q     Do you know if that memorandum was issued
9  before you came on as Director.
10       A     Yes.  The memorandum was issued prior to
11 my coming.
12       Q     Okay.  Prior to the August 2007 guidance
13 that was given with respect to compliance with the
14 Presidential Records Act, do you know if any of the
15 office of Administration's records were -- let me
16 rephrase.  Prior to August of 2007, did the Office
17 of Administration during your tenure request
18 authority from the Archives to dispose of any
19 records, if you know?
20       A     I don't know for certain.  We had a
21 Federal Records Manager.
22       Q     Does that person report to you?
0054
1        A     No.  That person actually reports to
2  the -- she has a supervisor that reports to the
3  CIO.
4        Q     And who is that person currently, the
5  Records Manager?
6        A     Her name is Sue Crippen.
7        Q     Sue Crippen, okay.  Are you familiar at
8  all with general records schedules?
9        A     Very general familiarity with them.
10       Q     And what is your understanding of what a
11 general records schedule is?
12       A     My understanding of a general records
13 schedule is that it sets forth category of records
14 and then with each category indicates how long
15 they're to be held, where they're to be held, when
16 they can be disposed of.
17       Q     Is it your understanding that if a record
18 is subject to a general records schedule, you do
19 not need to seek additional authority from the
20 Archives to dispose of it?
21             MS. SHAPIRO:  Objection to form.
22       A     I believe there are records for which you
                              Page 20

Alan Swendiman 3 13 08

0055
1   need to seek the permission of the National
2   Archives.
3        Q    You do?
4        A    I believe -- my understanding is, is that
5   there are records for which you need to seek the
6   permission.
7        Q    Records subject to a general records
8   schedule; that's your understanding?
9        A    That's correct; that's my understanding.
10       Q    Okay.  Do you know if prior to
11  August 2007, during your tenure, the Office of
12  Administration disposed of any records under the
13  authority of the Federal Records Act?
14       A    I do not know.
15       Q    Are the obligations that the Office of
16  Administration has to preserve different under the
17  Federal Records Act than the Presidential Records
18  Act?
19            MS. SHAPIRO:  Objection to form.
20       A    My understanding is, is that under the
21  Presidential Records Act we are obligated to
22  preserve all records subject to the act and to
0056
1   transfer them at the end of term of the
2   administration.  Under the Federal Records Act
3   there are schedules, which categorize records and
4   indicate how long they are to be retained and when
5   they can be disposed of.
6        Q    I just want to make sure I'm clear on
7   this.  Is it your understanding that, prior to
8   August of 2007, the Office of Administration was
9   complying with the Federal Records Act for its
10  records, not the Presidential Records Act?
11            MS. SHAPIRO:  Objection to form;
12  mischaracterizes.
13       A    My understanding is, is that the
14  employees of OA were following the obligations
15  under the Federal Records Act.
16       Q    Okay.  And when you say "following the
17  obligations", that would mean both as to
18  preservation and as to disposition?
19            MS. SHAPIRO:  Objection to form.
20       A    Whatever the requirements are, my
21  understanding is, is that the office was complying
22  with them.  I do not know whether there's been any
0057
1   disposition of records.
2        Q    Okay.  In addition to the Freedom of
3   Information Act and the Recordkeeping Statutes,
4   has there been any other changes in OA's compliance
5   with federal laws since its determination that it
6   is not an agency subject to the FOIA?
7            MS. SHAPIRO:  Objection to form.
8        A    Nothing comes to my mind immediately.
9        Q    Are you familiar with the Privacy Act?
10       A    Generally so.
11       Q    Do you know if, prior to August of 2007,
12  the Office of Administration viewed itself as
13  subject to that statute?
14       A    I don't know specifically whether it did.
15  To my recollection, the issue never came to my
16  attention.

Alan Swendiman 3 13 08

17      Q    And do you know if currently the Office
18  of Administration considers itself bound by the
19  Privacy Act?
20          MS. SHAPIRO:  Objection.  That calls for
21  a legal conclusion.
22      A    I can't -- I can't render an opinion on
0058
1  that.
2      Q    Do you know if the Office of
3  Administration currently has any regulations or
4  guidance with respect to the Privacy Act?
5      A    My understanding is, is that there are
6  existing regulations.
7      Q    And has there been any change in those
8  regulations during your tenure at the OA?
9      A    To my knowledge, there have been no
10  changes to the regulations due to pending
11  litigation.
12      Q    Does the Office of Administration, in its
13  handling of records, comply with the Privacy Act?
14  And I'm not asking comply in every case.  I'm just
15  saying, does it generally treat its records as
16  subject to the Privacy Act?
17          MS. SHAPIRO:  Objection; asked and
18  answered.
19      A    I cannot specifically state.  I know that
20  we comply with whatever existing obligations that
21  we have as an entity not subject to an -- not being
22  an agency.
0059
1      Q    In addition to the Freedom of Information
2  Act, the Federal Recordkeeping Statutes and the
3  Privacy Act, does the fact that the Office of
4  Administration is not an agency for FOIA purposes
5  affect its status with respect to any other
6  statutes, if you know?
7          MS. SHAPIRO:  Objection to form.
8      A    Well, I believe that there are posted
9  what we call Touhey Regulations.
10      Q    Okay.  And what is -- and would you
11  explain to me what the consequences of the Office
12  of Administration not being an agency means for
13  purposes of those regulations?
14      A    I can't speak as to the consequence of
15  it.  All I can indicate is that my understanding
16  and the brief experience I've had with Touhey is
17  the obligation of a federal employee to advise his
18  or her agency in the event that they have been
19  subpoenaed to testify as a witness.
20      Q    And currently are the Office of
21  Administration employees subject to that
22  obligation?
0060
1      A    I have not had an illustration brought to
2  my attention on that.
3      Q    Do you have an understanding of whether
4  or not Office of Administration are subject to
5  Touhey Regulations currently?
6      A    I think that's a legal conclusion and I'm
7  not in a position to render an opinion on that.
8      Q    Do Office of Administration employees act
9  as if they are subject to Touhey Regulations?
10          MS. SHAPIRO:  Objection to form;

Page 22

Alan Swendiman 3 13 08
```
11   foundation.
12        A     I wouldn't know.
13        Q     Okay.  In your case, when you received
14   the deposition notice, did you comply with any of
15   the procedures of the Touhey Regulations?
16              MS. SHAPIRO:  Objection to form.
17        A     I did not because everyone knew that I
18   was -- had received a subpoena.  So I didn't need
19   to inform anybody.  Everybody knew.
20        Q     Is it your understanding that the Touhey
21   Regulations are still outstanding regulations?
22        A     I understand that they're still posted
0061
1    and they've been posted because of pending
2    litigation.
3         Q     I'm not sure I understand what your
4    reference to pending litigation is.
5         A     Well, I think there are pending lawsuits
6    involving the Office of Administration.  And my
7    understanding is, is that no action has been taken
8    with regards to those regulations until such time
9    as there's a disposition in the litigation.
10        Q     And are you talking about CREW's lawsuit
11   here?
12        A     That's certainly one case.
13        Q     And when you started as Director of
14   Office of Administration were the Touhey
15   Regulations in place?
16        A     My understanding is, is that they were
17   posted.
18        Q     They were posted.  And the regulations
19   that are currently posted, are those the same as
20   the ones that were posted when you started as
21   Director of OA?
22        A     I do not know whether they're the same
0062
1    because I've not made a comparison between what's
2    posted now and what was there when I came.
3         Q     But you're not aware of any changes?
4         A     Nobody's brought any changes to my
5    attention.
6         Q     Okay.  For purposes of exercising the
7    contractual authority that the Office of
8    Administration has, has there been any evaluation
9    of whether its non-agency status changes that
10   authority in any way?
11             MS. SHAPIRO:  Objection to form.
12        A     No.  I don't think it -- has any analysis
13   been made; no.
14        Q     So, for example, earlier I showed you
15   provisions of the Economy act, which was the cited
16   authority for one of the memorandums -- Memorandums
17   of Understanding.  Has there been any analysis done
18   of whether or not that statute still applies to the
19   Office of administration given that it no longer
20   considers itself to be an executive branch agency?
21        A     There -- to my knowledge, there's been no
22   analysis.
0063
1         Q     And has there been any change within the
2    Office of Administration with respect to its
3    reliance on that statute as authority to enter into
4    Memorandums of Understanding?
```
Page 23

