# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, )<br><br>Plaintiff, )<br><br>v. )<br><br>OFFICE OF ADMINISTRATION, )<br><br>Defendant. ) | Civil Action No: 1:07-CV-00964 (CKK) |

## DEFENDANT'S MOTION TO DISMISS FOR
## LACK OF SUBJECT MATTER JURISDICTION

Pursuant to Fed. R. Civ. P. 12(b)(1), defendant the Office of Administration respectfully moves this Court to dismiss this case, filed by plaintiff Citizens for Responsibility and Ethics in Washington under the Freedom of Information Act, 5 U.S.C. § 552, for lack of subject matter jurisdiction. The accompanying memorandum sets forth the grounds for this motion.

Dated: April 25, 2008

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

　　　　/s/ Jean Lin　　　　
JEAN LIN
Federal Programs Branch, Civil Division
United States Department of Justice
20 Massachusetts Ave., N.W.
Washington, D.C. 20530
Tel: (202) 514-3716
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, ) ) ) Plaintiff, ) ) v. ) ) OFFICE OF ADMINISTRATION, ) ) Defendant. ) ) | Civil Action No: 1:07-CV-00964 (CKK) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND. ...................................................................................................................... 2

    I.     The Establishment of the Office of Administration and Its Function. ................... 2

    II.    OA's Organizational Structure and the OA Director's Responsibilities. .............. 4

    III.   The Executive Branch's Consideration of OA's Status under FOIA. ................... 5

    IV.   CREW's FOIA Action and the Procedural History. ............................................. 6

ARGUMENT. ........................................................................................................................... 8

THIS COURT LACKS JURISDICTION TO HEAR THIS CASE BECAUSE
THE OFFICE OF ADMINISTRATION IS NOT AN "AGENCY" AS
DEFINED IN FOIA. ............................................................................................................... 8

    I.     Standard of Review. ............................................................................................. 8

    II.    A Component of the Executive Office of the President Must Wield
          "Substantial Independent Authority" to Qualify As An "Agency"
          Under FOIA. ...................................................................................................... 10

    III.   The Office of Administration Does Not Have Substantial Independent
          Authority and Exists Solely to Advise and Assist the President. ......................... 15

    IV.   Application of the *Meyer* Three-Part Test Confirms that the Office
          of Administration Is Not An "Agency" Under FOIA. ......................................... 20

          A.    The Office of Administration has a self-contained structure. ................... 22

          B.    The Office of Administration's proximity to the President confirms
                that it is more like the President's immediate personal staff. ................... 23

          C.    The nature of the Office of Administration's delegated authority
                confirms that it does not have substantial independent authority. ............ 24

V.  Neither OA's Past Conduct Nor Its Continued Reliance on the Economy
    Act Precludes It From Asserting That It is Not An "Agency"
    Subject to FOIA. ................................................................................................ 25

    A.  OA's Past Conduct Is Not Probative of Its Status Under FOIA. .............. 25

    B.  OA's Continued Contractual Relationships with Federal Agencies
        Pursuant to the Economy Act Are Not Probative of OA's Status
        Under FOIA. ........................................................................................... 26

CONCLUSION. ...................................................................................................... 28

TABLE OF AUTHORITIES

CASES                                                                            PAGE(S)

Armstrong v. EOP,
        1 F.3d 1274 (D.C. Cir. 1993). ..................................................................... 13, 25

Armstrong v. EOP,
        877 F. Supp. 690 (D.D.C. 1995). ...................................................................... 6

Armstrong v. EOP,
        90 F.3d 553 (D.C. Cir. 1996). ................................................................... passim

Coalition for Underground Expansion v. Mineta,
        333 F.3d 193 (D.C. Cir. 2003). ......................................................................... 9

Dep't of Justice v. Tax Analysts,
        492 U.S. 136 (1989)............................................................................................ 8

Herbert v. Nat'l Acad. of Scis.,
        974 F.2d 192 (D.C. Cir. 1992). ......................................................................... 9

Kissinger v. Reporters Comm. for Freedom of the Press,
        445 U.S. 136 (1980).............................................................................. 8, 10, 25

Meyer v. Bush,
        981 F.2d 1288 (D.C. Cir. 1993). ................................................................ passim

National Security Archive v. Archivist of the United States,
        909 F.2d 541 (D.C. Cir. 1990). ....................................................................... 12

Pacific Legal Found. v. Council on Envtl. Quality,
        636 F.2d 1259 (D.C. Cir. 1980). ................................................................... 9, 12

Rushforth v. Council of Economic Advisers,
        762 F.2d 1038 (D.C. Cir. 1985). ..................................................................... 12

Sierra Club v. Andrus,
        581 F.2d 895 (D.C. Cir. 1978), rev'd on other grounds, 442 U.S. 347
        (1979)................................................................................................ 9, 12, 18

-iii-

_Soucie v. David,_
    448 F.2d 1067 (D.C. Cir. 1971). ............................................................ 11, 17, 21

_Steel Co. v. Citizens for a Better Environment,_
    523 U.S. 83 (1998). ............................................................................. 10

_Sweetland v. Walters,_
    60 F.3d 852 (D.C. Cir. 1995). .......................................................... _passim_

_Techniarts Eng'g v. United States,_
    51 F.3d 301 (D.C. Cir. 1995). .............................................................. 27

_Voinche v. EOP,_
    No. 06-cv-1272, 2007 U.S. Dist. LEXIS 42268 (D.D.C. June 12, 2007). ......................... 8

_Wang v. EOP,_
    No. 07-0891, 2008 WL 180189 (D.D.C. Jan. 18, 2008). ................................... 8

_Wilderness Soc. v. Griles,_
    824 F.2d 4 (D.C. Cir. 1987). ............................................................... 9

STATUTES

3 U.S.C. § 105(b)(1). ................................................................................ 14

3 U.S.C. § 107(b). ......................................................................... 3, 4, 16, 17

3 U.S.C. § 107(b)(1)(A). ............................................................................ 16

3 U.S.C. § 109. .................................................................................... 14

3 U.S.C. § 110. .................................................................................... 14

5 U.S.C. § 552 .................................................................................... 8

5 U.S.C. § 552(a)(4)(B). ............................................................................ 8

5 U.S.C. § 552(e). ................................................................................ 22

5 U.S.C. § 552(f). ................................................................................ 10

15 U.S.C. § 1023. ................................................................................ 12

31 U.S.C. § 101. ................................................................................ 28

31 U.S.C. § 102. ....................................................................................................... 28

31 U.S.C. § 1535(a). ............................................................................................... 27

42 U.S.C. § 4342. ................................................................................................... 18

42 U.S.C. § 6612. ................................................................................................... 18

Pub. L. 97-258, 96 Stat. 933 (Sept. 13 1982). ....................................................... 27

## RULES AND REGULATIONS

5 C.F.R. Part 2502, 42 Fed. Reg. 47112 (July 14, 1980). ........................................ 5

32 C.F.R. §§ 2101-2103 (1993). ............................................................................ 25

48 C.F.R. § 17.502. ................................................................................................. 26

Executive Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977). ..................................... passim

Executive Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979). ..................................... passim

Executive Order No. 12291. ................................................................................... 14

Reorganization Plan No. 1 of 1977
    42 Fed. Reg. 5601, 91 Stat. 1633. .......................................................... passim

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(1). .......................................................................................... 9

## MISCELLANEOUS

H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 14 (1974). .................................. 10, 11

S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 15 (1974), *reprinted in* 1974 U.S.C.C.A.N.
    6293 ................................................................................................................ 10

2AJ. Moore & J. Lucas, Moore's Federal Practice (1986). ..................................... 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No: 1:07-CV-00964 (CKK) |
| | ) |
| OFFICE OF ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO
DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

**PRELIMINARY STATEMENT**

The law is settled that a component of the Executive Office of the President ("EOP") whose sole function is to advise and assist the President, and which wields no substantial authority independently of the President, is not an "agency" within the definition of the Freedom of Information Act ("FOIA"). Defendant Office of Administration ("OA") is indisputably such an EOP component. As OA previously has shown when it moved for judgment on the pleadings, OA's charter documents clearly delineate its functions to include only administrative support services within the EOP, and, even with respect to the performance of its purely administrative functions, OA is subject to presidential supervision and approval. Neither the President nor Congress has delegated OA any federal program or policy responsibilities. Instead, OA's mission is to provide EOP components the necessary administrative support and services so that they can focus on advising and assisting the President on policy decisions without the distractions caused by routine administrative matters.

In denying OA's motion for judgment on the pleadings without prejudice, this Court

agreed that the language of OA's charter documents is specific, and "entirely devoid of the types of vague terms" that would suggest that OA has substantial independent authority to make it an "agency" subject to FOIA.  Order of Feb. 11, 2008 at 3.  This Court permitted discovery out of an abundance of caution to determine the "only question" at issue:  whether in exercising its authority delegated by its charter documents, "OA acts with the type of substantial independent authority that has been found sufficient to make the Office of Science and Technology, Council on Environmental Quality, and Office of Management and Budget agencies subject to FOIA." *Id.* at 5.  Those EOP components are subject to FOIA because they have independent authority to issue guidelines to federal agencies, to coordinate and evaluate federal programs, to oversee certain activities of other federal agencies, or to perform other significant statutory duties.

Factual evidence elicited during discovery confirms that OA does not have any authority over federal agencies and third parties, much less the type of substantial independent authority possessed by the Office of Science and Technology Policy, Council on Environmental Quality, and Office of Management and Budget.  Consistent with the authority delineated in OA's charter documents, the factual record indicates that OA exists solely to assist and advise the President on administrative matters internal to the EOP, and has no independent function outside the EOP. Accordingly, OA is not subject to FOIA's disclosure requirements, and this Court should dismiss this case for lack of subject matter jurisdiction.

## BACKGROUND

### I.    The Establishment of the Office of Administration and Its Function

OA was established as a unit within the EOP by President Carter's Reorganization Plan No. 1 of 1977 in order to advise and assist the President in his efficient management and

operation of the EOP. *See* Reorganization Plan No. 1 of 1977 ("Reorganization Plan"), § 2, 42 Fed. Reg. 56101, 91 Stat. 1633 (attached as Exhibit 1). As explained in President Carter's message accompanying the Reorganization Plan, the reorganization was "based on the premise that the EOP exists to serve the President and should be structured to meet his needs." President's Message, Exh. 1, at 3. To that end, the President proposed, among other things, to "combine administrative support operations into a Central Administrative Unit in EOP," which would exist as "a separate EOP entity because of the need to assure equal access by all other units." *Id.* at 8. This consolidation was intended to provide monetary savings, improved and more innovative services, "a focus for monitoring the efficiency and responsibility of administrative services," and "a base for an effective EOP budget/planning system through which *the President* can manage an integrated EOP rather than a collection of disparate units." *Id.* (emphasis added). Accordingly, the Reorganization Plan specified that OA "shall be headed by the President," and shall provide components of the EOP with such administrative services "as the President shall from time to time direct." Reorganization Plan, § 2.

President Carter further set forth OA's specific duties and responsibilities in Executive Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977), *as amended by* Executive Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979).[1] Under section 3(a) of Executive Order No. 12028,

---

[1] Executive Order No. 12122 amended only section 4 of Executive Order No. 12028 and only in minor respects. Specifically, section 4(a) previously provided that, in addition to organizing OA and contracting for supplies or services, the OA Director shall also "employ personnel." Exec. Order No. 12028, § 4(a). The amendment deleted the reference to "employ personnel" in section 4(a), but added a new subsection (c), which governs the OA Director's authority to appoint and fix the pay of employees. *See* Exec. Order No. 12122, § 4(c). It also added subsection (b), which designates the OA Director to perform the function of the President under 3 U.S.C. § 107(b) "in order to provide limited employment authority for the Office of

(continued...)

OA "shall provide common administrative support and services to all units within the Executive

Office of the President, except for such services provided primarily in direct support of the

President." Specifically, OA shall provide "all types of administrative support and services that

may be used by, or useful to, units within the [EOP]," including, but not limited to, personnel

management services; financial management services; data processing, including support and

services; library, records, and information services; and office services and operations, including

mail, messenger, printing and duplication, graphics, word processing, procurement, and supply

services. *Id.* § 3(b). As for the provision of administrative services to the President, the

Executive Order specified that OA "shall, upon request, assist the White House Office in

performing its role of providing those administrative services which are primarily in direct

support of the President." *Id.*, § 3(a).

## II.    OA's Organizational Structure and the OA Director's Responsibilities

The President appoints a Director as the chief administrative officer of OA, *see*

Reorganization Plan, § 2, who in turn "report[s] to the President," Exec. Order No. 12028, § 2,

through the Deputy Assistant to the President for Management and Administration, *see*

Deposition Transcript of Alan R. Swendiman, dated March 13, 2008, [hereinafter Swendiman

Tr.] (attached as Exhibit 2) at 9. The Director carries the additional title of Special Assistant to

the President, *id.* at 6, and "organize[s] OA, contract[s] for supplies and services, and "do[es] all

other things that the President, as head of the Office of Administration, might do." Exec. Order

No. 12028, § 4(a). Thus, for example, the Director performs the function of the President under

---

[1](...continued)

Administration." Exec. Order No. 12122. References in this brief to Executive Order 12028 are
to the executive order as amended.

3 U.S.C. § 107(b), which authorizes the President (or his designee) to appoint and fix the pay of OA employees, and to procure temporary experts and consultants.  *See id.* § 4(b).

The Director's central responsibility, however, is to "ensur[e] that [OA] provides units within the [EOP] common administrative support and services."  *Id.* § 2.  Consistent with OA's administrative role, the Executive Order specifies that the OA Director is "not accountable for the programs and management responsibilities of units within the EOP."  *Id.* § 4(d).  Rather, "the head of each unit [] remain[s] responsible for those functions."  *Id.*  In addition, consistent with the OA Director's role as a Special Assistant to the President, the Executive Order further specifies that the OA Director's performance of his duties and responsibilities is "subject to such direction or approval as the President may provide or require."  *Id.* § 4(a).  OA does not have any independent role outside the EOP.

In its Fiscal Year 2009 budget submission to Congress, OA described the following organizational lines:  Office of the Director; Office of the Chief Operating Officer; Office of the Chief Financial Officer; Office of Security and Emergency Preparedness; Office of the Chief Facilities Management Officer; Office of the Chief Procurement and Contract Management Officer; and Office of the Chief Information Officer.  *See* OA Fiscal Year ("FY") 2009 Budget (attached as Exhibit 3), at OA-3.  The Office of the Director, in turn, includes the Office of the General Counsel and the Equal Employment Opportunity Office.  *See id.*  OA has a staff of more than 200 employees.  *See id.* at OA-4; Swendiman Tr. at 10.

### III.     The Executive Branch's Consideration of OA's Status under FOIA

OA first published its regulations implementing FOIA in 1980.  5 C.F.R. Part 2502, 42 Fed. Reg. 47112 (July 14, 1980).  In 1995, the issue of whether OA meets the FOIA definition of

5

"agency" first surfaced after the district court's decision in *Armstrong v. EOP*, 877 F. Supp. 690 (D.D.C. 1995), which involved the National Security Council's ("NSC") status under FOIA. *See* Declaration of M. Elizabeth Medaglia, dated April 18, 2008 [hereinafter Medaglia Decl.] (dkt. No. 45), ¶ 5.  Since that time, whether OA met the FOIA definition of "agency" was discussed from time to time within the Executive Branch. *Id.*

In April 2006, the White House Counsel's Office requested the legal advice of the Office of Legal Counsel ("OLC") of the Department of Justice regarding OA's status under FOIA. *Id.* ¶ 6.  The deliberative process regarding that question took place from April 2006 through August 2007.[2] *Id.*  The final decision that OA is not subject to, and will no longer comply with, FOIA – despite its history of responding to FOIA requests – was made on August 21, 2007 as a result of a collaborative effort and after OLC formally memorialized its legal advice in a memorandum to the White House Counsel's Office. *Id.* ¶¶ 6, 8-9.  Starting on September 12, 2007, OA began advising requesters that OA is not subject to FOIA and returning their requests. *Id.* ¶ 10.

## IV.    CREW's FOIA Action and the Procedural History

In the fall of 2005, OA learned of an issue with the EOP's electronic email capturing process, and commenced an examination of that issue. *See* Answer, ¶ 19.  On April 17 and 18, 2007, CREW sent two FOIA requests to OA primarily seeking documents or materials relating to the potential loss of emails from the EOP electronic email capturing process. *See* Compl., Ex. A & B.  OA acknowledged receipt of CREW's FOIA requests on April 27, 2007, and

---

[2] On several occasions during this deliberative process, although not consistently, OA included language in its FOIA responses advising the requesters that OA was processing their requests as a matter of administrative discretion.  Medaglia Decl. ¶ 7.  Some of these written responses were sent prior to OA's receipt of CREW's FOIA requests in April 2007. *Id.*

6

simultaneously granted expedition and fee waiver. *See* Compl., Ex. C. On May 24, 2007, while

OA was in the process of seeking clarification of the scope of CREW's FOIA requests, CREW

filed the instant action and a motion for preliminary injunction, seeking to compel OA to process

the requested materials within ten days. This Court resolved CREW's emergency motion and set

forth a schedule for OA's processing of six categories of documents specified by CREW to be

prioritized for purposes of the emergency motion. *See* Orders of June 4 and 7, 2007. OA met

both of the deadlines specified in that schedule.

On August 21, 2007, OA moved for judgment on the pleadings, asserting that it is not an

"agency" subject to FOIA. This Court denied that motion without prejudice on February 11,

2008. As noted, however, although the Court found the language of OA's charter documents to

be clearly devoid of the type of vague terms that would suggest OA's "substantial independent

authority," the Court nevertheless permitted limited discovery out of an abundance of caution to

determine whether OA in fact "exercises substantial independent authority, i.e., beyond its

administrative functions for EOP components." Feb. 22, 2008 Order at 2; *see also* Feb. 11, 2008

Order at 5.

Thereafter, OA produced to plaintiff over 1,300 pages of documents, and made OA's then

Director, Alan R. Swendiman, available for deposition. In addition, pursuant to the Court's

Order of March 30, 2008, OA produced on April 7, 2008 one document relating to OA's

implementation of the Presidential Records Act (dkt. No. 42), and submitted, on April 18, 2008,

the declaration of OA's General Counsel, M. Elizabeth Medaglia, (dkt. No. 45), which responded

to factual questions posed by the Court during a March 28, 2008 telephone conference. None of

the factual information produced indicates that OA performs functions beyond those specifically

delineated in its charter documents. To the contrary, the factual record confirms that OA does

not have any independent role outside the EOP, nor any authority over federal agencies or third

parties.

**ARGUMENT**

**THIS COURT LACKS JURISDICTION TO HEAR THIS CASE BECAUSE
THE OFFICE OF ADMINISTRATION IS NOT AN "AGENCY" AS
DEFINED IN FOIA**

**I.    Standard of Review**

The Freedom of Information Act requires that "[e]ach agency" make available to the

public non-exempt agency records, 5 U.S.C. § 552, and "confers jurisdiction on the district courts

'to enjoin *the agency* from withholding agency records and to order the production of any agency

records improperly withheld.'" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)

(quoting 5 U.S.C. § 552(a)(4)(B)) (emphasis added). In *Kissinger v. Reporters Comm. for

Freedom of the Press*, the Supreme Court held that "federal jurisdiction [under FOIA] is

dependent upon a showing that *an agency* has (1) 'improperly'; (2) 'withheld'; (3) 'agency

records.'" 445 U.S. 136, 150 (1980) (emphasis added). "Unless each of these criteria is met, a

district court lacks jurisdiction to devise remedies." *Tax Analysts*, 492 U.S. at 142. Accordingly,

if a FOIA request is not directed at an "agency" as defined by FOIA, the court has no jurisdiction

to hear a suit seeking release of requested records. *See Voinche v. EOP*, No. 06-1272, 2007 U.S.

Dist. LEXIS 42268 at *4 (D.D.C. June 12, 2007) (where a FOIA requester has not "direct[ed] his

request towards . . . a discrete agency subject to FOIA . . . the Court is [] without subject matter

jurisdiction" over the FOIA claim); *Wang v. EOP*, No. 07-0891, 2008 WL 180189 at *1 (D.D.C.

Jan. 18, 2008) (dismissing for lack subject matter jurisdiction FOIA suit seeking release of

8

documents from the White House Press Office because that office is not an "agency" within the meaning of FOIA). OA now moves to dismiss this suit for lack of subject matter jurisdiction because it is not an "agency" within the meaning of FOIA.[3]

In reviewing a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), "the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction to hear the action." *Wilderness Soc. v. Griles*, 824 F.2d 4, 16 n. 10 (D.C. Cir. 1987) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 12.07(2.-1), at 12-45-46 (1986)); *accord Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003). Thus, "'where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Mineta*, 333 F.3d at 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.,* 974 F.2d 192, 197 (D.C. Cir. 1992)). As the party seeking to invoke the

---

[3] In OA's prior motion for judgment on the pleadings, OA cited the D.C. Circuit's holding in *Sweetland v. Walters* that the issue of an EOP component's "agency" status under FOIA goes to whether the plaintiff has stated a claim upon which relief can be granted. 60 F.3d 852, 855 (D.C. Cir. 1995). As OA noted, however, that holding appears to be in tension with Supreme Court precedent. In denying OA's motion without prejudice, this Court held that the issue of OA's status under FOIA "at least arguably goes to the Court's jurisdiction to hear a FOIA case," and "given that this Circuit's standard for permitting jurisdictional discovery is quite liberal," this Court permitted the parties "to engage in what may be viewed as jurisdictional discovery." Order of Feb. 11, 2008 at 4. Discovery was thus conducted on that basis. Although OA continues to believe under D.C. Circuit precedent that the issue of its "agency" status under FOIA can be decided on the pleadings alone, *see Sweetland*, 60 F.3d at 854; *Pacific Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262-64 (D.C. Cir. 1980); *Sierra Club v. Andrus*, 581 F.2d 895, 902-903 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979). OA will cite to factual evidence developed during discovery as further support that OA is not a FOIA agency as a matter of law.

jurisdiction of a federal court, the plaintiff has the burden of establishing that jurisdiction exists.

*See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 104 (1998).

> **II.    A Component of the Executive Office of the President Must Wield "Substantial Independent Authority" to Qualify As An "Agency" Under FOIA**

As amended in 1974, FOIA defines the term "agency" to include

> any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f).  The Conference Committee Report accompanying the 1974 amendments to

FOIA, which added the reference to the "Executive Office of the President," explains that the

term "Executive Office of the President" is "not to be interpreted as including the President's

immediate personal staff or units in the Executive Office whose sole function is to advise and

assist the President."  S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 15 (1974), *reprinted in* 1974

U.S.C.C.A.N. 6293; H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 14 (1974) (same).  Citing

this "unambiguous" legislative history, the Supreme Court held in *Kissinger v. Reporters

Comm. for Freedom of the Press* that the "'Executive Office' does not include the Office of the

President" and that "'the President's immediate personal staff or units in the Executive Office

whose sole function is to advise and assist the President' are not included within the term

'agency' under the FOIA."  445 U.S. at 156 (quoting H.R. Conf. Rep. No. 1380, 93d Cong., 2d

Sess., at 15 (1974)); *accord Meyer v. Bush*, 981 F.2d 1288, 1293 n.3 (D.C. Cir. 1993) (FOIA

excludes "at least those approximately 400 individuals employed in the White House Office"

who are the President's immediate personal staff).

10

The legislative history also makes clear that Congress intended to codify the D.C. Circuit's decision in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971). *See* 1974 U.S.C.C.A.N. 6293; H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 14 (1974) ("with respect to the meaning of the term 'Executive Office of the President' the conferees intend the result reached in *Soucie v. David*, 448 F.2d 1067"); *see also Armstrong v. EOP*, 90 F.3d, 553, 558 (D.C. Cir. 1996) ("That the Congress intended to codify *Soucie* is clear enough."); *accord Meyer*, 981 F.2d at 1291. *Soucie* involved whether the Office of Science and Technology ("OST"), an EOP component now known as the Office of Science and Technology Policy ("OSTP"), was an "agency" subject to FOIA. The D.C. Circuit held that it was, because, beyond its duties of advising the President, OST also had "the independent function of evaluating federal [scientific] programs." 448 F.2d at 1075. When OST inherited that function from one of its predecessor organizations, the court further noted, both Congress and the President contemplated that Congress would "retain control over information on federal programs accumulated by the OST, despite any confidential relation between the Director of the OST and the President." *Id.* OST was found to be a FOIA agency because it did not have the "sole function" of advising and assisting the President, and instead, had "substantial independent authority in the exercise of specific functions." *Id.* at 1073.

Because Congress drew on and codified the sole function test articulated in *Soucie*, subsequent D.C. Circuit cases addressing an EOP unit's "agency" status under FOIA have focused on whether the entity possessed "substantial independent authority." And, as the D.C. Circuit has observed, "every one of the EOP units that [it] found to be subject to FOIA has wielded substantial authority independently of the President." *Sweetland v. Walters*, 60 F.3d

11

852, 854 (D.C. Cir. 1995).  For example, the Council on Environmental Quality ("CEQ") is an agency for FOIA purposes because it has independent authority to coordinate federal environmental regulatory programs, issue guidelines for preparing environmental impact statements, and promulgate regulations – legally binding on the agencies – for implementing the procedural provisions of the National Environmental Policy Act.  *See Pacific Legal Found. v. Council on Envtl. Quality*, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980).  Similarly, the Office of Management and Budget ("OMB") is a FOIA agency because it has a statutory duty to provide budget information to Congress, along with "numerous other statutory duties."  *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979); *see also id.* 902 at n. 25 (noting OMB's authority to "assemble, correlate, revise, reduce, or increase the requests for appropriations of the several departments or establishments").

By contrast, the D.C. Circuit has consistently refused to hold that EOP components that lack substantial independent authority but serve only to advise or assist the President are subject to FOIA.  In *Rushforth v. Council of Economic Advisers*, 762 F.2d 1038 (D.C. Cir. 1985), for example, the court found that the Council of Economic Advisers ("CEA") is not a FOIA agency because each of its enumerated statutory duties is directed at providing advice and assistance to the President,[4] and neither the governing statute nor any executive order gives CEA any regulatory power.  *Id.* at 1043; *see also National Security Archive v. Archivist of the United*

---

[4]  The CEA's governing statute, 15 U.S.C. § 1023, authorizes the CEA to (1) assist and advise the President in the preparation of the Economic Report; (2) gather, compile and submit to the President timely and authoritative information concerning economic developments and economic trends; (3) appraise the various programs and activities of the Federal Government and make recommendations to the President; (4) develop and recommend to the President national economic policies to foster and promote free competitive enterprise; and (5) make and furnish whatever material and President may request on matters of Federal economic policy.

*States*, 909 F.2d 541, 545 (D.C. Cir. 1990) (the White House Counsel's Office is not a FOIA agency).  In contrast to the Council on Environmental Quality, "CEA had no similar power to issue formal legally authoritative commands to entities or persons within or without the executive branch."  *Meyer*, 981 F.2d at 1292.

Similarly, in *Armstrong v. EOP*, the D.C. Circuit found that the National Security Council ("NSC") is not an "agency" under FOIA because neither the President nor Congress has delegated any function to the NSC other than that of advising and assisting the President.  90 F.3d at 553.  Although NSC is authorized, among other things, to review and provide guidance and direction for the conduct of intelligence activities, and to provide overall policy direction for the information security program, *see id.* at 561, there was no showing that the "NSC exercises meaningful non-advisory authority."  *Id.* at 565.  As the court found, "to the extent that the NSC assists the President in coordinating the activities of the various agencies with national security responsibilities, it exercises no authority of its own."  *Id.* at 561.

Likewise, in *Meyer v. Bush*, the D.C. Circuit held that the President's *ad hoc* Task Force on Regulatory Relief was exempt from FOIA, even though the Executive Director of the Task Force (who was the Director of the OMB) had the authority, among other things, to review regulatory impact analyses ("RIAs") and to issue guidelines both for filing the RIAs and for identifying major rules.  981 F.2d at 1290.  In fact, the Executive Order creating the Task Force also gave the OMB Director – subject to the Task Force's guidance – the authority (1) to designate regulations as major rules; (2) to require agencies to seek additional information in connection with a regulation; (3) to require interagency consultation designed to reduce conflicting regulations; (4) to develop procedures for estimating the annual social costs and

13

benefits of regulations; and (5) to prepare recommendations to the President for changes in agency statutes. *See* Exec. Order No. 12291, § 6. Nevertheless, the D.C. Circuit found that the Task Force lacked "substantial independent authority to direct executive branch officials." *Meyer*, 981 F.2d at 1297. As the court noted, the Executive Order creating the Task Force specified that the Order was "intended only to improve the internal management of the Federal Government . . . ." *Id.* at 1290 (internal quotation marks omitted).

And in *Sweetland v. Walters*, the D.C. Circuit held that the staff of the Executive Residence, which the court analogized to an EOP unit for purposes of a FOIA analysis, is not an "agency" under FOIA because the staff's functions are "exclusively dedicated to assisting the President in maintaining his home and carrying out his various ceremonial duties." 60 F.3d at 854. As the court analyzed, "[t]he staff does not oversee and coordinate federal programs, as does the Office of Science and Technology, or promulgate binding regulations, as does the Council on Environmental Quality." *Id.* Even though the staff is charged by statute with specific obligations regarding the public property and furniture in the White House, *see id.* at 855, and is to "perform such official duties as the President may prescribe," *id.* (quoting 3 U.S.C. § 105(b)(1)), those duties are required to be carried out "under the direction" or "with the approval of the President." *Id.* (quoting 3 U.S.C. §§ 109, 110). The court concluded that, "[i]n short, neither Congress nor the President has delegated independent authority to these employees." *Id.* Thus, D.C. Circuit precedent is clear that an EOP unit is an "agency" under FOIA if and only if it has substantial independent authority.

14

### III.    The Office of Administration Does Not Have Substantial Independent Authority and Exists Solely to Advise and Assist the President

Under the foregoing precedent, it is plain that OA lacks the type of "substantial independent authority" that would render it an "agency" for purposes of FOIA. Instead, it exists solely to advise and assist the President in his efficient management and operation of the EOP. As noted above, OA was established by Reorganization Plan No. 1 of 1977 to "combine administrative support operations into a Central Administrative Unit in EOP," so that the EOP can better serve the President's needs. *See* President's Message at 3 and 8 (Exh. 1). This consolidation was intended to provide, among other things "a focus for monitoring the efficiency and responsibility of administrative services" and "a base for an effective EOP budget/planning system through which *the President* can manage an integrated EOP rather than a collection of disparate units." *Id.* (emphasis added). Thus, the Reorganization Plan specified that OA "shall be headed by the President," and shall provide components of the EOP with such administrative services "as the President shall from time to time direct." Reorganization Plan, § 2.

Consistent with the Reorganization Plan, OA's governing executive order makes clear that OA's function is to provide administrative support and services to EOP units, including direct support to the President. *See* Exec. Order No. 12028, § 3 (OA "shall provide all types of administrative support and services that may be used by, or useful, to units within the [EOP]," and "shall upon request, assist the White House Office in performing its role of providing those administrative services"). As OA has explained to Congress, OA's mission is to provide the necessary administrative support for the staff of the EOP "so that policy-making staff elsewhere

15

in the EOP can focus on national policy decisions without having the distractions caused by routine administrative services." *See* OA Fiscal Year 2006 Budget (excerpt attached as Exhibit 4), at 69. Indeed, the executive order specifies that the OA Director is not "accountable for the program and management responsibilities" of those EOP units." Exec. Order No. 12028, § 4(d). Rather, "the head of each unit shall remain responsible for those functions." *Id.*

To the extent that OA or its Director is delegated any authority, that is so that OA can carry out its administrative functions and its Director can operate OA as its "chief operating officer," Reorganization Plan, § 2. Section 4(a) of the governing executive order authorizes the OA Director to "organize [OA], contract for supplies and services; and do all other things that the President, as head of [OA] might do." Exec. Order No. 12028, § 4(a). Section 4(b), which was amended in 1979 "to provide limited employment authority for [OA]," further authorizes the OA Director to perform the functions of the President under 3 U.S.C. § 107(b) regarding the appointment and fixing of pay of OA employees and the procurement of temporary or intermittent experts and consultants. *Id.* § 4(b); *see also id.* § 4(c) ("The Director may appoint and fix the pay of employees pursuant to [3 U.S.C. § 107(b)(1)(A)] . . . .").

Clearly, the OA Director's ability to contract for supplies and services is central to OA's ability to provide administrative support to the EOP. As for the OA Director's authority over OA's day-to-day operation, its organization, and the employment of its employees – *i.e.*, to do all other things the President as the head of OA might do – that does not suggest that OA has any substantial independent authority over others in the Executive Branch. In fact, even the OA Director's authority to *operate OA* is "subject to such direction or approval as the President may provide or require," *id.* § 4(a). Indeed, as a Special Assistant to the President, OA's Director

16

reports directly to the Deputy Assistant to the President for Management and Administration. *See* Swendiman Tr. at 9; *see also id.* at 11 ("my understanding [of Executive Order 12122] is that I report to the President of the United States and that I'm subject to the President's direction and approval").

The same is true of OA's authority to procure temporary or intermittent experts and consultants, or detailees from other federal agencies – a topic on which plaintiff placed much emphasis during discovery.[5]   Not only is such authority exercised "in order to enable the Office of Administration to perform its functions," 3 U.S.C. § 107(b), but Mr. Swendiman testified that OA has no authority over the federal agencies from which the detailees come.  *See* Swendiman Tr. at 78-79; *see also id.* at 79 ("if an individual is interested [in a detailee position with OA], it depends upon approval of that person's supervisor").  And again, even the procurement of detailees is subject to Presidential approval.  *See id.* at 116 ("I've got to get the approval of the White House Management and Administration of getting detailees").

As this Court has already found, OA's charter documents "are entirely devoid of the type of vague terms" that would suggest that OA has the type of substantial independent authority that would make it an "agency" under FOIA.  *See* Order of Feb. 11, 2008 at 3.  Unlike the EOP units found to be FOIA "agencies," OA does not have any "independent function of evaluating federal programs," *Soucie*, 448 F.3d at 1075, as does the Office of Science and Technology Policy.  Nor does it have any independent authority to coordinate federal regulatory programs,

---

[5] In response to plaintiff's document requests, OA produced documents relating to its advertisements of temporary employment opportunities with OA, the Director's requests to other federal agencies for non-reimbursable detail of qualified individuals, and OA's agreements with other federal agencies for detailee assignment services.  *See* Ex. 4-6 to Swendiman Dep. (Exh. 2).

promulgate regulations for implementation of any federal law, or "issue formal legally

authoritative commands to entities or persons within or without the executive branch," *Meyer*,

981 F.2d at 1292, as does the Council on Environmental Quality.  OA also has no

congressionally delegated duties, such as the duty delegated to the Office of Management and

Budget to report budget information to Congress.  *See Armstrong*, 90 F.3d at 565 (noting that an

office within the EOP will be more likely to act independently of the President when, like an

agency outside the EOP, the office is charged with specific duties by statute, rather than by an

immediate delegation from the President).  Presidential appointment of OA's Director is not

subject to Congressional approval, as is the case with the heads of EOP units that have been

found to be FOIA agencies.  *See Andrus*, 581 F.2d at 902 (noting that "Congress signified the

importance of OMB's power and function, when it provided, also by amendment in 1974, for

Senate confirmation of the Director and Deputy Director of the OMB"); *see also* 42 U.S.C.

