## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZEN FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) |
| Plaintiff, | ) ) |
| v. | ) |  Civil Action No: 1:07-CV-00964 (CKK) |
| OFFICE OF ADMINISTRATION, | ) ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## FOR LACK OF SUBJECT-MATTER JURISDICTION

Respectfully submitted,

ANNE L. WEISMANN
(D.C. Bar No. 298190)
MELANIE SLOAN
(D.C. Bar No. 434584)
WILLIAM C. HOLMES
(D.C. Bar No. 495186)
Citizens for Responsibility and Ethics
 in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20005
Phone:  202-408-5565
Fax:  202-588-5020

Attorneys for Plaintiff

May 9, 2008

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT ..................................................... 1

BACKGROUND ................................................... 2

    A. Establishing The Office Of Administration ............................................ 2

    B. The Functioning Of OA Under The FOIA ................................................. 4

    C. CREW's FOIA Request, OA's Response And This Litigation ................ 7

ARGUMENT ..................................................... 11

I. UNDER THE GOVERNING STANDARD OF REVIEW THIS COURT
   MAY PROPERLY CONSIDER UNDISPUTED FACTS ................................... 11

II. OA IS AN AGENCY SUBJECT TO THE FOIA ................................................. 12

    A. Factors That Bear On Agency Status Under The FOIA ........................... 12

    B. OA Exercises Sufficient Independence In Its Functioning To
       Render It An Agency Subject To The FOIA ............................................ 15

    C. OA Is An Agency Because It Is Not Operationally Close To
       The President ............................................................................................. 27

    D. OA's Self-Contained Structure Is Consistent With Its Status
       As An Agency .............................................................................................. 30

III. REGARDLESS OF OA'S CURRENT STATUS, IT WAS AN AGENCY
    WHEN IT CREATED THE RECORDS CREW SEEKS HERE, WHEN IT
    ACCEPTED CREW'S FOIA REQUEST AND WHEN IT AGREED TO BE
    BOUND BY A COURT-ORDERED TIME-FRAME FOR PROCESSING ........ 31

CONCLUSION ......................................................... 33

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGE(S)**

Armstrong v. Bush, 924 F.2d 282 (D.C. Cir. 1991) ............................................. 23

Armstrong v. Exec. Off. of the President, 90 F.3d 553 (D.C. Cir. 1996) ........... passim

Armstrong v. Exec. Off. of the President, 1 F.3d 1274 (D.C. Cir. 1993) ........... 13

Armstrong v. Exec. Off. of the President, 877 F.Supp. 690 (D.D.C. 1995) ........ 6

Coalition for Underground Expansion v. Mineta, 333 F.3d 193 (D.C. Cir.
       2003) .................................................................................................. 11

Goldgar v. Off. of Administration, 26 F.3d 32 (5th Cir. 1994) .......................... 25

Hebert v. Nat'l Acad. of Scis., 974 F.2d 192 (D.C. Cir. 1992) .......................... 11

Meyer v. Bush, 981 F.2d 1288 (D.C. Cir. 1993) ................................................. passim

Nat'l Security Archive v. Archivist, 909 F.2d 541 (D.C. Cir. 1990) ................... 25

Pacific Legal Found. v. Council on Envtl. Quality, 636 F.2d 1259 (D.C.
       Cir. 1980) ....................................................................................... 15, 16

Rushforth v. Council of Econ Advisers, 762 F.2d 1038 (D.C. Cir. 1980) ........... 27

Ryan v. Dep't of Justice, 617 F.2d 781 (D.C. Cir. 1980) .................................... 13-14

Sierra Club v. Andrus, 581 F.2d 895 (D.C. Cir. 1978), *rev' on other grounds*,
       442 U.S. 347 (1979) ................................................................................ 15

Soucie v. David, 448 F.2d 1067 (D.C. Cir. 1971) ............................................... passim

Sweetland v. Walters, 60 F.3d 852 (D.C. Cir. 1995) .......................................... 12, 18, 30

U.S. v. Gaubert, 499 U.S. 315 (1991) .................................................................11

U.S. ex rel. Touhy v. Ragan, 340 U.S. 462 (1951) ............................................. 25

## STATUTES

5 U.S.C. § 552 ..................................................................................................... 25

5 U.S.C. § 552(a)(2) ............................................................................................. 6

5 U.S.C. § 552(e) .................................................................................................. 6

5 U.S.C. § 552(e)(1) ............................................................................................. 24

5 U.S.C. § 552(f)(1) .............................................................................................. 12

5 U.S.C. § 552(g) .................................................................................................. 5

31 U.S.C. § 1535 ................................................................................................... 21

31 U.S.C. § 1536 ................................................................................................... 21

## RULES AND REGULATIONS

5 C.F.R. Part 2502, 45 Fed. Reg. 47112 (July 14, 1980) ...................................... 5

5 C.F.R. § 2502.16 ............................................................................................. 5, 24

5 C.F.R. § 2502.30 ................................................................................................ 25

Executive Order 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977) .............................. passim

Executive Order 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979) .............................. passim

Reorganization Plan No. 1 of 1977, 42 Fed. Reg. 56101, 91 Stat. 1633 ............... 3

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 12(b)(1) ....................................................................................... 11

## LEGISLATIVE MATERIALS

H.R. Conf. Rep. No. 93-1380, 93d Cong., 2d Sess. 14 (1974) .............................. 13

S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 15 (2974), *reprinted in* 1974

U.S.C.C.A.N. 6293 ...................................................................................... 13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITIZEN FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OFFICE OF ADMINISTRATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No: 1:07-CV-00964 (CKK)

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## FOR LACK OF SUBJECT-MATTER JURISDICTION

### STATEMENT

In arguing that it is not an agency subject to the Freedom of Information Act ("FOIA"), defendant Office of Administration ("OA") asks this Court to ignore the multi-factor agency test established by governing case law and OA's consistent prior practice of functioning as an agency, which dates back to its inception. These matter little, OA contends, because it performs only an administrative support role within the Executive Office of the President ("EOP") and accordingly cannot be considered an agency under the FOIA.

OA's approach, however, ignores the critical fact that OA is not operationally close to the president and exercises substantial independence in carrying out its functions. Lacking the requisite operational proximity, OA differs fundamentally from other EOP components deemed non-agencies because they advise and assist the president and essentially function like the president's immediate staff. Indeed, OA's chartering documents expressly carve out from OA's duties providing administrative support and services "primarily in direct support of the

President."[1]

Consistent with its chartering documents, OA has held itself out as an agency since its creation. Toward that end, OA has complied with or relied on a host of federal laws applicable to federal agencies. Of particular significance here, OA held itself out as bound by the FOIA until faced with the obligation of justifying why it withheld from CREW and the public thousands of pages of documentation concerning missing White House emails.

OA's arguments are also based on a premise that has no legal support, namely that OA cannot be deemed an agency because it provides only administrative support services. No court has ever held that entities providing only support services by definition are not agencies subject to the FOIA. Instead, in the EOP context, courts look to operational proximity to the president -- whether the EOP component in question advises and assists the president -- and the extent to which the entity exercises independence in discharging its functions. Under this test, as confirmed by the limited discovery to date, OA has all the characteristics of an agency.

Moreover, even if OA had transformed itself into a non-agency -- something very much in dispute -- it was clearly an agency when it created the records CREW is seeking, when it accepted CREW's FOIA request for expedited processing and when it agreed to be bound by this Court's processing order. Accordingly, the records CREW seeks here are subject to mandatory disclosure under the FOIA.

## **BACKGROUND**

### A. Establishing The Office Of Administration

Through the Reorganization Plan No. 1 of 1977, President Jimmy Carter established the

---

[1] Executive Order No. 12028, § 3, 42 Fed. Reg. 62785 (Dec. 12, 1977) ("EO 12028").

Office of Administration within the EOP and directed that it "shall provide components of the

Executive Office of the President with such administrative services as the President shall from

time to time direct."  Reorganization Plan No. 1 of 1977, § 2, 42 Fed. Reg. 56101, 91 Stat. 1633.

In explaining the need for this "Central Administrative Unit," President Carter noted that a single

separate EOP entity that would "provide support in administrative services common to all EOP

entities" would address the inefficiencies of the then-current system.  Message of the President

(Exhibit 1 to Defendant's Memorandum in Support of Defendant's Motion to Dismiss for Lack

of Subject Matter Jurisdiction ("D's Mem.")), p. 6.  Prior to OA's creation, the White House

relied not only on EOP components for administrative support services, but also on "OMB,

GSA, other federal departments or several of these sources . . ."  Id.

Subsequently, through Executive Order 12028, President Carter clarified more

specifically that OA's duties and responsibilities in providing "common administrative support

and services to all units within the [EOP]" do *not* include "such services provided primarily in

direct support of the President."  Executive Order No. 12028, § 3(a), 42 Fed. Reg. 62891 (Dec.

12, 1977) (emphasis added).  Instead, the White House Office -- and not OA -- continues to have

responsibility for performing administrative support and service functions "in direct support of

the President."  EO 12028, § 5.

Through EO 12028 President Carter also transferred direct responsibility for OA from the

president[2] to the director of OA, "[s]ubject to such direction or approval as the President may

provide or require."  EO 12028, § 4(a).  Specifically, EO 12028 empowers OA's director to

_____

[2] Under Reorganization Plan No. 1, OA was to be headed by the president.
Reorganization Plan No. 1 of 1977, § 2.

3

"organize the [OA]," "employ personnel," "contract for supplies and services" and "*do all other things that the President, as head of the [OA], might do*." Id. at §§ (1)-(4) (emphasis added).

This transfer of power from the president to OA's director was reiterated in Executive Order 12122, which also expanded the director's power to include "perform[ing] the functions of the President under Section 107(b) of Title 3 of the United States Code," and "appoint[ing] and fix[ing] the pay of employees pursuant to the provisions of Section 107(b) of Title 3 of the United States Code . . ." Executive Order 12122, §§ 4(b), (c), 44 Fed. Reg. 11197 (Feb. 26, 1979) ("EO 12122"). In addition, EO 12122 provides that OA's director is not "accountable for the program and management responsibilities of units within the [EOP]" and instead "the head of each unit shall remain responsible for those functions." Id. at § 4(d).

### B. The Functioning Of OA Under The FOIA

Historical documents reveal that from its inception OA was considered to be an agency subject to the FOIA. For example, a June 28, 1978 White House memorandum now housed at the Carter Library discusses the applicability of the FOIA to White House documents in the custody of OA. Applying the test set forth in Soucie v. David, 448 F.2d 1067 (D.C. Cir. 1971), the memorandum concludes: "OA performs functions for other offices within the EOP and there are no identifiable units within the OA which function solely to serve the President. Accordingly, it is reasonable to conclude that the Office of Administration is an 'agency' subject to the Act [the FOIA]." Memorandum for Margaret McKenna from Patrick Apodaca re. Applicability of the FOIA to White House Documents, June 28, 1978, p. 2 (attached as Exhibit

1).[3]  The White House further concluded that "[w]ith respect to documents actually generated by OA and in its possession, it is clear that these constitute OA documents subject to the Act." Id. at 3.

This conclusion is confirmed by OA's FOIA regulations, first published in 1980, that establish procedures for requesters to obtain records from OA.  5 C.F.R. Part 2502, 45 Fed. Reg. 47112 (July 14, 1980) (attached as Exhibit 2).  Among other things, OA's initial FOIA regulations provided that "all records by the Office of Administration are available to the public, *as required by the Freedom of Information Act*." Id. at Part 2502.16 (emphasis added).  OA's current FOIA regulations, also found at 5 C.F.R. Part 2502, contain this very same language, thereby acknowledging the legal constraints and obligations the FOIA places on OA.  See 5 C.F.R. § 2502.16.[4]

OA also continues to comply with the FOIA's requirement that the head of each agency "prepare and make publicly available upon request . . . (1) an index of all major information systems of the agency" and "(2) a description of major information and record locator systems maintained by the agency . . ." 5 U.S.C. § 552(g).  OA's index and description of its major information and record locator systems are posted at http://www.whitehouse.gov/oa/functions/ (last visited Apr. 30, 2008).

In addition, OA filed annual FOIA reports from Fiscal Year 1996, when amendments to

---

[3] It is CREW's understanding that Margaret McKenna held the position of Deputy White House Counsel while Patrick Apodaca was Associate Counsel to President Carter.

[4] According to Lexis, these regulations are current through the May 1, 2008 issue of the Federal Register.  See Exhibit 3.

the FOIA first imposed this reporting requirement, through Fiscal Year 2006.[5]  These reports are also posted on OA's electronic reading room, www.whitehouse.gov/oa/foia/readroom.html (last visited Apr. 30, 2008), another obligation that FOIA imposes.  See 5 U.S.C. § 552(a)(2).  Among other things, these reports reveal the number of FOIA requests OA receives and processes each fiscal year and the basis for any withholdings the agency has made.  For example, in Fiscal Year 2006, OA received 67 FOIA requests.  See www.whitehouse.gov/oa/foia/foia2006.pdf.

Until late August 2007 (and after OA had filed its motion for judgment on the pleadings in this case), the White House's official website at www.whitehouse.gov/oa/foia/handbook.html, expressly provided that OA is an agency subject to the FOIA.  See Exhibit 4.  The White House's listing of EOP components that are agencies subject to the FOIA also included the Council on Environmental Quality ("CEQ"), the Office of Management and Budget ("OMB"), the Office of National Drug Control Policy, the Office of Science and Technology Policy and the Office of the U.S. Trade Representative.  Id.

OA now claims that the issue of its agency status first surfaced after the district court's decision in Armstrong v. Exec. Off. of the President, 877 F.Supp. 690 (D.D.C. 1995), and continued until August 21, 2007, when OA made a "final decision" that it is not an agency subject to the FOIA.[6]  As support OA cites to the declaration of M. Elizabeth Medaglia, OA's general counsel.  Ms. Medaglia was not subject to cross-examination by plaintiff and defendant's submission of her declaration contravenes this Court's Order of February 11, 2008, denying defendant's request "to provide a declaration as to OA's functions and authority in lieu of

---

[5] See 5 U.S.C. § 552(e).

[6] See D's Mem. at 5-6.

6

engaging in discovery."  Order of Feb. 11, 2007, p. 4.  In any event, OA's public statements and conduct, at least until August 21, 2007, reflect an unambiguous view that it was an agency subject to the FOIA.

### C.  CREW's[7] FOIA Request, OA's Response And This Litigation

Based on information CREW received that many millions of email during a two and one-half year period mysteriously went missing from White House servers, CREW sent a FOIA request to OA on April 16, 2007, seeking documents OA had assembled and prepared related to that loss of EOP email records.  <u>See</u> Exhibit A to Complaint.  On April 28, 2007, CREW sent a second clarifying request that delineated four categories of records CREW is seeking, all related to the loss of email and proposals developed to restore the deleted email and to implement a new electronic record keeping system that would ensure proper preservation of records under both the Federal Records Act and the Presidential Records Act.  <u>See</u> Exhibit B to Complaint.  CREW's requests also sought a waiver of fees and expedition based on the widespread and exceptional media interest in the missing White House emails, the revelations about the use by high-ranking EOP officials of outside email accounts and the fact that the White House has known since the fall of 2005 that many millions of emails are missing from its records management system, but has done nothing to address or fix the problem.  Exhibits A and B to Complaint.

By letter dated April 27, 2007, Carol Ehrlich, OA's Freedom of Information Act Officer, acknowledged receipt of CREW's requests and granted CREW's requests for a fee waiver and expedited processing.  Exhibit C to Complaint.  OA also stated, however, that due to "unusual

---

[7] CREW is the acronym for plaintiff Citizens for Responsibility and Ethics in Washington.

circumstances" it could neither process the requests within FOIA's mandatory time-frames nor provide an anticipated date for completing processing.  Id.

On April 30, 2007, CREW sent a follow-up letter to OA explaining the inaccuracies in OA's assessment that CREW is seeking an "extensive list of records."  Exhibit D to Complaint. When OA failed to respond to this letter or provide CREW with an anticipated date for completing processing, CREW filed the complaint in this matter on May 23, 2007, along with a motion for a preliminary injunction.

At the direction and with the assistance of the Court, the parties negotiated a time-table for OA to process CREW's prioritized categories of documents that resolved the pending motion for emergency relief.  See Order of June 4, 2007, as modified by Order of June 7, 2007.  That time-table was based in large part on representations OA made about the months it would need to process CREW's prioritized request. See Transcript of Conference Call, June 1, 2007 (Exhibit A to Plaintiff's Reply in Support of Plaintiff's Motion to Modify Order (Document 16-2)).  At no time during these court-supervised discussions did OA suggest it was not subject to the FOIA.

Pursuant to the Court's processing Orders, OA made its first response on June 21, 2007. There for the first time OA stated it was processing CREW's requests "as a matter of administrative discretion" (notwithstanding a Court order compelling it to do so) based on its claim that "*on occasion*" OA provides direct administrative support to the president.  Letter from Carol Ehrlich to Anne L. Weismann, June 21, 2007 (attached as Exhibit 5) (emphasis added). OA also claimed to have located 504 pages that "may be responsive" and that include "emails, spreadsheets, procurement-related documents, and internal guidance."  Id.  Of those documents, OA claimed approximately 454 pages were exempt under FOIA Exemptions 2, 5 and 6.  OA

released 50 pages, including nine pages of a document dated November 12, 2002; 26 pages of a

document dated June 24, 2003; a July 2005 amendment and interagency agreement dated

September 24, 2005 that accompanied the June 24, 2003 document (attached as Exhibit 6); and

15 pages of a document dated September 21, 2004.  Id.

On August 21, 2007, pursuant to a court-ordered schedule, OA filed a motion for

judgment on the pleadings based on its claim that it is not an agency subject to the FOIA.  In

opposition, CREW argued that the issue of whether OA is an agency could not be decided on the

basis of the pleadings and that CREW, accordingly, should be afforded discovery on the agency

issue.  Toward that end, CREW outlined the nature of the discovery it needs to resolve the

pending agency question.  CREW argued alternatively that the Court should rule, based on the

language of OA's governing executive orders and its consistent prior position, that it is an

agency subject to the FOIA.

By Order dated February 11, 2008, the Court denied defendant's motion without

prejudice based on its conclusion that "*very limited* discovery -- which might be considered

jurisdictional in nature -- is appropriate . . ."  Order of Feb. 11, 2008, p. 1 (emphasis in original).

The Court deemed most of the discovery CREW is seeking as "entirely unnecessary in light of

the limited question at issue."  Id. at p. 5.  Specifically, the Court refused to allow CREW

discovery concerning "the nature of OA's communications and interactions with the president

and his advisors and the extent to which the president has expressly approved OA decisions,

findings, or other initiatives," which the Court characterized as "ill directed because the issue

here is not whether OA is part of the President's 'immediate personal staff . . .'"  Id. (citation

omitted).  The Court also denied CREW's request for discovery on OA's staffing and

9

organizational structure.  Id.  Discovery as to OA's actual functioning was limited to "evidence regarding OA's authority over or responsibilities to any third parties . . ."  Order of Feb. 11, 2007, pp. 5-6.

As ordered by the Court, the parties submitted a joint discovery plan on February 21, 2008.  CREW included its proposed request for production of documents and sought leave to depose four individuals:  (1) Alan Swendiman, director of OA; (2) Carol Ehrlich, OA's FOIA officer; (3) OA's chief operating officer; and (4) Theresa Payton, OA's chief information officer. See Joint Discovery Plan at pp. 1-6.  OA opposed all depositions and all but two of CREW's proposed document requests.  Id. at pp. 9-18.  As to the proposed deposition of OA's FOIA officer, OA stated that it "has not taken the position in prior litigation that it is not subject to FOIA," but argued that this and other evidence of its past conduct is not relevant.  Id. at 13.[8]  OA also indicated that it did not intend to take any discovery of its own.  Id. at p. 9.

On February 22, 2008, the Court issued an order denying CREW much of its requested discovery.  The Court stated that it "is not permitting additional discovery into issues that are addressed by documents already in the record or issues that are uncontested."  Order of Feb. 22, 2008, p. 1.  These putatively uncontested issues include "OA's prior functioning under FOIA, the Presidential Records Act, or the Federal Records Act," as well as "that OA provides extensive administrative services to all EOP components . . ."  Id. at 2.  The Court noted expressly that "[i]t is likewise uncontested that 'OA has not taken the position in prior litigation that it is not subject to FOIA . . .'"  Id.  The Court limited CREW's discovery to "OA's provision

---

[8] In its recently filed motion to dismiss, however, OA now claims to be "aware . . . of a case in which OA raised the prospect that it is not subject to FOIA."  D's Mem. at 25 n.6.

of services for, authority over, or responsibilities to third parties *outside of EOP units*." Id. at 4 (emphasis in original).

During the discovery phase OA objected to written discovery seeking to ascertain precisely when OA took the position that it is no longer an agency. Thereafter, in a March 28, 2008 telephone conference, the Court posed a number of questions to OA's counsel related to this issue and directed responses through a sworn agency declaration. On April 18, 2008, OA submitted the declaration of its general counsel, M. Elizabeth Medaglia. OA has also claimed it has no document reflecting its final decision on August 21, 2007, that it is not an agency. See Declaration of M. Elizabeth Medaglia (Document 44-2), ¶ 9.

## ARGUMENT

### I.  UNDER THE GOVERNING STANDARD OF REVIEW THIS COURT MAY PROPERLY CONSIDER UNDISPUTED FACTS.

In ruling on a motion to dismiss under Rule 12(b)(1), the Court is entitled to look at material outside the four corners of the complaint "where necessary,"[9] but must still accept as true all factual allegations in the complaint. U.S. v. Gaubert, 499 U.S. 315, 327 (1991). Moreover, a court's review of facts outside the pleadings is confined to "'undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" Coalition for Underground Expansion, 333 F.3d at 198, *quoting* Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Although OA has asked this Court to consider matters outside the four corners of the pleadings in ruling on its motion to dismiss, it has also suggested that the Court should, under

---

[9] See, e.g., Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) and cases cited therein.

D.C. Circuit precedent, decide the issue of OA's agency status "on the pleadings alone . . ." D's

Mem. at 9 n.3. The cases OA cites, however, do not even suggest, much less hold, that the issue

of an agency's status under the FOIA should be decided on the basis of the pleadings alone.

Rather, each of the cited cases presents a situation where the parties and the court were able to

rely on the pleadings as supplemented by legislative history to ascertain the actual functioning of

the EOP entity at issue. See, e.g., Sweetland v. Walters, 60 F.3d 852, 854 (D.C. Cir. 1995)

(citing to report of Senate Appropriations Committee describing staff and duties of the Executive

Residence). Here, as the Court has already determined, discovery is necessary to decide whether

OA exercises "the type of substantial independent authority" that would make it an agency. See

Order of Feb. 11, 2008, p. 5.[10] This ruling fully comports with Circuit precedent.[11]

## II. OA IS AN AGENCY SUBJECT TO THE FOIA.

### A. Factors That Bear On Agency Status Under The FOIA.

In 1974, Congress amended the FOIA expressly to include the EOP. As amended, the

term "agency" under the FOIA encompasses:

> any executive department military department, Government
> corporation, Government controlled corporation, or other
> establishment in the executive branch of the Government
> (*including the Executive Office of the President*), or any
> independent regulatory agency . . .

5 U.S.C. § 552(f)(1) (emphasis added).

The legislative history of this provision explains that in amending the definition of

---

[10] Of note, defendant never challenged this ruling through a motion for reconsideration or any other procedural vehicle.

[11] See, e.g., Armstrong v. Exec. Off. of the President, 90 F.3d 553, 559-60 (D.C. Cir. 1996).

"agency" Congress intended to codify the approach of the D.C. Circuit in <u>Soucie v. David</u>, 448

F.2d 1067 (D.C. Cir. 1971). <u>See</u> H.R. Conf. Rep. No. 93-1380, 93d Cong., 2d Sess. 14 (1974);

<u>see also</u> S. Conf. Rep. No. 1200, 93d Cong., 2d Sess. 15 (1974), *reprinted in* 1974 U.S.C.C.A.N.

6293. Specifically, Congress did not intend the term "agency" to include "the President's

immediate personal staff or units in the Executive Office whose sole function is to advise and

assist the President." H.R. Conf. Rep. No. 93-1380 at 14.

In <u>Soucie v. David</u>, the D.C. Circuit applied a "sole function" test to conclude that the

Office of Science and Technology Policy ("OST"), a component within the EOP, is an agency.

Critical to the Court's conclusion was the fact that the OST's functions went beyond solely

advising and assisting the president to include an "independent function of evaluating federal

programs . . ." 448 F.2d at 1075. By contrast, "[i]f the OST's sole function were to advise and

assist the President, that might be taken as an indication that the OST *is part of the President's*

*staff and not a separate agency*." <u>Id.</u> (emphasis added).

The <u>Soucie</u> court's reasoning that EOP entities with the sole function of advising and

assisting the president are functionally equivalent to the president's staff and therefore not

agencies is compelled by the constitutional implications of subjecting the president and his staff

directly to the FOIA. As the D.C. Circuit explained in <u>Armstrong v. Exec. Off. of the President</u>,

in defining the term "agency,"

> Congress was 'keenly aware of the separation of powers
> concerns that were implicated by legislation regulating
> the conduct of the President's daily operations,' and thus
> sought 'to minimize outside interference with the day-to-
> day operations of the President and his closest advisors . . .'

1 F.3d 1274, 1292 (D.C. Cir. 1993) (citation omitted). <u>See also</u> <u>Ryan v. Dep't of Justice</u>, 617

13

F.2d 781, 788 n.19 (D.C. Cir. 1980) ("Failure to exempt presidential staff from the FOIA would raise a constitutional issue of separation of powers."). Accordingly, "Congress intended the phrase 'solely to advise and assist' the President to refer to *entities whose characteristics and functions were similar to those of the President's immediate personal staff*." Meyer v. Bush, 981 F.2d 1288, 1283 (D.C. Cir. 1993) (emphasis added).

The D.C. Circuit further expanded upon the meaning of agency under the FOIA in Meyer v. Bush, explaining that any analysis of agency status should focus on "three interrelated factors. We must ask how close operationally the group is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure." 981 F.2d at 1293. Subsequently, in Armstrong v. Exec. Off. of the President, the D.C. Circuit reaffirmed the vitality of Meyer's three-part agency test. 90 F.3d at 558. As the Armstrong court stressed, however, these factors are not "weighed equally" and each factor "warrants consideration insofar as it is illuminating in the particular case." Id.

Notwithstanding this authority OA argues that the three-factor test does not apply here because "it is beyond dispute that OA does not supervise others in the Executive Branch." D's Mem. at 21. First, the record is far from clear on this issue, particularly given the limitations this Court imposed on discovery. In any event, the three-factor Meyer test is simply a way to determine whether a particular entity within the EOP is not an agency because it has "characteristics and functions . . . similar to those of the President's immediate personal staff." Meyer, 981 F.2d at 1293. Whether viewed exclusively through the lens of the actual authority that OA wields or informed by its structure and operational closeness to the president the touchstone is the same: the language and intent of the FOIA to exclude from the definition of

agency those entities of the EOP whose sole function is to advise and assist the President.  <u>See</u>
<u>Armstrong</u>, 90 F.3d at 558-59 (<u>Meyer</u> test "designed succinctly to capture the court's prior
learning on the subject whether a unit within the [EOP] is an agency covered by the FOIA . . .
the specific evidence bearing upon that question varies with the entity in question.").

Moreover, in applying these factors there is no single piece of evidence that is outcome-
determinative.  Instead, "the specific evidence bearing upon that [the agency] question varies
with the entity in question."  <u>Armstrong</u>, 90 F.3d at 559.  So, for example, the D.C. Circuit has
looked at factors such as independent authority to issue guidelines,[12] the independent ability to
evaluate federal programs,[13] and a statutory duty to provide certain information to Congress.[14]
<u>See</u> <u>Armstrong</u>, 90 F.3d at 558-59 (discussing various types of evidence on which court has
relied).  But the D.C. Circuit has never said that only those EOP entities that have substantial
authority over third parties outside of the EOP are agencies subject to the FOIA.

### B.  OA Exercises Sufficient Independence In Its Functioning To Render It An Agency Subject To The FOIA.

The nature of OA's delegated authority points decisively to the conclusion that OA is an
agency subject to the FOIA.  The starting point for the Court's analysis must be the governing
executive orders, which are the "most important indication" of OA's actual functioning.  <u>Meyer</u>,
981 F.2d at 1294.

Through EO 12028, OA's director acquired from the president direct responsibility to

---

[12] <u>Pacific Legal Found. v. Council on Envtl. Quality</u>, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980).

[13] <u>Soucie</u>, 448 F.2d at 1075.

[14] <u>Sierra Club v. Andrus</u>, 581 F.2d 895, 902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979).

organize OA, employ personnel for OA, contract for OA's supplies and services and "do all other things that the President, as head of the Office of Administration, might do."  EO 12028, §§ 4(a)(1)-(4).  Subsequently, through EO 12122, OA's director acquired additional power to "perform the functions of the President under Section 107(b) of Title 3 of the United States Code," and to "appoint and fix the pay of employees pursuant to the provisions of Section 107(b) of Title 3 of the United States Code . . ."  EO 12122, §§ 4(b), (c).  As the government has recognized in the past, through executive order (EO 12122) "the President has effected a broad delegation of authority over the OA to its Director."  See Armstrong v. Exec. Off. of the President, No. 96-1242 (S. Ct. 1996), Brief for the Respondent in Opposition, p. 18 n.5.[15]

Moreover, while the director is "[s]ubject to such direction or approval as the President may provide or require," EO 12122, § 4(a) (emphasis added), the use of the word "may" denotes that, in the absence of such direction or approval, the director is free to act.  In other words, OA's director is authorized to act as the president might, exercising all the authority that the president would exercise over OA, and need not wait for direction, guidance, or orders from the president.  Accord Pacific Legal Found. v. Council on Envtl. Quality, 636 F.2d at 1262 (CEQ found to be an agency where by executive order it was granted independent authority that went beyond solely advising and assisting the president).

Beyond its chartering documents, OA's actual functions demonstrate that it exercises

---

[15] Available at http://www.usdoj.gov/osg/briefs/1996/w961242w.txt.  The government was responding to a petition for certiorari that suggested, among other things, that the National Security Council is not unique in having the president as its head because the OA is also headed by the president.  As the government pointed out in response, "[t]hat suggestion is incorrect."  Not only did EO 12122 effect "a broad delegation of authority over the OA to its director," but "[t]he OA's governing regulations state that the OA 'consists of specified offices,' which do not include the President."  Id.

substantial independence both within and outside of the EOP in providing administrative support

and services.  As to its functioning within the EOP, OA does not appear to contest that it

exercises  significant independence and wields substantial authority in the provision of

administrative support and services to EOP components with the exception of the president.[16]

See D's Mem. at 16.

OA's budget documents confirm the independence and substantial authority OA

exercises over other EOP components.  For example, OA's Fiscal Year 2008 Budget (attached as

Exhibit 7), describes the responsibilities of the Office of the Chief Financial Officer ("OCFO")

as "direct[ing], manag[ing], and provid[ing] policy guidance and oversight of financial

management activities and operations, including procurement and travel support."  Executive

Office of the President, Office of Administration, Fiscal year 2008 Budget at OA-3.  Similarly,

OA's chief information officer is responsible for providing "leadership to the components that

OA supports."  Id.   And OA's salaries and expenses are paid from funds that come from other

EOP components, including EOP components that are agencies such as the Office of

Management and Budget, OST, the U.S. Trade Representative and the Council on

Environmental Quality.  Id. at OA 4-5.  See also Order of Feb. 22, 2008 (noting that OA's FY

---

[16] Although OA was constituted to provide support to all EOP components except for the president, EO 12028, § 3(a), OA argues here that its responsibilities include "direct support to the President" because that executive order also provides that OA shall assist the White House Office "upon request . . ."  D's Mem. at 15.  As noted above, OA has not provided any specific examples where, at the request of the White House Office, it has provided such services.  Instead, the most it has stated is that "OA, *on occasion*, provides . . . direct support to the President . . ."  Letter from Carol Ehrlich to Anne Weismann, June 21, 2007 (Exhibit 4) (emphasis added).  This vague statement, coupled with the mere possibility that OA could be asked to provide support to the White House Office in addition to servicing all other EOP components, is insufficient to render OA a non-agency with the "sole function" of advising and assisting the president.  Soucie, 448 F.2d at 1075.

2008 Budget describes "ongoing cross-servicing agreements" OA has with other agencies).

Notwithstanding this clear evidence that OA exercises substantial and independent responsibilities for other EOP components, including those components that are agencies, OA argues that EOP is not an agency because it has "no independent role outside the EOP" and its director has only "limited" "interactions with federal agencies." D's Mem. at 18. Likewise, this Court has also suggested that the only relevant question is whether OA has "authority over or responsibilities to any third parties . . ." Order of February 11, 2008, pp. 5-6. This approach, however, is not compelled by governing case law and misapprehends the burden OA bears in demonstrating that it is not an agency subject to the FOIA.

Under the 1974 amendments to the FOIA and their incorporation of Soucie v. David, OA is an agency unless its sole function is to advise and assist the president. In fleshing out the meaning of this sole function test, the D.C. Circuit has explained that the common characteristic of EOP entities found to be subject to the FOIA is that each "has wielded substantial authority independently of the President." Sweetland v. Walters, 60 F.3d at 854. Yet each entity that has been held subject to the FOIA as an agency has manifested its independence differently. OST, for example, was found to be an agency "because it had independent authority to evaluate federal scientific programs . . ." Id. CEQ was deemed an agency because it too wielded substantial independent authority, but in CEQ's case that authority was the "power to coordinate federal environmental programs and issue guidelines and regulations to federal agencies . . ." Id. Non-agency EOP components, by contrast, "lack[] substantial independent authority." Id. In all cases, however, the focus was on "[t]he nature of " the EOP component's "delegated authority . . ." Armstrong, 90 F.3d at 558 (citation omitted).

18

On the other hand, where an EOP entity had no independent authority whatsoever, the court had no reason to look at its interaction with other Executive branch entities, either those within or outside of the EOP.  See Sweetland, 60 F.3d at 854 (staff of executive residence "is exclusively dedicated to assisting the President in maintaining his home and carrying out his various ceremonial duties.").   In cases like Armstrong, by contrast, where it was argued that the National Security Council ("NSC") exercised independent authority over the Director of Central Intelligence ("DCI"),  the court analyzed the nature of that interaction to conclude that the NSC was not an agency because the president, not the NSC, was delegated authority over the DCI.  90 F.3d at 560-61.  And in Meyer, the court evaluated a task force's interaction with OMB, another EOP component, to conclude that the task force was not an agency because it did not operate independently of the president.  981 F.2d at 1295.

As applied here, the Court's focus must be on the degree to which OA has wielded authority independent of the president.  To be sure, OA is unlike entities such as the CEQ and OST that the courts have determined are agencies based on the fact that they exercise independent authority over other, non-EOP agencies.  But the most critical factor -- the exercise of independent authority -- is clearly present here in OA's interactions with both EOP and non-EOP agencies and demonstrates unequivocally that OA does not have the sole function of advising and assisting the president.

An examination of the actual functions that OA performs illustrates precisely why it cannot be equated with the president's immediate staff who exist solely to advise and assist the president.  First, OA contracts with non-EOP agencies for a variety of services both for itself and other EOP components.  For example, OA contracted with the Department of Interior in

19

September 2004 for the implementation of an email archive retrieval system that would service the entire EOP, as reflected in its interagency agreement with Interior.  <u>See</u> Exhibit 6.  OA has also contracted to provide services to other executive branch agencies using interagency agreements.  In November, 2007, for example, OA entered into an interagency agreement with the Department of the Navy under which EOP was to provide the Navy "voice systems operations and maintenance . . ."  <u>See</u> Exhibit 8, p. 2.  OA has also entered interagency agreements with the Secret Service, the Harry S. Truman Scholarship Foundation, White House Fellows, the President's Commission on White House Fellowships, the White House Communications Agency, the Department of Health and Human Services, and the General Services Administration for the provision of goods and services (all attached as Exhibit 9).[17]

OA also enters into reimbursable agreements with other executive branch agencies for the provision of services, which Director Swendiman described as "a form of outsourcing." Deposition Transcript of Alan R. Swendiman ("Swendiman Dep.") at p. 64 (attached as Exhibit 10).  For example, in January 2008, OA entered into a reimbursable agreement with the Department of Education, accompanied by an order of goods and services for the provision of financial support for the president's visit to a school in Chicago, Illinois.  <u>See</u> Exhibit 11.[18] Memoranda of understanding with other executive branch agencies also accompany many of these reimbursable agreements.  For example, in October 2007, OA, on behalf of the Office of

---

[17] <u>See</u> <u>also</u> <u>http://www.whitehouse.gov/omb/print_request_comments.doc</u> (last visited May 2, 2008) (request by OA "acting on behalf of the Office of Management and Budget" for comments on draft terms and conditions).

[18] Other examples of reimbursable service agreements that OA has entered are attached as Exhibit 12 and include agreements with the Department of Health and Human Services, the Department of Labor and the Treasury Franchise Fund.

National Drug Control Policy ("ONDCP"), entered into a memorandum of understanding with the Department of Health and Human Services ("HHS") providing that HHS would process certain requests for funds from ONDCP for payment to ONDCP grantees.  See Exhibit 13.  Mr. Swendiman explained that OA, like other executive branch agencies such as the General Services Administration, "contract[s] with other government entities to handle certain administrative functions."  Swendiman Dep. at p. 31.

Notably these agreements were entered into under the authority of the Economy Act, 31 U.S.C. § 1535, which provides in pertinent part as follows:

> § 1535.  *Agency* agreements
>
> (a) The *head of an agency or major organizational unit within an agency* may place an order with a major organizational unit within the same agency or another agency for goods or services . . .

(emphasis added).  The crediting of payments for purchases between OA and executive agencies is also carried out pursuant to the Economy Act, 31 U.S.C. § 1536, which is entitled "Crediting payments from purchases *between executive agencies*."  (emphasis added).  That OA has relied on the authority granted agencies by the Economy Act to enter into inter-agency agreements for the provision of goods and services further demonstrates its agency status.

OA minimizes the significance of the Economy Act, noting that OA's reliance on that statute flows from OA's charter documents, which reference the Economy Act as authority for OA to execute interagency agreements.  D's Mem. at 27.  But this merely confirms that in creating OA President Carter understood (as the memorandum of his White House confirms) that OA is an agency and will carry out its functions pursuant to statutory authority directed to executive branch agencies.

OA's interactions with and exercise of authority over other non-EOP entities include arranging for non-reimbursable details.  Mr. Swendiman, as head of OA, was personally involved in the process of recruiting employees of other executive branch agencies to fulfill details at OA.  See Exhibit 14 (generic letter from then-Director Swendiman requesting "the non-reimbursable detail of a qualified individual from your [federal] organization . . .").  And in at least one instance OA posted a job vacancy for a detailee to work as a procurement analyst/contract specialist that included a "Reasonable Accommodation Policy Statement."  See Exhibit 15 at p. 4.  That statement provides in pertinent part:  "*Federal agencies* must provide reasonable accommodation to applicants with disabilities where appropriate . . ."  Id. (emphasis added).  In other words, OA held itself out as a federal agency bound by the Americans With Disabilities Act in its solicitation of other federal agencies for the services of detailees.

As this evidence demonstrates, by "providing services for, having authority over, or having responsibilities to" other executive branch agencies through a variety of different cross-servicing arrangements, "OA exercises substantial independent authority."  Order of February 22, 2008.  OA discounts all of this evidence as non-probative because it relates to OA "supporting the EOP, including the President."  D's Mem. at 18-19.  But OA ignores the most critical impact of this evidence:  OA has exercised substantial and independent authority in an administrative support role for all of EOP (*except* for the President) and does not function as an entity that solely advises and assists the president.[19]

_____

[19] Thus, OA is, in many respects, functionally equivalent to the General Services Administration, which is without question an agency with a similar mission to "help[] federal agencies better serve the public by offering, at best value, superior workplaces, expert solutions, acquisition services, and management policies."  See GSA - Mission, Values, and Goals, available at http://www.gsa.gov (last visited May 8, 2008).

OA's exercise of its independent authority is also evidenced by the responsibilities that other executive branch agencies ask OA to take on. For example, on May 6, 2007, Paul Wester, Jr., Director of the Modern Records Programs at the National Archives and Records Administration ("NARA"), wrote to then OA Director Alan Swendiman, requesting that he look into "the possible loss of Federal records of the federal agency components of the EOP that are required to be maintained on the White House email system) and "determine whether instances of alienation of Federal records actually occurred and then notify us [NARA] of your findings." (attached as Exhibit 16). In addition, Mr. Webster requested that if Mr. Swendiman concluded that federal records "were alienated without proper authorization," that he furnish NARA "with a report as required and described under 36 CFR 1228.104." Id. That regulation provides in pertinent part that "*[t]he head of a Federal agency* shall report any unlawful or accidental destruction, defacing, alteration, or removal of records in the custody of that agency to NARA . . ." Clearly NARA understood Mr. Swendiman to be the head of a federal agency with the legal responsibility to investigate destruction of federal records within the EOP and to report back to NARA.[20]

Second, in its actual functioning OA has held itself out publicly as an agency. Most significantly, from its inception OA has complied with a number of record keeping laws and practices applicable only to federal agencies, including the FOIA. OA's published FOIA

---

[20] Accepting OA's argument that it is not an agency would have many consequences, including the likelihood that no one within the EOP would be accountable to NARA for any unlawful or accidental destruction or removal of records within the custody of OA, given the unreviewable discretion that the Presidential Records Act accords the president over his records while in office. See Armstrong v. Bush, 924 F.2d 282, 289 (D.C. Cir. 1991) (("the PRA precludes review of the President's recordkeeping practices and decisions.").

regulations, first promulgated in 1980 and currently in effect, provide unambiguously that "all records by the Office of Administration are available to the public, *as required by the Freedom of Information Act*."  5 C.F.R. § 2502.16 (emphasis added).  Pursuant to the FOIA regime OA has adopted, it has processed hundreds of FOIA requests over the years and submitted yearly reports as the FOIA requires (5 U.S.C. § 552(e)(1)).  See www.whitehouse.gov/oa/foia/readroom.html.  And through the end of August 2007, the White House's own website expressly described OA as an EOP entity that is subject to the FOIA because its sole function is not to advise and assist the president.  See Exhibit 3.

OA's handling of CREW's FOIA requests at issue here also reinforces the conclusion that it is an agency subject to the FOIA.  OA granted CREW's request for expedition and a fee waiver, never suggesting at any time that OA was not subject to the FOIA.  See Exhibit C to Complaint.  Once in litigation, OA participated in court-supervised discussions concerning a schedule for processing CREW's six prioritized categories of documents and never suggested it was not subject to the FOIA.  In answering the complaint, OA's only jurisdictional defense was that "no records have been improperly withheld."  Answer, First Defense.

In addition, until August 2007, OA was complying with the Federal Records Act, a statute that imposes record keeping obligations on federal agencies.  See Swendiman Dep. at 56.  NARA's letter of May 6, 2007, discussed *supra*, confirms that NARA also understood OA was an agency subject to federal record keeping obligations.[21]  According to Mr. Swendiman, OA

---

[21] In addition, an email dated November 6, 2007, from Sam Watkins at NARA to Theresa Payton at OA states NARA's view that "it would be helpful, now that OA considers itself s Presidential component of the EOP, if in the next meeting we had a general discussion of the functions that OA uniquely performs for the President as opposed to OA's monitoring or passing off on other agencies functions." (attached as Exhibit 17).  The clear implication is that in early

also has current Privacy Act regulations that have not been changed notwithstanding OA's position here that it is not an agency (and therefore would not be subject to the Privacy Act). Swendiman Dep. at 58.

Mr. Swendiman also confirmed that OA has current Touhy regulations, id. at 59, an action entirely at odds with its claim here that it is a non-agency. Touhy regulations generally set forth agency procedures for responding to requests for records and agency testimony in litigation to which the agency is not a party. See generally U.S. ex rel. Touhy v. Ragen, 340 U.S. 462 (1951). OA's Touhy regulations, found at 5 C.F.R. § 2502.30, are issued explicitly pursuant to the FOIA, 5 U.S.C. § 552. See id. In other words, OA currently maintains Touhy regulations promulgated in reliance on the FOIA, a statute to which OA now argues it is not subject.

OA's past conduct also includes the litigating positions it has adopted throughout the years. As discussed *supra*, the government's brief filed before the Supreme Court in Armstrong adopts the same expansive interpretation of OA's independent authority pursuant to EO 12122 as CREW advances here -- an interpretation that cannot be reconciled with OA's newly minted argument that it is not an agency. In neither of the two reported FOIA cases involving OA that CREW has found -- Nat'l. Security Archive v. Archivist, 909 F.2d 541 (D.C. Cir. 1990) and Goldgar v. Off. of Administration, 26 F.3d 32 (5th Cir. 1994) -- is there any suggestion that OA is not an agency and therefore not subject to the FOIA.

Notwithstanding OA's clear and consistent prior conduct of functioning as an agency on

---

November 2007, NARA was just learning for the first time that OA no longer considered itself to be an agency and that NARA had no understanding of why that was the case.

25

all fronts, OA now argues this evidence is not probative here on the question of whether OA is

an agency under the FOIA, citing Armstrong.  D's Mem. at 25-26.  This reliance is misplaced.

The Armstrong court discounted the NSC's past conduct, which included prior references to

itself as an agency, as not probative on the agency issue because "quite simply, the

Government's position on that question has changed over the years" and because "the NSC's

past behavior has been inconsistent -- both logically and factually."  90 F.3d at 566.  Indeed,

even the Armstrong plaintiff conceded that "as the NSC was treating some of its institutional

records as though they were subject to the FOIA and the FRA, it was declining to treat other

records in that way."  Id.  Accordingly, the court found that the NSC's past behavior did not

"illuminate the legal question" of whether the NSC was an agency subject to the FOIA.  Id.

        Here, by contrast, OA's past practices have been entirely consistent and in conformity

with agency status.  Unlike the NSC, OA has never "voluntarily subjected [only] certain of its

records to the FOIA."  Quite the opposite is true.  Since at least 1980, OA through its

regulations, and later through its website, has represented that it is an agency and therefore

required under the FOIA to make all of its records available upon request.  In the 30 years of its

existence there has been no suggestion until now -- when faced with a potentially very

embarrassing, if not outright damaging, FOIA request -- that it is not an agency subject to the

FOIA.[22]  But this kind of sudden about-face on the agency question has been rejected repeatedly

and explicitly by the D.C. Circuit in favor of precisely the kind of evidence of agency status

---

        [22] OA now claims, despite its prior representation to the Court that it had never before
taken the position in litigation that it was not subject to the FOIA, that it "raised the prospect that
it is not subject to FOIA" in Barr v. EOP, No 99-1695.  D's Mem. at 25 n.6.  This cryptic
reference and inclusion of one page of its brief cannot overcome or even cast doubt on years of
its past practices functioning as an agency.

present here.  See Rushforth v. Council of Econ. Advisers, 762 F.2d 1038, 1041 (D.C. Cir. 1980)

(discussing Pacific Legal Found. where the D.C. Circuit "rejected the CEQ's proffered on again-

off again definition" after CEQ had admitted in the past that it was an agency); Soucie, 448 F.2d

at 1075 (OST's publication of FOIA regulations "lends additional support to the conclusion that

it is a separate administrative entity").

### C.  OA Is An Agency Because It Is Not Operationally Close To The President.

Operational closeness or proximity to the president is a critical factor in determining

agency status because "[t]he closer an entity is to the President, the more it is like the White

House staff, which solely advises and assists the President, and the less it is like an agency to

which substantial independent authority has been delegated."  Armstrong, 90 F.3d at 558.  The

record here is devoid of any facts demonstrating OA's operational proximity to the president.

Indeed, what facts are present demonstrate that OA is not operationally close to the president.

By executive order, OA is headed by a director who has been given direct responsibility

for OA.  See EO 12028, EO 12122.  This stands in stark contrast to EOP components such as the

National Security Council, at issue in Armstrong, which is chaired by the president and

controlled by the president's national security advisor, "working in close contact with and under

the direct supervision of the President . . ."  90 F.3d at 560.

Not only is there no "*intimate* organizational and operating relationship between the

President and the [OA]" that was present in Armstrong,[23] but there is no evidence of *any* working

or operational relationship directly between the president and OA.  Former OA Director Alan

---

[23] Id. (emphasis added).

27

Swendiman testified that he does not report directly to the president, but instead "through a chain of command."  Swendiman Dep. at 11.  See also Swendiman Dep. at 9 (testifying that he reports directly to "the Deputy Assistant to the President for Management of Administration").[24]  This does not establish the requisite degree of proximity that, for purposes of determining agency status, is measured by a "continuing interaction" with the president, which "is surely in part what Congress had in mind when it exempted the President's 'immediate personal staff' without requiring a careful examination of its function."  Meyer v. Bush, 981 F.2d at 1293.

In arguing to the contrary, OA points to the fact that OA's director also bears the title "Special Assistant to the President."  D's Mem. at 23.  A title standing alone, however, discloses nothing meaningful about the degree of operational closeness or proximity the director actually has to the president, and provides no basis to presume that this particular "special assistant" has the same degree of proximity to the president as his "immediate personal staff."  Meyer, 981 F.2d at 1293 (footnote omitted).

OA also points to Mr. Swendiman's deposition testimony that he "report[s] to the President of the United States and  . . . [is] subject to the President's direction and approval" as evidence of OA's proximity to the president.  D's Mem. at 23-24, *quoting* Swendiman Dep. at 11.  This citation, taken out of context, is very misleading; moments later Mr. Swendiman

---

[24] In its memorandum in support of its motion to dismiss OA seriously mischaracterizes this testimony as evidencing that "on a day-to-day basis, the OA Director reports to the President through the Deputy Assistant to the President for Management and Administration . . ."  D's Mem. at 23.  Former Director Swendiman, however, said nothing about his reporting on a "day-to-day basis" to anyone, much less to the president.  Indeed, Mr. Swendiman never suggested he has had any direct contact with the president at any time about any issue.  Of note, CREW was not permitted discovery on this area of inquiry.  See Order of Feb. 11, 2008.

clarified that his reporting is "through a chain of command . . ." Swendiman Dep. at 11.[25]

At bottom, OA's arguments rest on mischaracterizations of Mr. Swendiman's deposition testimony as well as the governing executive orders. That under EO 12028 OA's director "shall report to the President"[26] is not relevant here, given that EO 12028 subsequently transferred authority from the president to the OA director. See EO 12028, § 4(a). Equally unavailing is the language of EO 12122 § 4(a) on which defendant relies,[27] providing that OA's director is "subject to such direction or approval as the President *may* provide or require." (emphasis added). The record here is devoid of any evidence that the president has, in fact, ever provided or required any specific direction of or approval for OA, something that is fatal to OA's claim that OA is proximate to the president and the equivalent of the president's immediate personal staff.

In sum, OA has not demonstrated that it is so operationally close to the president that it should be considered the functional equivalent of the president's immediate staff. Far from being "a hair's breadth from the President,"[28] OA operates completely outside the orbit of the president and his immediate staff. This conclusion is underscored by the governing executive

_____

[25] Moreover, the entire exchange on this issue reveals an almost deliberate effort on Mr. Swendiman's part to avoid answering the questions posed by reciting generalized, pre-formulated assertions on an issue that CREW was unable to probe further because of limitations this Court imposed on the scope of discovery. This is particularly apparent in the videotape of Mr. Swendiman's deposition. Accordingly, if the Court deems this testimony probative CREW respectfully suggests that the Court view the videotape, which more fully captures this testimony and which CREW is happy to provide the Court.

[26] See D's Mem. at 23, citing EO 12028 § 2.

[27] D's Mem. at 23.

[28] Meyer, 981 F.2d at 1294.

29

order carving out from OA's responsibilities the provision of administrative support and service functions "in direct support of the President."  EO 12028, § 5.  Subjecting OA to the FOIA simply does not raise the kinds of constitutional concerns that Congress recognized it must avoid by excluding the president and his immediate staff from the direct reach of the FOIA.[29]

### D.  OA's Self-Contained Structure Is Consistent With Its Status As An Agency.

As it must, OA concedes that it has a self-contained structure, one of the hallmarks of an agency under the Meyer test.  See D's Mem. at 22.[30]  The Meyer court explained that "structure and function, for purposes of defining agency, are interrelated . . . another characteristic of the President's immediate staff is its lack of a firm structure."  981 F.2d at 1296.[31]  When coupled with OA's lack of proximity to the president, the evidence establishes that OA is an agency subject to the FOIA.

In sum, all three Meyer factors point definitively to the conclusion that OA is an agency subject to the FOIA.  It has none of the attributes of an entity functioning like the president's

---

[29] That OA has been subjected to the FOIA virtually from its inception with no hint of any undue intrusion into areas committed constitutionally to the president further evidences the degree to which OA differs from those entities in close proximity to the president that courts have found are not agencies, such as the National Security Council (Armstrong) and the executive residence (Sweetland).

[30] At the same time, however, OA portrays the evidence of its self-contained structure as less than certain.  For example, OA states that "[i]t appears that OA does have such a defined structure" and similarly that "[t]here also appear to be clearly established lines of authority both among and within the offices . . ." D's Mem. at 22 (emphasis added).  Of course, this is evidence uniquely available to OA, especially given that the Court denied CREW's request for discovery on this issue.  Accordingly, OA should not be permitted to exploit its unique access to facts by casting doubt on evidence it has at hand on the nature of its structure.

[31] The Meyer court also observed that "the structure of the group is important in determining its relative independence from the President.  Function is crucial, but, like the architect Louis Sullivan, we believe that form follows function."  981 F.2d at 1296-97.

immediate staff and subjecting it to the FOIA raises no constitutional concerns.

### III.  REGARDLESS OF OA'S CURRENT STATUS, IT WAS AN AGENCY WHEN IT CREATED THE RECORDS CREW SEEKS, WHEN IT ACCEPTED CREW'S FOIA REQUEST AND WHEN IT AGREED TO BE BOUND BY A COURT-ORDERED TIME-FRAME FOR PROCESSING.

What sets this case apart from virtually any other case involving a claim by an EOP component that it is not an agency is that OA has attempted to change its status by unilateral administrative fiat.  OA essentially admits that until August 21, 2007, OA considered itself to be an agency and functioned like an agency.  On that date, however, apparently after a lengthy period of legal deliberation, OA decided it is no longer an agency and accordingly refused to comply further with the FOIA.

Missing from this record, however, is any evidence of a substantive change in OA's functioning that would support its conclusion that it is no longer an agency.  OA still does not function solely to advise and assist the president; at most it has claimed that "on occasion" it provides support to the president.  See Exhibit 4.  Nor have its chartering documents changed; the president has issued no new executive order reconstituting OA as an entity that solely advises and assists the president.

Yet even if OA were able to transform itself into a non-agency simply by relabeling itself as a non-agency, the records CREW is seeking would still be subject to mandatory disclosure under the FOIA.  First, all of the documents CREW seeks were created well within a period of time that OA was an agency subject to the FOIA.  CREW's request seeks records relating to a discovery by OA in the fall of 2005 of millions of missing emails from White House servers, a time period during which there was no question that OA was an agency.

Moreover, the records CREW seeks include OA's detailed analysis of the problem, its

31

estimates of the volume of missing email and a plan of action to recover the missing email.  See Complaint, ¶¶ 19-23.  These are quintessentially agency records, prepared by OA in the exercise of its independent authority over White House servers and in the performance of its record keeping obligations under the Federal Records Act.  The White House has certainly never suggested that OA conducted an analysis of the problem at the express direction of and in close coordination with the president.  To the contrary, the White House continues to deny that there is even a missing email problem.  See Defendants' Responses to and Request For Reconsideration of the First Report and Recommendation on Plaintiff NSA's Motion to Extend TRO/Preservation Order, filed in CREW v. Exec. Off. of the President, No. 07-1707 (HHK/JMF), pp. 4-5 n.3 (relevant pages attached as Exhibit 18).

Likewise, OA was an agency when it accepted CREW's FOIA requests and agreed to grant CREW both expedition and a fee waiver.  See Exhibit C to Complaint.  In explaining why it could not meet the FOIA's prescribed time limits for responding to expedited requests OA cited expressly to the FOIA, 5 U.S.C. § 552(a)(6)(A)(B)(iii)(II).  Id.  OA's counsel subsequently confirmed for this Court that OA had "put CREW at the very beginning of the FOIA processing que [sic]."  Transcript of Conference Call, June 1, 2007, p. 43.

Perhaps of most significance, OA agreed to be bound by a Court Order that mandated processing of key aspects of CREW's requests in resolution of CREW's motion for emergency relief.  See Order of June 4, 2007 at p. 2 (noting that "[d]uring the course of the June 1, 2007 conference call, the parties agreed to a schedule for production that will resolve CREW's TRO/PI.").

This evidence and course of events point to one unmistakable conclusion:  the records

CREW seeks and, in particular, the records the Court has already ordered OA to produce are subject to mandatory disclosure both by the authority of the FOIA and this Court.  That OA may be able to change its agency status as of August 21, 2007 -- something CREW very much disputes -- does not affect its undisputed status as an agency prior to that date.  Given that all of the records CREW seeks were created when OA was an agency and given that CREW's FOIA requests were perfected when OA was an agency, the necessary consequence is that OA must produce all non-exempt documents sought by CREW.[32]

## CONCLUSION

For the foregoing reasons defendant's motion to dismiss must be denied.

Respectfully submitted,

_____/s/_____
Anne L. Weismann
(D.C. Bar No. 298190)
Melanie Sloan
(D.C. Bar No. 434584)
William C. Holmes
(D.C. Bar No. 495186)
Citizens for Responsibility and Ethics
  in Washington
1400 Eye Street, N.W., Suite 450
Washington, D.C.  20530

---

[32] CREW is aware of  no other case that has addressed and ruled on the status of particular records separately from the agency status of a particular EOP entity.  The court in Armstrong noted explicitly that it was not being asked "in this round of litigation to resolve the status of particular documents," 90 F.3d at 562, and accordingly did not address whether any particular documents were agency records subject to disclosure under the FOIA.  Moreover unlike here where OA has conceded it was an agency until August 21, the NSC did not concede it functioned as an agency until a date certain when its status changed.  And while the Armstrong court also stated it was obligated in deciding the agency issue to "apply the law in effect at the time we render our decision," id., that statement was in response to the argument of the dissent that a regulation that had been effectively voided by the revocation of an old executive order and the issuance of a new executive order should still be given effect.  See id.

Telephone:  202-408-5565
Fax:  202-588-5020

Attorneys for plaintiff

Dated:  May 9, 2008

# EXHIBIT 1



THE WHITE HOUSE
WASHINGTON

June 28, 1978

MEMORANDUM FOR MARGARET McKENNA

FROM:      PATRICK APODACA

SUBJECT:   Applicability of the FOIA to White House Documents

This will address questions you raised concerning the applic-
ability of the Freedom of Information Act to White House
documents which are currently in or may in the future be
placed in the custody of the Office of Administration. I
have discussed the problem with individuals who worked on
the OMB reorganization staff when OA was created and there
appears to have been no formal consideration of these is-
sues at that time.

Applicability of the FOIA will depend on whether 1) the Office
of Administration is an "agency"; and 2) whether the docu-
ments in question are "agency records".

The term "agency" specifically includes the Executive Office
of the President but has been interpreted to exclude the
President's immediate personal staff or units in the Executive
Office whose sole function is to advise and assist the Presi-
dent. Soucie v. David, 448 F.2d 1067 (C.A.D.C. 1971); House
of Rep. 93-1380, pp. 14-15. OA performs functions for other
offices within the EOP and there are no identifiable units
within the OA which function solely to serve the President.
Accordingly, it is reasonable to conclude that the Office of
Administration is an "agency" subject to the Act.

The FOIA applies to "agency records" but the Act defines
neither "record" nor "agency records". The question is
whether OA's involvement with White House documents in its
custody is sufficient to deem them agency records subject
to the Act.

[illegible] White House ownership of the documents under
[illegible] would preclude any argument that the documents
[illegible] records. However, because of OA's custody of

Attachment I

the documents or obtain services which it performs, any
circuit therein, although incidental to these ends, are
also incidental to OA's performance of administrative
services essential to the operation of administration of
a policy for the White House and thereby never acting
exclusively for the White House and thereby never acting
exclusively for the White House and therefore are subject to the Act. [1]

For purposes of this analysis, documents that are currently
that might be located in OA custody can be divided into
the following categories:

1. Documents which are in OA's possession
only for a short period of time while a service
with regard to them is being performed, e.g.,
messenger service, duplication.

2. Documents in the form of ADP applications,
the control of and access to which is restricted
exclusively to White House staff. No such
systems presently exist.

3. Documents whose information is available to
OA personnel for the purpose of performing a related
support function, e.g., payroll processing,
accounting, correspondence tracking, etc., and
documents (including copies of White House docu-
ments retained by OA) created by OA relative to
or incidental to functions it performs for the
White House, e.g., catalog of information systems,
status reports, computer printouts, etc. [2]

---

[1]    There is no written agreement between the White
House and OA establishing the exact scope of authority
which the latter may exercise in regard to any of the
documents in its possession. It appears to be in-
formally established that OA may not disclose to a
third party any documents or information transferred
to it from the White House without the latter's
express approval.

[2]    Specifically exempted from the FOIA are "personnel
and medical files and similar files the disclosure of
which would constitute a clearly unwarranted invasion
of personal privacy." 5 U.S.C. §552(b)(6). This exemption
would afford considerable but not absolute protection
from disclosure of White House personnel records in the
OA computer system. The exemption would not preclude
judicial review of a record to determine whether, on
balance, an individual's privacy interest outweighs the
public's interest in obtaining disclosure.



OA's limited possession of Category One documents amounts to only a bailment, and not ownership. Accordingly, these are not "agency records" subject to FOIA.

Analyzing the opposite extreme, it would appear that OA's dominion and control over Category Three documents is sufficiently extensive to rebut a bailment theory and strongly suggest that these are agency documents. With regard to it is clear that these constitute OA documents actually generated by OA and in its possession Act. These remains, however, a question of whether White House documents to which OA has regular access and use might not be restricted in the manner described below to minimize the risk of compelled disclosure under the Act.

The most difficult question arises with respect to Category Two documents. If the information involved in creating these records were inputed and accessed exclusively by White House staff, the risk of exposure to FOIA would be minimal. In other words, OA would merely provide the White House with computer facilities but would not itself become involved in creating the computer records. However, I understand that it may be necessary for OA personnel to become involved in at least a transformation process in creating these records. For example, raw data would be provided to OA (either orally or in writing) which OA staff would then transform to a computer usable form. Under these circumstances, it is unclear whether the documents would constitute agency records, but there is a significant risk that they would be subject to FOIA.

The risk that any Category Two documents would be subject to FOIA could be effectively minimized or eliminated by implementing certain safeguards. A written agreement between OA and the White House could be effected making explicit OA's restricted possessory interest over documents and making clear that ownership and control in spite of OA's limited interest, remains in the White House. In addition, as has already been suggested, the elimination of OA staff access or involvement with these documents at any step in the process would seem to create a very strong presumption that the documents are not agency records.

As an alternative to the Office of Administration, use of House Communication Agency (WHCA) facilities is under consideration. The FOIA risks attendant to using WHCA



that the White House are fewer than if services were
provided by OA.

It is not clear from doubt a persuasive argument can be
made that WHCA is not an agency subject to the FOIA. Establish-
ed as a field operation of the Defense Communications
Agency (DCA), Department of Defense. DCA may exercise
discretion concerning administrative matters (e.g., as-
signment of personnel, but the day-to-day control and there-
fore direction is clearly directed by the Director of the White House
Military Office, a White House staff person. Consistent
with the purpose for which WHCA was created, its per-
sonnel are assigned to the White House exclusively to pro-
vide communications and transportation assistance and support
to the President. It would therefore appear that WHCA is
an entity whose sole function is to advise and assist the
President and not an agency subject to FOIA.

In summary, applicability of FOIA to White House documents
will depend on the extent to which the Office of Administration
is able to exercise control over them. Documents in OA's
custody for a temporary period while OA is performing a
specific service are not subject to the Act. Where custody
is of a more permanent nature there may be a significant
risk of compelled disclosure, unless OA's control, use and
access is restricted. Although not entirely clear, WHCA
would not appear to be an "agency" under FOIA and any risks
of public disclosure would be fewer for documents in its
custody.

cc:  Val Giannini

**EXHIBIT 2**

LEXSEE 45 FED. REG. 47112

EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION

AGENCY: Office of Administration, Executive Office of the President.

5 CFR PART 2502

Availability of Records -- Freedom of Information Act: Final Regulations

*45 FR 47112*

July 14, 1980

ACTION: Final rule.

SUMMARY: The following regulations were published in the Federal Register, for public review and comment, on April 21, 1980. No comments have been received. These regulations establish the procedures by which records may be obtained from all organizational units within the Office of Administration; however, they apply only to the Office of Administration and not to other agencies within the Executive Office of the President.

EFFECTIVE DATE: August 13, 1980.

FOR FURTHER INFORMATION CONTACT: Donald Street, Assistant to the Deputy Director, (202) 456-2970.

The following Part 2502 is added to Title 5 of CFR.

TEXT: Sarah T. Kadec,

Deputy Director.

CHAPTER XV -- OFFICE OF ADMINISTRATION; FREEDOM OF INFORMATION ACT REGULATIONS

PART 2502 -- AVAILABILITY OF RECORDS

Subpart A -- Production or Disclosure of Records Under the Freedom of Information Act, U.S.C. 552

Sec.

2502.1 Definitions.

2502.2 Statutory requirements.

2502.3 Purpose and scope.

2502.4 Organization and functions.

2502.5 Public reference facilities and current index.

45 FR 47112

2502.6 Records of other agencies.

2502.7 How to request records: Form and content.

2502.8 Initial determination.

2502.9 Prompt response.

2502.10 Responses: Form and content.

2502.11 Appeals to the Director from initial denials.

2502.12 Maintenance of files.

2502.13 Schedule of fees.

2502.14 Waiver of fees.

2502.15 Payment of fees.

2502.16 Information to be disclosed.

2502.17 Exemptions.

2502.18 Deletion of exempted information.

2502.19 Annual report.

Subpart B -- Production in Response to Subpoenas or Demands of Courts or Other Authorities

2502.30 Purpose and scope.

2502.31 Production prohibited unless approved by Director.

2502.32 Procedure in the event of a demand for disclosure.

2502.33 Procedure in the event of an adverse ruling.

Authority: *15 U.S.C. 552,* as amended by Pub. L. 93-502.

Subpart A -- Production or Disclosure of Records Under the Freedom of Information Act, *5 U.S.C. 552*

Authority: *5 U.S.C. 552,* as amended by Pub. L. 93-502.

§ 2502.1 Definitions.

(a) "Office" means the Office of Administration, Executive Office of the President;

(b) "Agency" means agency as defined in *5 U.S.C. 552*(e);

45 FR 47112

(c) "Workday" means those days when the Office is open for the conduct of government business, and does not include Saturdays, Sundays and legal public holidays;

(d) "FOIA" means Freedom of Information Act, *5 U.S.C. 552,* as amended.

§ 2502.2 Statutory requirements.

*5 U.S.C. 552*(a)(3) requires each Agency, when it receives a request which reasonable describes the records sought and which is in accordance with the implementing regulations published by the Agency, to make the records promptly available. *5 U.S.C. 552*(b) exempts specified classes of records from the public access requirements of *5 U.S.C. 552*(a) and permits them to be withheld.

§ 2502.3 Purpose and scope.

This subpart contains the regulations of the Office of Administration, Executive Office of the President, implementing *5 U.S.C. 552.* The regulations of this subpart describe the procedures by which records may be obtained from all organizational units within the Office of Administration. Official records of the Office made available pursuant to the requirements of *5 U.S.C. 552* shall be furnished to members of the public only as prescribed by this subpart. To the extent that it is not prohibited by other laws the Office also will make available records which it is authorized to withhold under *5 U.S.C. 552* whenever it determines that such disclosure is in the public interest.

§ 2502.4 Organization and functions.

The Office of Administration was created by Reorganization Plan No. 1 of 1977 and Executive Order 12028. Its primary function is to provide common administrative and support services for the various Agencies of the Executive Office of the President. It consists of:

(a) The Office of the Director, which includes the Director and the Deputy Director and their principal assistants, including the Assistant for Audit and Assessment;

(b) Six Assistant Directors and their staffs, who are responsible for the following Divisions:

(1) Administrative Services

(2) Computer Facilities Management

(3) Financial Management

(4) Information Management and Services

(5) Information Systems Development

(6) Personnel Management

The Office has no field organization. Offices of the Office of Administration are presently located in the Executive Office Building, 17th & Pennsylvania Ave, NW., and in the New Executive Office Building, 726 Jackson Place NW., Washington, D.C. 20503. Regular office hours are from 9 a.m. to 5:30 p.m., Monday through Friday. Both buildings are under security control. Persons desiring access are encouraged to make advance arrangements for an appointment.

§ 2502.5 Public Reference Facilities and Current Index.

(a) The Office of Administration will maintain in a public reading area located in the Executive Office of the President Information Center, Room G-102, New Executive Office Building, 726 Jackson Place NW., Washington, D.C., and make available for public inspection and copying a current index providing identifying information for the public as to any matter which is issued, adopted, or promulgated after January 1, 1978, and which is required to be indexed by *5 U.S.C. 552*(a)(2). The office will also maintain on file in this public reading area all material published by the Office of Administration in the Federal Register and currently in effect.

§ 2502.6 Records of other Agencies.

Requests for records that originated in another Agency and are in the custody of the Office of Administration, will be referred to that Agency for processing, and the person submitting the request shall be so notified. The decision made by that Agency with respect to such records will be honored by the Office of Administration.

45 FR 47112

§ 2502.7 How to request records -- form and content.

(a) A request made under the Freedom of Information Act must be submitted in writing, addressed to: Deputy Director, Office of Administration, 726 Jackson Place, NW, Washington, D.C. 20503. The words "FOIA REQUEST" should be clearly marked on both the letter and the envelope. Due to security measures in force at the Old and New Executive Office Buildings, requests made in person can only be accepted from current employees of the Executive Office of the President, who have the appropriate security clearances.

(b) Any Office employee or official who receives a FOIA Request shall promptly forward it to the Deputy Director. Any Office employee or official who receives an oral request made under the FOIA, shall inform the person making the request to the provisions of this subpart.

(c) Each request must reasonably describe the record(s) sought, including, when known: Agency/individual orginating the record, date, subject matter, type of document, location, and any other pertinent information which would assist in promptly locating the record(s).

(d) When a request is not considered reasonably descriptive, or requires the production of voluminous records, or places an extraordinary burden on the Office of Administration, seriously interfering with its normal functioning to the detriment of the business of the government, the Office may require the person making the request, or such person's agent, to confer with an Office representative in order to attempt to verify, and, if possible, narrow the scope of the request.

§ 2502.8 Initial determination.

The Deputy Director shall have the authority to approve or deny requests received pursuant to these regulations. The decision of the Deputy Director shall be final, subject only to administrative review as provided in § 2502.11.

§ 2502.9 Prompt response.

(a) The Deputy Director shall either approve or deny a request for records within 10 working days after receipt of the request unless additional time is required for one of the following reasons:

(1) It is necessary to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

(2) It is necessary to consult with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein.

(b) When additional time is required for one of the reasons stated in paragraph (a) of this section, the Deputy Director or his designee shall acknowledge receipt of the request within the 10 workday period and include a brief explanation of the reason for the delay, indicating the date by which a determination will be forthcoming. An extended deadline adopted for one of the reasons set forth above may not exceed 10 additional workdays.

§ 2502.10 Responses -- form and content.

(a) When a requested record has been identified and is available, the Deputy Director shall notify the person making the request as to where and when the record is available for inspection or the copies will be available. The notification shall also advise the person making the request of any fees assessed under § 2502.13 hereof.

(b) A denial or partial denial of a request for a record shall be in writing signed by the Deputy Director and shall include:

(1) The name and title of the person making the determination;

(2) A reference to the specific exemption under the Freedom of Information Act authorizing the withholding of the record, and a brief explanation of how the exemption applies to the record withheld; or

(3) A statement that, after diligent effort, the requested records have not been found or have not been adequately examined during the time allowed by § 2502.9, and that the denial will be reconsidered as soon as the search or examination is complete;

(4) A statement that the denial may be appealed to the Director within 30 days of receipt of the denial or partial denial.

45 FR 47112

If a requested record cannot be located from the information supplied, or is known to have been destroyed or otherwise disposed of, the person making the request shall be so notified and the legal authority for disposition shall be cited.

§ 2501.11 Appeals to the Director from initial denials.

(a) When the Deputy Director had denied a request for records in whole or in part, the person making the request may, within 30 days of its receipt, appeal the denial to the Director. The appeal must be in writing, addressed to the Director, Office of Administration, 726 Jackson Place, NW., Washington, D.C. 20503 and clearly labeled as a "Freedom of Information Act Appeal".

(b) The Director will act upon the appeal within 20 workdays of its receipt. The Director may extend the 20 day period of time by any number of workdays which could have been claimed and consumed by the Deputy Director under § 2502.9 but which were not claimed and consumed in making the initial determination. The Office of Administration's action on an appeal shall be in writing, signed by the Director of the Office.

(c) If the decision is in favor of the person making the request, the Director shall order records promptly made available to the person making the request.

(d) A denial in whole or in part of a request on appeal shall set forth the exemption relied on and a brief explanation of how the exemption applied to the records withheld and the reasons for asserting it, if different from that described by the Deputy Director under § 2502.10. The denial shall state that the person making the request may, if dissatisfied with the decision on appeal, file a civil action in the district in which the person resides or has his principal place of business, in the district where the records are located, or in the District of Columbia.

(e) No personal appearance, oral argument or hearing will ordinarily be permitted in connection with an appeal to the Office of Administration.

(f) On appeal, the Office may reduce any fees previously assessed.

§ 2502.12 Maintenance of files.

(a) The Deputy Director shall maintain files, containing all materials required to be retained by or furnished to him under this subpart. The material shall be filed by individual request, indexed according to the exemptions assorted, and, to the extent feasible indexed according to the type of records requested.

(b) The Deputy Director shall also maintain a file open to the public, which shall contain copies of all grants or denials of appeals by the office of Administration. The materials shall be indexed as stated in paragraph (a) of this section.

§ 2502.13 Schedule of fees.

(a) Except as otherwise provided, the following specific fees shall be applicable with respect to services rendered to members of the public under this subpart:

(1) *Search for Records.*  Five dollars per hour when the search is conducted by a clerical employee. Ten dollars per hour when the search is conducted by a professional employee. There will be no charges for searches of less than one hour.

(2) *Duplication of Records.*  Records will be duplicated at a rate of $0.10 per page for copying 4 pages or more. There will be no charges for duplicating 3 pages or less.

(3) *Other.*  When no specific fee has been established for a service, the Deputy Director is authorized to establish an appropriate fee based on "direct costs" as provided in the Freedom of Information Act. Examples of services covered by this provision include searches involving computer time or special travel, transportation, or communication costs.

(b) If the Office anticipates that the fees chargeable under this section will amount to more than $30, or the maximum amount specified in the request, the requester shall be promptly notified of the estimated amount of the fee, before costs have been incurred. In such instances the requester will be advised of the option to consult with Office personnel in order to reformulate the request in a manner which will reduce the fees, yet still meet your needs. A reformulated request shall be considered a new request, thus beginning a new 10 workday period for processing.

§ 2502.14 Waiver of fees.

45 FR 47112

The Deputy Director shall assess fees for the search and, if necessary, duplication of records requested. The Deputy Director shall also have authority to furnish records without charge, or at a reduced charge, where he determines that waiver or reduction of the fee is in the public interest.

§ 2502.15 Payment of fees.

(a) Fees must be paid in full prior to issuance of the requested copies. In the event the requestor owes money for a previous request, copies of records will not be provided for any subsequent request until the debt has been paid in full. Fees for search time must be paid before records are made available.

(b) Search costs are due and payable even if the record which was requested cannot be located after all reasonable efforts have been made.

(c) Payment of fees shall be in the form either of a personal check or bank draft drawn on a bank in the United States, or a postal money order. Remittances shall be made payable to the order of the Treasury of the United States and mailed or delivered to the Deputy Director, Office of Administration, 726 Jackson Place, NW., Washington, D.C. 20503.

§ 2502.16 Information to be disclosed.

In general, all records by the Office of Administration are available to the public, as required by the Freedom of Information Act. However, the Office claims the right, where it is applicable, to withhold material under the provisions specified in the Freedom of Information Act as amended *(5 U.S.C. 552*(b)).

§ 2502.17 Exemptions.

(a) *5 U.S.C. 552* exempts from all of its publication and disclosure requirements nine categories of records which are described in 552(b). These categories include such matters as national defense and foreign policy information, investigatory files, internal procedures and communications, materials exempted from disclosure by other statutes, information given in confidence and matters involving personal privacy.

(b) Executive Order 12028 (December 4, 1977) provides that the Office of Administration shall upon request, assist the White House office in performing its role of providing those administrative services which are primarily in direct support of the President. Due to this role of providing direct support of the President, members of the public should presume that communications between the Director of the Office of Administration and the President (and their staffs) are confidential or ordinarily will not be released; they will usually fall, at a minimum, within Exemption 5 of the Act.

(c) The records of the Office of Administration which are part of systems of records subject to the Privacy Act of 1974 are exempt from disclosure to the public except as provided by 5 CFR Part 2504.

§ 1502.18 Deletion of exempted information.

Where requested records contain matters which are exempted under *5 U.S.C. 552*(b) but which matters are reasonably segregable from the remainder of the records, they shall be disclosed by the Office with deletions. To each such record, the Office shall attach a written justification for making deletions. A single such justification shall suffice for deletions made in a group of similar or related records.

§ 2502.19 Annual Report.

The Deputy Director shall annually on or before March 1, submit a Freedom of Information report covering the preceding calendar year to the Speaker of the House of Representatives and President of the Senate. The report shall include those matters required by *5 U.S.C. 552*(d).

Subpart B -- Production in Response to Subpoenas or Demands of Courts or other Authorities

§ 2502.30 Purpose and scope.

This subpart contains the regulations of the Office concerning procedures to be followed when a subpoena, order or other demand (hereinafter in this subpart referred to as a "demand") of a court or other authority is issued for the production or disclosure of: (a) Any material contained in the files of the Office of Administration; (b) any information relating to materials contained in the files of the Office; or (c) any information or material acquired by any person while such person as an employee of the Office of Administration as a part of the performance of his official duties or because of his official status.

45 FR 47112

§ 2502.31 Production prohibited unless approved by the Director.

No employee or former employee of the Office of Administration shall, in response to a demand of a court or other authority, produce any material contained in the files of the Office of Administration or disclose any information or produce any material acquired as part of the performance of his official status without the prior approval of the Director.

§ 2502.32 Procedure in the event of a demand for disclosure.

(a) Whenever a demand is made upon an employee or former employee of the Office of Administration for the production of material or the disclosure of information described in § 2502.31, he shall immediately notify the Director. If possible, the Director shall be notified before the employee or former employee concerned replies to or appears before the court or other authority.

(b) If response to the demand is required before instructions from the Director are received, an attorney designated for that purpose by the Office of Administration shall appear with the employee or former employee upon whom the demand has been made, and shall furnish the court or other authority with a copy of the regulations contained in this part and inform the court or other authority that the demand has been or is being, as the case may be, referred for prompt consideration by the Director. The court or other authority shall be requested respectfully to stay the demand pending receipt of the requested instructions from the Director.

§ 2502.33 Procedure in the event of an adverse ruling.

If the court or other authority declines to stay the effect of the demand in response to a request made in accordance with § 2502.32(b) pending receipt of instructions from the Director, or if the court or other authority rules that the demand must be complied with irrespective of the instructions from the Director not to produce the material or disclose the information sought, the employee or former employee upon whom the demand has been made shall respectfully decline to comply with the demand. (*United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951)*).
[FR Doc. 80-20856 Filed 7-11-80; 8:45 am]

BILLING CODE 3115-01-M

# EXHIBIT 3

LEXSTAT 5 C.F.R. 2502.16

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2008, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE MAY 1, 2008 ISSUE OF ***
*** THE FEDERAL REGISTER ***

TITLE 5 -- ADMINISTRATIVE PERSONNEL
CHAPTER XV -- OFFICE OF ADMINISTRATION, EXECUTIVE OFFICE OF THE PRESIDENT
PART 2502 -- AVAILABILITY OF RECORDS
SUBPART A -- PRODUCTION OR DISCLOSURE OF RECORDS UNDER THE FREEDOM OF
INFORMATION ACT, 5 U.S.C. 552
CHARGES FOR SEARCH AND REPRODUCTION

**Go to the CFR Archive Directory**

*5 CFR 2502.16*

§ 2502.16 Information to be disclosed.

(a) In general, all records of the Office of Administration are available to the public, as required by the Freedom of Information Act. However, the Office claims the right, where it is applicable, to withhold material under the provisions specified in the Freedom of Information Act as amended *(5 U.S.C. 552*(b)).

(b) Records from Non-U.S. Government Source. (1) Upon receipt of a request for a record that was obtained from a non-U.S. Government source, or for a record containing information clearly identified as having been provided by a non-U.S. Government source, including a contract proposal or contract material, the Office will contact the source of the requested record or information requesting advice as to whether release of the record would adversely affect the source's competitive position or invade anyone's privacy. Subsequent to receipt of such advice, the Office will independently examine the requested document and will notify the requester of the final decision.

(2) OA personnel will generally consider two exemptions in the FOIA in deciding whether to withhold from disclosure material from a non-U.S. Government source. Exemption 4 permits withholding of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Exemption 6 permits withholding certain information, the disclosure of which "would constitute a clearly unwarranted invasion of personal privacy." The source whose material has been requested will be asked to supply convincing justification for any material it wishes withheld under the Act, in accordance with the following general guidelines.

(i) For consideration under exemption 4, the supplier of the record or information should identify material that would be likely to cause substantial harm to its present or future competitive position if it were released. If a contractor, the provider should assume that the material will be released to a competitor, even if that is not always the case. A contractor must provide detailed information on why release would be harmful, e.g., the general custom or usage in the business; the number and situation of the persons who have access to the information; the type and degree of risk of financial injury that release would cause; and the length of time the information will need to be kept confidential.

(A) In this respect, the Office of Administration will--as a general rule--look favorably upon recommendations for withholding information about ideas, methods, and processes that are unique; about equipment, materials, or systems that are potentially patentable; or about a unique use of equipment which is specifically outlined.

(B) OA will not withhold information that is known through custom or usage in the relevant trade, business, or profession, or information that is generally known to any reasonably educated person. Self-evident statements or reviews of the general state of the art will not ordinarily be withheld.

5 CFR 2502.16

(C) OA will withhold all cost data submitted except the total estimated cost for each year of the contract. Where appropriate, OA will release unit pricing data except where that information would disclose confidential information such as profit margins. It will release these total estimated costs and ordinarily release explanatory material and headings associated with the cost data, withholding only the figures themselves. If a contractor believes some of the explanatory material should be withheld, that material must be identified and a justification be presented as to why it should not be released.

(ii) Exemption 6 is not a blanket exemption for all personal information. The Office will balance the need to keep a person's private affairs from unnecessary public scrutiny with protection of the public's right to information on Government records.

(A) As a general practice, the Office will release information about any person named in a contract itself or about any person who signed a contract as well as information given in a proposal about any officer of a corporation submitting that proposal. Except for names and other identifying details, the Office usually releases all information in resumes concerning employees, including education and experience. Efforts will be made to identify information that should be deleted and offerors are urged to point out such material for guidance. Any information in the proposal which might constitute an unwarranted invasion of personal privacy if released should be identified and a justification for non-release provided in order to receive proper consideration.

(B) The Office can protect the names of and identifying details about other staff members who are described in a contract proposal if it is clear that identification of these employees would assist competitors in raiding and hiring them away. In this regard, names and other identifying details could be protected under Exemption 4 (harmful to competitive position) and also under Exemption 6 (it would be an unwarranted invasion of personal privacy to release them). In such a case, the Office would withhold names, home addresses, salaries, telephone numbers, social security numbers, marital status and, if these served to identify them, perhaps some details about past employment or professional activities of these persons.

**HISTORY:** *[45 FR 47112,* July 14, 1980. Redesignated and amended at *49 FR 28234,* July 11, 1984. Redesignated and amended at *56 FR 5744,* Feb. 13, 1991]

**AUTHORITY:** *5 U.S.C. 552,* as amended by Pub. L. 93-502 and Pub. L. 99-570.

**NOTES:** NOTES APPLICABLE TO ENTIRE TITLE:
Title 5 of the United States Code was revised and enacted into positive law by Public Law 89-554, Sept. 6, 1966. New citations for obsolete references to sections of 5 U.S.C. appearing in this title may be found in a redesignation table under title 5, Government Organization and Employees, United States Code.

903 words

**EXHIBIT 4**



## THE WHITE HOUSE

PRESIDENT GEORGE W. BUSH

PRESIDENT | VICE PRE

Your Governmei

### ☆ IN FOCUS

Budget Management
Defense
Economy
Education
Energy
Environment
Gulf Coast
Health Care
Homeland Security
Immigration
Iraq
Judicial Nominations
Medicare
National Security
Pandemic Flu
Patriot Act
Veterans

more issues  →

**News**

Current News
Press Briefings
Proclamations
Executive Orders
Radio

more news  →

**Contact**

Ask the White House
White House Interactive

**Government**

President's Cabinet
USA Freedom Corps
Faith-Based & Community Initiatives
Office of Management and Budget
National Security Council
USA.gov

**Documents**

Home > Government > Office of Administration > Freedom of Information Act

## FOIA HANDBOOK

This handbook is intended to assist you in making a Freedom of Information Act (FOIA) request to the Office of Administration (OA), Executive Office of the President (EOP). For further details please refer to the OA FOIA Regulations which can be found at 5 CFR §2502. These regulations are currently being updated.

OA is a distinct entity from the other components of the EOP. Please contact the separate EOP entities, that are subject to FOIA, individually, if you would like to make a FOIA request for their records.

The EOP entities subject to the FOIA are:

- Council on Environmental Quality
- Office of Administration
- Office of Management and Budget
- Office of National Drug Control Policy
- Office of Science and Technology Policy
- Office of the United States Trade Representative

The EOP entities exempt from the provisions of the FOIA are:

- White House Office
- Office of the Vice President
- Council of Economic Advisers
- National Security Council
- Office of Policy Development
  - Domestic Policy Council
  - Office of National AIDS Policy
  - National Economic Council
- President's Foreign Intelligence Advisory Board


PLAINTIFF'S EXHIBIT
tabbies
3HJ108 JS

### MISSION OF THE OFFICE OF ADMINISTRATION:

The Office of Administration (OA) was established within the Executive Office of the President (EOP) by Reorganization Plan No. 1 of 1977. The Office was activated, effective December 4, 1977, by Executive Order 12028 of December 12, 1977. Its primary function is to provide common administrative and support services for the various entities of the EOP. The services include personnel; financial management; data processing; library services; records management, and general office operations, such as mail, messenger, printing, procurement, and supply services. OA has no field organizations and consists of the following:

(1) Office of the Director and General Counsel

Nominations
Applications

(2) Equal Employment Opportunity

(3) Facilities Management

(4) Financial Management

(5) General Services

(6) Human Resources Management

(7) Information Systems & Technology

(8) Library Research Services

(9) Operations and Legislative Liaison

(10) Security

### CURRENT PUBLICATIONS:

None at this time.

### SUBMITTING A FREEDOM OF INFORMATION ACT REQUEST:

A request made under the FOIA must be submitted in writing, by mail
or fax, to the following address:

Office of Administration
FOIA Officer
725 17th Street NW
Washington, DC 20503
Phone: (202) 395-2273
Fax: (202) 456-7921

The words **FOIA REQUEST** should be clearly marked on both the
letter and the envelope. Due to security measures at the Eisenhower
Executive Office Building and the New Executive Office Building,
requests made in person should be delivered to Room G-1, at the
above address. Describe the specific records requested in enough
detail so that they can be located with a reasonable amount of effort.
Requests for answers posed as questions are not covered under the
FOIA. The request must be for records. Records must exist at the
time the request is submitted.

Please state your willingness and ability to pay applicable fees or
provide a justification to support a fee waiver.

For further information, please refer to the Office of Administration
FOIA Regulations at 5 CFR §2502, which are currently being
reviewed in light of the passage of the E-FOIA Amendment of 1996.
Questions relating to the OA records and disclosure regulations may
be directed to (202) 395-2273.

### PRIVACY ACT:

Information may also be requested from OA under the Privacy Act, 5
U.S.C. 552a. Privacy Act requests for information in OA's files must
be in writing and sent to the same address as FOIA requests (see
**Submitting a Freedom of Information Act Request**). For further
details please refer to the OA Privacy Act Regulations which can be
found at 5 CFR §2504.

The Privacy Act Regulations apply to all records maintained by the
Office of Administration that are contained in a system of records, and
that contain information about an individual. The regulations also
establish procedures that (a) authorize an individual's access to
records maintained about him/her; (b) limit the access of other
persons to those records; and (c) permit an individual to request the

amendment or correction of records about him/her self.

Please note that records maintained by OA are usually kept only on individuals employed by the office and not on all other citizens or residents of the United States.

EOP Publications:

There are no OA publications. If you are interested in publications from other EOP entities, please visit the individual web sites.

## OA'S WEBSITE ADDRESS:

http://www.whitehouse.gov/oa/

## OA'S ELECTRONIC READING ROOM

OA's Electronic Reading Room located on OA's website (see address above) contains documents specifically identified for inclusion by the FOIA, as well as documents for which we have received multiple requests:

- The IMPAC Credit Card Holders Listing;
- Government Information Locator System (GILS);
- Office of Administration Annual FOIA Reports;
- Handbook for FOIA Requests;
- Office of Administration FOIA Regulations; and
- Index and Description of Major Information and Record Locater Systems

President | Vice President | First Lady | Mrs. Cheney | News & Policies
History & Tours | Kids | Your Government | Appointments | Jobs | Contact | Text only
Accessibility | Search | Privacy Policy | Help | Site Map

**EXHIBIT 5**



EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
WASHINGTON, D.C. 20503

June 21, 2007

Ms. Anne Weismann
Citizens for Responsibility and Ethics in Washington
1400 Eye Street, NW, Suite 450
Washington, DC  20005

RE:  Freedom of Information Act Request

Dear Ms. Weismann:

Pursuant to the Court's Order of June 4, 2007, this letter responds in part to the pending FOIA requests of Citizens for Responsibility and Ethics in Washington ("CREW").  Specifically, this provides the response, due by June 21, as specified in the Court's June 4, 2007 Order with respect to the six categories of documents quoted at pages 1-2 of the Order, from CREW's May 29, 2007 letter to OA.  This includes the response with respect to categories 1-4 (paragraphs 1 and 2 of the Court's Order beginning on page 3); with respect to category 5 (paragraph 1 of the Court's Order beginning on page 2); and with respect to category 6 (paragraph 1 of the Court's Order at the top of page 4).  It also responds to category 6, paragraph 2 of the Court's Order at the top of page 4.

OA provides common administrative support and services to components within the EOP, including certain administrative support and services in direct support of the President.  Because OA, on occasion, provides such direct support to the President, OA is not within the definition of an "agency" and therefore, elects to process this FOIA request as a matter of administrative discretion.

OA has located 504 pages that may be responsive to CREW's requests described above.   Such documents include emails, spreadsheets, procurement-related documents, and internal guidance.  After reviewing the documents, following consultation with the OA General Counsel and current and former Deputy General Counsel, I determined that approximately 454 pages are exempt from disclosure in their entirety or do not contain reasonably segregable portions that OA could release.  There are 48 pages that are released in their entirety and 2 that are partially released; these documents are enclosed.  The documents are exempt from release in whole or in part under the following FOIA provisions:

    (1) Title 5 U.S.C. § 552(b)(2) [High 2], exempts documents from disclosure when the disclosure would risk circumvention of a statute or an organization regulation or internal security matters.  OA has located potentially responsive documents that fall within those categories;

    (2) Title 5 U.S.C. § 552(b)(5) exempts inter-agency/intra-agency communications and records that fall within the Attorney Work Product, Attorney Client and Deliberative Process

Privileges.  OA has located potentially responsive documents that fall within those categories; and

(3) Title 5 U.S.C. § 552(b)(6) [Personal Privacy Matters] protects the identities of Federal employees who may be potential targets of threats and harassment.  As such, there is a heightened interest in the identity and duty locations of current and former employees that is concurrent with the increased security awareness demanded in this time of national emergency. OA has located potentially responsive documents that fall within those categories.

Since this matter is in litigation, please contact Jean Lin at 202-514-3716 if you have any questions.

Sincerely,

Carol Ehrlich
Freedom of Information Act Officer

**EXHIBIT 6**

OMB Approved 3700-0042

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | | 1 | | 1 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (if applicable) |
|---|---|---|---|
| 0036 | See Block 16C | CIG24012 | |

| 6. ISSUED BY | CODE | | 7. ADMINISTERED BY (if other than item 6) | CODE | |
|---|---|---|---|---|---|
| GovWorks/Department of Interior<br>381 Elden Street, MS-2500<br>Herndon, Virginia 20170-4817 | | | Rob V. Roberts<br>Contracting Officer (Address Same as Block 6)<br>Telephone: (703) 787-1493 | | |

| 8. NAME AND ADDRESS OF CONTRACTOR (No. Street, county, State and ZIP. Code) | | | | (✓) | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|---|---|---|
| Unisys Corporation                    DUNS: 150780674<br>117220 Plaza America Drive          TIN: 380387840<br>Tower 3, 11th Floor<br>Reston, VA 20190-4757<br>Attn: Judy Williams   Email: Judy.Williams@unisys.com<br>Voice: (703) 439-5703 Fax: (703) 439-3393 | | | | | |
| | | | | | 9B. DATED (SEE ITEM 11) |
| | | | | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>DCA200-02-D-5014/ 71359 |
| | | | | | 10B. DATED (SEE ITEM 13)<br>April 04, 2003 |
| CODE | | FACILITY CODE | | | |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and returning one (1) copy of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATA SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. ACCOUNTING AND APPROPRIATION DATA (if required) |
|---|
| 05-5B-2500-R57 OC:252J   Obligate $275,230.95 |

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,<br>IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| (✓) | A. | THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A. |
|---|---|---|
| | B. | THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. | THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:<br>52.212-4(c) |
| | D. | OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ___ is not, _X_ is required to sign this document and return _1_ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The purpose of this modification is to increase the level of effort for the ECRMS task.

A. The cost proposal dated 23 June 2005 in the amount of $275,230.95 which provides follow on work for the EOP Electronic Communications Records Management System (ECRMS) is hereby incorporated into the subject task order.

B. Increase total funded order amount from $27,399,840.88 to $27,675,071.83; a net increase of $275,230.95.

C. Increase total Not-to-Exceed (NTE) order amount from $70,443,931.66 to $70,719,162.61; a net increase of $275,230.95.

D. Please note the 4% award fee of $10,895.92 for this project has not been obligated but will be paid separately subject to the approval of the Award Fee Board which meets on a quarterly basis.

Except as provided herein, all terms and conditions of the document referenced in item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|
| Judy H. Williams, Manager, Contracts | ROBERT V. ROBERTS | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| *(Signature)* (Signature of person authorized to sign) | 6/27/05 | BY *(Signature)* (Signature of Contracting Officer) | 07/07/2005 |

| NSN 7540-01-152-8070<br>PREVIOUS EDITION UNUSABLE | 30-105<br>Computer Generated | STANDARD FORM 30 (REV. 10-83)<br>Prescribed by GSA<br>FAR (48 CFR) 53.243 |
|---|---|---|

SEP-24-2004  07:44          PROCUREMENT                          202 395 3962    P.02

| INTERAGENCY AGREEMENT | 1. IAA NO.<br>CIG24012 | | | PAGE<br>1 | OF<br>2 |
|---|---|---|---|---|---|

| 2. ORDER NO. | 3. REQUISITION NO.<br>RCI24236 | | 4. SOLICITATION NO. | | |
|---|---|---|---|---|---|

| 5. EFFECTIVE DATE<br>09/24/2004 | 6. AWARD DATE<br>09/24/2004 | 7. PERIOD OF PERFORMANCE |
|---|---|---|

| 8. SERVICING AGENCY<br>Department of Interior<br>GOVWORKS<br>381 Elden Street, MS 2510<br>Herndon VA 20170-4817<br><br>POC Katherine Valitos<br>TELEPHONE NO. 703787-1349 | 9. DELIVER TO<br>GSD-RDF-PC#<br>GSA Supply Center<br>6810 Loisdale Road<br>Bldg A Door 17<br>ATTN:<br>Springfield VA 22150 |
|---|---|

| 10. REQUESTING AGENCY<br>Office of Administration/OCIO<br>725 17th Street, NW<br>Washington DC 20503<br><br>POC Mack Bayne<br>TELEPHONE NO. 202-395-6487 | 11. INVOICE OFFICE<br>OA/IS&T/CIP<br>FAX INVOICES TO:<br>(202) 395-6236<br>FOR VENDOR INVOICE INQUIRIES,<br>PLEASE CALL (202) 395-7259. |
|---|---|

| 12. ISSUING OFFICE<br>Office of Administration<br>COO/Procurement Branch<br>(202) 395-3314<br>Washington DC 20503 USA | 13. LEGISLATIVE AUTORITY<br>SECTION 403, P.L. 103-356 |
|---|---|
| | 14. PROJECT ID |
| | 15. PROJECT TITLE |

16. ACCOUNTING DATA

| 17.<br>ITEM NO. | 18.<br>SUPPLIES OR SERVICES. | 19.<br>QUANTITY | 20.<br>UNIT | 21.<br>UNIT PRICE | 22.<br>AMOUNT |
|---|---|---|---|---|---|
| | Delivery: 09/29/2004<br>FY: X2004 INDEX: OA3600734D22 Object: 253000<br>Project: CI430 Sub-Project: 001 | | | | |
| 0001 | Please send funding to GovWorks for the<br>implementation of the E-Mail Archive Retrieval<br>System. See Statement of Work attached dated<br>September 21, 2004. | 1.00 | LO | 401,800.00 | 401,800.00 |
| 0002 | 2% GovWorks Fee<br><br>POC IS STEVE MCDEVITT AT 202-355-6403.<br>Continued ... | 1.00 | LO | 8,200.00 | 8,200.00 |

| 23. PAYMENT PROVISIONS<br>Servicing Agency to IPAC the Receiving Agency | 24. TOTAL AMOUNT<br>$410,000.00 |
|---|---|

| 25a. SIGNATURE OF GOVERNMENT REPRESENTATIVE(SERVICING)<br>*Mary J. Carver, Contracting Officer* | 25d. SIGNATURE OF GOVERNMENT REPRESENTATIVE(REQUESTING)<br>*Lynnae C. Ancae* | |
|---|---|---|
| 25b. NAME AND TITLE<br>Mary J. Carver | 25c. DATE<br>9-24-04 | 25e. CONTRACTING OFFICER<br>LYNNAE C. ROSCOE | 25d. DATE<br>9-24-04 |

CMB 9-24-04

| IAA NO.<br>CIG24012 | ORDER NO. | PAGE<br>2 |
| --- | --- | --- |

GOVWORKS SHALL IPAC OA FUNDS IN THE AMOUNT OF
$410,000 AS FOLLOWS:

Servicing Agency DUNS # 161559646
OA DUNS # 031649358
OA AGENCY LOCATION CODE # 11 01 0005
OA APPROPRIATION CODE: 11 X 0038

STANDARD GENERAL LEDGER:
DEBIT: 4700 COMMITMENTS
CREDIT: 4801 UNDELIVERED ORDERS UNPAID

Total amount of award: $410,000.00.

**CONTRACT/**
**ORDER NO.:** 71359 mod 36
**COST** ~~$272,398.01~~ 275,230.95
**FEE** ~~$5,447.96~~ $5,504.62
**NOTE** 2% Fee

| INTERAGENCY AGREEMENT | 1. IAA NO.<br>CIG24012 | | PAGE<br>1 | OF<br>2 |
|---|---|---|---|---|

| 2. ORDER NO. | 3. REQUISITION NO.<br>RCI24236 | 4. SOLICITATION NO. |
|---|---|---|

| 5. EFFECTIVE DATE<br>09/24/2004 | 6. AWARD DATE<br>09/24/2004 | 7. PERIOD OF PERFORMANCE |
|---|---|---|

| 8. SERVICING AGENCY<br>Department of Interior<br>GOVWORKS<br>381 Elden Street, MS 2510<br>Herndon VA 20170-4817<br><br>POC Katherine Valitos<br>TELEPHONE NO. 703787-1349 | 9. DELIVER TO<br>GSD-RDF-PO#<br>GSA Supply Center<br>6810 Loisdale Road<br>Bldg A Door 17<br>ATTN:<br>Springfield VA 22150 |
|---|---|

| 10. REQUESTING AGENCY<br>Office of Administration/OCIO<br>725 17th Street, NW<br>Washington DC 20503<br><br>POC Mack Bayne<br>TELEPHONE NO. 202-395-6487 | 11. INVOICE OFFICE<br>OA/IS&T/CIP<br>FAX INVOICES TO:<br>(202) 395-6236<br>FOR VENDOR INVOICE INQUIRIES,<br>PLEASE CALL (202) 395-7259. |
|---|---|

| 12. ISSUING OFFICE<br>Office of Administration<br>COO/Procurement Branch<br>(202) 395-3314<br>Washington DC 20503 USA | 13. LEGISLATIVE AUTORITY<br>SECTION 403, P.L. 103-356 |
|---|---|
| | 14. PROJECT ID |
| | 15. PROJECT TITLE |

**16. ACCOUNTING DATA**

| 17.<br>ITEM NO. | 18.<br>SUPPLIES OR SERVICES. | 19.<br>QUANTITY | 20.<br>UNIT | 21.<br>UNIT PRICE | 22.<br>AMOUNT |
|---|---|---|---|---|---|
| | Delivery: 09/29/2004<br>FY: X2004 INDEX: OA3600734D22 Object: 253000<br>Project: CI430 Sub-Project: 001 | | | | |
| 0001 | Please send funding to GovWorks for the<br>implementation of the E-Mail Archive Retrieval<br>System. See Statement of Work attached dated<br>September 21, 2004. | 1.00 | LO | 401,800.00 | 401,800.00 |
| 0002 | 2% GovWorks Fee | 1.00 | LO | 8,200.00 | 8,200.00 |
| | POC IS STEVE MCDEVITT AT 202-395-6403.<br>Continued ... | | | | |

| 23. PAYMENT PROVISIONS<br>Servicing Agency to IPAC the Receiving Agency | 24. TOTAL AMOUNT<br>$410,000.00 |
|---|---|

| 25a. SIGNATURE OF GOVERNMENT REPRESENTATIVE(SERVICING) | 26a. SIGNATURE OF GOVERNMENT REPRESENTATIVE(REQUESTING)<br>*Lynnae C. Roscoe* |
|---|---|
| 25b. NAME AND TITLE | 25c. DATE | 26B. CONTRACTING OFFICER<br>LYNNAE C. ROSCOE | 26c. DATE<br>9-24-04 |

| IAA NO.<br>CIG24012 | ORDER NO. | PAGE<br>2 |
| --- | --- | --- |

GOVWORKS SHALL IPAC OA FUNDS IN THE AMOUNT OF
$410,000 AS FOLLOWS:

Servicing Agency DUNS # 161559646
OA DUNS # 031649358
OA AGENCY LOCATION CODE # 11 01 0005
OA APPROPRIATION CODE: 11 X 0038

STANDARD GENERAL LEDGER:
DEBIT: 4700 COMMITMENTS
CREDIT: 4801 UNDELIVERED ORDERS UNPAID

Total amount of award: $410,000.00.

**EXHIBIT 7**

# Executive Office of the President



# *Office of Administration*

## Fiscal Year 2008 Budget

OA00500

# Executive Office of the President
# Office of Administration

## Mission Statement and Background

The Office of Administration (OA) was created by Reorganization Plan No. 1 of 1977, and was formally established by Executive Order 12028 on December 12, 1977. OA's mission is to provide enterprise-level administrative services to the Executive Office of the President (EOP) and the Office of the Vice President.

OA is organized along the following lines:

**Office of the Director** includes the Director's personal staff, Office of the General Counsel, and the Equal Employment Opportunity Office. This office provides leadership, manages allocation of resources, and ensures that priorities reflect customer needs.

**Office of the Chief Operating Officer** manages human resources, library, office supply, receiving and warehousing, duplicating, facilities management, telecommunications, and mail/messenger functions.

**Office of the Chief Financial Officer (OCFO)** oversees financial management activities related to EOP components. The OCFO directs, manages, and provides policy guidance and oversight of financial management activities and operations, including procurement and travel support.

**Office of Security and Emergency Preparedness** is responsible for oversight of EOP security, emergency preparedness, and continuity of operations programs. This office also serves as a liaison with the United States Secret Service.

**Office of the Chief Information Officer (OCIO)** efficiently and effectively delivers strategic and operational technology leadership to the components that OA supports.

## Overview

For fiscal year (FY) 2008, the estimated funding requirement for OA is $103,110,000 and a full-time equivalent (FTE) level of 222. The overall FY 2008 OA budget represents a net increase of $693,000, or 0.7 percent, from the FY 2007 budget request.

The OA budget is divided into single-year and no-year accounts as follows:

- The Salaries and Expenses (S&E) budget is composed of single-year funds amounting to $91,187,000, which represents an increase of $167,000 from the FY 2007 budget request level.

OA00501

- o Personnel compensation and benefits amounts to a $910,000 increase to cover the expected cost-of-living adjustment for Federal employees. The number of FTEs remains unchanged.

- o Within the Enterprise Services Initiative, the OA S&E budget includes the following adjustments from the amounts originally proposed in the FY 2007 request: an increase of $123,000 for GSA space rent on behalf of Office of Management and Budget (OMB), and an $866,000 decrease on behalf of the Office of National Drug Control Policy (ONDCP). The net impact is a reduction of $743,000.

- The Capital Investment Plan (CIP) represents $11,923,000 in no-year funds. This includes a program increase of $526,000 in equipment to replace servers dedicated to systems maintained for Human Resources Management. There are no FTEs associated with the CIP.

FY 2008 Estimate

**Salaries and Expenses: $91,187,000**

The S&E account supports core OA functions, and the FY 2008 OA budget request reiterates the FY 2007 request in that it moves $11,176,000 in funding from other EOP components to the OA Enterprise Services Initiative:

- $10,281,000 for space rent paid to GSA:

  - o $7,528,000 from OMB
  - o $2,753,000 from ONDCP

- $658,000 for employee transportation subsidies:

  - o $100,000 from the White House Office (WHO)
  - o $2,000 from the Executive Residence (EXR)
  - o $4,000 from the Office of Policy Development (OPD)
  - o $25,000 from the National Security Council (NSC)
  - o $6,000 from the Council of Economic Advisers (CEA)
  - o $327,000 from OMB
  - o $52,000 from ONDCP
  - o $19,000 from the Office of Science and Technology Policy (OSTP)
  - o $119,000 from the United States Trade Representative (USTR)
  - o $4,000 from the Council on Environmental Quality (CEQ)

OA00502

- $237,000 for services:

  o $25,000 for rent-based security charges from the Federal Protective Service (FPS):
    - $25,000 from ONDCP

  o $65,000 for health unit services:
    - $53,000 from OMB
    - $12,000 from ONDCP

  o $105,000 for burn bag pickup services:
    - $77,000 from WHO
    - $6,000 from CEA
    - $7,000 from ONDCP
    - $15,000 from USTR

  o $42,000 for employee Flexible Spending Account (FSA) administrative fees:
    - $4,000 from WHO
    - $1,000 from EXR
    - $1,000 from NSC
    - $1,000 from CEA
    - $22,000 from OMB
    - $3,000 from ONDCP
    - $1,000 from OSTP
    - $8,000 from USTR
    - $1,000 from CEQ

OA's S&E request includes $2,522,000 for the OCFO. These funds are used to maintain systems used by the EOP community for financial reporting, financial systems, and internal controls. This funding provides for the ongoing cross-servicing agreements with the Bureau of the Public Debt, Administrative Resource Center (core accounting system), and the Department of Health and Human Services, Division of Payment Management (grant management system), as well as, travel support services, OCFO employee training, and general office supplies for the OCFO.

**Capital Investment Plan (CIP): $11,923,000**

The CIP provides $11,923,000 to support the continued development of EOP information technology infrastructure, and it is a vital component in the mission of the OCIO. The use of these funds is managed and closely controlled by the OCIO. The four areas described below will be supported by the FY 2008 CIP requirement:

- **Customer Solutions ($4,526,000)** funds are directed to enterprise-wide solutions which serve the common needs of all EOP components as well as unique business requirements of the White House Office and the Office of Administration. This is achieved by analyzing customer requirements, developing customized solutions or finding existing solutions that meet these requirements, and implementing systems that automate common business

OA00503

practices across the EOP. The particular focus of these implemented systems is on mission, operational and cost effectiveness, as well as statutory compliance. This area supports the migration of the current infrastructure architecture to a common architecture. The overall goal is to reduce the total cost of ownership of EOP information technology while strengthening the service that the OCIO provides to its customers.

- **Customer Service and Desktop Systems ($2,243,000)** is necessary for ensuring that the technological infrastructure is adequate for supporting the mission of the EOP. This area provides for the scheduled modernization of the desktop, laptop, and printer hardware for all EOP components. Included in this category is the acquisition of enterprise software licenses, augmentation of the infrastructure for wireless handheld communications devices, and the provisioning of equipment and services to support Presidential and Vice Presidential travel.

- **EOP Systems Infrastructure ($3,974,000)** is needed to ensure that the information technology and communications infrastructure resident within EOP is upgraded to meet the capacity and performance requirements of its mission and organizational requirements. This includes the ongoing update of the EOP data network and supporting infrastructure to provide faster and more reliable network connections, the upgrade of business software that supports EOP functions, and implementation of virtual server technology to improve recoverability and availability of applications. Failure to refresh this core infrastructure will cause outages in vital infrastructure components that degrade critical communication and business functions, resulting in the failure to meet the EOP's mission and goals. This area includes the program increase to replace servers for systems maintained by Human Resources Management.

- **Information Security ($1,180,000)** includes a significant investment in information technology required for compliance with the common identification standards mandated by Homeland Security Presidential Directive 12. The CIP in this area continues the implementation and improvement of internal security systems that monitor the EOP network. Additionally, the policies and systems which authorize and control user access capabilities are continuously improved upon, increasing the effectiveness of the EOP staff.

OA00504

## Executive Office of the President
## Office of Administration - Overall S&E and CIP

### Summary Change to Object Class
### ($ in thousands)

A summary of the estimated funding requirement is shown below:

|  | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated |
|---|---|---|---|
| Total, Direct Obligations................................. | 84,967 | 102,417 | 103,110 |
| Full-Time Equivalent Level............................ | 222 | 222 | 222 |

The increases and/or decreases for FY 2008 are as follows:

| | | |
|---|---|---|
| FY 2007 requested level........................................................................ | | 102,417 |
| Net increases to FY 2007 requested level: | | |
| Personnel Compensation & Benefits......................................... | 910 | |
| Equipment................................................................................. | 526 | |
| Subtotal, increases to FY 2007 requested level........................... | | 1,436 |
| Net decreases to FY 2007 requested level: | | |
| Rental Payments to GSA............................................................ | -743 | |
| Subtotal, decreases to FY 2007 requested level......................... | | -743 |
| FY 2008 estimated level........................................................................ | | 103,110 |

OA00505

# Executive Office of the President
## Office of Administration - Overall S&E and CIP

### Object Class
### ($ in thousands)

| | Object Class and Title | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated | FY07/FY08 Difference |
|---|---|---|---|---|---|
| 10 | Personnel Compensation & Benefits.... | 22,885 | 23,874 | 24,784 | 910 |
| 21 | Travel & Transportation of Persons..... | 118 | 196 | 196 | 0 |
| 22 | Transportation of Things...................... | 107 | 138 | 138 | 0 |
| 23.1 | Rental Payments to GSA...................... | 19,360 | 32,989 | 32,246 | -743 |
| 23.3 | Comm., Utilities & Misc. Charges....... | 6,415 | 6,656 | 6,656 | 0 |
| 24 | Printing and Reproduction................... | 168 | 192 | 192 | 0 |
| 25 | Other Contractual Services.................. | 28,451 | 27,365 | 27,365 | 0 |
| 26 | Supplies and Materials........................ | 1,488 | 1,423 | 1,423 | 0 |
| 31 | Equipment........................................... | 5,975 | 9,584 | 10,110 | 526 |
| | Total, Direct Obligations.................... | 84,967 | 102,417 | 103,110 | 693 |
| | | | | | |
| 99 | Reimbursement................................... | 917 | 1,000 | 1,000 | |
| | Total................................................... | 85,884 | 103,417 | 104,110 | |

### Personnel Summary

| | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated | FY07/FY08 Difference |
|---|---|---|---|---|
| Full-Time Equivalent Level........................... | 222 | 222 | 222 | 0 |

OA00506

# Executive Office of the President
## Office of Administration - Salaries & Expenses

### Summary Change to Object Class
### ($ in thousands)

A summary of the estimated funding requirement is shown below:

|  | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated |
|---|---|---|---|
| Total, Direct Obligations.................................. | 76,381 | 91,020 | 91,187 |
| Full-Time Equivalent Level............................ | 222 | 222 | 222 |

The increases and/or decreases for FY 2008 are as follows:

| | | |
|---|---|---|
| FY 2007 requested level....................................................................... | | 91,020 |
| Net increases to FY 2007 requested level: | | |
| Personnel Compensation & Benefits.......................................... | 910 | |
| Subtotal, increases to FY 2007 requested level.......................... | | 910 |
| Net decreases to FY 2007 requested level: | | |
| Rental Payments to GSA............................................................ | -743 | |
| Subtotal, decreases to FY 2007 requested level......................... | | -743 |
| FY 2008 estimated level................................................................ | | 91,187 |

OA00507

# Executive Office of the President
## Office of Administration - Salaries & Expenses

**Object Class**
**($ in thousands)**

| | Object Class and Title | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated | FY07/FY08 Difference |
|---|---|---|---|---|---|
| 10 | Personnel Compensation & Benefits.... | 22,885 | 23,874 | 24,784 | 910 |
| 21 | Travel & Transportation of Persons..... | 118 | 196 | 196 | 0 |
| 22 | Transportation of Things.................... | 107 | 138 | 138 | 0 |
| 23.1 | Rental Payments to GSA..................... | 19,360 | 32,989 | 32,246 | -743 |
| 23.3 | Comm., Utilities & Misc. Charges....... | 6,415 | 6,656 | 6,656 | 0 |
| 24 | Printing and Reproduction................... | 168 | 192 | 192 | 0 |
| 25 | Other Contractual Services.................. | 24,910 | 25,158 | 25,158 | 0 |
| 26 | Supplies and Materials........................ | 1,488 | 1,423 | 1,423 | 0 |
| 31 | Equipment........................................... | 930 | 394 | 394 | 0 |
| | Total, Direct Obligations..................... | 76,381 | 91,020 | 91,187 | 167 |
| | | | | | |
| 99 | Reimbursement.................................... | 917 | 1,000 | 1,000 | |
| | Total.................................................. | 77,298 | 92,020 | 92,187 | |

**Personnel Summary**

| | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated | FY07/FY08 Difference |
|---|---|---|---|---|
| Full-Time Equivalent Level.......................... | 222 | 222 | 222 | 0 |

OA00508

**Executive Office of the President**
**Office of Administration - Salaries & Expenses**

**Explanation of Changes by Object Class**
($ in thousands)

| FY 2007 Requested | FY 2008 Estimate | | Net Change |
|---|---|---|---|
| 23,874 | 24,784 | **Personnel Compensation and Benefits (10)** | 910 |

This object class includes salaries, terminal leave, premium pay, reimbursable detailees, assignments under the Intergovernmental Personnel Act, and all employee benefits.

The increase in this object class represents payroll and benefits inflation adjustments required for maintaining FY 2007 personnel levels. (There are no increases in full time equivalent levels for FY 2008.)

| 196 | 196 | **Travel and Transportation of Persons (21)** | 0 |

This object class includes official travel, such as per diem, hotel, transportation, auto rental, and local transportation.

There is no net change in this object class.

| 138 | 138 | **Transportation of Things (22)** | 0 |

This object class includes commercial express delivery as well as freight and other shipping charges.

There is no net change in this object class.

OA00509

| FY 2007 Requested | FY 2008 Estimate | | Net Change |
|---|---|---|---|
| 32,989 | 32,246 | Rental Payments to GSA (23.1) | -743 |

This category includes payments to the General Services Administration (GSA) for rental of space and rent related services.

The FY 2007 request included additional OA enterprise services space rent funding for a potential ONDCP relocation into commercial office space. The FY 2008 rent on behalf of ONDCP has been reduced by $866 since no such relocations are planned in FY 2008. Additionally, the enterprise services funding for OMB space rent has been increased by $123. The net effect of these adjustments is a $743 decrease.

| | | | |
|---|---|---|---|
| 6,656 | 6,656 | Communications, Utilities & Miscellaneous Charges (23.3) | 0 |

This object class includes data, voice, and wireless communications from Federal and commercial sources, as well as utilities, postage, and miscellaneous rental charges.

There is no net change in this object class.

| | | | |
|---|---|---|---|
| 192 | 192 | Printing and Reproduction (24) | 0 |

This object class includes printing and reproduction obtained from the private sector or from other Federal entities.

There is no net change in this object class.

| | | | |
|---|---|---|---|
| 25,158 | 25,158 | Other Contractual Services (25) | 0 |

This object class includes advisory and assistance services, other purchases of goods and services from Government accounts, operations and maintenance of facilities, research and development contracts, medical care, operations and maintenance of equipment, or subsistence and support of persons.

There is no net change in this object class.

OA00510

| FY 2007 Requested | FY 2008 Estimate | | Net Change |
|---|---|---|---|
| | | | 0 |
| 1,423 | 1,423 | Supplies and Materials (26) This object class includes general supplies, information technology (IT) supplies, newspaper and magazine subscriptions, and Government publications. There is no net change in this object class. | |
| 394 | 394 | Equipment (31) This object class includes IT hardware and software, customized software programming, peripheral IT equipment (e.g., printers and network devices), office furniture, and office equipment (e.g., photocopiers, facsimile machines, and telephones). There is no net change in this object class. | 0 |
| 91,020 | 91,187 | Total for all Object Classes | 167 |

OA00511

OA-13

# Executive Office of the President
## Office of Administration - Capital Investment Plan

### Summary Change to Object Class
### ($ in thousands)

A summary of the estimated funding requirement is shown below:

|  | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated |
|---|---|---|---|
| Total, Direct Obligations................................. | 8,586 | 11,397 | 11,923 |
| Full-Time Equivalent Level............................ | 0 | 0 | 0 |

The increases and/or decreases for FY 2008 are as follows:

| | | |
|---|---|---|
| FY 2007 requested level.................................................................. | | 11,397 |
| Net increases to FY 2007 requested level: | | |
| Equipment.................................................................................. | 526 | |
| Subtotal, increases to FY 2007 requested level.......................... | | 526 |
| Net decreases to FY 2007 requested level: | | |
| Subtotal, decreases to FY 2007 requested level......................... | | 0 |
| FY 2008 estimated level.................................................................. | | 11,923 |

OA00512

# Executive Office of the President
## Office of Administration - Capital Investment Plan

### Object Class
### ($ in thousands)

| | Object Class and Title | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated | FY07/FY08 Difference |
|---|---|---|---|---|---|
| 25 | Other Contractual Services................... | 3,541 | 2,207 | 2,207 | 0 |
| 31 | Equipment.......................................... | 5,045 | 9,190 | 9,716 | 526 |
| | Total, Direct Obligations...................... | 8,586 | 11,397 | 11,923 | 526 |
| | | | | | |
| 99 | Reimbursement................................... | 0 | 0 | 0 | |
| | Total.................................................. | 8,586 | 11,397 | 11,923 | |

### Personnel Summary

| | FY 2006 Actual | FY 2007 Requested | FY 2008 Estimated | FY07/FY08 Difference |
|---|---|---|---|---|
| Full-Time Equivalent Level........................... | 0 | 0 | 0 | 0 |

OA00513

| FY 2007 Requested | FY 2008 Estimate | | Net Change |
|---|---|---|---|
| 2,207 | 2,207 | Other Contractual Services (25) | 0 |

This object class includes advisory and assistance services, other purchases of goods and services from Government accounts, operations and maintenance of facilities, research and development contracts, medical care, operations and maintenance of equipment, or subsistence and support of persons.

There is no net change in this object class.

| 9,190 | 9,716 | Equipment (31) | 526 |

This object class includes IT hardware and software, customized software programming, peripheral IT equipment (e.g., printers and network devices), office furniture, and office equipment (e.g., photocopiers, facsimile machines, and telephones).

The increase in this object class covers the replacement of servers used for operation of Human Resources systems during FY 2008.

| 11,397 | 11,923 | Total for all Object Classes | 526 |

OA00514

# EXHIBIT 8

# Executive Office of the President - Interagency Agreement

| 1. Customer Component: | 2. Servicing Component: |
|---|---|
| Situation Support Staff | Office of Administration |

**Administrative Contact:**

Administrative Contact:
Name: Kenneth Finley
Address: 237 EEOB
Washington, DC 20503
Phone/Fax:
E-mail:

Administrative Contact:
Name: Mary Anne Cushner-Fox
Address: 1800 G. St., NW., 10th Floor
Washington, DC 20503
Phone/Fax:
E-mail:

**3. Financial Data (enter all data):**

Document Number: N417S608MD50125
Fund: Operation & Maintenance, Navy
Budget Fiscal Year: 2008
Treasury Account Symbol (TAS): 1781804
Agency Location Code: 00 00 8404
DUNS/DPN:
Other: AA 1781804 DUGS 000 000000 0 068941 2D 0000000 130009371000

Amendment:
BETC: DISB

**4. Financial Data (enter applicable data):**

Document Number:
Fund:
Budget Fiscal Year: 2008
Treasury Account Symbol (TAS): 11 X 0100
Agency Location Code: 11 01 0001
Servicing Cost Center:
Other: OA8180000

Amendment:
OA58X516 BETC: COLL
OA50038REN0XX
Project Costs
DUNS/DPN: 01040353
Object Class: 2110

**5. Authority Citation:**
Economy Act,31 U.S.C. §§ 1535 and 1536

**6. Period of Performance:** October 1, 2007 through September 30, 2008

Rejection Notice: Billing will be rejected if it does not cite EOP financial data as noted above.

**7. Additional Requirements**

Note: EOP - Please collect via IPAC using ALC# 00008404 and financial data above after billings are complete.

**8. Description of Goods or Services Provided:**

| Line | Service/Description/Unit cost | Object Class | Customer Cost Center | Customs Project Code | Amount | Charges | New Total |
|---|---|---|---|---|---|---|---|
| 1 | AT&T Voice System Operation and Maintenance | 2110 | | | $ 36,888.00 | $ | $ 36,888.00 |
| 2 | | | | | $ | $ | $ |
| 3 | | | | | $ | $ | $ |
| | Total.................... | | | | $ 36,888.00 | $ | $ 36,888.00 |

**9. Customer Approval (Signature):** _[signature]_   Date: 11/14/2007

11. Name/Title:
Thomas J. North
Kenneth Finley, Director of Acquisition and Resource Management

MACF 11.2.07

**10. Servicing Approval (Signature):** _[signature]_   Date: JAN 2, 2007

12. Name/Title:
Edgar Bennett, Chief Financial Officer

OA00335

Standard Form 1080
Revised April 1982
Department of the Treasury
I TFRM2-2500
1080-109

**VOUCHER FOR TRANSFERS
BETWEEN APPROPRIATIONS AND/OR FUNDS**

VOUCHER NO.
N4175608MD50125

SCHEDULE NO.

Department, establishment, bureau, or office receiving funds
NAVY SYSTEMS MANAGEMENT ACTIVITY
1851 S. Bell St.
Arlington, VA 22202                          ALC# 00008404

BILL NO.

PAID BY

Department, establishment, bureau, or office charged

EXECUTIVE OFFICE OF THE PRESIDENT
1800 G. St., NW; 10th Floor
WASHINGTON, D.C. 20503
POC: Mary Anne Cochran-Fox;
PH:
ALC: 11 03 0001

| ORDER NO. | DATE OF DELIVERY | ARTICLE OR SERVICES | QUAN-TITY | UNIT PRICE | | AMOUNT |
| | | | | COST | PER | DOLLARS AND CENTS |
|---|---|---|---|---|---|---|
| | | Funds are provided to the Executive Office of the President for AT&T voice systems operations and maintenance under document N4175608MD50125/OASI8S16. | | | | $36,888.00 |
| | | Please collect via IPAC using ALC# 00008404 after billings are complete using document number N4175608MD50125. | | | | |
| | | NSMA POC: ANTHONY ZGAINER PH:        – FAX: | | | | |
| | | | | | TOTAL | $36,888.00 |

Remittance in payment should be sent to -

**ACCOUNTING CLASSIFICATION -** *Office Receiving Funds*

**CERTIFICATE OF OFFICE CHARGED**
I certify that the above articles were received and accepted or the services performed as stated and should be charged to the appropriation(s) and/or fund(s) as indicated below; or that the advance payment requested is approved and should be paid as indicated.

11/14/2007
(Date)

(Authorized administrative or certifying officer)

(Title)

**ACCOUNTING CLASSIFICATION -** *Office Charged*

AA 1781804 DUG3 000 00000 0 068941 2D 000000 130009371000

OA00336

Paid by Check No.

NSN 7540-00-634-4230                    Designed using PreForm Pro software                    Previous Editions Are Usable

TOTAL P.02

# EXHIBIT 9

Exhibit 3 (page 89 of the ...)

| 1. Customer Component: United States Secret Service | 2. Servicing Component: Office of Administration |
|---|---|

**Administrative Contact:**

| Name: Vanessa Spencer | Administrative Contact: |
| Address: 950 H St., Rm. 6700, NW Washington, DC 20223 | Name: Mary Anne Cochran-Fox Address: 1800 G. St., NW, 10th Floor Washington, DC 20503 |
| Phone/fax: | Phone/fax: |
| E-mail: | E-mail: |

| 3. Financial Data (enter all data): | 4. Financial Data (enter applicable data): |
|---|---|
| Document Number: HSSS01-08-M-0017 ...amendment: | Document Number: OASIRS17    Amendment: |
| Fund: BETC: DISB | Fund: OAS0038RE08XX    BETC: COLL |
| Budget Fiscal Year: 2008 | Budget Fiscal Year: 2008 |
| Treasury Account Symbol (TAS): 70 8 0400 | Treasury Account Symbol (TAS): 11 8 0038    Project Code 03164958 |
| Agency Location Code: 70 04 0001 | Agency Location Code: 11 03 0001    DUNS/BPN: |
| DUNS/BPN: | Servicing Cost Center: OASI050000    Object Class: 2310 |
| Other: 2008-7080400-IRM-25209-145040-610001-0-0-0 | Other: |

Rejection Notice: Billing will be rejected if it does not cite EOP financial data as noted above.

**5. Authority Citation:**
Economy Act, 31 U.S.C. §§ 1535 and 1536

**6. Period of Performance:**
October 1, 2007 through September 30, 2008

**7. Description of Goods or Services Provided:**

| Line | Service/quantity/unit cost | Object Class | Customer Cost Center | Customer Project Code | Amount | Changes | New Total |
|---|---|---|---|---|---|---|---|
| | AT&T Voice Systems Operations and Maintenance | 2330 | | | $145,902.00 | $ - | $145,902.00 |
| | Verizon Special Circuits - for the time period October 1, 2007 to December 31, 2007 only. After that date USSS will pay special circuit charges directly to Verizon. | 2330 | | | $40,000.00 | $ - | $40,000.00 |
| | | | | | $ - | $ - | $ - |
| | | | | | $ - | $ - | $ - |
| | | | | Total.............. | $185,902.00 | $ - | $185,902.00 |

| 11. Name/Title: Donald Simcox | 12. Name/Title: Edgar Bennett, Chief Financial Officer |
|---|---|
| Customer Approval (Signature): _Signature on MIR_ | 10. Servicing Approval (Signature): _[signature]_ |
| Date | Date _Nov 2, 2007_ |

_MACF 11-2-07_

OA00337

MILITARY INTERDEPARTMENTAL PURCHASE REQUEST

Page 1 of 2 Pages

| 2 FSC | 3 CONTROL SYMBOL NO. | | 4 DATE PREPARED | 5 MIPR NUMBER | | 6 AMENDNO |
|---|---|---|---|---|---|---|
| N/A | 134088 | | 11/19/2007 | HSSS01-08-M-0017 | | BASIC |

| 7 TO | 8 FROM (Agency, name, telephone number of originator) |
|---|---|
| EOP - OFFICE OF ADMINISTRATION<br>OLD EXECUTIVE OFFICE BUILDING<br>ROOM 09<br>WASHINGTON DC 20503 | PRO-PROCUREMENT DIV<br>950 H STREET NW<br>PROCUREMENT<br>ROOM 6700<br>WASHINGTON DC 20223 |

9 ITEMS [ ] ARE [X] ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING [ ] HAS [X] HAS NOT BEEN ACCOMPLISHED

| ITEM NO.<br>a | DESCRIPTION<br>(Federal Stock Number, Nomenclature, Specification and/or Drawing No., etc.)<br>b | QTY.<br>c | UNIT<br>d | ESTIMATED<br>UNIT PRICE<br>e | ESTIMATED<br>TOTAL PRICE<br>f |
|---|---|---|---|---|---|
| | 08-IRM-VPB-VS-0006<br><br>Contact Vanessa Spencer at telephone number<br>                  for any required delivery<br>coordination.<br>Period of Performance: 10/01/2007 to 09/30/2008 | | | | |
| 0001 | AT&T Voice systems operations and maintenance<br>(VSOM).  To include Verizon Tariff, Verizon<br>Centrex Lines, AT&T International long distance,<br>GSA/FTS Long Distance.<br>Fully Funded Obligation Amount--$145,902.00<br>Requisition No: 134088<br><br><br>Continued ... | 145902 | US | 1.00 | 29,897.95 |

| 10  SEE ATTACHED PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS. | 11  GRAND TOTAL<br>$62,506.65 |
|---|---|

| 12  TRANSPORTATION ALLOTMENT (Used if FOR Contractor's plant) | 13  MAIL INVOICES TO (Payment will be made by) |
|---|---|
| | COMMUNICATIONS CENTER (FMD)<br>ATTN:  COMML & GOVT PAYMENTS<br>PO BOX 6500<br>SPRINGFIELD VA 22150 |

PAY OFFICE DODAAD | FMS - PO BOX

14  FUNDS FOR PROCUREMENT ARE PROPERLY CHARGEABLE TO THE ALLOTMENTS SET FORTH BELOW, THE AVAILABLE BALANCES OF WHICH ARE SUFFICIENT TO COVER THE ESTIMATED TOTAL PRICE

| ACRN | APPROPRIATION | LIMIT/<br>SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION | ACCTG STA<br>DODAAD | AMOUNT |
|---|---|---|---|---|---|
| | | | See schedule | | |

| 15  AUTHORIZING OFFICER (Type name and title) | 16  SIGNATURE | 17  DATE |
|---|---|---|
| Benjamin P. Senker | | 11/19/2007 |

PREVIOUS EDITIONS IS OBSOLETE

DD FORM 448

S/N 0102-664-6501    C-25708

**MILITARY INTERDEPARTMENTAL**
**PURCHASE REQUEST**
**(CONTINUATION SHEET)**

| 1. MIPR NUMBER | 2. AMEND NO. | 3. | Page | 2 of | 2 Pages |
|---|---|---|---|---|---|
| HSSQ01-08-M-0017 | BASIC | | | | |

| ITEM NO.a | DESCRIPTION (Federal stock number, nomenclature, specification and/or drawing No., etc.)b | QTY c | UNIT d | ESTIMATED UNIT PRICE e | ESTIMATED TOTAL PRICE f |
|---|---|---|---|---|---|
| 0002 | Verizon Special Circuits.<br>Fully Funded Obligation Amount--$40,000.00<br><br>Period of Performance: 10/01/2007 to 12/31/2007<br><br><br>The Contract Specialist for this effort is<br>Charles L. Keeney, Jr.  Contact him at<br>    if you have any questions regarding<br>this MIPR.<br><br>This MIPR is subject to availability of funds<br>beyond December 14, 2007.  This MIPR hereby<br>obligates funds in the amount of $62,506.65. The<br>Servicing Agency will be notified, in writing,<br>when additional funding becomes available.<br><br>The total amount of award: $185,902.00. The<br>obligation for this award is $62,506.65. | 40000 | US | 1.00 | 32,608.70 |
| | APPROP    SUPPLEMENTAL ACCOUNTING CLASSIFICATION CODE | | | | AMOUNT |
| | 2008-7080400-TRM-25209-145040-610001-0-0-0 | | | | $62,506.65 |

DD FORM 448 C

OA00339

MIPR TERMS AND CONDITIONS

1.  **GENERAL**

The MIPR/IAA Form, for MIPR/IAA number HSSS01-08-M-0017, these Terms and Conditions, the Statement of Work (SOW), and any attachments constitute a Payable IA between the requesting agency, United States Secret Service (USSS), and the servicing agency, EOP - OFFICE OF ADMINISTRATION. This agreement shall be effective on the date of the final signature by authorized officials of both agencies, and shall remain in effect for the period(s) stated on the form, or until terminated in accordance with Cancellation/Termination provision of this document.

2.  **DEFINITIONS**

*COTR/POC:* the requesting agency's Contracting Officer's Technical Representative/Point of Contact. The Contracting Officer may designate Government personnel to act as the COTR to perform functions under the contract such as review or inspection and acceptance of supplies, services, including construction, and other functions of a technical nature.

*Requesting Agency:* the funding DHS Organizational Element named in one (1) above, or any duly authorized representative.

*Servicing Agency:* the federal agency that is performing services or providing goods under this agreement named in one (1) above, or any duly authorized representative.

3.  **COMPETITION REQUIREMENTS FOR THE SERVICING AGENCY**

All acquisitions awarded by the servicing agency in performance of this MIPR/IAA shall comply with the Competition in Contracting Act (CICA), Public Law 98-369.

4.  **FUNDING AND REIMBURSEMENT**

The servicing agency is limited to recovery of actual costs only. The servicing agency shall notify the requesting agency's COTR/POC in writing when the costs incurred and outstanding commitments equal 80% percent of the estimated total costs.

The servicing agency shall make no other commitments or expenditures beyond 100% of funds obligated and shall be excused from further performance of the work unless and until the requesting agency's Contracting Officer (CO), or other authorized official, increases the total obligation under this agreement by modification.

*Special Terms for One-year Funding:*
The total amount to be reimbursed shall not exceed the total amount obligated for the current fiscal year. If this agreement is issued under the authority of the Economy Act (31 U.S.C. 1535 and 1536 and the servicing agency uses in-house resources to perform part or all of the agreement, work must stop on September 30th of the current fiscal year and any unexpended funds must be deobligated. In-house work to continue in the next fiscal year must be funded effective October 1st with the new fiscal year's funds. If the servicing agency obligates the annualized funds by awarding a contract or delivery/task order prior to the expiration of the fiscal year, the funds will be protected and do not need to be deobligated after September 30.

*Special Terms for Greater Than One-year Funding:*
For longer than one-year (e.g., two-year, no-year) funding availability, the dates are extended appropriately.

5.  **BILLING INSTRUCTIONS/SUPPORT DOCUMENTATION FOR EXPENDITURES**

Billing and reimbursement may be handled through the Intra-governmental Payment and Collection (IPAC)

OA00340

system, or the servicing agency may submit invoices when the work is completed or as otherwise authorized. The MIPR/IAA number, the Agency Locator Codes, appropriate accounting code(s), and associated dollar amounts must be referenced on all IPAC transactions or invoices.

If IPAC is used, the servicing agency shall provide documentation supporting all charges to the requesting agency's COTR/POC. In the event that advance payment is requested and authorized, the servicing agency shall furnish expenditure reports to the COTR/POC on a monthly basis. The U.S. Secret Service Locator Code (ACL) number is: 70-04-0001.

If invoices are used, the invoices, along with supporting documentation, shall be submitted to the following address:

> COMMUNICATIONS CENTER (FMD)
> ATTN: COMMERCIAL & GOVT PAYMENTS
> PO BOX 6500
> SPRINGFIELD VA 22150

with a copy furnished to the COTR/POC. Per the Economy Act and Federal Acquisition Regulation 17.505, bills or requests for advance payment will not be subject to audit or certification in advance of payment.

Both agencies agree to promptly discuss and resolve issues and questions regarding payments. The servicing agency will promptly initiate year-end and closeout adjustments once final costs are known.

6.  TRAVEL

All travel under this MIPR/IAA shall be in accordance with the Federal Travel Regulations.

7.  PROMPT PAYMENT

The servicing agency shall not assess the requesting agency for any prompt payment interest charged to the servicing agency.

8.  MODIFICATIONS

When appropriate, a unilateral administrative modification will be issued by the requesting agency, e.g., to add funds with no change to the SOW, to change a COTR/POC name. A written bilateral modification (i.e., agreed to and signed by authorized officials of both parties) will be issued to change the MIPR/IAA, modify the SOW, etc.

9.  PROGRAM OFFICE/COTR RESPONSIBILITIES

The requesting agency COTR/POC and the servicing agency program office shall be responsible for technical oversight of the specified product or service, as set forth in the SOW of this agreement. In carrying out these responsibilities, they will operate within the scope of applicable regulations, specifically delegated authorities, and the program authorities and funding limitations of the MIPR/IAA. The COTR/POC has no authority to make changes to the terms of the MIPR/IAA.

10. PROPERTY

Non-expendable property purchased from funds supplied under this agreement shall become an asset of the requesting agency unless otherwise agreed to in writing by both agencies. Purchase of equipment required for performance of the work must be authorized under this MIPR/IAA.

11. THIRD PARTY LIABILITY

With respect to third-party liability for acts arising out of the performance of official duty by a government employee of the servicing agency, the servicing agency undertakes responsibilities for the investigation, adjudication, settlement, and payment of any claim asserted against the United States; except that, in all cases,

OA00341

the responsibility for the investigation, adjudication, settlement, and payment of any claim with respect to third-party liability arising out of the use, damage, or destruction of loaned personal property shall be the responsibility of the particular agency that has custody and control of the said personal property. In addition, the servicing agency representative shall have the duty of investigating and reporting, in accordance with the servicing agency's regulations and policies, incidents occurring on, or involving that servicing agency's real property, and the requesting agency agrees to cooperate fully in such investigations.

12. DISPUTES

Nothing in this agreement is intended to conflict with current requesting agency or Department of Homeland Security directives. However, should disagreement arise as to the interpretation of the provisions of this agreement that cannot be resolved between the servicing agency program office and the requesting agency COTR/POC, the area(s) of disagreement will be reduced to writing by each agency and presented to the authorized officials at both agencies for resolution. If settlement cannot be reached at this level, the disagreement will be raised to next level in accordance with servicing agency and requesting agency procedures for final resolution.

13. CANCELLATION/TERMINATION

This agreement is subject to cancellation or termination, with at least 60 calendar days (unless the Statement of Work specifies a different period) advance written notice by either party. The servicing agency shall be reimbursed for the cost of all completed and partially completed work (up to the MIPR/IAA ceiling) as of the effective date of cancellation.

14. PROJECT COMPLETION AND CLOSEOUT

When the requesting agency has accepted all deliverables related to the SOW, the servicing agency will provide a written project evaluation and final accounting of project costs to the requesting agency CO. The servicing agency account will then be closed and any remaining funds will be returned to the requesting agency immediately. After final accounting, the remaining balance in the project account will be deobligated by MIPR/IAA modification.

15. ACCESSIBILITY OF ELECTRONIC AND INFORMATION TECHNOLOGY

Each Electronic and Information Technology (EIT) product or service furnished under this agreement shall comply with the Electronic and Information Technology Accessibility Standards (36 CFR 1194), which implements section 508 of the Rehabilitation Act of 1973, as amended (29 U.S.C. 794d).

16. DELIVERY REQUIREMENTS

Any required deliveries shall be made to the following address:

   *Various*

17. UNAUTHORIZED USE OF THE U.S. SECRET SERVICE NAME

In accordance with 18 U.S.C. 709, any contractor, except with the written permission of the Director of the U.S. Secret Service, who knowingly uses the words Secret Service, Secret Service Uniformed Division, U.S.S.S., U.D. or any colorable imitation of such words or initials, in connection with, or as a part of any advertisement, circular, book, pamphlet or other publication, play, motion picture, broadcast, telecast, other production, product, or item, in a manner reasonably calculated to convey the impression that such advertisement, circular, book, pamphlet or other publication, product, or item, is approved, endorsed, or authorized by or associated in any manner with, the U.S. Secret Service or the U.S. Secret Service Uniformed Division shall be punishable as follows: a corporation, partnership, business trust, association, or other business entity, by a fine under this title; an officer or member thereof participating or knowingly acquiescing in such violation or any individual violating this section, by a fine under this title or imprisonment for not more than one year, or both.

Executive Office of the President - Interagency Agreement

| 1. Customer Component: | | | 2. Servicing Component: | | | |
|---|---|---|---|---|---|---|
| Harry S. Truman Scholarship Foundation | | | Office of Administration | | | |

| Administrative Contact: | | Administrative Contact: | |
|---|---|---|---|
| Name: Elise Derstine | | Name: Mary Anne Cochran-Fox | |
| Address: 712 Jackson Place | | Address: 1800 G. St., NW, 10th Floor | |
| Washington, DC 20503 | | Washington, DC 20503 | |
| Phone/fax: | | Phone/fax: | |
| E-mail: | | E-mail: | |

| 3. Financial Data (enter all): | | 4. Financial Data (enter applicable data): | |
|---|---|---|---|
| Document Number: E4037276 | Amendment: | Document Number: OASIE8I8 | Amendment/ |
| Fund: 806X | BETC: DISB | Fund: OAS0038REE08XX | BETC: COLL |
| Budget Fiscal Year: 2008 | | Budget Fiscal Year: 2008 | Project Code |
| Treasury Account Symbol (TAS): 95 x 8296 | | Treasury Account Symbol (TAS): 11 8 0038 | DUNS/BPN: 031649358 |
| Agency Location Code: 47 00 0016 | | Agency Location Code: 11 03 0001 | Object Class: 2310 |
| DUNS/BPN: 624516274 | | Servicing Cost Center: OAS1050000 | |
| Other: | | Other: | |

5. Authority Citation:
Economy Act, 31 U.S.C. §§ 1535 and 1536

Rejection Notice: Billing will be rejected if it does not cite EOP financial data as noted above.

6. Period of Performance: October 1, 2007 through September 30, 2008

| 8. Description of Goods or Services Provided: | | | |
|---|---|---|---|
| Line | Service(quantity/unit cost) | Object Class | Customer Cost Center |
| 1 | AT&T Voice Systems Operations and Maintenance | 2310 | |
| 2 | | | |
| 3 | | | |

| Customer Project Code | Amount | Changes | New Total |
|---|---|---|---|
| | $  3,854.00 | $  - | $  3,854.00 |
| | $  - | $  - | $  - |
| | $  - | $  - | $  - |
| Total........................ | $  3,854.00 | $  - | $  3,854.00 |

7. Additional Requirements

| 9. Customer Approval (Signature): | | 10. Servicing Approval (Signature): | |
|---|---|---|---|
| | Date 11-7-07 | | Date Nov 2 2007 |

11. Name/Title:
Frederick G. Slabach
Executive Secretary

12. Name/Title:
Edgar Bennett, Chief Financial Officer

MADE 11-2-07

OA00343

# Executive Office of the President – Interagency Agreement

| 1. Customer Component:<br>White House Fellows | 2. Servicing Component:<br>Office of Administration |
|---|---|
| Administrative Contact:<br>Name:<br>Address:<br>Phone/fax:<br>E-mail: | Administrative Contact:<br>Name: Mary Anne Cochran-Fox<br>Address: 1800 G. St., NW, 10th Floor<br>Washington, DC 20503<br>Phone/fax:<br>E-mail: |

**3. Financial Data (enter all data):**

| | | Amendment: |
|---|---|---|
| Document Number: | | BETC: DISB |
| Fund: | | |
| Budget Fiscal Year: | 2008 | |
| Treasury Account Symbol (TAS): | 24 X 0100  24 0 0100 | |
| Agency Location Code: | 24000001 | |
| DUNS/BPN: | 126336929 | |
| Other: | | |

**4. Financial Data (enter applicable data):**

| | | Amendment: |
|---|---|---|
| Document Number: | OAS18819<br>OAS0038RE08XX | BETC: COLL |
| Fund: | 2008 | Project Code |
| Budget Fiscal Year: | 2008 | DUNS/BPN: 031649558 |
| Treasury Account Symbol (TAS): | 11 8 0038 | Object Class: 2310 |
| Agency Location Code: | 11 03 0001 | |
| Servicing Cost Center: | OAS10500000 | |
| Other: | | |

**5. Authority Citation:**
Economy Act, 31 U.S.C. §§ 1535 and 1536

**Rejection Notice:** Billing will be rejected if it does not cite EOP financial data as noted above.

**6. Period of Performance:**
October 1, 2007 through September 30, 2008

**7. Additional Requirements**

**8. Description of Goods or Services Provided:**

| Line | Service/quantity/unit cost | Object Class | Customer Cost Center | Customer Project Code | Amount | Changes | New Total |
|---|---|---|---|---|---|---|---|
| 1 | AT&T Voice Systems Operations and Maintenance | 23N 2320 | | | $ 4,680.00 | $ - | $ 4,680.00 |
| 2 | | | | | $ - | $ - | $ - |
| 3 | | | | | $ - | $ - | $ - |
| | Total............... | | | | $ 4,680.00 | $ - | 4,680.00 |

**9. Customer Approval (Signature):**
*[signature]* Pandora Nolus-Grs
Date 11/16/07

11. Name/Title:
Pandoria Nobles-Jones
Administrative Officer

**10. Servicing Approval (Signature):**
*[signature]*
Date ILN Z 2007

12. Name/Title:
Edgar Bennett, Chief Financial Officer

OA00344

# U. S. Office of Personnel Management
## Interagency Agreement
### Reimbursement or Advance of Funds

| | |
|---|---|
| **Agreement Name:** FY 08 EOP Telephone Services | |
| **Fiscal Year** 2008 | **Estimated Amount** $4,680 |
| **Effective** 10/01/2007 | **Expires** 9/30/2008 |

| **Requesting Agency** | **Performing Agency** |
|---|---|
| **Agency Name and Address** | **Agency Name and Address** |
| President's Commission on Whitehouse Fellowships | Executive Office of the President |
| 712 Jackson Place, NW | 1800 G Street NW |
| Washington, DC 20503 | 10th Floor, Washington, DC 20503 |
| **Program Office Contact** | **Program Office Contact** |
| Pandoria Nobles-Jones  *Phone #:* | *Name* Mary Anne Cochran-Fox |
| **Finance Office Contact** | **Financial Office Contact** |
| *Name* Myrtle Naskela  *Phone #* | *Name*                    Phone # |
| **Authorizing Official Signature & Date** | **Program Office Signature & Date** |
| *[signature]* 11/8/07 | *[signature]* 11-8-07 |
| **Typed Name & Title** | **Typed Name & Title** |
| Pandoria Nobles-Jones, Administrative Officer | MaryAnne Cochran-Fox, OA/COO Financial Analyst |
| **DCFO Reviewing Office Signature & Date** | **Finance/ Budget Reviewing Office Signature & Date** |
| *[signature]* | *[signature]* |
| **Typed Name & Title** DEPUTY CFO 11/16/07 | **Typed Name & Title** Edgar Bennett, OA/CFO |

| **BILLING INFORMATION-REQUESTING AGENCY** | **ACCOUNTING INFORMATION** |
|---|---|
| U.S. Office of Personnel Management | **Agency Location Code : 11 03 0001** |
| 1900 E Street, N.W.  Suite 5475 | |
| Washington, D.C.  20415 | |
| **Agency Location Code** | **Treasury Account Symbol  11 & 0038** |
| 24000001 | |
| **Treasury Account Symbol** | **DUNS/CCR # :** 031649358 |
| 2460100 | **BETC:** |
| **BETC:** | |
| DISB | |
| **Obligating Document Number** | |
| | **Other Accounting Data** |
| **Other Accounting Data** | |
| Fund 1A Org. 22AA 2332 21 $4,680 | |

| **Timing of Billing** *(check one)* ☐ Advance ☐ Quarterly | **Billing Method** |
|---|---|
| ☐ On Completion  X☒ Other *(explain)* Monthly | X OPAC/EDIPAC *(automated billing/payment – Federal agency)* |
| | ☐ SF 180 *(paper billing – Federal Agency)* |
| | ☐ Standard *(Non-Federal agency)* |

## Services to be performed:

AT&T Voice Systems Operations and Maintenance

| *(attach additional pages if necessary; if reimbursable detail, attach SF 52)* | |
|---|---|
| Statutory Authorization:  Economy Act  31 USC 1535 | If not Economy Act, cite other statutory authority: |

OPM A&B.1616
(Rev. 10/15/01)

OA00345

*Executive Office of the President - Interagency Agreement*

| 1. Customer Component: | 2. Servicing Component: |
|---|---|
| White House Communication Agency | Office of Administration |

**Administrative Contact:**

| | Administrative Contact: |
|---|---|
| Name: TSgt. Samuel Parks | Name: Mary Anne Cochran-Fox |
| Address: | Address: 1800 G. St., NW, 10th Floor |
| | Washington, DC 20503 |
| Phone/fax: | Phone/fax: |
| E-mail: | E-mail: |

| 3. Financial Data (enter all data): | 4. Financial Data (enter applicable data): |
|---|---|
| Document Number: MPR830    MRB3001    Amendment: | Document Number: OASIS820    Amendment: |
| Fund: | Fund: OAS0038RE08XX    BETC: COLL |
| Budget Fiscal Year: 2008    BETC: DISB | Budget Fiscal Year: 2008    Project Code |
| Treasury Account Symbol (TAS): 9780100 | Treasury Account Symbol (TAS): 11 8 0038    031649358 |
| P83QAMJ0 WHJ3 2336 DWHMR83002 | DUNS/BPN: 11 03 0001    Object Class: 2310 |
| DUNS/BPN: | Agency Location Code: 11 03 0001 |
| Agency Location Code: | Servicing Cost Center: OASIS050000 |
| Other: ACCTG STA DODAAD: S12137;    Pay Office DODAAD: HCI015 | Other: |

**5. Authority Citation:**
Economy Act, 31 U.S.C. §§ 1535 and 1536

Rejection Notice: Billing will be rejected if it does not cite EOP financial data as noted above.

**6. Period of Performance:**
October 1, 2007 through September 30, 2008

**7. Additional Requirements**

**8. Description of Goods or Services Provided:**

| Line | Service/Quantity/Unit cost | Object Class | Customer Cost Center | Customer Project Code | Amount | Changes | New Total |
|---|---|---|---|---|---|---|---|
| 1 | AT&T Voice Systems Operations and Maintenance | 2310 | | | $ 6,607.00 | $ - | $ 6,607.00 |
| 2 | | | | | $ | $ - | $ |
| 3 | | | | | $ | $ - | $ |
| | | | | Total............ | $ 6,607.00 | $ - | $ 6,607.0 |

| 9. Customer Approval (Signature): | Date | 10. Servicing Approval (Signature): | Date |
|---|---|---|---|

**11. Name/Title:**
TSgt. Samuel Parks

**12. Name/Title:**
Edgar Bennett, Chief Financial Officer

OA00346

## Reimbursable Agreement Transmittal Form
### (To be Attached to Interagency Agreement when EOP Component is the Servicing Agency)

**Fund Manager Completes:**

Date: _11·13·07_                    From: _MA Cochran fm_

Servicing EOP Component: _OA_

Servicing Component Agreement Number: _OASI8520_

Servicing Component Fund: _OAS 0038RE08xx_

Servicing Component Cost Center: _OAS 1050000_

Servicing Component Project (Required for Budget Allocation Transaction Only):
_____ Default Project: EOP201000)

Major Object Class(es): _2310_
(Budget Level Only)

Amount to be loaded: _$6,607.00_

Agreement Total: _$12,000.00_

Customer Name: _White House Communications Agency_

Customer DUNS/ALC: _P85QAMJ0 WHJ3 2336 DWHMR85002_

Is there travel associated with this agreement? _____Yes ___✓___ No
(If Yes, Systems will set up accounting string in GovTrip.)

Will there be Purchase Card activity associated with this agreement? ___Yes ___✓___No
(If Yes, Systems will set up accounting string in Citidirect.)

**CFO Use Only:**

GovTrip Set up:          Date: _____ Initials _____

Citidirect Set up:        Date: _____ Initials _____

Reporting Category Set up:   Date : _____ Initials _____

Posted by Budget:        Date _____ Initials _____

Posted by Accounting      Date _____ Initials _____

OA00347

| MILITARY INTERDEPARTMENTAL PURCHASE REQUEST | | | | | | 1. PAGE **1** OF **1** PAGES |
|---|---|---|---|---|---|---|
| 2. FSC | 3. CONTROL SYMBOL NO. | | 4. DATE PREPARED 13 Aug 07 | 5. MIPR NUMBER MR83001 | | 6. AMEND NO. BAS |

7. TO:
Mary Anne Cochran-Fox
1800 G Street, 10th Floor
Washington, DC 20503
Phone:

8. FROM: (Agency, name, telephone number of originator)
White House Communications Agency
Attn: J7 Accounting
2743 Defense Blvd., SW
Anacostia Annex, DC 20373-5815

9. ITEMS ☐ ARE ☐ ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING ☐ HAS ☐ HAS NOT BEEN ACCOMPLISHED.

| ITEM NO. | DESCRIPTION (Federal stock number, nomenclature, specification and/or drawing No., etc.) | QTY c | UNIT d | ESTIMATED UNIT PRICE e | ESTIMATED TOTAL PRICE f |
|---|---|---|---|---|---|
| | MIPR to provide funds for maintenance and tolls WHCA incurs when using telephone support with the OA Switch AT&T. | | | | |
| 1 | O/A Switch Support | 1 | Ea | $12,000.00 | $12,000.00 |
| | ***FY08 FUNDS CONTINGENT UPON CONGRESS ENACTING APPROPRIATIONS*** | | | | |
| | Period of Performance: 1 Oct 07 - 30 Sep 08 | | | | |
| | Funds will expire for obligation 30 Sep 08 | | | | |
| | Please submit payment to WHCA the 5th working day after the end of each quarter.  Negative replies also requested. Project Coordinator:  SFC Napoleon Cooper Accounting POC:  TSgt Samuel Parks Phone: Email: | | | | |

| 10. SEE ATTACHED PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS. | 11. GRAND TOTAL $12,000.00 |
|---|---|

| 12. TRANSPORTATION ALLOTMENT  (Used if FOB Contractor's plant) | 13. MAIL INVOICES TO  (Payment will be made by) See Block #8 |
|---|---|
| | PAY OFFICE DODAAD  HC1015 |

14. FUNDS FOR PROCUREMENT ARE PROPERLY CHARGEABLE TO THE ALLOTMENTS SET FORTH BELOW.  THE AVAILABLE BALANCES OF WHICH ARE SUFFICIENT TO COVER THE ESTIMATED TOTAL PRICE.

| ACRN | APPROPRIATION | LIMIT/ SUBHEAD | SUPPLEMENTAL ACCOUNTING CLASSIFICATION | ACCTG STA DODAAD | AMOUNT |
|---|---|---|---|---|---|
| | 9780100 | 4300 | P834QAMJ0 WHJ3 2336 DWHMR83001 | S12137 | $12,000.00 |

OA00348

| 15. AUTHORIZING OFFICER  (Type name and title) AARON PANTOJA, SSG, USA ACCOUNTING TECH CERTIFYING OFFICIAL | 16. SIGNATURE | 17. DATE 13 AUG 07 |
|---|---|---|

DD FORM 448, JUN 72          PREVIOUS EDITION IS OBSOLETE.          USAPPC V5 11

**DISA Purchase Request (PR)/ COORDINATION COVER SHEET FOR MIPRs/ROs**

**1. ORIGINATOR**

| NAME  Cooper, Napoleona P   J3-TCO | | CODE | **2. PS/MIPR/RO NUMBER** |
|---|---|---|---|
| PHONE NUMBER | E-MAIL ADDRESS | | |
| SIGNATURE | | DATE  31-May-2007 | **3. AMENDMENT NUMBER** |

**4.** **COORDINATION**

| TO | ACTION | NAME  (Type) | INT | DATE | TO | ACTION | NAME (Type) | INT | DATE |
|---|---|---|---|---|---|---|---|---|---|
| J3 | APPROVED | Gonsalves, Harold R. | | | | | | | |
| J7-BB | PROCESSED | | | | | | | | |
| J7-AB | PROCESSED | | | | | | | | |
| J7-AMD | PROCESSED | | | | | | | | |

**5.** **SHORT TITLE AND/OR DESCRIPTION OF PURCHASE** *(Continue 5, 5A, 5B on Page 2)*

TCO MIPR's -Annual PDC Charges (2008) OA AT&T                                              Requested By Date  01-Oct-2007

MOD/Annual/Recurring/Funding for FY2008 Monthly PDC Charges

*OA -AcF MR83001 Annuyr*

Continue items 5, 5A &          X  Yes          No                     Optional Use-Resource Table ?          Yes          No

| 5A. ITEM SPECIFICATIONS (Complete on Page 2 | 5B. SOURCE LIST (Complete on Page 2) | 5C. RESOURCE TABLE (Complete on Page 3) | TOTAL AMOUNT          $12,000.00 |
|---|---|---|---|

| 6. EXISTING OR PRECEDING CONTRACT/ORDER NUMBER | 7. IT DETERMINATION | 8.PERIOD OF PERFORMANCE/DELIVERY SCHEDU | 9.DPAS PRIORITY RATING |
|---|---|---|---|
| | ☐ IT   ☐ NSS IT   ☐ NON-IT | Est. Starting Date   Year(s)          Month(s) | ☐ DO   ☐ DX   ☐ N/A |

**10.** **PR PACKAGE CHECKLIST**

**A. ATTACHMENT/COMPLIANCE**    Mark each box with one of the following: X - N/A    A - Attached   P - Previously Provided   C - Compliant

| | |
|---|---|
| ☐ Approved PP   Identifier | ☐ Contact Security Classification Specification, DD Form 2 |
| ☐ Independent Government Cost Estimate, DISA Form 752 | ☐ Contact Date Requirements List (CDRL), DD Form 1423 |
| ☐ Approved AP  AP/ASC          POA No. | ☐ Report Document Page (SF Form 298) |
| ☐ J&A or Sole Source Justification | ☐ Data Item Description (DID), DD Form 1664 |
| ☐ Market Research/Source List | ☐ Technical Evaluation/Source Selection/Award Fee Plan( |
| ☐ GFP/GFI Lists | ☐ MIPR (DD Form 448/448-2)/RO (DISA Form 125) |
| ☐ Statement of Objectives/Work (SOO/SOW) | ☐ D&F for Economy Act Order |
| ☐ Specification or Purchase Description | ☐ Support Agreement (DD Form 1144) & other funded MOAs |
| ☐ Proper User of Non-DoD Contracts | |
| ☐ Section 608, Rehabilitation Act | |

**B. INFORMATION TECHNOLOGY (IT) MANAGEMENT**

| ☐ Information Assurance & Security Checklist (ISSM/ISSO) | ☐ IT/IM Review Checklist (IMO/IMR) |
|---|---|

**11.** **ACCOUNTING AND FUNDING DATA**

| A. FUND TYPE (Check appropriate box | X  O&M | RDT&E | PROCUREMENT | DWCF | OTHER | TOTAL |
|---|---|---|---|---|---|---|

**B. ACCOUNTING CLASSIFICATION CODE(s)** *(Continue on page 2)*

97801004300  P834QAMJ0 WHJ3  2336  DWHXX83XXX s12137                              $12,000 00

*MR83 001*

OA00349

|  | | | Continue to page 2 ?          Yes |
|---|---|---|---|

| C. FUNDING IS PROPER | AVAILABLE | SUBJECT TO AVAILABILITY | |
|---|---|---|---|
| SGT Gerardo E. Fabrega  Financial Analyst | J7-BUDGET | | |
| RESOURCE/FUNDS MANAGER NAME (Type/Print) | OFFICE CODE | SIGNATURE | DATE |

D. THE COMPTROLLER'S DESIGNEE OR CERTIFYING OFFICER CERTIFIES THAT THE PURCHASE LISTED ON THIS REQUEST IS PROPERLY CHARGABLE TO THE ALLOTMENT(S) IDENTIFIED AND THERE ARE SUFFICIENT BALANCES TO COVER THE COST THEREOF.

**CERTIFYING OFFICIAL**

| CERTIFYING OFFICIAL'S NAME (Type/Print) | J7-Acct  OFFICE CODE | SIGNATURE | DATE |
|---|---|---|---|

**12. DEPUTY DIRECTOR OR DESIGNATED APPROVING OFFICIAL**
*(Type/Print Name, Office Code & Phone No.)*

| | SIGNATURE | DATE |
|---|---|---|
| CHRISTOPHER  ROTH, LTC, CHIEF, J3 COD | /S/ GS-14 HAROLD R. GONSALVES  SIGNATURE ID# 0401014045 | 30-May-2007 |

DISA FORM 1, JAN 07                                   Previous editions are obsolete

| PR/MIPR/RO NUMBER | AMENDMENT NUMBER |
|---|---|

**5. SHORT TITLE AND/OR DESCRIPTION OF PURCHASE** *(Continuation)*

MOD/Annual/Recurring/Funding for FY2008 Monthly PDC Charges

**5A.** ITEM SPECIFICATIONS *(Continuation)*

| ITEM | DESCRIPTION OF SUPPLIES OR SERVICES TO BE PURCHASED | QUANTITY | UNIT | ESTIMATED UNIT PRICE | ESTIMATED TOTAL PRICE |
|---|---|---|---|---|---|
| 1 | Name  MIPR-PDC | 1 | | $12,000.00 | $12,000.00 |
| | Manufacturer  n/a | | | | |
| | Model  n/a | | | | |
| | Desc  Maint & Tolls-OA AT&T | | | | |
| | TOTAL SHIPPING | | | | $0.00 |
| | | | | TOTAL COST | $12,000.00 |

**5B.** SOURCE LIST *(Continuation)*

| SOURCE | BUSINESS SIZE | E-MAIL ADDRESS |
|---|---|---|
| Item | | |
| *Mary Anne Buchanan* | | |
| *AT&T* | | |
| *Wash DC 20503* | | |
| *Integration Div 800* | | |
| *Court Grand* | | |

**11B. ACCOUNTING CLASSIFICATION CODE(s)** *(Continuation)*

OA00350

DISA FORM 1, JAN 07                    Previous editions are obsolete

# Executive Office of the President - Interagency Agreement

OASI8 C08

| 1. Customer Component: | 2. Servicing Component: |
|---|---|
| Office of Administration/OCFO | Dept. of Health & Human Services, Program Support Center (PSC) |

| Administrative Contact: | Administrative Contact: |
|---|---|
| Name: STEPHEN O'NEILL | Name: TRANG L. DINH |
| Address: 1800 G STREET NW, OA/OCFO | Address: 11400 ROCKVILLE PIKE, SUITE 700 |
| WASHINGTON, DC 20503 | ROCKVILLE, MD 20852 |
| Phone/fax: | Phone/fax: |
| E-mail: | E-mail: |

**3. Financial Data (enter all data):**

| | Amendment: |
|---|---|
| Document Number: OASI8C08 | |
| Fund: OAS0038SE08XX | |
| Budget Fiscal Year: 2008 | BETC: DISB |
| Treasury Account Symbol (TAS): 1180038 | |
| 1130001 | |
| Agency Location Code: 03164935B | |
| DUNS/BPN: | |
| Other: EIN 521101890 | |

**4. Financial Data (enter applicable data):**

| | Amendment: |
|---|---|
| Document Number: | |
| Fund: | |
| Budget Fiscal Year: 2008 | BETC: COLL |
| Treasury Account Symbol (TAS): 75X4552 | |
| 75030030 | |
| Agency Location Code: OP402 | Project Code: |
| Servicing Cost Center: | DUNS/BPN: 045982218 |
| Other: EIN 1530196960A6 | Object Class: |

**5. Authority Citation:** Economy Act, 31 U.S.C. §§ 1535 and 1536

**Rejection Notice:** Billing will be rejected if it does not cite EOP financial data as noted above.

**6. Period of Performance:** 10/01/2007 - 09/30/2008

**7. Additional Requirements**

**8. Description of Goods or Services Provided:**

| Line | Service/quantity/unit cost | Object Class | Customer Cost Center | Customer Project Code | Amount | Changes | New Total |
|---|---|---|---|---|---|---|---|
| 1 | Division of Payment Management, Payment Management System for processing EOP ONDCP Grants | 2531 | OAS1020000 | XXXXXXXXX | $ 45,000.00 | $ - | $ 45,000.00 |
| 2 | Please reference EOP obligating document number OASI8C08 in all IPAC/billing documents. | | | | $ - | $ - | $ - |
| 3 | | | | | $ - | $ - | $ - |
| | | | | Total.............. | $ 45,000.00 | $ - | $ 45,000.00 |

| 9. Customer Approval (Signature): | Date | 10. Screening Approval (Signature): | Date |
|---|---|---|---|
| | | | |

| 11. Name/Title: | 12. Name/Title: |
|---|---|
| EDGAR BENNETT, CHIEF FINANCIAL OFFICER | ANTHONY J. DITOTO, JR., DIRECTOR, DIVISION OF PAYMENT MANAGEMENT |

OA00013

# Executive Office of the President – Interagency Agreement

| 1. Customer Component: | 2. Servicing Component: |
|---|---|
| General Services Administration | Office of Administration |

**Administrative Contact:**

Administrative Contact:
Name: SHERON CHAPLIN
Address: 1800 F St., NW, Rm. G351
Washington, DC
Phone/fax:
E-mail:

Administrative Contact:
Name: Mary Anne Cochran-Fox
Address: 1800 G. St., NW, 10th Floor
Washington, DC 20503
Phone/fax:
E-mail:

**3. Financial Data (enter all data):**

| | | Amendment: |
|---|---|---|
| Document Number: | 192X | |
| Fund: | 2008 | BETC: DISB |
| Budget Fiscal Year: | | |
| Treasury Account Symbol (TAS): | PX00101452.192X.P112202I.61.25.901.536 | |
| Agency Location Code: | 47.00.0017 | |
| DUNS/BPN: | 130044726 | |
| Other: | | |

**4. Financial Data (enter applicable data):**

| | | Amendment: |
|---|---|---|
| Document Number: | OASI8S15 | BETC: COLL |
| Fund: | OAS9003BRE08XX | |
| Budget Fiscal Year: | 2008 | Project Code |
| Treasury Account Symbol (TAS): | 11 8 0038 | DUNS/BPN: 031649358 |
| Agency Location Code: | 11 03 0001 | Object Class: 2310 |
| Servicing Cost Center: | OAST050000 | |
| Other: | | |

**5. Authority Citation:**

Economy Act, 31 U.S.C. §§ 1535 and 1536

**Rejection Notice:** Billing will be rejected if it does not cite EOP financial data as noted above.

**6. Period of Performance:** October 1, 2007 through September 30, 2008

**7. Additional Requirements**

**8. Description of Goods or Services Provided:**

| | | Object Class | Customer Cost Center | Customer Project Code | Amount | Changes | New Total |
|---|---|---|---|---|---|---|---|
| 1 | AT&T Voice Systems Operations and Maintenance Lines Service@apn/whidnt.com | 2310 | | | $ 105,159.00 | $ - | $ 105,159.00 |
| 2 | | | | | $ - | $ - | $ - |
| 3 | | | | | $ - | $ - | $ - |
| | | | | Total................... | $ 105,159.00 | $ - | $ 105,159.00 |

**9. Customer Approval (Signature):**

*[signature]*                Date 11/6/07

**10. Servicing Approval (Signature):**

*[signature]*                Date Nov 2 07

**11. Name/Title:**
David T. Turano, White House Center, GSA (WPW)

**12. Name/Title:**
Edgar Bennett, Chief Financial Officer

MACP 11.2.07

OA00351

**EXHIBIT 10**

**Capital Reporting Company**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - X

CITIZENS FOR RESPONSIBILITY :

AND ETHICS IN WASHINGTON,     :

                              :

     Plaintiff,              : Civil Action No.

vs.                           : 07-964 (CKK)

                              :

OFFICE OF ADMINISTRATION,     :

                              :

     Defendant.              :

- - - - - - - - - - - - - X

                      Washington, D.C.

                 Thursday, March 13, 2008

Videotape deposition of:

       ALAN R. SWENDIMAN

called for oral examination by counsel for

Plaintiff, pursuant to notice, at the offices

of CREW, 14 Eye Street, Northwest, Suite 450,

Washington, D.C., before Jodi Scheffel, a Notary

Public in and for the District of Columbia,

beginning at 10:00 a.m., when were present on

behalf of the parties:

**Capital Reporting Company**

Page 6

1  transcript -- the written transcript will reflect
2  them as well.  If you do not understand a question
3  or don't hear a question, please let me know and I
4  will rephrase it or, you know, reiterate it.  If
5  you don't let me know I will assume that you have
6  heard and understood the question.  Is that okay?
7      A   I understand.
8      Q   All right.  Good enough.  Mr. Swendiman,
9  what is your current position?
10      A   It's Special Assistant to the President
11  Director of Office of Administration.
12      Q   How long have you been in that position?
13      A   I've been in that position since on or
14  about Novemeber 27th, 2006.
15      Q   And what was your employment immediately
16  preceding your work with the Office of
17  Administration?
18      A   I was the general Counsel of the General
19  Services Administration.
20      Q   And what was your period of time in that
21  position?
22      A   I was with the General Services

Page 7

1  Administration from July 6th, 2005 to
2  November 26th, 2006.
3      Q   So you went right from the GSA to the
4  Office of Administration?
5      A   That is correct.
6      Q   And prior to your employment as General
7  Counsel at GSA what were you doing?
8      A   I was in the private practice of law for
9  approximately 31 years with the law firm of Jackson
10  and Campbell.
11      Q   And did you have a specialty in that
12  practice?
13      A   I worked in real estate, medium and
14  small business nonprofit organizations.
15      Q   And prior to your employment with Jackson
16  & Campbell, did you have any other professional
17  experience?
18      A   I was law clerk to the Honorable Edward
19  S. Northrop, Chief Judge, United States District
20  Court for the District of Maryland.
21      Q   Okay.  And you've never held any other
22  public positions?

Page 8

1      A   I stand corrected.  I was General Counsel
2  of the Federal Labor Relations Authority from 1992
3  to 1993.
4      Q   Okay.  And prior to that did you have a
5  role with the Legal Services Corporation?
6      A   I was outside counsel to the Legal
7  Services Corporation.  I was not an employee.
8      Q   Okay.  So your first federal experience,
9  employment experience -- professional experience
10  with the Federal Labor Relations Authority; is that
11  correct?
12      A   Well, I would like to think that my
13  professional experience began with His Honor, Judge
14  Northrop.
15      Q   I'm sorry, okay.  Briefly, what is your
16  academic background, your educational background?
17      A   I'm a graduate of the University of North
18  Carolina, Chapel Hill, and I received my law
19  training from Georgetown University Law Center.
20      Q   Okay.  In your current position -- is it
21  okay with you if I refer to you as Director of the
22  Office Administration?  I realize you have a title

Page 9

1  that's greater than that but just --
2      A   You may do so.
3      Q   Okay.  In your current position as
4  Director, who do you report directly to?
5      A   I report to the Deputy Assistant to the
6  President for Management of Administration.
7      Q   Has that been the consistent reporting
8  chain throughout your tenure at OA?
9      A   It has been consistent throughout my
10  tenure.
11      Q   And who reports to you directly?
12      A   There are a number of people that report
13  to me directly.  There is the CIO, the --
14      Q   The Chief Information Officer?
15      A   -- Chief Information Officer, the Chief
16  Financial Officer, the Chief Procurement and
17  Contract Management Officer, the Chief Operating
18  Officer, the Chief Facilities Management Officer,
19  the General Counsel, the Director for Equal
20  Employment Opportunity.
21      Q   And these are all within a direct chain
22  of authority directly to you?

3  (Pages 6 to 9)

**Capital Reporting Company**

Page 10

1   A   That is correct.
2   Q   And then I presume they each have staff
3   under them that report to them?
4   A   They all have staff with the exception of
5   the EEO Director who is an office of one.
6   Q   And how many employees, full-time
7   employees, are within the Office of Administration?
8   A   Well, we have approximately currently 222
9   FTEs.
10  Q   And has that been pretty constant since
11  your tenure there?
12  A   It's actually increased a little bit
13  during my tenure.
14  Q   Okay. Are you familiar with Executive
15  Order 12122?
16  A   I have read that Executive Order
17      MS. WEISMANN: And just for your
18  convenience I'm going to hand you a copy of it. I
19  have extras.
20      (Tenders document witness.)
21  BY MS. WEISMANN:
22  Q   What is your understanding of what this

Page 11

1   Executive Order does with respect to the Director
2   of the Office of Administration?
3   A   Well, my understanding is, is that I
4   report to the President of the United States and
5   that I'm subject to the President's direction and
6   approval.
7   Q   Specifically focussing on Section 4(b),
8   it says, the Director is designated to perform the
9   functions of the President under Section 107(b) of
10  Title 3 of the United State Code. Have I read that
11  correctly?
12  A   That's what it says.
13  Q   And what is your understanding of what
14  this Executive Order -- what authority it gives
15  you, that specific provision?
16  A   My authority, as I understand it, is to
17  report to the President of the United States
18  through a chain of command, and I make
19  recommendations with regards to the operations of
20  the office.
21  Q   Okay. But, Mr. Swendiman, I'm asking
22  much more specifically to focus just on Subsection

Page 12

1   (b) and it's very express reference to Section
2   107(b) of Title 3 of the United States Code. Do
3   you have any other understanding of what is
4   encompassed by that, this Executive Order and that
5   reference, beyond what you've stated?
6   A   Well, if you have a copy of Section
7   107(b) --
8   Q   Yes, I do.
9       (Tenders document to witness.)
10  A   Is there a particular portion of 107(b)
11  to which you're referring?
12  Q   No, because I'm referring primarily to
13  the Executive Order and it just refers generally to
14  Section 107(b). And I'm just trying to get your
15  understanding of what authorities are conferred on
16  you through this Executive Order 12122.
17  A   Well, it says the President (or his
18  designee) is authorized and then sets forth what
19  can be done with respect to rates of pay for
20  certain enumerated employees.
21  Q   So do you understand Executive Order
22  12122 to be designating you as the designee for

Page 13

1   purposes of 107(b)?
2   A   I would say, yes, that the Director would
3   be the designee under the Executive Order in
4   reference to 107(b).
5   Q   Okay. Also, looking at 3 USC 107(b),
6   there is -- 3 USC 107(b)(1)(B), there's a reference
7   to procure or intermittent services of experts and
8   consultants. What is your understanding of what
9   that authority is?
10  A   To my -- to the best of my knowledge, I
11  would understand it to mean that we would procure
12  services of consultants through our normal
13  procurement process.
14  Q   Okay. And is that pretty much the
15  entirety of your understanding of that authority?
16  A   That is correct.
17  Q   Okay. Does James Knodell report to you?
18  A   James Knodell is no longer employed in
19  the Office of Administration.
20  Q   Okay. What was his tenure in the Office
21  of Administration; do you know?
22  A   Well, he was Chief Security Officer. I

4 (Pages 10 to 13)

## Capital Reporting Company

Page 14

1  do not know his tenure because he was in office
2  when I arrived --
3      Q   Okay.
4      A   -- so I do not know when he began.
5      Q   But he -- you did overlap with him?
6      A   I did overlap with his tenure.
7      Q   And did he -- when he was at the Office
8  of Administration in that position, did he report
9  directly to you?
10     A   Yes, he did.
11     Q   Was Mr. Knodell considered to be Senior
12 Official of the Intelligence Community or SOIC; do
13 you know?
14     MS. SHAPIRO:  Object to relevance.
15     You can answer the question.
16     A   I don't know whether he was considered
17 that or not.
18     MS. WEISMANN:  Okay.  Can we have this
19 marked as Plaintiff's Exhibit 1.
20     (Plaintiff's Exhibit No. 1
21     was marked for identification.)
22     (Tenders document to witness.)

Page 15

1  BY MS. WEISMANN:
2      Q   Okay.  I've just handed you a document
3  that has been produced to us by the Office of
4  Administration as part of the document production
5  that was just made.  And I will represent to you
6  that this is a document that Mr. Knodell referred
7  to in his testimony before the House Oversight
8  Committee on Government Reform when he was asked to
9  identify what document provided, I think it was,
10 instructions for conducting an examination.  I'm
11 paraphrasing the question.  Have you ever seen this
12 document before?
13     A   I've seen this document before in
14 connection with production -- requests for
15 production of documents submitted by your
16 organization.
17     Q   And -- but had -- prior to that had you
18 ever seen this document?
19     A   I had not seen the document before.
20     Q   Okay.  The document refers -- uses within
21 it the phrase Senior Official of the Intelligence
22 Community.  Does that refresh your memory in any

Page 16

1  way whether or not Mr. Knodell would have been
2  considered a senior official of the Intelligence
3  Community?
4      MS. SHAPIRO:  Can you point him to where
5  that appears?
6      MS. WEISMANN:  The first reference is on
7  page one under purpose.  It is about a third of the
8  way down.  It says, this directive emphasizes the
9  responsibilities of Senior Officials of the
10 Intelligence Community (SOICs).
11 BY MS. WEISMANN:
12     Q   Do you see the reference?
13     A   Yes, I do.
14     Q   Okay.  Do you have any understanding of
15 whether Mr. Knodell was such an SOIC?
16     A   I don't have any direct knowledge.  I
17 have my own opinion.
18     Q   And that would be?
19     A   My opinion is, is that he would not be
20 considered a senior, an SOIC.
21     Q   Okay.  Well, was there anyone within the
22 Office of Administration who carried out any of the

Page 17

1  functions delineated -- or had responsibility for
2  any of the matters delineated in this document,
3  Plaintiff's Exhibit 1?
4      A   Well, I would need to read through the
5  entire document again in terms of functions.
6  Certainly, the Office of Security and Emergency
7  Preparedness would have functions with regard to
8  security.
9      MS. SHAPIRO:  Do you want him to read
10 this document?
11     MS. WEISMANN:  Well, if I have a pending
12 question and he needs to, absolutely, if he wants
13 to read it.
14     MS. SHAPIRO:  Well, I wasn't sure if that
15 was responsive to your question or if there was a
16 question pending.
17     MS. WEISMANN:  No.
18 BY MS. WEISMANN:
19     Q   If Mr. Knodell identified this document
20 as reflect -- as containing the policy about the
21 initiation of an administrative investigation by
22 the Office of Administration, would he have been

5 (Pages 14 to 17)

**Capital Reporting Company**

Page 18

1  correct?
2      MS. SHAPIRO:  Objection to form.
3      You can answer.
4      A    Well I don't know Mr. Knodel's testimony.
5  I haven't read Mr. Knodel's testimony.  So I don't
6  know exactly what he said or the context in which
7  he said it.
8      Q    Well, I would note that in the document
9  request here of production number one, we describe
10  the document as -- and I quote -- it was a
11  document -- in response to a request that he --
12  referring to Mr. Knodell -- identify where the
13  policy concerning the initiation of an
14  administrative investigation by his office was
15  written.  And there was no objection to that
16  description by the Office of Administration.
17      So I am not asking you to be familiar
18  with his testimony.  I'm asking if that statement
19  is correct, that this, in fact, is a document that
20  contains the policy of the initiation of an
21  administration investigation of a security breach
22  by the Office of Administration?

Page 19

1      A    Well, I do --
2      MS. SHAPIRO:  Objection to form.
3      Go ahead and answer.
4      THE WITNESS: -- I do know that we've
5  used this document as what I would call best
6  practices and that is that we have -- I've been
7  advised that we've used the aspects that would be
8  relevant to the office in terms of processing.
9  BY MS. WEISMANN:
10      Q    Does your office consider itself bound by
11  this document?
12      A    To my knowledge I do not believe that
13  we're bound by it, but we do follow best practices.
14      Q    What is your understanding of the
15  authority of the office then to conduct
16  administrative investigations of security breaches?
17      A    Well, my understanding is -- and I
18  believe Mr. Knodell may have testified as to
19  this -- is that security breaches may be brought to
20  our attention in which case we will then -- that
21  office will conduct -- follow up in terms of
22  investigation.  It is not the sole component,

Page 20

1  however, that has security functions.
2      Q    Yes.  My question asked what the
3  authority for conducting those investigations is?
4      A    I can't -- I can't speak directly as to
5  what the written authority is.
6      Q    What is your understanding of the
7  responsibility of the Office of Security to conduct
8  investigations?
9      A    My understanding is, is that the office
10  initiates investigations upon matters that are
11  brought to its attention.
12      Q    And would you be more specific by what
13  you mean by matters?
14      A    Incidents that may have occurred that
15  require investigation in terms of any potential
16  breach of security.
17      Q    And what is the jurisdiction of the
18  office to conduct investigations?
19      A    Well, that jurisdiction, I -- my
20  understanding is, is in conjunction with other
21  components that may have security officers.
22      Q    When you say "other components", are you

Page 21

1  talking about other components of EOP?
2      A    Yes.  It would be other components of the
3  Executive Office of the President.
4      Q    And is it -- does the Office of
5  Administration Security Office have the authority
6  to conduct a security investigation anywhere within
7  the EOP?
8      A    Well, my understanding is, is that, for
9  example, the National Security Council has its own
10  security office or officers and so our office may
11  work in conjunction with them.
12      Q    And is that the only limitation that you
13  understand on the -- I use the word jurisdiction.
14  I don't mean to be overly formalistic, but I'm
15  trying to understand the -- the scope of what --
16  geographic scope, if you will, of what the office
17  can investigate.
18      A    Well, in terms of investigation,
19  certainly there is -- there can be potential
20  breach, which would involve the Secret Service.  We
21  don't have any jurisdiction over the Secret
22  Service.  So I'm not able to testify as to the

6  (Pages 18 to 21)

**Capital Reporting Company**

Page 22

1   nature of their operations.
2       Q   So is it your testimony that if there
3   were a breach of security that involved the Secret
4   Service, this is something that the Office of
5   Administration could investigate?
6       A   No. Quite to the contrary. I believe
7   that the Secret Service handles its own
8   investigations.
9       Q   If there were a breach of security that
10  happened outside of the physical perimeters of the
11  Executive Office of the President, is it something
12  that your office could investigate?
13      A   It could investigate if it involved an
14  EOP employee.
15      Q   And if it involved employees from other
16  agencies or private individuals in addition, would
17  there be any limitations on what that office could
18  investigate?
19      A   Well, my understanding is, is that we
20  don't have any jurisdiction in terms of security
21  investigations as to non -- with regard to third
22  parties, Non-Executive Office of the President

Page 23

1   entities.
2       Q   If there were a security breach that
3   happened at another security agency but that
4   involved EO -- EOP employees, is that something
5   this office would have at least some jurisdiction
6   over?
7       A   That's a possibility, that it would. It
8   may very well work in conjunction with the other
9   agency.
10      Q   Okay. And if this office conducts a
11  security investigation and finds evidence of some
12  kind of comprise to security, is there any
13  obligation to report it to any entity outside of
14  EOP?
15      A   I -- my understanding is, is that it may
16  be an obligation, if it involves a criminal matter,
17  to report it to the appropriate authorities.
18      Q   Okay. Referring you back to this
19  document that Plaintiff -- that's been identified
20  as Plaintiff's Exhibit 1, on page two of the
21  document, Subsection B, the last sentence, if you'd
22  look at that -- and I'll just read it for you --

Page 24

1   upon completion of an investigation and in
2   accordance with the guidelines of this DCID, SOICs
3   shall assess the significance of any significant
4   security violation or compromise to assist the DCI
5   in strengthening and refinding -- refining
6   Intelligence Community safeguards.
7       I know you've describes this as best
8   practices, your language, rather than binding
9   guidance on OA. But does OA, the Office of
10  Security or any office within -- entity within OA
11  consider that it has any obligation to assist the
12  DCI if it finds a security problem or to at least
13  report to the DCI? And I know that that's a
14  compound question. So why don't you ask -- answer
15  the assist question and then I'll --
16      MS. SHAPIRO: I'll object to form.
17      Go ahead and answer.
18      A   It's possible that it may have to assist
19  the DCI depending upon the circumstances.
20      Q   And do you understand the Office of
21  Administration to have any obligation to advise the
22  DCI of any finding that there has been a security

Page 25

1   breach?
2       A   I'm not aware of an obligation to report
3   to the DCI.
4       Q   Okay. Are you aware of any instances in
5   which the Office of Security or the Office of
6   Administration has reported to the DCI any findings
7   or potential findings of security breaches?
8       A   None that has been brought to my
9   attention.
10      Q   And is it something that, if that were
11  found, you would know about it in advance of
12  advising the DCI?
13      MS. SHAPIRO: Objection to form.
14      You can answer.
15      A   Most likely I would be advised that if
16  there had been a breach that required reporting to
17  a third party.
18      Q   Does the Office of Administration have a
19  role in deciding which -- or whether EOP employees
20  should be granted access to classified information?
21      A   It has a role in -- well, let me stop
22  there. Could you repeat the question again for me?

7 (Pages 22 to 25)

# Capital Reporting Company

## Page 26

1  Q   Does the Office of Administration have a
2  role in deciding which employee should have access
3  to classified information?
4  A   It has a role in deciding whether an
5  employee has access.
6  Q   And what is that role?
7  A   Well, it takes several levels.  First of
8  all, in terms of just access to the premises, we do
9  a name check.  That name check is actually
10 delegated -- or farmed out to the FBI, and that the
11 FBI then advises us as to clearance of the
12 individual, and then that clearance is then
13 forwarded to our office, that is the Office of
14 Security, to the Secret Service, which then reviews
15 whether that individual gains access to the
16 premises.
17 Q   Okay.  My question went not to access to
18 the premises but access to classified information,
19 in other words, whether a particular employee who
20 has a security clearance is cleared to see
21 classified information?
22 A   Well, it certainly will involve the --

## Page 27

1  the FBI.  And then ultimately the request does go
2  through our Security Office and -- at least as to
3  the Office of Administration.  I will then review
4  it and -- review the recommendation as to whether
5  they receive -- should receive clearance or not.
6  Q   And who makes the final decision on
7  clearance?
8  A   As to the Office of Administration, I
9  will review it and, depending on the circumstances,
10 will either grant it or make a recommendation that
11 they be given it.
12 Q   And what about EOP employees outside of
13 the office of Administration; who makes that
14 decision?
15 A   I really don't know specifically as to
16 each component of the Executive Office of the
17 President who makes that decision.
18 Q   But it's not you or your office?
19 A   It is not my office nor me that makes a
20 decision as to who gains access to classified
21 information and other components.
22 Q   Do you have a role, though, in the

## Page 28

1  process of granting access to non-OA EOP employees?
2  A   When you say "access" --
3  Q   To classified information.
4  A   To my knowledge, I do not.
5  Q   Okay.  Mr. Swendiman, are you familiar
6  with a Memorandum of Understanding that OA entered
7  into with the Department of Health and Human
8  Services for the processing of grantee requests for
9  funds for the ONDCP?
10 A   I'm aware of the memorandum.
11     MS. WEISMANN:  Can we have this marked as
12 Plaintiff's Exhibit 2, and then give it to the
13 witness, please.  Thank you.
14     (Plaintiff's Exhibit No. 2
15     was marked for identification.)
16 BY MS. WEISMANN:
17 Q   The document I'm showing you is also part
18 of the document production that OA made in this
19 case.  And if you'll look to the second page it's
20 the one that's labeled Memorandum of Understanding.
21     Can you explain for me generally what
22 this Memorandum of Understanding does?

## Page 29

1  A   My understanding is, is that the
2  Memorandum basically, for lack of a better term,
3  outsources the functions of managing the grants
4  made by ONDCP.
5  Q   And when you say managing the accounts,
6  is this a financial transaction?
7  A   It's a financial transaction and a grant
8  review matter, as I understand it.
9  Q   And does HHs actually do reviews of
10 grant proposals?
11 A   My understanding is that ONDCP would do
12 the review of the grant proposals but that
13 basically the -- what I would call the
14 administrative function is handled by HHS.
15 Q   And this MOU, Memorandum of
16 Understanding, is actually entered into between
17 your office and HHS; is it not?
18 A   That is correct.
19 Q   And would you explain why that is the
20 case?
21 A   My understanding is, is that because we
22 do -- we provide the financial management services

8  (Pages 26 to 29)

# Capital Reporting Company

<table>
<tr><td valign="top">

Page 30

1  to ONDCP as we do to other components of the
2  Executive Office of the President.
3      Q    Would you explain what you mean by
4  financial services?
5      A    Well we, for lack of a better term,
6  manage -- we reconcile the accounts.
7      Q    And by this MOU, this is a function that
8  rather -- that if it were not handled by HHS, would
9  it be the responsibility of the Office of
10 Administration?
11     A    That -- I think that's a fairly accurate
12 characterization.  If we had a large staff, we
13 would be able to handle it in-house, but we have a
14 limited staff.
15     Q    And do you have any understanding of what
16 the authority is for OA to outsource these kinds of
17 services?
18     A    I can't site the specific authority.
19 This is not unusual.  I think one of the other
20 documents that you may have is -- the Bureau of
21 Public Debt handles our payroll and handles certain
22 financial management systems and government

</td><td valign="top">

Page 32

1      A    -- it does involve fiscal matters and use
2  of dollars, but I can't give you a recitation on
3  the Economy Act.
4      Q    I don't have extra copies.  I'm just
5  going to show this to you.  31 USE 1536 is one of
6  the sections, is it not, that's referenced on that
7  document as the authority?
8      A    Let's see.  Sections 1535 and 1536.
9      Q    I will hand them both to you.
10         (Tenders documents to witness.)
11         If you'll look at 1536 first, can you
12 read for me what I have highlighted?
13     A    It says, Crediting Payments -- the title
14 of it is called Crediting Payments From Purchases
15 Between Executive Agencies.
16     Q    Okay.  Does OA currently consider itself
17 to be within the scope of that statutory provision?
18     A    I believe that calls for a legal
19 conclusion, and I'm not in a position to make that
20 legal determination.
21     Q    Do you know whether OA is continuing to
22 exercise authority under the Economy Act to enter

</td></tr>
<tr><td valign="top">

Page 31

1  entities do do that.  When I was at General
2  Services Administration I believe that our payroll
3  was handled by one of the DOD units.  It's not
4  unusual for government entities to contract with
5  other government entities to handle certain
6  administrative functions.
7      Q    And who pays for this service with HSS?
8      A    Well, we would -- I mean, it would come
9  out of ONDCP's budget.  They would be paying HHS
10 for the service that HHS renders.
11     Q    Okay.  Would you turn back to the first
12 page of this document.  If you look at it, it's
13 number five, Authority Citation.  Do you see that?
14 It's on the left-hand.  It's above the Period of
15 Performance column.  There's a reference to the
16 Economy Act.  Do you see that reference?
17     A    I do.
18     Q    And what is -- can you tell me what your
19 understanding of the Economy Act is?
20     A    I can't give you, at this juncture, a
21 complete answer with regards to the Economy Act --
22     Q    Okay.  Why don't -- I'm sorry.

</td><td valign="top">

Page 33

1  into agreements?
2      A    Well, we enter into Interagency
3  Agreements and I -- and that's what the term is
4  called, an Interagency Agreement, an IA.
5      Q    Right.  And is it your testimony that OA
6  is continuing to enter in such agreements?
7      A    Well, we have an IA Agreement with the
8  Bureau of Public Debt in terms of financial
9  management systems of which I'm aware.
10     Q    And has OA -- at what point did OA stop
11 considering itself to be an agency subject to the
12 Freedom of Information Act?
13         MS. SHAPIRO:  Objection to form and
14 foundation.
15     A    I think that the conclusion that was
16 reached with regards to whether or not OA was an
17 agency for the purposes of FOIA occurred prior to
18 my tenure as OA Director.
19     Q    And would you refresh my memory again
20 when your tenure began.
21     A    I started November -- approximately
22 Novemeber 27th, 2006.

</td></tr>
</table>

9  (Pages 30 to 33)

# Capital Reporting Company

Page 34

1    MS. WEISMANN:  Can we take a short break?
2    THE VIDEOGRAPHER:  10:38 a.m.; off
3    record.
4    (Recess taken.)
5    THE VIDEOGRAPHER:  Our time now is 10:44
6    a.m.; on record.
7    MS. WEISMANN:  Can we have that last
8    answer read back.
9    (The last answer was read back by the
10   court reporter.)
11   MS. SHAPIRO:  Can we have this marked --
12   is this 3?
13   (Plaintiff's Exhibit No. 3
14   was marked for identification.)
15   MS. SHAPIRO:  Mr. Swendiman, I'm handing
16   you a document that's already in this case that's
17   been admitted as an exhibit, Exhibit 3, to CREW's
18   Memorandum in Opposition to the Motion for Judgment
19   on the Pleadings.
20   (Tenders document to witness.)
21   BY MS. WEISMANN:
22   Q    This is a printout of the Whitehouse.gov

Page 35

1    Website.  And if you'll look at the bottom
2    right-hand corner, the date is 8/31/2007.  And I
3    draw your attention to the paragraph that states
4    the EOP entities subject to the FOIA are:  Do you
5    see that?
6    A    Yes.  On the first page?
7    Q    Yes.
8    A    I do.
9    Q    And the second entity listed is the
10   Office of Administration; is it not?
11   A    It is so listed.
12   Q    And if then this document was printed out
13   on August 31st, 2007, that would be after you began
14   as Director of the Office of Administration?
15   MS. SHAPIRO:  Objection to form.
16   A    That would be correct.
17   Q    Okay.  Have you seen this document either
18   as a paper document or the actual Website?
19   A    I've seen it as a paper document once
20   before.
21   Q    Okay.  And going back to my prior
22   question to you about when the Office of

Page 36

1    Administration decided it was no longer subject to
2    the FOIA, it was your testimony that that happened
3    prior to your commencing work as Director; is that
4    correct?
5    A    My understanding is, is that I was
6    advised when I came that the OA was not an agency
7    subject to FOIA.
8    Q    And were you advised that prior to CREW
9    filing its lawsuit in this case?
10   A    If you can refresh my recollection as to
11   when the lawsuit was filed.
12   Q    I believe it was filed in May of 2007.
13   A    I was advised prior to that time.
14   Q    Okay.  And were you advised in writing or
15   orally?
16   MS. SHAPIRO:  Objection to form and to
17   relevance.
18   A    Orally.
19   Q    And who advised you?
20   MS. SHAPIRO:  Objection to relevance.
21   BY MS. WEISMANN:
22   Q    Who advised you?

Page 37

1    A    I was advised by the OA General Counsel's
2    Office.
3    Q    Were you aware that notwithstanding that
4    advice the Website for the White House continued to
5    list OA as subject to the FOIA?
6    MS. SHAPIRO:  I'm going to object.  I'm
7    going to allow him to answer that question, but I'm
8    going to note the Court's Order of February 11th --
9    I'm sorry, February 22nd, which instructs that OA's
10   prior functioning under the FOIA is not disputed
11   and therefore not an issue in discovery.
12   You can answer the question yes or no.
13   THE WITNESS:  Could you repeat the
14   question?
15   MS. WEISMANN:  Could you read it back?
16   (The last question was read back by the
17   court reporter.)
18   THE WITNESS:  I'm aware that this -- that
19   what you've shown me remained on the Website.
20   BY MS. WEISMANN:
21   Q    Is it your testimony that as of the date
22   of this document, August 31st, 2007, the Office of

10  (Pages 34 to 37)

**Capital Reporting Company**

Page 38

1    Administration was not functioning a FOIAable
2    entity?
3         MS. SHAPIRO:  I'm going to instruct the
4    witness not to answer that question based on the
5    February 22nd Order, which instructs that the OA's
6    prior functioning under the FOIA is not a disputed
7    issue in this case and is therefore not subject to
8    discovery.
9         MS. WEISMANN:  The whole point of this
10   line of questioning is to pin down exactly when
11   that prior practice stopped.  I'm certainly
12   entitled to find that out because, in order to
13   comply with the Court's order, I have to have a
14   time in mind.  And all of these questions are
15   designed to define that period of time.  So are you
16   still going to instruct him not to answer?
17        MS. SHAPIRO:  He testified already as to
18   that date.
19        MS. WEISMANN:  I do not believe that is
20   the case.
21        MS. SHAPIRO:  His testimony --
22        MS. WEISMANN:  Are you going to instruct

Page 39

1    him not to answer?
2         MS. SHAPIRO:  I am instructing him not to
3    answer.
4         MS. WEISMANN:  Okay.  Then let's take a
5    five-minute break.
6         THE VIDEOGRAPHER:  10:49 a.m; off record.
7    (Recess taken.)
8         THE VIDEOGRAPHER:  Our time now is 11:04
9    a.m; on record.
10        MS. SHAPIRO:  When we were off the
11   record, Ms. Weismann and I had a conversation about
12   my prior objection.  Ms. Weismann explained to me
13   that she wants to establish a cut-off date for OA's
14   functioning as a FOIA entity and that her
15   questions were intended to be designed strictly to
16   that purpose for establishing a date parameter.
17   If, in fact, that is the sole purpose of those
18   questions, I'll allow them to go forward for that
19   purpose.  And if I've mischaracterized anything,
20   Ms. Weismann can correct me.  So if you want to go
21   back and ask the question that I previously
22   objected to, you can ask that question again.

Page 40

1         MS. WEISMANN:  Can you read back my
2    question?
3         (The last question was read back by the
4    court reporter.)
5         MS. SHAPIRO:  I will interpose an
6    objection to the form and the ambiguity with
7    respect to the word functioning.
8         Go ahead and answer.
9         THE WITNESS:  As of the date that is
10   shown on this document, August 31st, 2007, OA did
11   not consider itself an agency subject to FOIA.
12   BY MS. WEISMANN:
13        Q   My question was specifically to whether
14   it was functioning as an agency subject to the
15   FOIA?
16        A   My understanding is, is that it was not
17   functioning as an agency subject to FOIA.
18        Q   Okay.  Do you know on what dated, if
19   there is a date certain, it stopped functioning as
20   an agency subject to the FOIA?
21        MS. SHAPIRO:  Objection to form.
22        A   I can't state a specific date.  I

Page 41

1    believe, as I previously said, I was advised that
2    OA did not consider itself an agency subject to
3    FOIA prior to my coming and I was advised of that.
4         Q   And you have since that time not gotten
5    any greater understanding of when it ceased
6    functioning as a FOIA -- FOIAable entity?
7         A   I'm not sure I understand your question
8    as to greater understanding.
9         Q   Beyond what you were initially advised
10   when you started at OA.
11        A   Well, my understanding is, is that it
12   hasn't changed since I've been Director of OA.
13        Q   Okay.  Let me rephrase the question.
14   You've testified that when you started you were
15   told that it was not an agency subject to the FOIA,
16   correct?
17        A   That is correct.
18        Q   I want to know, since being told that.
19   have you learned any other information that
20   would -- as to when the Office of Administration
21   stopped functioning as a FOIAable entity?
22        MS. SHAPIRO:  Objection to form.

11  (Pages 38 to 41)

# Capital Reporting Company

Page 42

1    You may answer.
2    A    Well, there was a deliberative process,
3 as I understand, that began prior to my tenure as
4 the Director of the Office of Administration, and
5 that a conclusion or decision was reached that
6 reaffirmed that OA was not an agency subject to
7 FOIA.
8    Q    And do you -- can you pin down more
9 precisely when that process took place?
10    A    Well, the process began prior to my
11 arrival as I understand it and as I was informed.
12    Q    Right.  But do you have an understanding
13 about when that process took place?
14    A    I do not.
15    Q    How was it that you know there was a
16 deliberative process?
17    A    I was advised by the OA General Counsel's
18 Office.
19    Q    Do you have an understanding of what
20 differences no longer being subject to the FOIA has
21 made to the Office of Administration?
22        MS. SHAPIRO:  Objection to the form.

Page 43

1    A    I'm not sure I understand your question.
2    Q    Okay.  It's your understanding that at
3 some point -- is this correct; is it your
4 understanding that at some point in time the Office
5 of Administration no longer functioned as an agency
6 subject to the FOIA?
7    A    That's my understanding.
8    Q    When that happened, how did the Office of
9 Administration's functions change?
10    A    Well, as I understand it, the office had
11 a person responsible for FOIA requests and that
12 person is no longer serving in that capacity.
13    Q    Do you know when that change happened?
14    A    I don't recall exactly when.
15    Q    Did it happen after you started as
16 Director?
17    A    It occurred after I started as Director.
18    Q    Okay.  So are you saying then that, at
19 the point in time when you came on as Director,
20 there was still a staff person processing FOIA
21 requests?
22    A    There was a person receiving FOIA

Page 44

1 requests as I understand it.
2    Q    Okay.  And do you know approximately what
3 year it was that that person stopped functioning in
4 that capacity?
5    A    It would have been 2007.
6    Q    And do you know approximately which half
7 of 2007.
8    A    I don't know exactly when she stopped
9 functioning in that capacity.
10    Q    Do you know -- CREW filed it's lawsuit I
11 believe it's May of 2007.  I can confirm if that's
12 wrong.  Do you know if it happened after CREW filed
13 its lawsuit in May of 2007?
14    A    I don't want to speculate.  I don't --
15    Q    Okay.
16    A    -- I can't place the date.
17    Q    In addition to the change in that
18 person's position, are there any other changes that
19 happened when OA no longer functioned as an agency
20 subject to the FOIA?
21        MS. SHAPIRO:  Objection to form.
22    A    Well, I believe that the responses,

Page 45

1 written responses to the FOIA requests, changed.
2    Q    Okay.  And how has that changed?  What is
3 that change, if you know?
4    A    I can't be specific as to the exact
5 nature of the response.
6    Q    Okay.  But it's your understanding that
7 there has been a change in the nature of the
8 response?
9    A    My understanding is that there's been a
10 change in the nature of the response.
11    Q    Are there any other changes that you're
12 aware of?
13    A    There's none that come to my
14 recollection.
15    Q    Outside of the context of the FOIA, the
16 Freedom of Information Act, have there been any
17 other changes in how OA has functioned since it no
18 longer considers itself to be an agency?
19        MS. SHAPIRO:  Objection to form.
20    A    None that I can specifically point to
21 because the -- OA always deemed itself not an
22 agency.

12  (Pages 42 to 45)

Page 46

1    Q   Okay.  Well, that's your understanding?

2    A   That's my understanding.  That's what I

3  was advised when I first came to the position.

4         THE VIDEOGRAPHER:  Off record; ending

5  tape one and are continuing deposition of Mr.

6  Swendiman.

7         (Recess taken.)

8         THE VIDEOGRAPHER:  Time now is 11:14 a.m.

9  on record beginning tape number two and continuing

10  deposition of Mr. Swendiman.

11  BY MS. WEISMANN:

12    Q   Are you familiar with the Presidential

13  Records Act?

14    A   I generally am familiar with it.

15    Q   And do you also have a general

16  familiarity with the Federal Records Acts?

17    A   A general familiarity.

18    Q   Just focussing for a moment on the

19  Federal Records Act, did the functioning of the

20  Office of Administration change when it decided it

21  was no longer subject to the Freedom of Information

22  Act?

Page 47

1         MS. SHAPIRO:  Objection to form.  In

2  connection with the FRA?

3    A   I can't be specific as to whether there

4  was a change in connection with the impact on the

5  Federal Records Act.

6    Q   Do you know if there was a change on the

7  recordkeeping practices of the Office of

8  Administration with respect to its own records

9  only?

10    A   To my knowledge there was no change in

11  the recordkeeping practices of the organization.

12    Q   And what are its current recordkeeping

13  practices?

14    A   It's current recordkeeping practices is

15  to retain all hard copy documents and electronic

16  documents.

17    Q   And do you have an understanding as to

18  the statutory authority or requirements it views

19  itself under for purposes of document retention?

20    A   Well, my understanding is, is that from a

21  standpoint of Presidential Records Act, the Office

22  of Administration is to transfer all records that

Page 48

1  it has in its possession to the National Archives

2  at the end of the term of its administration.

3    Q   Does the Office of Administration create

4  any records currently that are subject to the

5  Federal Records Act?

6    A   My understanding is that that may be

7  still an issue to be resolved with the National

8  Archives.

9    Q   And what is your understanding of what

10  that specific issue is?

11    A   Well, there are -- there are records, for

12  example, that transcend administration's such as

13  contracts, invoices and the like, which there is an

14  ongoing discussion on how those records will be

15  handled.

16    Q   With the exception of those records, the

17  status of which it sounds like is, as of yet,

18  unresolved, correct?

19    A   My understanding is, it has not been

20  completely resolved yet as to how a new

21  administration would come in and what would be

22  available to it in terms of ongoing operations.

Page 49

1    Q   Okay.  So putting aside those records

2  that fall into this category of what I will just

3  call unresolved, to your knowledge has there been a

4  change within the Office of Administration on which

5  statutes, recordkeeping obligations, it complies

6  with?

7    A   Well, the staff has been advised that we

8  comply with the Presidential Records Act.

9    Q   Right.  And my question is whether or not

10  that represents a change for the Office of

11  Administration?

12    A   It is a different approach from what, as

13  I understand, the office previously followed.

14    Q   When you say "the office previously

15  followed," could you be more specific?

16    A   I believe in terms of the difference

17  between the Presidential Records Act and the

18  Federal Records Act.

19    Q   But when you say "previously" could you

20  be more specific in time?

21    A   My understanding is, is that previously

22  OA was operating under the Federal Records Act.

13  (Pages 46 to 49)

# Capital Reporting Company

Page 50

1    Q    And do you know when it ceased operating
2    under the Federal Records Act?
3    A    Well, the position is, is that this
4    represents a correction from how it was operating
5    in the past.  Staff was advised to ensure that they
6    preserved all records at the end of August of 2007,
7    the beginning of September of 2007.
8    Q    So is it your testimony that in the
9    August, September 2007 period is when staff was
10   first advised that it's subject to the Presidential
11   Records Act?
12   A    Well, I can't speak to what occurred
13   prior to my tenure.  What I can say is, is that the
14   staff was advised during my tenure of the need to
15   preserve all records, both hard copy and
16   electronic, in August and in September of 2007.
17   Q    And what is your understanding of the
18   statutory obligation that imposed that requirement?
19   A    Well, my understanding is the statutory
20   obligation is the transfer of records to the
21   National Archives at the end of this
22   administration.

Page 51

1    Q    Right.  I'm sorry, I wasn't clear on my
2    question.  Which statute do you understand imposes
3    that obligation?
4    A    Well, my understanding is, is the
5    Presidential Records Act.
6    Q    Okay.  And prior to August 2007, what is
7    your understanding of the statute that your staff
8    was complying with with respect to recordkeeping
9    obligations?
10   A    Well, my understanding is, is that they
11   believed that they were operating under the Federal
12   Records Act.
13   Q    Okay.  In addition to the guidance that
14   it gave them in August -- in the August,
15   September 2007 period -- well, let me take a
16   step -- is this guidance that you gave them?
17   A    It's a collaborative effort in terms of
18   guidance.  I advised the senior staff of the
19   necessity of preserving records.  The OA General
20   Counsel's Office briefed the staff at mandatory
21   briefings with regards to the obligation to
22   preserve records.

Page 52

1    Q    And were any of these guidances put in
2    writing -- any of this guidance put in writing?
3    A    Guidance, in my recollection -- the
4    guidance that we do have in writing is guidance
5    from the White House Counsel's Office with regards
6    to Presidential records and preservation of
7    records.
8    Q    And do you know when that White House
9    Counsel's Office guidance was issued?
10   A    I think there certainly was a memorandum
11   from Harriett Meyers who, at the time, was White
12   House Counsel that issued guidance on the
13   preservation of Presidential records.
14   Q    And was this guidance from the White
15   House Counsel's Office specific to the Office of
16   Administration?
17   A    It was general guidance.
18   Q    Okay.  With the exception of the general
19   guidance you've just described, to your knowledge,
20   since August of 2007, has there been any written
21   guidance to OA employees regarding their
22   obligations under the Presidential Records Act?

Page 53

1    A    I don't recall whether there is written
2    guidance other than the guidance from the written
3    memorandum from the then White House Counsel.
4    Q    And do you know the date of that
5    memorandum approximately?
6    MS. SHAPIRO:  Objection to form.
7    A    I don't recall the exact date.
8    Q    Do you know if that memorandum was issued
9    before you came on as Director.
10   A    Yes.  The memorandum was issued prior to
11   my coming.
12   Q    Okay.  Prior to the August 2007 guidance
13   that was given with respect to compliance with the
14   Presidential Records Act, do you know if any of the
15   office of Administration's records were -- let me
16   rephrase.  Prior to August of 2007, did the Office
17   of Administration during your tenure request
18   authority from the Archives to dispose of any
19   records, if you know?
20   A    I don't know for certain.  We had a
21   Federal Records Manager.
22   Q    Does that person report to you?

14  (Pages 50 to 53)

# Capital Reporting Company

| Page 54 | Page 56 |
|---|---|
| 1    A    No.  That person actually reports to | 1    transfer them at the end of term of the |
| 2    the -- she has a supervisor that reports to the | 2    administration.  Under the Federal Records Act |
| 3    CIO. | 3    there are schedules, which categorize records and |
| 4        Q    And who is that person currently, the | 4    indicate how long they are to be retained and when |
| 5    Records Manager? | 5    they can be disposed of. |
| 6    A    Her name is Sue Crippen. | 6        Q    I just want to make sure I'm clear on |
| 7        Q    Sue Crippen, okay.  Are you familiar at | 7    this.  Is it your understanding that, prior to |
| 8    all with general records schedules? | 8    August of 2007, the Office of Administration was |
| 9    A    Very general familiarity with them. | 9    complying with the Federal Records Act for its |
| 10        Q    And what is your understanding of what a | 10    records, not the Presidential Records Act? |
| 11    general records schedule is? | 11        MS. SHAPIRO:  Objection to form; |
| 12    A    My understanding of a general records | 12    mischaracterizes. |
| 13    schedule is that it sets forth category of records | 13    A    My understanding is, is that the |
| 14    and then with each category indicates how long | 14    employees of OA were following the obligations |
| 15    they're to be held, where they're to be held, when | 15    under the Federal Records Act. |
| 16    they can be disposed of. | 16        Q    Okay.  And when you say "following the |
| 17        Q    Is it your understanding that if a record | 17    obligations", that would mean both as to |
| 18    is subject to a general records schedule, you do | 18    preservation and as to disposition? |
| 19    not need to seek additional authority from the | 19        MS. SHAPIRO:  Objection to form. |
| 20    Archives to dispose of it? | 20    A    Whatever the requirements are, my |
| 21        MS. SHAPIRO:  Objection to form. | 21    understanding is, is that the office was complying |
| 22    A    I believe there are records for which you | 22    with them.  I do not know whether there's been any |

| Page 55 | Page 57 |
|---|---|
| 1    need to seek the permission of the National | 1    disposition of records. |
| 2    Archives. | 2        Q    Okay.  In addition to the Freedom of |
| 3        Q    You do? | 3    Information Act and the Recordkeeping Statutes, |
| 4    A    I believe -- my understanding is, is that | 4    has there been any other changes in OA's compliance |
| 5    there are records for which you need to seek the | 5    with federal laws since its determination that it |
| 6    permission. | 6    is not an agency subject to the FOIA? |
| 7        Q    Records subject to a general records | 7        MS. SHAPIRO:  Objection to form. |
| 8    schedule; that's your understanding? | 8    A    Nothing comes to my mind immediately. |
| 9    A    That's correct; that's my understanding. | 9        Q    Are you familiar with the Privacy Act? |
| 10        Q    Okay.  Do you know if prior to | 10    A    Generally so. |
| 11    August 2007, during your tenure, the Office of | 11        Q    Do you know if, prior to August of 2007, |
| 12    Administration disposed of any records under the | 12    the Office of Administration viewed itself as |
| 13    authority of the Federal Records Act? | 13    subject to that statute? |
| 14    A    I do not know. | 14    A    I don't know specifically whether it did. |
| 15        Q    Are the obligations that the Office of | 15    To my recollection, the issue never came to my |
| 16    Administration has to preserve different under the | 16    attention. |
| 17    Federal Records Act than the Presidential Records | 17        Q    And do you know if currently the Office |
| 18    Act? | 18    of Administration considers itself bound by the |
| 19        MS. SHAPIRO:  Objection to form. | 19    Privacy Act? |
| 20    A    My understanding is, is that under the | 20        MS. SHAPIRO:  Objection.  That calls for |
| 21    Presidential Records Act we are obligated to | 21    a legal conclusion. |
| 22    preserve all records subject to the act and to | 22    A    I can't -- I can't render an opinion on |

15  (Pages 54 to 57)

# Capital Reporting Company

Page 58

1    that.
2        Q    Do you know if the Office of
3    Administration currently has any regulations or
4    guidance with respect to the Privacy Act?
5        A    My understanding is, is that there are
6    existing regulations.
7        Q    And has there been any change in those
8    regulations during your tenure at the OA?
9        A    To my knowledge, there have been no
10   changes to the regulations due to pending
11   litigation.
12       Q    Does the Office of Administration, in its
13   handling of records, comply with the Privacy Act?
14   And I'm not asking comply in every case. I'm just
15   saying, does it generally treat its records as
16   subject to the Privacy Act?
17           MS. SHAPIRO: Objection; asked and
18   answered.
19       A    I cannot specifically state. I know that
20   we comply with whatever existing obligations that
21   we have as an entity not subject to an -- not being
22   an agency.

Page 59

1        Q    In addition to the Freedom of Information
2    Act, the Federal Recordkeeping Statutes and the
3    Privacy Act, does the fact that the Office of
4    Administration is not an agency for FOIA purposes
5    affect its status with respect to any other
6    statutes, if you know?
7           MS. SHAPIRO: Objection to form.
8        A    Well, I believe that there are posted
9    what we call Touhey Regulations.
10       Q    Okay. And what is -- and would you
11   explain to me what the consequences of the Office
12   of Administration not being an agency means for
13   purposes of those regulations?
14       A    I can't speak as to the consequence of
15   it. All I can indicate is that my understanding
16   and the brief experience I've had with Touhey is
17   the obligation of a federal employee to advise his
18   or her agency in the event that they have been
19   subpoenaed to testify as a witness.
20       Q    And currently are the Office of
21   Administration employees subject to that
22   obligation?

Page 60

1        A    I have not had an illustration brought to
2    my attention on that.
3        Q    Do you have an understanding of whether
4    or not Office of Administration are subject to
5    Touhey Regulations currently?
6        A    I think that's a legal conclusion and I'm
7    not in a position to render an opinion on that.
8        Q    Do Office of Administration employees act
9    as if they are subject to Touhey Regulations?
10          MS. SHAPIRO: Objection to form;
11   foundation.
12       A    I wouldn't know.
13       Q    Okay. In your case, when you received
14   the deposition notice, did you comply with any of
15   the procedures of the Touhey Regulations?
16          MS. SHAPIRO: Objection to form.
17       A    I did not because everyone knew that I
18   was -- had received a subpoena. So I didn't need
19   to inform anybody. Everybody knew.
20       Q    Is it your understanding that the Touhey
21   Regulations are still outstanding regulations?
22       A    I understand that they're still posted

Page 61

1    and they've been posted because of pending
2    litigation.
3        Q    I'm not sure I understand what your
4    reference to pending litigation is.
5        A    Well, I think there are pending lawsuits
6    involving the Office of Administration. And my
7    understanding is, is that no action has been taken
8    with regards to those regulations until such time
9    as there's a disposition in the litigation.
10       Q    And are you talking about CREW's lawsuit
11   here?
12       A    That's certainly one case.
13       Q    And when you started as Director of
14   Office of Administration were the Touhey
15   Regulations in place?
16       A    My understanding is, is that they were
17   posted.
18       Q    They were posted. And the regulations
19   that are currently posted, are those the same as
20   the ones that were posted when you started as
21   Director of OA?
22       A    I do not know whether they're the same

16 (Pages 58 to 61)

# Capital Reporting Company

Page 62

1  because I've not made a comparison between what's
2  posted now and what was there when I came.
3     Q   But you're not aware of any changes?
4     A   Nobody's brought any changes to my
5  attention.
6     Q   Okay.  For purposes of exercising the
7  contractual authority that the Office of
8  Administration has, has there been any evaluation
9  of whether its non-agency status changes that
10 authority in any way?
11     MS. SHAPIRO: Objection to form.
12    A   No.  I don't think it -- has any analysis
13 been made; no.
14    Q   So, for example, earlier I showed you
15 provisions of the Economy act, which was the cited
16 authority for one of the memorandums -- Memorandums
17 of Understanding.  Has there been any analysis done
18 of whether or not that statute still applies to the
19 Office of administration given that it no longer
20 considers itself to be an executive branch agency?
21    A   There -- to my knowledge, there's been no
22 analysis.

Page 63

1     Q   And has there been any change within the
2  Office of Administration with respect to its
3  reliance on that statute as authority to enter into
4  Memorandums of Understanding?
5      MS. SHAPIRO: Objection to form.
6     A   None that's been brought to my attention.
7     Q   Okay.  Are you familiar with Reimbursable
8  Services Agreements?
9     A   In a general way, yes.
10    Q   And what is your general understanding
11 about the authority the Office of Administration
12 has to enter into those agreements?
13    A   Well, I know that that is a practice that
14 the Office of Administration follows.
15    Q   Would you explain what a Reimbursable
16 Services Agreement is?
17    A   Well, my understanding is, is that a
18 Reimbursable Services Agreement provides that one
19 entity provides services to another entity and that
20 second entity reimburses the first for the expenses
21 incurred in providing that service.
22    Q   And when OA enters into these

Page 64

1  Reimbursable Services Agreements, does it enter
2  into them with other executive branch agencies?
3     A   My understanding is that it has.
4     Q   And do you have an understanding of what
5  the legal authority for entering into those
6  agreements is?
7     A   Well, let me correct what I may have
8  said.  I think the question was -- you asked me
9  whether we've entered into a Reimbursable Agreement
10 with other agencies.  We have in those instances
11 where they've rendered service to us and we have
12 paid them for that service.
13    Q   And is this another example of
14 outsourcing to use your word from earlier?
15    A   It's certainly a form of outsourcing.
16    Q   And what are the differences between
17 these kinds of agreements and the agreement that we
18 looked at with respect to HHS?
19    A   Well, I think they're analogous.
20 They're, in both cases, providing a service to the
21 Office of Administration.
22    Q   Are there any differences?

Page 65

1     A   There may be some legal difference but I
2  think my understanding is, from a practical
3  standpoint, it's basically paying for services
4  rendered.
5     Q   And can you give me some examples of when
6  OA has entered into these Reimbursable Services
7  Agreements.  Let me be clear.  What kinds of
8  service does OA typically negotiate for into these
9  agreements?
10     MS. SHAPIRO: Objection to form.
11    A   Well, we had to -- one example is the
12 White House Press Briefing Room in which we had to
13 reimburse the General Services Administration for
14 services it rendered in terms of improving that
15 facility.
16    Q   Okay.  Are you familiar with the
17 Government Management Reform Act of 1994?
18    A   I am not, no.
19    Q   Okay.  Are you familiar with the Treasury
20 Department's Franchise Fund?
21    A   In a very general way.
22    Q   The -- I will represent to you that the

17  (Pages 62 to 65)

# Capital Reporting Company

Page 66

1 statute appears to be the organic statute for
2 setting up the Treasury Fund. What is OA's
3 relationship to that fund?
4     MS. SHAPIRO: Objection to form.
5     A  Well, my understanding is -- and I
6 believe this relates to the Bureau of Public Debt,
7 which provides financial management systems and
8 maintenance to the Office of Administration.
9     Q  And would these be comparable to the
10 kinds of financial services that HHS was performing
11 in that other agreement?
12     A  No. I think it's slightly different.
13 With HHS I think that was what I called management
14 of grants whereas the Bureau of Public Debt is
15 providing, for example, such things as payroll
16 service, financial management systems, for the
17 Office of Administration. So I think you might say
18 it's perhaps a little more extensive in terms of
19 the services that it's providing but it's
20 outsourcing nevertheless.
21     Q  And where did the funds come from for
22 those services?

Page 67

1     A  Funds come -- you mean the funds that OA
2 uses to pay for the services?
3     Q  Yes.
4     A  They come from appropriated funds.
5     Q  To OA?
6     A  To the -- to OA and the Executive Office
7 of the President.
8     Q  So that as of the other agreement is it
9 the case that OA enters into these agreements for
10 service for other EOP components outside of OA?
11     MS. SHAPIRO: Objection to form.
12 Would you repeat the question again?
13     Q  I'll ask it differently. Does OA enter
14 into these agreements to provide services to non-OA
15 EOP components?
16     A  Yes, it does.
17     Q  Okay. I'm going to -- this isn't going
18 to be marked, but I want to ask you a question. If
19 you would -- there are Bates stamp numbers at the
20 bottom. I assume these were put on by the Office
21 of Administration. If you would turn to page
22 OA00025, please. Number four, Establishment of

Page 68

1 Financial Management System Infrastructure -- I'm
2 sorry, 3.1 at the top. That first sentence,
3 there's a reference to a system platform
4 established and maintained by another government
5 organization under a Cross-Serving Agreement. Do
6 you see that?
7     A  Yes.
8     Q  Do you know what that is?
9     A  I don't know what the reference to the
10 other government organization under a
11 Cross-Servicing Agreement is. I do not know.
12     Q  Are you familiar generally with the term
13 Cross-Servicing Agreement?
14     A  In a very general way.
15     Q  And what is your understanding of what a
16 Cross-Servicing Agreement is?
17     A  Well, it's my understanding is, is that
18 it's services going in both directions.
19     Q  And do you know in this particular case
20 what services EOP was providing?
21     A  I do not know. I'm not familiar with --
22 I don't know the reference to another government

Page 69

1 organization.
2     Q  Okay. Describe for me the process by
3 which one of these agreements is generated. Is it
4 done at the initiation of OA?
5     A  That's a very general question, which is
6 difficult to answer.
7     Q  Well, let me break it down into some
8 pieces then. Is one of these agreements generated
9 when an EOP component comes to you with a need for
10 a service?
11     A  It can.
12     Q  Okay. And if that's the case who
13 decides -- which component of EOP decides what the
14 requirements for the service are?
15     A  Well, it's the entity that's requesting
16 the service that determines the requirements.
17     Q  Okay. So would it be fair to say that
18 they would come to OA with a specification of the
19 requirements they need?
20     A  Yes, because they would know more what
21 they need than we would.
22     Q  Okay. And then what would OA do next

# Capital Reporting Company

Page 70

1  with that information?
2      A   Well, it would -- basically it's
3  reference to the procurement people who would
4  prepare a request for proposal.
5      Q   And what would happen to that request?
6      A   Well, the request has to be reviewed by
7  the entity or organization requiring the services
8  to make sure that it meets their needs, meets their
9  requirements.
10     Q   And then how do you go about finding a
11 source for those requirements?
12     A   Well, I mean, there are several ways of
13 doing it. I'm not an expert in procurement but
14 certainly there are -- you know a request for
15 proposal is issued and published. You can also
16 seek to utilize GSA schedules. You can use other
17 vehicles. It may be also that the procurement --
18 because the limited number of folks that are in
19 that group -- they may have to use a procurement
20 organization such as GovWorks, which is under the
21 Department of Interior, or NASA SEWP, which is
22 under NASA or a component under DOD.

Page 71

1      Q   In the package of materials I handed you,
2  this was with the Treasury Franchise Fund. That is
3  a specific provider of services, correct?
4      A   I mean, that's my understanding.
5      Q   Right, as opposed to one of these
6  entities you were just describing?
7      A   What I call a procurement --
8      Q   Procurement --
9      A   -- organization.
10     Q   That's not a procurement entity?
11     A   No, it's not. It's a delivery of
12 service.
13     Q   All right. And if you look at OA00024,
14 it's a Memorandum of Understanding between the
15 Office of Administration and the Treasury Franchise
16 Fund; is that correct?
17     A   That is correct.
18     Q   Do you know who decides the terms of
19 agreements of a Memorandum of Understanding? I
20 don't mean the individuals but which entities to
21 this agreement?
22     A   I can't speak to this specific agreement

Page 72

1  because this was executed prior to my tenure.
2      Q   Okay. In -- have you been -- during your
3  tenure, have there been Memorandum of Understanding
4  that OA has entered into with either the Treasury
5  Franchise Fund or other entities like the Treasury
6  Franchise Fund?
7      A   I think that there was -- my
8  understanding -- my recollection is, is that there
9  was a renewal of this agreement during my tenure.
10     Q   Okay. And was there a negotiation
11 process over the terms of the Memorandum of
12 Understanding?
13     A   Well, I didn't read the memorandum. My
14 understanding is, is that the terms continued from
15 the last either agreement or modification that the
16 only -- that the primary difference, as I
17 understand it, was the cost.
18     Q   Okay. Have there been any other
19 Memorandum of Understanding since you started at OA
20 that weren't just a continuation that were newly
21 entered not necessarily with the Treasury Franchise
22 Fund?

Page 73

1      A   My recollection is that those that have
2  come to my attention have been primarily renewals.
3      Q   Do you have an understanding of the
4  process by which a Memorandum of Understanding is
5  reached, the terms of a Memorandum of
6  Understanding?
7      A   Well, it's based on negotiation between
8  parties.
9      Q   And who are the parties to that
10 negotiation?
11     A   Well, if it's --
12         MS. SHAPIRO: Objection to form.
13         THE WITNESS: -- if it's involving the
14 Office of Administration, it would be the Office of
15 Administration in conjunction with White House
16 Management and Administration and the other
17 providing organization.
18 BY MS. WEISMANN:
19     Q   Do you have in the packet I gave you
20 Bates number 00079?
21     A   Not in the last document you gave me.
22     Q   All right. Well, we're not going to mark

19  (Pages 70 to 73)

| Page 74 |
|---|

1   this, but I'm going to show you -- again, this
2   comes from the document production that the Office
3   of Administration just made this week. I'd like
4   you to look at Bates number 00079. You'll see some
5   highlighted language. If you could -- I apologize,
6   I don't have copies. It's 79. Do you see the
7   reference to Customer Government Agency?
8        A   Uh-huh. Yes, I do.
9        Q   Okay. Do -- If you need to look at the
10  additional pages -- do you have any understanding
11  of what the Customer Government Agency is?
12       MS. SHAPIRO: Objection to form;
13  ambiguous.
14       A   Well, the front page says Customer Agency
15  Executive Office of the President.
16       Q   Okay, thank you.
17       A   Now, these are standard government forms.
18  which generally use the word agency.
19       Q   With respect to the processes of entering
20  into these Memoranda of Understanding, has the --
21  have the responsibilities of the Office of
22  Administration changed since it deemed itself a

| Page 75 |
|---|

1   non-agency to your knowledge?
2        A   Well, my understanding is, is that it's
3   not considered itself an agency prior to my coming.
4   It's not considered itself an agency while I've
5   been there. I don't know what you mean with
6   regards to has the process changed.
7        Q   I'm not entering -- marking this yet. On
8   this one, if you could look at Bates number 235.
9   If you'll look at page 17, number 11.5.2.10. Do
10  you see that? It's about three-quarters of the way
11  down.
12       A   Uh-huh. Yes, I do.
13       Q   Well, the 11.5.2 says, upon authorization
14  from the EOP Procurement Office the ARC shall meet
15  all federal regulations and guidelines with regard
16  to intergovernmental reporting. Does -- when EOP
17  enters these agreements, does EOP itself have any
18  kind of reporting requirements; do you know?
19       MS. SHAPIRO: Objection to form.
20       A   If I can get a clarification.
21  Intergovernmental reporting to whom?
22       Q   I don't know. I'm looking at the

| Page 76 |
|---|

1   language of the document and trying to figure it
2   out myself. I was hoping you could shed some light
3   on that.
4        A   Well, I cannot state specifically what
5   the regulations are as to intergovernmental
6   reporting or whether they're applicable.
7   Certainly, the Treasury Fund and ARC would report
8   to us or, I should say, to OA with regards to the
9   services that it's providing --
10       Q   Okay.
11       A   -- simply because the EOP Procurement
12  Office basically would manage this contract.
13       Q   Okay, thank you.
14       A   (Tenders document to counsel.)
15       Q   Are you familiar with the process by
16  which the Office of Administration secures
17  detailees, individuals doing details within the
18  Office of Administration?
19       A   I'm generally familiar.
20       Q   And what is your understanding of the
21  source of OA's authority to procure detailees?
22       A   I can't cite a specific authority for

| Page 77 |
|---|

1   procuring detailees. The practice of seeking
2   detailees occurred prior to my tenure as OA
3   Director.
4        MS. WEISMANN: Just bear with me. Too
5   many documents.
6   BY MS. WEISMANN:
7        Q   I'm handing you another packet of
8   material, and I'd like you to turn to Bates number
9   319.
10       (Tenders documents to witness.)
11       I think it's the last page of this. Do
12  you see that document?
13       A   I do.
14       Q   Would you explain what this document is?
15       A   What it is, is a form letter that was
16  sent to various governmental entities requesting
17  a -- their consideration of a non-reimbursable
18  detail to the Office of Administration.
19       Q   And this letter was sent out under your
20  signature; is that correct?
21       MS. SHAPIRO: Objection to form.
22       A   Correct, with the approval of the White

20   (Pages 74 to 77)

# Capital Reporting Company

Page 78

1   House Management Administration.
2       Q    Were you involved in negotiating with
3   parent organizations for the specific detailees --
4   for specific details?
5       A    I have been in the past.
6       Q    And what has that negotiation involved?
7       A    Basically, it's not a negotiation.  I
8   wouldn't characterize it as that.  It's a request
9   that was made as to whether they would consider
10  detailing someone to us from their organization on
11  a non-reimbursable basis up to a period of six
12  months.
13      Q    And by "non-reimbursable basis", does
14  that mean that the salary for that detailee would
15  continue to be paid by its parent organization?
16      A    That is correct.
17      Q    And in the specific instance that you
18  just referenced, what was the parent organization?
19      A    The parent organization was the General
20  Services Administration.
21      Q    And you were seeking someone.  What was
22  the nature of the detail?

Page 79

1       A    It was to assist in our procurement
2   office.
3       Q    And this is something that you personally
4   were involved in?
5       A    Well, I called and asked whether they
6   would consider it, and then the human resources
7   office did the follow-up and did the necessary
8   paperwork.  All of it is done certainly on the
9   approval by -- first of all, approval by White
10  House Management Administration of my seeking that
11  request, and, second, if an individual is
12  interested, it depends upon approval of that
13  person's supervisor.
14      Q    In terms of executing paperwork to
15  finalize a detail, is there someone within the
16  Office of Administration that signs on behalf of
17  EOP?
18      A    Referencing the documents that you've
19  given me, I think there have been -- some of the
20  documents have been signed on behalf of OA.
21          MS. WEISMANN:  Okay.  I'd like to have
22  the last page, Bates number 319, marked as the next

Page 80

1   exhibit.
2          (Plaintiff's Exhibit No. 4 was
3           marked for identification.)
4   BY MS. WEISMANN:
5       Q    Okay.  Turning again to the packet that
6   starts with Bates number 269, if you could turn to
7   271.  And under the purpose it states to work with
8   GSA IAGs and IAPCs.  Can you tell me what that
9   means?
10      A    Well, I think the reference is to -- is
11  Interagency Agreements.  And I'm trying to remember
12  what IPAC stands for.  I truly can't remember at
13  this juncture.  It will come to me later.
14      Q    What about IAG?
15      A    InterAgency agreement.
16      Q    Okay.  And so -- from reading this
17  document, do you have an understanding of what the
18  detailee would --
19      A    Actually, I do have an understanding of
20  this one.  This one -- I don't think that the
21  purpose specifically encompasses everything that
22  this individual was doing, but this individual was

Page 81

1   designed to assist our procurement people with
2   regards to various procurement matters that OA had,
3   which includes instances where we utilize GSA as a
4   procurement organization.
5       Q    And the relationship that you have
6   with -- by "you," I mean, OA -- has with GSA in
7   this regard, is it comparable to the relationship
8   OA has with the agencies in which it's entered into
9   Memorandum of Understanding?
10      A    Well, Memorandum of Understanding is
11  rather a broad term.
12      Q    All right.  Let's talk about the
13  Memorandum of Understanding that I've shown you so
14  far today.
15      A    Well, it would be perhaps comparable to
16  the one with regards to the Treasury Fund in which
17  the Treasury Bureau of Public Debt specifically is
18  providing services to OA, likewise GSA is a
19  procuring organization.  It's similar to GovWorks,
20  the Department of Government, NASA SEWP under NASA,
21  and there are instances where we have -- my
22  understanding is, we've utilized GSA to procure

21  (Pages 78 to 81)

## Capital Reporting Company

Page 82

1  services.
2      Q    And this request -- part of the
3  responsibilities for this person would be to be
4  that interface with GSA?
5      A    I can't specifically -- I don't know
6  specifically whether this person interfaced with
7  GSA or not.
8          MS. WEISMANN:  Okay.  If you can pull
9  that sheet out, please.  I'm going to have it
10  marked as the next exhibit.
11          (Plaintiff's Exhibit No. 5 was
12            marked for identification.)
13          (Tenders documents to witness.)
14  BY MS. WEISMANN:
15      Q    Okay.  I've just handed you a few more
16  pages of documents.  Again, these are documents
17  that were part of the production that the Office
18  of Administration made this week.  Specifically, if
19  I can direct you to Bates number 00324.  Actually,
20  323 as well.  Let's start with 323.  At the bottom
21  it says, federal agencies must provide reasonable
22  accommodation to applicants with disabilities where

Page 83

1  appropriate.  Do you see that language?
2          MS. SHAPIRO:  I've got the wrong Bates
3  numbers, sorry.  What page are you reading from?
4          MS. WEISMANN:  323.
5          MS. SHAPIRO:  The very last page?
6          MS. WEISMANN:  At the top it says page 4
7  of 4.
8          MS. SHAPIRO:  Okay.
9  BY MS. WEISMANN:
10      Q    Do you see that?
11      A    I do.
12      Q    And then if you go on to the next page,
13  at the very bottom it says, this component provides
14  reasonable accommodations.
15          MS. SHAPIRO:  There is no next page.
16  That's the problem.
17      A    I don't have a next page.
18          MS. WEISMANN:  You have 323?
19          MS. SHAPIRO:  Right.  That's the last
20  page of this packet.
21          MS. WEISMANN:  Well, that's okay.  We'll
22  stick to 323.  It doesn't matter.

Page 84

1  BY MS. WEISMANN:
2      Q    Do you have an understanding of what this
3  reference to reasonable accommodations is?
4      A    My understanding would be that it
5  reflects the accommodations under the ADA.
6      Q    The ADA being?
7      A    American Disabilities Act.
8      Q    Okay.  Are you also familiar with an
9  Executive Order 13164 entitled Requiring Federal
10  Agencies to Establish Procedures to Facilitate the
11  Provision of Reasonable Accommodation?
12      A    I'm not familiar with the Executive
13  Order.
14      Q    Okay.  Is it your understanding -- what
15  is your understanding about the Office of
16  Administration's obligations with respect to the
17  ADA?
18          MS. SHAPIRO:  Objection to form.
19      A    I know that we adhere to the provisions
20  of the ADA.
21      Q    Is it your understanding that you do so
22  because you're required by law to do so?

Page 85

1          MS. SHAPIRO:  Objection to form.
2      A    That's a legal conclusion.  I could not
3  give an opinion on that.
4      Q    Well, as Director of OA, do you have an
5  understanding that you have a legal obligation to
6  comply with the ADA?
7      A    What I know is that we adhere to the
8  obligations under the ADA.
9      Q    And you have no further understanding
10  beyond that?
11      A    I have no further understanding other
12  than that.
13      Q    And who within the Office of
14  Administration is charged with compliance with the
15  ADA?
16          MS. SHAPIRO:  Objection to form.
17      A    Well, the office itself is charged with
18  complying with it.
19      Q    And is there any individual with the O --
20      A    The Director ultimately is responsible in
21  terms of in conjunction with White House
22  management.

22  (Pages 82 to 85)

**Capital Reporting Company**

Page 86

1     Q    Responsible for what?
2     A    To ensure that we are adhering to the
3   obligations under the ADA.
4     Q    Okay.  So by your testimony you are
5   ultimately responsible for the office's adherence
6   to the ADA, correct?
7     A    Ultimately, yes.
8     Q    And yet you have no understanding about
9   whether you're required to do so or whether it's a
10   matter of policy?
11     A    Well, my understanding is, is that we do
12   adhere to it and that's -- that's what we do.
13     Q    Have you delegated this responsibility to
14   anyone else within the Office of administration?
15     MS. SHAPIRO:  Objection to form.
16     A    Well, we certainly are -- HR people are
17   cognizant of the obligations under it and seek to
18   make sure, to the best of their ability, that we --
19   you know, we follow it.
20     Q    Okay.  And the document I showed, what's
21   the first page number?
22     A    It's OA00320.

Page 87

1     Q    Okay.  Would you explain what this
2   document is?
3     A    Well, it's a posting, as I understand it,
4   on USAJOBS, which is a government internet site for
5   the posting of open government positions in various
6   government organizations.
7     Q    Okay.  And part of this posting includes
8   the language of page 323, does it not, that I read
9   earlier about federal agencies must provide
10   reasonable accommodations?
11     A    Well, that's what the document reflects.
12     Q    Right.  That's part of the posting.  Do
13   you have an understanding of why this language was
14   included?
15     A    No.  I don't get involved with the
16   details of, you know, every posting.  So I can't
17   tell you specifically as to this language.
18     Q    To your knowledge, is this language
19   generally included in postings?
20     A    I cannot tell you whether it's generally
21   included in postings.  I don't review postings in
22   the federal government.

Page 88

1     Q    Okay.  When you were at the General
2   Services Administration, did you have any
3   involvement in postings like this?
4     A    Generally, my Associate General Counsels
5   handle the postings in conjunction with the human
6   resources office.
7     (Tenders documents to witness.)
8     MS. WEISMANN:  The four pages that I just
9   handed you, can we have that marked as the next
10   exhibit, please.
11     (Plaintiff's Exhibit No. 6
12     was marked for identification.)
13     MS. WEISMANN:  Can we just go off the
14   record for a minute and just talk about scheduling.
15   I don't know if you want to just keep going, if you
16   want to take a break.  It's really up to you.
17     THE WITNESS:  I'm fine.
18     MS. SHAPIRO:  Do you have an estimation
19   as to how long we'll go?
20     MS. WEISMANN:  I can't give you a time
21   estimation.
22     THE VIDEOGRAPHER:  12:11 p.m; off record

Page 89

1   ending tape number two in our continuing deposition
2   of Swendiman.
3     (Recess taken.)
4     THE VIDEOGRAPHER:  Our time now is 12:16
5   p.m.  We're on record beginning tape number three
6   in our continuing deposition of Mr. Swendiman.
7     (Tenders documents to witness.)
8   BY MS. WEISMANN:
9     Q    I just handed you another grouping of
10   documents.  Again, these are documents that were
11   recently produced by the Office of Administration
12   as part of its document production here.  The first
13   page of the first document, Bates number 335, can
14   you -- at the top it says Executive Office of the
15   President - Interagency Agreement.  What is the --
16   as I read this, it appears that the Office of
17   Administration is agreeing to provide a service; is
18   that correct?
19     A    My reading of this document seems to
20   indicate that the Office of Administration is
21   providing a service on a reimbursable basis.
22     Q    And it's providing a service to the Navy,

23  (Pages 86 to 89)

# Capital Reporting Company

Page 90

1  or am I wrong on that?
2      A    It appears that's the case.
3      Q    Can you tell from looking at this
4  document the nature of the service OA is providing?
5      A    I can't tell exactly from the document.
6  It references AT&T voice systems operations.
7      Q    That's on Bates number 336?
8      A    It's on 335.
9      Q    And if you'll look on 336 it describes
10  the service.  Funds are provided to the Executive
11  Office of the President for AT&T voice systems
12  operation and maintenance?
13      A    My understanding is, is that we do a
14  minimal service for them.  My understanding is --
15      Q    When you say "for them," who is the them?
16      A    In this case, the Navy.  And it's -- I
17  can't tell you exactly what the nature of the
18  service is other than what is stated there.
19      Q    Okay.  And would it be fair to say that
20  these Interagency Agreements are similar to the
21  ones we looked at earlier, only in this case it's
22  OA providing the service to another agency?

Page 91

1      A    Yes.  It's a minimal service provided to
2  this -- to the Navy on a reimbursable basis.
3      Q    And why does OA outsource -- or not
4  outsource.  Why does it provide services to other
5  agencies?
6      A    Well, in this particular case -- I can
7  speak generally -- is that there are entities
8  within the White House complex with whom OA has to
9  work in conjunction with.  The Navy is certainly
10  one of them.  And oftentimes the service that we're
11  providing is actually for the benefit of OA in
12  order for us to service -- service the President
13  and White House Management Administration.
14      Q    But -- and this is an agreement -- in
15  order to do that you are providing a service to a
16  non-EOP entity, correct?
17      A    Well, I can't tell exactly.  It's got
18  operation and maintenance Navy.  I can't tell from
19  this document exactly what aspect of the Navy that
20  service is.  My understanding is, it is with
21  regards to the presence within White House complex.
22      MS. WEISMANN:  Okay.  Can we have this

Page 92

1  document, all of the pages that are clipped
2  together, marked.  It's Bates number 335 and 336 --
3  I'm sorry, let's have 335 and 336 marked as the
4  next exhibit.
5      (Plaintiff's Exhibit No. 7 was
6      marked for identification.)
7      MS. WEISMANN:  Also, in the packet that I
8  gave you should be 00343 and 344, which is also
9  another EOP Interagency Agreement.
10      MS. SHAPIRO:  I don't think we have that.
11      MS. WEISMANN:  Keep going.  It would be
12  further on.  You don't have it?
13      MS. SHAPIRO:  It ends at 342.
14      THE WITNESS:  It ends at 342 and then it
15  picks up at 352.
16      MS. WEISMANN:  All tight.  I apologize.
17  I've got copies.  I just didn't give them to you
18  yet.  All right, well, I'm not going to make this
19  an exhibit and I apologize.  I thought I had
20  copies.  I'm going to give you --
21      (Tenders document to witness.)
22  BY MS. WEISMANN:

Page 93

1      Q    If you can take a look at this document
2  and tell me if you can tell from these two pages
3  the nature of the -- what the agreement is about
4  and what's the nature of the service.
5      MS. SHAPIRO:  Can you give us the Bates
6  numbers?
7      MS. WEISMANN:  343 and 344.
8      THE WITNESS:  Well, I can't tell from the
9  documents to whom the service is rendered.  It's
10  for nominal amounts.  It references AT&T voice
11  systems operations and maintenance.  We do do some
12  maintenance with regards to telephone connections.
13  Again, oftentimes this is for the benefit of OA in
14  order to carry out its mission.
15  BY MS. WEISMANN:
16      Q    But would this be maintenance done at a
17  non-EOP agency?
18      A    Well, this is the Harry S. Truman
19  Scholarship Foundation.  They're not considered a
20  component of the EOP, but I cannot tell you where
21  they fall under the organizational chart with
22  respect to the White House complex.

24  (Pages 90 to 93)

# Capital Reporting Company

Page 94

1    Q    But as you read this document it appears
2 to be agreement to provide some kinds of
3 maintenance services?
4    A    Some maintenance service which is
5 generally, is my understanding, has been telephone
6 connections.
7    Q    Okay, thank you.  Do you have number --
8 Bates number 356?
9    A    I do.
10    Q    Good.  This is document entitled
11 Agreement Between Federal Agencies.  What are the
12 two entities that are parties to this agreement?
13    A    The buyer is referenced as Office of the
14 Secretary; and the agency and office, the name is
15 the White House.
16    Q    And it's the Office of Administration
17 within the White House; is it not?
18    A    Well, it says address, Executive Office
19 of the President, Office of Administration.
20    Q    Okay.  And what is the nature of the
21 goods and services being provided here, if you can
22 tell?

Page 95

1    A    This looks to be an event.
2    Q    Would this be an event at the Department
3 of Education?
4    A    It could be an event at the Department of
5 Education.  It could be an event outside the
6 Department of Education building.
7    Q    Is this -- what service or goods is the
8 White House Office of Administration providing; can
9 you tell?  It's a multi-page document, I believe.
10 Oh, yeah, if you'll look at 359 --
11        MS. MEDAGLIA:  What page does this start
12 with?
13        MS. WEISMANN:  It starts with 356.
14        MS. MEDAGLIA:  Actually, I don't think
15 so.  That's not how it was produced.
16        MS. WEISMANN:  For purposes of this
17 deposition, we're looking at a document that starts
18 at page 356.
19        THE WITNESS:  This looks to be an event
20 that was held at the Horace Greeley Elementary
21 School in Chicago.
22 BY MS. WEISMANN:

Page 96

1    Q    Okay.  And what is the nature of goods or
2 service that the Office of Administration is
3 providing?
4    A    I cannot tell from this document exactly
5 what the service is.  The service is on a
6 reimbursable basis.
7    Q    Okay.  And there are, in fact, four pages
8 that precede 356.  Do you have 352?
9    A    Yes, I have it in my hand.
10    Q    All right.  Do those four pages relate to
11 this agreement?
12    A    Well, the first one starting with
13 OA00352 --
14    Q    Correct.
15    A    -- is with the Department of Health and
16 Human Services.
17    Q    Okay.  So that's a separate document?
18    A    That's a separate document.
19    Q    Right.
20    A    The next document is OA --
21    Q    If you'll look at 354 --
22    A    354, it is -- it's associated with the

Page 97

1 visit of the President and the Secretary of
2 Education to the Horace Greeley Elementary Shool in
3 Chicago on January 7th, 2008.
4    Q    So that appears to relate to the
5 agreement document?
6    A    That appears to relate to the agreement.
7        MS. WEISMANN:  So let's make, for
8 purposes of this deposition, page numbers 354
9 through 359 the next exhibit.  If you could hand
10 those to her, I apologize.
11        (Plaintiff's Exhibit No. 8 was
12        marked for identification.)
13        THE WITNESS:  354 --
14        MS. WEISMANN:  Through 359.  So 4, 5, 6
15 7, 8 and 9.  I think that's all one document.
16        (Tenders documents to witness.)
17 BY MS. WEISMANN:
18    Q    Okay.  I've just handed you what is again
19 another document produced in this litigation as
20 part of OA's document production.  And it's 0
21 Fiscal Year 2003 Congressional Budget Submission?
22    A    That is correct.

25  (Pages 94 to 97)

# Capital Reporting Company

|  |  |
|---|---|
| Page 98 | Page 100 |

**Page 98**

1    Q   Okay.  Would you turn to -- have you seen
2  this document before?
3    A   I've -- I've seen the document before.
4    Q   And do you have a role in preparing the
5  budget submission to Congress on behalf of the
6  Office of Administration?
7    A   Well, we have a -- we have a role in
8  preparing the budget on behalf of the Office of
9  administration in conjunction with the White House
10  Management -- in conjunction with White House
11  Management and Administration.
12    Q   Would you turn to Bates number 410,
13  please.  There's a section that states the Office
14  of Administration is organized along the following
15  lines.  Do you see that?
16    A   I do.
17    Q   And the second one is the Chief Special
18  Projects Officer or CSPO.  Do you see that?
19    A   I see that.
20    Q   Was this a new position that was created?
21    A   I have no idea --
22        MS. SHAPIRO:  Objection to form.

**Page 99**

1        THE WITNESS:  I'm sorry.  I have no idea.
2  This is for fiscal year 2003.  This preceded my
3  tenure.  There is no such office.
4  BY MS. WEISMANN:
5    Q   Okay.  And so during your entire tenure
6  at the Office of Administration there has not been
7  a Chief Special Projects Officer?
8    A   There has been somebody in charge of
9  special projects but not -- but there has been no
10  Chief Special Projects Officer.
11    Q   Okay.  And just looking at the
12  description of that position, if you could just
13  read that.  I recognize there isn't a person
14  occupying this job, but it's still the case that
15  EOP coordinates within EOP and within the EOP
16  affiliated entities?
17        MS. SHAPIRO:  Objection to form.
18    A   Well, we do work in conjunction with and
19  parallel to the White House Military Office, for
20  example.
21    Q   Okay.  I want you to focus on the phrase
22  EOP affiliated entities.  Would you explain what

**Page 100**

1  those entities are?
2        MS. SHAPIRO:  Objection to form.
3    A   I can't explain that entity -- I can't
4  explain those entities.
5    Q   Do you understand the Military Office to
6  be the White House Military Office?
7    A   I would understand that to be the White
8  House Military Office.
9    Q   And what is the -- OA's relationship with
10  the White House Military Office?
11    A   Well, we work in conjunction and parallel
12  with them to support the President.
13    Q   And what is the nature of your
14  interaction with the White House Military Office?
15    A   Well, For example, if the President goes
16  on trips, the White House Military Office supports
17  him with regards to IT.  The Office of
18  Administration also supports with regards to IT.
19    Q   Would you consider that to be an EOP
20  affiliated entity?
21    A   I can't describe --
22    Q   That's not a phrase you're familiar with?

**Page 101**

1    A   That's not a phrase I'm familiar with.
2    Q   Okay.  What about the Secret Service;
3  What is the relationship of the Office of
4  Administration with the Secret Service?
5    A   Well, again, I think as I've explained
6  before, for example, in terms of the Secret
7  Service, we forward approved name checks that we
8  receive from the FBI to the Secret Service in terms
9  of access to the complex.
10    Q   Is there any -- does your office have any
11  other interaction with the Secret Service?
12    A   Well, we've had interaction previously.
13  For example, it's been reported there was a fire in
14  the EEOB in December and both the Secret Service
15  and our Office of Security, Emergency of
16  Preparedness -- and by "our", I mean, OA -- were
17  involved with reacting and responding to that fire.
18    Q   Okay.  This paragraph refers to large
19  scale EOP projects with entities such as the Secret
20  Service.  Are you aware of any current or ongoing
21  EOP projects that your office has with the Secret
22  Service?

26  (Pages 98 to 101)

# Capital Reporting Company

| Page 102 | Page 104 |
|---|---|

**Page 102**

1    A  I'm not aware of any ongoing projects.

2    Q  And there's also a reference here to the

3  General Services Administration.  Other than what

4  you had described earlier in the contracting or

5  agreement documents with GSA, does your office have

6  any additional relationship or interaction with --

7    A  Oh, yes, we have a relation -- or

8  interaction with General Services Administration.

9  As is known, the EEOB or the Eisenhower Executive

10  Office Building is undergoing a modernization of

11  the building and GSA, for lack of a better term, is

12  the entity that oversees the modernization effort

13  from a -- from a real estate standpoint.  GSA owns

14  the building, owns the EEOB, and they basically

15  hire the contractor or contractors to do the work

16  that's necessary to modernize the building.

17    Q  And then given that GSA is the owner of

18  the building, does the EOP pay rent to GSA for the

19  building?

20    A  Yes, EOP pays rent to GSA.

21    Q  Okay.  And does your office get involved

22  in negotiations over what the rent will be?

**Page 103**

1    A  My experience has been. is that GSA

2  generally tells us what the rent is.

3    Q  It's not a negotiated process?

4    A  It's not necessarily a negotiated

5  process, although we do have discussions and see

6  whether we're being fairly charged on our rent.

7    Q  Okay.  I'm going to hand you what is --

8  at least portions of the fiscal year 2007 budget,

9  again, another document that was produced to us as

10  part of the document production in this case.

11    (Tenders documents to witness.)

12    And I'd like you specifically to look at

13  page 485.  Under the Admission Statement it states,

14  OA's mission is to provide enterprise level

15  administrative services to the Executive Office of

16  the President and the Office of the Vice President?

17    A  That's correct.

18    Q  What do you understand is meant by the

19  term enterprise level administrative services?

20    A  By enterprise services. I understand that

21  to mean that we are providing the common support

22  and services to all of the components of the

**Page 104**

1  Executive Office of the President and that it is --

2  those services are folded under the budget of the

3  Office of Administration.

4    Q  To your knowledge, has anything about the

5  OA's budgeting process changed since it deemed

6  itself to no longer be an agency?

7    MS. SHAPIRO:  Objection to form.

8    A  None to my knowledge.  And by

9  clarification, I came at the time of the budget

10  process for 2008 and I came towards the end.  So I

11  was not involved with the budget -- intimately

12  involved with the budget process at that time.  My

13  full involvement and participation of the budget

14  process came with the fiscal year 2009 budget.

15    MS. WEISMANN:  Can we have this marked as

16  the next exhibit number.

17    (Plaintiff's Exhibit No. 9 was

18    marked for identification.)

19    (Tenders document to witness.)

20  BY MS. WEISMANN:

21    Q  I've just handed you a document that is

22  an e-mail exchange between Sam Watkins and Theresa

**Page 105**

1  Payton.  Have you seen this document before?

2    A  I saw the document in connection with the

3  production of documents in response to your

4  organization's request.

5    Q  Okay.  This actually was not part of the

6  documents that your agency produced to us.

7    A  Okay.

8    Q  Would you look at the second half of the

9  first page, which has a page number of 47.  It

10  says, Theresa we missed you at last week's -- let

11  me backstep. It's dated November 6th, 2007; is it

12  not?

13    A  Okay.

14    Q  It says, Theresa we missed you at last

15  week's OA transition meeting with representatives

16  of the CFO's Office held on October 31st, 2007.  We

17  now have a better understanding of the systems used

18  by the office of OA CFO and what Presidential

19  records may be generated by those meetings now that

20  OA is a PRA organization.  We look forward to

21  future meetings with representatives of other

22  elements of OA.  We suggest that it would be

27 (Pages 102 to 105)

# Capital Reporting Company

Page 106

1  helpful now that OA considers itself a Presidential
2  component of the EOP. If in the next meeting we
3  had a general discussion of the functions that OA
4  uniquely performs for the president as opposed of
5  OA's monitoring or passing off on other agencies
6  functions. This general discussion would assist us
7  in giving better advice as to which of the OA IT
8  systems are creating Presidential records.
9        Do you know if those future discussions
10 have taken place?
11     A  Well, I know that -- I know that future
12 discussions took place.
13     Q  And do you know if there are any
14 documents that were generated by those discussions?
15     A  I don't know whether any documents were
16 generated or not.
17     Q  Now, this says, we suggest that it would
18 be helpful now that OA considers itself a
19 Presidential component. Do you know -- have you
20 had any discussions with personnel at the National
21 Archives and Records Administration about OA's
22 status under the Presidential Records Act or the

Page 107

1  Federal Records Act?
2      A  I have attended at least one meeting in
3  which a discussion was held as to the
4  responsibilities that OA indicated it would adhere
5  to in order to meet the obligations under the
6  Presidential Records Act.
7      Q  And when did that meeting take place?
8      A  Well, it occurred after November.
9      Q  After November of 2007?
10     A  It occurred after this date. I can't
11 tell you the exact date.
12     Q  And was the meeting at the Office of
13 Administration or at NARA?
14     A  Well, there have been a series of
15 meetings. There have been roughly eight meetings
16 with NARA, approximately eight meetings with NARA,
17 since August of 2007. There have been numerous
18 internal meetings in terms of preparing for the
19 meetings and to be responsive to NARA. I can't
20 give you the exact dates of those meetings.
21        A number of the meetings that were
22 coordinated with NARA were technical meetings in

Page 108

1  which the technical people of NARA were meeting
2  with the technical people at OA, which I was not
3  present because I could not provide any value in
4  terms of the technical issues and questions that
5  were generated.
6      Q  Do you know if any documents were
7  generated either internally or between the two
8  entities with respect to those meetings?
9      A  I don't know whether any documents were
10 generated or not.
11     Q  Did you have a role in locating
12 responsive documents for our document request?
13     A  I did. I was asked to look at my own
14 records to see what I had received that was
15 responsive.
16     Q  Do you know whether others within the
17 Office of Administration were similarly asked to
18 look for responsive records?
19     A  The responsibility in terms of
20 responsiveness to the request for production of
21 documents was delegated to OA's Office of General
22 Counsel.

Page 109

1      Q  Okay. And did you have occasion to see
2  all of the documents that had been produced to the
3  General Counsel's Office as potentially responsive?
4      A  I did not see -- what I saw was the
5  documents that were produced in response to the
6  request.
7      Q  Okay. Turning back to this e-mail, based
8  on what you know from the meeting or meetings you
9  did attend with NARA officials, is it your
10 understanding that prior to November of 2007, NARA
11 did not understand that OA was not an agency
12 subject to the Federal Records Act and the FOIA?
13        MS. SHAPIRO: Objection to form.
14     A  I don't know what NARA's understanding
15 was.
16     Q  And that was not -- none of the
17 discussions that happened between the two agencies
18 at these meetings shed any light on NARA's prior
19 understanding?
20        MS. SHAPIRO: Objection to form.
21     A  Not the two agencies because OA is not an
22 agency.

28  (Pages 106 to 109)

**Capital Reporting Company**

Page 110

1    Q    Two entities?
2    A    Two entities.  At one meeting I believe
3  that representatives of NARA referenced the fact
4  that OA was now an entity subject to the PRA, but I
5  can't recall specifically the discussions.  Most of
6  the discussions that I attended had to do with what
7  NARA wanted and what it needed in terms of
8  facilitating transfer of records to it by the end
9  of the administration.
10    Q    Has NARA provided the Office of
11  Administration with its advice as to which of OA's
12  IT systems are creating Presidential records?
13    A    I can't -- I do not know.  That would be
14  a matter among the technical people.
15    Q    Has NARA provided OA with any
16  recordkeeping guidance generally on compliance with
17  the Presidential Records Act?
18    A    My recollection is, is that in terms of
19  guidance, NARA has deferred to White House
20  Counsel's Office as to what Presidential record is.
21    Q    Do you know if there's anything in
22  writing from either NARA, the White House Counsel's

Page 111

1  Office, on that subject?
2    A    Well, I believe I had referenced a
3  memorandum from the then White House Counsel,
4  Harriett Meyers, that addressed the issue of the
5  Presidential Records Act and retention of records.
6    Q    Do you know of any other documents?
7    A    There was a document, I believe, issued
8  by then White House Counsel, Alberto Gonzalez, that
9  I had heard of, but the Memorandum of Guidance that
10  we had followed has been the memorandum issued by
11  Ms. Meyers.
12    Q    Mr. Swendiman, do you participate in any
13  interagency groups or forums?
14    A    I do not.
15    Q    Do you participate in any
16  intergovernmental groups?
17    A    I do not.
18    Q    Does anyone within the Office of
19  Administration, to your knowledge, participate in
20  any interagency groups or forums?  And by this I
21  don't mean a one-time event such as a conference.
22    A    None that I'm aware of.

Page 112

1    Q    And does anyone else, to your knowledge,
2  within OA participate in any intergovernmental
3  groups either at a federal or state level?
4    A    None that I'm aware of.
5    Q    In your position as Director of Office of
6  Administration, in addition to what you've
7  described to date, what is the nature of your
8  interaction with other federal agencies?
9    A    I would characterize my interaction with
10  other federal agencies as limited.  The primary
11  agency with which I've had contact is the General
12  Services Administration and that is because of the
13  fact that it's the owner of the EEOB and is
14  primarily responsible for the modernization of the
15  project and also other projects on the White House
16  complex.
17    Q    Do you serve as a representative for the
18  Office of Administration in any non-governmental
19  functions?
20    A    Could you repeat that --
21    MS. SHAPIRO:  Objection to form.
22    THE WITNESS:  Repeat that question again.

Page 113

1  BY MS. WEISMANN:
2    Q    Do you serve as a representative for the
3  Office of Administration at any non-governmental
4  functions?
5    A    I think I was invited to a dinner, which
6  included numerous people in which I got approval
7  from our Counsel's office as being a widely
8  attended event.  Right now I'm drawing a blank as
9  to -- oh, I think I recall.  I think it was the Fed
10  100 Dinner I was invited to attend, and that was
11  because the folks knew me from the General Services
12  Administration.
13    Q    What documents did you review prior to
14  your deposition?
15    A    Basically, the documents that were
16  produced in response to the request plus the two
17  Executive Orders plus Title 3, I think it's Section
18  107, dealing with pay.
19    Q    What is your last date of employment with
20  the Office of Administration?
21    A    It will be -- what's today -- I'm trying
22  to figure out what today is -- March 15th.

29  (Pages 110 to 113)

# Capital Reporting Company

| Page 114 |
|---|

1  Q   So you will continued to employed through
2  the 15th?
3  A   The payroll -- the way the government
4  works is that payroll ends on a Saturday and picks
5  up with a Sunday. My last fiscal day will be
6  tomorrow, March 14th.
7  Q   And where are you going?
8  A   The General Counsel of USAID.
9  Q   And when do you start your employment
10 there?
11 A   March 17th.
12 Q   When did you decide to change your last
13 date of employment from February 26th --
14     MS. SHAPIRO: Objection to form. It
15 builds assumptions.
16 BY MS. WEISMANN:
17 Q   -- to a subsequent date?
18 A   Well, I didn't actually change the date.
19 I think there's been a misunderstanding of what
20 occurred because I got that same question from
21 Committee staffers. I had indicated that, at least
22 for that week, I was going to be away the balance

| Page 115 |
|---|

1  of the week because I was attending a family
2  function out of town.
3  BY MS. WEISMANN:
4  Q   What did you decide that your last day
5  would be March 15th?
6  A   Once this deposition date was set.
7  Q   And when is your understanding of when
8  the deposition was set?
9  A   Well, let's see, when I was advised by --
10 I'm not sure if I was advised by DOJ Counsel or OA
11 General Counsel that an agreement had been reached
12 as to today's date, whenever that was, whenever you
13 all decided.
14     MS. SHAPIRO: Okay. If we can take a
15 short break. I need to sort of regroup. We may be
16 done. I'm not going to promise anything.
17     THE VIDEOGRAPHER: 12:55 p.m.; off
18 record.
19     (Recess taken.)
20     THE VIDEOGRAPHER: The time now is
21 1:03 p.m.; on record.
22 BY MS. WEISMANN:

| Page 116 |
|---|

1  Q   Mr. Swendiman, going back to the subject
2  of detailees, who oversea them while they're at
3  the Office of Administration?
4  A   Well, the individual or individuals who
5  would oversee them would be the head or supervisor
6  in a particular operating unit in which they are
7  working.
8  Q   And do you have any role in that
9  relationship with the detailee and supervision?
10 A   Not directly. I don't have a role in
11 that.
12 Q   Are there any reports that you or others
13 within OA have to prepare internally for detailees?
14 A   Well, first of all, I've got to get the
15 approval of the White House Management
16 Administration for getting detailees. We do have a
17 report that goes to the detailee's supervisor in
18 his or her government organization. Because they
19 serve for a period of time with us, the supervisor
20 generally wants a report on how well they did, you
21 know, what kind of job they did for us while they
22 were on detail. My understanding is, we keep track

| Page 117 |
|---|

1  of their time and attendance and we report that
2  back to their governmental organization.
3  Q   Okay. In addition to the agencies that
4  have been identified so far in this deposition as
5  ones to which the EOP provides services, are there
6  any others?
7      MS. SHAPIRO: Objection to form.
8      You can answer.
9  A   I cannot recall specifically. I think
10 the documents that have been shown was in reference
11 to the Navy, in reference to the Secret Service.
12 There's none that comes to my mind right now.
13     MS. WEISMANN: Okay. That concludes the
14 deposition from our perspective.
15     MS. SHAPIRO: Okay. I don't have any
16 questions to ask the witness. I just wanted to
17 note that we agreed to talk after the deposition
18 about the use of the videotape and confining it to
19 the contours of the litigation and that if we
20 couldn't agree you would give us an opportunity to
21 seek relief on that score.
22     MS. WEISMANN: Uh-huh.

30  (Pages 114 to 117)

**Capital Reporting Company**

Page 118

1    MS. SHAPIRO:  That's all we have.
2    MS. WEISMANN:  Okay.
3    MS. SHAPIRO:  Thank you.
4    THE VIDEOGRAPHER:  The time now is
5    1:06 p.m.  This concludes our videotape deposition.
6        (Whereupon, at 1:06 p.m., the
7        deposition of Alan R. Swendiman
8        was concluded.)
9            * * * * *

Page 120

6    ACKNOWLEDGEMENT OF DEPONENT

7    I, ALAN R. SWENDIMAN, do hereby acknowledge I

8    have read and examined the foregoing pages

9    of testimony, and the same is a true, correct

10   and complete transcription of the testimony given

11   by me, and any changes or corrections, if any,

12   appear in the attached errata sheet signed by me.

18   _____   _____
     Alan R. Swendiman    Date

Page 119

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Jodi Scheffel, RPR, the officer before
3    whom the foregoing deposition was taken, do hereby
4    certify that the witness whose testimony appears in
5    the foregoing deposition was duly sworn by me; that
6    the testimony of said witness was taken by me in
7    stenotype and thereafter reduced to typewriting
8    under my direction; that said deposition is a true
9    record of the testimony given by said witness, that
10   I am neither counsel for, related to, nor employed
11   by any of the parties to the action in which this
12   deposition was taken; and further, that I am not a
13   relative or employee of any attorney or counsel
14   employed by the parties hereto, nor financially, or
15   otherwise interested in the outcome of the action.

17        Jodi Scheffel
18        Notary Public in and for
19        the District of Columbia

21   My commission expires:
22   August 31, 2011

Page 121

1    Elizabeth Shapiro, Esquire
     U.S. Department of Justice
2    Civil Division
     20 Massachusetts Avenue, N.W.
3    Washington, D.C. 20001

5    IN RE:  CREW vs. Office of Administration
6    Dear Ms. Shapiro,
7        Enclosed, please find your copy of the
     deposition of ALAN R. SWENDIMAN, along with the
8    original signature page.
9        As agreed, you will be responsible for
     contacting the witness.  Within 30 days of receipt,
10   please forward errata sheet and original signed
     signature page to counsel for Plaintiff, Ms.
11   Weismann.
12       If you have any questions, please do not
     hesitate to call.  Thank you.

14       Yours,

16       Jodi Scheffel
         Reporter/Notary Public

18   cc:  Anne L. Weismann, Esquire

31  (Pages 118 to 121)

**EXHIBIT 11**



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

PROJECT CODE: P80107CHI                    DATE 1/4/2008

REIMBURSABLE AGREEMENT
BETWEEN
THE
EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
AND
THE DEPARTMENT OF EDUCATION

REIMBURSABLE AGREEMENT NUMBER: P80107CHI
REPORTING CATEGORY: P80107CHI

1. The Department of Education will provide financial support by funding official event costs associated with the visit of the President of the United States and the Secretary of Education to the Horace Greeley Elementary School in Chicago, IL on January 7, 2008 to meet with students and discuss NCLB and the importance of maintaining accountability in schools. This Reimbursable Agreement (RA) between the Department of Education and the Executive Office of the President (EOP), Office of Administration (OA), authorizes an amount not to exceed ten thousand dollars ($10,000.00).

2. Pursuant to the Economy Act (31 U.S.C. 1535 (EOP)) and (20 USC 3475 (ED)), the Department of Education and EOP enter into this agreement with respect to the event of the President of the United States on January 7, 2008. This agreement reduced to writing an agreement entered into by the Department of Education and the EOP orally and/or electronically prior to that date.

3. Following the event, funds will be collected monthly based upon event invoices received. The funds will be collected via the U.S. Treasury Intra-Governmental Payment and Collection (IPAC) System by the Executive Office of the President, Office of Administration. Once the event costs have been finalized, notification will be made of any funds available for deobligation. If IPAC is not available, checks must be made payable to the U.S. Treasury and sent c/o Executive Office of the President, Office of the Chief Financial Officer, Attn: Presidential Travel Team, 10th Floor – CFO/Accounting, 1800 G Street NW Washington, DC 20503. Please provide your Agency Location Code and any other financial information needed to process this transaction. The financial point of contact of the supporting agency will be notified prior to the collection of funds.

4. The point of contact for this letter of commitment is Heather Martin at

OA00354



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

5.  Agency Accounting Information:
    Agency Location Code:
    Appropriation:
    Accounting Data:
    DUNS #

EOP Accounting Information
Agency Location Code: 11030001
Appropriation: ~~1170110~~  1180110
Accounting Data:
DUNS# 031649358

_____ Date 1/3/08

NAME    JoAnn Ryan
TITLE    Executive officer, OS
DEPARTMENT/AGENCY  Department of Education

_____ 1/4/2008
                                    Date

Heather Martin
Branch Chief
Travel Services


ALC: 91-02-0001

APPROPRIATION: 9180806

ACCOUNTING DATA:

0800A2008A2008EA000000
5002536A00000000000000000

DUNS: 001044168

OA00355

**U.S. DEPARTMENT OF EDUCATION**
OUTGOING

### AGREEMENT BETWEEN FEDERAL AGENCIES
# FOR ED ORDER OF GOODS AND SERVICES

NOTE TO EDUCATION POINT OF CONTACT: Provide a brief explanation of the goods or services ordered, basis for determining costs, and estimated total costs for multi-year projects using the BS-008 EDBUYER Payment Addendum, SOW or MOU. GSA Optional Form 347 (Order for Supplies or Services) and BS-008 EDBUYER PAYMENT ADDENDUM must be attached to this Agreement. Applicable provisions of the FAR, Parts 3.1, 9.5, and 17.5, and all applicable conflict of interest laws and regulations are incorporated by reference with the same force and effect as if given in full text.

| EDUCATION OFFICE REQUESTING SERVICE: (BUYER) | OTHER FEDERAL AGENCY PERFORMING SERVICE: (SELLER) |
|---|---|
| PRINCIPAL OFFICE NAME: Office of the Secretary | AGENCY AND OFFICE NAME: The White House |
| ADDRESS: 400 Maryland Avenue, SW | ADDRESS: Executive Office of the President |
| Room 7E103 | Office of Administration |
| Washington, DC 20202 | Washington, DC |
| CONTRACTING OFFICER REPRESENTATIVE CONTACT NAME: William Doyle | INTERAGENCY AGREEMENT CONTACT NAME: Heather Martin |
| TELEPHONE NUMBER: 202-205-7851   FAX #: 202-401-1971 | TELEPHONE NUMBER:   FAX #: |
| EMAIL ADDRESS: William.Doyle@ed.gov | EMAIL ADDRESS: |
| BPN (DUNS) NUMBER: 0 0 1 0 4 4 1 6 8 | BPN (DUNS) NUMBER: 0 3 5 6 4 8 3 5 8 |
| ORDER NUMBER: E D - 0 8 - A R - 0 0 4 7 | INTERAGENCY REFERENCE NUMBER: P60107CHI |
| IAO NAME & INITIALS: William Doyle | |
| IAO EMAIL ADDRESS: William.Doyle@ed.gov | |
| TOTAL ORDER AMOUNT: $ 10,000.00       FISCAL YEAR: 2008 | |

PO FINANCIAL/BUDGET OFFICER SIGNATURE: _[signature]_ DATE: 1/3/08

FINANCIAL/BUDGET OFFICER SIGNATURE (SELLER): _[signature]_ DATE: 01/04/08

### AUTHORITY

ED AUTHORITY: 20 USC 3476          SELLER AUTHORITY: 31 USC 1535

### PERFORMANCE PERIOD

FROM: January 4, 2008          THROUGH: March 1, 2008

### ACCOUNTING DATA AND CLEARANCES

| FINANCING: (BUYING AGENCY - $ OUT) | | FINANCING: (SELLING AGENCY - $ IN) | |
|---|---|---|---|
| ALC: 9 1 - 0 2 - 0 0 0 1 | | ALC: 1 1 - 0 3 - 0 0 0 1 | |
| APPROP/TREASURY ACCT SYMBOL(TAS): 9180800 | APPROP/TREASURY ACCT SYMBOL(TAS): | APPROP/TREASURY ACCT SYMBOL(TAS): 1170116   11B0116 | APPROP/TREASURY ACCT SYMBOL(TAS): |
| AMOUNT: $ 10,000.00 | AMOUNT: $ | AMOUNT: $ 10,000.00 | AMOUNT: $ |
| APPROP EXP DATE: 9/30/2008 | APPROP EXP DATE: | | |
| APPROP CANCEL DATE: 9/30/2013 | APPROP CANCEL DATE: | | |
| BUSINESS EVENT TYPE CODE (BETC): D I S B | | BUSINESS EVENT TYPE CODE (BETC): C O L L | |
| Will initiate payment transaction: Yes ___ No X | | Will initiate payment transaction: Yes X No ___ | |

| ED CLEARANCES Sign and date below: | OTHER INFORMATION: (optional) |
|---|---|
| DCIO: _[signature]_ 1-4-2008   DCIO: _[signature]_ 1/4/08 | |
| EARL: _[signature]_ 1/4/08   BCAR: | |
| OCFO: _[signature]_ 1/4/08 | |

| APPROVALS FOR BUYING AGENCY | APPROVALS FOR SELLING AGENCY |
|---|---|
| APPROVING OFFICIAL PRINTED NAME: JoAnn Ryan | APPROVING OFFICIAL PRINTED NAME: Heather Martin |
| TITLE: Executive Officer | TITLE: Branch Chief |
| SIGNATURE & DATE: _[signature]_ 1/3/08 | SIGNATURE & DATE: _[signature]_ 1/3/2008 |

BS-008 EDBUYER (SEPT 2007)

OA00356

**U.S. DEPARTMENT OF EDUCATION**
OUTGOING
**EDBUYER PAYMENT ADDENDUM**
AGREEMENT BETWEEN FEDERAL AGENCIES
**FOR ED ORDER OF GOODS AND SERVICES**

**ED PRINCIPAL OFFICE (BUYER)**
Completes Sections I, II, III and IV

**I.    Payment Information:**

ORDER NUMBER:   E D - 0 8 - A R - 0 0 4 7

MODE:   REIMBURSEMENT [X]   ADVANCE OF FUNDS [ ]

TIMING:   LUMP SUM [X]   MONTHLY [ ]   QUARTERLY [ ]   OTHER (explain): _____

METHOD:   IPAC [X]   or   OTHER [ ] (explain): _____

**II.    Additional Financing Information:**   (Use this space if more than 2 ED appropriations are being used to fund this order)

Appropriation/TAS:
Amount:
Appropriation Expiration Date:
Appropriation Cancellation Date:

Appropriation/TAS:
Amount:
Appropriation Expiration Date:
Appropriation Cancellation Date:

**III.    Brief Description of Goods or Services Ordered:**   (A brief description of the goods must be furnished in this section.)
This interagency agreement provides financial support by funding official event costs associated with the visit of the President of the United States and the Secretary of Education to the Horace Greeley Elementary School in Chicago, IL on January 7, 2008 to meet with students and discuss NCLB and the importance of maintaining accountability in schools.

**IV.    Additional Terms and Conditions:**

MODIFICATION, TERMINATION, OR CANCELLATION
Each party may, at its option, modify, terminate, or cancel this agreement with   30   days notice to the other party.   (Enter the number of days notice as negotiated by the Parties.)
In the event an order is cancelled by the buyer, the seller is authorized to collect costs incurred prior to cancellation of the order plus any termination costs.

DISPUTE RESOLUTION
In the event of a dispute concerning either the accounting treatment or the contractual aspects of this agreement, the parties agree to resolve the dispute using the dispute resolution procedures set forth in Office of Management and Budget (OMB) Memorandum M-07-03, Business Rules for Intragovernmental Transactions, dated November 13, 2006, and Treasury Financial Manual, Volume 1, Bulletin No. 2007-03, Section VI. The link to the Business Rules is provided below.
http://www.fms.treas.gov/tfm/vol1/07-03.pdf.

**OTHER FEDERAL AGENCY (SELLER): Complete Section V**

**V.    Chief Financial Officer Required Information:**   (To be completed by the Selling Agency Finance Office.)
Complete either the reimbursement or advances section below based on the payment mode indicated in Section I above.
Questions pertaining to this section should be directed to the ED Finance Points of Contact: Leon Scott (202) 205-3421 or Carolyn Ashby (202) 401-1817;
Email: Leon.Scott@ed.gov or Carolyn.Ashby@ed.gov; Fax: (202) 205-0765

REIMBURSEMENTS:                                                              SELLING AGENCY NAME: _____ and Response/FEMA

1.  When will REVENUE be recognized?
   a) Upon signing of agreement: [X]   b) Upon receipt of IPAC cash: [ ]   c) As expenses accrue: [ ]
   d) Periodically the lesser of the specified billing amount or expenses incurred. Period is:   Monthly [ ]   Quarterly [ ]   Yearly [ ]   Upon Completion [ ]
   e) Periodically to the specified billing amount regardless of the expenses incurred period is:   Monthly [ ]   Quarterly [ ]   Yearly [ ]   Upon Completion [X]
   f) Other: _____

2.  When will RECEIVABLE be recognized?
   a) As expenses accrue: [ ]   b) Periodically for the lesser of the specified billing amount or expenses incurred period is:   Monthly [ ]   Quarterly [ ]   Yearly [ ]   Upon Completion [ ]
   c) Periodically for the specified billing amount regardless of the expenses incurred period is:   Monthly [ ]   Quarterly [ ]   Yearly [ ]   Upon Completion [X]
   d) Other: _____

ADVANCES:

1.  When will an ADVANCE FROM OTHERS be recognized?
   a) Upon signing of agreement: [ ]   b) Upon receipt of IPAC cash: [ ]   c) At the end of the fiscal year: [ ]   d) We are not going to recognize an entry to "Advances from Others" SGL 2310: [ ]
   e) Other: _____

2.  When will the ADVANCES FROM OTHERS be liquidated?
   a) At fiscal year end: [ ]   b) As expenses accrue: [ ]   c) Periodically, Period is:   Monthly [ ]   Quarterly [ ]   Yearly [ ]   Upon Completion [ ]
   d) Other: _____   e) Not applicable: [ ]

3.  If an advance is recognized, the ED Finance POC will be notified quarterly via fax or email of the advance liquidation and balance for elimination and expense recognition purposes.
   a) Agree: [ ]   b) Disagree and have discussed with ED Finance POC:   Comments: _____

4.  When will REVENUE be recognized?
   a) Upon signing of agreement: [ ]   b) Upon receipt of IPAC cash: [ ]   c) As expenses accrue: [ ]   d) Periodically, Period is:   Monthly [ ]   Quarterly [ ]   Yearly [ ]   Upon Completion [ ]
   e) Other: _____

Accounting/Finance Point of Contact:   NOTE: By signing this agreement, you agree that the amount received will be processed and indicated in Section IV above.

Heather Martin                                    January 4, 2008
Printed Name:        Signature:                   Date:

BS-008 EDBUYER PAYMENT ADDENDUM (SEPT 2007)

OA00357

| ORDER FOR SUPPLIES OR SERVICES | | | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | | 1 | | 3 |

IMPORTANT: Mark all packages and papers with contract and/or order numbers.

| | | 6. SHIP TO: |
|---|---|---|
| 2. CONTRACT NO. *(if any)*<br>ED-08-AR-0047 | a. NAME OF CONSIGNEE | |
| 3. ORDER NO. | 4. REQUISITION/REFERENCE NO. | b. STREET ADDRESS |
| 5. ISSUING OFFICE *(Address correspondence to)* EA<br>US DoED/OS, 400 Maryland Ave SW - Rm 7E103<br>Washington, DC, 20202, USA<br>William Doyle IV, 202-205-7851 | | c. CITY | d. | e. ZIP CODE |
| 7. TO: 00001733 | | f. SHIP VIA |
| a. NAME OF CONTRACTOR DUNS: 031649358<br>THE WHITE HOUSE | | |
| b. COMPANY NAME | | 8. TYPE OF ORDER |
| c. STREET ADDRESS<br>OFFICE OF POLICY DEVELOPMENT<br>ROOM 145, OEOB | ☒ a. PURCHASE<br>REFERENCE YOUR: -<br>Please furnish the following on the terms and conditions specified on both sides of this order and on the attached sheet, if any, including delivery as indicated. | ☐ b. DELIVERY – Except for billing instructions on the reverse, this delivery order is subject to instructions contained on this side only of this form and is issued subject to the terms and conditions of the above-numbered contract. |

| d. CITY<br>WASHINGTON | e. STATE<br>DC | f. ZIP CODE<br>20503 | |
|---|---|---|---|
| 9. ACCOUNTING AND APPROPRIATION DATA<br>See Schedule    Obligated Amount: $10,000.00 | | | 10. REQUISITIONING OFFICE |

| 11. BUSINESS CLASSIFICATION *(Check appropriate box(es))* | | | 12. F.O.B. POINT |
|---|---|---|---|
| ☐ a. SMALL  ☑ b. OTHER THAN SMALL  ☐ c. DISADVANTAGED  ☐ g. SERVICE-DISABLED VETERAN-OWNED | | | Destination |
| ☐ d. WOMEN-OWNED  ☐ e. HUBZone  ☐ f. EMERGING SMALL BUSINESS | | | |

| 13. PLACE OF | | 14. GOVERNMENT B/L NO. | 15. DELIVER TO F.O.B. POINT ON OR BEFORE *(Date)* | 16. DISCOUNT TERMS |
|---|---|---|---|---|
| a. INSPECTION | b. ACCEPTANCE | | | 0% 0 Days Net 0 |

**17. SCHEDULE (See reverse for Rejections)**

| ITEM NO.<br>(a) | SUPPLIES OR SERVICES<br>(b) | QUANTITY ORDERED<br>(c) | UNIT<br>(d) | UNIT PRICE<br>(e) | AMOUNT<br>(f) | QUANTITY ACCEPTED<br>(g) |
|---|---|---|---|---|---|---|
| | See Continuation Page For Line Item Details | | | | | |

| 18. SHIPPING POINT | 19. GROSS SHIPPING WEIGHT | 20. INVOICE NO. | | 17(h) TOT.<br>*(Cont. pages)* |
|---|---|---|---|---|
| *SEE BILLING INSTRUCTIONS ON REVERSE* | 21. MAIL INVOICE TO: EA | | | $10000 |
| | a. NAME | | | |
| | b. STREET ADDRESS *(or P.O. Box)*<br>US DoED/OS, 400 Maryland Ave SW - Rm 7E103 | | | 17(i) GRAND TOTAL |
| | c. CITY<br>Washington | d. STATE<br>DC | e. ZIP CODE<br>20202 | $10000 |

| 22. UNITED STATES OF AMERICA BY *(Signature)* | 23. NAME *(Typed)*<br>Norman P. Hall |
|---|---|
| | TITLE: CONTRACTING/ORDERING OFFICER |

AUTHORIZED FOR LOCAL REPRODUCTION<br>PREVIOUS EDITION NOT USABLE

OPTIONAL FORM 347 (REV. 3/2005)<br>Prescribed by GSA/FAR 48 CFR 53.213(e)

OA00358

| SCHEDULE Continued | | | | | |
|---|---|---|---|---|---|
| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE $ | AMOUNT $ |
| 0001 | This interagency agreement provides financial support by funding official event costs associated with the visit of the President of the United States and the Secretary of Education to the Horace Greeley Elementary School in Chicago, IL on January 7, 2008 to meet with students and discuss NCLB and the importance of maintaining accountability in schools.<br><br>ED staff in attendance will be Lauren Maddox, Emily Gribble, and Grant Lebens.<br><br>The authority for this agreement is the Department of Education (20 U.S.C. 3475) (Department of Education) and the Economy Act (31 U.S.C. 1535)(Executive Office of the President). Education and the EOP enter into this agreement with respect to the event of the President of the United States on Monday, January 7, 2008. This agreement reduced to writing an agreement entered into by Education and the EOP orally and/or electronically prior to that date.<br><br>Following the event, funds will be collected monthly based upon event invoices received. The funds will be collected via the U.S. Treasury Intra-Governmental Payment and Collection (IPAC) System by the Resource Management Division, Office of Administration, Executive Office of the President. Once the event costs have been finalized, notification will be made of any funds available for deobligation. If IPAC is not available, checks must be made payable to the U.S. Treasury and sent c/o Executive Office of the President, Office of the Chief Financial Officer, Attn: Presidential Team Accountant, 10th Floor, CFO/Accounting, 1800 G Street NW, Washington, DC 20503. Please provide your Agency Location Code and any other financial information needed to process this transaction. The financial point of contact of the supporting agency will be notified prior to the collection of funds.<br><br>Accounting and Appropriation Data:<br>0800A2008.A.2008.EA000000.500.2530A.000.000.0000.000000<br>$10,000.00 | 1.00 | SE | NTE<br>10,000.00 | NTE<br>10,000.00 |

OA00359

**EXHIBIT 12**



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

PROJECT CODE: P81205OMA                    DATE 12/05/2007

REIMBURSABLE AGREEMENT
BETWEEN
THE
EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
AND
THE DEPARTMENT OF HEALTH AND HUMAN SERVICES

REIMBURSABLE AGREEMENT NUMBER: P81205OMA
REPORTING CATEGORY: P81205OMA

SUBJECT:  Letter of Financial Commitment

1. The **Department of Health and Human Services** will provide financial support by funding official event costs associated with the visit of the President of the United States to **Omaha, NE on December 5, 2007, regarding Community Health Centers.** This Reimbursable Agreement (RA) between the **Department of Health and Human Services** and the Executive Office of the President (EOP), Office of Administration (OA), authorizes an amount not to exceed **ten thousand dollars ($10,000.00).**

2. Pursuant to the Economy Act (31U.S.C.  1535), the **Department of Health and Human Services** and EOP enter into this agreement with respect to the event of the President of the United States on **December 5, 2007.** This agreement reduced to writing an agreement entered into by the **Department of Health and Human Services** and the EOP orally and/or electronically prior to that date.  The funds will not be used for travel costs or food/beverage items.

3. Following the event, funds will be collected monthly based upon event invoices received. The funds will be collected via the U.S. Treasury Intra-Governmental Payment and Collection (IPAC) System by the Executive Office of the President, Office of Administration.  Once the event costs have been finalized, notification will be made of any funds available for deobligation.  If IPAC is not available, checks must be made payable to the U.S. Treasury and sent c/o Executive Office of the President, Office of the Chief Financial Officer, Attn: Presidential Travel Team, 10th Floor – CFO/Accounting, 1800 G Street NW Washington, DC 20503.  Please provide your Agency Location Code and any other financial information needed to process this transaction.  The financial point of contact of the supporting agency will be notified prior to the collection of funds.

4. The point of contact for this letter of commitment is Heather Martin **at**

OA00352

12/10/2007 09:29 FAX 690 6818    ASPE FORMAS    @005



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

5.  **Agency Accounting Information:  HRSA**
   **Agency Location Code:**  75-03-0030
   **Appropriation:**  7580350
   **Accounting Data:**  CAN 8-3981171
              ORG HRBPHC25000
              BA  160011098
              OC  25308
   **DUNS #044007990**
   **EIN #52-0821668**

EOP Accounting Information
Agency Location Code: ~~11080001~~ 11 0 3 0 0 0 1
Appropriation: 11~~8~~0110

DUNS# 031649358

_(signature)_  12/07/07
_____ Date

**Eugene Collins**
**Executive Officer**
**HHS/Executive Office**

_(signature)_  12/10/07
_____ Date

**Heather Martin**
**Branch Chief**
**Travel Services**
**Executive Office of the President**
**Office of Administration**

OA00353



### EXECUTIVE OFFICE OF THE PRESIDENT
#### OFFICE OF ADMINISTRATION
##### WASHINGTON, D.C 20503

PROJECT CODE: P80129BAL                              DATE: January 25, 2008

REIMBURSABLE AGREEMENT
BETWEEN
THE
EXECUTIVE OFFICE OF THE PRESIDENT
OFFICE OF ADMINISTRATION
AND
**DEPARTMENT OF LABOR**

REIMBURSABLE AGREEMENT NUMBER: P80129BAL
REPORTING CATEGORY: P80129BAL

SUBJECT: Letter of Financial Commitment

1. The **Department of Labor** will provide financial support by funding official event costs associated with the visit of the President of the United States to **Baltimore, MD** on **January 29, 2008.** This Reimbursable Agreement (RA) between the **Department of Labor** and the Executive Office of the President (EOP), Office of Administration (OA), authorizes an amount not to exceed **five thousand dollars ($5,000.00)** to advance faith-based initiatives that the Department of Labor supports.

2. Pursuant to the Economy Act (31U.S.C. 1535), **Department of Labor** and the EOP enter into this agreement with respect to the event of the President of the United States on **January 29, 2008.** This agreement reduced to writing an agreement entered into by **Department of Labor** and the EOP orally and/or electronically prior to that date.

3. Following the event, funds will be collected monthly based upon event invoices received. The funds will be collected via the U.S. Treasury Intra-Governmental Payment and Collection (IPAC) System by the Executive Office of the President, Office of Administration. Once the event costs have been finalized, notification will be made of any funds available for deobligation. If IPAC is not available, checks must be made payable to the U.S. Treasury and sent c/o Executive Office of the President, Office of the Chief Financial Officer, Attn: Presidential Travel Team, 10th Floor – CFO/Accounting, 1800 G Street NW Washington, DC 20503. Please provide your Agency Location Code and any other financial information needed to process this transaction. The financial point of contact of the supporting agency will be notified prior to the collection of funds.

4. The point of contact for this letter of commitment is Heather Martin at

OA00360



## EXECUTIVE OFFICE OF THE PRESIDENT
### OFFICE OF ADMINISTRATION
#### WASHINGTON, D.C 20503

5.  **Providing Agency Accounting Information:**      EOP Accounting Information
    Agency Location Code:                            ~~11080001~~ 11030001
    Appropriation:                                   11X0110
    Accounting Data:
    DUNS #:                                          031649358

6.  **Customer Agency Accounting Information:**      U.S. Department of Labor
    Agency Location Code:                            16-01-2014
    Accounting Codes:                                08-4001-RZAD-2589-71000-000
    Treasury Accounting Symbol:                      1680165
    DUNS #:                                          943992107
    Point of Contact:                                Larry Allen

_____  1/30/08 _____ Date        _____ 1/29/08 ____ Date

**Patrick Pizzella**                                **Heather Martin**
**Assistant Secretary for Administration & Mgt**    **Branch Chief**
**U.S. Department of Labor**                         **Travel Services**
**Ph:** _                                            **Executive Office of the President**
**Fax:**                                             **Office of Administration**

OA00361



**EXECUTIVE OFFICE OF THE PRESIDENT**
OFFICE OF ADMINISTRATION
WASHINGTON, D.C 20503

Determination and Finding

<u>Finding</u>

In accordance with interagency acquisition requirements of the Economy Act (31 U.S.C. 1535, see also Federal Acquisition Regulation (FAR) 48 C.F.R. § 17.503), this Determination and Finding (D & F) supports the above agreement between the Department of Labor (DOL - the requesting agency) and the Executive Office of the President (EOP – the servicing agency), under which DOL will acquire services from EOP:

1. Amounts are available.

2. Use of an interagency acquisition is in the best interest of the U.S. Government as the White House is coordinating the event with the Department of Labor providing supporting funds.

3. The services cannot be obtained as conveniently or economically by contracting directly with a private source. The White House will handle these services as part of normal processes for such events.

4. If the order requires or may require contracting action by the servicing agency, the following circumstances are applicable:

The acquisition will appropriately be made under an existing contract of the servicing agency, entered into before placement of the order, to meet the requirements of the servicing agency for the same or similar supplies or services;

The servicing agency has capabilities or expertise to enter into a contract for such supplies or services which are not available within the requesting agency; or

5. The servicing agency is subject to the Federal Acquisition Regulations.

<u>Determination</u>

Based upon the above, this action is determined to be appropriate under the Economy Act.

Authorized signatures:

_____
Patrick Pizzella
Assistant Secretary for Administration & Mgt
U.S. Department of Labor

OA00362



administrative resource center

# REIMBURSABLE SERVICES AGREEMENT

ARC Agreement No. <u>2051IA07-016</u>
Modification No. <u>1</u>

This agreement is entered on behalf of the Treasury Franchise Fund, Administrative Resource Center (Providing Agency), and the following Customer Agency, under the Treasury Franchise Fund authority, 31 U.S.C. 322, note and is inclusive of the attached MOU, schedules, and service descriptions.

Customer Agency: **Executive Office of the President**
**1800 G Street, NW 10th Floor**
**Washington, DC 20503**

Primary Contact: **Stephen O'Neill**
(Name)                    (Phone)              (FAX)

Secondary Contact:
(Name)                    (Phone)              (FAX)

| | | |
|---|---|---|
| FACTS(Dept/Bureau) ID: **1100** | Customer Agency ALC: **11-03-0001** | Obligation No: **OASI7C02** |
| TAFS Symbol: **1170038** | BETC Code: **DISB** | |
| Last BPN update: **02/06** | Customer DUNS/BPN: **031649358** | |

Services to be Provided: **Full Service Accounting for USTR per Section 8 of the attached Memorandum of Understanding. Modification #1 is to replace the current MOU with an updated version. No monetary change to the agreement.**

Period Covered: **10/1/2006 to 9/30/2007**       Estimated Costs: **$413,205.00**
Subject To Availability of Funds

Payment Provisions: **Monthly**       **Via IPAC**

---

## APPROVALS

**PROVIDING AGENCY**

*Michelle Yacoub for*
(Signature)
**Orlando Yaconis**       10/23/06
(Typed Name)       (Date)
**Deputy Executive Director**
(Title)
TREASURY FRANCHISE FUND
ADMINISTRATIVE RESOURCE CENTER
FRANCHISE SERVICES
200 THIRD STREET – AVERY BLDG 5 - I
PARKERSBURG WV 26106

PHONE: (304) 480-7227    FAX: (304) 480-7161
FACTS (DEPT/BUREAU) ID: 2045
ALC: 20-55-0861
TREASURY APPROPRIATION FUND SYMBOL (TAFS):
20X4560.010
DUNS/BPN: 126520464
BETC CODE: COLL

**CUSTOMER AGENCY**

*Stephen T. O'Neill*
(Signature – Financial Manager)
**Stephen T. O'Neill**       10-24-2006
(Typed Name)       (Date)
FINANCIAL OPERATIONS OFFICER
(Title)

(Signature – Program Official)
**Edgar Bennett**
(Typed Name)       (Date)
CHIEF FINANCIAL OFFICER
(Title)

OA00190

Agreement # : 2051IA07-016
Modification # :           1

**Bureau of the Public Debt**
**Administrative Resource Center**

**Executive Office of the President - USTR**
**Cost Schedule**
**10/01/06 - 9/30/07**

|  | Annual Fixed Costs |
|---|---|
| **Financial Management Services** | |
| Accounting Services | $413,205 |
| | |
| **Total Services** | $413,205 |

OA00191

Agreement # : <u>2051IA07-016</u>
Modification # :     1

**Bureau of the Public Debt**
**Administrative Resource Center**

**Executive Office of the President USTR**
**FTE and Transaction Volume Analysis**
**10/01/06 - 9/30/07**

|  | Annual Fixed Costs | Total FTE |
|---|---|---|
| **Financial Management Services** | | |
| Accounting Services | $413,205 | 4.497 |
| | | |
| **Total Services** | $413,205 | 4.497 |

|  | 06 Counts |
|---|---|
| **Financial Management Services** | |
| Invoice Documents | 1,054 |
| Commitment Documents | 0 |
| Obligation Documents | 190 |
| Billing Documents | 38 |
| Collection Documents | 106 |
| Centrally Billed Account Processing | 2,000 |

OA00192

**EXHIBIT 13**

# MEMORANDUM OF UNDERSTANDING
### Between
### Office of the Chief Financial Officer, Office of Administration,
### Executive Office of the President
### and
### Health and Human Services
### Program Support Center
### Division Of Payment Management

**PURPOSE:**

This Memorandum of Understanding (MOU) between the Office of the Chief Financial Officer (OCFO), Office of Administration, Executive Office of the President (EOP), and the Department of Health and Human Services (HHS), Program Support Center, Division of Payment Management, provides that HHS will process all grantee/recipient requests for funds (cash drawdowns) via the HHS Payment Management System (PMS) - SMARTLINK Electronic Funds Transfer (EFT).

**AUTHORITY:**

This MOU is entered into under the authority of The Economy Act, 31 U.S.C. Section 1535; The Chief Financial Officers Act, 31 U.S.C. Section 901, et seq., as amended by P.L. 106-58, Section 638; OMB Circular A-127 Revised (Transmittal Memorandum No. 2), Financial Management Systems; and OMB Circular 130, Revised (Transmittal Memorandum No. 4), Management of Federal Information Resources.

I. The EOP will:

A. The EOP Office of National Drug Control Policy (ONDCP) will provide HHS with current information regarding grantees, including:

  1. Authorization documents
  2. Recipient organization and banking information (SF 1199A)
  3. Verified organization name, signature, and bank account information on the completed SF 1199A

B. ONDCP will provide HHS with the following point of contact information:

  1. Contact name (primary & alternate)
  2. Mailing address (regular & overnight mail)
  3. Telephone numbers
  4. Fax numbers
  5. Email addresses

OA00014

C. ONDCP will provide HHS with the following information for each grant recipient:

  1. Contact name (primary and alternate)
  2. Mailing address
  3. Telephone numbers
  4. Fax numbers
  5. Email addresses

D. OCFO will provide HHS with a list of key personnel responsible for liaison and data transfer problem solving and/or enhancements.

E. OCFO and ONDCP will provide HHS with copies of EOP policies, procedures, and guidelines for PMS that impact operations and grantees.

F. ONDCP will adhere to HHS and Treasury requirements for paying grantees via SMARTLINK, and maintain the necessary authorizations to access PMS-SMARTLINK data bases.

G. OCFO will, on a monthly basis, reconcile grants paid through PMS with the corresponding data maintained in the EOP accounting records.


II. HHS will:

A. Provide an adequate back-up system for PMS to insure that ONDCP grantees are paid.

B. Maintain sufficient and adequately-trained staff to ensure that ONDCP grantees are paid when proper requests for funds are made.

C. Maintain the necessary equipment, etc., to ensure II(B) above. This includes providing the system access required for the Miami Service Center to perform its function.

D. Provide the necessary security to ensure that EOP and grantee data is not compromised.

E. Provide EOP with the appropriate points of contact for:

  1. Resolution of problems with or enhancements to services and data provided by PMS.

  2. Names, telephone numbers, and addresses of personnel responsible for assisting grantees with problems regarding payment rejections.


Page 2 of 6

OA00015

F. Provide the EOP with all appropriate system generated reports in a timely manner. These reports include:

   1. Payment reports
   2. SF-224
   3. SF-272
   4. Other reports as required

G. Provide EOP with access to data via computer inquiry and/or audits or related review.

H. Ensure that the PMS system provides an adequate audit trail of all transactions, and that proper accounting and administrative internal controls are in place and functioning.

I. Ensure that Treasury, Federal Reserve Bank, and other Federal requirements are adhered to as they relate to the processing of EOP payments.

III. Statement of Position

A. Normal Operations. It is the intent of the OCFO to have minimal impact on HHS. HHS is to coordinate all PMS activities with the EOP. OCFO will be involved in policy and administrative matters; not the day-to-day operations of the system.

B. Payment Approval and/or Confirmation. Grant authorizations will be documented and approved by ONDCP prior to grant funds being loaded into the HHS system. ONDCP will be responsible for validating all grant authorizations, and will initiate the loading of all grant authorizations into the HHS system. No grant funds shall be made available to grantees without complete and proper ONDCP approval.

ONDCP plans to utilize the National High Intensity Drug Trafficking Areas (HIDTA) Assistance Center (NHAC) in Miami, Florida to review and validate the completeness of grant payment requests. ONDCP will identify to the HHS Division of Payment Management, each user at the NHAC that is authorized to perform this task. ONDCP will also identify each grantee that is eligible for payment via the HHS system, and will identify all users who are authorized to request and approve payments.

It is an OCFO and ONDCP requirement that all grantee payment requests must be approved by the grantee approving official, and reviewed and released by either ONDCP or the NHAC. ONDCP agrees that each approved grant payment request will be signed by the grantee approving official, and include a certification by the grantee that the payment request is proper and correct. Approved payment requests will be reviewed by the NHAC to ensure that documentation is complete and in order. Only approved payment requests found by the NHAC to be complete and in order will be released by the NHAC for payment. ONDCP (or NHAC) will also be responsible for notifying grantees whose payment requests are not being

OA00016

released.

Since the NHAC is also a grantee under the ONDCP grant program, all NHAC grant payment requests must be reviewed and released by ONDCP. Under no circumstances shall the NHAC be allowed to release its own grant payment requests.

It is understood that over the course of each month, HHS will process and disburse funds to grantees from its own working fund. At the end of each month, HHS will provide an SF224 to OCFO and the U.S. Treasury reporting the funds that were disbursed by HHS to ONDCP grantees. These SF224's will result in the U.S. Treasury transferring funds from the EOP accounts to HHS to reimburse HHS for payments made to ONDCP grantees. OCFO hereby delegates the authority to HHS to disburse grant payments on behalf of ONDCP with the following stipulations:

1. HHS will only disburse funds for which corresponding grant authorizations have been loaded into the HHS grants system.

2. Grant authorizations will only be loaded into the HHS system by authorized EOP users or their designees.

3. HHS will only disburse funds for payment requests that have been approved and certified by authorized grantees.

4. HHS will only disburse funds for payment requests that have been released by authorized NHAC or EOP employees.

C. Coordination. During the implementation of PMS-SMARTLINK, all coordination (i.e., enhancements, meetings, training, etc.) will be through the OCFO. Following implementation, all coordination will be through the ONDCP.

IV. Funding

A. OCFO agrees to reimburse HHS for maintaining the PMS on a monthly basis, subject to the availability of funds, via Treasury's Online Payment and Collection System (OPAC). Billings will be made to ALC 11010005 and shall reference the interagency agreement number provided by the EOP.

B. The monthly cost to OCFO for PMS will be provided by HHS. Sufficient detail will be provided to allow the EOP adequate review of costs prior to payment.

C. The monthly billing should be FAXED to 202-395-7202, Attn: Office of the CFO.

OA00017

D.  The estimated annual costs to OCFO for PMS will be negotiated annually 90 days prior to the beginning of the fiscal year.  The estimates for fiscal year 2003 are 1,100 active grants at an annual cost of $100.00 per grant.  This cost will be prorated to the actual number of active grants at year end.


V.  Period of agreement

This agreement is effective on the date of signature of both parties.  The initial agreement is for the five year period from May 2003 through May 2008, but can be extended based upon both parties written consent.  An interagency agreement document (separate from this memorandum of understanding) will be issued by OCFO to HHS to authorize funding for these fees.


VI.  Termination

Either party may terminate this MOU by providing at least 60 days written notice to the other party.  Any termination of this agreement by HHS will not take effect until the OCFO has had sufficient time to find another service provider, including the securing of sufficient funding, and is able to transition in an orderly fashion to that service provider's system.  HHS will cooperate with any required transition.

This agreement may be modified by mutual consent of both parties.

OA00018

JUL-23-2003  12:58                                                                      P.07/07

_Michele C. Marx_                          _7/7/03_
Michele Marx                                Date
Associate Director, Management & Administration
Office of National Drug Control Policy


_Albert A. Muhlbauer_                       _7/7/03_
Albert A. Muhlbauer                          Date
Deputy Chief Financial Officer
Office of Administration, Executive Office of the President


_Philip J. Giza_                           _7/10/03_
Philip J. Giza                              Date
Director, Division of Payment Management
Financial Management Service
Program Support Center
Department of Health and Human Services


_Thomas F. Greene_                         _7/17/03_
Thomas F. Greene                            Date
Director, Financial Management Service
Program Support Center
Department of Health and Human Services


Page 6 of 6


OA00019

TOTAL P.07

**EXHIBIT 14**

(Date)

(Header)

(Greeting)

On behalf of the Executive Office of the President, Office of Administration, I would request the non-reimbursable detail of a qualified individual from your organization for a period of time not to exceed six months.

Current detail opportunities within OA lend valuable experience in the areas of information technology and financial management, specifically working alongside our Chief Information Officer and Chief Financial Officer. For you reference, attached are three current detail opportunities outlining specific duties and responsibilities.

In advance, I appreciate your attention and full consideration of this request. Should you have any questions, please feel free to contact me at

Sincerely yours,


Alan R. Swendiman
Special Assistant to the President and
 Director, Office of Administration

OA00319

**EXHIBIT 15**



**Department: Executive Office of the President**
**Agency: Office of Administration**
**Sub Agency: Office of Procurement and Contract Officer**

**Job Announcement Number:**
**OA-NRD-08-01-JJ**

Overview                                    

## Procurement Analyst/Contract Specialist

**Salary Range:** 0.00 - 0.00 USD per year

**Series & Grade:** GS-1102-12/13

**Open Period:** Thursday, October 18, 2007
to Friday, April 18, 2008

**Position Information:** Full-Time  Detail not to
exceed 6 months

**Duty Locations:** 1 vacancy - Washington, DC

### Who May Be Considered:
Current Permanent Federal employees in the Washington DC commuting who are interested in a non-reimbursable detail position.

### Job Summary:
The Office of Administration (OA) provides a full array of customer-based services to all entities of the Executive Office of the President (EOP). OA is composed of four offices: the Office of the Chief Financial Officer, the Office of the Chief Information Officer, the Office of the Chief Operating Officer and the Office of Security and Emergency Preparedness. In addition to these offices, OA also has a General Counsel and an Equal Employment Opportunity Division.

**THIS IS AN EXCELLENT CAREER BROADENING OPPORTUNITY TO SERVE A DETAILEE IN THE EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION. THIS ANNOUNCEMENT IS TO SOLICIT APPLICATIONS FOR A NON-REIMBURSABLE DETAIL UP TO 6 MONTHS.**

Duties

### Major Duties:
Position is located in the Office of Administration, Office of the Chief Procurement and Contract Officer.  The detailee in this position will comprehensively review the existing Purchase and Fleet Card Program.  The detailee would be expected to work with all staff involved in the program to gather information, develop best practices and streamline the process.  The detailee would ultimately need to incorporate this information by updating the "Standard Operating Procedures for use of the Government wide Commercial Bankcard Service" which details the procedures of the EOP Purchase and Fleet Card Program and train the staff and implement the process.  In order to be successful in this detail, this procurement analyst must have knowledge of federal purchase-card programs, and have knowledge of Federal Acquisition Regulations concerning purchase card programs.

OA00320

USAJOBS

Qualifications and Evaluation

## Qualifications:
**SECURITY CLEARANCE:** This position requires the detailee to obtain and maintain a security clearance. This means that a full field background investigation will be conducted including appropriate credit checks. A detailee starting date will depend on the outcome of pre-employment interviews and any additional information obtained prior to the initiation of a full background investigation. This component has the right to rescind the detailee agreement at any time before the actual starting date based on any negative information that may be found during a preliminary security and/or credit check. Detailees selected must be 18 years of age as of the detail start date.

**DRUG TESTING:** The detailee selected for this position will be required to submit to urinalysis screening for illegal drug use prior to start date. After starting, the detailee will be included in the component's random drug testing program.

**CITIZENSHIP:** Under Executive Order 11935, only United States citizens and nationals (residents of American Samoa and Swains Island) may compete for this detail opportunity.

## How You Will Be Evaluated:
APPLICANTS WILL BE EVALUATED ON THEIR EXPERIENCE/EDUCATION.

Benefits and Other Information

## Benefits:
**THIS IS AN EXCELLENT CAREER BROADENING OPPORTUNITY TO SERVE AS A DETAILEE IN THE EXECUTIVE OFFICE OF THE PRESIDENT, OFFICE OF ADMINISTRATION.**

How to Apply

## How To Apply:
ALL APPLICANTS MUST SUBMIT THE FOLLOWING:

· Resume

· Detailee Assignment Approval Form (located at the bottom of this announcement) signed by your supervisor. Once signed by your supervisor, please fax the document to the attention of Jarrett Johnson at (202)395-1262 or (202)395-1264

## THERE ARE 2 OPTIONS FOR APPLYING:

Email your resume to EOPJOBS@OA.EOP.GOV

OA00321

**OR**

You may submit your resume from the USAJOBS web site on the Internet. After reviewing the full text of this announcement, click on the 'Submit Resume on-line' shown on this page.

USAJOBS

Create or edit your resume.  Please be sure to use the space entitled "Supplemental Information" to add and/or fax any additional information specified in this announcement, as stated above.

When you have finished and select 'Send', your resume will be sent to our agency.  Electronic Resumes can only be sent using the special icon in our announcement.   To apply on-line, you must prepare your resume and SEND it before midnight Eastern Time of the closing date.

After you complete and send the OPM online resume, you will receive a web page message stating that your resume (for the specified announcement number) was sent to our agency. This message serves as a confirmation of your mailing. If you do not receive this statement that your resume was not successfully transmitted, you should try again.

Users of the Telecommunications Device for the Deaf (TDD) may call:  (202) 395-1160.

**Contact Information:**
Jarrett Johnson
Phone: 202-395-1088
Fax: 202-395-5608
Email: EOPJOBS@OA.EOP.GOV

Or write:
Executive Office of the President
725 17th Street NW
Washington, DC 20503
US
Fax: 202-395-5608

**What To Expect Next:**
**NON-REIMBURSABLE DETAILEE ASSIGNMENT APPROVAL**

I APPROVE MY EMPLOYEE _____ TO SERVE A NON-REIMBURSABLE DETAILEE ASSIGNMENT FOR THE OFFICE OF ADMINISTRATION, OFFICE OF THE CHIEF INFORMATION OFFICER FOR A SPECIFIED PERIOD OF TIME.    AS THE PARENT ORGANIZATION, I UNDERSTAND THAT I CAN TERMINATE THE DETAILEE ASSIGNMENT AT ANY TIME IF CONDITIONS WARRANT.

Supervisor or Approving Official Name/Date

Supervisor Title and Organization

OA00322

Supervisor Signature

USAJOBS

EEO Policy Statement

The United States Government does not discriminate in employment on the basis of race, color, religion, sex, national origin, political affiliation, sexual orientation, marital status, disability, age, membership in an employee organization, or other non-merit factor.

Reasonable Accommodation Policy Statement

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application and hiring process should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a case-by-case basis.



 **Send Mail**

**Send Mail to:**
Executive Office of the President
725 17th Street NW
Washington, DC 20503
US
Fax: 202-395-5608

**Questions?**

**For questions about this job:**
Jarrett Johnson
Phone: 202-395-1088
Fax: 202-395-5608
Email: EOPJOBS@OA.EOP.GOV

**USAJOBS Control Number:** 1038476



OA00323

**EXHIBIT 16**

 *National Archives and Records Administration*

*8601 Adelphi Road*
*College Park, Maryland 20740-6001*

May 6, 2007

Mr. Alan R. Swindeman
Director
Office of Administration
Executive Office of the President
Washington, DC 20503

By Fax: 202-456-6512

Dear Mr. Swindeman:

Based on recent press reports and a meeting that the Deputy Archivist of the United States and NARA General Counsel had with the Counsel to the President, I am writing concerning the possible loss of Federal records of the federal agency components of the EOP that are required to be maintained on the White House email system.

We request that you look into this matter to determine whether instances of alienation of Federal records actually occurred and then notify us of your findings. If you conclude Federal records were alienated without proper authorization, we request that you furnish us with a report as required and described under 36 CFR 1228.104 (Reporting Damage to, Alienation, and Unauthorized Destruction of Records). Your report should include a statement about the safeguards established to prevent further loss of records.

We look forward to your response and thank you for your cooperation. If you have any questions, please contact Laurence Brewer of the Life Cycle Management Division at 301-837-1539 or at laurence.brewer@nara.gov.

Sincerely,

*Paul M. Wester, Jr.*

PAUL M. WESTER, JR
Director
Modern Records Programs

OA00586

# EXHIBIT 17

yM Stern - RE: Follow-up    Page 1

| From: | "Payton, Theresa M." < |
|---|---|
| To: | "Sam Watkins" <                    >, "Turley, F. Andrew" |

>, "Medaglia, M. Elizabeth (Liz)"
"Reynolds, William D." <                    , "Crippen,
"Oprison, Christopher G."

**Date:** 11/7/07 10:14:23 PM
**Subject:** RE: Follow-up

Sam,
Just wanted to let you know that I received your note and we're having
discussions about when the next meeting will be.

Thanks for sending your questions and thoughts ahead of time so we can
review. The next time we get together, it would be good to discuss your
note below along with the action plan and the RACI (Responsible,
Accountable, Consulted, Informed) model so we can assign tasks and
owners for the next steps.

Hope you are doing well and that everyone has a safe holiday on
Veterans' Day. Semper Fi.

Thanks,
TP

-----Original Message-----
From: Sam Watkins
Sent: Tuesday, November 06, 2007 1:58 PM
To: Turley, F. Andrew; Medaglia, M. Elizabeth (Liz); Reynolds, William
D.; Crippen, Susan M.; Payton, Theresa M.; Oprison, Christopher G.
Cc: GaryM Stern; Jason Baron; Nancy Smith
Subject: Follow-up

Theresa,

We missed you at last week's OA transition meeting with representatives
of the CFO's office held on October 31, 2007. We now have a better
understanding of the systems used by the office of the OA CFO, and what
Presidential records may be generated by those systems now that OA is a
PRA organization. We look forward to future meetings with
representatives of other elements of OA. We suggest that it would be
helpful, now that OA considers itself a Presidential component of the
EOP, if in the next meeting we had a general discussion of the functions
that OA uniquely performs for the President as opposed to OA's
monitoring or passing off on other agencies functions. This general
discussion would assist us in giving better advice as to which of the OA
IT systems are creating Presidential records.

We (Gary Stern, Jason Baron, Nancy Smith, and I) were also afforded a
brief opportunity to view a paper copy of the 2005 spreadsheet or chart
(what has been referred to by some as the "2005 report") that first
raised concerns about the "message collection system." I refer to it as
a "message collection system" even though we all understand that it
hardly qualifies as a "system" by the usual IT definition.
Nevertheless, our brief review of the chart suggests a number of ideas
relating to how you might approach determining whether there is a


PLAINTIFF'S
EXHIBIT 9
3/3/08

00163 4

clearance of the person who will be able to apply the new forensic tool you have acquired).

1) On the chart, many files are identified as "issue" files, which I believe means the chart tool could not identify in which organizational PST the file should be deposited. We recommend that you examine some of these files to see if a closer look could determine what organizational element was appropriate.

2) Specific days for certain organizations show no messages collected/stored. We recommend that you run a search of the message system for anything for those days in that organization. If such a search produced a positive result, it would be a clear indication that the original chart was flawed (unless the messages have somehow been added since the original chart was run).

3) As we mentioned when we last met with you on Oct. 11, 2007, you also may be able to ascertain the meaning of the data elements in the chart by examining the spreadsheet in electronic form (for metadata in the form of formulas, comment fields, or other audit data on its creation that might exist). For example, the chart has a column labeled "expected" or "projected" number of messages for an organization for a particular day. The spreadsheet formulas might reveal where this number came from. Also, we will need some type of "expected numbers" with which to compare the results of your next chart generated with the new tool.

4) We have also mentioned this before, but it bears repeating: you could do some type of partial restore of messages from backup tapes, e.g., for a one day or one week time period, to allow you to compare the results against the chart. We are not suggesting initiating a full tape restoration project, but rather taking a sample to ascertain the scope of the problem.

5) Given that there appears to be a continuing level of confusion, or loss of institutional memory, as to the origination of the 2005 chart and its purpose, we agree with Chris's suggestion that it would be useful for someone to contact the original authors/requestors of the chart to ask questions about its nature and meaning, the methodology used to produce it, the shortcomings or flaws you have noted, and whether they prepared any additional or related documentation about the issue (and if so, where is it filed).

I hope these ideas are helpful, and would be happy to assist in following up or carrying out any of them. We look forward to continuing with our OA meetings and assume that another meeting will be scheduled soon.

Sam Watkins
Director, Product Management
National Archives & Records Administration

CC:       "GaryM Stern"      , "Jason Baron"

48

001635

**EXHIBIT 18**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01707 (HHK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| NATIONAL SECURITY ARCHIVE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No: 1:07-cv-01577 (HHK/JMF) |
| | ) | |
| EXECUTIVE OFFICE OF THE PRESIDENT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSES TO AND REQUEST FOR RECONSIDERATION
OF THE FIRST REPORT AND RECOMMENDATION ON
PLAINTIFF NSA's MOTION TO EXTEND TRO/PRESERVATION ORDER**

**INTRODUCTION**

Plaintiff NSA's latest request for expanding the Court's preservation order strays from

the core issues presented in the consolidated complaints. Although the complaints simply (1)

ask whether defendants should notify the Attorney General of any "unlawful removal . . . or

destruction of records" to initiate recovery action, 44 U.S.C. § 3106, and (2) question whether

defendants' record-keeping practices are adequate under the Federal Records Act ("FRA"),

plaintiff would sidetrack the Court on questions only marginally relevant, if at all, to the issues

Against this backdrop of the FRA's actual requirements and the nature of the remedy it provides, plaintiff's focus on the intricacies of technical questions about "slack space," "forensic copying," "remote querying," and ".pst files" misses the mark. The only relevant question before the Court is an "extremely narrow" one about the Court's ability, if necessary, to preserve its ability to afford effective relief on the merits.[3] Or. [11] at 2 (Oct. 19, 2007). This question has been addressed -- on numerous occasions – and resolved by the Court's November 12, 2007 Order. The disaster recovery back-up tapes in the Office of Administration's "possess[ion] or . . . custody or control," Or. [18] at 2 (Nov. 12, 2007), "should contain substantially all the emails sent or received in the 2003-2005 time period," Decl. of Theresa Payton [48-2] ¶ 12d (Jan. 15, 2008) ("Payton Decl."), and are under court-ordered preservation. Or. [18] at 2. The Court has satisfied any need to ensure itself the ability to afford effective future relief, and that should be the end of the matter.

It is therefore remarkable that NSA continues to ask this Court to consider imposing extreme injunctive relief that would impose significant burdens on the Office of Administration ("OA"), while providing no marginal benefit to the plaintiffs or the Court. The history of plaintiffs' repeated requests for injunctive relief illuminates just how far plaintiffs have strayed from the Court's initial inquiry about preserving its ability to provide effective relief. In relevant part, after the Court ordered defendants to preserve its disaster recovery backup tapes, see Or. [18] at 2 (Nov. 12, 2007), plaintiffs raised unsupported doubts about the completeness of the

---

3  Even then, plaintiffs have provided no underline{evidence} to establish the predicate condition for any concern about the Court's ability to afford relief:  that there are missing emails to justify its request for injunctive relief.  See, e.g., Defs.' Opp'n to Mot. for TRO [4]; Defs.' Obj. to report

disaster recovery back-up tapes and sought, among other things, expedited discovery on this and

other issues.  In response, this Court explained that "[t]o the extent that the missing emails are

contained on the back-ups preserved pursuant to Judge Kennedy's order, there is simply no

convincing need to expedite discovery."  Mem. Or. [46] at 3 (Jan. 8, 2008).  "If the missing

emails are not on those back-ups," this Court posited, "emails that might now be retrievable from

email account folders or 'slack space'" would be considered for preservation.  Id.  Thus, the

Court requested a "<u>small amount of information</u> not currently in the record," and posed four

questions to obtain that small amount of information.  <u>Id.</u> at 4 (emphasis added).

EOP defendants responded on January 15, 2008 with a declaration from Ms. Theresa

Payton, Chief Information Officer for the Office of Administration.  Among other things,

Ms. Payton explained that email sent or received between 2003 and 2005 should be on the

disaster recovery back-up tapes under court-ordered preservation.  <u>See</u> Payton Decl. ¶ 12(c); <u>see

also</u> <u>id.</u> ¶ 12(d) (explaining that "the back-up tapes should contain substantially all the emails

sent or received in the 2003-2005 time period," which are the emails that are the subject of the

lawsuit).

On March 11, plaintiffs CREW and NSA requested additional emergency relief,

contending that Ms. Payton's declaration contradicted earlier-sworn testimony provided before

the Committee on Oversight and Government Reform on February 26, 2008.  <u>See, e.g.</u>, Pl.

CREW's Mot. for Or. to Show Cause [57]; Pl. NSA's Emergency Mot. for TRO [58].  Plaintiffs

each alleged, in some form, that OA knew emails were missing from the EOP .pst file stores and

---

and Recommendations [12].