                          Alan Swendiman 3 13 08
5               MS. SHAPIRO:  Objection to form.
6      A    None that's been brought to my attention.
7      Q    Okay.  Are you familiar with Reimbursable
8  Services Agreements?
9      A    In a general way, yes.
10     Q    And what is your general understanding
11 about the authority the Office of Administration
12 has to enter into those agreements?
13     A    Well, I know that that is a practice that
14 the Office of Administration follows.
15     Q    Would you explain what a Reimbursable
16 Services Agreement is?
17     A    Well, my understanding is, is that a
18 Reimbursable Services Agreement provides that one
19 entity provides services to another entity and that
20 second entity reimburses the first for the expenses
21 incurred in providing that service.
22     Q    And when OA enters into these
0064
1  Reimbursable Services Agreements, does it enter
2  into them with other executive branch agencies?
3      A    My understanding is that it has.
4      Q    And do you have an understanding of what
5  the legal authority for entering into those
6  agreements is?
7      A    Well, let me correct what I may have
8  said.  I think the question was -- you asked me
9  whether we've entered into a Reimbursable Agreement
10 with other agencies.  We have in those instances
11 where they've rendered service to us and we have
12 paid them for that service.
13     Q    And is this another example of
14 outsourcing to use your word from earlier?
15     A    It's certainly a form of outsourcing.
16     Q    And what are the differences between
17 these kinds of agreements and the agreement that we
18 looked at with respect to HHS?
19     A    Well, I think they're analogous.
20 They're, in both cases, providing a service to the
21 Office of Administration.
22     Q    Are there any differences?
0065
1      A    There may be some legal difference but I
2  think my understanding is, from a practical
3  standpoint, it's basically paying for services
4  rendered.
5      Q    And can you give me some examples of when
6  OA has entered into these Reimbursable Services
7  Agreements.  Let me be clear.  What kinds of
8  service does OA typically negotiate for into these
9  agreements?
10             MS. SHAPIRO:  Objection to form.
11     A    Well, we had to -- one example is the
12 White House Press Briefing Room in which we had to
13 reimburse the General Services Administration for
14 services it rendered in terms of improving that
15 facility.
16     Q    Okay.  Are you familiar with the
17 Government Management Reform Act of 1994?
18     A    I am not, no.
19     Q    Okay.  Are you familiar with the Treasury
20 Department's Franchise Fund?
21     A    In a very general way.
                                    Page 24

Alan Swendiman 3 13 08
22      Q    The -- I will represent to you that the
0066
1  statute appears to be the organic statute for
2  setting up the Treasury Fund.  What is OA's
3  relationship to that fund?
4           MS. SHAPIRO:  Objection to form.
5      A    Well, my understanding is -- and I
6  believe this relates to the Bureau of Public Debt,
7  which provides financial management systems and
8  maintenance to the Office of Administration.
9      Q    And would these be comparable to the
10 kinds of financial services that HHS was performing
11 in that other agreement?
12     A    No.  I think it's slightly different.
13 With HHS I think that was what I called management
14 of grants whereas the Bureau of Public Debt is
15 providing, for example, such things as payroll
16 service, financial management systems, for the
17 Office of Administration.  So I think you might say
18 it's perhaps a little more extensive in terms of
19 the services that it's providing but it's
20 outsourcing nevertheless.
21     Q    And where did the funds come from for
22 those services?
0067
1      A    Funds come -- you mean the funds that OA
2  uses to pay for the services?
3      Q    Yes.
4      A    They come from appropriated funds.
5      Q    To OA?
6      A    To the -- to OA and the Executive Office
7  of the President.
8      Q    So that as of the other agreement is it
9  the case that OA enters into these agreements for
10 service for other EOP components outside of OA?
11         MS. SHAPIRO:  Objection to form.
12     A    Would you repeat the question again?
13     Q    I'll ask it differently.  Does OA enter
14 into these agreements to provide services to non-OA
15 EOP components?
16     A    Yes, it does.
17     Q    Okay.  I'm going to -- this isn't going
18 to be marked, but I want to ask you a question.  If
19 you would -- there are Bates stamp numbers at the
20 bottom.  I assume these were put on by the Office
21 of Administration.  If you would turn to page
22 OA00025, please.  Number four, Establishment of
0068
1  Financial Management System Infrastructure -- I'm
2  sorry, 3.1 at the top.  That first sentence,
3  there's a reference to a system platform
4  established and maintained by another government
5  organization under a Cross-Serving Agreement.  Do
6  you see that?
7      A    Yes.
8      Q    Do you know what that is?
9      A    I don't know what the reference to the
10 other government organization under a
11 Cross-Servicing Agreement is.  I do not know.
12     Q    Are you familiar generally with the term
13 Cross-Servicing Agreement?
14     A    In a very general way.
15     Q    And what is your understanding of what a
                              Page 25

Alan Swendiman 3 13 08

```
16  Cross-Servicing Agreement is?
17       A    Well, it's my understanding is, is that
18  it's services going in both directions.
19       Q    And do you know in this particular case
20  what services EOP was providing?
21       A    I do not know.  I'm not familiar with --
22  I don't know the reference to another government
0069
 1  organization.
 2       Q    Okay.  Describe for me the process by
 3  which one of these agreements is generated.  Is it
 4  done at the initiation of OA?
 5       A    That's a very general question, which is
 6  difficult to answer.
 7       Q    Well, let me break it down into some
 8  pieces then.  Is one of these agreements generated
 9  when an EOP component comes to you with a need for
10  a service?
11       A    It can.
12       Q    Okay.  And if that's the case who
13  decides -- which component of EOP decides what the
14  requirements for the service are?
15       A    Well, it's the entity that's requesting
16  the service that determines the requirements.
17       Q    Okay.  So would it be fair to say that
18  they would come to OA with a specification of the
19  requirements they need?
20       A    Yes, because they would know more what
21  they need than we would.
22       Q    Okay.  And then what would OA do next
0070
 1  with that information?
 2       A    Well, it would -- basically it's
 3  reference to the procurement people who would
 4  prepare a request for proposal.
 5       Q    And what would happen to that request?
 6       A    Well, the request has to be reviewed by
 7  the entity or organization requiring the services
 8  to make sure that it meets their needs, meets their
 9  requirements.
10       Q    And then how do you go about finding a
11  source for those requirements?
12       A    Well, I mean, there are several ways of
13  doing it.  I'm not an expert in procurement but
14  certainly there are -- you know a request for
15  proposal is issued and published.  You can also
16  seek to utilize GSA schedules.  You can use other
17  vehicles.  It may be also that the procurement --
18  because the limited number of folks that are in
19  that group -- they may have to use a procurement
20  organization such as GovWorks, which is under the
21  Department of Interior, or NASA SEWP, which is
22  under NASA or a component under DOD.
0071
 1       Q    In the package of materials I handed you,
 2  this was with the Treasury Franchise Fund.  That is
 3  a specific provider of services, correct?
 4       A    I mean, that's my understanding.
 5       Q    Right, as opposed to one of these
 6  entities you were just describing?
 7       A    What I call a procurement --
 8       Q    Procurement --
 9       A    -- organization.
```

Page 26

Alan Swendiman 3 13 08

```
10      Q     That's not a procurement entity?
11      A     No, it's not.  It's a delivery of
12   service.
13      Q     All right.  And if you look at OA00024,
14   it's a Memorandum of Understanding between the
15   Office of Administration and the Treasury Franchise
16   Fund; is that correct?
17      A     That is correct.
18      Q     Do you know who decides the terms of
19   agreements of a Memorandum of Understanding?  I
20   don't mean the individuals but which entities to
21   this agreement?
22      A     I can't speak to this specific agreement
0072
1    because this was executed prior to my tenure.
2       Q     Okay.  In -- have you been -- during your
3    tenure, have there been Memorandum of Understanding
4    that OA has entered into with either the Treasury
5    Franchise Fund or other entities like the Treasury
6    Franchise Fund?
7       A     I think that there was -- my
8    understanding -- my recollection is, is that there
9    was a renewal of this agreement during my tenure.
10      Q     Okay.  And was there a negotiation
11   process over the terms of the Memorandum of
12   Understanding?
13      A     Well, I didn't read the memorandum.  My
14   understanding is, is that the terms continued from
15   the last either agreement or modification that the
16   only -- that the primary difference, as I
17   understand it, was the cost.
18      Q     Okay.  Have there been any other
19   Memorandum of Understanding since you started at OA
20   that weren't just a continuation that were newly
21   entered not necessarily with the Treasury Franchise
22   Fund?
0073
1       A     My recollection is that those that have
2    come to my attention have been primarily renewals.
3       Q     Do you have an understanding of the
4    process by which a Memorandum of Understanding is
5    reached, the terms of a Memorandum of
6    Understanding?
7       A     Well, it's based on negotiation between
8    parties.
9       Q     And who are the parties to that
10   negotiation?
11      A     Well, if it's --
12            MS. SHAPIRO:  Objection to form.
13            THE WITNESS:  -- if it's involving the
14   Office of Administration, it would be the Office of
15   Administration in conjunction with White House
16   Management and Administration and the other
17   providing organization.
18   BY MS. WEISMANN:
19      Q     Do you have in the packet I gave you
20   Bates number 00079?
21      A     Not in the last document you gave me.
22      Q     All right.  Well, we're not going to mark
0074
1    this, but I'm going to show you -- again, this
2    comes from the document production that the Office
3    of Administration just made this week.  I'd like
```