§ 4342 (requiring Presidential appointment of the head of Council on Environmental Quality be

subject to the advice and consent of the Senate); 42 U.S.C. § 6612 (requiring Presidential

appointment of the head of Office of Science and Technology Policy be subject to the advice

and consent of the Senate).

        OA has no independent role outside the EOP, and its Director's interactions with federal

agencies are limited.  *See* Swendiman Tr. at 112 ("I would characterize my interaction with

other federal agencies as limited.  The primary agency with which I've had contact is the

General Services Administration and that is because of the fact that it's the owner of the

[Eisenhower Executive Office Building] . . . .").  The factual record confirms that OA's

interactions with federal agencies outside the EOP and other third parties are purely for the

purpose of supporting the EOP, including the President. For example, OA currently has an ongoing relationship with the General Services Administration ("GSA") regarding the modernization of the Eisenhower Executive Office Building because GSA, being the landlord of the building, is the federal agency overseeing the modernization effort. *See id.* at 102. OA also has a reimbursable services agreement with GSA for GSA's improvement of the White House Press Office. *Id.* at 65. In addition, OA sometimes uses procurement organizations within the federal government (such as GSA; GovWorks, a component of the Department of Interior; and NASA SEWP, a component of the National Air and Space Administration) to procure supplies and services on behalf of the EOP. *See id.* 70, 81-82.

OA also enters into agreements with federal agencies to outsource certain administrative services. For example, in connection with OA's responsibility for providing financial management services to all EOP components, OA has executed an interagency agreement with the Department of Health and Human Services ("HHS"), Division of Payment Management, for HHS to process and manage grants awarded by the Office of National Drug Control Policy ("ONDCP"), an EOP component. *See* Ex. 2 to Swendiman Dep. (Exh. 2); Swendiman Tr. at 29-31; *see also id.* at 66. OA also contracts, as it has done in the past, with the Bureau of Public Debt, Administrative Resource Center ("ARC"), for the ARC to handle OA's payroll and certain financial management systems. *See* Swendiman Tr. at 30-31.

Furthermore, OA has interagency agreements for OA's provision of voice systems operation and maintenance on the White House complex to several non-EOP entities, such as the Secret Service and the Navy, because of those entities' presence there to support the EOP. *See id.* at 90-91; Ex. 7 to Swendiman Dep. And, OA routinely enters into interagency

agreements with federal agencies for the reimbursement of expenses incurred relating to the

President's or the First Lady's attendance at events sponsored by those agencies. *See, e.g.,* Ex. 8

to Swendiman Dep.; Swendiman Tr. at 95-97.

Finally, OA interacts with the National Archives and Records Administration concerning

OA's record preservation/management functions relating to OA itself and relating to other EOP

components. Those interactions are in connection with duties imposed by the Federal Records

Act and the Presidential Records Act regarding the preservation and accession of federal records

or the transfer of presidential records at the end of each administration. *See, e.g.,* Ex. 9 to

Swendiman Dep.; Testimony of Alan R. Swendiman before the House Committee on Oversight

and Government Reform (February 26, 2008) (attached as Exhibit 5); *see also* Swendiman Tr.

47- 49, 53-56, 107-110.

In sum, OA wields no "substantial independent authority" over others in the Executive

Branch, and is not an "agency" within the definition of FOIA.

### IV.    Application of the *Meyer* Three-Part Test Confirms that the Office of Administration Is Not An "Agency" Under FOIA

The above discussion makes clear that OA is not subject to FOIA's disclosure

requirements. Notably, in certain contexts, the D.C. Circuit has applied a three-factor test to

determine an EOP unit's "agency" status under FOIA. The test was first articulated in *Meyer v.

Bush*, where, as discussed above, the D.C. Circuit held that a group of senior advisers to the

President working within the EOP as the Task Force on Regulatory Relief did not constitute an

"agency" under FOIA, even though the group "evaluated agency regulatory efforts and had

authority to provide some direction over agency rulemaking." 981 F.2d at 1292. The D.C.

20

Circuit later applied the test to hold that the National Security Council, which is headed by the President and is authorized to provide guidance and policy direction for national security issues, is not an "agency" subject to FOIA, but is more like the President's immediate personal staff. *Armstrong*, 90 F.3d at 567.

This Court need not apply the three-factor test articulated in *Meyer* and *Armstrong* because, as the D.C. Circuit explained, the test is "relevant to determining whether those who both advise the President *and supervise others in the Executive Branch* exercise 'substantial independent authority' and hence should be deemed an agency subject to the FOIA." *Id.* at 558 (emphasis added); *see also Meyer*, 981 F.2d at 1293 ("when we apply *Soucie* to those who help the President *supervise others in the executive branch*, we think it is necessary to focus on three interrelated factors") (emphasis added). In this case, in contrast, it is beyond dispute that OA does not supervise others in the Executive Branch. Indeed, the D.C. Circuit did not apply the three-part test in *Sweetland*, a case decided after *Meyer*, when it found the staff of the Executive Residence not subject to FOIA because "[t]he staff does not oversee and coordinate federal programs . . . or promulgate binding regulations . . . ." *Sweetland*, 60 F.3d at 854.

In any event, application of the three-part test confirms that OA is not subject to FOIA. The test requires consideration of "(1) 'how close operationally the group is to the President,' (2) 'whether it has a self-contained structure,' and (3) 'the nature of its delegate[d] authority.'" *Armstrong*, 90 F.3d at 558 (quoting *Meyer*, 981 F.2d at 1293). Each factor is not "weighed equally" but "warrants consideration insofar as it is illuminating in a particular case." *Id.*

**A.      The Office of Administration has a self-contained structure**

The logical first inquiry, which is the second prong of the *Meyer* test, is whether OA has

"a self-contained structure" such that it would be in a position to exercise independent authority

if so delegated.  *Armstrong*, 90 F.3d at 559.  *See also Meyer*, 981 F.2d at 1296 ("FOIA, by

declaring that only 'establishments in the executive branch' are covered, 5 U.S.C. § 552(e),

requires a definite structure for agency status.").  It appears that OA does have such a defined

structure.  OA maintains a staff of some 200 employees and is organized along the lines of five

offices, with each office having its own defined functions.  *See* FY 2009 Budget at OA-3 (Exh.

3); Swendiman Tr. 9-10.  There also appear to be clearly established lines of authority both

among and within the offices, with the OA Director being the chief administrative officer of the

entire organization, and the President being the head of the organization.  *See* Reorganization

Plan, § 2; Swendiman Tr. at 9.

However, as the D.C. Circuit has explained, "while a definite structure may be a

prerequisite to qualify as an establishment within the executive branch . . . not every

establishment is an agency under the FOIA."  *Armstrong*, 90 F.3d at 558 (internal quotations

and citations omitted).  Even when an office "has a structure sufficiently self-contained that the

entity could exercise substantial independent authority . . . [t]he remaining question is whether

the [entity] does in fact exercise such authority."  *Id.* at 560.  Thus, for example, while the D.C.

Circuit found that the NSC has a self-contained structure, it ultimately concluded that the NSC

does not, in fact, exercise substantial independent authority to qualify as an "agency" under

FOIA.  *See id.* 560, 565.

**B.     The Office of Administration's proximity to the President confirms that it is more like the President's immediate personal staff**

Addressing the "proximity" factor, the D.C. Circuit has explained that "[t]he closer an entity is to the President, the more it is like the White House staff, which solely advises and assists the President, and the less it is like an agency to which substantial independent authority has been delegated." *Armstrong*, 90 F.3d at 558.  In holding that the NSC is not an "agency" for purposes of FOIA, the D.C. Circuit noted that the NSC shares an "intimate organizational and operational relationship" with the President in that the NSC is chaired by the President and supervised by the National Security Adviser, who "work[s] in close contact with and under the direct supervision of the President."  90 F.3d at 560.  As the court found, "[w]hen arrayed against the overwhelming fact that the President is the head of the NSC, more is required to demonstrate that [the challenged] staff activities cast the NSC in any role outside its statutory assignment to advise and assist the President."  *Id.* at 565.

Like the NSC, OA is "headed by the President."  Reorganization Plan, § 2.  Like the National Security Adviser, who is an Assistant to the President, the OA Director is a Special Assistant to the President.  This is in contrast to the Directors of the OMB and OSTP, and the Chairman of CEQ, all of whose units have been found to be "agencies" under FOIA.  Moreover, as noted above, on a day-to-day basis, the OA Director reports to the President through the Deputy Assistant to the President for Management and Administration, Swendiman Tr. at 9; *see also* Exec. Order 12028 § 2 (OA Director "shall report to the President"), and is "subject to such direction or approval as the President may provide or require," Exec. Order No. 12122, § 4(a); *see also* Swendiman Tr. at 11 ("I report to the President of the United States and [] I'm subject

to the President's direction and approval.").   Much like the Executive Residence, such

supervision and approval clearly is to ensure that OA's activities are carried out consistently

with the President's wishes,.  *See Sweetland*, 60 F.3d at 855.  In sum, OA is close to the

President operationally, and its characteristics and functions are similar to those of the

President's immediate personal staff.

**C.     The nature of the Office of Administration's delegated authority**
**confirms that it does not have substantial independent authority**

Consideration of the third factor – *i.e.*, the nature of OA's delegated authority – which is

a factor "[c]losely related to the proximity factor," *Meyer*, 981 F.2d at 1293, confirms that OA is

not an "agency" within the definition of FOIA.  As discussed at length in section III, *supra*, far

from wielding any "substantial independent authority," OA's only delegated authority is to

provide administrative support and assistance within the EOP, including direct support to the

President.  And even the performance of its purely administrative functions is subject to

Presidential supervision and approval.  Like the staff of the Executive Residence, OA has no

program or policy responsibilities, nor does it have any power to issue formal, legally

authoritative commands to entities or persons outside the EOP.  OA exists solely to advise and

assist the President on administrative matters internal to the EOP, and under settled D.C. Circuit

precedent, OA does not meet FOIA's definition of "agency."

24

V.     **Neither OA's Past Conduct Nor Its Continued Reliance on the Economy Act Precludes It From Asserting That It is Not An "Agency" Subject to FOIA**

A.     **OA's Past Conduct Is Not Probative of Its Status Under FOIA**

To be sure, since 1980, OA has had regulations implementing FOIA, and has not taken the position in prior litigation that it is not subject to FOIA.[6]  However, the D.C. Circuit has held that such prior conduct is not probative on the question of whether an EOP unit does, in fact, satisfy FOIA's definition of "agency."  In *Armstrong*, the plaintiff FOIA requester argued that the NSC had conceded its agency status under FOIA through past conduct and statements, including submissions in earlier rounds of that litigation.  90 F.3d at 565.  Indeed, in one of the earlier *Armstrong* cases, the D.C. Circuit observed that not only had the NSC "routinely conceded its status as an 'agency'" in FOIA litigation, but in *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980), "[t]he Supreme Court also appears to have assumed, without deciding the issue, that the NSC is a FOIA agency."  *Armstrong v. EOP*, 1 F.3d 1274, 1296 (D.C. Cir. 1993).  Like OA, the NSC also had issued regulations for the disclosure of information under FOIA.  *See id.* at 557; *see also* 32 C.F.R. §§ 2101-2103 (1993).

The D.C. Circuit ultimately held, however, that the NSC's prior compliance with FOIA and the Federal Records Act "should not be taken as a matter of law that the NSC is subject to

---

[6]  OA is aware, however, of a case in which OA raised the prospect that it is not subject to FOIA.  In *Barr v. EOP, et al.,* No. 99-cv-01695 (JLG), a Privacy Act case, OA noted that "there is reason to doubt that the Office of Administration has the type of 'substantial independent authority' that is a necessary precondition for an entity within the Executive Office of the President to be deemed an 'agency.'"  Memo. in Support of Partial Sum. J. Mot. at 26 n.8, filed Feb. 24, 2000 (relevant excerpt attached as Exhibit 6).  This is so, OA then reasoned, because the Executive Order creating OA expressly provides that the Director of the Office of Administration is not accountable for the program and management responsibilities of units within the Executive Office of the President. *Id.*

those statutes." *Armstrong*, 90 F.3d at 566. As the Court found, "[t]he NSC's prior references to itself as an agency are not probative on the question before the court – whether the NSC is indeed an agency within the meaning of the FOIA; quite simply the Government's position on that question has changed over the years." *Id.*[7]

As was the case with the NSC in *Armstrong*, the Executive Branch originally acted as if OA was subject to FOIA. Upon review of OA's status, however, the Executive Branch has determined that OA does not fall within the definition of "agency" under FOIA. The issue of OA's status under FOIA has never been decided by a court, and it is now ripe for this Court's determination based on well-settled D.C. Circuit precedent.

### B.    OA's Continued Contractual Relationships with Federal Agencies Pursuant to the Economy Act Are Not Probative of OA's Status Under FOIA

Finally, contrary to CREW's suggestion, OA is not precluded from asserting its non-agency status under FOIA simply because it has continued to enter into interagency agreements with executive branch agencies under the authority of the Economy Act. That Act authorizes agencies to enter into mutual agreements to obtain supplies and services through interagency acquisition, *see* 48 C.F.R. § 17.502, and provides in pertinent part:

> (a) The head of an agency or major organizational unit within an agency may place an order with a major organizational unit within the same agency or another agency for goods or services if –
>
>     . . . .

---

[7] The D.C. Circuit also rejected the district court's alternative ruling that the NSC's newly adopted position was arbitrary and capricious under the Administrative Procedure Act ("APA") for lack of a reasoned explanation. *See Armstrong,* 90 F.3d at 566. The court held that the NSC was not required to provide "a reasoned explanation for its change of position on the question whether it is an agency" because "invocation of the APA begs the question whether the NSC was an 'agency' within the meaning of that term as it is used in the APA," a question that was rendered moot by the court's determination that the NSC is not an agency under FOIA. *Id.*

> (4) the head of the agency decides ordered goods or services cannot be provided by contract as conveniently or cheaply by a commercial enterprise.

31 U.S.C. § 1535(a). OA's charter documents specifically authorize OA to execute interagency agreements with executive agencies under the Economy Act. Specifically, section 3(c) of the governing executive order requires OA to provide administrative support and services to all EOP units in a manner consistent with available funds and other resources, "or in accord with Section 7 of the Act of May 21, 1920 (41 Stat. 613), as amended (31 U.S.C. 686, referred to as the Economy Act)." Section 686 in Title 31 of the U.S. Code is the predecessor provision of 31 U.S.C. § 1535(a). *See* Pub. L. 97-258, 96 Stat. 933 (Sept. 13 1982).

Indeed, because such interagency agreements are intended to achieve economy and efficiency for the government, *see Techniarts Eng'g v. United States*, 51 F.3d 301, 304 (D.C. Cir. 1995), they also further one of the purposes that OA was created, which is to provide monetary savings for the EOP as a whole and "a focus for monitoring the efficiency and responsibility of administrative services." President's Message at 8 (Exh. 1). The factual record contains no support for the proposition that OA wields "substantial independent authority" in entering into such agreements. In other words, OA's execution of interagency acquisition agreements under the Economy Act does not make it an "agency" under FOIA as a matter of law.

In any event, whether OA may properly enter into agreements under the Economy Act because of its non-agency status under FOIA is not in issue this case. The Economy Act's use of the words "agencies" or "executive agencies" says nothing about OA's "agency" status under FOIA, which is a wholly different statute. Unlike the definition of "agency" under FOIA, the

27

term "agency" under Title 31 is simply defined as "a department, agency, or instrumentality of

the United States Government."  31 U.S.C. § 101.  Similarly, the term "executive agency"

means "a department, agency, or instrumentality in the executive branch of the United States

Government."  31 U.S.C. § 102.  Simply put, OA's continued reliance on the Economy Act is

irrelevant to determining whether OA is an "agency" subject to FOIA.

## CONCLUSION

For all the foregoing reasons, this Court should dismiss this action for lack of subject

matter jurisdiction.

Dated: April 25, 2008                         Respectfully submitted,

                                              JEFFREY S. BUCHOLTZ
                                              Acting Assistant Attorney General

                                              JEFFREY A. TAYLOR
                                              United States Attorney

                                              ELIZABETH J. SHAPIRO
                                              Assistant Branch Director

                                              _____ /s/ Jean Lin _____
                                              JEAN LIN
                                              Federal Programs Branch, Civil Division
                                              United States Department of Justice
                                              20 Massachusetts Ave., N.W.
                                              Washington, D.C.  20530
                                              Tel: (202) 514-3716
                                              Fax: (202) 616-8407

                                              Attorneys for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No: 1:07-CV-00964 (CKK) |
| ) | |
| OFFICE OF ADMINISTRATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

**ORDER**

Upon consideration of Defendant's Motion to Dismiss for Lack of Subject Matter

Jurisdiction, it is hereby

ORDERED that the motion is GRANTED, it is further

ORDERED that this case shall be dismissed with prejudice.


Dated: _____

_____ UNITED STATES DISTRICT JUDGE

EXHIBIT 1

**U.S.C.A. REORG. PLAN 1 1977**

United States Code Annotated Currentness
  Title 5. Government Organization and Employees (Refs & Annos)
    Appendix 1. Reorganization Plans   [FN1]

➡ **REORGANIZATION PLAN NO. 1 OF 1977**

<42 F.R. 56101, 91 Stat. 1633, as amended Pub.L. 97-195, § 1(c)(5),
June 16, 1982, 96 Stat. 115>

Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, July 15, 1977, pursuant to the provisions of Chapter 9 of Title 5 of the United States Code. [FN1]

### EXECUTIVE OFFICE OF THE PRESIDENT

**Section 1. Redesignation of Domestic Council Staff**

The Domestic Council staff is hereby designated the Domestic Policy Staff and shall consist of such staff personnel as are determined by the President to be necessary to assure that the needs of the President for prompt and comprehensive advice are met with respect to matters of economic and domestic policy. The staff shall continue to be headed by an Executive Director who shall be an Assistant to the President, designated by the President, as provided in Section 203 of Reorganization Plan No. 2 of 1970. The Executive Director shall perform such functions as the President may from time to time direct.

**Section 2. Establishment of an Office of Administration**

There is hereby established in the Executive Office of the President the Office of Administration which shall be headed by the President. There shall be a Director of the Office of Administration. The Director shall be appointed by the President and shall serve as chief administrative officer of the Office of Administration. The President is authorized to fix the compensation and duties of the Director.

The Office of Administration shall provide components of the Executive Office of the President with such administrative services as the President shall from time to time direct.

**Section 3. Abolition of components**

The following components of the Executive Office of the President are hereby abolished:

  **A.** The Domestic Council;

  **B.** The Office of Drug Abuse Policy;

  **C.** The Office of Telecommunications Policy; and

  **D.** The Economic Opportunity Council.

**Section 4. Appointment of the Assistant Secretary of Commerce for Communications and Information**

There shall be in the Department of Commerce an Assistant Secretary for Communications and Information who shall be appointed by the President, by and with the advice and consent of the Senate.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Section 5. Transfers of functions**

The following functions shall be transferred:

**A.** All functions vested in the Director of the Office of Science and Technology Policy and in the Office of Science and Technology Policy pursuant to sections 205(a)(2), 206 and 209 of the National Science and Technology Policy, Organization, and Priorities Act of 1976 (Public Law 94-282; 90 Stat. 459) [sections 6614(a)(2), 6615 and 6618 of Title 42, The Public Health and Welfare], are hereby transferred to the Director of the National Science Foundation. The Intergovernmental Science, Engineering, and Technology Advisory Panel, the President's Committee on Science and Technology, and the Federal Coordinating Council for Science, Engineering and Technology, established in accordance with the provisions of Titles II, III, IV of the National Science and Technology Policy, Organization, and Priorities Act of 1976 [sections 6611 et seq., 6631 et seq., and 6651 et seq. of Title 42], are hereby abolished, and their functions transferred to the President.

**B.** Those functions of the Office of Telecommunications Policy and of its Director relating to:

**(1)** the preparation of Presidential telecommunications policy options including, but not limited to those related to the procurement and management of Federal telecommunications systems, national security, and emergency matters; and

**(2)** disposition of appeals from assignments of radio frequencies to stations of the United States Government;

are hereby transferred to the President who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable. All other functions of the Office of Telecommunications Policy and of its Director are hereby transferred to the Secretary of Commerce who shall provide for the performance of such functions.

**C.** The functions of the Office of Drug Abuse Policy and its Director are hereby transferred to the President, who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable.

**D.** The functions of the Domestic Council are hereby transferred to the President, who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable.

**E.** Those functions of the Council on Environmental Quality and the Office of Environmental Quality relating to the evaluation provided for by Section 11 of the Federal Nonnuclear Energy Research and Development Act of 1974 (Public Law 93-577, 88 Stat. 1878) [section 5910 of Title 42], are hereby transferred to the Administrator of the Environmental Protection Agency.

**F.** Those functions of the Office of Management and Budget and its Director relating to the Committee Management Secretariat (Public Law 92-463, 86 Stat. 770, as amended by Public Law 94-409, 90 Stat. 1247) [see section 7 of the Federal Advisory Committee Act, Pub.L. 92-463, Oct. 6, 1972, 86 Stat. 770, set out in Appendix 2 of this title] are hereby transferred to the Administrator of General Services.

**G.** The functions of the Economic Opportunity Council are hereby transferred to the President, who may delegate such functions within the Executive Office of the President as the President may from time to time deem desirable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

**Section 6. Incidental transfers**

So much of the personnel, property, records, and unexpended balances of appropriations, allocations and other funds employed, used, held, available, or to be made available in connection with the functions transferred under this Plan, as the Director of the Office of Management and Budget shall determine, shall be transferred to the appropriate department, agency, or component at such time or times as the Director of the Office of Management and Budget shall provide, except that no such unexpended balances transferred shall be used for purposes other than those for which the appropriation was originally made. The Director of the Office of Management and Budget shall provide for terminating the affairs of all agencies abolished herein and for such further measures and dispositions as such Director deems necessary to effectuate the purposes of this Reorganization Plan.

**Section 7. Effective date**

This Reorganization Plan shall become effective at such time or times on or before April 1, 1978, as the President shall specify, but not sooner than the earliest time allowable under Section 906 of Title 5 of the United States Code.

[For Executive Orders setting effective dates of various provisions of Reorg. Plan No. 1 of 1977 pursuant to section 7 thereof, and further implementing such Reorg. Plan, see notes set out preceding section 101 of Title 3, The President.]

[FN1] As amended Sept. 15, 1977.

MESSAGE OF THE PRESIDENT

To the Congress of the United States:

I herewith transmit my plan for the Reorganization of the Executive Office of the President (EOP), Reorganization Plan No. 1 of 1977. This plan is the first of a series I intend to submit under the reorganization authority vested in me by the Reorganization Act of 1977 (Public Law 95-17) [sections 901 to 912 of this title]. It adheres to the purposes set forth in Section 901(a) of the Act [section 901(a) of this title].

This plan in conjunction with the other steps I am taking will:

Eliminate seven of the seventeen units now within the EOP and modify the rest. There were 19 units when I took office; the President's Foreign Intelligence Advisory Board and the Economic Policy Board have already been abolished. Thus with this plan I will have eliminated nine of 19 EOP units.

Reduce EOP staffing by about 250 which includes the White House staff reduction of 134 or 28 percent which I have already ordered.

Improve efficiency by centralizing administrative functions; and

Improve the process by which information is provided for Presidential decisionmaking.

These recommendations arise from a careful, systematic study of the EOP. They are based on the premise that the EOP exists to serve the President and should be structured to meet his needs. They will reduce waste and cost while improving the service the President, and the nation, receive from the EOP.

The EOP now consists of the immediate White House Office, the Vice President's Office, the Office of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

Management and Budget, and fourteen other agencies. The EOP has a budget authority of about $80,000,000 and 1,712 full time employees.

The White House Office concentrates on close personal support including policy and political advice and administrative and operational services. The Office of the Vice President provides similar support to him. OMB's primary mission is to develop and implement the budget; it also carries out a number of management and reorganization activities.

Three EOP units have responsibility for policy development:

National Security Council.

Domestic Council.

Council on International Economic Policy.

The other 11 are more specialized offices that offer analysis and advice, help develop policy in certain areas, or carry out special projects. These are:

Council of Economic Advisers.

Council on Wage and Price Stability.

Office of the Special Representative for Trade Negotiations.

Council on Environmental Quality.

Office of Science and Technology Policy.

Office of Drug Abuse Policy.

Office of Telecommunications Policy.

Intelligence Oversight Board.

Federal Property Council.

Energy Resources Council.

Economic Opportunity Council.

To make the EOP more effective, four steps are necessary:

**I.** Strengthen management of policy issues.

**II.** Limit the EOP, wherever possible, to functions directly related to the President's work.

**III.** Centralize administrative services.

**IV.** Reduce size of White House and EOP staffs.

I. STRENGTHEN PROCESS MANAGEMENT OF POLICY ISSUES

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S.C.A. REORG. PLAN 1 1977

Perhaps the most important function of the President's staff is to make sure he has the wide variety of views and facts he needs to make decisions. By building a more orderly system for collecting information and advice, the President can make sure that he will hear all the views he should--and hear them in time. To better insure that this happens, I am taking the following actions to:

Institute for domestic and economic issues, a system similar to the Presidential Review Memorandum process currently used for National Security issues.

Create a committee of Presidential advisers, chaired by the Vice President, to set priorities among issues and oversee their staffing.

Assure that Presidential decision memoranda on policy issues are coordinated with Cabinet and EOP advisers most involved with the issue.

Consolidate under the Staff Secretary the two current White House paper circulation systems.

Appoint a group of advisers to review the decisionmaking process periodically.

Give the Assistant to the President for Domestic Affairs and Policy clear responsibility for managing the way in which domestic and most economic policy issues are prepared for Presidential decision.

Assign follow-up responsibility for Presidential decisions as follows: immediate follow-up will be handled by the NSC or Domestic Policy Staff most directly involved in the issue; long term follow-up on selected issues will be handled by the Assistant to the President for Intergovernmental Relations.

These actions recognize that the White House and Executive Office staff must use their proximity to the President to insure that the full resources of the government and the public are brought to bear on Presidential decisions in a timely fashion. It is my purpose in instituting these changes to strengthen Cabinet participation in Presidential decisions.

## II. RATIONALIZE EOP STRUCTURE BY LIMITING EOP, WHEREVER POSSIBLE, TO FUNCTIONS WHICH BEAR A CLOSE RELATIONSHIP TO THE WORK OF THE PRESIDENT

As the President's principal staff institution, there are several major things the EOP must do:

Provide day-to-day operational support (e.g. scheduling, appointments) and help the President communicate with the public, the Congress, and the press.

Manage the budget and coordinate Administration positions on matters before the Congress.

Manage the Presidential decisionmaking processes efficiently and fairly, and bring the President the widest possible range of opinions.

Help the President: plan and set priorities; monitor and evaluate progress toward achieving the President's objectives; understand and resolve major conflicts among line subordinates; manage crises, especially in national security matters.

In order to restructure the EOP around these basic functions, the functions of seven units should be discontinued or transferred, and ten units, including the White House Office, should be retained but modified.

Seven units should be discontinued or their functions transferred. These are:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   **1.** Office of Drug Abuse Policy.

   **2.** Office of Telecommunications Policy.

   **3.** Council on International Economic Policy.

   **4.** Federal Property Council.

   **5.** Energy Resources Council.

   **6.** Economic Opportunity Council.

   **7.** Domestic Council.

The functions of the Office of Drug Abuse Policy (ODAP) can be performed by a smaller staff reporting to a Presidential adviser in the EOP. The Office itself will be discontinued.

Much of the work done by the Office of Telecommunications Policy (OTP) can be more effectively performed outside the EOP. It is important that the EOP have the capacity to resolve differences and that the President have immediate advice on telecommunications and information policy, especially on national security, emergency preparedness and privacy issues. This only requires a small staff within EOP. The Office of Management and Budget would take responsibility for Federal telecommunications procurement and management policy and arbitration of interagency disputes about frequency allocation. All other functions except developing Presidential policy options would be transferred to a new office within the Department of Commerce, headed by a new Assistant Secretary for Communications and Information, who will perform many of the functions previously performed by the head of the OTP.

I propose that the Economic Opportunity Council be discontinued; it is dormant and its only active function (preparation of the Catalogue of Federal Domestic Assistance) is being performed by OMB. Three other units are also inactive and should be discontinued: Council on International Economic Policy, the Federal Property Council, and the Energy Resources Council.

The Domestic Council should be abolished. It has rarely functioned as a Council, because it is too large and its membership too diverse to make decisions efficiently. Its functions have been performed entirely by its staff. This Domestic Policy Staff should report to the Assistant to the President for Domestic Affairs and Policy. Under the policy process system described earlier, they should manage the process which coordinates the making of domestic and most economic policy. They should work closely with the Cabinet departments and agencies to insure that the views of the Cabinet and agency heads are brought to the President before decisions are made.

The ten EOP units which will continue with some modification are:

   **1.** White House Office.

   **2.** Office of the Vice President.

   **3.** Office of Management and Budget.

   **4.** Council on Environmental Quality.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**5.** Council of Economic Advisers.

**6.** Office of Science and Technology Policy.

**7.** Office of the Special Representative for Trade Negotiations.

**8.** National Security Council.

**9.** Intelligence Oversight Board.

**10.** Council on Wage and Price Stability.

The operations of the Office of the Vice President reflect the combination of constitutional, statutory, and Presidentially assigned duties that make it unique among EOP units. Because his interests and assignments cover the same range as the President's, the Vice President requires a staff with expertise in diverse areas. Its basic functions should not be changed. However, I propose that certain support functions--involving accounting, personnel services, and supply--be transferred to a centralized EOP Administrative Unit.

The Office of Management and Budget would remain as a separate entity in the EOP, but some functional changes should be made. Four functions should be transferred from OMB to other parts of the government:

Administration to the new EOP Central Administrative Unit;

Executive Department/Labor Relations (except for Pay Agent, Executive Level Pools, and Legislative Analysis) to the Civil Service Commission;

Advisory Committee Management Secretariat to the General Services Administration;

Statistical Policy (except Forms Clearance) to the Department of Commerce.

I have asked the OMB to reorganize its management arm to emphasize major Presidential initiatives, such as reorganization, program evaluation, paperwork reduction, and regulatory reform.

The Council on Environmental Quality (CEQ) should remain in the EOP as an environmental adviser to the President. The CEQ's major purpose is to provide an independent assessment of our policies for improving the environment. Toward this end, it will analyze long term trends and conditions in the environment. It will advise OMB on the reorganization of natural resources functions within the Federal government. The Council will retain the functions it now has under NEPA and Executive Order No. 11514 with the exception of routine review of the adequacy of impact statements and the administrative aspects of their receipt and handling. The EPA will take over CEQ's evaluation responsibility under the Federal Nonnuclear Energy Research Development Act of 1974 [section 5901 et seq. of Title 42, The Public Health and Welfare]. The CEQ will continue to review and publish the Annual Report on Environmental Quality.

The strength of the Council of Economic Advisers (CEA) lies in its economic analysis of current policy choices. It also presents objective economic data, makes macroeconomic forecasts, and analyzes economic trends and their impact on the national economy. It will continue with a small reduction in staff.

The Office of Science and Technology Policy (OSTP) should retain those science, engineering, and technology functions which can be so useful in helping the President and his advisers make decisions about policy and budget issues. Instead of the Intergovernmental Science, Engineering, and Technology Advisory Panels, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

President should rely on an intergovernmental relations working group, chaired by the Science Adviser. The Federal Coordinating Council on Science and Technology should operate as a sub-Cabinet working group chaired by the Science Adviser. The reorganization work of the President's Committee on Science and Technology would be part of the overall reorganization effort. The responsibility for preparing certain reports should be transferred to the National Science Foundation.

The proposal places manageable limits on OSTP's broad mandate while emphasizing functions that support the President.

The Office of the Special Representative for Trade Negotiations (STR) is now operating effectively and will be retained essentially as is. With the difficult negotiations now underway in Geneva, the benefits of transferring the STR to another agency are outweighed by the potential reduction in its effectiveness as an international negotiator.

The National Security Council (NSC) will be retained in its present form and its staff slightly reduced.

Intelligence Oversight Board (IOB) should be retained to insure that abuses of the past are not repeated and to emphasize Presidential concerns regarding intelligence issues.

The Council of Wage and Price Stability (COWPS) is a necessary weapon in the continuing fight against inflation and will be retained. To be sure that its work is closely coordinated with the economic analyses performed by the Council of Economic Advisers (CEA), COWPS should be directed by the Chairman of CEA.

### III. CENTRALIZE ADMINISTRATIVE FUNCTIONS

About 380 (22 percent) of the full-time, permanent EOP personnel perform administrative support services in EOP units. Most EOP units besides the White House and OMB are too small to provide a full complement of administrative services. They depend on the White House, OMB, GSA, other federal departments, or several of these sources for many of these services. This approach is inefficient; the quality is uneven and the coordination poor. Some services are duplicated, others inconsistently distributed (excess capacity in some units and deficiencies in others), and most too costly.

I propose to combine administrative support operations into a Central Administrative Unit in EOP to provide support in administrative services common to all EOP entities. It should be a separate EOP entity because of the need to assure equal access by all other units.

This consolidation will result in:

Saving of roughly 40 positions and about $1.1 million improved and more innovative services.

A focus for monitoring the efficiency and responsibility of administrative services.

A base for an effective EOP budget/planning system through which the President can manage an integrated EOP rather than a collection of disparate units.

The EOP has never before been organized as a single, unified entity serving the President. It is only by viewing it as a whole that we can improve efficiency through steps like the Central Administrative Unit.

### IV. REDUCE THE SIZE OF WHITE HOUSE AND EOP STAFFS

I am reducing the White House staff by 28 percent, from the 485 I inherited from my predecessor to 351. This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

involves cuts in my policy and administrative staffs as well as transfers to the Central Administrative Unit.

I estimate that this plan and the other steps I am taking will reduce staff levels in the EOP by about 250, from 1,712 full-time permanent positions to about 1,460 and will save the taxpayers at least $6 million.

As in the rest of the government, I will be reluctant to add staff unless necessary to help me do my job better.

I ask that you support me in improving the operations of the Executive Office of the President by approving the attached reorganization plan.

In summary this plan would:

Abolish the Domestic Council and establish a Domestic Policy Staff.

Establish within the EOP a Central Administrative Unit.

Transfer certain functions of the Council on Environmental Quality to the President for redelegation.

Abolish the Office of Drug Abuse Policy and vest functions in the President for redelegation.

Abolish the Office of Telecommunications Policy and transfer functions to the Department of Commerce and to the President for redelegation.

Create an Assistant Secretary of Commerce for Communications and Information.

Vest some Office of Science and Technology Policy functions in the President for redelegation.

Abolish the Economic Opportunity Council and vest those functions in the President for redelegation.

Transfer the Committee Management Secretariat function of the Office of Management and Budget to the President for redelegation.

Make other incidental transfers attendant to those mentioned above.

Each of the changes set forth in the plan accompanying this message is necessary to accomplish one or more of the purposes set forth in Section 901(a) of Title 5 of the United States Code. I have taken care to determine that all functions abolished by the plan are done so only under statutory authority provided by Section 903(b) of Title 5 of the United States Code. The provisions in the plan for the appointment and pay of any head or officer of any agency have been found by me to be necessary.