Page 27

Alan Swendiman 3 13 08
4  you to look at Bates number 00079.  You'll see some
5  highlighted language.  If you could -- I apologize,
6  I don't have copies.  It's 79.  Do you see the
7  reference to Customer Government Agency?
8       A    Uh-huh.  Yes, I do.
9       Q    Okay.  Do -- If you need to look at the
10  additional pages -- do you have any understanding
11  of what the Customer Government Agency is?
12            MS. SHAPIRO:  Objection to form;
13  ambiguous.
14       A    Well, the front page says Customer Agency
15  Executive Office of the President.
16       Q    Okay, thank you.
17       A    Now, these are standard government forms,
18  which generally use the word agency.
19       Q    With respect to the processes of entering
20  into these Memoranda of Understanding, has the --
21  have the responsibilities of the Office of
22  Administration changed since it deemed itself a
0075
1  non-agency to your knowledge?
2       A    Well, my understanding is, is that it's
3  not considered itself an agency prior to my coming.
4  It's not considered itself an agency while I've
5  been there.  I don't know what you mean with
6  regards to has the process changed.
7       Q    I'm not entering -- marking this yet.  On
8  this one, if you could look at Bates number 235.
9  If you'll look at page 17, number 11.5.2.10.  Do
10  you see that?  It's about three-quarters of the way
11  down.
12       A    Uh-huh.  Yes, I do.
13       Q    Well, the 11.5.2 says, upon authorization
14  from the EOP Procurement Office the ARC shall meet
15  all federal regulations and guidelines with regard
16  to intergovernmental reporting.  Does -- when EOP
17  enters these agreements, does EOP itself have any
18  kind of reporting requirements; do you know?
19            MS. SHAPIRO:  Objection to form.
20       A    If I can get a clarification.
21  Intergovernmental reporting to whom?
22       Q    I don't know.  I'm looking at the
0076
1  language of the document and trying to figure it
2  out myself.  I was hoping you could shed some light
3  on that.
4       A    Well, I cannot state specifically what
5  the regulations are as to intergovernmental
6  reporting or whether they're applicable.
7  Certainly, the Treasury Fund and ARC would report
8  to us or, I should say, to OA with regards to the
9  services that it's providing --
10       Q    Okay.
11       A    -- simply because the EOP Procurement
12  Office basically would manage this contract.
13       Q    Okay, thank you.
14       A    (Tenders document to counsel.)
15       Q    Are you familiar with the process by
16  which the Office of Administration secures
17  detailees, individuals doing details within the
18  Office of Administration?
19       A    I'm generally familiar.
20       Q    And what is your understanding of the
                                        Page 28

                                   Alan Swendiman 3 13 08
21  source of OA's authority to procure detailees?
22      A    I can't cite a specific authority for
0077
1   procuring detailees.  The practice of seeking
2   detailees occurred prior to my tenure as OA
3   Director.
4               MS. WEISMANN:  Just bear with me.  Too
5   many documents.
6   BY MS. WEISMANN:
7       Q    I'm handing you another packet of
8   material, and I'd like you to turn to Bates number
9   319.
10              (Tenders documents to witness.)
11              I think it's the last page of this.  Do
12  you see that document?
13      A    I do.
14      Q    Would you explain what this document is?
15      A    What it is, is a form letter that was
16  sent to various governmental entities requesting
17  a -- their consideration of a non-reimbursable
18  detail to the Office of Administration.
19      Q    And this letter was sent out under your
20  signature; is that correct?
21              MS. SHAPIRO:  Objection to form.
22      A    Correct, with the approval of the White
0078
1   House Management Administration.
2       Q    Were you involved in negotiating with
3   parent organizations for the specific detailees --
4   for specific details?
5       A    I have been in the past.
6       Q    And what has that negotiation involved?
7       A    Basically, it's not a negotiation.  I
8   wouldn't characterize it as that.  It's a request
9   that was made as to whether they would consider
10  detailing someone to us from their organization on
11  a non-reimbursable basis up to a period of six
12  months.
13      Q    And by "non-reimbursable basis", does
14  that mean that the salary for that detailee would
15  continue to be paid by its parent organization?
16      A    That is correct.
17      Q    And in the specific instance that you
18  just referenced, what was the parent organization?
19      A    The parent organization was the General
20  Services Administration.
21      Q    And you were seeking someone.  What was
22  the nature of the detail?
0079
1       A    It was to assist in our procurement
2   office.
3       Q    And this is something that you personally
4   were involved in?
5       A    Well, I called and asked whether they
6   would consider it, and then the human resources
7   office did the follow-up and did the necessary
8   paperwork.  All of it is done certainly on the
9   approval by -- first of all, approval by White
10  House Management Administration of my seeking that
11  request, and, second, if an individual is
12  interested, it depends upon approval of that
13  person's supervisor.
14      Q    In terms of executing paperwork to
                                              Page 29

Alan Swendiman 3 13 08
15  finalize a detail, is there someone within the
16  Office of Administration that signs on behalf of
17  EOP?
18      A    Referencing the documents that you've
19  given me, I think there have been -- some of the
20  documents have been signed on behalf of OA.
21          MS. WEISMANN:  Okay.  I'd like to have
22  the last page, Bates number 319, marked as the next
0080
1   exhibit.
2              (Plaintiff's Exhibit No. 4 was
3               marked for identification.)
4   BY MS. WEISMANN:
5       Q    Okay.  Turning again to the packet that
6   starts with Bates number 269, if you could turn to
7   271.  And under the purpose it states to work with
8   GSA IAGs and IAPCs.  Can you tell me what that
9   means?
10      A    Well, I think the reference is to -- is
11  Interagency Agreements.  And I'm trying to remember
12  what IPAC stands for.  I truly can't remember at
13  this juncture.  It will come to me later.
14      Q    What about IAG?
15      A    InterAgency agreement.
16      Q    Okay.  And so -- from reading this
17  document, do you have an understanding of what the
18  detailee would --
19      A    Actually, I do have an understanding of
20  this one.  This one -- I don't think that the
21  purpose specifically encompasses everything that
22  this individual was doing, but this individual was
0081
1   designed to assist our procurement people with
2   regards to various procurement matters that OA had,
3   which includes instances where we utilize GSA as a
4   procurement organization.
5       Q    And the relationship that you have
6   with -- by "you," I mean, OA -- has with GSA in
7   this regard, is it comparable to the relationship
8   OA has with the agencies in which it's entered into
9   Memorandum of Understanding?
10      A    Well, Memorandum of Understanding is
11  rather a broad term.
12      Q    All right.  Let's talk about the
13  Memorandum of Understanding that I've shown you so
14  far today.
15      A    Well, it would be perhaps comparable to
16  the one with regards to the Treasury Fund in which
17  the Treasury Bureau of Public Debt specifically is
18  providing services to OA, likewise GSA is a
19  procuring organization.  It's similar to GovWorks,
20  the Department of Government, NASA SEWP under NASA,
21  and there are instances where we have -- my
22  understanding is, we've utilized GSA to procure
0082
1   services.
2       Q    And this request -- part of the
3   responsibilities for this person would be to be
4   that interface with GSA?
5       A    I can't specifically -- I don't know
6   specifically whether this person interfaced with
7   GSA or not.
8           MS. WEISMANN:  Okay.  If you can pull
Page 30

Alan Swendiman 3 13 08
```
 9  that sheet out, please.  I'm going to have it
10  marked as the next exhibit.
11              (Plaintiff's Exhibit No. 5 was
12               marked for identification.)
13              (Tenders documents to witness.)
14  BY MS. WEISMANN:
15      Q    Okay.  I've just handed you a few more
16  pages of documents.  Again, these are documents
17  that were part of the production that the Office
18  of Administration made this week.  Specifically, if
19  I can direct you to Bates number 00324.  Actually,
20  323 as well.  Let's start with 323.  At the bottom
21  it says, federal agencies must provide reasonable
22  accommodation to applicants with disabilities where
0083
 1  appropriate.  Do you see that language?
 2              MS. SHAPIRO:  I've got the wrong Bates
 3  numbers, sorry.  What page are you reading from?
 4              MS. WEISMANN:  323.
 5              MS. SHAPIRO:  The very last page?
 6              MS. WEISMANN:  At the top it says page 4
 7  of 4.
 8              MS. SHAPIRO:  Okay.
 9  BY MS. WEISMANN:
10      Q    Do you see that?
11      A    I do.
12      Q    And then if you go on to the next page,
13  at the very bottom it says, this component provides
14  reasonable accommodations.
15              MS. SHAPIRO:  There is no next page.
16  That's the problem.
17      A    I don't have a next page.
18              MS. WEISMANN:  You have 323?
19              MS. SHAPIRO:  Right.  That's the last
20  page of this packet.
21              MS. WEISMANN:  Well, that's okay.  We'll
22  stick to 323.  It doesn't matter.
0084
 1  BY MS. WEISMANN:
 2      Q    Do you have an understanding of what this
 3  reference to reasonable accommodations is?
 4      A    My understanding would be that it
 5  reflects the accommodations under the ADA.
 6      Q    The ADA being?
 7      A    American Disabilities Act.
 8      Q    Okay.  Are you also familiar with an
 9  Executive Order 13164 entitled Requiring Federal
10  Agencies to Establish Procedures to Facilitate the
11  Provision of Reasonable Accommodation?
12      A    I'm not familiar with the Executive
13  Order.
14      Q    Okay.  Is it your understanding -- what
15  is your understanding about the Office of
16  Administration's obligations with respect to the
17  ADA?
18              MS. SHAPIRO:  Objection to form.
19      A    I know that we adhere to the provisions
20  of the ADA.
21      Q    Is it your understanding that you do so
22  because you're required by law to do so?
0085
 1              MS. SHAPIRO:  Objection to form.
 2      A    That's a legal conclusion.  I could not
```
Page 31