As we continue our studies of other parts of the Executive Branch, we will find more ways to improve services in the EOP and elsewhere. This plan is only a beginning, but I am confident that it represents a major step toward a more efficient government that will serve the needs of the people and the President well.

JIMMY CARTER.

THE WHITE HOUSE, July 15, 1977.

[FN1] Number and order of Appendixes editorially supplied.

**U.S.C.A. REORG. PLAN 1 1977,** 5 USCA APP. 1 REORG. PLAN 1 1977

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**U.S.C.A. REORG. PLAN 1 1977**

Current through P.L. 110-80 approved 08-13-07

Copr. © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2 - Part 1

## Capital Reporting Company

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - X

CITIZENS FOR RESPONSIBILITY :

AND ETHICS IN WASHINGTON,    :

                              :

     Plaintiff,       : Civil Action No.

vs.                : 07-964 (CKK)

                              :

OFFICE OF ADMINISTRATION,    :

                              :

     Defendant.       :

- - - - - - - - - - - - - - X

                         Washington, D.C.

               Thursday, March 13, 2008

Videotape deposition of:

      ALAN R. SWENDIMAN

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the offices

of CREW, 14 Eye Street, Northwest, Suite 450,

Washington, D.C., before Jodi Scheffel, a Notary

Public in and for the District of Columbia,

beginning at 10:00 a.m., when were present on

behalf of the parties:

# Capital Reporting Company

|  |  |
|---|---|
| Page 2 | Page 4 |

**Page 2**

1  A P P E A R A N C E S
2  On behalf of the Plaintiff:
3  ANNE L. WEISMANN, ESQUIRE
   CLIFF HOLMES, ESQUIRE
4  CREW
   1400 Eye Street, N.W.
5  Suite 450
   Washington, D.C. 20005
6  (202) 408-5565
7
8  On behalf of the Defendant:
9  ELIZABETH SHAPIRO, ESQUIRE
   JEAN LIN, ESQUIRE
10 U.S. Department of Justice
   Civil Division
11 20 Massachusetts Avenue, N.W.
   Washington, D.C. 20001
12 (202) 514-3716
13
14 Also Present:  M. Elizabeth Medaglia, Esquire
        Kenneth Nuzzi, Videographer
15
        * * * * *
16
17
18
19
20
21
22

**Page 3**

1  C O N T E N T S
2  EXAMINATION BY:                PAGE
3  Counsel for Plaintiff              5
4
5  E X H I B I T S
6  PLAINTIFF'S DEPOSITION EXHIBITS:
7  1 Document Bates Stamped OA0002      14
   2 Document Bates Stamped OA00013     28
8  3 Excerpt of FOIA Handbook          34
   4 Document Bates Stamped OA00319     80
9  5 Document Bates Stamped OA00271     82
   6 Document Bates Stamped OA00320     88
10 7 EOP Interagency Agreement
     Document Bates Stamped OA00335-336  92
11 8 Document Bates Stamped OA00354-359  97
   9 E-mail 11/07/07 RE: Follow-up     104
12
13     (*Exhibits attached to transcript.)
14
15
16
17
18
19
20
21
22

**Page 4**

1  P R O C E E D I N G S
2      THE VIDEOGRAPHER:  This videotape
3  deposition is being taken pursuant to Federal Rules
4  of Civil Procedure.  Today's date is March 13th,
5  2008.  Our starting time is 10:00 a.m.  Our
6  location is 1400 Eye Street, Northwest, Washington,
7  D.C.  Our court reporter is Jodi Scheffel with
8  Capital Reporting Services.  Our videographer is
9  Ken Nuzzi also with Capital Reporting Services.
10      The caption of this case is in the United
11  States District Court for the District of Columbia,
12  Citizens for Responsibility and Ethics in
13  Washington versus the Office of Administration.
14  This Case Number is CA07-964 (CKK).  The party
15  giving notice of this deposition is the Plaintiff.
16      Will the attorneys please now identify
17  themselves and whom they represent.
18      MS. WEISMANN:  Anne Weismann for the
19  Plaintiff CREW.
20      MR. HOLMES:  Cliff Holmes for the
21  Plaintiff CREW.
22      MS. SHAPIRO:  Elizabeth Shapiro from the

**Page 5**

1  Department of Justice representing the Witness.
2      MS. LIN:  Jean Lin from the Department of
3  Justice representing the Witness.
4      MS. MEDAGLIA:  Elizabeth Medaglia,
5  General Counsel of the Office of Administration
6  representing the Witness.
7      THE VIDEOGRAPHER:  Thank you very much.
8  Our witness today is Mr. Alan R. Swendiman and will
9  now be sworn in by our court reporter.
10  Whereupon,
11      ALAN R. SWENDIMAN,
12  called as a witness, and having been first duly
13  sworn, was examined and testified as follows:
14      EXAMINATION BY COUNSEL FOR PLAINTIFF
15  BY MS. WEISMANN:
16      Q  Mr. Swendiman, my name is Anne Weismann.
17  I'm counsel for the Plaintiff in this case.  Have
18  you ever had your deposition taken before?
19      A  Not in a court proceeding.
20      Q  Okay.  Well, just a reminder, even though
21  we do also have a videographer here, that your
22  responses do need to be oral so that the

2 (Pages 2 to 5)

# Capital Reporting Company

Page 6

1    transcript -- the written transcript will reflect
2    them as well. If you do not understand a question
3    or don't hear a question, please let me know and I
4    will rephrase it or, you know, reiterate it. If
5    you don't let me know I will assume that you have
6    heard and understood the question. Is that okay?
7        A    I understand.
8        Q    All right. Good enough. Mr. Swendiman,
9    what is your current position?
10       A    It's Special Assistant to the President
11   Director of Office of Administration.
12       Q    How long have you been in that position?
13       A    I've been in that position since on or
14   about Novemeber 27th, 2006.
15       Q    And what was your employment immediately
16   preceding your work with the Office of
17   Administration?
18       A    I was the general Counsel of the General
19   Services Administration.
20       Q    And what was your period of time in that
21   position?
22       A    I was with the General Services

Page 7

1    Administration from July 6th, 2005 to
2    November 26th, 2006.
3        Q    So you went right from the GSA to the
4    Office of Administration?
5        A    That is correct.
6        Q    And prior to your employment as General
7    Counsel at GSA what were you doing?
8        A    I was in the private practice of law for
9    approximately 31 years with the law firm of Jackson
10   and Campbell.
11       Q    And did you have a specialty in that
12   practice?
13       A    I worked in real estate, medium and
14   small business nonprofit organizations.
15       Q    And prior to your employment with Jackson
16   & Campbell, did you have any other professional
17   experience?
18       A    I was law clerk to the Honorable Edward
19   S. Northrop, Chief Judge, United States District
20   Court for the District of Maryland.
21       Q    Okay. And you've never held any other
22   public positions?

Page 8

1        A    I stand corrected. I was General Counsel
2    of the Federal Labor Relations Authority from 1992
3    to 1993.
4        Q    Okay. And prior to that did you have a
5    role with the Legal Services Corporation?
6        A    I was outside counsel to the Legal
7    Services Corporation. I was not an employee.
8        Q    Okay. So your first federal experience,
9    employment experience -- professional experience
10   with the Federal Labor Relations Authority; is that
11   correct?
12       A    Well, I would like to think that my
13   professional experience began with His Honor, Judge
14   Northrop.
15       Q    I'm sorry, okay. Briefly, what is your
16   academic background, your educational background?
17       A    I'm a graduate of the University of North
18   Carolina, Chapel Hill, and I received my law
19   training from Georgetown University Law Center.
20       Q    Okay. In your current position -- is it
21   okay with you if I refer to you as Director of the
22   Office Administration? I realize you have a title

Page 9

1    that's greater than that but just --
2        A    You may do so.
3        Q    Okay. In your current position as
4    Director, who do you report directly to?
5        A    I report to the Deputy Assistant to the
6    President for Management of Administration.
7        Q    Has that been the consistent reporting
8    chain throughout your tenure at OA?
9        A    It has been consistent throughout my
10   tenure.
11       Q    And who reports to you directly?
12       A    There are a number of people that report
13   to me directly. There is the CIO, the --
14       Q    The Chief Information Officer?
15       A    -- Chief Information Officer, the Chief
16   Financial Officer, the Chief Procurement and
17   Contract Management Officer, the Chief Operating
18   Officer, the Chief Facilities Management Officer,
19   the General Counsel, the Director for Equal
20   Employment Opportunity.
21       Q    And these are all within a direct chain
22   of authority directly to you?

3 (Pages 6 to 9)

## Capital Reporting Company

Page 10

1    A    That is correct.
2    Q    And then I presume they each have staff
3  under them that report to them?
4    A    They all have staff with the exception of
5  the EEO Director who is an office of one.
6    Q    And how many employees, full-time
7  employees, are within the Office of Administration?
8    A    Well, we have approximately currently 222
9  FTEs.
10   Q    And has that been pretty constant since
11  your tenure there?
12   A    It's actually increased a little bit
13  during my tenure.
14   Q    Okay.  Are you familiar with Executive
15  Order 12122?
16   A    I have read that Executive Order
17       MS. WEISMANN:  And just for your
18  convenience I'm going to hand you a copy of it.  I
19  have extras.
20       (Tenders document witness.)
21  BY MS. WEISMANN:
22   Q    What is your understanding of what this

Page 11

1  Executive Order does with respect to the Director
2  of the Office of Administration?
3    A    Well, my understanding is, is that I
4  report to the President of the United States and
5  that I'm subject to the President's direction and
6  approval.
7    Q    Specifically focussing on Section 4(b),
8  it says, the Director is designated to perform the
9  functions of the President under Section 107(b) of
10  Title 3 of the United State Code.  Have I read that
11  correctly?
12   A    That's what it says.
13   Q    And what is your understanding of what
14  this Executive Order -- what authority it gives
15  you, that specific provision?
16   A    My authority, as I understand it, is to
17  report to the President of the United States
18  through a chain of command, and I make
19  recommendations with regards to the operations of
20  the office.
21   Q    Okay.  But, Mr. Swendiman, I'm asking
22  much more specifically to focus just on Subsection

Page 12

1  (b) and it's very express reference to Section
2  107(b) of Title 3 of the United States Code.  Do
3  you have any other understanding of what is
4  encompassed by that, this Executive Order and that
5  reference, beyond what you've stated?
6    A    Well, if you have a copy of Section
7  107(b) --
8    Q    Yes, I do.
9        (Tenders document to witness.)
10   A    Is there a particular portion of 107(b)
11  to which you're referring?
12   Q    No, because I'm referring primarily to
13  the Executive Order and it just refers generally to
14  Section 107(b).  And I'm just trying to get your
15  understanding of what authorities are conferred on
16  you through this Executive Order 12122.
17   A    Well, it says the President (or his
18  designee) is authorized and then sets forth what
19  can be done with respect to rates of pay for
20  certain enumerated employees.
21   Q    So do you understand Executive Order
22  12122 to be designating you as the designee for

Page 13

1  purposes of 107(b)?
2    A    I would say, yes, that the Director would
3  be the designee under the Executive Order in
4  reference to 107(b).
5    Q    Okay.  Also, looking at 3 USC 107(b),
6  there is -- 3 USC 107(b)(1)(B), there's a reference
7  to procure or intermittent services of experts and
8  consultants.  What is your understanding of what
9  that authority is?
10   A    To my -- to the best of my knowledge, I
11  would understand it to mean that we would procure
12  services of consultants through our normal
13  procurement process.
14   Q    Okay.  And is that pretty much the
15  entirety of your understanding of that authority?
16   A    That is correct.
17   Q    Okay.  Does James Knodell report to you?
18   A    James Knodell is no longer employed in
19  the Office of Administration.
20   Q    Okay.  What was his tenure in the Office
21  of Administration; do you know?
22   A    Well, he was Chief Security Officer.  I

4  (Pages 10 to 13)

# Capital Reporting Company

| Page 14 |
|---|
| 1  do not know his tenure because he was in office |
| 2  when I arrived -- |
| 3    Q   Okay. |
| 4    A   -- so I do not know when he began. |
| 5    Q   But he -- you did overlap with him? |
| 6    A   I did overlap with his tenure. |
| 7    Q   And did he -- when he was at the Office |
| 8  of Administration in that position, did he report |
| 9  directly to you? |
| 10   A   Yes, he did. |
| 11   Q   Was Mr. Knodell considered to be Senior |
| 12 Official of the Intelligence Community or SOIC; do |
| 13 you know? |
| 14     MS. SHAPIRO:  Object to relevance. |
| 15     You can answer the question. |
| 16   A   I don't know whether he was considered |
| 17 that or not. |
| 18     MS. WEISMANN:  Okay.  Can we have this |
| 19 marked as Plaintiff's Exhibit 1. |
| 20     (Plaintiff's Exhibit No. 1 |
| 21       was marked for identification.) |
| 22     (Tenders document to witness.) |

| Page 15 |
|---|
| 1  BY MS. WEISMANN: |
| 2    Q   Okay.  I've just handed you a document |
| 3  that has been produced to us by the Office of |
| 4  Administration as part of the document production |
| 5  that was just made.  And I will represent to you |
| 6  that this is a document that Mr. Knodell referred |
| 7  to in his testimony before the House Oversight |
| 8  Committee on Government Reform when he was asked to |
| 9  identify what document provided, I think it was, |
| 10 instructions for conducting an examination.  I'm |
| 11 paraphrasing the question.  Have you ever seen this |
| 12 document before? |
| 13   A   I've seen this document before in |
| 14 connection with production -- requests for |
| 15 production of documents submitted by your |
| 16 organization. |
| 17   Q   And -- but had -- prior to that had you |
| 18 ever seen this document? |
| 19   A   I had not seen the document before. |
| 20   Q   Okay.  The document refers -- uses within |
| 21 it the phrase Senior Official of the Intelligence |
| 22 Community.  Does that refresh your memory in any |

| Page 16 |
|---|
| 1  way whether or not Mr. Knodell would have been |
| 2  considered a senior official of the Intelligence |
| 3  Community? |
| 4      MS. SHAPIRO:  Can you point him to where |
| 5  that appears? |
| 6      MS. WEISMANN:  The first reference is on |
| 7  page one under purpose.  It is about a third of the |
| 8  way down.  It says, this directive emphasizes the |
| 9  responsibilities of Senior Officials of the |
| 10 Intelligence Community (SOICs). |
| 11 BY MS. WEISMANN: |
| 12   Q   Do you see the reference? |
| 13   A   Yes, I do. |
| 14   Q   Okay.  Do you have any understanding of |
| 15 whether Mr. Knodell was such an SOIC? |
| 16   A   I don't have any direct knowledge.  I |
| 17 have my own opinion. |
| 18   Q   And that would be? |
| 19   A   My opinion is, is that he would not be |
| 20 considered a senior, an SOIC. |
| 21   Q   Okay.  Well, was there anyone within the |
| 22 Office of Administration who carried out any of the |

| Page 17 |
|---|
| 1  functions delineated -- or had responsibility for |
| 2  any of the matters delineated in this document, |
| 3  Plaintiff's Exhibit 1? |
| 4    A   Well, I would need to read through the |
| 5  entire document again in terms of functions. |
| 6  Certainly, the Office of Security and Emergency |
| 7  Preparedness would have functions with regard to |
| 8  security. |
| 9      MS. SHAPIRO:  Do you want him to read |
| 10 this document? |
| 11     MS. WEISMANN:  Well, if I have a pending |
| 12 question and he needs to, absolutely, if he wants |
| 13 to read it. |
| 14     MS. SHAPIRO:  Well, I wasn't sure if that |
| 15 was responsive to your question or if there was a |
| 16 question pending. |
| 17     MS. WEISMANN:  No. |
| 18 BY MS. WEISMANN: |
| 19   Q   If Mr. Knodell identified this document |
| 20 as reflect -- as containing the policy about the |
| 21 initiation of an administrative investigation by |
| 22 the Office of Administration, would he have been |

5  (Pages 14 to 17)

## Capital Reporting Company

| Page 18 |
|---|

1  correct?
2        MS. SHAPIRO: Objection to form.
3        You can answer.
4    A   Well I don't know Mr. Knodel's testimony.
5  I haven't read Mr. Knodel's testimony. So I don't
6  know exactly what he said or the context in which
7  he said it.
8    Q   Well, I would note that in the document
9  request here of production number one, we describe
10  the document as -- and I quote -- it was a
11  document -- in response to a request that he --
12  referring to Mr. Knodell -- identify where the
13  policy concerning the initiation of an
14  administrative investigation by his office was
15  written. And there was no objection to that
16  description by the Office of Administration.
17        So I am not asking you to be familiar
18  with his testimony. I'm asking if that statement
19  is correct, that this, in fact, is a document that
20  contains the policy about the initiation of an
21  administration investigation of a security breach
22  by the Office of Administration?

| Page 19 |
|---|

1    A   Well, I do --
2        MS. SHAPIRO: Objection to form.
3        Go ahead and answer.
4        THE WITNESS: -- I do know that we've
5  used this document as what I would call best
6  practices and that is that we have -- I've been
7  advised that we've used the aspects that would be
8  relevant to the office in terms of processing.
9  BY MS. WEISMANN:
10    Q   Does your office consider itself bound by
11  this document?
12    A   To my knowledge I do not believe that
13  we're bound by it, but we do follow best practices.
14    Q   What is your understanding of the
15  authority of the office then to conduct
16  administrative investigations of security breaches?
17    A   Well, my understanding is -- and I
18  believe Mr. Knodell may have testified as to
19  this -- is that security breaches may be brought to
20  our attention in which case we will then -- that
21  office will conduct -- follow up in terms of
22  investigation. It is not the sole component,

| Page 20 |
|---|

1  however, that has security functions.
2    Q   Yes. My question asked what the
3  authority for conducting those investigations is?
4    A   I can't -- I can't speak directly as to
5  what the written authority is.
6    Q   What is your understanding of the
7  responsibility of the Office of Security to conduct
8  investigations?
9    A   My understanding is, is that the office
10  initiates investigations upon matters that are
11  brought to its attention.
12    Q   And would you be more specific by what
13  you mean by matters?
14    A   Incidents that may have occurred that
15  require investigation in terms of any potential
16  breach of security.
17    Q   And what is the jurisdiction of the
18  office to conduct investigations?
19    A   Well, that jurisdiction, I -- my
20  understanding is, is in conjunction with other
21  components that may have security officers.
22    Q   When you say "other components", are you

| Page 21 |
|---|

1  talking about other components of EOP?
2    A   Yes. It would be other components of the
3  Executive Office of the President.
4    Q   And is it -- does the Office of
5  Administration Security Office have the authority
6  to conduct a security investigation anywhere within
7  the EOP?
8    A   Well, my understanding is, is that, for
9  example, the National Security Council has its own
10  security office or officers and so our office may
11  work in conjunction with them.
12    Q   And is that the only limitation that you
13  understand on the -- I use the word jurisdiction.
14  I don't mean to be overly formalistic, but I'm
15  trying to understand the -- the scope of what --
16  geographic scope, if you will, of what the office
17  can investigate.
18    A   Well, in terms of investigation,
19  certainly there is -- there can be potential
20  breach, which would involve the Secret Service. We
21  don't have any jurisdiction over the Secret
22  Service. So I'm not able to testify as to the

6  (Pages 18 to 21)

## Capital Reporting Company

Page 22

1 nature of their operations.
2    Q   So is it your testimony that if there
3 were a breach of security that involved the Secret
4 Service, this is something that the Office of
5 Administration could investigate?
6    A   No. Quite to the contrary. I believe
7 that the Secret Service handles its own
8 investigations.
9    Q   If there were a breach of security that
10 happened outside of the physical perimeters of the
11 Executive Office of the President, is it something
12 that your office could investigate?
13    A   It could investigate if it involved an
14 EOP employee.
15    Q   And if it involved employees from other
16 agencies or private individuals in addition, would
17 there be any limitations on what that office could
18 investigate?
19    A   Well, my understanding is, is that we
20 don't have any jurisdiction in terms of security
21 investigations as to non -- with regard to third
22 parties, Non-Executive Office of the President

Page 23

1 entities.
2    Q   If there were a security breach that
3 happened at another security agency but that
4 involved EO -- EOP employees, is that something
5 this office would have at least some jurisdiction
6 over?
7    A   That's a possibility, that it would. It
8 may very well work in conjunction with the other
9 agency.
10    Q   Okay. And if this office conducts a
11 security investigation and finds evidence of some
12 kind of comprise to security, is there any
13 obligation to report it to any entity outside of
14 EOP?
15    A   I -- my understanding is, is that it may
16 be an obligation, if it involves a criminal matter,
17 to report it to the appropriate authorities.
18    Q   Okay. Referring you back to this
19 document that Plaintiff -- that's been identified
20 as Plaintiff's Exhibit 1, on page two of the
21 document, Subsection B, the last sentence, if you'd
22 look at that -- and I'll just read it for you --

Page 24

1 upon completion of an investigation and in
2 accordance with the guidelines of this DCID, SOICs
3 shall assess the significance of any significant
4 security violation or compromise to assist the DCI
5 in strengthening and refinding -- refining
6 Intelligence Community safeguards.
7    I know you've describes this as best
8 practices, your language, rather than binding
9 guidance on OA. But does OA, the Office of
10 Security or any office within -- entity within OA
11 consider that it has any obligation to assist the
12 DCI if it finds a security problem or to at least
13 report to the DCI? And I know that that's a
14 compound question. So why don't you ask -- answer
15 the assist question and then I'll --
16    MS. SHAPIRO: I'll object to form.
17    Go ahead and answer.
18    A   It's possible that it may have to assist
19 the DCI depending upon the circumstances.
20    Q   And do you understand the Office of
21 Administration to have any obligation to advise the
22 DCI of any finding that there has been a security

Page 25

1 breach?
2    A   I'm not aware of an obligation to report
3 to the DCI.
4    Q   Okay. Are you aware of any instances in
5 which the Office of Security or the Office of
6 Administration has reported to the DCI any findings
7 or potential findings of security breaches?
8    A   None that has been brought to my
9 attention.
10    Q   And is it something that, if that were
11 found, you would know about it in advance of
12 advising the DCI?
13    MS. SHAPIRO: Objection to form.
14    You can answer.
15    A   Most likely I would be advised that if
16 there had been a breach that required reporting to
17 a third party.
18    Q   Does the Office of Administration have a
19 role in deciding which -- or whether EOP employees
20 should be granted access to classified information?
21    A   It has a role in -- well, let me stop
22 there. Could you repeat the question again for me?

7 (Pages 22 to 25)

## Capital Reporting Company

Page 26

1    Q    Does the Office of Administration have a
2    role in deciding which employee should have access
3    to classified information?
4        A    It has a role in deciding whether an
5    employee has access.
6        Q    And what is that role?
7        A    Well, it takes several levels. First of
8    all, in terms of just access to the premises, we do
9    a name check. That name check is actually
10   delegated -- or farmed out to the FBI, and that the
11   FBI then advises us as to clearance of the
12   individual, and then that clearance is then
13   forwarded to our office, that is the Office of
14   Security, to the Secret Service, which then reviews
15   whether that individual gains access to the
16   premises.
17       Q    Okay. My question went not to access to
18   the premises but access to classified information,
19   in other words, whether a particular employee who
20   has a security clearance is cleared to see
21   classified information?
22       A    Well, it certainly will involve the --

Page 27

1    the FBI. And then ultimately the request does go
2    through our Security Office and -- at least as to
3    the Office of Administration. I will then review
4    it and -- review the recommendation as to whether
5    they receive -- should receive clearance or not.
6        Q    And who makes the final decision on
7    clearance?
8        A    As to the Office of Administration, I
9    will review it and, depending on the circumstances,
10   will either grant it or make a recommendation that
11   they be given it.
12       Q    And what about EOP employees outside of
13   the office of Administration; who makes that
14   decision?
15       A    I really don't know specifically as to
16   each component of the Executive Office of the
17   President who makes that decision.
18       Q    But it's not you or your office?
19       A    It is not my office nor me that makes a
20   decision as to who gains access to classified
21   information and other components.
22       Q    Do you have a role, though, in the

Page 28

1    process of granting access to non-OA EOP employees?
2        A    When you say "access" --
3        Q    To classified information.
4        A    To my knowledge, I do not.
5        Q    Okay. Mr. Swendiman, are you familiar
6    with a Memorandum of Understanding that OA entered
7    into with the Department of Health and Human
8    Services for the processing of grantee requests for
9    funds for the ONDCP?
10       A    I'm aware of the memorandum.
11       MS. WEISMANN:  Can we have this marked as
12   Plaintiff's Exhibit 2, and then give it to the
13   witness, please. Thank you.
14           (Plaintiff's Exhibit No. 2
15            was marked for identification.)
16   BY MS. WEISMANN:
17       Q    The document I'm showing you is also part
18   of the document production that OA made in this
19   case. And if you'll look to the second page it's
20   the one that's labeled Memorandum of Understanding.
21           Can you explain for me generally what
22   this Memorandum of Understanding does?

Page 29

1        A    My understanding is, is that the
2    Memorandum basically, for lack of a better term,
3    outsources the functions of managing the grants
4    made by ONDCP.
5        Q    And when you say managing the accounts,
6    is this a financial transaction?
7        A    It's a financial transaction and a grant
8    review matter, as I understand it.
9        Q    And does HHs actually do reviews of
10   grant proposals?
11       A    My understanding is that ONDCP would do
12   the review of the grant proposals but that
13   basically the -- what I would call the
14   administrative function is handled by HHS.
15       Q    And this MOU, Memorandum of
16   Understanding, is actually entered into between
17   your office and HHS; is it not?
18       A    That is correct.
19       Q    And would you explain why that is the
20   case?
21       A    My understanding is, is that because we
22   do -- we provide the financial management services

8  (Pages 26 to 29)

## Capital Reporting Company

<table>
<tr><td colspan="2">

Page 30

1  to ONDCP as we do to other components of the
2  Executive Office of the President.
3      Q   Would you explain what you mean by
4  financial services?
5      A   Well we, for lack of a better term,
6  manage -- we reconcile the accounts.
7      Q   And by this MOU, this is a function that
8  rather -- that if it were not handled by HHS, would
9  it be the responsibility of the Office of
10 Administration?
11     A   That -- I think that's a fairly accurate
12 characterization.  If we had a large staff, we
13 would be able to handle it in-house, but we have a
14 limited staff.
15     Q   And do you have any understanding of what
16 the authority is for OA to outsource these kinds of
17 services?
18     A   I can't site the specific authority.
19 This is not unusual.  I think one of the other
20 documents that you may have is -- the Bureau of
21 Public Debt handles our payroll and handles certain
22 financial management systems and government

</td><td colspan="2">

Page 32

1      A   -- it does involve fiscal matters and use
2  of dollars, but I can't give you a recitation on
3  the Economy Act.
4      Q   I don't have extra copies.  I'm just
5  going to show this to you.  31 USE 1536 is one of
6  the sections, is it not, that's referenced on that
7  document as the authority?
8      A   Let's see.  Sections 1535 and 1536.
9      Q   I will hand them both to you.
10         (Tenders documents to witness.)
11         If you'll look at 1536 first, can you
12 read for me what I have highlighted?
13     A   It says, Crediting Payments -- the title
14 of it is called Crediting Payments From Purchases
15 Between Executive Agencies.
16     Q   Okay.  Does OA currently consider itself
17 to be within the scope of that statutory provision?
18     A   I believe that calls for a legal
19 conclusion, and I'm not in a position to make that
20 legal determination.
21     Q   Do you know whether OA is continuing to
22 exercise authority under the Economy Act to enter

</td></tr>
<tr><td colspan="2">

Page 31

1  entities do do that.  When I was at General
2  Services Administration I believe that our payroll
3  was handled by one of the DOD units.  It's not
4  unusual for government entities to contract with
5  other government entities to handle certain
6  administrative functions.
7      Q   And who pays for this service with HSS?
8      A   Well, we would -- I mean, it would come
9  out of ONDCP's budget.  They would be paying HHS
10 for the service that HHS renders.
11     Q   Okay.  Would you turn back to the first
12 page of this document.  If you look at it, it's
13 number five, Authority Citation.  Do you see that?
14 It's on the left-hand.  It's above the Period of
15 Performance column.  There's a reference to the
16 Economy Act.  Do you see that reference?
17     A   I do.
18     Q   And what is -- can you tell me what your
19 understanding of the Economy Act is?
20     A   I can't give you, at this juncture, a
21 complete answer with regards to the Economy Act --
22     Q   Okay.  Why don't -- I'm sorry.

</td><td colspan="2">

Page 33

1  into agreements?
2      A   Well, we enter into Interagency
3  Agreements and I -- and that's what the term is
4  called, an Interagency Agreement, an IA.
5      Q   Right.  And is it your testimony that OA
6  is continuing to enter in such agreements?
7      A   Well, we have an IA Agreement with the
8  Bureau of Public Debt in terms of financial
9  management systems of which I'm aware.
10     Q   And has OA -- at what point did OA stop
11 considering itself to be an agency subject to the
12 Freedom of Information Act?
13         MS. SHAPIRO:  Objection to form and
14 foundation.
15     A   I think that the conclusion that was
16 reached with regards to whether or not OA was an
17 agency for the purposes of FOIA occurred prior to
18 my tenure as OA Director.
19     Q   And would you refresh my memory again
20 when your tenure began.
21     A   I started November -- approximately
22 Novemeber 27th, 2006.

</td></tr>
</table>

9  (Pages 30 to 33)

## Capital Reporting Company

Page 34

1    MS. WEISMANN: Can we take a short break?
2    THE VIDEOGRAPHER: 10:38 a.m.; off
3 record.
4    (Recess taken.)
5    THE VIDEOGRAPHER: Our time now is 10:44
6 a.m.; on record.
7    MS. WEISMANN: Can we have that last
8 answer read back.
9    (The last answer was read back by the
10 court reporter.)
11    MS. SHAPIRO: Can we have this marked --
12 is this 3?
13    (Plaintiff's Exhibit No. 3
14     was marked for identification.)
15    MS. SHAPIRO: Mr. Swendiman, I'm handing
16 you a document that's already in this case that's
17 been admitted as an exhibit, Exhibit 3, to CREW's
18 Memorandum in Opposition to the Motion for Judgment
19 on the Pleadings.
20    (Tenders document to witness.)
21 BY MS. WEISMANN:
22    Q    This is a printout of the Whitehouse.gov

Page 35

1 Website. And if you'll look at the bottom
2 right-hand corner, the date is 8/31/2007. And I
3 draw your attention to the paragraph that states
4 the EOP entities subject to the FOIA are: Do you
5 see that?
6    A    Yes. On the first page?
7    Q    Yes.
8    A    I do.
9    Q    And the second entity listed is the
10 Office of Administration; is it not?
11    A    It is so listed.
12    Q    And if then this document was printed out
13 on August 31st, 2007, that would be after you began
14 as Director of the Office of Administration?
15    MS. SHAPIRO: Objection to form.
16    A    That would be correct.
17    Q    Okay. Have you seen this document either
18 as a paper document or the actual Website?
19    A    I've seen it as a paper document once
20 before.
21    Q    Okay. And going back to my prior
22 question to you about when the Office of

Page 36

1 Administration decided it was no longer subject to
2 the FOIA, it was your testimony that that happened
3 prior to your commencing work as Director; is that
4 correct?
5    A    My understanding is, is that I was
6 advised when I came that the OA was not an agency
7 subject to FOIA.
8    Q    And were you advised that prior to CREW
9 filing its lawsuit in this case?
10    A    If you can refresh my recollection as to
11 when the lawsuit was filed.
12    Q    I believe it was filed in May of 2007.
13    A    I was advised prior to that time.
14    Q    Okay. And were you advised in writing or
15 orally?
16    MS. SHAPIRO: Objection to form and to
17 relevance.
18    A    Orally.
19    Q    And who advised you?
20    MS. SHAPIRO: Objection to relevance.
21 BY MS. WEISMANN:
22    Q    Who advised you?

Page 37

1    A    I was advised by the OA General Counsel's
2 Office.
3    Q    Were you aware that notwithstanding that
4 advice the Website for the White House continued to
5 list OA as subject to the FOIA?
6    MS. SHAPIRO: I'm going to object. I'm
7 going to allow him to answer that question, but I'm
8 going to note the Court's Order of February 11th --
9 I'm sorry, February 22nd, which instructs that OA's
10 prior functioning under the FOIA is not disputed
11 and therefore not an issue in discovery.
12    You can answer the question yes or no.
13    THE WITNESS: Could you repeat the
14 question?
15    MS. WEISMANN: Could you read it back?
16    (The last question was read back by the
17 court reporter.)
18    THE WITNESS: I'm aware that this -- that
19 what you've shown me remained on the Website.
20 BY MS. WEISMANN:
21    Q    Is it your testimony that as of the date
22 of this document, August 31st, 2007, the Office of

10  (Pages 34 to 37)

## Capital Reporting Company

Page 38

1  Administration was not functioning a FOIAable
2  entity?
3      MS. SHAPIRO: I'm going to instruct the
4  witness not to answer that question based on the
5  February 22nd Order, which instructs that the OA's
6  prior functioning under the FOIA is not a disputed
7  issue in this case and is therefore not subject to
8  discovery.
9      MS. WEISMANN: The whole point of this
10 line of questioning is to pin down exactly when
11 that prior practice stopped. I'm certainly
12 entitled to find that out because, in order to
13 comply with the Court's order, I have to have a
14 time in mind. And all of these questions are
15 designed to define that period of time. So are you
16 still going to instruct him not to answer?
17     MS. SHAPIRO: He testified already as to
18 that date.
19     MS. WEISMANN: I do not believe that is
20 the case.
21     MS. SHAPIRO: His testimony --
22     MS. WEISMANN: Are you going to instruct

Page 39

1  him not to answer?
2      MS. SHAPIRO: I am instructing him not to
3  answer.
4      MS. WEISMANN: Okay. Then let's take a
5  five-minute break.
6      THE VIDEOGRAPHER: 10:49 a.m; off record.
7      (Recess taken.)
8      THE VIDEOGRAPHER: Our time now is 11:04
9  a.m; on record.
10     MS. SHAPIRO: When we were off the
11 record, Ms. Weismann and I had a conversation about
12 my prior objection. Ms. Weismann explained to me
13 that she wants to establish a cut-off date for OA's
14 functioning as a FOIA entity and that her
15 questions were intended to be designed strictly to
16 that purpose for establishing a date parameter.
17 If, in fact, that is the sole purpose of those
18 questions, I'll allow them to go forward for that
19 purpose. And if I've mischaracterized anything,
20 Ms. Weismann can correct me. So if you want to go
21 back and ask the question that I previously
22 objected to, you can ask that question again.