Alan Swendiman 3 13 08

```
 3   give an opinion on that.
 4        Q    Well, as Director of OA, do you have an
 5   understanding that you have a legal obligation to
 6   comply with the ADA?
 7        A    What I know is that we adhere to the
 8   obligations under the ADA.
 9        Q    And you have no further understanding
10   beyond that?
11        A    I have no further understanding other
12   than that.
13        Q    And who within the Office of
14   Administration is charged with compliance with the
15   ADA?
16             MS. SHAPIRO:  Objection to form.
17        A    Well, the office itself is charged with
18   complying with it.
19        Q    And is there any individual with the O --
20        A    The Director ultimately is responsible in
21   terms of in conjunction with White House
22   management.
0086
 1        Q    Responsible for what?
 2        A    To ensure that we are adhering to the
 3   obligations under the ADA.
 4        Q    Okay.  So by your testimony you are
 5   ultimately responsible for the office's adherence
 6   to the ADA, correct?
 7        A    Ultimately, yes.
 8        Q    And yet you have no understanding about
 9   whether you're required to do so or whether it's a
10   matter of policy?
11        A    Well, my understanding is, is that we do
12   adhere to it and that's -- that's what we do.
13        Q    Have you delegated this responsibility to
14   anyone else within the Office of administration?
15             MS. SHAPIRO:  Objection to form.
16        A    Well, we certainly are -- HR people are
17   cognizant of the obligations under it and seek to
18   make sure, to the best of their ability, that we --
19   you know, we follow it.
20        Q    Okay.  And the document I showed, what's
21   the first page number?
22        A    It's OA00320.
0087
 1        Q    Okay.  Would you explain what this
 2   document is?
 3        A    Well, it's a posting, as I understand it,
 4   on USAJOBS, which is a government internet site for
 5   the posting of open government positions in various
 6   government organizations.
 7        Q    Okay.  And part of this posting includes
 8   the language of page 323, does it not, that I read
 9   earlier about federal agencies must provide
10   reasonable accommodations?
11        A    Well, that's what the document reflects.
12        Q    Right.  That's part of the posting.  Do
13   you have an understanding of why this language was
14   included?
15        A    No.  I don't get involved with the
16   details of, you know, every posting.  So I can't
17   tell you specifically as to this language.
18        Q    To your knowledge, is this language
19   generally included in postings?
```

Alan Swendiman 3 13 08

20      A    I cannot tell you whether it's generally
21  included in postings.  I don't review postings in
22  the federal government.
0088
1       Q    Okay.  When you were at the General
2  Services Administration, did you have any
3  involvement in postings like this?
4       A    Generally, my Associate General Counsels
5  handle the postings in conjunction with the human
6  resources office.
7            (Tenders documents to witness.)
8            MS. WEISMANN:  The four pages that I just
9  handed you, can we have that marked as the next
10 exhibit, please.
11           (Plaintiff's Exhibit No. 6
12            was marked for identification.)
13           MS. WEISMANN:  Can we just go off the
14 record for a minute and just talk about scheduling.
15 I don't know if you want to just keep going, if you
16 want to take a break.  It's really up to you.
17           THE WITNESS:  I'm fine.
18           MS. SHAPIRO:  Do you have an estimation
19 as to how long we'll go?
20           MS. WEISMANN:  I can't give you a time
21 estimation.
22           THE VIDEOGRAPHER:  12:11 p.m; off record
0089
1  ending tape number two in our continuing deposition
2  of Swendiman.
3            (Recess taken.)
4            THE VIDEOGRAPHER:  Our time now is 12:16
5  p.m.  We're on record beginning tape number three
6  in our continuing deposition of Mr. Swendiman.
7            (Tenders documents to witness.)
8  BY MS. WEISMANN:
9       Q    I just handed you another grouping of
10 documents.  Again, these are documents that were
11 recently produced by the Office of Administration
12 as part of its document production here.  The first
13 page of the first document, Bates number 335, can
14 you -- at the top it says Executive Office of the
15 President - Interagency Agreement.  What is the --
16 as I read this, it appears that the Office of
17 Administration is agreeing to provide a service; is
18 that correct?
19      A    My reading of this document seems to
20 indicate that the Office of Administration is
21 providing a service on a reimbursable basis.
22      Q    And it's providing a service to the Navy,
0090
1  or am I wrong on that?
2       A    It appears that's the case.
3       Q    Can you tell from looking at this
4  document the nature of the service OA is providing?
5       A    I can't tell exactly from the document.
6  It references AT&T voice systems operations.
7       Q    That's on Bates number 336?
8       A    It's on 335.
9       Q    And if you'll look on 336 it describes
10 the service.  Funds are provided to the Executive
11 Office of the President for AT&T voice systems
12 operation and maintenance?
13      A    My understanding is, is that we do a
                                          Page 33

Alan Swendiman 3 13 08

14    minimal service for them.  My understanding is --
15         Q    When you say "for them", who is the them?
16         A    In this case, the Navy.  And it's -- I
17    can't tell you exactly what the nature of the
18    service is other than what is stated there.
19         Q    Okay.  And would it be fair to say that
20    these Interagency Agreements are similar to the
21    ones we looked at earlier, only in this case it's
22    OA providing the service to another agency?
0091
1         A    Yes.  It's a minimal service provided to
2    this -- to the Navy on a reimbursable basis.
3         Q    And why does OA outsource -- or not
4    outsource.  Why does it provide services to other
5    agencies?
6         A    Well, in this particular case -- I can
7    speak generally -- is that there are entities
8    within the White House complex with whom OA has to
9    work in conjunction with.  The Navy is certainly
10    one of them.  And oftentimes the service that we're
11    providing is actually for the benefit of OA in
12    order for us to service -- service the President
13    and White House Management Administration.
14         Q    But -- and this is an agreement -- in
15    order to do that you are providing a service to a
16    non-EOP entity, correct?
17         A    Well, I can't tell exactly.  It's got
18    operation and maintenance Navy.  I can't tell from
19    this document exactly what aspect of the Navy that
20    service is.  My understanding is, it is with
21    regards to the presence within White House complex.
22         MS. WEISMANN:  Okay.  Can we have this
0092
1    document, all of the pages that are clipped
2    together, marked.  It's Bates number 335 and 336 --
3    I'm sorry, let's have 335 and 336 marked as the
4    next exhibit.
5         (Plaintiff's Exhibit No. 7 was
6         marked for identification.)
7         MS. WEISMANN:  Also, in the packet that I
8    gave you should be 00343 and 344, which is also
9    another EOP Interagency Agreement.
10         MS. SHAPIRO:  I don't think we have that.
11         MS. WEISMANN:  Keep going.  It would be
12    further on.  You don't have it?
13         MS. SHAPIRO:  It ends at 342.
14         THE WITNESS:  It ends at 342 and then it
15    picks up at 352.
16         MS. WEISMANN:  All tight. I apologize.
17    I've got copies. I just didn't give them to you
18    yet.  All right, well, I'm not going to make this
19    an exhibit and I apologize.  I thought I had
20    copies.  I'm going to give you --
21         (Tenders document to witness.)
22    BY MS. WEISMANN:
0093
1         Q    If you can take a look at this document
2    and tell me if you can tell from these two pages
3    the nature of the -- what the agreement is about
4    and what's the nature of the service.
5         MS. SHAPIRO:  Can you give us the Bates
6    numbers?
7         MS. WEISMANN:  343 and 344.

Alan Swendiman 3 13 08
```
 8           THE WITNESS:  Well, I can't tell from the
 9   documents to whom the service is rendered.  It's
10   for nominal amounts.  It references AT&T voice
11   systems operations and maintenance.  We do do some
12   maintenance with regards to telephone connections.
13   Again, oftentimes this is for the benefit of OA in
14   order to carry out its mission.
15   BY MS. WEISMANN:
16        Q     But would this be maintenance done at a
17   non-EOP agency?
18        A     Well, this is the Harry S. Truman
19   Scholarship Foundation.  They're not considered a
20   component of the EOP, but I cannot tell you where
21   they fall under the organizational chart with
22   respect to the white House complex.
0094
 1        Q     But as you read this document it appears
 2   to be agreement to provide some kinds of
 3   maintenance services?
 4        A     Some maintenance service which is
 5   generally, is my understanding, has been telephone
 6   connections.
 7        Q     Okay, thank you.  Do you have number --
 8   Bates number 356?
 9        A     I do.
10        Q     Good.  This is document entitled
11   Agreement Between Federal Agencies.  what are the
12   two entities that are parties to this agreement?
13        A     The buyer is referenced as Office of the
14   Secretary; and the agency and office, the name is
15   the White House.
16        Q     And it's the Office of Administration
17   within the White House; is it not?
18        A     Well, it says address, Executive Office
19   of the President, Office of Administration.
20        Q     Okay.  And what is the nature of the
21   goods and services being provided here, if you can
22   tell?
0095
 1        A     This looks to be an event.
 2        Q     Would this be an event at the Department
 3   of Education?
 4        A     It could be an event at the Department of
 5   Education.  It could be an event outside the
 6   Department of Education building.
 7        Q     Is this -- what service or goods is the
 8   White House Office of Administration providing; can
 9   you tell?  It's a multi-page document, I believe.
10   Oh, yeah, if you'll look at 359 --
11           MS. MEDAGLIA:  What page does this start
12   with?
13           MS. WEISMANN:  It starts with 356.
14           MS. MEDAGLIA:  Actually, I don't think
15   so.  That's not how it was produced.
16           MS. WEISMANN:  For purposes of this
17   deposition, we're looking at a document that starts
18   at page 356.
19           THE WITNESS:  This looks to be an event
20   that was held at the Horace Greeley Elementary
21   School in Chicago.
22   BY MS. WEISMANN:
0096
 1        Q     Okay.  And what is the nature of goods or
```
Page 35