Page 40

1      MS. WEISMANN: Can you read back my
2  question?
3      (The last question was read back by the
4  court reporter.)
5      MS. SHAPIRO: I will interpose an
6  objection to the form and the ambiguity with
7  respect to the word functioning.
8      Go ahead and answer.
9      THE WITNESS: As of the date that is
10 shown on this document, August 31st, 2007, OA did
11 not consider itself an agency subject to FOIA.
12 BY MS. WEISMANN:
13     Q  My question was specifically to whether
14 it was functioning as an agency subject to the
15 FOIA?
16     A  My understanding is, is that it was not
17 functioning as an agency subject to FOIA.
18     Q  Okay. Do you know on what dated, if
19 there is a date certain, it stopped functioning as
20 an agency subject to the FOIA?
21     MS. SHAPIRO: Objection to form.
22     A  I can't state a specific date, I

Page 41

1  believe, as I previously said, I was advised that
2  OA did not consider itself an agency subject to
3  FOIA prior to my coming and I was advised of that.
4      Q  And you have since that time not gotten
5  any greater understanding of when it ceased
6  functioning as a FOIA -- FOIAable entity?
7      A  I'm not sure I understand your question
8  as to greater understanding.
9      Q  Beyond what you were initially advised
10 when you started at OA.
11     A  Well, my understanding is, is that it
12 hasn't changed since I've been Director of OA.
13     Q  Okay. Let me rephrase the question.
14 You've testified that when you started you were
15 told that it was not an agency subject to the FOIA,
16 correct?
17     A  That is correct.
18     Q  I want to know, since being told that,
19 have you learned any other information that
20 would -- as to when the Office of Administration
21 stopped functioning as a FOIAable entity?
22     MS. SHAPIRO: Objection to form.

11  (Pages 38 to 41)

# Capital Reporting Company

| Page 42 | Page 44 |
|---|---|

**Page 42**

1    You may answer.

2    A    Well, there was a deliberative process,

3    as I understand, that began prior to my tenure as

4    the Director of the Office of Administration, and

5    that a conclusion or decision was reached that

6    reaffirmed that OA was not an agency subject to

7    FOIA.

8    Q    And do you -- can you pin down more

9    precisely when that process took place?

10   A    Well, the process began prior to my

11   arrival as I understand it and as I was informed.

12   Q    Right.    But do you have an understanding

13   about when that process took place?

14   A    I do not.

15   Q    How was it that you know there was a

16   deliberative process?

17   A    I was advised by the OA General Counsel's

18   Office.

19   Q    Do you have an understanding of what

20   differences no longer being subject to the FOIA has

21   made to the Office of Administration?

22       MS. SHAPIRO:    Objection to the form.

**Page 43**

1    A    I'm not sure I understand your question.

2    Q    Okay.    It's your understanding that at

3    some point -- is this correct; is it your

4    understanding that at some point in time the Office

5    of Administration no longer functioned as an agency

6    subject to the FOIA?

7    A    That's my understanding.

8    Q    When that happened, how did the Office of

9    Administration's functions change?

10   A    Well, as I understand it, the office had

11   a person responsible for FOIA requests and that

12   person is no longer serving in that capacity.

13   Q    Do you know when that change happened?

14   A    I don't recall exactly when.

15   Q    Did it happen after you started as

16   Director?

17   A    It occurred after I started as Director.

18   Q    Okay.    So are you saying then that, at

19   the point in time when you came on as Director,

20   there was still a staff person processing FOIA

21   requests?

22   A    There was a person receiving FOIA

**Page 44**

1    requests as I understand it.

2    Q    Okay.    And do you know approximately what

3    year it was that that person stopped functioning in

4    that capacity?

5    A    It would have been 2007.

6    Q    And do you know approximately which half

7    of 2007.

8    A    I don't know exactly when she stopped

9    functioning in that capacity.

10   Q    Do you know -- CREW filed it's lawsuit I

11   believe it's May of 2007.    I can confirm if that's

12   wrong.    Do you know if it happened after CREW filed

13   its lawsuit in May of 2007?

14   A    I don't want to speculate.    I don't --

15   Q    Okay.

16   A    -- I can't place the date.

17   Q    In addition to the change in that

18   person's position, are there any other changes that

19   happened when OA no longer functioned as an agency

20   subject to the FOIA?

21       MS. SHAPIRO:    Objection to form.

22   A    Well, I believe that the responses,

**Page 45**

1    written responses to the FOIA requests, changed.

2    Q    Okay.    And how has that changed?    What is

3    that change, if you know?

4    A    I can't be specific as to the exact

5    nature of the response.

6    Q    Okay.    But it's your understanding that

7    there has been a change in the nature of the

8    response?

9    A    My understanding is that there's been a

10   change in the nature of the response.

11   Q    Are there any other changes that you're

12   aware of?

13   A    There's none that come to my

14   recollection.

15   Q    Outside of the context of the FOIA, the

16   Freedom of Information Act, have there been any

17   other changes in how OA has functioned since it no

18   longer considers itself to be an agency?

19       MS. SHAPIRO:    Objection to form.

20   A    None that I can specifically point to

21   because the -- OA always deemed itself not an

22   agency.

12    (Pages 42 to 45)

## Capital Reporting Company

Page 46

1    Q   Okay. Well, that's your understanding?
2    A   That's my understanding. That's what I
3    was advised when I first came to the position.
4        THE VIDEOGRAPHER: Off record; ending
5    tape one and are continuing deposition of Mr.
6    Swendiman.
7        (Recess taken.)
8        THE VIDEOGRAPHER: Time now is 11:14 a.m.
9    on record beginning tape number two and continuing
10   deposition of Mr. Swendiman.
11   BY MS. WEISMANN:
12   Q   Are you familiar with the Presidential
13   Records Act?
14   A   I generally am familiar with it.
15   Q   And do you also have a general
16   familiarity with the Federal Records Acts?
17   A   A general familiarity.
18   Q   Just focussing for a moment on the
19   Federal Records Act, did the functioning of the
20   Office of Administration change when it decided it
21   was no longer subject to the Freedom of Information
22   Act?

Page 47

1        MS. SHAPIRO: Objection to form. In
2    connection with the FRA?
3    A   I can't be specific as to whether there
4    was a change in connection with the impact on the
5    Federal Records Act.
6    Q   Do you know if there was a change on the
7    recordkeeping practices of the Office of
8    Administration with respect to its own records
9    only?
10   A   To my knowledge there was no change in
11   the recordkeeping practices of the organization.
12   Q   And what are its current recordkeeping
13   practices?
14   A   It's current recordkeeping practices is
15   to retain all hard copy documents and electronic
16   documents.
17   Q   And do you have an understanding as to
18   the statutory authority or requirements it views
19   itself under for purposes of document retention?
20   A   Well, my understanding is, is that from a
21   standpoint of Presidential Records Act, the Office
22   of Administration is to transfer all records that

Page 48

1    it has in its possession to the National Archives
2    at the end of the term of its administration.
3    Q   Does the Office of Administration create
4    any records currently that are subject to the
5    Federal Records Act?
6    A   My understanding is that that may be
7    still an issue to be resolved with the National
8    Archives.
9    Q   And what is your understanding of what
10   that specific issue is?
11   A   Well, there are -- there are records, for
12   example, that transcend administration's such as
13   contracts, invoices and the like, which there is an
14   ongoing discussion on how those records will be
15   handled.
16   Q   With the exception of those records, the
17   status of which it sounds like is, as of yet,
18   unresolved, correct?
19   A   My understanding is, it has not been
20   completely resolved yet as to how a new
21   administration would come in and what would be
22   available to it in terms of ongoing operations.

Page 49

1    Q   Okay. So putting aside those records
2    that fall into this category of what I will just
3    call unresolved, to your knowledge has there been a
4    change within the Office of Administration on which
5    statutes, recordkeeping obligations, it complies
6    with?
7    A   Well, the staff has been advised that we
8    comply with the Presidential Records Act.
9    Q   Right. And my question is whether or not
10   that represents a change for the Office of
11   Administration?
12   A   It is a different approach from what, as
13   I understand, the office previously followed.
14   Q   When you say "the office previously
15   followed," could you be more specific?
16   A   I believe in terms of the difference
17   between the Presidential Records Act and the
18   Federal Records Act.
19   Q   But when you say "previously" could you
20   be more specific in time?
21   A   My understanding is, is that previously
22   OA was operating under the Federal Records Act.

13  (Pages 46 to 49)

## Capital Reporting Company

Page 50

1    Q    And do you know when it ceased operating
2    under the Federal Records Act?
3        A    Well, the position is, is that this
4    represents a correction from how it was operating
5    in the past.  Staff was advised to ensure that they
6    preserved all records at the end of August of 2007,
7    the beginning of September of 2007.
8        Q    So is it your testimony that in the
9    August, September 2007 period is when staff was
10   first advised that it's subject to the Presidential
11   Records Act?
12       A    Well, I can't speak to what occurred
13   prior to my tenure.  What I can say is, is that the
14   staff was advised during my tenure of the need to
15   preserve all records, both hard copy and
16   electronic, in August and in September of 2007.
17       Q    And what is your understanding of the
18   statutory obligation that imposed that requirement?
19       A    Well, my understanding is the statutory
20   obligation is the transfer of records to the
21   National Archives at the end of this
22   administration.

Page 51

1        Q    Right.  I'm sorry, I wasn't clear on my
2    question.  Which statute do you understand imposes
3    that obligation?
4        A    Well, my understanding is, is the
5    Presidential Records Act.
6        Q    Okay.  And prior to August 2007, what is
7    your understanding of the statute that your staff
8    was complying with with respect to recordkeeping
9    obligations?
10       A    Well, my understanding is, is that they
11   believed that they were operating under the Federal
12   Records Act.
13       Q    Okay.  In addition to the guidance that
14   it gave them in August -- in the August,
15   September 2007 period -- well, let me take a
16   step -- is this guidance that you gave them?
17       A    It's a collaborative effort in terms of
18   guidance.  I advised the senior staff of the
19   necessity of preserving records.  The OA General
20   Counsel's Office briefed the staff at mandatory
21   briefings with regards to the obligation to
22   preserve records.

Page 52

1        Q    And were any of these guidances put in
2    writing -- any of this guidance put in writing?
3        A    Guidance, in my recollection -- the
4    guidance that we do have in writing is guidance
5    from the White House Counsel's Office with regards
6    to Presidential records and preservation of
7    records.
8        Q    And do you know when that White House
9    Counsel's Office guidance was issued?
10       A    I think there certainly was a memorandum
11   from Harriett Meyers who, at the time, was White
12   House Counsel that issued guidance on the
13   preservation of Presidential records.
14       Q    And was this guidance from the White
15   House Counsel's Office specific to the Office of
16   Administration?
17       A    It was general guidance.
18       Q    Okay.  With the exception of the general
19   guidance you've just described, to your knowledge,
20   since August of 2007, has there been any written
21   guidance to OA employees regarding their
22   obligations under the Presidential Records Act?

Page 53

1        A    I don't recall whether there is written
2    guidance other than the guidance from the written
3    memorandum from the then White House Counsel.
4        Q    And do you know the date of that
5    memorandum approximately?
6        MS. SHAPIRO:  Objection to form.
7        A    I don't recall the exact date.
8        Q    Do you know if that memorandum was issued
9    before you came on as Director.
10       A    Yes.  The memorandum was issued prior to
11   my coming.
12       Q    Okay.  Prior to the August 2007 guidance
13   that was given with respect to compliance with the
14   Presidential Records Act, do you know if any of the
15   office of Administration's records were -- let me
16   rephrase.  Prior to August of 2007, did the Office
17   of Administration during your tenure request
18   authority from the Archives to dispose of any
19   records, if you know?
20       A    I don't know for certain.  We had a
21   Federal Records Manager.
22       Q    Does that person report to you?

14  (Pages 50 to 53)

## Capital Reporting Company

| Page 54 |
|---|
| 1      A   No.  That person actually reports to |
| 2  the -- she has a supervisor that reports to the |
| 3  CIO. |
| 4      Q   And who is that person currently, the |
| 5  Records Manager? |
| 6      A   Her name is Sue Crippen. |
| 7      Q   Sue Crippen, okay.  Are you familiar at |
| 8  all with general records schedules? |
| 9      A   Very general familiarity with them. |
| 10      Q   And what is your understanding of what a |
| 11  general records schedule is? |
| 12      A   My understanding of a general records |
| 13  schedule is that it sets forth category of records |
| 14  and then with each category indicates how long |
| 15  they're to be held, where they're to be held, when |
| 16  they can be disposed of. |
| 17      Q   Is it your understanding that if a record |
| 18  is subject to a general records schedule, you do |
| 19  not need to seek additional authority from the |
| 20  Archives to dispose of it? |
| 21      MS. SHAPIRO:  Objection to form. |
| 22      A   I believe there are records for which you |

| Page 55 |
|---|
| 1  need to seek the permission of the National |
| 2  Archives. |
| 3      Q   You do? |
| 4      A   I believe -- my understanding is, is that |
| 5  there are records for which you need to seek the |
| 6  permission. |
| 7      Q   Records subject to a general records |
| 8  schedule; that's your understanding? |
| 9      A   That's correct; that's my understanding. |
| 10      Q   Okay.  Do you know if prior to |
| 11  August 2007, during your tenure, the Office of |
| 12  Administration disposed of any records under the |
| 13  authority of the Federal Records Act? |
| 14      A   I do not know. |
| 15      Q   Are the obligations that the Office of |
| 16  Administration has to preserve different under the |
| 17  Federal Records Act than the Presidential Records |
| 18  Act? |
| 19      MS. SHAPIRO:  Objection to form. |
| 20      A   My understanding is, is that under the |
| 21  Presidential Records Act we are obligated to |
| 22  preserve all records subject to the act and to |

| Page 56 |
|---|
| 1  transfer them at the end of term of the |
| 2  administration.  Under the Federal Records Act |
| 3  there are schedules, which categorize records and |
| 4  indicate how long they are to be retained and when |
| 5  they can be disposed of. |
| 6      Q   I just want to make sure I'm clear on |
| 7  this.  Is it your understanding that, prior to |
| 8  August of 2007, the Office of Administration was |
| 9  complying with the Federal Records Act for its |
| 10  records, not the Presidential Records Act? |
| 11      MS. SHAPIRO:  Objection to form; |
| 12  mischaracterizes. |
| 13      A   My understanding is, is that the |
| 14  employees of OA were following the obligations |
| 15  under the Federal Records Act. |
| 16      Q   Okay.  And when you say "following the |
| 17  obligations", that would mean both as to |
| 18  preservation and as to disposition? |
| 19      MS. SHAPIRO:  Objection to form. |
| 20      A   Whatever the requirements are, my |
| 21  understanding is, is that the office was complying |
| 22  with them.  I do not know whether there's been any |

| Page 57 |
|---|
| 1  disposition of records. |
| 2      Q   Okay.  In addition to the Freedom of |
| 3  Information Act and the Recordkeeping Statutes, |
| 4  has there been any other changes in OA's compliance |
| 5  with federal laws since its determination that it |
| 6  is not an agency subject to the FOIA? |
| 7      MS. SHAPIRO:  Objection to form. |
| 8      A   Nothing comes to my mind immediately. |
| 9      Q   Are you familiar with the Privacy Act? |
| 10      A   Generally so. |
| 11      Q   Do you know if, prior to August of 2007, |
| 12  the Office of Administration viewed itself as |
| 13  subject to that statute? |
| 14      A   I don't know specifically whether it did. |
| 15  To my recollection, the issue never came to my |
| 16  attention. |
| 17      Q   And do you know if currently the Office |
| 18  of Administration considers itself bound by the |
| 19  Privacy Act? |
| 20      MS. SHAPIRO:  Objection.  That calls for |
| 21  a legal conclusion. |
| 22      A   I can't -- I can't render an opinion on |

# Capital Reporting Company

| Page 58 |
|---|

1 that.
2     Q   Do you know if the Office of
3 Administration currently has any regulations or
4 guidance with respect to the Privacy Act?
5     A   My understanding is, is that there are
6 existing regulations.
7     Q   And has there been any change in those
8 regulations during your tenure at the OA?
9     A   To my knowledge, there have been no
10 changes to the regulations due to pending
11 litigation.
12     Q   Does the Office of Administration, in its
13 handling of records, comply with the Privacy Act?
14 And I'm not asking comply in every case. I'm just
15 saying, does it generally treat its records as
16 subject to the Privacy Act?
17         MS. SHAPIRO:  Objection; asked and
18 answered.
19     A   I cannot specifically state. I know that
20 we comply with whatever existing obligations that
21 we have as an entity not subject to an -- not being
22 an agency.

| Page 59 |
|---|

1     Q   In addition to the Freedom of Information
2 Act, the Federal Recordkeeping Statutes and the
3 Privacy Act, does the fact that the Office of
4 Administration is not an agency for FOIA purposes
5 affect its status with respect to any other
6 statutes, if you know?
7         MS. SHAPIRO:  Objection to form.
8     A   Well, I believe that there are posted
9 what we call Touhey Regulations.
10     Q   Okay. And what is -- and would you
11 explain to me what the consequences of the Office
12 of Administration not being an agency means for
13 purposes of those regulations?
14     A   I can't speak as to the consequence of
15 it. All I can indicate is that my understanding
16 and the brief experience I've had with Touhey is
17 the obligation of a federal employee to advise his
18 or her agency in the event that they have been
19 subpoenaed to testify as a witness.
20     Q   And currently are the Office of
21 Administration employees subject to that
22 obligation?

| Page 60 |
|---|

1     A   I have not had an illustration brought to
2 my attention on that.
3     Q   Do you have an understanding of whether
4 or not Office of Administration are subject to
5 Touhey Regulations currently?
6     A   I think that's a legal conclusion and I'm
7 not in a position to render an opinion on that.
8     Q   Do Office of Administration employees act
9 as if they are subject to Touhey Regulations?
10         MS. SHAPIRO:  Objection to form;
11 foundation.
12     A   I wouldn't know.
13     Q   Okay. In your case, when you received
14 the deposition notice, did you comply with any of
15 the procedures of the Touhey Regulations?
16         MS. SHAPIRO:  Objection to form.
17     A   I did not because everyone knew that I
18 was -- had received a subpoena. So I didn't need
19 to inform anybody. Everybody knew.
20     Q   Is it your understanding that the Touhey
21 Regulations are still outstanding regulations?
22     A   I understand that they're still posted

| Page 61 |
|---|

1 and they've been posted because of pending
2 litigation.
3     Q   I'm not sure I understand what your
4 reference to pending litigation is.
5     A   Well, I think there are pending lawsuits
6 involving the Office of Administration. And my
7 understanding is, is that no action has been taken
8 with regards to those regulations until such time
9 as there's a disposition in the litigation.
10     Q   And are you talking about CREW's lawsuit
11 here?
12     A   That's certainly one case.
13     Q   And when you started as Director of
14 Office of Administration were the Touhey
15 Regulations in place?
16     A   My understanding is, is that they were
17 posted.
18     Q   They were posted. And the regulations
19 that are currently posted, are those the same as
20 the ones that were posted when you started as
21 Director of OA?
22     A   I do not know whether they're the same

16 (Pages 58 to 61)

# Capital Reporting Company

| Page 62 | Page 64 |
|---|---|
| 1 because I've not made a comparison between what's | 1 Reimbursable Services Agreements, does it enter |
| 2 posted now and what was there when I came. | 2 into them with other executive branch agencies? |
| 3   Q   But you're not aware of any changes? | 3   A   My understanding is that it has. |
| 4   A   Nobody's brought any changes to my | 4   Q   And do you have an understanding of what |
| 5 attention. | 5 the legal authority for entering into those |
| 6   Q   Okay.  For purposes of exercising the | 6 agreements is? |
| 7 contractual authority that the Office of | 7   A   Well, let me correct what I may have |
| 8 Administration has, has there been any evaluation | 8 said.  I think the question was -- you asked me |
| 9 of whether its non-agency status changes that | 9 whether we've entered into a Reimbursable Agreement |
| 10 authority in any way? | 10 with other agencies.  We have in those instances |
| 11     MS. SHAPIRO:  Objection to form. | 11 where they've rendered service to us and we have |
| 12   A   No.  I don't think it -- has any analysis | 12 paid them for that service. |
| 13 been made; no. | 13   Q   And is this another example of |
| 14   Q   So, for example, earlier I showed you | 14 outsourcing to use your word from earlier? |
| 15 provisions of the Economy act, which was the cited | 15   A   It's certainly a form of outsourcing. |
| 16 authority for one of the memorandums -- Memorandums | 16   Q   And what are the differences between |
| 17 of Understanding.  Has there been any analysis done | 17 these kinds of agreements and the agreement that we |
| 18 of whether or not that statute still applies to the | 18 looked at with respect to HHS? |
| 19 Office of administration given that it no longer | 19   A   Well, I think they're analogous. |
| 20 considers itself to be an executive branch agency? | 20 They're, in both cases, providing a service to the |
| 21   A   There -- to my knowledge, there's been no | 21 Office of Administration. |
| 22 analysis. | 22   Q   Are there any differences? |

| Page 63 | Page 65 |
|---|---|
| 1   Q   And has there been any change within the | 1   A   There may be some legal difference but I |
| 2 Office of Administration with respect to its | 2 think my understanding is, from a practical |
| 3 reliance on that statute as authority to enter into | 3 standpoint, it's basically paying for services |
| 4 Memorandums of Understanding? | 4 rendered. |
| 5     MS. SHAPIRO:  Objection to form. | 5   Q   And can you give me some examples of when |
| 6   A   None that's been brought to my attention. | 6 OA has entered into these Reimbursable Services |
| 7   Q   Okay.  Are you familiar with Reimbursable | 7 Agreements.  Let me be clear.  What kinds of |
| 8 Services Agreements? | 8 service does OA typically negotiate for into these |
| 9   A   In a general way, yes. | 9 agreements? |
| 10   Q   And what is your general understanding | 10     MS. SHAPIRO:  Objection to form. |
| 11 about the authority the Office of Administration | 11   A   Well, we had to -- one example is the |
| 12 has to enter into those agreements? | 12 White House Press Briefing Room in which we had to |
| 13   A   Well, I know that that is a practice that | 13 reimburse the General Services Administration for |
| 14 the Office of Administration follows. | 14 services it rendered in terms of improving that |
| 15   Q   Would you explain what a Reimbursable | 15 facility. |
| 16 Services Agreement is? | 16   Q   Okay.  Are you familiar with the |
| 17   A   Well, my understanding is, is that a | 17 Government Management Reform Act of 1994? |
| 18 Reimbursable Services Agreement provides that one | 18   A   I am not, no. |
| 19 entity provides services to another entity and that | 19   Q   Okay.  Are you familiar with the Treasury |
| 20 second entity reimburses the first for the expenses | 20 Department's Franchise Fund? |
| 21 incurred in providing that service. | 21   A   In a very general way. |
| 22   Q   And when OA enters into these | 22   Q   The -- I will represent to you that the |

17  (Pages 62 to 65)

## Capital Reporting Company

Page 66

1    statute appears to be the organic statute for
2    setting up the Treasury Fund. What is OA's
3    relationship to that fund?
4         MS. SHAPIRO: Objection to form.
5         A   Well, my understanding is -- and I
6    believe this relates to the Bureau of Public Debt,
7    which provides financial management systems and
8    maintenance to the Office of Administration.
9         Q   And would these be comparable to the
10   kinds of financial services that HHS was performing
11   in that other agreement?
12        A   No. I think it's slightly different.
13   With HHS I think that was what I called management
14   of grants whereas the Bureau of Public Debt is
15   providing, for example, such things as payroll
16   service, financial management systems, for the
17   Office of Administration. So I think you might say
18   it's perhaps a little more extensive in terms of
19   the services that it's providing but it's
20   outsourcing nevertheless.
21        Q   And where did the funds come from for
22   those services?

Page 67

1         A   Funds come -- you mean the funds that OA
2    uses to pay for the services?
3         Q   Yes.
4         A   They come from appropriated funds.
5         Q   To OA?
6         A   To the -- to OA and the Executive Office
7    of the President.
8         Q   So that as of the other agreement is it
9    the case that OA enters into these agreements for
10   service for other EOP components outside of OA?
11        MS. SHAPIRO: Objection to form.
12        A   Would you repeat the question again?
13        Q   I'll ask it differently. Does OA enter
14   into these agreements to provide services to non-OA
15   EOP components?
16        A   Yes, it does.
17        Q   Okay. I'm going to -- this isn't going
18   to be marked, but I want to ask you a question. If
19   you would -- there are Bates stamp numbers at the
20   bottom. I assume these were put on by the Office
21   of Administration. If you would turn to page
22   OA00025, please. Number four, Establishment of

Page 68

1    Financial Management System Infrastructure -- I'm
2    sorry, 3.1 at the top. That first sentence,
3    there's a reference to a system platform
4    established and maintained by another government
5    organization under a Cross-Serving Agreement. Do
6    you see that?
7         A   Yes.
8         Q   Do you know what that is?
9         A   I don't know what the reference to the
10   other government organization under a
11   Cross-Servicing Agreement is. I do not know.
12        Q   Are you familiar generally with the term
13   Cross-Servicing Agreement?
14        A   In a very general way.
15        Q   And what is your understanding of what a
16   Cross-Servicing Agreement is?
17        A   Well, it's my understanding is, is that
18   it's services going in both directions.
19        Q   And do you know in this particular case
20   what services EOP was providing?
21        A   I do not know. I'm not familiar with --
22   I don't know the reference to another government

Page 69

1    organization.
2         Q   Okay. Describe for me the process by
3    which one of these agreements is generated. Is it
4    done at the initiation of OA?
5         A   That's a very general question, which is
6    difficult to answer.
7         Q   Well, let me break it down into some
8    pieces then. Is one of these agreements generated
9    when an EOP component comes to you with a need for
10   a service?
11        A   It can.
12        Q   Okay. And if that's the case who
13   decides -- which component of EOP decides what the
14   requirements for the service are?
15        A   Well, it's the entity that's requesting
16   the service that determines the requirements.
17        Q   Okay. So would it be fair to say that
18   they would come to OA with a specification of the
19   requirements they need?
20        A   Yes, because they would know more what
21   they need than we would.
22        Q   Okay. And then what would OA do next

18  (Pages 66 to 69)

EXHIBIT 2 - Part 2

# Capital Reporting Company

## Page 70

1  with that information?
2      A   Well, it would -- basically it's
3  reference to the procurement people who would
4  prepare a request for proposal.
5      Q   And what would happen to that request?
6      A   Well, the request has to be reviewed by
7  the entity or organization requiring the services
8  to make sure that it meets their needs, meets their
9  requirements.
10      Q   And then how do you go about finding a
11  source for those requirements?
12      A   Well, I mean, there are several ways of
13  doing it. I'm not an expert in procurement but
14  certainly there are -- you know a request for
15  proposal is issued and published. You can also
16  seek to utilize GSA schedules. You can use other
17  vehicles. It may be also that the procurement --
18  because the limited number of folks that are in
19  that group -- they may have to use a procurement
20  organization such as GovWorks, which is under the
21  Department of Interior, or NASA SEWP, which is
22  under NASA or a component under DOD.

## Page 71

1      Q   In the package of materials I handed you,
2  this was with the Treasury Franchise Fund. That is
3  a specific provider of services, correct?
4      A   I mean, that's my understanding.
5      Q   Right, as opposed to one of these
6  entities you were just describing?
7      A   What I call a procurement --
8      Q   Procurement --
9      A   -- organization.
10      Q   That's not a procurement entity?
11      A   No, it's not. It's a delivery of
12  service.
13      Q   All right. And if you look at OA00024,
14  it's a Memorandum of Understanding between the
15  Office of Administration and the Treasury Franchise
16  Fund; is that correct?
17      A   That is correct.
18      Q   Do you know who decides the terms of
19  agreements of a Memorandum of Understanding? I
20  don't mean the individuals but which entities to
21  this agreement?
22      A   I can't speak to this specific agreement

## Page 72

1  because this was executed prior to my tenure.
2      Q   Okay. In -- have you been -- during your
3  tenure, have there been Memorandum of Understanding
4  that OA has entered into with either the Treasury
5  Franchise Fund or other entities like the Treasury
6  Franchise Fund?
7      A   I think that there was -- my
8  understanding -- my recollection is, is that there
9  was a renewal of this agreement during my tenure.
10      Q   Okay. And was there a negotiation
11  process over the terms of the Memorandum of
12  Understanding?
13      A   Well, I didn't read the memorandum. My
14  understanding is, is that the terms continued from
15  the last either agreement or modification that the
16  only -- that the primary difference, as I
17  understand it, was the cost.
18      Q   Okay. Have there been any other
19  Memorandum of Understanding since you started at OA
20  that weren't just a continuation that were newly
21  entered not necessarily with the Treasury Franchise
22  Fund?

## Page 73

1      A   My recollection is that those that have
2  come to my attention have been primarily renewals.
3      Q   Do you have an understanding of the
4  process by which a Memorandum of Understanding is
5  reached, the terms of a Memorandum of
6  Understanding?
7      A   Well, it's based on negotiation between
8  parties.
9      Q   And who are the parties to that
10  negotiation?
11      A   Well, if it's --
12      MS. SHAPIRO:  Objection to form.
13      THE WITNESS:  -- if it's involving the
14  Office of Administration, it would be the Office of
15  Administration in conjunction with White House
16  Management and Administration and the other
17  providing organization.
18  BY MS. WEISMANN:
19      Q   Do you have in the packet I gave you
20  Bates number 00079?
21      A   Not in the last document you gave me.
22      Q   All right. Well, we're not going to mark

19  (Pages 70 to 73)

## Capital Reporting Company

Page 74

1 this, but I'm going to show you -- again, this
2 comes from the document production that the Office
3 of Administration just made this week. I'd like
4 you to look at Bates number 00079. You'll see some
5 highlighted language. If you could -- I apologize,
6 I don't have copies. It's 79. Do you see the
7 reference to Customer Government Agency?
8    A   Uh-huh. Yes, I do.
9    Q   Okay. Do -- If you need to look at the
10 additional pages -- do you have any understanding
11 of what the Customer Government Agency is?
12    MS. SHAPIRO: Objection to form;
13 ambiguous.
14    A   Well, the front page says Customer Agency
15 Executive Office of the President.
16    Q   Okay, thank you.
17    A   Now, these are standard government forms,
18 which generally use the word agency.
19    Q   With respect to the processes of entering
20 into these Memoranda of Understanding, has the --
21 have the responsibilities of the Office of
22 Administration changed since it deemed itself a

Page 75

1 non-agency to your knowledge?
2    A   Well, my understanding is, is that it's
3 not considered itself an agency prior to my coming.
4 It's not considered itself an agency while I've
5 been there. I don't know what you mean with
6 regards to has the process changed.
7    Q   I'm not entering -- marking this yet. On
8 this one, if you could look at Bates number 235.
9 If you'll look at page 17, number 11.5.2.10. Do
10 you see that? It's about three-quarters of the way
11 down.
12    A   Uh-huh. Yes, I do.
13    Q   Well, the 11.5.2 says, upon authorization
14 from the EOP Procurement Office the ARC shall meet
15 all federal regulations and guidelines with regard
16 to intergovernmental reporting. Does -- when EOP
17 enters these agreements, does EOP itself have any
18 kind of reporting requirements; do you know?
19    MS. SHAPIRO: Objection to form.
20    A   If I can get a clarification.
21 Intergovernmental reporting to whom?
22    Q   I don't know. I'm looking at the

Page 76

1 language of the document and trying to figure it
2 out myself. I was hoping you could shed some light
3 on that.
4    A   Well, I cannot state specifically what
5 the regulations are as to intergovernmental
6 reporting or whether they're applicable.
7 Certainly, the Treasury Fund and ARC would report
8 to us or, I should say, to OA with regards to the
9 services that it's providing --
10    Q   Okay.
11    A   -- simply because the EOP Procurement
12 Office basically would manage this contract.
13    Q   Okay, thank you.
14    A   (Tenders document to counsel.)
15    Q   Are you familiar with the process by
16 which the Office of Administration secures
17 detailees, individuals doing details within the
18 Office of Administration?
19    A   I'm generally familiar.
20    Q   And what is your understanding of the
21 source of OA's authority to procure detailees?
22    A   I can't cite a specific authority for

Page 77

1 procuring detailees. The practice of seeking
2 detailees occurred prior to my tenure as OA
3 Director.
4    MS. WEISMANN: Just bear with me. Too
5 many documents.
6 BY MS. WEISMANN:
7    Q   I'm handing you another packet of
8 material, and I'd like you to turn to Bates number
9 319.
10    (Tenders documents to witness.)
11    I think it's the last page of this. Do
12 you see that document?
13    A   I do.
14    Q   Would you explain what this document is?
15    A   What it is, is a form letter that was
16 sent to various governmental entities requesting
17 a -- their consideration of a non-reimbursable
18 detail to the Office of Administration.
19    Q   And this letter was sent out under your
20 signature; is that correct?
21    MS. SHAPIRO: Objection to form.
22    A   Correct, with the approval of the White

20  (Pages 74 to 77)

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  House Management Administration.
2      Q    Were you involved in negotiating with
3  parent organizations for the specific detailees --
4  for specific details?
5      A    I have been in the past.
6      Q    And what has that negotiation involved?
7      A    Basically, it's not a negotiation. I
8  wouldn't characterize it as that. It's a request
9  that was made as to whether they would consider
10  detailing someone to us from their organization on
11  a non-reimbursable basis up to a period of six
12  months.
13      Q    And by "non-reimbursable basis", does
14  that mean that the salary for that detailee would
15  continue to be paid by its parent organization?
16      A    That is correct.
17      Q    And in the specific instance that you
18  just referenced, what was the parent organization?
19      A    The parent organization was the General
20  Services Administration.
21      Q    And you were seeking someone. What was
22  the nature of the detail?

**Page 79**

1      A    It was to assist in our procurement
2  office.
3      Q    And this is something that you personally
4  were involved in?
5      A    Well, I called and asked whether they
6  would consider it, and then the human resources
7  office did the follow-up and did the necessary
8  paperwork. All of it is done certainly on the
9  approval by -- first of all, approval by White
10  House Management Administration of my seeking that
11  request, and, second, if an individual is
12  interested, it depends upon approval of that
13  person's supervisor.
14      Q    In terms of executing paperwork to
15  finalize a detail, is there someone within the
16  Office of Administration that signs on behalf of
17  EOP?
18      A    Referencing the documents that you've
19  given me, I think there have been -- some of the
20  documents have been signed on behalf of OA.
21      MS. WEISMANN: Okay. I'd like to have
22  the last page, Bates number 319, marked as the next

**Page 80**

1  exhibit.
2      (Plaintiff's Exhibit No. 4 was
3      marked for identification.)
4  BY MS. WEISMANN:
5      Q    Okay. Turning again to the packet that
6  starts with Bates number 269, if you could turn to
7  271. And under the purpose it states to work with
8  GSA IAGs and IAPCs. Can you tell me what that
9  means?
10      A    Well, I think the reference is to -- is
11  Interagency Agreements. And I'm trying to remember
12  what IPAC stands for. I truly can't remember at
13  this juncture. It will come to me later.
14      Q    What about IAG?
15      A    InterAgency agreement.
16      Q    Okay. And so -- from reading this
17  document, do you have an understanding of what the
18  detailee would --
19      A    Actually, I do have an understanding of
20  this one. This one -- I don't think that the
21  purpose specifically encompasses everything that
22  this individual was doing, but this individual was

**Page 81**

1  designed to assist our procurement people with
2  regards to various procurement matters that OA had,
3  which includes instances where we utilize GSA as a
4  procurement organization.
5      Q    And the relationship that you have
6  with -- by "you," I mean, OA -- has with GSA in
7  this regard, is it comparable to the relationship
8  OA has with the agencies in which it's entered into
9  Memorandum of Understanding?
10      A    Well, Memorandum of Understanding is
11  rather a broad term.
12      Q    All right. Let's talk about the
13  Memorandum of Understanding that I've shown you so
14  far today.
15      A    Well, it would be perhaps comparable to
16  the one with regards to the Treasury Fund in which
17  the Treasury Bureau of Public Debt specifically is
18  providing services to OA, likewise GSA is a
19  procuring organization. It's similar to GovWorks,
20  the Department of Government, NASA SEWP under NASA,
21  and there are instances where we have -- my
22  understanding is, we've utilized GSA to procure

21  (Pages 78 to 81)

## Capital Reporting Company

Page 82

1  services.
2     Q   And this request -- part of the
3  responsibilities for this person would be to be
4  that interface with GSA?
5     A   I can't specifically -- I don't know
6  specifically whether this person interfaced with
7  GSA or not.
8        MS. WEISMANN: Okay. If you can pull
9  that sheet out, please. I'm going to have it
10  marked as the next exhibit.
11        (Plaintiff's Exhibit No. 5 was
12           marked for identification.)
13        (Tenders documents to witness.)
14  BY MS. WEISMANN:
15     Q   Okay. I've just handed you a few more
16  pages of documents. Again, these are documents
17  that were part of the production that the Office
18  of Administration made this week. Specifically, if
19  I can direct you to Bates number 00324. Actually,
20  323 as well. Let's start with 323. At the bottom
21  it says, federal agencies must provide reasonable
22  accommodation to applicants with disabilities where

Page 83

1  appropriate. Do you see that language?
2        MS. SHAPIRO: I've got the wrong Bates
3  numbers, sorry. What page are you reading from?
4        MS. WEISMANN: 323.
5        MS. SHAPIRO: The very last page?
6        MS. WEISMANN: At the top it says page 4
7  of 4.
8        MS. SHAPIRO: Okay.
9  BY MS. WEISMANN:
10     Q   Do you see that?
11     A   I do.
12     Q   And then if you go on to the next page,
13  at the very bottom it says, this component provides
14  reasonable accommodations.
15        MS. SHAPIRO: There is no next page.
16  That's the problem.
17     A   I don't have a next page.
18        MS. WEISMANN: You have 323?
19        MS. SHAPIRO: Right. That's the last
20  page of this packet.
21        MS. WEISMANN: Well, that's okay. We'll
22  stick to 323. It doesn't matter.