Alan Swendiman 3 13 08
2  service that the Office of Administration is
3  providing?
4       A    I cannot tell from this document exactly
5  what the service is.  The service is on a
6  reimbursable basis.
7       Q    Okay.  And there are, in fact, four pages
8  that precede 356.  Do you have 352?
9       A    Yes, I have it in my hand.
10       Q    All right.  Do those four pages relate to
11  this agreement?
12       A    Well, the first one starting with
13  OA00352 --
14       Q    Correct.
15       A    -- is with the Department of Health and
16  Human Services.
17       Q    Okay.  So that's a separate document?
18       A    That's a separate document.
19       Q    Right.
20       A    The next document is OA --
21       Q    If you'll look at 354 --
22       A    354, it is -- it's associated with the
0097
1  visit of the President and the Secretary of
2  Education to the Horace Greeley Elementary Shool in
3  Chicago on January 7th, 2008.
4       Q    So that appears to relate to the
5  agreement document?
6       A    That appears to relate to the agreement.
7            MS. WEISMANN:  So let's make, for
8  purposes of this deposition, page numbers 354
9  through 359 the next exhibit.  If you could hand
10  those to her, I apologize.
11            (Plaintiff's Exhibit No. 8 was
12             marked for identification.)
13            THE WITNESS:  354 --
14            MS. WEISMANN:  Through 359.  So 4, 5, 6
15  7, 8 and 9.  I think that's all one document.
16            (Tenders documents to witness.)
17  BY MS. WEISMANN:
18       Q    Okay.  I've just handed you what is again
19  another document produced in this litigation as
20  part of OA's document production.  And it's 0
21  Fiscal Year 2003 Congressional Budget Submission?
22       A    That is correct.
0098
1       Q    Okay.  Would you turn to -- have you seen
2  this document before?
3       A    I've -- I've seen the document before.
4       Q    And do you have a role in preparing the
5  budget submission to Congress on behalf of the
6  Office of Administration?
7       A    Well, we have a -- we have a role in
8  preparing the budget on behalf of the Office of
9  administration in conjunction with the White House
10  Management -- in conjunction with White House
11  Management and Administration.
12       Q    Would you turn to Bates number 410,
13  please.  There's a section that states the Office
14  of Administration is organized along the following
15  lines.  Do you see that?
16       A    I do.
17       Q    And the second one is the Chief Special
18  Projects Officer or CSPO.  Do you see that?

Alan Swendiman 3 13 08

```
19      A    I see that.
20      Q    Was this a new position that was created?
21      A    I have no idea --
22           MS. SHAPIRO:  Objection to form.
0099
1            THE WITNESS:  I'm sorry.  I have no idea.
2    This is for fiscal year 2003.  This preceded my
3    tenure.  There is no such office.
4    BY MS. WEISMANN:
5       Q    Okay.  And so during your entire tenure
6    at the Office of Administration there has not been
7    a Chief Special Projects Officer?
8       A    There has been somebody in charge of
9    special projects but not -- but there has been no
10   Chief Special Projects Officer.
11      Q    Okay.  And just looking at the
12   description of that position, if you could just
13   read that.  I recognize there isn't a person
14   occupying this job, but it's still the case that
15   EOP coordinates within EOP and within the EOP
16   affiliated entities?
17           MS. SHAPIRO:  Objection to form.
18      A    Well, we do work in conjunction with and
19   parallel to the White House Military Office, for
20   example.
21      Q    Okay.  I want you to focus on the phrase
22   EOP affiliated entities.  Would you explain what
0100
1    those entities are?
2            MS. SHAPIRO:  Objection to form.
3       A    I can't explain that entity -- I can't
4    explain those entities.
5       Q    Do you understand the Military Office to
6    be the White House Military Office?
7       A    I would understand that to be the White
8    House Military Office.
9       Q    And what is the -- OA's relationship with
10   the White House Military Office?
11      A    Well, we work in conjunction and parallel
12   with them to support the President.
13      Q    And what is the nature of your
14   interaction with the White House Military Office?
15      A    Well, For example, if the President goes
16   on trips, the White House Military Office supports
17   him with regards to IT.  The Office of
18   Administration also supports with regards to IT.
19      Q    Would you consider that to be an EOP
20   affiliated entity?
21      A    I can't describe --
22      Q    That's not a phrase you're familiar with?
0101
1       A    That's not a phrase I'm familiar with.
2       Q    Okay.  What about the Secret Service;
3    what is the relationship of the Office of
4    Administration with the Secret Service?
5       A    Well, again, I think as I've explained
6    before, for example, in terms of the Secret
7    Service, we forward approved name checks that we
8    receive from the FBI to the Secret Service in terms
9    of access to the complex.
10      Q    Is there any -- does your office have any
11   other interaction with the Secret Service?
12      A    Well, we've had interaction previously.
```

Page 37

Alan Swendiman 3 13 08
13  For example, it's been reported there was a fire in
14  the EEOB in December and both the Secret Service
15  and our Office of Security, Emergency of
16  Preparedness -- and by "our", I mean, OA -- were
17  involved with reacting and responding to that fire.
18       Q      Okay.  This paragraph refers to large
19  scale EOP projects with entities such as the Secret
20  Service.  Are you aware of any current or ongoing
21  EOP projects that your office has with the Secret
22  Service?
0102
1        A      I'm not aware of any ongoing projects.
2        Q      And there's also a reference here to the
3  General Services Administration.  Other than what
4  you had described earlier in the contracting or
5  agreement documents with GSA, does your office have
6  any additional relationship or interaction with --
7        A      Oh, yes, we have a relation -- or
8  interaction with General Services Administration.
9  As is known, the EEOB or the Eisenhower Executive
10  Office Building is undergoing a modernization of
11  the building and GSA, for lack of a better term, is
12  the entity that oversees the modernization effort
13  from a -- from a real estate standpoint.  GSA owns
14  the building, owns the EEOB, and they basically
15  hire the contractor or contractors to do the work
16  that's necessary to modernize the building.
17       Q      And then given that GSA is the owner of
18  the building, does the EOP pay rent to GSA for the
19  building?
20       A      Yes, EOP pays rent to GSA.
21       Q      Okay.  And does your office get involved
22  in negotiations over what the rent will be?
0103
1        A      My experience has been, is that GSA
2  generally tells us what the rent is.
3        Q      It's not a negotiated process?
4        A      It's not necessarily a negotiated
5  process, although we do have discussions and see
6  whether we're being fairly charged on our rent.
7        Q      Okay.  I'm going to hand you what is --
8  at least portions of the fiscal year 2007 budget,
9  again, another document that was produced to us as
10  part of the document production in this case.
11              (Tenders documents to witness.)
12              And I'd like you specifically to look at
13  page 485.  Under the Admission Statement it states,
14  OA's mission is to provide enterprise level
15  administrative services to the Executive Office of
16  the President and the Office of the Vice President?
17       A      That's correct.
18       Q      What do you understand is meant by the
19  term enterprise level administrative services?
20       A      By enterprise services, I understand that
21  to mean that we are providing the common support
22  and services to all of the components of the
0104
1  Executive Office of the President and that it is --
2  those services are folded under the budget of the
3  Office of Administration.
4        Q      To your knowledge, has anything about the
5  OA's budgeting process changed since it deemed
6  itself to no longer be an agency?
Page 38

                                      Alan Swendiman 3 13 08
 7              MS. SHAPIRO:  Objection to form.
 8         A    None to my knowledge.  And by
 9    clarification, I came at the time of the budget
10    process for 2008 and I came towards the end.  So I
11    was not involved with the budget -- intimately
12    involved with the budget process at that time.  My
13    full involvement and participation of the budget
14    process came with the fiscal year 2009 budget.
15              MS. WEISMANN:  Can we have this marked as
16    the next exhibit number.
17              (Plaintiff's Exhibit No. 9 was
18              marked for identification.)
19              (Tenders document to witness.)
20    BY MS. WEISMANN:
21         Q    I've just handed you a document that is
22    an e-mail exchange between Sam Watkins and Theresa
0105
 1    Payton.  Have you seen this document before?
 2         A    I saw the document in connection with the
 3    production of documents in response to your
 4    organization's request.
 5         Q    Okay.  This actually was not part of the
 6    documents that your agency produced to us.
 7         A    Okay.
 8         Q    Would you look at the second half of the
 9    first page, which has a page number of 47.  It
10    says, Theresa we missed you at last week's -- let
11    me backstep.  It's dated November 6th, 2007; is it
12    not?
13         A    Okay.
14         Q    It says, Theresa we missed you at last
15    week's OA transition meeting with representatives
16    of the CFO's Office held on October 31st, 2007.  We
17    now have a better understanding of the systems used
18    by the office of OA CFO and what Presidential
19    records may be generated by those meetings now that
20    OA is a PRA organization.  We look forward to
21    future meetings with representatives of other
22    elements of OA.  We suggest that it would be
0106
 1    helpful now that OA considers itself a Presidential
 2    component of the EOP.  If in the next meeting we
 3    had a general discussion of the functions that OA
 4    uniquely performs for the president as opposed of
 5    OA's monitoring or passing off on other agencies
 6    functions.  This general discussion would assist us
 7    in giving better advice as to which of the OA IT
 8    systems are creating Presidential records.
 9              Do you know if those future discussions
10    have taken place?
11         A    Well, I know that -- I know that future
12    discussions took place.
13         Q    And do you know if there are any
14    documents that were generated by those discussions?
15         A    I don't know whether any documents were
16    generated or not.
17         Q    Now, this says, we suggest that it would
18    be helpful now that OA considers itself a
19    Presidential component.  Do you know -- have you
20    had any discussions with personnel at the National
21    Archives and Records Administration about OA's
22    status under the Presidential Records Act or the
0107
                                    Page 39