Page 84

1  BY MS. WEISMANN:
2     Q   Do you have an understanding of what this
3  reference to reasonable accommodations is?
4     A   My understanding would be that it
5  reflects the accommodations under the ADA.
6     Q   The ADA being?
7     A   American Disabilities Act.
8     Q   Okay. Are you also familiar with an
9  Executive Order 13164 entitled Requiring Federal
10  Agencies to Establish Procedures to Facilitate the
11  Provision of Reasonable Accommodation?
12     A   I'm not familiar with the Executive
13  Order.
14     Q   Okay. Is it your understanding -- what
15  is your understanding about the Office of
16  Administration's obligations with respect to the
17  ADA?
18        MS. SHAPIRO: Objection to form.
19     A   I know that we adhere to the provisions
20  of the ADA.
21     Q   Is it your understanding that you do so
22  because you're required by law to do so?

Page 85

1        MS. SHAPIRO: Objection to form.
2     A   That's a legal conclusion. I could not
3  give an opinion on that.
4     Q   Well, as Director of OA, do you have an
5  understanding that you have a legal obligation to
6  comply with the ADA?
7     A   What I know is that we adhere to the
8  obligations under the ADA.
9     Q   And you have no further understanding
10  beyond that?
11     A   I have no further understanding other
12  than that.
13     Q   And who within the Office of
14  Administration is charged with compliance with the
15  ADA?
16        MS. SHAPIRO: Objection to form.
17     A   Well, the office itself is charged with
18  complying with it.
19     Q   And is there any individual with the O --
20     A   The Director ultimately is responsible in
21  terms of in conjunction with White House
22  management.

22  (Pages 82 to 85)

## Capital Reporting Company

Page 86

1    Q   Responsible for what?
2    A   To ensure that we are adhering to the
3    obligations under the ADA.
4    Q   Okay. So by your testimony you are
5    ultimately responsible for the office's adherence
6    to the ADA, correct?
7    A   Ultimately, yes.
8    Q   And yet you have no understanding about
9    whether you're required to do so or whether it's a
10   matter of policy?
11   A   Well, my understanding is, is that we do
12   adhere to it and that's -- that's what we do.
13   Q   Have you delegated this responsibility to
14   anyone else within the Office of administration?
15   MS. SHAPIRO: Objection to form.
16   A   Well, we certainly are -- HR people are
17   cognizant of the obligations under it and seek to
18   make sure, to the best of their ability, that we --
19   you know, we follow it.
20   Q   Okay. And the document I showed, what's
21   the first page number?
22   A   It's OA00320.

Page 87

1    Q   Okay. Would you explain what this
2    document is?
3    A   Well, it's a posting, as I understand it,
4    on USAJOBS, which is a government internet site for
5    the posting of open government positions in various
6    government organizations.
7    Q   Okay. And part of this posting includes
8    the language of page 323, does it not, that I read
9    earlier about federal agencies must provide
10   reasonable accommodations?
11   A   Well, that's what the document reflects.
12   Q   Right. That's part of the posting. Do
13   you have an understanding of why this language was
14   included?
15   A   No. I don't get involved with the
16   details of, you know, every posting. So I can't
17   tell you specifically as to this language.
18   Q   To your knowledge, is this language
19   generally included in postings?
20   A   I cannot tell you whether it's generally
21   included in postings. I don't review postings in
22   the federal government.

Page 88

1    Q   Okay. When you were at the General
2    Services Administration, did you have any
3    involvement in postings like this?
4    A   Generally, my Associate General Counsels
5    handle the postings in conjunction with the human
6    resources office.
7    (Tenders documents to witness.)
8    MS. WEISMANN: The four pages that I just
9    handed you, can we have that marked as the next
10   exhibit, please.
11   (Plaintiff's Exhibit No. 6
12   was marked for identification.)
13   MS. WEISMANN: Can we just go off the
14   record for a minute and just talk about scheduling.
15   I don't know if you want to just keep going, if you
16   want to take a break. It's really up to you.
17   THE WITNESS: I'm fine.
18   MS. SHAPIRO: Do you have an estimation
19   as to how long we'll go?
20   MS. WEISMANN: I can't give you a time
21   estimation.
22   THE VIDEOGRAPHER: 12:11 p.m; off record

Page 89

1    ending tape number two in our continuing deposition
2    of Swendiman.
3    (Recess taken.)
4    THE VIDEOGRAPHER: Our time now is 12:16
5    p.m. We're on record beginning tape number three
6    in our continuing deposition of Mr. Swendiman.
7    (Tenders documents to witness.)
8    BY MS. WEISMANN:
9    Q   I just handed you another grouping of
10   documents. Again, these are documents that were
11   recently produced by the Office of Administration
12   as part of its document production here. The first
13   page of the first document, Bates number 335, can
14   you -- at the top it says Executive Office of the
15   President - Interagency Agreement. What is the --
16   as I read this, it appears that the Office of
17   Administration is agreeing to provide a service; is
18   that correct?
19   A   My reading of this document seems to
20   indicate that the Office of Administration is
21   providing a service on a reimbursable basis.
22   Q   And it's providing a service to the Navy,

23  (Pages 86 to 89)

## Capital Reporting Company

Page 90

1 or am I wrong on that?
2    A  It appears that's the case.
3    Q  Can you tell from looking at this
4 document the nature of the service OA is providing?
5    A  I can't tell exactly from the document.
6 It references AT&T voice systems operations.
7    Q  That's on Bates number 336?
8    A  It's on 335.
9    Q  And if you'll look on 336 it describes
10 the service. Funds are provided to the Executive
11 Office of the President for AT&T voice systems
12 operation and maintenance?
13    A  My understanding is, is that we do a
14 minimal service for them. My understanding is --
15    Q  When you say "for them," who is them?
16    A  In this case, the Navy. And it's -- I
17 can't tell you exactly what the nature of the
18 service is other than what is stated there.
19    Q  Okay. And would it be fair to say that
20 these Interagency Agreements are similar to the
21 ones we looked at earlier, only in this case it's
22 OA providing the service to another agency?

Page 91

1    A  Yes. It's a minimal service provided to
2 this -- to the Navy on a reimbursable basis.
3    Q  And why does OA outsource -- or not
4 outsource. Why does it provide services to other
5 agencies?
6    A  Well, in this particular case -- I can
7 speak generally -- is that there are entities
8 within the White House complex with whom OA has to
9 work in conjunction with. The Navy is certainly
10 one of them. And oftentimes the service that we're
11 providing is actually for the benefit of OA in
12 order for us to service -- service the President
13 and White House Management Administration.
14    Q  But -- and this is an agreement -- in
15 order to do that you are providing a service to a
16 non-EOP entity, correct?
17    A  Well, I can't tell exactly. It's got
18 operation and maintenance Navy. I can't tell from
19 this document exactly what aspect of the Navy that
20 service is. My understanding is, it is with
21 regards to the presence within White House complex.
22    MS. WEISMANN: Okay. Can we have this

Page 92

1 document, all of the pages that are clipped
2 together, marked. It's Bates number 335 and 336 --
3 I'm sorry, let's have 335 and 336 marked as the
4 next exhibit.
5    (Plaintiff's Exhibit No. 7 was
6    marked for identification.)
7    MS. WEISMANN: Also, in the packet that I
8 gave you should be 00343 and 344, which is also
9 another EOP Interagency Agreement.
10    MS. SHAPIRO: I don't think we have that.
11    MS. WEISMANN: Keep going. It would be
12 further on. You don't have it?
13    MS. SHAPIRO: It ends at 342.
14    THE WITNESS: It ends at 342 and then it
15 picks up at 352.
16    MS. WEISMANN: All tight. I apologize.
17 I've got copies. I just didn't give them to you
18 yet. All right, well, I'm not going to make this
19 an exhibit and I apologize. I thought I had
20 copies. I'm going to give you --
21    (Tenders document to witness.)
22 BY MS. WEISMANN:

Page 93

1    Q  If you can take a look at this document
2 and tell me if you can tell from these two pages
3 the nature of the -- what the agreement is about
4 and what's the nature of the service.
5    MS. SHAPIRO: Can you give us the Bates
6 numbers?
7    MS. WEISMANN: 343 and 344.
8    THE WITNESS: Well, I can't tell from the
9 documents to whom the service is rendered. It's
10 for nominal amounts. It references AT&T voice
11 systems operations and maintenance. We do do some
12 maintenance with regards to telephone connections.
13 Again, oftentimes this is for the benefit of OA in
14 order to carry out its mission.
15 BY MS. WEISMANN:
16    Q  But would this be maintenance done at a
17 non-EOP agency?
18    A  Well, this is the Harry S. Truman
19 Scholarship Foundation. They're not considered a
20 component of the EOP, but I cannot tell you where
21 they fall under the organizational chart with
22 respect to the White House complex.

24  (Pages 90 to 93)

## Capital Reporting Company

Page 94

1    Q    But as you read this document it appears
2  to be agreement to provide some kinds of
3  maintenance services?
4    A    Some maintenance service which is
5  generally, is my understanding, has been telephone
6  connections.
7    Q    Okay, thank you. Do you have number --
8  Bates number 356?
9    A    I do.
10    Q    Good. This is document entitled
11  Agreement Between Federal Agencies. What are the
12  two entities that are parties to this agreement?
13    A    The buyer is referenced as Office of the
14  Secretary; and the agency and office, the name is
15  the White House.
16    Q    And it's the Office of Administration
17  within the White House; is it not?
18    A    Well, it says address, Executive Office
19  of the President, Office of Administration.
20    Q    Okay. And what is the nature of the
21  goods and services being provided here, if you can
22  tell?

Page 95

1    A    This looks to be an event.
2    Q    Would this be an event at the Department
3  of Education?
4    A    It could be an event at the Department of
5  Education. It could be an event outside the
6  Department of Education building.
7    Q    Is this -- what service or goods is the
8  White House Office of Administration providing; can
9  you tell? It's a multi-page document, I believe.
10  Oh, yeah, if you'll look at 359 --
11    MS. MEDAGLIA: What page does this start
12  with?
13    MS. WEISMANN: It starts with 356.
14    MS. MEDAGLIA: Actually, I don't think
15  so. That's not how it was produced.
16    MS. WEISMANN: For purposes of this
17  deposition, we're looking at a document that starts
18  at page 356.
19    THE WITNESS: This looks to be an event
20  that was held at the Horace Greeley Elementary
21  School in Chicago.
22    BY MS. WEISMANN:

Page 96

1    Q    Okay. And what is the nature of goods or
2  service that the Office of Administration is
3  providing?
4    A    I cannot tell from this document exactly
5  what the service is. The service is on a
6  reimbursable basis.
7    Q    Okay. And there are, in fact, four pages
8  that precede 356. Do you have 352?
9    A    Yes, I have it in my hand.
10    Q    All right. Do those four pages relate to
11  this agreement?
12    A    Well, the first one starting with
13  OA00352 --
14    Q    Correct.
15    A    -- is with the Department of Health and
16  Human Services.
17    Q    Okay. So that's a separate document?
18    A    That's a separate document.
19    Q    Right.
20    A    The next document is OA --
21    Q    If you'll look at 354 --
22    A    354, it is -- it's associated with the

Page 97

1  visit of the President and the Secretary of
2  Education to the Horace Greeley Elementary Shool in
3  Chicago on January 7th, 2008.
4    Q    So that appears to relate to the
5  agreement document?
6    A    That appears to relate to the agreement.
7    MS. WEISMANN: So let's make, for
8  purposes of this deposition, page numbers 354
9  through 359 the next exhibit. If you could hand
10  those to her, I apologize.
11    (Plaintiff's Exhibit No. 8 was
12    marked for identification.)
13    THE WITNESS: 354 --
14    MS. WEISMANN: Through 359. So 4, 5, 6
15  7, 8 and 9. I think that's all one document.
16    (Tenders documents to witness.)
17  BY MS. WEISMANN:
18    Q    Okay. I've just handed you what is again
19  another document produced in this litigation as
20  part of OA's document production. And it's 0
21  Fiscal Year 2003 Congressional Budget Submission?
22    A    That is correct.

25  (Pages 94 to 97)

## Capital Reporting Company

Page 98

1    Q    Okay. Would you turn to -- have you seen
2    this document before?
3        A    I've -- I've seen the document before.
4        Q    And do you have a role in preparing the
5    budget submission to Congress on behalf of the
6    Office of Administration?
7        A    Well, we have a -- we have a role in
8    preparing the budget on behalf of the Office of
9    administration in conjunction with the White House
10   Management -- in conjunction with White House
11   Management and Administration.
12       Q    Would you turn to Bates number 410,
13   please. There's a section that states the Office
14   of Administration is organized along the following
15   lines. Do you see that?
16       A    I do.
17       Q    And the second one is the Chief Special
18   Projects Officer or CSPO. Do you see that?
19       A    I see that.
20       Q    Was this a new position that was created?
21       A    I have no idea --
22       MS. SHAPIRO: Objection to form.

Page 99

1        THE WITNESS: I'm sorry. I have no idea.
2    This is for fiscal year 2003. This preceded my
3    tenure. There is no such office.
4    BY MS. WEISMANN:
5        Q    Okay. And so during your entire tenure
6    at the Office of Administration there has not been
7    a Chief Special Projects Officer?
8        A    There has been somebody in charge of
9    special projects but not -- but there has been no
10   Chief Special Projects Officer.
11       Q    Okay. And just looking at the
12   description of that position, if you could just
13   read that. I recognize there isn't a person
14   occupying this job, but it's still the case that
15   EOP coordinates within EOP and within the EOP
16   affiliated entities?
17       MS. SHAPIRO: Objection to form.
18       A    Well, we do work in conjunction with and
19   parallel to the White House Military Office, for
20   example.
21       Q    Okay. I want you to focus on the phrase
22   EOP affiliated entities. Would you explain what

Page 100

1    those entities are?
2        MS. SHAPIRO: Objection to form.
3        A    I can't explain that entity -- I can't
4    explain those entities.
5        Q    Do you understand the Military Office to
6    be the White House Military Office?
7        A    I would understand that to be the White
8    House Military Office.
9        Q    And what is the -- OA's relationship with
10   the White House Military Office?
11       A    Well, we work in conjunction and parallel
12   with them to support the President.
13       Q    And what is the nature of your
14   interaction with the White House Military Office?
15       A    Well, For example, if the President goes
16   on trips, the White House Military Office supports
17   him with regards to IT. The Office of
18   Administration also supports with regards to IT.
19       Q    Would you consider that to be an EOP
20   affiliated entity?
21       A    I can't describe --
22       Q    That's not a phrase you're familiar with?

Page 101

1        A    That's not a phrase I'm familiar with.
2        Q    Okay. What about the Secret Service;
3    What is the relationship of the Office of
4    Administration with the Secret Service?
5        A    Well, again, I think as I've explained
6    before, for example, in terms of the Secret
7    Service, we forward approved name checks that we
8    receive from the FBI to the Secret Service in terms
9    of access to the complex.
10       Q    Is there any -- does your office have any
11   other interaction with the Secret Service?
12       A    Well, we've had interaction previously.
13   For example, it's been reported there was a fire in
14   the EEOB in December and both the Secret Service
15   and our Office of Security, Emergency of
16   Preparedness -- and by "our", I mean, OA -- were
17   involved with reacting and responding to that fire.
18       Q    Okay. This paragraph refers to large
19   scale EOP projects with entities such as the Secret
20   Service. Are you aware of any current or ongoing
21   EOP projects that your office has with the Secret
22   Service?

26 (Pages 98 to 101)

# Capital Reporting Company

Page 102

1    A    I'm not aware of any ongoing projects.
2    Q    And there's also a reference here to the
3    General Services Administration.  Other than what
4    you had described earlier in the contracting or
5    agreement documents with GSA, does your office have
6    any additional relationship or interaction with --
7    A    Oh, yes, we have a relation -- or
8    interaction with General Services Administration.
9    As is known, the EEOB or the Eisenhower Executive
10    Office Building is undergoing a modernization of
11    the building and GSA, for lack of a better term, is
12    the entity that oversees the modernization effort
13    from a -- from a real estate standpoint.  GSA owns
14    the building, owns the EEOB, and they basically
15    hire the contractor or contractors to do the work
16    that's necessary to modernize the building.
17    Q    And then given that GSA is the owner of
18    the building, does the EOP pay rent to GSA for the
19    building?
20    A    Yes, EOP pays rent to GSA.
21    Q    Okay.  And does your office get involved
22    in negotiations over what the rent will be?

Page 103

1    A    My experience has been, is that GSA
2    generally tells us what the rent is.
3    Q    It's not a negotiated process?
4    A    It's not necessarily a negotiated
5    process, although we do have discussions and see
6    whether we're being fairly charged on our rent.
7    Q    Okay.  I'm going to hand you what is --
8    at least portions of the fiscal year 2007 budget,
9    again, another document that was produced to us as
10    part of the document production in this case.
11    (Tenders documents to witness.)
12    And I'd like you specifically to look at
13    page 485.  Under the Admission Statement it states,
14    OA's mission is to provide enterprise level
15    administrative services to the Executive Office of
16    the President and the Office of the Vice President?
17    A    That's correct.
18    Q    What do you understand is meant by the
19    term enterprise level administrative services?
20    A    By enterprise services, I understand that
21    to mean that we are providing the common support
22    and services to all of the components of the

Page 104

1    Executive Office of the President and that it is --
2    those services are folded under the budget of the
3    Office of Administration.
4    Q    To your knowledge, has anything about the
5    OA's budgeting process changed since it deemed
6    itself to no longer be an agency?
7    MS. SHAPIRO:  Objection to form.
8    A    None to my knowledge.  And by
9    clarification, I came at the time of the budget
10    process for 2008 and I came towards the end.  So I
11    was not involved with the budget -- intimately
12    involved with the budget process at that time.  My
13    full involvement and participation of the budget
14    process came with the fiscal year 2009 budget.
15    MS. WEISMANN:  Can we have this marked as
16    the next exhibit number.
17    (Plaintiff's Exhibit No. 9 was
18    marked for identification.)
19    (Tenders document to witness.)
20    BY MS. WEISMANN:
21    Q    I've just handed you a document that is
22    an e-mail exchange between Sam Watkins and Theresa

Page 105

1    Payton.  Have you seen this document before?
2    A    I saw the document in connection with the
3    production of documents in response to your
4    organization's request.
5    Q    Okay.  This actually was not part of the
6    documents that your agency produced to us.
7    A    Okay.
8    Q    Would you look at the second half of the
9    first page, which has a page number of 47.  It
10    says, Theresa we missed you at last week's -- let
11    me backstep.  It's dated November 6th, 2007; is it
12    not?
13    A    Okay.
14    Q    It says, Theresa we missed you at last
15    week's OA transition meeting with representatives
16    of the CFO's Office held on October 31st, 2007.  We
17    now have a better understanding of the systems used
18    by the office of OA CFO and what Presidential
19    records may be generated by those meetings now that
20    OA is a PRA organization.  We look forward to
21    future meetings with representatives of other
22    elements of OA.  We suggest that it would be

27 (Pages 102 to 105)

**Capital Reporting Company**

Page 106

1 helpful now that OA considers itself a Presidential
2 component of the EOP. If in the next meeting we
3 had a general discussion of the functions that OA
4 uniquely performs for the president as opposed of
5 OA's monitoring or passing off on other agencies
6 functions. This general discussion would assist us
7 in giving better advice as to which of the OA IT
8 systems are creating Presidential records.
9         Do you know if those future discussions
10 have taken place?
11     A  Well, I know that -- I know that future
12 discussions took place.
13     Q  And do you know if there are any
14 documents that were generated by those discussions?
15     A  I don't know whether any documents were
16 generated or not.
17     Q  Now, this says, we suggest that it would
18 be helpful now that OA considers itself a
19 Presidential component. Do you know -- have you
20 had any discussions with personnel at the National
21 Archives and Records Administration about OA's
22 status under the Presidential Records Act or the

Page 107

1 Federal Records Act?
2     A  I have attended at least one meeting in
3 which a discussion was held as to the
4 responsibilities that OA indicated it would adhere
5 to in order to meet the obligations under the
6 Presidential Records Act.
7     Q  And when did that meeting take place?
8     A  Well, it occurred after November.
9     Q  After November of 2007?
10     A  It occurred after this date. I can't
11 tell you the exact date.
12     Q  And was the meeting at the Office of
13 Administration or at NARA?
14     A  Well, there have been a series of
15 meetings. There have been roughly eight meetings
16 with NARA, approximately eight meetings with NARA,
17 since August of 2007. There have been numerous
18 internal meetings in terms of preparing for the
19 meetings and to be responsive to NARA. I can't
20 give you the exact dates of those meetings.
21         A number of the meetings that were
22 coordinated with NARA were technical meetings in

Page 108

1 which the technical people of NARA were meeting
2 with the technical people at OA, which I was not
3 present because I could not provide any value in
4 terms of the technical issues and questions that
5 were generated.
6     Q  Do you know if any documents were
7 generated either internally or between the two
8 entities with respect to those meetings?
9     A  I don't know whether any documents were
10 generated or not.
11     Q  Did you have a role in locating
12 responsive documents for our document request?
13     A  I did. I was asked to look at my own
14 records to see what I had received that was
15 responsive.
16     Q  Do you know whether others within the
17 Office of Administration were similarly asked to
18 look for responsive records?
19     A  The responsibility in terms of
20 responsiveness to the request for production of
21 documents was delegated to OA's Office of General
22 Counsel.

Page 109

1     Q  Okay. And did you have occasion to see
2 all of the documents that had been produced to the
3 General Counsel's Office as potentially responsive?
4     A  I did not see -- what I saw was the
5 documents that were produced in response to the
6 request.
7     Q  Okay. Turning back to this e-mail, based
8 on what you know from the meeting or meetings you
9 did attend with NARA officials, is it your
10 understanding that prior to November of 2007, NARA
11 did not understand that OA was not an agency
12 subject to the Federal Records Act and the FOIA?
13         MS. SHAPIRO: Objection to form.
14     A  I don't know what NARA's understanding
15 was.
16     Q  And that was not -- none of the
17 discussions that happened between the two agencies
18 at these meetings shed any light on NARA's prior
19 understanding?
20         MS. SHAPIRO: Objection to form.
21     A  Not the two agencies because OA is not an
22 agency.

28  (Pages 106 to 109)

## Capital Reporting Company

### Page 110

1    Q   Two entities?

2    A   Two entities.  At one meeting I believe

3  that representatives of NARA referenced the fact

4  that OA was now an entity subject to the PRA, but I

5  can't recall specifically the discussions.  Most of

6  the discussions that I attended had to do with what

7  NARA wanted and what it needed in terms of

8  facilitating transfer of records to it by the end

9  of the administration.

10    Q   Has NARA provided the Office of

11  Administration with its advice as to which of OA's

12  IT systems are creating Presidential records?

13    A   I can't -- I do not know.  That would be

14  a matter among the technical people.

15    Q   Has NARA provided OA with any

16  recordkeeping guidance generally on compliance with

17  the Presidential Records Act?

18    A   My recollection is, is that in terms of

19  guidance, NARA has deferred to White House

20  Counsel's Office as to what Presidential record is.

21    Q   Do you know if there's anything in

22  writing from either NARA, the White House Counsel's

### Page 111

1  Office, on that subject?

2    A   Well, I believe I had referenced a

3  memorandum from the then White House Counsel,

4  Harriet Meyers, that addressed the issue of the

5  Presidential Records Act and retention of records.

6    Q   Do you know of any other documents?

7    A   There was a document, I believe, issued

8  by then White House Counsel, Alberto Gonzalez, that

9  I had heard of, but the Memorandum of Guidance that

10  we had followed has been the memorandum issued by

11  Ms. Meyers.

12    Q   Mr. Swendiman, do you participate in any

13  interagency groups or forums?

14    A   I do not.

15    Q   Do you participate in any

16  intergovernmental groups?

17    A   I do not.

18    Q   Does anyone within the Office of

19  Administration, to your knowledge, participate in

20  any interagency groups or forums?  And by this I

21  don't mean a one-time event such as a conference.

22    A   None that I'm aware of.

### Page 112

1    Q   And does anyone else, to your knowledge,

2  within OA participate in any intergovernmental

3  groups either at a federal or state level?

4    A   None that I'm aware of.

5    Q   In your position as Director of Office of

6  Administration, in addition to what you've

7  described to date, what is the nature of your

8  interaction with other federal agencies?

9    A   I would characterize my interaction with

10  other federal agencies as limited.  The primary

11  agency with which I've had contact is the General

12  Services Administration and that is because of the

13  fact that it's the owner of the EEOB and is

14  primarily responsible for the modernization of the

15  project and also other projects on the White House

16  complex.

17    Q   Do you serve as a representative for the

18  Office of Administration in any non-governmental

19  functions?

20    A   Could you repeat that --

21        MS. SHAPIRO:  Objection to form.

22        THE WITNESS:  Repeat that question again.

### Page 113

1  BY MS. WEISMANN:

2    Q   Do you serve as a representative for the

3  Office of Administration at any non-governmental

4  functions?

5    A   I think I was invited to a dinner, which

6  included numerous people in which I got approval

7  from our Counsel's office as being a widely

8  attended event.  Right now I'm drawing a blank as

9  to -- oh, I think I recall.  I think it was the Fed

10  100 Dinner I was invited to attend, and that was

11  because the folks knew me from the General Services

12  Administration.

13    Q   What documents did you review prior to

14  your deposition?

15    A   Basically, the documents that were

16  produced in response to the request plus the two

17  Executive Orders plus Title 3, I think it's Section

18  107, dealing with pay.

19    Q   What is your last date of employment with

20  the Office of Administration?

21    A   It will be -- what's today -- I'm trying

22  to figure out what today is -- March 15th.

29  (Pages 110 to 113)

## Capital Reporting Company

| Page 114 | Page 116 |
|---|---|
| 1    Q    So you will continued to employed through<br>2  the 15th?<br>3    A    The payroll -- the way the government<br>4  works is that payroll ends on a Saturday and picks<br>5  up with a Sunday. My last fiscal day will be<br>6  tomorrow, March 14th.<br>7    Q    And where are you going?<br>8    A    The General Counsel of USAID.<br>9    Q    And when do you start your employment<br>10 there?<br>11   A    March 17th.<br>12   Q    When did you decide to change your last<br>13 date of employment from February 26th --<br>14       MS. SHAPIRO: Objection to form. It<br>15 builds assumptions.<br>16 BY MS. WEISMANN:<br>17   Q    -- to a subsequent date?<br>18   A    Well, I didn't actually change the date.<br>19 I think there's been a misunderstanding of what<br>20 occurred because I got that same question from<br>21 Committee staffers. I had indicated that, at least<br>22 for that week, I was going to be away the balance | 1    Q    Mr. Swendiman, going back to the subject<br>2  of detailees, who overseas them while they're at<br>3  the Office of Administration?<br>4    A    Well, the individual or individuals who<br>5  would oversee them would be the head or supervisor<br>6  in a particular operating unit in which they are<br>7  working.<br>8    Q    And do you have any role in that<br>9  relationship with the detailee and supervision?<br>10   A    Not directly. I don't have a role in<br>11 that.<br>12   Q    Are there any reports that you or others<br>13 within OA have to prepare internally for detailees?<br>14   A    Well, first of all, I've got to get the<br>15 approval of the White House Management<br>16 Administration for getting detailees. We do have a<br>17 report that goes to the detailee's supervisor in<br>18 his or her government organization. Because they<br>19 serve for a period of time with us, the supervisor<br>20 generally wants a report on how well they did, you<br>21 know, what kind of job they did for us while they<br>22 were on detail. My understanding is, we keep track |

| Page 115 | Page 117 |
|---|---|
| 1  of the week because I was attending a family<br>2  function out of town.<br>3  BY MS. WEISMANN:<br>4    Q    What did you decide that your last day<br>5  would be March 15th?<br>6    A    Once this deposition date was set.<br>7    Q    And when is your understanding of when<br>8  the deposition was set?<br>9    A    Well, let's see, when I was advised by --<br>10 I'm not sure if I was advised by DOJ Counsel or OA<br>11 General Counsel that an agreement had been reached<br>12 as to today's date, whenever that was, whenever you<br>13 all decided.<br>14       MS. SHAPIRO: Okay. If we can take a<br>15 short break. I need to sort of regroup. We may be<br>16 done. I'm not going to promise anything.<br>17       THE VIDEOGRAPHER: 12:55 p.m.; off<br>18 record.<br>19       (Recess taken.)<br>20       THE VIDEOGRAPHER: The time now is<br>21 1:03 p.m.; on record.<br>22 BY MS. WEISMANN: | 1  of their time and attendance and we report that<br>2  back to their governmental organization.<br>3    Q    Okay. In addition to the agencies that<br>4  have been identified so far in this deposition as<br>5  ones to which the EOP provides services, are there<br>6  any others?<br>7        MS. SHAPIRO: Objection to form.<br>8        You can answer.<br>9    A    I cannot recall specifically. I think<br>10 the documents that have been shown was in reference<br>11 to the Navy, in reference to the Secret Service.<br>12 There's none that comes to my mind right now.<br>13       MS. WEISMANN: Okay. That concludes the<br>14 deposition from our perspective.<br>15       MS. SHAPIRO: Okay. I don't have any<br>16 questions to ask the witness. I just wanted to<br>17 note that we agreed to talk after the deposition<br>18 about the use of the videotape and confining it to<br>19 the contours of the litigation and that if we<br>20 couldn't agree you would give us an opportunity to<br>21 seek relief on that score.<br>22       MS. WEISMANN: Uh-huh. |

30  (Pages 114 to 117)

## Capital Reporting Company

Page 118

1    MS. SHAPIRO: That's all we have.
2    MS. WEISMANN: Okay.
3    MS. SHAPIRO: Thank you.
4    THE VIDEOGRAPHER: The time now is
5    1:06 p.m. This concludes our videotape deposition.
6        (Whereupon, at 1:06 p.m., the
7        deposition of Alan R. Swendiman
8        was concluded.)
9            * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 120

1
2
3
4
5
6        ACKNOWLEDGEMENT OF DEPONENT
7
        I, ALAN R. SWENDIMAN, do hereby acknowledge I
8    have read and examined the foregoing pages
9    of testimony, and the same is a true, correct
10   and complete transcription of the testimony given
11   by me, and any changes or corrections, if any,
12   appear in the attached errata sheet signed by me.
13
14
15
16
17
18   _____    _____
     Alan R. Swendiman      Date
19
20
21
22

Page 119

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Jodi Scheffel, RPR, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the witness whose testimony appears in
5    the foregoing deposition was duly sworn by me; that
6    the testimony of said witness was taken by me in
7    stenotype and thereafter reduced to typewriting
8    under my direction; that said deposition is a true
9    record of the testimony given by said witness, that
10   I am neither counsel for, related to, nor employed
11   by any of the parties to the action in which this
12   deposition was taken; and further, that I am not a
13   relative or employee of any attorney or counsel
14   employed by the parties hereto, nor financially, or
15   otherwise interested in the outcome of the action.
16
17            Jodi Scheffel
18          Notary Public in and for
19            the District of Columbia
20
21   My commission expires:
22   August 31, 2011

Page 121

1    Elizabeth Shapiro, Esquire
     U.S. Department of Justice
2    Civil Division
     20 Massachusetts Avenue, N.W.
3    Washington, D.C. 20001
4
5    IN RE: CREW vs. Office of Administration
6    Dear Ms. Shapiro,
7        Enclosed, please find your copy of the
     deposition of ALAN R. SWENDIMAN, along with the
8    original signature page.
9        As agreed, you will be responsible for
     contacting the witness. Within 30 days of receipt,
10   please forward errata sheet and original signed
     signature page to counsel for Plaintiff, Ms.
11   Weismann.
12       If you have any questions, please do not
     hesitate to call. Thank you.
13
14       Yours,
15
16       Jodi Scheffel
         Reporter/Notary Public
17
18       cc: Anne L. Weismann, Esquire
19
20
21
22

31 (Pages 118 to 121)

## Capital Reporting Company

Page 122

```
 1      Capital Reporting Company
        1821 Jefferson Place, N.W.
 2      Third Floor
        Washington, D.C. 20036
 3      (202) 857-3376
 4
 5         E R R A T A  S H E E T
 6      Case:  CREW vs. Office of Administration
 7      Witness:  Alan R. Swendiman
 8      Date:  Thursday, March 13, 2008
 9
10      Page No.    Line No.       Reason/Change
11
12
13
14
15
16
17
18
19
20
21
        _____    _____
22      Signature          Date
```

1                    CERTIFICATE OF NOTARY PUBLIC

2            I, Jodi Scheffel, RPR, the officer before

3    whom the foregoing deposition was taken, do hereby

4    certify that the witness whose testimony appears in

5    the foregoing deposition was duly sworn by me; that

6    the testimony of said witness was taken by me in

7    stenotype and thereafter reduced to typewriting

8    under my direction; that said deposition is a true

9    record of the testimony given by said witness, that

10   I am neither counsel for, related to, nor employed

11   by any of the parties to the action in which this

12   deposition was taken; and further, that I am not a

13   relative or employee of any attorney or counsel

14   employed by the parties hereto, nor financially, or

15   otherwise interested in the outcome of the action.