Alan Swendiman 3 13 08
```
 1   Federal Records Act?
 2        A    I have attended at least one meeting in
 3   which a discussion was held as to the
 4   responsibilities that OA indicated it would adhere
 5   to in order to meet the obligations under the
 6   Presidential Records Act.
 7        Q    And when did that meeting take place?
 8        A    Well, it occurred after November.
 9        Q    After November of 2007?
10        A    It occurred after this date.  I can't
11   tell you the exact date.
12        Q    And was the meeting at the Office of
13   Administration or at NARA?
14        A    Well, there have been a series of
15   meetings.  There have been roughly eight meetings
16   with NARA, approximately eight meetings with NARA,
17   since August of 2007.  There have been numerous
18   internal meetings in terms of preparing for the
19   meetings and to be responsive to NARA.  I can't
20   give you the exact dates of those meetings.
21        A number of the meetings that were
22   coordinated with NARA were technical meetings in
0108
 1   which the technical people of NARA were meeting
 2   with the technical people at OA, which I was not
 3   present because I could not provide any value in
 4   terms of the technical issues and questions that
 5   were generated.
 6        Q    Do you know if any documents were
 7   generated either internally or between the two
 8   entities with respect to those meetings?
 9        A    I don't know whether any documents were
10   generated or not.
11        Q    Did you have a role in locating
12   responsive documents for our document request?
13        A    I did.  I was asked to look at my own
14   records to see what I had received that was
15   responsive.
16        Q    Do you know whether others within the
17   Office of Administration were similarly asked to
18   look for responsive records?
19        A    The responsibility in terms of
20   responsiveness to the request for production of
21   documents was delegated to OA's Office of General
22   Counsel.
0109
 1        Q    Okay.  And did you have occasion to see
 2   all of the documents that had been produced to the
 3   General Counsel's Office as potentially responsive?
 4        A    I did not see -- what I saw was the
 5   documents that were produced in response to the
 6   request.
 7        Q    Okay.  Turning back to this e-mail, based
 8   on what you know from the meeting or meetings you
 9   did attend with NARA officials, is it your
10   understanding that prior to November of 2007, NARA
11   did not understand that OA was not an agency
12   subject to the Federal Records Act and the FOIA?
13        MS. SHAPIRO:  Objection to form.
14        A    I don't know what NARA's understanding
15   was.
16        Q    And that was not -- none of the
17   discussions that happened between the two agencies
```
Page 40

Alan Swendiman 3 13 08
```
18   at these meetings shed any light on NARA's prior
19   understanding?
20              MS. SHAPIRO:  Objection to form.
21        A    Not the two agencies because OA is not an
22   agency.
0110
 1        Q    Two entities?
 2        A    Two entities.  At one meeting I believe
 3   that representatives of NARA referenced the fact
 4   that OA was now an entity subject to the PRA, but I
 5   can't recall specifically the discussions.  Most of
 6   the discussions that I attended had to do with what
 7   NARA wanted and what it needed in terms of
 8   facilitating transfer of records to it by the end
 9   of the administration.
10        Q    Has NARA provided the Office of
11   Administration with its advice as to which of OA's
12   IT systems are creating Presidential records?
13        A    I can't -- I do not know.  That would be
14   a matter among the technical people.
15        Q    Has NARA provided OA with any
16   recordkeeping guidance generally on compliance with
17   the Presidential Records Act?
18        A    My recollection is, is that in terms of
19   guidance, NARA has deferred to White House
20   Counsel's Office as to what Presidential record is.
21        Q    Do you know if there's anything in
22   writing from either NARA, the White House Counsel's
0111
 1   Office, on that subject?
 2        A    Well, I believe I had referenced a
 3   memorandum from the then White House Counsel,
 4   Harriett Meyers, that addressed the issue of the
 5   Presidential Records Act and retention of records.
 6        Q    Do you know of any other documents?
 7        A    There was a document, I believe, issued
 8   by then White House Counsel, Alberto Gonzalez, that
 9   I had heard of, but the Memorandum of Guidance that
10   we had followed has been the memorandum issued by
11   Ms. Meyers.
12        Q    Mr. Swendiman, do you participate in any
13   interagency groups or forums?
14        A    I do not.
15        Q    Do you participate in any
16   intergovernmental groups?
17        A    I do not.
18        Q    Does anyone within the Office of
19   Administration, to your knowledge, participate in
20   any interagency groups or forums?  And by this I
21   don't mean a one-time event such as a conference.
22        A    None that I'm aware of.
0112
 1        Q    And does anyone else, to your knowledge,
 2   within OA participate in any intergovernmental
 3   groups either at a federal or state level?
 4        A    None that I'm aware of.
 5        Q    In your position as Director of Office of
 6   Administration, in addition to what you've
 7   described to date, what is the nature of your
 8   interaction with other federal agencies?
 9        A    I would characterize my interaction with
10   other federal agencies as limited.  The primary
11   agency with which I've had contact is the General
```
Page 41

Alan Swendiman 3 13 08
12  Services Administration and that is because of the
13  fact that it's the owner of the EEOB and is
14  primarily responsible for the modernization of the
15  project and also other projects on the White House
16  complex.
17       Q    Do you serve as a representative for the
18  Office of Administration in any non-governmental
19  functions?
20       A    Could you repeat that --
21       MS. SHAPIRO:  Objection to form.
22       THE WITNESS:  Repeat that question again.
0113
1  BY MS. WEISMANN:
2       Q    Do you serve as a representative for the
3  Office of Administration at any non-governmental
4  functions?
5       A    I think I was invited to a dinner, which
6  included numerous people in which I got approval
7  from our Counsel's office as being a widely
8  attended event.  Right now I'm drawing a blank as
9  to -- oh, I think I recall.  I think it was the Fed
10  100 Dinner I was invited to attend, and that was
11  because the folks knew me from the General Services
12  Administration.
13       Q    What documents did you review prior to
14  your deposition?
15       A    Basically, the documents that were
16  produced in response to the request plus the two
17  Executive Orders plus Title 3, I think it's Section
18  107, dealing with pay.
19       Q    What is your last date of employment with
20  the Office of Administration?
21       A    It will be -- what's today -- I'm trying
22  to figure out what today is -- March 15th.
0114
1       Q    So you will continued to employed through
2  the 15th?
3       A    The payroll -- the way the government
4  works is that payroll ends on a Saturday and picks
5  up with a Sunday.  My last fiscal day will be
6  tomorrow, March 14th.
7       Q    And where are you going?
8       A    The General Counsel of USAID.
9       Q    And when do you start your employment
10  there?
11       A    March 17th.
12       Q    When did you decide to change your last
13  date of employment from February 26th --
14       MS. SHAPIRO:  Objection to form.  It
15  builds assumptions.
16  BY MS. WEISMANN:
17       Q    -- to a subsequent date?
18       A    Well, I didn't actually change the date.
19  I think there's been a misunderstanding of what
20  occurred because I got that same question from
21  Committee staffers.  I had indicated that, at least
22  for that week, I was going to be away the balance
0115
1  of the week because I was attending a family
2  function out of town.
3  BY MS. WEISMANN:
4       Q    What did you decide that your last day
5  would be March 15th?

Page 42

Alan Swendiman 3 13 08

6       A      Once this deposition date was set.
7       Q      And when is your understanding of when
8    the deposition was set?
9       A      Well, let's see, when I was advised by --
10   I'm not sure if I was advised by DOJ Counsel or OA
11   General Counsel that an agreement had been reached
12   as to today's date, whenever that was, whenever you
13   all decided.
14            MS. SHAPIRO:  Okay.  If we can take a
15   short break.  I need to sort of regroup.  We may be
16   done. I'm not going to promise anything.
17            THE VIDEOGRAPHER:  12:55 p.m.; off
18   record.
19            (Recess taken.)
20            THE VIDEOGRAPHER:  The time now is
21   1:03 p.m.; on record.
22   BY MS. WEISMANN:
0116
1       Q      Mr. Swendiman, going back to the subject
2    of detailees, who overseas them while they're at
3    the Office of Administration?
4       A      Well, the individual or individuals who
5    would oversee them would be the head or supervisor
6    in a particular operating unit in which they are
7    working.
8       Q      And do you have any role in that
9    relationship with the detailee and supervision?
10      A      Not directly.  I don't have a role in
11   that.
12      Q      Are there any reports that you or others
13   within OA have to prepare internally for detailees?
14      A      Well, first of all, I've got to get the
15   approval of the White House Management
16   Administration for getting detailees.  We do have a
17   report that goes to the detailee's supervisor in
18   his or her government organization.  Because they
19   serve for a period of time with us, the supervisor
20   generally wants a report on how well they did, you
21   know, what kind of job they did for us while they
22   were on detail.  My understanding is, we keep track
0117
1    of their time and attendance and we report that
2    back to their governmental organization.
3       Q      Okay.  In addition to the agencies that
4    have been identified so far in this deposition as
5    ones to which the EOP provides services, are there
6    any others?
7            MS. SHAPIRO:  Objection to form.
8            You can answer.
9       A      I cannot recall specifically.  I think
10   the documents that have been shown was in reference
11   to the Navy, in reference to the Secret Service.
12   There's none that comes to my mind right now.
13            MS. WEISMANN:  Okay.  That concludes the
14   deposition from our perspective.
15            MS. SHAPIRO:  Okay.  I don't have any
16   questions to ask the witness.  I just wanted to
17   note that we agreed to talk after the deposition
18   about the use of the videotape and confining it to
19   the contours of the litigation and that if we
20   couldn't agree you would give us an opportunity to
21   seek relief on that score.
22            MS. WEISMANN:  Uh-huh.
                                        Page 43