16

17                           Jodi Scheffel

18                           Notary Public in and for

19                           the District of Columbia

20

21   My commission expires:

22   August 31, 2011

Deposition
ERRATA Sheet

Page 1

| Page | Line | Change |
|------|------|--------|
| 6 | 10 | Add a comma after "President" |
| 6 | 18 | Change "generlae" to "General" |
| 7 | 14 | Insert "and" after "business" |
| 9 | 6 | Change "of" to "and" |
| 19 | 6 | Delete the second "that" |
| 20 | 19 | Delete "I" |
| 22 | 21 | Delete "non" |
| 23 | 15 | Change "it" to "there" |
| 26 | 10 | Insert " —— " after "out" |
| 26 | 12 | Delete the second "then" |
| 26 | 14 | Insert "then" after the comma |
| 30 | 18 | Change "site" to "cite" |
| 30 | 22 | Insert comma after "systems" |
| 40 | 18 | Change "dated" to "date" |
| 45 | 21 | Delete " —— " |
| 47 | 21 | Insert "the" after "of" |
| 48 | 12 | Change "administration's" to "administration" |
| 52 | 3 | Change "in" to "to" |
| 53 | 11 | Change "meyors" to "miers" |
| 54 | 18 | Change "category" to "categories" |
| 62 | 13 | Change "made; no" to "made? No." |
| 66 | 14 | Add comma after "grants" |
| 70 | 3 | Change "reference" to "referred" |
| 70 | 22 | Add comma after "NASA" |
| 72 | 7 | Change "negotiation" to "negotiations" |
| 73 | 16 | Add comma after "Administration" |
| 77 | 17 | Delete "a——" |
| 79 | 10 | Insert "and" after "management" |
| 79 | 10 | Change "seeking" to "making" |
| 81 | 20 | Change "Government" to "Interior" |
| 85 | 22 | Add "and Administration" |

Deposition
ERRATA SHEET

| Page | Line | Change |
|------|------|--------|
| 91 | 13 | Insert "and" after "management" |
| 98 | 9 | Change "administration" to "Administration" |
| 99 | 19 | Insert "in" before "parallel" |
| 100 | 15 | Change "For" to "for" |
| 101 | 15 | Insert "and" after "Security" |
| 109 | 1 | Insert "all" after "see" |
| 110 | 9 | Change "administration" to "Administration" |
| 110 | 20 | Insert "a" before "Presidential" |
| 111 | 4 | Change "meyers" to "miers" |
| 111 | 11 | Change "meyers" to "miers" |
| 114 | 5 | Change "fiscal" to "physical" |
| 116 | 15 | Insert "and" after "management" |

March 29, 2008

EXHIBIT 2 - Part 3

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## DIRECTOR OF CENTRAL INTELLIGENCE DIRECTIVE 6/8

Unauthorized Disclosures, Security Violations, and Other
Compromises of Intelligence Information

(Effective 9 December 2002)

**EXHIBIT**
/
3/13/08 JS

This directive is issued pursuant to the authorities and
responsibilities of the Director of Central Intelligence under
the National Security Act of 1947, as amended, Executive Order
12333, Executive Order 12958, and other applicable authorities to
protect intelligence sources, methods, and related information
and activities from unauthorized disclosure, ensure programs are
developed by the Intelligence Community to protect such
information and activities, and to keep the President and
Congress fully and currently informed of intelligence activities,
including any significant intelligence failure. Applicable
provisions cited in DCID 1/1 (19 November 1998) are included by
reference. This directive rescinds DCID 3/18P.

### I. Purpose

A. To carry out responsibilities prescribed by law, the DCI
reaffirms a strong Intelligence Community commitment to
aggressive, consistent, and effective measures to protect
intelligence, intelligence sources and methods, and related
information and activities ("intelligence information", or
"intelligence sources and methods") from unauthorized
disclosure. This directive emphasizes the responsibilities
of Senior Officials of the Intelligence Community (SOICs) to
protect intelligence information under their cognizance and
to ensure that SOICs establish effective policies and
procedures within their organizations to deter, investigate,
and promptly report unauthorized disclosures, security
violations, compromises of intelligence information, and to
take appropriate protective and corrective actions.

B. Nothing in this directive is intended to supersede or
modify current obligations of Executive department or agency
heads to protect classified information, to investigate its
compromise, or to report to appropriate law enforcement
authorities serious or continuing breaches of security,
unauthorized disclosures, or other actual or suspected
violations of federal criminal law.

### II. Policy

A. SOICs shall be aggressive in carrying out their
responsibilities, individually and collectively, to guard

UNCLASSIFIED//FOR OFFICIAL USE ONLY          OA00002

UNCLASSIFIED//FOR OFFICIAL USE ONLY

against, investigate, report, and to redress unauthorized disclosures and other security violations or compromises of intelligence or intelligence information.  SOICs shall continuously emphasize and enhance security and counterintelligence awareness and ensure related policies and procedures are relevant and up to date.  Intentional leaks of intelligence are a violation of trust, may constitute a violation of law, may result in irrevocable damage to national security, and will not be tolerated.

B.   SOICs shall promptly notify the DCI of any significant security violation, unauthorized disclosure, or other compromise, as defined for purposes of this DCID, in a way that enables the DCI to keep the President and the Congress fully informed and ensure an appropriate IC response.  Upon completion of an investigation and in accordance with the guidelines of this DCID, SOICs shall assess the significance of any significant security violation or compromise to assist the DCI in strengthening and refining Intelligence Community safeguards.

## III.   Unauthorized Disclosures

Unauthorized disclosures of intelligence are a serious and recurring problem whose deterrence requires continuous security vigilance, thorough inquiry and investigation, and appropriately applied sanctions.  The damage to US intelligence, foreign relations, national defense, and law enforcement interests caused by unauthorized disclosures, whether individual, cumulative, intentional, or unintentional, can be as great as that caused by espionage.  SOICs must constantly take steps to vigorously deter unauthorized disclosures, to identify the persons responsible, and take appropriate corrective measures.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

OA00003

UNCLASSIFIED//FOR OFFICIAL USE ONLY

A.  General Responsibilities.  SOICs shall:

1.  Take appropriate action to ensure that elements under their responsibility attack the problem of unauthorized disclosures from several perspectives.  Such actions shall, at a minimum, ensure that:

a.  Robust personnel security screening programs assist in hiring and retaining trustworthy people;

b.  Security and counterintelligence training and awareness programs emphasize and regularly reinforce security rules, procedures and objectives;

c.  All personnel limit access to information to those who actually need to know; and

d.  Within their IC elements and in conjunction with other agencies as appropriate, utilize a full range of security, analytic, and investigatory resources to identify those who intentionally disclose or otherwise jeopardize intelligence information, take appropriate steps to sanction such persons who violate applicable statutory, Executive Order, or regulatory provisions, and take such other corrective steps necessary to prevent a recurrence of such disclosures.

2.  Periodically review security programs, policies, and procedures under their cognizance in order to strengthen safeguards and update programs, policies and procedures as necessary in light of events, including changes in personnel, expanded interactions with the public, or emerging technological developments.

3.  Develop procedures to ensure the appropriate protection of intelligence information by personnel engaged in collection, analytic, public information activities, or other interactions with members of the general public.  Such procedures shall provide for relevant and timely guidance to reduce the likelihood of inadvertent or otherwise unintentional disclosure of classified or other intelligence information that warrants continued protection.

B.  Specific Responsibilities

1.  Nondisclosure Agreements.  SOICs shall review their respective policies and procedures to ensure that:

a.  As a condition for access to classified intelligence information under their cognizance, all individuals prior to being granted such access to

3

UNCLASSIFIED//FOR OFFICIAL USE ONLY

OA00004

UNCLASSIFIED//FOR OFFICIAL USE ONLY

classified intelligence sign appropriate
nondisclosure agreements in accordance with
applicable law and presidential directive.  The
agreements must address the responsibility to
safeguard intelligence information that is classified
or that is in the process of a classification
determination, pursuant to law or Executive Order.

b.  Personnel are aware that the prohibition against
unauthorized release or disclosure applies to
individuals having former as well as current access
to classified intelligence information.

c.  Upon termination of access to classified
intelligence information, individuals receive an exit
briefing.  The individual's signature will be
requested acknowledging his or her continuing
obligation to protect classified intelligence
information and materials and to return any such
information and materials in his or her possession.
Refusal to provide a signature will not relieve the
individual from the obligation to abide by the
conditions set forth in the original nondisclosure
agreement.  Any individual who refuses to do so shall
be so advised.  Any individual who refuses to return
classified intelligence information and materials in
his or her possession shall be advised of applicable
sanctions and reported to appropriate investigating
authorities.

2.  Training and Awareness.

SOICs shall ensure that their IC elements maintain
security and counterintelligence training and awareness
programs that specifically address the topic of
unauthorized disclosures and reinforce the vital
requirement to protect all categories of intelligence
information, including Sensitive Compartmented
Information (SCI), third agency information, and other
intelligence in accordance with applicable law and
directive.

a.  At the initial security briefing, security
officials shall provide employees with information
concerning policies and procedures for handling
requests for official or nonofficial information that
could affect intelligence interests.  This
information shall also include methods for
determining if an individual is authorized access to
intelligence information as well as the requirement
to report inquiries from persons not authorized
access to intelligence information, so as to guard

4

UNCLASSIFIED//FOR OFFICIAL USE ONLY

UNCLASSIFIED//FOR OFFICIAL USE ONLY

against unintentional or deliberate unauthorized disclosures.[1]

b.  Security training and counterintelligence awareness courses shall include specific discussion of the damage that unauthorized disclosures cause and examples of the impact they have on organizational missions and national security.  Such examples shall not draw upon an ongoing investigation or prosecution.

c.  Training modules on unauthorized disclosure issues (to include ethics, reporting-including crimes reporting--requirements, and responsibilities) also shall be added to appropriate generic training courses.

IV.  Reporting Significant Unauthorized Disclosures, Security Violations and Compromises.

SOICs shall ensure that the DCI and, where appropriate, law enforcement authorities, are promptly notified of unauthorized disclosures, security violations, or other compromises of intelligence information that they determine is or could be significant as defined in this directive.

A.  General Responsibilities.  Senior Officials of the Intelligence Community shall put mechanisms in place, with respect to personnel and intelligence information under their cognizance, that ensure:

1.  SOICs and their authorized designees receive timely information on significant unauthorized disclosures, security violations, or compromises.

2.  Appropriate officials initially and periodically remind personnel of their obligations to report promptly, through appropriate channels, any potential or actual security violation or compromise of classified intelligence information.

3.  Security officials act quickly to conduct internal security inquiries regarding actual or suspected violations or compromises of intelligence information and determine their significance.

4.  The DCI, and law enforcement authorities as appropriate, receive prompt and meaningful notice of an unauthorized disclosure, security violation, or

---

[1] Annex E of DCID 6/4 provides additional standards for SCI security awareness programs in the US Intelligence Community.

5

OA00006

UNCLASSIFIED//FOR OFFICIAL USE ONLY

compromise of intelligence information in accordance with applicable law, policy, and this directive.

B.   Specific Notification Requirements.  SOICs shall notify the DCI of any actual or suspected unauthorized disclosure, security violation, or other compromise of intelligence information that they, in their discretion, determine is consistent with the definition and guidance herein regarding "significant" unauthorized disclosures, security violations or compromises.

   1.   Initial Notice.

        a.   Upon receiving credible information suggesting a significant security violation or compromise has or may have occurred, the responsible SOIC shall provide an immediate preliminary alert to the DCI.

        b.   If the SOIC concludes that a suspected or actual significant security violation or compromise involves classified intelligence information originated by or otherwise within the responsibility of another IC element, the SOIC shall alert and consult with the SOIC having originator authority over the information prior to notifying the DCI.

   2.   Ongoing Notification.

        a.   Concurrently, the responsible SOIC shall ensure the conduct of a prompt, security-oriented internal inquiry to identify relevant facts related to the actual or suspected significant security violation or compromise, to include what has or may have been compromised. The responsible SOIC shall provide the DCI periodic status reports, as appropriate, until a formal notification can be provided that indicates whether or not a significant security violation or compromise has, in fact, occurred.

        b.   Notification to the DCI is not intended to affect the authorities of the heads of executive departments and agencies to exercise their responsibilities to manage elements of the Community under their responsibility, including providing notification of an authorized disclosure, security violation, or compromise to appropriate law enforcement authorities.  The responsible SOIC shall ensure that he or she, or the FBI when serving as the lead investigative agency, keeps the DCI apprised of the national security implications as revealed by any investigation into a significant violation or compromise of classified intelligence information.

6

OA00007

UNCLASSIFIED//FOR OFFICIAL USE ONLY

c.  SOICs shall be mindful of their existing
obligations to also ensure that information
reflecting a violation of federal law shall be
reported to the Department of Justice, if
appropriate, under section 1.7(a) of Executive Order
12333, and that information indicating classified
intelligence information is being, or may have been,
disclosed in an unauthorized manner to a foreign
power or agent of a foreign power is reported to the
Federal Bureau of Investigation, in accordance with
Section 811 of the Counterintelligence and Security
Enhancements Act of 1994 as amended, as well as to
the DCI in accordance with applicable policies and
procedures.

3.  Final Reporting.

a.  The responsible SOIC shall provide the DCI a
final written determination of whether a significant
violation or compromise occurred, a complete
statement of the facts, the scope of any significant
unauthorized disclosure, security violation or
compromise, contributing security deficiencies, and
the significance to the national security.  If,
however, the violation or compromise results or may
result in a criminal prosecution, prior to developing
the final evaluation or preparing a damage
assessment, the responsible SOIC shall keep the DCI
appropriately informed and await either (a) a
decision by the appropriate prosecutorial authority
not to prosecute, (b) court acceptance of any plea
agreement (c) completion of the criminal prosecution,
or (d) a determination by the Attorney General or his
authorized designee that a final damage assessment
would not jeopardize a pending or anticipated
prosecution.

b.  SOICs shall ensure that deficiencies determined
to have contributed directly to a significant
security violation or compromise are corrected.  If
the responsible SOIC cannot achieve the requisite
corrections within his or her available resources or
authorities, that SOIC shall provide full details and
recommendations on Intelligence Community remedies to
the DCI.

7

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## V.   Sanctions

SOICs shall review the internal policies and procedures that govern intelligence information and activities under their responsibility to ensure that they facilitate the full range of available actions against those who make unauthorized disclosures of intelligence or otherwise breach security procedures or regulations.  SOICs shall ensure that IC personnel in their organizations found in violation of applicable law or regulations prohibiting disclosure of intelligence information or materials to unauthorized recipients or determined to have engaged in a significant security violation or compromise are subject to appropriate administrative penalties and, in certain cases, criminal investigation and possible prosecution.  Administrative penalties, applied from appropriate managerial levels, may include such actions as written reprimands, suspension without pay, monetary penalties, or termination of employment or accesses.   The intentional disclosure or release of classified intelligence information to persons not authorized to receive it shall not be tolerated or condoned.

## VI.   Definitions

**Classified Intelligence.**  Intelligence information classified pursuant to Executive Order 12958, Executive Order 12951, or other applicable authority.

**Intelligence Information, Sources and Methods (and Related Materials).**  Includes the following information whether written or in any other medium:

> 1.   Foreign intelligence and counterintelligence, as defined in the National Security Act of 1947, as amended, and Executive Order 12333;

> 2.   Information describing or otherwise revealing US foreign intelligence and counterintelligence activities, sources, methods, equipment, or methodology used for the acquisition, processing, or exploitation of such intelligence; foreign military hardware obtained through intelligence activities for exploitation and the results of the exploitation; and any other data resulting from US intelligence collection efforts; or

> 3.   Information on Intelligence Community protective security programs (e.g., personnel, physical, technical, and information security).

**Responsible SOIC.**  SOIC with primary or sole authority to conduct an internal inquiry into the suspected violation or compromise.

8

UNCLASSIFIED//FOR OFFICIAL USE ONLY

OA00009

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**Senior Official of the Intelligence Community (SOIC).** The head of an agency, office, bureau, or other intelligence element as identified in Section 3 of the National Security Act of 1947, as amended, and Executive Order 12333.

**Significant security violation or compromise**, whether actual or suspected, is an unauthorized disclosure, a security violation, or a compromise of intelligence information that is either extensive in scope, indicates pervasive breach of security procedures, or is otherwise likely to have a serious effect on national security interests. Examples include:

- Evidence of an unauthorized disclosure of classified intelligence information to an international organization, a foreign power, or an agent of a foreign power, or evidence indicating possible espionage;

- Loss or compromise of classified intelligence information that could pose a risk to human life;

- Loss or compromise of classified intelligence information on a scale or over such an extended period of time as to indicate the possibility of a systemic compromise;

- Loss or compromise of information storage media or equipment containing intelligence information of such quantity or sensitivity as to potentially jeopardize intelligence activities, sources or methods;

- Evidence of clandestine surveillance devices discovered in a sensitive area;

- Loss or compromise of information revealing covert or clandestine US or liaison partner's intelligence operations or locations;

- Loss or compromise of classified intelligence information that could seriously impair foreign relations;

- Such other disclosure, release, violation, or compromise of intelligence sources, methods, activities, or information that a SOIC determines could have a substantial or otherwise adverse impact on the conduct of activities related to US national security.

**VII.   References**

A.   National Security Act of 1947, as amended (including 50 USC 402a, 404g, and 421 et seq.)
B.   Title 18 USC Section 793, 794, 798, 1924.
C.   Title 28 USC Section 535

9

OA00010

UNCLASSIFIED//FOR OFFICIAL USE ONLY

D.  Executive Order 12333, United States Intelligence
Activities
E   Executive Order 12958, Classified National Security
Information
F.  Executive Order 12968, Access to Classified Information
G.  NSDD-84, Safeguarding National Security Information
H.  NSCID-1, Basic Duties and Responsibilities (17 February
1972)
I.  MOU, Reporting of Information Concerning Federal Crimes
(August 1995)

VIII.  Interpretation

Questions concerning the interpretation of this policy shall be
referred to the Office of the Deputy Director of Central
Intelligence for Community Management for resolution in
coordination with the DCI's Office of General Counsel.


_____        _____
Director of Central Intelligence        Date

10

UNCLASSIFIED//FOR OFFICIAL USE ONLY            OA00011

# Executive Office of the President - Interagency Agreement

OAS I8C08

| 1. Customer: Component: | 2. Servicing Component: |
|---|---|
| Office of Administration/OCFO | Dept. of Health & Human Services, Program Support Center (PSC) |
| Administrative Contact: | Administrative Contact: |
| Name:  STEPHEN O'NEILL | Name:  TRANG L. DINH |
| Address:  1800 G STREET NW, OA/OCFO | Address:  11400 ROCKVILLE PIKE, SUITE 700 |
|          WASHINGTON, DC 20503 |          ROCKVILLE, MD 20852 |
| Phone/fax: | Phone/fax: |
| E-mail: | E-mail: |

| 3. Financial Data (enter all data): | Amendment: |
|---|---|
| Document Number:  OASI8C08 | BETC: DISB |
| Fund:  OAS003SE08XX | |
| Budget Fiscal Year:  2008 | |
| Treasury Account Symbol (TAS):  1180018 | |
| Agency Location Code:  1130001 | |
| DUNS/BPN:  031649358 | |
| Other:  EIN 521101890 | |

| 4. Financial Data (enter applicable data): | Amendment: |
|---|---|
| Document Number: | BETC: COLL |
| Fund:  2008 | |
| Budget Fiscal Year:  75X4552 | |
| Treasury Account Symbol (TAS):  75020030 | Project Code |
| Agency Location Code:  OP402 | DUNS/BPN:  043982318 |
| Servicing Cost Center: | Object Class: |
| Other:  EIN 1530196960A6 | |

**Rejection Notice:  Billing will be rejected if it does not cite EOP financial data as noted above.**

5. Authority Citation:
   Economy Act, 31 U.S.C. §§ 1535 and 1536

6. Period of Performance:   10/01/2007 - 09/30/2008

7. Additional Requirements:

8. Description of Goods or Services Provided:

| Line | Service/quantity/unit cost | Object Class | Customer Cost Center | Customer Project Code | Amount | Charges | New Total |
|---|---|---|---|---|---|---|---|
| 1 | Division of Payment Management, Payment Management System for processing EOP ONDCP Grants | 2531 | OASI020000 | XXXXXXXXX | $ 45,000.00 | $ | $ 45,000.00 |
| 2 | Please reference EOP obligating document number OASI8C08 in all IPAC/billing documents. | | | | $ | $ | $ |
| 3 | | | | | $ | $ | $ |
| | | | | Total.............. | $ 45,000.00 | $ | $ 45,000.00 |

9. Customer Approval (Signature):

10. Servicing Approval (Signature):

11. Name/Title:
    EDGAR BENNETT, CHIEF FINANCIAL OFFICER

Date 03/22/07

12. Name/Title:
    ANTHONY J. DITOTO, JR., DIRECTOR, DIVISION OF PAYMENT MANAGEMENT

Date 10/22/07

EXHIBIT 2   3/13/08

OA00013

# MEMORANDUM OF UNDERSTANDING
### Between
### Office of the Chief Financial Officer, Office of Administration,
### Executive Office of the President
### and
### Health and Human Services
### Program Support Center
### Division Of Payment Management

**PURPOSE:**

This Memorandum of Understanding (MOU) between the Office of the Chief Financial Officer (OCFO), Office of Administration, Executive Office of the President (EOP), and the Department of Health and Human Services (HHS), Program Support Center, Division of Payment Management, provides that HHS will process all grantee/recipient requests for funds (cash draw-downs) via the HHS Payment Management System (PMS) - SMARTLINK Electronic Funds Transfer (EFT).

**AUTHORITY:**

This MOU is entered into under the authority of The Economy Act, 31 U.S.C. Section 1535; The Chief Financial Officers Act, 31 U.S.C. Section 901, et seq., as amended by P.L. 106-58, Section 638; OMB Circular A-127 Revised (Transmittal Memorandum No. 2), Financial Management Systems; and OMB Circular 130, Revised (Transmittal Memorandum No. 4), Management of Federal Information Resources.

I. The EOP will:

A. The EOP Office of National Drug Control Policy (ONDCP) will provide HHS with current information regarding grantees, including:

    1. Authorization documents
    2. Recipient organization and banking information (SF 1199A)
    3. Verified organization name, signature, and bank account information on the completed SF 1199A

B. ONDCP will provide HHS with the following point of contact information:

    1. Contact name (primary & alternate)
    2. Mailing address (regular & overnight mail)
    3. Telephone numbers
    4. Fax numbers
    5. Email addresses

OA00014

C. ONDCP will provide HHS with the following information for each grant recipient:

    1. Contact name (primary and alternate)
    2. Mailing address
    3. Telephone numbers
    4. Fax numbers
    5. Email addresses

D. OCFO will provide HHS with a list of key personnel responsible for liaison and data transfer problem solving and/or enhancements.

E. OCFO and ONDCP will provide HHS with copies of EOP policies, procedures, and guidelines for PMS that impact operations and grantees.

F. ONDCP will adhere to HHS and Treasury requirements for paying grantees via SMARTLINK, and maintain the necessary authorizations to access PMS-SMARTLINK data bases.

G. OCFO will, on a monthly basis, reconcile grants paid through PMS with the corresponding data maintained in the EOP accounting records.

II. HHS will:

A. Provide an adequate back-up system for PMS to insure that ONDCP grantees are paid.

B. Maintain sufficient and adequately-trained staff to ensure that ONDCP grantees are paid when proper requests for funds are made.

C. Maintain the necessary equipment, etc., to ensure II(B) above. This includes providing the system access required for the Miami Service Center to perform its function.

D. Provide the necessary security to ensure that EOP and grantee data is not compromised.

E. Provide EOP with the appropriate points of contact for:

    1. Resolution of problems with or enhancements to services and data provided by PMS.

    2. Names, telephone numbers, and addresses of personnel responsible for assisting grantees with problems regarding payment rejections.

OA00015

F. Provide the EOP with all appropriate system generated reports in a timely manner. These reports include:

    1. Payment reports
    2. SF-224
    3. SF-272
    4. Other reports as required

G. Provide EOP with access to data via computer inquiry and/or audits or related review.

H. Ensure that the PMS system provides an adequate audit trail of all transactions, and that proper accounting and administrative internal controls are in place and functioning.

I. Ensure that Treasury, Federal Reserve Bank, and other Federal requirements are adhered to as they relate to the processing of EOP payments.

III. Statement of Position

A. <u>Normal Operations.</u> It is the intent of the OCFO to have minimal impact on HHS. HHS is to coordinate all PMS activities with the EOP. OCFO will be involved in policy and administrative matters; not the day-to-day operations of the system.

B. <u>Payment Approval and/or Confirmation.</u> Grant authorizations will be documented and approved by ONDCP prior to grant funds being loaded into the HHS system. ONDCP will be responsible for validating all grant authorizations, and will initiate the loading of all grant authorizations into the HHS system. No grant funds shall be made available to grantees without complete and proper ONDCP approval.

ONDCP plans to utilize the National High Intensity Drug Trafficking Areas (HIDTA) Assistance Center (NHAC) in Miami, Florida to review and validate the completeness of grant payment requests. ONDCP will identify to the HHS Division of Payment Management, each user at the NHAC that is authorized to perform this task. ONDCP will also identify each grantee that is eligible for payment via the HHS system, and will identify all users who are authorized to request and approve payments.

It is an OCFO and ONDCP requirement that all grantee payment requests must be approved by the grantee approving official, and reviewed and released by either ONDCP or the NHAC. ONDCP agrees that each approved grant payment request will be signed by the grantee approving official, and include a certification by the grantee that the payment request is proper and correct. Approved payment requests will be reviewed by the NHAC to ensure that documentation is complete and in order. Only approved payment requests found by the NHAC to be complete and in order will be released by the NHAC for payment. ONDCP (or NHAC) will also be responsible for notifying grantees whose payment requests are not being

OA00016

released.

Since the NHAC is also a grantee under the ONDCP grant program, all NHAC grant payment requests must be reviewed and released by ONDCP. Under no circumstances shall the NHAC be allowed to release its own grant payment requests.

It is understood that over the course of each month, HHS will process and disburse funds to grantees from its own working fund. At the end of each month, HHS will provide an SF224 to OCFO and the U.S. Treasury reporting the funds that were disbursed by HHS to ONDCP grantees. These SF224's will result in the U.S. Treasury transferring funds from the EOP accounts to HHS to reimburse HHS for payments made to ONDCP grantees. OCFO hereby delegates the authority to HHS to disburse grant payments on behalf of ONDCP with the following stipulations:

1. HHS will only disburse funds for which corresponding grant authorizations have been loaded into the HHS grants system.

2. Grant authorizations will only be loaded into the HHS system by authorized EOP users or their designees.

3. HHS will only disburse funds for payment requests that have been approved and certified by authorized grantees.

4. HHS will only disburse funds for payment requests that have been released by authorized NHAC or EOP employees.

C. Coordination. During the implementation of PMS-SMARTLINK, all coordination (i.e., enhancements, meetings, training, etc.) will be through the OCFO. Following implementation, all coordination will be through the ONDCP.

IV. Funding

A. OCFO agrees to reimburse HHS for maintaining the PMS on a monthly basis, subject to the availability of funds, via Treasury's Online Payment and Collection System (OPAC). Billings will be made to ALC 11010005 and shall reference the interagency agreement number provided by the EOP.

B. The monthly cost to OCFO for PMS will be provided by HHS. Sufficient detail will be provided to allow the EOP adequate review of costs prior to payment.

C. The monthly billing should be FAXED to 202-395-7202, Attn: Office of the CFO.

OA00017

D. The estimated annual costs to OCFO for PMS will be negotiated annually 90 days prior to the beginning of the fiscal year. The estimates for fiscal year 2003 are 1,100 active grants at an annual cost of $100.00 per grant. This cost will be prorated to the actual number of active grants at year end.

## V. Period of agreement

This agreement is effective on the date of signature of both parties. The initial agreement is for the five year period from May 2003 through May 2008, but can be extended based upon both parties written consent. An interagency agreement document (separate from this memorandum of understanding) will be issued by OCFO to HHS to authorize funding for these fees.

## VI. Termination

Either party may terminate this MOU by providing at least 60 days written notice to the other party. Any termination of this agreement by HHS will not take effect until the OCFO has had sufficient time to find another service provider, including the securing of sufficient funding, and is able to transition in an orderly fashion to that service provider's system. HHS will cooperate with any required transition.

This agreement may be modified by mutual consent of both parties.

OA00018

_Michele C. Marx_                          _7/7/03_
Michele Marx                                Date
Associate Director, Management & Administration
Office of National Drug Control Policy


_Albert A. Muhlbauer_                       _7/7/03_
Albert A. Muhlbauer                          Date
Deputy Chief Financial Officer
Office of Administration, Executive Office of the President


_Philip J. Giza_                           _7/10/03_
Philip J. Giza                              Date
Director, Division of Payment Management
Financial Management Service
Program Support Center
Department of Health and Human Services


_Thomas F. Greene_                         _7/17/03_
Thomas F. Greene                            Date
Director, Financial Management Service
Program Support Center
Department of Health and Human Services


Page 6 of 6

OA00019



PRESIDENT | VICE PRE

Your Governmen

# THE WHITE HOUSE
### PRESIDENT GEORGE W. BUSH



Home > Government > Office of Administration > Freedom of Information Act

## IN FOCUS

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Judicial Nominations
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues

### News

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news

### Interact

Ask the White House
White House Interactive

### Your Government

President's Cabinet
USA Freedom Corps
Faith-Based & Community Initiatives
Office of Management and Budget
National Security Council
USA.gov

Appointments

## FOIA HANDBOOK

This handbook is intended to assist you in making a Freedom of Information Act (FOIA) request to the Office of Administration (OA), Executive Office of the President (EOP). For further details please refer to the OA FOIA Regulations which can be found at 5 CFR §2502. These regulations are currently being updated.

OA is a distinct entity from the other components of the EOP. Please contact the separate EOP entities, that are subject to FOIA, individually, if you would like to make a FOIA request for their records.

The EOP entities subject to the FOIA are:

- Council on Environmental Quality
- Office of Administration
- Office of Management and Budget
- Office of National Drug Control Policy
- Office of Science and Technology Policy
- Office of the United States Trade Representative

The EOP entities exempt from the provisions of the FOIA are:

- White House Office
- Office of the Vice President
- Council of Economic Advisers
- National Security Council
- Office of Policy Development
  - Domestic Policy Council
  - Office of National AIDS Policy
  - National Economic Council
- President's Foreign Intelligence Advisory Board

PLAINTIFF'S
EXHIBIT
3
3I3I08 JS

### MISSION OF THE OFFICE OF ADMINISTRATION:

The Office of Administration (OA) was established within the Executive Office of the President (EOP) by Reorganization Plan No. 1 of 1977. The Office was activated, effective December 4, 1977, by Executive Order 12028 of December 12, 1977. Its primary function is to provide common administrative and support services for the various entities of the EOP. The services include personnel; financial management; data processing; library services; records management; and general office operations, such as mail, messenger, printing, procurement, and supply services. OA has no field organizations and consists of the following:

(1) Office of the Director and General Counsel

Nominations
Applications

(2) Equal Employment Opportunity

(3) Facilities Management

(4) Financial Management

(5) General Services

(6) Human Resources Management

(7) Information Systems & Technology

(8) Library Research Services

(9) Operations and Legislative Liaison

(10) Security

CURRENT PUBLICATIONS:

None at this time.

SUBMITTING A FREEDOM OF INFORMATION ACT REQUEST:

A request made under the FOIA must be submitted in writing, by mail
or fax, to the following address:

Office of Administration
FOIA Officer
725 17th Street NW
Washington, DC 20503
Phone: (202) 395-2273
Fax: (202) 456-7921

The words FOIA REQUEST should be clearly marked on both the
letter and the envelope. Due to security measures at the Eisenhower
Executive Office Building and the New Executive Office Building,
requests made in person should be delivered to Room G-1, at the
above address. Describe the specific records requested in enough
detail so that they can be located with a reasonable amount of effort.
Requests for answers posed as questions are not covered under the
FOIA. The request must be for records. Records must exist at the
time the request is submitted.

Please state your willingness and ability to pay applicable fees or
provide a justification to support a fee waiver.

For further information, please refer to the Office of Administration
FOIA Regulations at 5 CFR §2502, which are currently being
reviewed in light of the passage of the E-FOIA Amendment of 1996.
Questions relating to the OA records and disclosure regulations may
be directed to (202) 395-2273.

PRIVACY ACT:

Information may also be requested from OA under the Privacy Act, 5
U.S.C. 552a. Privacy Act requests for information in OA's files must
be in writing and sent to the same address as FOIA requests (see
Submitting a Freedom of Information Act Request). For further
details please refer to the OA Privacy Act Regulations which can be
found at 5 CFR §2504.

The Privacy Act Regulations apply to all records maintained by the
Office of Administration that are contained in a system of records, and
that contain information about an individual. The regulations also
establish procedures that (a) authorize an individual's access to
records maintained about him/her; (b) limit the access of other
persons to those records; and (c) permit an individual to request the

amendment or correction of records about him/her self.

Please note that records maintained by OA are usually kept only on individuals employed by the office and not on all other citizens or residents of the United States.

EOP Publications:

There are no OA publications. If you are interested in publications from other EOP entities, please visit the individual web sites.

OA'S WEBSITE ADDRESS:

http://www.whitehouse.gov/oa/

OA'S ELECTRONIC READING ROOM

OA's Electronic Reading Room located on OA's website (see address above) contains documents specifically identified for inclusion by the FOIA, as well as documents for which we have received multiple requests:

- The IMPAC Credit Card Holders Listing;
- Government Information Locator System (GILS);
- Office of Administration Annual FOIA Reports;
- Handbook for FOIA Requests;
- Office of Administration FOIA Regulations; and
- Index and Description of Major Information and Record Locater Systems

President | Vice President | First Lady | Mrs. Cheney | News & Policies

History & Tours | Kids | Your Government | Appointments | Jobs | Contact | Text only

Accessibility | Search | Privacy Policy | Help | Site Map

(Date)

(Header)

(Greeting)

On behalf of the Executive Office of the President, Office of Administration, I would request the non-reimbursable detail of a qualified individual from your organization for a period of time not to exceed six months.

Current detail opportunities within OA lend valuable experience in the areas of information technology and financial management, specifically working alongside our Chief Information Officer and Chief Financial Officer. For you reference, attached are three current detail opportunities outlining specific duties and responsibilities.