Alan Swendiman 3 13 08

0118
1        MS. SHAPIRO:  That's all we have.
2        MS. WEISMANN:  Okay.
3        MS. SHAPIRO:  Thank you.
4        THE VIDEOGRAPHER:  The time now is
5   1:06 p.m.  This concludes our videotape deposition.
6            (Whereupon, at 1:06 p.m., the
7            deposition of Alan R. Swendiman
8            was concluded.)
9                    *   *   *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
0119
1            CERTIFICATE OF NOTARY PUBLIC
2            I, Jodi Scheffel, RPR, the officer before
3   whom the foregoing deposition was taken, do hereby
4   certify that the witness whose testimony appears in
5   the foregoing deposition was duly sworn by me; that
6   the testimony of said witness was taken by me in
7   stenotype and thereafter reduced to typewriting
8   under my direction; that said deposition is a true
9   record of the testimony given by said witness, that
10  I am neither counsel for, related to, nor employed
11  by any of the parties to the action in which this
12  deposition was taken; and further, that I am not a
13  relative or employee of any attorney or counsel
14  employed by the parties hereto, nor financially, or
15  otherwise interested in the outcome of the action.
16
17                    Jodi Scheffel
18              Notary Public in and for
19              the District of Columbia
20
21  My commission expires:
22  August 31, 2011
0120
1
2
3
4
5
6            ACKNOWLEDGEMENT OF DEPONENT
7
        I, ALAN R. SWENDIMAN, do hereby acknowledge I
8
    have read and examined the foregoing pages
9
    of testimony, and the same is a true, correct
10
    and complete transcription of the testimony given
11
    by me, and any changes or corrections, if any,
                    Page 44

Alan Swendiman 3 13 08

12
   appear in the attached errata sheet signed by me.
13
14
15
16
17

   _____   _____
18  Alan R. Swendiman        Date
19
20
21
22
0121
1   Elizabeth Shapiro, Esquire
   U.S. Department of Justice
2   Civil Division
   20 Massachusetts Avenue, N.W.
3   Washington, D.C. 20001
4
5   IN RE:  CREW vs. Office of Administration
6   Dear Ms. Shapiro,
7        Enclosed, please find your copy of the
   deposition of ALAN R. SWENDIMAN, along with the
8   original signature page.
9        As agreed, you will be responsible for
   contacting the witness.  Within 30 days of receipt,
10  please forward errata sheet and original signed
   signature page to counsel for Plaintiff, Ms.
11  Weismann.
12        If you have any questions, please do not
   hesitate to call.  Thank you.
13
14        Yours,
15
16        Jodi Scheffel
   Reporter/Notary Public
17
18        cc:  Anne L. Weismann, Esquire
19
20
21
22
0122
1   Capital Reporting Company
   1821 Jefferson Place, N.W.
2   Third Floor
   Washington, D.C. 20036
3   (202) 857-3376
4
5        E R R A T A   S H E E T
6   Case:  CREW vs. Office of Administration
7   Witness:  Alan R. Swendiman
8   Date:  Thursday, March 13, 2008
9
10  Page No.     Line No.          Reason/Change
11
12
13
14
15
16
17
                                    Page 45

Alan Swendiman 3 13 08

18
19
20
21
22   _____        _____
     Signature                Date

**EXHIBIT 4**

From:      "Payton, Theresa M."
To:      "Sam Watkins"              "Turley, F. Andrew"
             "Medaglia, M. Elizabeth (Liz)"
"Reynolds, William D."              Crippen, Susan M."
             "Oprison, Christopher G."
Date:      11/7/2007 10:14:28 PM
Subject:      RE: Follow-up

Sam,
Just wanted to let you know that I received your note and we're having
discussions about when the next meeting will be.

Thanks for sending your questions and thoughts ahead of time so we can
review. The next time we get together, it would be good to discuss your
note below along with the action plan and the RACI (Responsible,
Accountable, Consulted, Informed) model so we can assign tasks and
owners for the next steps.

Hope you are doing well and that everyone has a safe holiday on
Veterans' Day. Semper Fi.

Thanks,
TP

-----Original Message-----
From: Sam Watkins
Sent: Tuesday, November 06, 2007 1:58 PM
To: Turley, F. Andrew; Medaglia, M. Elizabeth (Liz); Reynolds, William
D.; Crippen, Susan M.; Payton, Theresa M.; Oprison, Christopher G.
Cc: GaryM Stern; Jason Baron; Nancy Smith
Subject: Follow-up

Theresa,

We missed you at last week's OA transition meeting with representatives
of the CFO's office held on October 31, 2007. We now have a better
understanding of the systems used by the office of the OA CFO, and what
Presidential records may be generated by those systems now that OA is a
PRA organization. We look forward to future meetings with
representatives of other elements of OA. We suggest that it would be
helpful, now that OA considers itself a Presidential component of the
EOP, if in the next meeting we had a general discussion of the functions
that OA uniquely performs for the President as opposed to OA's
monitoring or passing off on other agencies functions. This general
discussion would assist us in giving better advice as to which of the OA
IT systems are creating Presidential records.

We (Gary Stern, Jason Baron, Nancy Smith, and I) were also afforded a
brief opportunity to view a paper copy of the 2005 spreadsheet or chart
(what has been referred to by some as the "2005 report") that first
raised concerns about the "message collection system." I refer to it as
a "message collection system" even though we all understand that it
hardly qualifies as a "system" by the usual IT definition.
Nevertheless, our brief review of the chart suggests a number of ideas
relating to how you might approach determining whether there is a
problem, and defining the scope of the problem (even as you await the

OA01305

clearance of the person who will be able to apply the new forensic tool
you have acquired).

1) On the chart, many files are identified as "issue" files, which I
believe means the chart tool could not identify in which organizational
PST the file should be deposited. We recommend that you examine some of
these files to see if a closer look could determine what organizational
element was appropriate.

2) Specific days for certain organizations show no messages
collected/stored. We recommend that you run a search of the message
system for anything for those days in that organization. If such a
search produced a positive result, it would be a clear indication that
the original chart was flawed (unless the messages have somehow been
added since the original chart was run).

3) As we mentioned when we last met with you on Oct. 11, 2007, you also
may be able to ascertain the meaning of the data elements in the chart
by examining the spreadsheet in electronic form (for metadata in the
form of formulas, comment fields, or other audit data on its creation
that might exist). For example, the chart has a column labeled
"expected" or "projected" number of messages for an organization for a
particular day. The spreadsheet formulas might reveal where this number
came from. Also, we will need some type of "expected numbers" with
which to compare the results of your next chart generated with the new
tool.

4) We have also mentioned this before, but it bears repeating: you could
do some type of partial restore of messages from backup tapes, e.g., for
a one day or one week time period, to allow you to compare the results
against the chart. We are not suggesting initiating a full tape
restoration project, but rather taking a sample to ascertain the scope
of the problem.

5) Given that there appears to be a continuing level of confusion, or
loss of institutional memory, as to the origination of the 2005 chart
and its purpose, we agree with Chris's suggestion that it would be
useful for someone to contact the original authors/requestors of the
chart to ask questions about its nature and meaning, the methodology
used to produce it, the shortcomings or flaws you have noted, and
whether they prepared any additional or related documentation about the
issue (and if so, where is it filed).

I hope these ideas are helpful, and would be happy to assist in
following up or carrying out any of them. We look forward to continuing
with our OA meetings and assume that another meeting will be scheduled
soon.

Sam Watkins
Director, Product Management
National Archives & Records Administration

OA01306

**EXHIBIT 5**

OAS18C08

**Executive Office of the President - Interagency Agreement**

| 1. Customer Component: | 2. Servicing Component: |
|---|---|
| Office of Administration/OCFO | Dept of Health & Human Services, Program Support Center (PSC) |

| Administrative Contact: | Administrative Contact: |
|---|---|
| Name: STEPHEN O'NEILL | Name: TRANG L. DINH |
| Address: 1800 G STREET NW, OA/OCFO | Address: 11400 ROCKVILLE PIKE, SUITE 700 |
| WASHINGTON, DC 20503 | ROCKVILLE, MD 20852 |
| Phone/fax: | Phone/fax: |
| E-mail: | E-mail: |

**3. Financial Data (enter all data):**

| | | Amendment: |
|---|---|---|
| Document Number: OAS18C08 | | BETC: DISB |
| Fund: OA.S0038SE08XX | | |
| Budget Fiscal Year: 2008 | | |
| Treasury Account Symbol (TAS): 1180038 | | |
| Agency Location Code: 11330001 | | |
| DUNS/BPN: 031649538 | | |
| Other: EIN 521101890 | | |

**4. Financial Data (enter applicable data):**

| | | Amendment: |
|---|---|---|
| Document Number: | | BETC: COLL |
| Fund: | | Project Code |
| Budget Fiscal Year: 2008 | | 04398Z318 |
| Treasury Account Symbol (TAS): 75X4552 | | DUNS/BPN: |
| Agency Location Code: 75030030 | | Object Class: |
| Servicing Cost Center: OP402 | | |
| Other: EIN 1S0196960A6 | | |