In advance, I appreciate your attention and full consideration of this request. Should you have any questions, please feel free to contact me at

Sincerely yours,


Alan R. Swendiman
Special Assistant to the President and
  Director, Office of Administration



PLAINTIFF'S EXHIBIT 4

OA00319

EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION

# PERSONNEL FROM OTHER ORGANIZATIONS

| TO: Human Resources Management Division 1800 G Street, Floor 10 | FROM: (Requesting Official) |
| --- | --- |

**THIS IS TO INFORM YOU THAT THE FOLLOWING INDIVIDUAL WILL BE PERFORMING DUTIES IN THE EOP COMPLEX**

| RECEIVING ORGANIZATION: EOP, OA, OCFO | PARENT ORGANIZATION: General Services Administration |
| --- | --- |

| NAME:   Last | First | MI |
| --- | --- | --- |

| PAY PLAN/GRADE/STEP: GS-501-14, Step 4 | SALARY: $100,547 | TYPE OF APPOINTMENT CURRENTLY SERVING ON PARENT ORGANIZATION: Detailee |
| --- | --- | --- |

SOCIAL SECURITY NUMBER:

| BIRTHDATE: 09-01-1956 | BIRTHPLACE: Ghana | DATE OF APPOINTMENT: 2/6/2006 |
| --- | --- | --- |

PURPOSE/JUSTIFICATION OF EXTENSION (Describe project or duties):

To work with GSA IAGs and IPACs

TYPE:
- [ ] HISTORICALLY PROVIDED SERVICE
- [ ] ASSIGNEE
- [ ] PRESIDENTIAL MANAGEMENT INTERN
- [ ] WHITE HOUSE FELLOW
- [x] DETAILEE
- [ ] STUDENT VOLUNTEER
- [ ] AGENCY REPRESENTATIVE
- [ ] OTHER _____

DRUG TESTING DESIGNATION:    [x] TDP    [ ] Non-TDP

| BEGINNING DATE (Mo/Day/Year): 2/6/2006 | ENDING Date (Mo/Day/Year): 8/4/2006 |
| --- | --- |

| POSITION TITLE (At the EOP Complex): Financial Management Analyst | BUILDING PASS IS REQUIRED FOR: [ ] WH   [x] EEOB   [ ] NEOB |
| --- | --- |

| TYPE OF DETAIL (If applicable): [x] Non-Reimbursable   [ ] Reimbursable IF REIMBURSABLE, FMD CERTIFICATION OF FUNDS AVAILABILITY: | ASSIGNMENT LOCATION (ORGANIZATION, DIVISION, BUILDING, ROOM NUMBER, TELEPHONE): EOP, OA, OCFO 1800 G St. 10th Floor Washington, DC |
| --- | --- |

| EOP CONTACT PERSON (Name & Telephone): Edfgar Bennett, |
| --- |

APPROVING OFFICIAL IN PARENT ORGANIZATION (Name & Telephone):
JOHN K. WILSON

| SIGNATURE OF EOP AGENCY APPROVING OFFICIAL: | DATE: 1/9/2006 |
| --- | --- |

OA FORM 08
REV. AUG 2003

OA00271



PLAINTIFF'S EXHIBIT 6 3/31/08 JS

TOTAL P.02



**Department: Executive Office of the President**
**Agency: Office of Administration**
**Sub Agency: Office of Procurement and Contract Officer**

**Job Announcement Number:**
**OA-NRD-08-01-JJ**

Overview     (DETAILED VERSION)   (☒ CLOSE)   (🖶 PRINT)

# Procurement Analyst/Contract Specialist

**Salary Range:** 0.00 - 0.00 USD per year

**Series & Grade:** GS-1102-12/13

**Open Period:** Thursday, October 18, 2007
to Friday, April 18, 2008

**Position Information:** Full-Time  Detail not to
exceed 6 months

**Duty Locations:** 1 vacancy - Washington, DC

## Who May Be Considered:
Current Permanent Federal employees in the Washington DC commuting who are interested in a non-reimbursable detail position.

## Job Summary:
The Office of Administration (OA) provides a full array of customer-based services to all entities of the Executive Office of the President (EOP). OA is composed of four offices: the Office of the Chief Financial Officer, the Office of the Chief Information Officer, the Office of the Chief Operating Officer and the Office of Security and Emergency Preparedness. In addition to these offices, OA also has a General Counsel and an Equal Employment Opportunity Division.

**THIS IS AN EXCELLENT CAREER BROADENING OPPORTUNITY TO SERVE A DETAILEE IN THE EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION. THIS ANNOUNCEMENT IS TO SOLICIT APPLICATIONS FOR A NON-REIMBURSABLE DETAIL UP TO 6 MONTHS.**

PLAINTIFF'S
EXHIBIT 6
5/3/07 JJ

Duties

## Major Duties:
Position is located in the Office of Administration, Office of the Chief Procurement and Contract Officer. The detailee in this position will comprehensively review the existing Purchase and Fleet Card Program. The detailee would be expected to work with all staff involved in the program to gather information, develop best practices and streamline the process. The detailee would ultimately need to incorporate this information by updating the "Standard Operating Procedures for use of the Government wide Commercial Bankcard Service" which details the procedures of the EOP Purchase and Fleet Card Program and train the staff and implement the process. In order to be successful in this detail, this procurement analyst must have knowledge of federal purchase-card programs, and have knowledge of Federal Acquisition Regulations concerning purchase card programs.

OA00320

USAJOBS

Qualifications and Evaluation

## Qualifications:

**SECURITY CLEARANCE:** This position requires the detailee to obtain and maintain a security clearance. This means that a full field background investigation will be conducted including appropriate credit checks. A detailee starting date will depend on the outcome of pre-employment interviews and any additional information obtained prior to the initiation of a full background investigation. This component has the right to rescind the detailee agreement at any time before the actual starting date based on any negative information that may be found during a preliminary security and/or credit check. Detailees selected must be 18 years of age as of the detail start date.

**DRUG TESTING:** The detailee selected for this position will be required to submit to urinalysis screening for illegal drug use prior to start date. After starting, the detailee will be included in the component's random drug testing program.

**CITIZENSHIP:** Under Executive Order 11935, only United States citizens and nationals (residents of American Samoa and Swains Island) may compete for this detail opportunity.

## How You Will Be Evaluated:
APPLICANTS WILL BE EVALUATED ON THEIR EXPERIENCE/EDUCATION.

Benefits and Other Information

## Benefits:
**THIS IS AN EXCELLENT CAREER BROADENING OPPORTUNITY TO SERVE AS A DETAILEE IN THE EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION.**

How to Apply

## How To Apply:
ALL APPLICANTS MUST SUBMIT THE FOLLOWING:

· Resume

· Detailee Assignment Approval Form (located at the bottom of this announcement) signed by your supervisor. Once signed by your supervisor, please fax the document to the attention of Jarrett Johnson at (202)395-1262 or (202)395-1264

### THERE ARE 2 OPTIONS FOR APPLYING:

Email your resume to EOPJOBS@OA.EOP.GOV

OA00321

**OR**

You may submit your resume from the USAJOBS web site on the Internet. After reviewing the full text of this announcement, click on the 'Submit Resume on-line' shown on this page.

USAJOBS

Create or edit your resume. Please be sure to use the space entitled "Supplemental Information" to add and/or fax any additional information specified in this announcement, as stated above.

When you have finished and select 'Send', your resume will be sent to our agency. Electronic Resumes can only be sent using the special icon in our announcement. To apply on-line, you must prepare your resume and SEND it before midnight Eastern Time of the closing date.

After you complete and send the OPM online resume, you will receive a web page message stating that your resume (for the specified announcement number) was sent to our agency. This message serves as a confirmation of your mailing. If you do not receive this statement that your resume was not successfully transmitted, you should try again.

Users of the Telecommunications Device for the Deaf (TDD) may call: (202) 395-1160.

**Contact Information:**
Jarrett Johnson
Phone: 202-395-1088
Fax: 202-395-5608
Email: EOPJOBS@OA.EOP.GOV

Or write:
Executive Office of the President
725 17th Street NW
Washington, DC 20503
US
Fax: 202-395-5608

**What To Expect Next:**
**NON-REIMBURSABLE DETAILEE ASSIGNMENT APPROVAL**

I APPROVE MY EMPLOYEE _____ TO SERVE A NON-REIMBURSABLE DETAILEE ASSIGNMENT FOR THE OFFICE OF ADMINISTRATION, OFFICE OF THE CHIEF INFORMATION OFFICER FOR A SPECIFIED PERIOD OF TIME. AS THE PARENT ORGANIZATION, I UNDERSTAND THAT I CAN TERMINATE THE DETAILEE ASSIGNMENT AT ANY TIME IF CONDITIONS WARRANT.

Supervisor or Approving Official Name/Date

Supervisor Title and Organization

OA00322

Supervisor Signature

EEO Policy Statement

The United States Government does not discriminate in employment on the basis of race, color, religion, sex, national origin, political affiliation, sexual orientation, marital status, disability, age, membership in an employee organization, or other non-merit factor.

Reasonable Accommodation Policy Statement

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application and hiring process should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a case-by-case basis.



✉ **Send Mail**

**Send Mail to:**
Executive Office of the President
725 17th Street NW
Washington, DC 20503
US
Fax: 202-395-5608

⑦ **Questions?**

**For questions about this job:**
Jarrett Johnson
Phone: 202-395-1088
Fax: 202-395-5608
Email: EOPJOBS@OA.EOP.GOV

**USAJOBS Control Number: 1038476**



OA00323

# Executive Office of the President - Interagency Agreement

| 1. Customer Component: | | | 2. Servicing Component: | |
|---|---|---|---|---|
| Situation Support Staff | | | Office of Administration | |
| Administrative Contact: | | | Administrative Contact: | |
| Name: Kenneth Pinley | | | Name: Mary Anne Cochran-Fox | |
| Address: 302 EEOB | | | Address: 1800 G. St., NW, 16th Floor | |
| Washington, DC 20503 | | | Washington, DC 20503 | |
| Phone/Fax: | | | Phone/Fax: | |
| E-mail: | | | E-mail: | |

| 3. Financial Data (enter all data): | | 4. Financial Data (enter applicable data): | | |
|---|---|---|---|---|
| Document Number: N417560BMDSO125 | Amendment: | Document Number: OASIS16 | Amendment: | |
| Fund: Operation & Maintenance, Navy | BETC: DISB | Fund: OASIS03RE01XX | BETC: COLL | |
| Budget Fiscal Year: 2008 | | Budget Fiscal Year: 2008 | | |
| Treasury Account Symbol (TAS): 1781804 | | Treasury Account Symbol (TAS): 11 X 0100 | Project Code | |
| Agency Location Codes: 00 00 8404 | | Agency Location Code: 11 03 0001 | DUNS/DPN: | |
| DUNS/DPN: | | Servicing Cost Center: OA81050000 | Object Class: 2110 | |
| Other: AA 1781804 DUG3 000 00000 0 068941 2D 000000 130009371000 | | Other: | | |

5. Authority Citation: Economy Act, 31 U.S.C. §§ 1535 and 1536

**Rejection Notice:** Billing will be rejected if it does not cite EOP financial data as noted above.

6. Period of Performance: October 1, 2007 through September 30, 2008

| 7. Additional Requirements | Note: EOP - Please collect via IPAC using ALC# 00008404 and financial data above after billings are complete. | | | | | | |
|---|---|---|---|---|---|---|---|

| 8. Description of Goods or Services Provided: | | | | | | | |
|---|---|---|---|---|---|---|---|
| Line Item/Requisition/Document # | | Object Class | Customer Cost Centre | Customer Project Code | Amount | Changes | New Total |
| 1 | AT&T Voice Systems Operations and Maintenance | 2110 | | | $ 36,888.00 | $ | $ 36,888.00 |
| 2 | | | | | $ | $ | $ |
| 3 | | | | | $ | $ | $ |
| | | | | | $ | $ | $ |
| | | | | | $ | $ | $ |
| | | | | Total.............. | $ 36,888.00 | $ | $ 36,888.00 |

| 9. Customer Approval (Signature): | | 10. Servicing Approval (Signature): | |
|---|---|---|---|
| [signature] | Date 11/14/2007 | [signature] | Date NOV 2, 2007 |
| 11. Name/Title: | | 12. Name/Title: | |
| Thomas J. North | | Edgar Bennett, Chief Financial Officer | |
| Kenneth Pinley, Director of Acquisition and Resource Management | | | |

MACF 11-2-0-

PLAINTIFF'S
EXHIBIT 7
3-13-08

OA00335

| Standard Form 1080 | | |
| Revised April 1982 | | VOUCHER NO. |
| Department of the Treasury | **VOUCHER FOR TRANSFERS** | N4175608MD50125 |
| I TFRM2-2500 | **BETWEEN APPROPRIATIONS AND/OR FUNDS** | SCHEDULE NO. |
| 1080-109 | | |

Department, establishment, bureau, or office receiving funds

**NAVY SYSTEMS MANAGEMENT ACTIVITY**
1851 S. Bell St.
Arlington, VA 22202                           ALC# 00008404

BILL NO.

Department, establishment, bureau, or office charged

· EXECUTIVE OFFICE OF THE PRESIDENT          ·
1800 G. St., NW; 10th Floor
WASHINGTON, D.C. 20503
POC: Mary Anne Cochran-Fox:
PH:
ALC: 11 03 0001

PAID BY

| ORDER NO. | DATE OF DELIVERY | ARTICLE OR SERVICES | QUAN- TITY | UNIT PRICE | | AMOUNT |
| | | | | COST | PER | DOLLARS AND CENTS |
| | | Funds are provided to the Executive Office of the President for AT&T voice systems operations and maintenance under document N4175608MD50125/OASI8S16. | | | | $36,888.00 |
| | | Please collect via IPAC using ALC# 00008404 after billings are complete using document number N4175608MD50125. | | | | |
| | | NSMA POC: ANTHONY ZGAINER PH:           –, FAX: | | | | |
| | | | | | TOTAL | $36,888.00 |

Remittance in payment should be sent to -

**ACCOUNTING CLASSIFICATION -** *Office Receiving Funds*

**CERTIFICATE OF OFFICE CHARGED**
I certify that the above articles were received and accepted or the services performed as stated and should be charged to the appropriation(s) and/or fund(s) as indicated below; or that the advance payment requested is approved and should be paid as indicated.

_____
11/14/2007
(Date)

_____
(Authorized administrative or certifying officer)

_____
(Title)

**ACCOUNTING CLASSIFICATION -** *Office Charged*

AA 1781804 DUG3 000 00000 0 068941 2D 000000 130009371000

OA00336

Paid by Check No.



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

PROJECT CODE: P80107CHI                              DATE 1/4/2008

**REIMBURSABLE AGREEMENT
BETWEEN
THE
EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
AND
THE DEPARTMENT OF EDUCATION**

REIMBURSABLE AGREEMENT NUMBER: P80107CHI
REPORTING CATEGORY: P80107CHI

1.  The Department of Education will provide financial support by funding official event costs associated with the visit of the President of the United States and the Secretary of Education to the Horace Greeley Elementary School in Chicago, IL on January 7, 2008 to meet with students and discuss NCLB and the importance of maintaining accountability in schools. This Reimbursable Agreement (RA) between the Department of Education and the Executive Office of the President (EOP), Office of Administration (OA), authorizes an amount not to exceed ten thousand dollars ($10,000.00).

2.  Pursuant to the Economy Act (31 U.S.C. 1535 (EOP)) and (20 USC 3475 (ED)), the Department of Education and EOP enter into this agreement with respect to the event of the President of the United States on January 7, 2008. This agreement reduced to writing an agreement entered into by the Department of Education and the EOP orally and/or electronically prior to that date.

3.  Following the event, funds will be collected monthly based upon event invoices received. The funds will be collected via the U.S. Treasury Intra-Governmental Payment and Collection (IPAC) System by the Executive Office of the President, Office of Administration. Once the event costs have been finalized, notification will be made of any funds available for deobligation. If IPAC is not available, checks must be made payable to the U.S. Treasury and sent c/o Executive Office of the President, Office of the Chief Financial Officer, Attn: Presidential Travel Team, 10th Floor – CFO/Accounting, 1800 G Street NW Washington, DC 20503. Please provide your Agency Location Code and any other financial information needed to process this transaction. The financial point of contact of the supporting agency will be notified prior to the collection of funds.

4.  The point of contact for this letter of commitment is Heather Martin at

OA00354



PLAINTIFF'S
EXHIBIT



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

5.  Agency Accounting Information:
- Agency Location Code:
- Appropriation:
- Accounting Data:
- DUNS #

EOP Accounting Information
Agency Location Code: 11030001
Appropriation: ~~1170110~~  1180110
Accounting Data:
DUNS# 031649358

_____ Date 1/3/08

NAME    JoAnn Ryan
TITLE    Executive officer, OS
DEPARTMENT/AGENCY    Department of Education

_____ 1/4/2008
Date

Heather Martin
Branch Chief
Travel Services

ALC: 91-02-0001

APPROPRIATION: 9180800

ACCOUNTING DATA:

0800A2008A2008EA000000
5002530A0000000000000000

DUNS: 001044168

OA00355

**U.S. DEPARTMENT OF EDUCATION**
OUTGOING

AGREEMENT BETWEEN FEDERAL AGENCIES
# FOR ED ORDER OF GOODS AND SERVICES

NOTE TO EDUCATION POINT OF CONTACT: Provide a brief explanation of the goods or services ordered, basis for determining costs, and estimated total costs for multi-year projects using the BS-008 EDBUYER Payment Addendum, SOW or MOU. GSA Optional Form 347 (Order for Supplies or Services) and BS-008 EDBUYER PAYMENT ADDENDUM must be attached to this Agreement. Applicable provisions of the FAR, Parts 3.1, 9.5, and 17.4, and all applicable conflict of interest laws and regulations are incorporated by reference with the same force and effect as if given in full text.

| EDUCATION OFFICE REQUESTING SERVICE: (BUYER) | OTHER FEDERAL AGENCY PERFORMING SERVICE: (SELLER) |
|---|---|
| PRINCIPAL OFFICE NAME: Office of the Secretary | AGENCY AND OFFICE NAME: The White House |
| ADDRESS: 400 Maryland Avenue, SW Room 7E303 Washington, DC 20202 | ADDRESS: Executive Office of the President Office of Administration Washington, DC |
| CONTRACTING OFFICER REPRESENTATIVE CONTACT NAME: William Doyle | INTERAGENCY AGREEMENT CONTACT NAME: Heather Martin |
| TELEPHONE NUMBER: 202-205-7851  FAX #: 202-401-1971 | TELEPHONE NUMBER:  FAX #: |
| EMAIL ADDRESS: William.Doyle@ed.gov | EMAIL ADDRESS: |
| BPN (DUNS) NUMBER: 0 0 0 4 1 0 0 8 8 | BPN (DUNS) NUMBER: 0 3 3 6 4 0 5 9 |
| ORDER NUMBER: E D - 0 8 - A R - 0 0 4 7 | INTERAGENCY REFERENCE NUMBER: P60107Ctrl |
| IAG NAME & INITIALS: William Doyle | |
| IAG EMAIL ADDRESS: William.Doyle@ed.gov | |
| TOTAL ORDER AMOUNT: $ 10,000.00  FISCAL YEAR: 2008 | |

| EDUCATION CFO AVAILABILITY OF FUNDS | APPROVAL FROM SELLER'S FINANCE BUDGET OFFICER |
|---|---|
| CFO FINANCE/BUDGET OFFICER SIGNATURE:  DATE: 1/3/08 | FINANCE/BUDGET OFFICER SIGNATURE (optional):  DATE: 01/04/08 |

AUTHORITY:

| ED AUTHORITY: 20 USC 3475 | SELLER AUTHORITY: 31 USC 1535 |
|---|---|

PERFORMANCE PERIOD:

| FROM: January 4, 2008 | THROUGH: March 1, 2008 |
|---|---|

ACCOUNTING DATA AND CLEARANCES:

| FINANCING (BUYING AGENCY; $ OUT) | | FINANCING (SELLING AGENCY; $ IN) | |
|---|---|---|---|
| ALC: 9 1 0 2 0 0 0 1 | | ALC: 1 1 1 0 3 0 0 0 1 | |
| APPROP/TREASURY ACCT SYMBOL (TAS): 9160800 | APPROP/TREASURY ACCT SYMBOL (TAS): | APPROP/TREASURY ACCT SYMBOL (TAS): 1170110  110110 | APPROP/TREASURY ACCT SYMBOL (TAS): |
| AMOUNT: $ 10,000.00 | AMOUNT: | AMOUNT: $ 10,000.00 | AMOUNT: $ |
| APPROP EXP DATE: 9/30/2008 | APPROP EXP DATE: | | |
| APPROP CANCEL DATE: 9/30/2013 | APPROP CANCEL DATE: | | |
| BUSINESS EVENT TYPE CODE (BETC): D I S B | | BUSINESS EVENT TYPE CODE (BETC): C O L L | |
| Will initiate payment transaction  Yes [ ]  No [X] | | Will initiate payment transaction  Yes [X]  No [ ] | |

| FEE CLEARANCES: Sign off and date below: | OTHER INFORMATION (optional) |
|---|---|
| CFO/ CAMS/CFO: 1-4-2008  OCIO/ OCIO: 1/4/08 | |
| OGC/ ARO:  1/4/08  BEAD/ BEAM: | |
| OCEAM: 1/4/08 | |

| APPROVALS FOR BUYING AGENCY | APPROVALS FOR SELLING AGENCY |
|---|---|
| APPROVING OFFICIAL PRINTED NAME: JoAnn Ryan | APPROVING OFFICIAL PRINTED NAME: Heather Martin |
| TITLE: Executive Officer | TITLE: Branch Chief |
| SIGNATURE & DATE: 1/3/08 | SIGNATURE & DATE: 1/3/2008 |

BS-008 EDBUYER (SEPT 2007)

OA00356

**U.S. DEPARTMENT OF EDUCATION**
OUTGOING
**EDBUYER PAYMENT ADDENDUM**
AGREEMENT BETWEEN FEDERAL AGENCIES
## FOR ED ORDER OF GOODS AND SERVICES

**ED PRINCIPAL OFFICE (BUYER)**
Completes Sections I, II, III and IV

**I.    Payment Information**

ORDER NUMBER:  [E][D][-][0][8][-][A][R][-][0][0][4][7]

MODE:    REIMBURSEMENT [X]    ADVANCE OF FUNDS [ ]

TIMING:    LUMP SUM [X]    MONTHLY [ ]    QUARTERLY [ ]    OTHER (explain): _____

METHOD:    IPAC [X] or OTHER [ ] (explain): _____

**II.    Additional Financing Information:**    (Use this space if more than 2 ED appropriations are being used to fund the order)

Appropriation/TAS1:    Appropriation/TAS2:
Appropriation/Amount:    Amount:
Appropriation Expiration Date:    Appropriation Expiration Date:
Appropriation Cancellation Date:    Appropriation Cancellation Date:

**III.    Brief Description of Goods or Services Ordered:**    (A brief description of the order must be provided in this section)
The Interagency agreement provides financial support by funding official event costs associated with the visit of our President of the United States and the Secretary of Education to the Horace Greeley Elementary School in Chicago, IL on January 7, 2008 to meet with students and discuss NCLB and the importance of maintaining accountability in schools.

**IV.    Additional Terms and Conditions:**

MODIFICATION, TERMINATION, OR CANCELLATION
Each party may, at its option, modify, terminate, or cancel this agreement with    30    days notice to the other party.  (Enter the number of days notice as negotiated by the Parties.)  In the event an order is cancelled by the buyer, the seller is authorized to collect costs incurred prior to cancellation of the order and any termination costs.

DISPUTE RESOLUTION
In the event of a dispute concerning either the accounting treatment or the contractual aspects of this agreement, the parties agree to resolve the dispute using the dispute resolution procedures set forth in Office of Management and Budget (OMB) Memorandum M-07-03, Business Rules for Intragovernmental Transactions, dated November 13, 2006, and Treasury Financial Manual, Volume 1, Bulletin No. 2007-03, Section VII.  The link to the Business Rules is provided below.
http://www.fms.treas.gov/cfm/m07-03.pdf

**OTHER FEDERAL AGENCY (SELLER): Completes Section V**

**V.    Chief Financial Officer Required Information:**    (To be completed by the Selling Agency Finance Office.)
Complete either the reimbursement or advance section below based on the payment mode indicated in Section I above.
Questions pertaining to this section should be directed to the ED Finance Points of Contact: Leon Scott (202) 205-3423 or Carolyn Ashby (202) 401-3887;
Email: Leon.Scott@ed.gov or Carolyn.Ashby@ed.gov; Fax: (202) 205-0745

REIMBURSEMENTS:    SELLING AGENCY NAME: _____ and Response/FEMA

1.  When will REVENUE be recognized?
a) Upon signing of agreement:  [X]    b) Upon receipt of IPAC cash:  [ ]    c) As expenses accrue:  [ ]
c) Periodically to the lesser of the specified billing amount or expenses incurred. Period is:    Monthly [ ]    Quarterly [ ]    Yearly [ ]    Upon Completion [ ]
f) Periodically to the specified billing amount regardless of the expenses incurred period is:    Monthly [ ]    Quarterly [ ]    Yearly [ ]    Upon Completion [X]
g) Other: _____

2.  When will RECEIVABLE be recognized?
a) As expenses accrue:    b) Periodically for the lesser of the specified billing amount or expenses incurred Period is:    Monthly [ ]    Quarterly [ ]    Yearly [ ]    Upon Completion [ ]
c) Periodically for the specified billing amount regardless of the expenses incurred period is:    Monthly [ ]    Quarterly [ ]    Yearly [ ]    Upon Completion [X]
d) Other: _____

ADVANCES:

1.  When will an ADVANCE FROM OTHERS be recognized?
a) Upon signing of agreement:  [ ]    b) Upon receipt of IPAC cash:  [ ]    c) At the end of the day is:    d) We are not going to recognize an entry to "Advances from Others" SGL 2310:  [ ]
d) Other: _____

2.  When will the ADVANCES FROM OTHERS be liquidated?
a) At fiscal year end:  [ ]    b) As expenses accrue:    c) Periodically, Period is:    Monthly [ ]    Quarterly [ ]    Yearly [ ]    Upon Completion [ ]
d) Other: _____    e) Not applicable:  [ ]

3.  If an advance is recognized, the ED Finance POC will be notified quarterly via fax or email of the advance liquidation and balance for elimination and expense recognition purposes.
a) Agree:    b) Disagree and have discussed with ED Finance POC:    Comments: _____

4.  When will REVENUE be recognized?
a) Upon signing of agreement:  [ ]    b) Upon receipt of IPAC cash:  [X]    c) As expenses accrue:  [ ]    d) Periodically, Periodic is:    Monthly [ ]    Quarterly [ ]    Yearly [ ]    Upon Completion [ ]
e) Other: _____

Accounting/Finance Point of Contact:    (Note: By signing this form you verify that the payment terms and conditions are accurate and as indicated in the CFO form above)

Heather Martin                    January 4, 2008
Printed Name:    Signature:    Date:

BS-008 EDBUYER PAYMENT ADDENDUM (SEPT 2007)

OA00357

## ORDER FOR SUPPLIES OR SERVICES

| | PAGE 1 | OF | PAGES 3 |

**IMPORTANT:** Mark all packages and papers with contract and/or order numbers.

| 2. CONTRACT NO. *(if any)* | 6. SHIP TO: |
| ED-08-AR-0047 | |

**3. ORDER NO.**

**a. NAME OF CONSIGNEE**

**4. REQUISITION/REFERENCE NO.**

**b. STREET ADDRESS**

**5. ISSUING OFFICE** *(Address correspondence to)* EA
US DoED/OS, 400 Maryland Ave SW - Rm 7E103
Washington, DC, 20202, USA
William Doyle IV, 202-205-7851

**c. CITY**   **d.**   **e. ZIP CODE**

**7. TO:** 00001733

**a. NAME OF CONTRACTOR** DUNS: 031649358
THE WHITE HOUSE

**f. SHIP VIA**

**b. COMPANY NAME**

**c. STREET ADDRESS**
OFFICE OF POLICY DEVELOPMENT
ROOM 145, OEOB

**8. TYPE OF ORDER**

☒ **a. PURCHASE**

REFERENCE YOUR: –
Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated.

☐ **b. DELIVERY** – Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract.

**d. CITY**   **e. STATE** DC   **f. ZIP CODE** 20503
WASHINGTON

**9. ACCOUNTING AND APPROPRIATION DATA**
See Schedule   Obligated Amount: $10,000.00

**10. REQUISITIONING OFFICE**

**11. BUSINESS CLASSIFICATION** *(Check appropriate box(es))*

☐ a. SMALL   ☒ b. OTHER THAN SMALL   ☐ c. DISADVANTAGED   ☐ g. SERVICE-DISABLED VETERAN-OWNED

☐ d. WOMEN-OWNED   ☐ e. HUBZone   ☐ f. EMERGING SMALL BUSINESS

**12. F.O.B. POINT**
Destination

**13. PLACE OF**

**a. INSPECTION**   **b. ACCEPTANCE**

**14. GOVERNMENT B/L NO.**

**15. DELIVER TO F.O.B. POINT ON OR BEFORE** *(Date)*

**16. DISCOUNT TERMS**
0% 0 Days Net 0

## 17. SCHEDULE (See reverse for Rejections)

| ITEM NO. (a) | SUPPLIES OR SERVICES (b) | QUANTITY ORDERED (c) | UNIT (d) | UNIT PRICE (e) | AMOUNT (f) | QUANTITY ACCEPTED (g) |
|---|---|---|---|---|---|---|
| | See Continuation Page For Line Item Details | | | | | |

**18. SHIPPING POINT**   **19. GROSS SHIPPING WEIGHT**   **20. INVOICE NO.**

**SEE BILLING INSTRUCTIONS ON REVERSE**

**21. MAIL INVOICE TO:** EA

**a. NAME:**

**b. STREET ADDRESS** *(or P.O. Box)*
US DoED/OS, 400 Maryland Ave SW - Rm 7E103

**c. CITY**
Washington

**d. STATE** DC   **e. ZIP CODE** 20202

**17(h) TOT.** $10000 (Cont. pages)

**17(i) GRAND TOTAL** $10000

**22. UNITED STATES OF AMERICA BY** *(Signature)* ▶

**23. NAME** *(Typed)*
Norman P. Hall
**TITLE.** CONTRACTING/ORDERING OFFICER

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 347 (REV. 3/2005)
Prescribed by GSA/FAR 48 CFR 53.213(c)

OA00358

SCHEDULE Continued

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
|---|---|---|---|---|---|
| 0001 | This interagency agreement provides financial support by funding official event costs associated with the visit of the President of the United States and the Secretary of Education to the Horace Greeley Elementary School in Chicago, IL on January 7, 2008 to meet with students and discuss NCLB and the importance of maintaining accountability in schools. | 1.00 | SE | NTE 10,000.00 | NTE 10,000.00 |

ED staff in attendance will be Lauren Maddox, Emily Gribble, and Grant Lebens.

The authority for this agreement is the Department of Education (20 U.S.C. 3475) (Department of Education) and the Economy Act (31 U.S.C. 1535) (Executive Office of the President). Education and the EOP enter into this agreement with respect to the event of the President of the United States on Monday, January 7, 2008. This agreement reduced to writing an agreement entered into by Education and the EOP orally and/or electronically prior to that date.

Following the event, funds will be collected monthly based upon event invoices received. The funds will be collected via the U.S. Treasury Intra-Governmental Payment and Collection (IPAC) System by the Resource Management Division, Office of Administration, Executive Office of the President. Once the event costs have been finalized, notification will be made of any funds available for deobligation. If IPAC is not available, checks must be made payable to the U.S. Treasury and sent c/o: Executive Office of the President, Office of the Chief Financial Officer, Attn: Presidential Team Accountant, 10th Floor, CFO/Accounting, 1800 G Street NW, Washington, DC 20503. Please provide your Agency Location Code and any other financial information needed to process this transaction. The financial point of contact of the supporting agency will be notified prior to the collection of funds.

Accounting and Appropriation Data:
0800A2008.A.2008.EA000000.500.2530A.000.000.0000.000000
$10,000.00

PAGE 3 OF 3

OA00359

Case 1:07-cv-00964-CKK    Document 47-7    Filed 04/25/2008    Page 44 of 45
Case 1:07-cv-01707-HHK-JMF    Document 57-6    Filed 03/06/2008    Page 48 of 51 | Page 1 |
GaryM Stern - RE: Follow-up

| From: | "Payton, Theresa M." < |
|---|---|

**From:** "Payton, Theresa M." <

**To:** "Sam Watkins" <​⬛⬛⬛⬛⬛>, "Turley, F. Andrew"
>, "Medaglia, M. Elizabeth (Liz)"                                        , "Crippen,
"Reynolds, William D." <
"Oprison, Christopher G."

**Date:** 11/7/07 10:14:23 PM
**Subject:** RE: Follow-up

Sam,
Just wanted to let you know that I received your note and we're having
discussions about when the next meeting will be.

Thanks for sending your questions and thoughts ahead of time so we can
review. The next time we get together, it would be good to discuss your
note below along with the action plan and the RACI (Responsible,
Accountable, Consulted, Informed) model so we can assign tasks and
owners for the next steps.

Hope you are doing well and that everyone has a safe holiday on
Veterans' Day. Semper Fi.

Thanks,
TP

-----Original Message-----
From: Sam Watkins ⬛⬛⬛⬛⬛⬛
Sent: Tuesday, November 06, 2007 1:58 PM
To: Turley, F. Andrew; Medaglia, M. Elizabeth (Liz); Reynolds, William
D.; Crippen, Susan M.; Payton, Theresa M.; Oprison, Christopher G.
Cc: GaryM Stern; Jason Baron; Nancy Smith
Subject: Follow-up

Theresa,

We missed you at last week's OA transition meeting with representatives
of the CFO's office held on October 31, 2007. We now have a better
understanding of the systems used by the office of the OA CFO, and what
Presidential records may be generated by those systems now that OA is a
PRA organization. We look forward to future meetings with
representatives of other elements of OA. We suggest that it would be
helpful, now that OA considers itself a Presidential component of the
EOP, if in the next meeting we had a general discussion of the functions
that OA uniquely performs for the President as opposed to OA's
monitoring or passing off on other agencies functions. This general
discussion would assist us in giving better advice as to which of the OA
IT systems are creating Presidential records.

We (Gary Stern, Jason Baron, Nancy Smith, and I) were also afforded a
brief opportunity to view a paper copy of the 2005 spreadsheet or chart
(what has been referred to by some as the "2005 report") that first
raised concerns about the "message collection system." I refer to it as
a "message collection system" even though we all understand that it
hardly qualifies as a "system" by the usual IT definition.
Nevertheless, our brief review of the chart suggests a number of ideas
relating to how you might approach determining whether there is a


PLAINTIFF'S
EXHIBIT
9
3/131/08

ÞE9Ţ00

clearance of the person who will be able to apply the new forensic tool you have acquired).

1) On the chart, many files are identified as "issue" files, which I believe means the chart tool could not identify in which organizational PST the file should be deposited. We recommend that you examine some of these files to see if a closer look could determine what organizational element was appropriate.

2) Specific days for certain organizations show no messages collected/stored. We recommend that you run a search of the message system for anything for those days in that organization. If such a search produced a positive result, it would be a clear indication that the original chart was flawed (unless the messages have somehow been added since the original chart was run).

3) As we mentioned when we last met with you on Oct. 11, 2007, you also may be able to ascertain the meaning of the data elements in the chart by examining the spreadsheet in electronic form (for metadata in the form of formulas, comment fields, or other audit data on its creation that might exist). For example, the chart has a column labeled "expected" or "projected" number of messages for an organization for a particular day. The spreadsheet formulas might reveal where this number came from. Also, we will need some type of "expected numbers" with which to compare the results of your next chart generated with the new tool.

4) We have also mentioned this before, but it bears repeating: you could do some type of partial restore of messages from backup tapes, e.g., for a one day or one week time period, to allow you to compare the results against the chart. We are not suggesting initiating a full tape restoration project, but rather taking a sample to ascertain the scope of the problem.