**5. Authority Citation:**
Economy Act, 31 U.S.C. §§ 1535 and 1536

**6. Period of Performance:**
10/01/2007 - 09/30/2008

**Rejection Notice: Billing will be rejected if it does not cite EOP financial data as noted above.**

**7. Additional Requirements**

**8. Description of Goods or Services Provided:**

| Line | Service/Quantity/Unit cost | Object Class | Customer Cost Center | Customer Project Code | Amount | Charges | New Total |
|---|---|---|---|---|---|---|---|
| 1 | Division of Payment Managment, Payment Management System for processing EOP ONDCP Grants | 2531 | OAS1020000 | XXXXXXXXXX | $ 45,000.00 | $ - | $ 45,000.00 |
| 2 | Please reference EOP obligating document number OAS18C08 in all IPAC/billing documents | | | | $ - | $ - | $ - |
| 3 | | | | | $ - | $ - | $ - |
| | | | | Total.................. | $ 45,000.00 | $ - | $ 45,000.00 |

| 9. Customer Approval (Signature): | Date | 10. Servicing Approval (Signature): | Date |
|---|---|---|---|
| | | | |

| 11. Name/Title: | 12. Name/Title: |
|---|---|
| EDGAR BENNETT, CHIEF FINANCIAL OFFICER | ANTHONY J. DITOTO, JR., DIRECTOR, DIVISION OF PAYMENT MANAGEMENT |

tabbies®

EXHIBIT 2

OA00013

OAS18C08

# MEMORANDUM OF UNDERSTANDING
### Between
### Office of the Chief Financial Officer, Office of Administration,
### Executive Office of the President
### and
### Health and Human Services
### Program Support Center
### Division Of Payment Management

**PURPOSE:**

This Memorandum of Understanding (MOU) between the Office of the Chief Financial Officer (OCFO), Office of Administration, Executive Office of the President (EOP), and the Department of Health and Human Services (HHS), Program Support Center, Division of Payment Management, provides that HHS will process all grantee/recipient requests for funds (cash drawdowns) via the HHS Payment Management System (PMS) - SMARTLINK Electronic Funds Transfer (EFT).

**AUTHORITY:**

This MOU is entered into under the authority of The Economy Act, 31 U.S.C. Section 1535; The Chief Financial Officers Act, 31 U.S.C. Section 901, et seq., as amended by P.L. 106-58, Section 638; OMB Circular A-127 Revised (Transmittal Memorandum No. 2), Financial Management Systems; and OMB Circular 130, Revised (Transmittal Memorandum No. 4), Management of Federal Information Resources.

I.  The EOP will:

A.  The EOP Office of National Drug Control Policy (ONDCP) will provide HHS with current information regarding grantees, including:

    1.  Authorization documents
    2.  Recipient organization and banking information (SF 1199A)
    3.  Verified organization name, signature, and bank account information on the completed SF 1199A

B.  ONDCP will provide HHS with the following point of contact information:

    1.  Contact name (primary & alternate)
    2.  Mailing address (regular & overnight mail)
    3.  Telephone numbers
    4.  Fax numbers
    5.  Email addresses

OA00014

C. ONDCP will provide HHS with the following information for each grant recipient:

    1. Contact name (primary and alternate)
    2. Mailing address
    3. Telephone numbers
    4. Fax numbers
    5. Email addresses

D. OCFO will provide HHS with a list of key personnel responsible for liaison and data transfer problem solving and/or enhancements.

E. OCFO and ONDCP will provide HHS with copies of EOP policies, procedures, and guidelines for PMS that impact operations and grantees.

F. ONDCP will adhere to HHS and Treasury requirements for paying grantees via SMARTLINK, and maintain the necessary authorizations to access PMS-SMARTLINK data bases.

G. OCFO will, on a monthly basis, reconcile grants paid through PMS with the corresponding data maintained in the EOP accounting records.

II. <u>HHS will</u>:

A. Provide an adequate back-up system for PMS to insure that ONDCP grantees are paid.

B. Maintain sufficient and adequately-trained staff to ensure that ONDCP grantees are paid when proper requests for funds are made.

C. Maintain the necessary equipment, etc., to ensure II(B) above. This includes providing the system access required for the Miami Service Center to perform its function.

D. Provide the necessary security to ensure that EOP and grantee data is not compromised.

E. Provide EOP with the appropriate points of contact for:

    1. Resolution of problems with or enhancements to services and data provided by PMS.

    2. Names, telephone numbers, and addresses of personnel responsible for assisting grantees with problems regarding payment rejections.

OA00015

F. Provide the EOP with all appropriate system generated reports in a timely manner. These reports include:

   1. Payment reports
   2. SF-224
   3. SF-272
   4. Other reports as required

G. Provide EOP with access to data via computer inquiry and/or audits or related review.

H. Ensure that the PMS system provides an adequate audit trail of all transactions, and that proper accounting and administrative internal controls are in place and functioning.

I. Ensure that Treasury, Federal Reserve Bank, and other Federal requirements are adhered to as they relate to the processing of EOP payments.

III. Statement of Position

A. Normal Operations. It is the intent of the OCFO to have minimal impact on HHS. HHS is to coordinate all PMS activities with the EOP. OCFO will be involved in policy and administrative matters; not the day-to-day operations of the system.

B. Payment Approval and/or Confirmation. Grant authorizations will be documented and approved by ONDCP prior to grant funds being loaded into the HHS system. ONDCP will be responsible for validating all grant authorizations, and will initiate the loading of all grant authorizations into the HHS system. No grant funds shall be made available to grantees without complete and proper ONDCP approval.

ONDCP plans to utilize the National High Intensity Drug Trafficking Areas (HIDTA) Assistance Center (NHAC) in Miami, Florida to review and validate the completeness of grant payment requests. ONDCP will identify to the HHS Division of Payment Management, each user at the NHAC that is authorized to perform this task. ONDCP will also identify each grantee that is eligible for payment via the HHS system, and will identify all users who are authorized to request and approve payments.

It is an OCFO and ONDCP requirement that all grantee payment requests must be approved by the grantee approving official, and reviewed and released by either ONDCP or the NHAC. ONDCP agrees that each approved grant payment request will be signed by the grantee approving official, and include a certification by the grantee that the payment request is proper and correct. Approved payment requests will be reviewed by the NHAC to ensure that documentation is complete and in order. Only approved payment requests found by the NHAC to be complete and in order will be released by the NHAC for payment. ONDCP (or NHAC) will also be responsible for notifying grantees whose payment requests are not being

OA00016

released.

Since the NHAC is also a grantee under the ONDCP grant program, all NHAC grant payment requests must be reviewed and released by ONDCP. Under no circumstances shall the NHAC be allowed to release its own grant payment requests.

It is understood that over the course of each month, HHS will process and disburse funds to grantees from its own working fund. At the end of each month, HHS will provide an SF224 to OCFO and the U.S. Treasury reporting the funds that were disbursed by HHS to ONDCP grantees. These SF224's will result in the U.S. Treasury transferring funds from the EOP accounts to HHS to reimburse HHS for payments made to ONDCP grantees. OCFO hereby delegates the authority to HHS to disburse grant payments on behalf of ONDCP with the following stipulations:

1. HHS will only disburse funds for which corresponding grant authorizations have been loaded into the HHS grants system.

2. Grant authorizations will only be loaded into the HHS system by authorized EOP users or their designees.

3. HHS will only disburse funds for payment requests that have been approved and certified by authorized grantees.

4. HHS will only disburse funds for payment requests that have been released by authorized NHAC or EOP employees.

C. <u>Coordination</u>. During the implementation of PMS-SMARTLINK, all coordination (i.e., enhancements, meetings, training, etc.) will be through the OCFO. Following implementation, all coordination will be through the ONDCP.


IV. <u>Funding</u>

A. OCFO agrees to reimburse HHS for maintaining the PMS on a monthly basis, subject to the availability of funds, via Treasury's Online Payment and Collection System (OPAC). Billings will be made to ALC 11010005 and shall reference the interagency agreement number provided by the EOP.

B. The monthly cost to OCFO for PMS will be provided by HHS. Sufficient detail will be provided to allow the EOP adequate review of costs prior to payment.

C. The monthly billing should be FAXED to 202-395-7202, Attn: Office of the CFO.

OA00017

D.  The estimated annual costs to OCFO for PMS will be negotiated annually 90 days prior to the beginning of the fiscal year.  The estimates for fiscal year 2003 are 1,100 active grants at an annual cost of $100.00 per grant.  This cost will be prorated to the actual number of active grants at year end.

## V.  Period of agreement

This agreement is effective on the date of signature of both parties.  The initial agreement is for the five year period from May 2003 through May 2008, but can be extended based upon both parties written consent.  An interagency agreement document (separate from this memorandum of understanding) will be issued by OCFO to HHS to authorize funding for these fees.

## VI.  Termination

Either party may terminate this MOU by providing at least 60 days written notice to the other party.  Any termination of this agreement by HHS will not take effect until the OCFO has had sufficient time to find another service provider, including the securing of sufficient funding, and is able to transition in an orderly fashion to that service provider's system.  HHS will cooperate with any required transition.

This agreement may be modified by mutual consent of both parties.

OA00018

JUL-23-2003  12:58                                                    P.07/07


*Michele C. Marx*                          7/7/03
Michele Marx                               Date
Associate Director, Management & Administration
Office of National Drug Control Policy


*Albert A. Muhlbauer*                      7/7/03
Albert A. Muhlbauer                        Date
Deputy Chief Financial Officer
Office of Administration, Executive Office of the President


*Philip J. Giza*                           7/10/03
Philip J. Giza                             Date
Director, Division of Payment Management
Financial Management Service
Program Support Center
Department of Health and Human Services


*Thomas F. Greene*                         7/17/03
Thomas F. Greene                           Date
Director, Financial Management Service
Program Support Center
Department of Health and Human Services

OA00019

TOTAL P.07