5) Given that there appears to be a continuing level of confusion, or loss of institutional memory, as to the origination of the 2005 chart and its purpose, we agree with Chris's suggestion that it would be useful for someone to contact the original authors/requestors of the chart to ask questions about its nature and meaning, the methodology used to produce it, the shortcomings or flaws you have noted, and whether they prepared any additional or related documentation about the issue (and if so, where is it filed).

I hope these ideas are helpful, and would be happy to assist in following up or carrying out any of them. We look forward to continuing with our OA meetings and assume that another meeting will be scheduled soon.

Sam Watkins
Director, Product Management
National Archives & Records Administration
███████████

CC:         "GaryM Stern" <████████████████████, "Jason Baron" <███████████████

001635

EXHIBIT 3

# Executive Office of the President



# *Office of Administration*

## Fiscal Year 2009 Budget

OA00515

# Executive Office of the President
# Office of Administration

## Mission Statement and Background

The Office of Administration (OA) was created by Reorganization Plan No. 1 of 1977 and was formally established by Executive Order 12028 on December 12, 1977. OA's mission is to provide enterprise-level administrative services to the Executive Office of the President (EOP) and the Office of the Vice President.

OA is organized along the following lines:

**Office of the Director** includes personal staff for the OA Director and Deputy Director, the Office of the General Counsel, and the Equal Employment Opportunity Office. This office provides leadership, manages allocation of resources, and ensures that priorities reflect customer needs.

**Office of the Chief Operating Officer** manages human resources, library, office supply, receiving and warehousing, duplicating, telecommunications, and mail/messenger functions.

**Office of the Chief Financial Officer (OCFO)** oversees financial management activities related to EOP components. The OCFO directs, manages, and provides policy guidance and oversight of financial management activities and operations, including travel support.

**Office of Security and Emergency Preparedness** is responsible for oversight of EOP physical security, emergency preparedness, and continuity of operations programs. This office also serves as a security liaison with the United States Secret Service and the Federal Protective Service.

**Office of the Chief Facilities Management Officer** oversees services and space allocations within EOP buildings, and also serves as a liaison with the General Services Administration.

**Office of the Chief Procurement and Contract Management Officer** oversees the issuance of contracts and purchase orders on behalf of EOP components.

**Office of the Chief Information Officer (OCIO)** efficiently and effectively delivers strategic and operational technology leadership to EOP components supported by OA.

OA00516

## Overview

For fiscal year (FY) 2009, the estimated funding requirement for OA is $105,919,000 and a full-time equivalent (FTE) level of 222. The overall FY 2009 OA budget represents a net increase of $14,174,000, or 15.45 percent, from the FY 2008 enacted budget.

The percentage increase in the OA request reflects a reallocation of $10,286,000 in space rent funding from the Office of Management and Budget (OMB) and the Office of National Drug Control Policy (ONDCP). Absent this space rent move, the OA request attributable to program adjustments amounts to a *real* increase of $3,888,000, or 4.24 percent, from the FY 2008 enacted budget, as shown below:

|  |  |
|---|---|
| $105,919,000 | FY 2009 total OA Request (15.44 percent) |
| ( 10,286,000) | less FY 2009 moves of space rent from OMB and ONDCP |
| **$ 95,633,000** | **FY 2009 OA Request less space rent (4.24 percent)** |

### FY 2009 Estimate

The OA budget is divided into Salaries and Expenses (single-year) and the Capital Investment Plan (no-year) accounts as follows:

|  |  |
|---|---|
| $ 93,996,000 | Salaries and Expenses (including OMB/ONDCP space rent) |
| 11,923,000 | Capital Investment Plan |
| $105,919,000 | FY 2009 total OA Request |

**Salaries and Expenses: $93,996,000**

The Salaries and Expenses (S&E) budget is composed of single-year funds amounting to $93,996,000, which represents an increase of $14,174,000 from the FY 2008 enacted OA S&E budget. Absent the space rent move from OMB and ONDCP, the OA S&E budget represents an increase of $3,888,000. A further breakdown of the OA S&E FY 2009 budget estimate is provided under the following categories:

|  |  |
|---|---|
| $ 10,286,000 | Space rent for OMB and ONDCP |
| 1,799,000 | Personnel support |
| 2,089,000 | Services |
| $ 14,174,000 | FY 2009 OA S&E budget increase requested |

o  *Space Rent*: Space rent costs increase by $10,286,000 resulting from the move of funds for space rent from the OMB and ONDCP to the OA S&E budget. *This does not represent a real cost increase*, but rather a reallocation of space rent funding among EOP components.

  ▪ $7,172,000 from OMB
  ▪ $3,114,000 from ONDCP

OA00517

o   *Personnel Support*: Personnel compensation and benefits increase by $1,799,000 to off-set payroll inflationary increases, maintain staffing at current levels, and absorb transportation subsidies and Flexible Spending Account (FSA) administrative fees for supported EOP components and programs.  The number of FTEs remains unchanged.

o   *Services*:  Services costs increase by $2,089,000 to primarily keep pace with inflationary costs in operating the EOP's data services infrastructure and support. OA did not request or receive inflationary increases for "services" in either FY 2007 or FY 2008.  As a consequence, the cumulative inflationary impact over several years is that OA cannot sustain *critical* existing services without this adjustment.    The FY 2009 request incorporates a request for funds necessary to maintain the following services:

   ▪   Contractor services and technology to host and protect the WhiteHouse.gov website.

   ▪   Ongoing cross-servicing agreement with the Bureau of Public Debt to provide a fully compliant core finance/accounting system.

   ▪   Maintenance and upgrade support of high-priority applications.

   ▪   Annual software maintenance required for information technology security.

Embedded within the above categories of *Personnel Support* and *Services* is an increase totaling $856,000 for Enterprise Services.  As shown in the following table, total amounts for each category is $759,000 in *Personnel Support* and $97,000 in *Services*.  These amounts are requested in the FY 2009 OA S&E budget request to absorb additional EOP Enterprise Services Initiative responsibilities commencing in FY 2009.  OA's FY 2008 budget submission requested funds for Enterprise Services to support the White House Office (WHO), the Executive Residence (EXR), the Office of Policy Development (OPD), the National Security Council (NSC), the Council of Economic Advisers (CEA), OMB, ONDCP, the Office of Science and Technology Policy (OSTP), the Office of the United States Trade Representative (USTR), and the Council on Environmental Quality (CEQ).  However, the *Executive Office of the President Appropriations Act, 2008*, did not provide funds which would have enabled OA to absorb these costs during FY 2008.  Enterprise Services to be absorbed into the OA Enterprise Services fund in FY 2009 are transit subsidies, FSA administrative fees, health unit operations, and Federal Protective Service (FPS) rent-based fees.

OA00518

| Component | Personnel Support $759,000 | | Services $97,000 | | Total |
| | Transit Subsidy | FSA Fees | Health Unit | Rent-Based FPS Fees | |
|---|---|---|---|---|---|
| WHO | 177,000 | 2,000 | - | - | 179,000 |
| EXR | 13,000 | | | | 13,000 |
| OPD | 4,000 | | | | 4,000 |
| NSC | 18,000 | 1,000 | | - | 19,000 |
| CEA | 8,000 | | | | 8,000 |
| OMB | 308,000 | 20,000 | 51,000 | | 379,000 |
| ONDCP | 48,000 | 3,000 | 12,000 | 34,000 | 97,000 |
| OSTP | 21,000 | 1,000 | | | 22,000 |
| USTR | 127,000 | 6,000 | | | 133,000 |
| CEQ | 2,000 | | | | 2,000 |
| Totals | 726,000 | 33,000 | 63,000 | 34,000 | 856,000 |

OA's S&E request includes $4,171,000 for the OCFO. These funds are used to maintain systems used by the EOP community for financial reporting, financial systems, and internal controls. This funding provides for the ongoing cross-servicing agreements with the Bureau of Public Debt (BPD), Administrative Resource Center (core accounting system), and the Department of Health and Human Services, Division of Payment Management (grant management system), as well as travel support services, OCFO employee training, and general office supplies for the OCFO.

**Capital Investment Plan (CIP): $11,923,000**

The CIP provides $11,923,000 to support the continued development of EOP information technology infrastructure, and it is a vital component in the mission of the OCIO. The requested amount of $11,923,000 represents no change from the FY 2008 enacted OA CIP budget. There are no FTEs associated with the CIP. The use of these funds is managed and closely controlled by the OCIO for the four areas described below:

o **Customer Solutions ($3,472,000)** funds are directed to enterprise-wide solutions which serve the common needs of all EOP components as well as unique business requirements received by the OA. This is achieved by analyzing customer requirements, developing solutions or finding existing solutions that meet these requirements, and implementing systems that automate common business practices across the EOP. The particular focus of these implemented systems is on mission, operational, and cost effectiveness, as well as statutory compliance. This area supports the migration of the current infrastructure to a common architecture.

OA00519

o **Customer Service and Desktop Systems ($5,232,000)** is necessary for ensuring that the technological infrastructure is adequate for supporting the mission of the EOP. This area provides for the scheduled modernization of the desktop, laptop, and printer hardware for all EOP components. Included in this category is the acquisition of enterprise software licenses, the wireless handheld communications framework, and the provisioning of equipment and services to support Presidential and Vice Presidential travel.

o **EOP Systems Infrastructure ($2,333,000)** is necessary for ensuring that the information technology and communications infrastructure resident within the EOP is upgraded to meet the capacity and performance requirements of its mission and organizational requirements. This includes the ongoing update of the EOP data network and supporting infrastructure to provide faster and more reliable network connections, the upgrade of business software that supports EOP functions, and implementation of a quality assurance environment and its processes.

o **Information Security ($886,000)** includes a significant investment in information technology required for the security of the EOP network. This includes the implementation of internal security systems that monitor the EOP network and the continuous improvement of the policies and systems that authorize and control user access capabilities.

OA00520

# Executive Office of the President
## Office of Administration – Overall S&E and CIP

### Summary Change to Object Class
### ($ in thousands)

A summary of requirements is shown below:

|  | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated |
|---|---|---|---|
| Total, Direct Obligations.................................. | 89,297 | 91,745 | 105,919 |
| Full-Time Equivalent Level............................. | 219 | 222 | 222 |

The increases and/or decreases for FY 2009 are as follows:

| | | |
|---|---|---|
| FY 2008 enacted level................................................................. | | 91,745 |
| Net increases to FY 2008 enacted level: | | |
| Personnel Compensation & Benefits........................................... | 1,799 | |
| Rental Payments to GSA............................................................ | 10,286 | |
| Other Contractual Services........................................................ | 2,089 | |
| | | |
| Subtotal, increases to FY 2008 enacted level.............................. | | 14,174 |
| Net decreases to FY 2008 enacted level: | | |
| Subtotal, decreases to FY 2008 enacted level............................. | | 0 |
| FY 2009 estimated level................................................................. | | 105,919 |

OA00521

## Executive Office of the President
## Office of Administration - Overall S&E and CIP

**Object Class**
**($ in thousands)**

| | Object Class and Title | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated | FY08/FY09 Difference |
|---|---|---|---|---|---|
| 10 | Personnel Compensation & Benefits.... | 23,335 | 24,850 | 26,649 | 1,799 |
| 21 | Travel & Transportation of Persons..... | 187 | 192 | 192 | 0 |
| 22 | Transportation of Things...................... | 105 | 133 | 133 | 0 |
| 23.1 | Rental Payments to GSA...................... | 19,965 | 21,935 | 32,221 | 10,286 |
| 23.3 | Comm., Utilities & Misc. Charges....... | 7,047 | 6,471 | 6,471 | 0 |
| 24 | Printing and Reproduction................... | 145 | 187 | 187 | 0 |
| 25 | Other Contractual Services.................. | 34,007 | 26,493 | 28,582 | 2,089 |
| 26 | Supplies and Materials......................... | 736 | 1,384 | 1,384 | 0 |
| 31 | Equipment............................................. | 3,770 | 10,100 | 10,100 | 0 |
| | Total, Direct Obligations...................... | 89,297 | 91,745 | 105,919 | 14,174 |
| 99 | Reimbursement..................................... | 763 | 1,000 | 1,000 | |
| | Total................:..................................... | 90,060 | 92,745 | 106,919 | |

**Personnel Summary**

| | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated | FY08/FY09 Difference |
|---|---|---|---|---|
| Full-Time Equivalent Level............................ | 219 | 222 | 222 | 0 |

OA00522

# Executive Office of the President
## Office of Administration - Salaries & Expenses

### Summary Change to Object Class
### ($ in thousands)

A summary of requirements is shown below:

|  | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated |
|---|---|---|---|
| Total, Direct Obligations.................................. | 81,596 | 79,822 | 93,996 |
| Full-Time Equivalent Level............................ | 219 | 222 | 222 |

The increases and/or decreases for FY 2009 are as follows:

| | | |
|---|---|---|
| FY 2008 enacted level.......................................................................... | | 79,822 |
| Net increases to FY 2008 enacted level: | | |
| Personnel Compensation & Benefits.......................................... | 1,799 | |
| Rental Payments to GSA............................................. | 10,286 | |
| Other Contractual Services........................................................ | 2,089 | |
| Subtotal, increases to FY 2008 enacted level............................. | | 14,174 |
| Net decreases to FY 2008 enacted level: | | |
| Subtotal, decreases to FY 2008 enacted level............................. | | 0 |
| FY 2009 estimated level................................................................... | | 93,996 |

OA00523

# Executive Office of the President
## Office of Administration - Salaries & Expenses

### Object Class
### ($ in thousands)

| | Object Class and Title | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated | FY08/FY09 Difference |
|---|---|---|---|---|---|
| 10 | Personnel Compensation & Benefits.... | 23,335 | 24,850 | 26,649 | 1,799 |
| 21 | Travel & Transportation of Persons..... | 187 | 192 | 192 | 0 |
| 22 | Transportation of Things..................... | 105 | 133 | 133 | 0 |
| 23.1 | Rental Payments to GSA..................... | 19,965 | 21,935 | 32,221 | 10,286 |
| 23.3 | Comm., Utilities & Misc. Charges....... | 7,047 | 6,471 | 6,471 | 0 |
| 24 | Printing and Reproduction.................. | 145 | 187 | 187 | 0 |
| 25 | Other Contractual Services.................. | 29,650 | 24,286 | 26,375 | 2,089 |
| 26 | Supplies and Materials......................... | 736 | 1,384 | 1,384 | 0 |
| 31 | Equipment........................................... | 426 | 384 | 384 | 0 |
| | Total, Direct Obligations...................... | 81,596 | 79,822 | 93,996 | 14,174 |
| | | | | | |
| 99 | Reimbursement.................................... | 763 | 1,000 | 1,000 | |
| | Total.................................................... | 82,359 | 80,822 | 94,996 | |

### Personnel Summary

| | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated | FY08/FY09 Difference |
|---|---|---|---|---|
| Full-Time Equivalent Level............................ | 219 | 222 | 222 | 0 |

OA00524

**Executive Office of the President**
**Office of Administration - Salaries & Expenses**

**Explanation of Changes by Object Class**
($ in thousands)

| FY 2008 Enacted | FY 2009 Estimate | | Net Change |
|---|---|---|---|
| 24,850 | 26,649 | Personnel Compensation and Benefits (10) | 1,799 |

This object class includes salaries, terminal leave, premium pay, reimbursable detailees, assignments under the Intergovernmental Personnel Act, and all employee benefits.

The increase of $1,799,000 in this object class represents $1,040,000 for annualizing FY 2008 pay adjustments and the anticipated FY 2009 pay adjustment (there are no increases in FY 2009 FTEs), as well as $759,000 for transit subsidies and flexible spending account administrative fees (as part of the Enterprise Services Initiative).

| | | | |
|---|---|---|---|
| 192 | 192 | Travel and Transportation of Persons (21) | 0 |

This object class includes official travel, such as per diem, hotel and transportation, auto rental, and local transportation.

There is no net change in this object class.

| | | | |
|---|---|---|---|
| 133 | 133 | Transportation of Things (22) | 0 |

This object class includes commercial express delivery as well as freight and other shipping charges.

There is no net change in this object class.

| | | | |
|---|---|---|---|
| 21,935 | 32,221 | Rental Payments to GSA (23.1) | 10,286 |

This category includes payments to the General Services Administration (GSA) for rental of space.

The increase reflects the move of space rent funding from OMB ($7,172,000) and ONDCP ($3,114,000).

OA00525

| FY 2008 Enacted | FY 2009 Estimate | | Net Change |
|---|---|---|---|
| 6,471 | 6,471 | Communications, Utilities & Miscellaneous Charges (23.3) | 0 |

This object class includes data, voice, and wireless communications from Federal and commercial sources, as well as utilities, postage, and miscellaneous rental charges.

There is no net change in this object class.

| | | | |
|---|---|---|---|
| 187 | 187 | Printing and Reproduction (24) | 0 |

This object class includes printing and reproduction obtained from the private sector or from other Federal entities.

There is no net change in this object class.

| | | | |
|---|---|---|---|
| 24,286 | 26,375 | Other Contractual Services (25) | 2,089 |

This object class includes advisory and assistance services, other purchases of goods and services from Government accounts, operations and maintenance of facilities, research and development contracts, medical care, operations and maintenance of equipment, or subsistence and support of persons.

The increase in this object class represents a program adjustment of $1,992,000 for data services infrastructure/support and an additional $97,000 for Enterprise Services (health unit operations and rent-based FPS fees).

| | | | |
|---|---|---|---|
| 1,384 | 1,384 | Supplies and Materials (26) | 0 |

This object class includes general supplies, information technology (IT), supplies, newspaper and magazine subscriptions, and Government publications.

There is no net change in this object class.

OA00526

| FY 2008 Enacted | FY 2009 Estimate | | Net Change |
|---|---|---|---|
| 384 | 384 | Equipment (31) | 0 |

This object class includes IT hardware and software, customized software programming, peripheral equipment (e.g., printers and network devices), office furniture and equipment, such as photocopiers, facsimile machines, and telephones.

There is no net change in this object class.

| 79,822 | 93,996 | Total for all Object Classes | 14,174 |

OA00527

# Executive Office of the President
# Office of Administration - Capital Investment Plan

### Summary Change to Object Class
### ($ in thousands)

A summary of requirements is shown below:

|  | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated |
|---|---|---|---|
| Total, Direct Obligations.................................. | 7,701 | 11,923 | 11,923 |
| Full-Time Equivalent Level............................. | 0 | 0 | 0 |

The increases and/or decreases for FY 2009 are as follows:

FY 2008 enacted level........................................................................ 11,923

Net increases to FY 2008 enacted level:

Subtotal, increases to FY 2008 enacted level............................. 0

Net decreases to FY 2008 enacted level:

Subtotal, decreases to FY 2008 enacted level............................ 0

FY 2009 estimated level..................................................................... 11,923

OA00528

## Executive Office of the President
## Office of Administration - Capital Investment Plan

### Object Class
### ($ in thousands)

| | Object Class and Title | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated | FY08/FY09 Difference |
|---|---|---|---|---|---|
| 25 | Other Contractual Services.................. | 4,357 | 2,207 | 2,207 | 0 |
| 31 | Equipment............................................ | 3,344 | 9,716 | 9,716 | 0 |
| | Total, Direct Obligations...................... | 7,701 | 11,923 | 11,923 | 0 |
| 99 | Reimbursement...................................... | 0 | 0 | 0 | |
| | Total...................................................... | 7,701 | 11,923 | 11,923 | |

### Personnel Summary

| | FY 2007 Actual | FY 2008 Enacted | FY 2009 Estimated | FY08/FY09 Difference |
|---|---|---|---|---|
| Full-Time Equivalent Level........................... | 0 | 0 | 0 | 0 |

OA00529

**Executive Office of the President**
**Office of Administration - Capital Investment Plan**

**Explanation of Changes by Object Class**
($ in thousands)

| FY 2008 Enacted | FY 2009 Estimate | | Net Change |
|---|---|---|---|
| 2,207 | 2,207 | Other Contractual Services (25) | 0 |

This object class includes advisory and assistance services, other purchases of goods and services from Government accounts, operations and maintenance of facilities, research and development contracts, medical care, operations and maintenance of equipment, or subsistence and support of persons.

There is no net change in this object class.

| 9,716 | 9,716 | Equipment (31) | 0 |
|---|---|---|---|

This object class includes IT hardware and software, customized software programming, peripheral equipment (e.g., printers and network devices), office furniture and equipment, such as photocopiers, facsimile machines, and telephones.

There is no net change in this object class.

| 11,923 | 11,923 | Total for all Object Classes | 0 |
|---|---|---|---|

OA00530

EXHIBIT 4

# Executive Office of the President



# *Office of Administration*

## Fiscal Year 2006 Budget

OA00466

# Executive Office of the President
## Office of Administration

## Mission Statement and Background

The Office of Administration (OA) was created by Reorganization Plan No. 1 of 1977, and was formally established by Executive Order 12028 on December 12, 1977. OA's mission is to provide administrative services to the Executive Office of the President (EOP).

OA's primary function is to provide enterprise-level services to the EOP. OA provides cost-effective and efficient services so that policy-making staff elsewhere in the EOP can focus on national policy decisions without having the distractions caused by routine administrative services.

OA is organized along the following lines:

**Office of the Director** includes the Director's personal staff, Office of the Deputy Director, Office of the General Counsel, and the Equal Employment Opportunity Office. This office provides leadership, manages allocation of resources, and ensures that priorities reflect customer needs.

**Office of the Chief Operating Officer** organization manages EOP services for human resources, receiving, office supply, warehousing, library, printing, facilities management, travel support, telecommunications, procurement, and mail/messenger.

**Office of the Chief Financial Officer (CFO)** oversees EOP financial management activities related to the programs and operations of the organization. The CFO directs, manages, and provides policy guidance and oversight of financial management activities and operations.

**Office of Security and Emergency Preparedness** is responsible for oversight of EOP security and emergency preparedness programs. This office also serves as a liaison with the United States Secret Service.

**Office of the Chief Information Officer** provides secure, effective, reliable, and easy-to-use information technology services in support of the President and the EOP by implementing best-in-class information resource management, service delivery, and customer service.

OA00467

EXHIBIT 5

Testimony of Alan R. Swendiman

Special Assistant to the President and Director, Office of Administration

Before the

House Committee on Oversight and Government Reform

February 26, 2008

Good morning Chairman Waxman, Ranking Member Davis, and members of the House Committee on Oversight and Government Reform.  I am Alan Swendiman and I currently serve as Special Assistant to the President and Director, Office of Administration (OA).  Thank you for inviting me to participate in this hearing.  Accompanying me this morning is Theresa Payton, Chief Information Officer of the Office of Administration.

I am pleased to appear before you today on the subjects of email records keeping practices at the Executive Office of the President (EOP) during this Administration, and the status of Presidential Transition planning in relation to records of this Administration.  I will summarize these remarks, and ask that my full statement be included in the record.

I have served as Special Assistant to the President and Director, Office of Administration since November 27, 2006.  OA was created by Reorganization Plan No. 1 of 1977 and was formally established by Executive Order 12028 on December 12, 1977.  OA's mission is to provide common administrative and support services to the EOP.

The Office of the Chief Information Officer (OCIO) is one of the operating units of OA. Among its important functions, OCIO is responsible for providing all EOP components with unified enterprise services such as production support, application development and support, office automation, email, disaster recovery back-up information, Continuity of Operations (COOP) support, and internet/intranet capabilities.  It also provides coordination of compliance

OA01307

programs for Federal Records, and is charged with protecting and safeguarding the complex, sensitive but unclassified EOP network (including the infrastructure, web sites, remote access, and data). Certain of the subjects that the Committee has asked OA to address today are within the purview of the OCIO, and Ms. Payton may speak to them.

I will direct my remarks principally to OA's efforts on the important subject of Presidential Transition planning. Presidential records are the property of the United States and OA takes very seriously its responsibilities for the transfer of records to the National Archives and Records Administration (NARA) at the end of this Administration. These responsibilities derive in significant measure from the Presidential Records Act (PRA) and effective fulfillment of these responsibilities is important to the continuity of the presidency as an institution, and for the Bush Presidency and Library. We are focused on making this transition process as smooth and cooperative as possible. We are working to anticipate and resolve issues as they are identified. In these efforts, we are working closely with NARA and the White House Office of Records Management. We have held a number of meetings with NARA representatives, and have ongoing communications with technical and legal representatives of NARA, including NARA's General Counsel. We know that NARA is eager to have the transition process completed. OA is likewise dedicated to ensuring a full and effective transition is accomplished in a timely manner.

Toward that end, transition-related meetings between NARA and the White House began approximately in the summer of 2007. NARA noted and welcomed what it described as the EOP's early engagement on transition and Presidential records issues. Since that first meeting, there have been at least 8 meetings with NARA, and numerous internal meetings to plan and prepare. For example, to date NARA has met with representatives of OA's Office of the Chief

2

OA01308

Financial Officer, Office of the Chief Operating Officer, and Office of the Chief Facilities

Management Officer, to receive records-related functional and operational briefings and to ask

questions. NARA and OA have committed to meeting regularly to complete the transition-

related reviews that are currently under way, and to address any transition-related issues as they

arise. Through these meetings, NARA will learn about the dozens of computer applications at

the EOP that may have records subject to the PRA which will need to be transferred to NARA at

the end of this Administration. Most of these applications are currently being used at the EOP; a

relative few are purely legacy systems that, while they may house Presidential records, are not

presently operational. NARA will also be surveying physical records as part of these meetings.

Internally to OA, our General Counsel has provided oral briefings and written guidelines

to the entire OA staff on compliance with the PRA. In addition, guidance and assistance has

been and is being provided by the White House Office of Records Management. OA's General

Counsel receives and responds to questions from OA personnel, consulting with NARA as

appropriate.

It must be acknowledged that the upcoming Presidential transition will be complex,

involving new technologies and new people. These complexities are heightened by the existing

cyber threats, of which this Committee is undoubtedly keenly aware. During this Administration

alone, OA has seen a tremendous increase in risk from cyber-threats to the EOP Network. As a

result, we cannot be too careful in protecting the security of EOP information and systems.

These cyber security considerations impact, among other things, the way we are able safely to

transfer records to NARA.

This will be OA's first transition as an entity whose records are subject to the PRA. OA

is fully engaged with NARA in this process. We have already seen issues arising as to whether

3

OA01309

certain materials are "records" or "non-records" under the PRA and we are dedicated to resolving these issues. One particular challenge facing the institution is the necessity of identifying, and making available in some form, records that will be needed by the forty-forth President and his or her staff. In order to satisfy its administrative services and support mission, which continues across administrations, it will be necessary to identify and then determine the correct handling of Presidential records that will need to be available across the EOP on January 20, 2009, in order to support the initial and continuing operations of the new Administration. Financial records, procurement records, leases, blueprints and other property records, security records, and personnel records are just a few of the kinds of documents that may need to be readily available to the new Administration.

As the Committee is aware, a significant portion of Presidential records are stored electronically. We are working with NARA to devise the means by which electronic records, including email records, will be transferred to NARA. As part of the transition planning, NARA is seeking an estimate of the size of the electronic records to be transferred, and we are working to provide that estimate. In addition, we are working to estimate the volume of hardcopy records to be transferred to NARA. These estimates will assist NARA to have adequate storage space for the records and other materials it will receive.

From this summary, we trust the Committee can see that a lot of predicate work has begun, and is ongoing. We have approximately 11 months remaining to work on this transition. We are committed to making sure that all the Presidential records that we have are transferred to NARA at the end of this Administration.

As a final matter, I understand that the Committee has inquired about whether EOP emails may not have been properly preserved between 2003 and 2005 and the potential

4

OA01310

implications on transition should it be determined that any such emails are missing. The discovery of a potential issue, and the immediate response to it, of course, pre-date my service as OA Director. The staff of the OCIO, including Ms. Payton, can discuss this issue in more detail, but I will say this: I am proud of the work they have been doing and continue to do under the leadership of Ms. Payton in order to determine whether any such emails have been lost. It is a complex process, one that takes time to do right, and one that we have not taken lightly.

Mr. Chairman, this concludes my statement. Thank you for your attention, and I would be pleased to answer any questions.

OA01311

EXHIBIT 6

FILED
U.S. COURT OF APPEALS
FOR THE
DISTRICT

2000 FEB 24 PM 4: 08

FILING DEPOSITORY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HONORABLE BOB BARR,               )
                                  )
            Plaintiff,            )
                                  )
      v.                          )    Case No. 1:99CV01695 JLG
                                  )
EXECUTIVE OFFICE OF THE PRESIDENT )
  and U.S. DEPARTMENT OF JUSTICE, )
                                  )
            Defendants.           )

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff Bob Barr, a member of the United States House of
Representatives, alleges in Count I of his Complaint that the
Executive Office of the President violated the Privacy Act,
5 U.S.C. § 552a, by maintaining confidential records on plaintiff
as part of a system of records, by denying plaintiff access to
those records, and by disclosing the contents of the records to
various private individuals. Specifically, plaintiff alleges
that he sent a written request for access to documents pertaining
to him to President Clinton, that, in response, the General
Accounting Office denied that the Privacy Act applied to "The
White House," and that one or more news articles reported that
"The White House" had obtained files on plaintiff and others as
part of a system of records. Complaint, ¶¶ 14-20.[1]

---

[1] In Count II of the Complaint, plaintiff alleges that the
Justice Department violated the Privacy Act by willfully
releasing records concerning plaintiff (¶¶ 36-37). Defendants'
motion for partial summary judgment addresses only Count I.

Sweetland v. Walters, 60 F.3d 852, 854 (D.C. Cir. 1995)

(Residence Staff "dedicated to assisting the President in

maintaining his home and carrying out his various ceremonial

duties" not an "agency" under FOIA as they lack independent

authority); see also United States v. Espy, 145 F.3d 1369, 1373

(D.C. Cir. 1998) ("An entity within the Executive Office does not

qualify as an 'agency' unless it exercises 'substantial

independent authority' . . . which, of course, would not be true

of either the Chief of Staff or the President's Counsel.").

     Thus, under the overwhelming, controlling authority in this

Circuit, the definition of "agency," as used in the FOIA, does

not encompass the immediate staff of the President who comprise

the White House Office.  As explained in point I.A. above, the

language of the Privacy Act makes clear that Congress intended

the definition of "agency" to be the same for the Privacy Act as

the definition of "agency" contained in the FOIA.  Because the

White House is not an "agency" under either statute, plaintiff's

claim that the White House has violated the Privacy Act is

without merit and should be dismissed.

C.   **WHITE HOUSE OFFICE RECORDS STORED ELECTRONICALLY ON OFFICE OF ADMINISTRATION COMPUTERS ARE NOT SUBJECT TO THE PRIVACY ACT**

     The Privacy Act likewise has no applicability to White House

records that remain under the exclusive control of the White

House Office, but are stored electronically on computers operated

- 23 -

by the Office of Administration of the Executive Office of the
President. As the Supreme Court's decision in <u>Kissinger</u> makes
clear, White House records do not become subject to the FOIA
merely because they are physically removed from the White House
and transported to an office within a FOIA-covered agency where
the records in question are not under the control of that agency.
<u>Kissinger</u>, 445 U.S. at 157; <u>accord</u>, <u>McGehee v. C.I.A.</u>, 697 F.2d
1095, 1107 (D.C. Cir. 1983). The Privacy Act adopts the same
principle and, by its express terms, applies solely to records
that are "under the control of any agency." 5 U.S.C.
§ 552a(a)(5) (definition of "system of records").

In the context of the FOIA, the D.C. Circuit has "identified
four factors relevant to a determination of whether an agency
exercises sufficient control over a document to render it an
'agency record'":

> (1) the intent of the document's creator to retain or
> relinquish control over the records;
>
> (2) the ability of the agency to use and dispose of the
> record as it sees fit;
>
> (3) the extent to which agency personnel have read or relied
> upon the document; and
>
> (4) the degree to which the document was integrated into the
> agency's record system or files.

<u>Burka v. U.S. Department of Health and Human Services</u>, 87 F.3d
508, 515 (D.C. Cir. 1996), <u>quoting in part</u> <u>Tax Analysts v.</u>

- 24 -

<u>Department of Justice</u>, 845 F.2d 1060, 1069 (D.C. Cir. 1988),

*aff'd on other grounds* 492 U.S. 136 (1989).

Analysis of each of these factors demonstrates that White House records stored on Office of Administration computers remain under the control of the White House Office and, conversely, are not "under the control of" the Office of Administration. First, the Agreement between the White House Office and the Office of Administration expressly provides that "White House data" stored on Office of Administration computers shall "remain at all times under the control of the White House Office," and "the Office of Administration and its personnel act solely as agents of the White House Office and under its exclusive direction." Lyle Declar., ¶¶ 3-4, and Exh. A thereto, at 2, ¶¶ 3-4. Second, the Office of Administration has no authority to enter, access, retrieve, use, dispose of, archive, or otherwise process records of electronic messages except as authorized by the White House Office. Lyle Declar., Exh. A, at 2, ¶ 4. Third, the Agreement requires that the data "be subject to security and access control functions . . . which limit access to the data to authorized personnel . . . ." Lyle Declar., Exh. A at 2, ¶ 3. Fourth, these same security and access control provisions prevent integration of White House data into Office of Administration files. <u>Id.</u>.

Thus, White House data stored on Office of Administration computers remains under the exclusive control of the White House Office, and is not, in any meaningful sense, under the control of the Office of Administration. Accordingly, the Privacy Act has no application to those records regardless of whether the Office of Administration is deemed to be an "agency" for purposes of the Privacy Act.[8/]

## II. THE COURT SHOULD CONSTRUE THE PRIVACY ACT IN A MANNER WHICH AVOIDS CREATION OF A CONFLICT WITH CONSTITUTIONAL PRINCIPLES OF SEPARATION OF POWERS

Separation of powers principles provide yet another reason for avoiding a construction of the Privacy Act that would unduly disrupt the day-to-day operation of the Presidency. "A statute must be construed, if fairly possible, so as to avoid not only

---

[8/] Although the Office of Administration adheres to the requirements of the Privacy Act, see 5 C.F.R. § 2504.1, et seq., the courts have not decided whether it is an "agency" within the meaning of the FOIA. See e.g., Armstrong v. Bush, 90 F.3d 553 (D.C. Cir. 1996) (National Security Council's "prior references to itself as an agency are not probative on the question before the court - whether the NSC is indeed an agency under the FOIA"). Given the fact that the Executive Order creating the Office of Administration expressly provides that the Director of the Office is "not accountable for the program and management responsibilities of units within the Executive office of the President," E.O. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977), as amended by E.O. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979), at ¶ 4(d), there is reason to doubt that the Office of Administration has the type of "substantial independent authority" that is a necessary precondition for an entity within the Executive Office to be deemed an "agency." Id. at 561; Sweetland v. Walters, 60 F.3d 852, 854 (D.C. Cir. 1995). For the reasons set out in the text, the Court need not reach that question here.

- 26 -

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment should be granted, and Count I of Plaintiff's Complaint should be dismissed with prejudice.

Dated: February 24, 2000

Respectfully submitted,


DAVID W. OGDEN
Acting Assistant Attorney General

WILMA A. LEWIS
United States Attorney


*Joseph W. LoBue*
ANNE L. WEISMANN, D.C. Bar # 298190
JOSEPH W. LOBUE, D.C. Bar # 293514
U.S. Department of Justice
Civil Division
901 E Street, N.W., Room 1060
Washington, D.C.  20004
Telephone:  (202) 514-4640
Attorneys for Defendants

- 32 -