UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,

   Plaintiff,

      v.                                            Civil Action No. 07-964 (CKK)

OFFICE OF ADMINISTRATION,

   Defendants.

**MEMORANDUM OPINION**
(June 16, 2008)

Currently pending before the Court is the [47] Motion to Dismiss for Lack of Subject

Matter Jurisdiction brought by Defendant, the Office of Administration ("OA"), Executive Office

of the President ("EOP").  Pursuant to the Freedom of Information Act ("FOIA"), Plaintiff,

Citizens for Responsibility and Ethics and Washington ("CREW"), filed a request for documents

that CREW asserts OA assembled and prepared relating to the White House's alleged loss of

EOP e-mail records.  When OA failed to timely process CREW's FOIA request, CREW filed its

Complaint in this action, along with a temporary restraining order/preliminary injunction seeking

an order requiring OA to process and disclose the records CREW sought.  OA has now moved to

dismiss CREW's FOIA action, arguing that this Court lacks subject matter jurisdiction over

CREW's action because OA is not, as a matter of law, an agency subject to the FOIA.  OA first

raised this argument in an August 2007 motion for judgment on the pleadings, which this Court

denied without prejudice, in order to allow the parties to conduct very limited discovery, "out of

1

an abundance of caution." *See* Order, Feb. 11, 2008, Docket No. [33]. Following the completion

of that limited discovery, OA filed its [47] Motion to Dismiss for Lack of Subject Matter

Jurisdiction, which CREW vigorously opposes.

The question OA's Motion presents is a close one, and is not easily resolved by reference

to the limited body of D.C. Circuit case law addressing the agency status of units within the EOP.

Quite frankly, the parties' discovery in this action reveals that OA's functions, which are strictly

administrative, in large part distinguish it from the EOP components previously considered by

the D.C. Circuit, which perform more substantive functions. Nevertheless, the Court has

conducted a searching review of OA's Motion to Dismiss, CREW's Opposition, OA's Reply, the

exhibits attached to those filings, the relevant statutes and case law, and the entire record herein.

Based upon the foregoing, the Court concludes that OA is not an agency subject to the FOIA, and

shall therefore GRANT OA's [47] Motion to Dismiss. The Court's conclusion that OA is not an

agency subject to the FOIA obviates OA's obligation to comply with CREW's FOIA request.

The Court shall therefore DENY as moot CREW's [12] motion to modify this Court's

scheduling orders, which was previously held-in-abeyance, and which seeks further information

as to the documents withheld by OA in its responses to CREW's FOIA request. Finally, the

Court shall DISMISS this case in its entirety.

## I: BACKGROUND

A.    *Complaint Allegations and Procedural History*

According to CREW's Complaint, in October 2005, OA discovered an issue relating to

the EOP's process for retaining e-mail, and conducted a detailed analysis of the problem.

Compl. ¶ 19. On April 17 and 18, 2007, CREW sent two FOIA requests to OA seeking records,

regardless of format and including electronic records and information, relating to the potential

loss of e-mail records of the EOP. *Id.* ¶ 25, Exs. A (4/17/07 Letter from A. Weismann), Ex. B

(4/18/07 Letter from A. Weismann). CREW's FOIA requests identified six specific categories of

records and requested expedited processing. *Id.* ¶¶ 26-29, Exs. A and B. By letter dated April

27, 2007, OA acknowledged receipt of CREW's FOIA requests and granted CREW's request for

expedited processing. *Id.* ¶ 30, Ex. C (4/27/07 Letter from C. Ehrlich). Despite granting

CREW's request for expedited process, OA determined that it could not meet the time limits for

processing described in the FOIA given the scope of CREW's request, and provided CREW

"with the opportunity to either limit the scope of [its] request so that it might be processed within

the prescribed time limits or arrange an alternate time frame to process these records." *Id.* ¶ 30,

Ex. C. CREW responded to OA by letter dated April 30, 2007, in which it attempted to clarify

the scope of its FOIA requests. Compl. ¶ 31; Ex. D (4/30/07 Letter from A. Weismann).

On May 23, 2007, having received neither a production of documents nor an anticipated

date for the completion of processing, CREW filed its Complaint, along with its application for a

temporary restraining order/preliminary injunction. *See* Compl., Docket No. [1]; Motion for

TRO/PI, Docket No. [3]. In lieu of litigating CREW's TRO/PI, the parties agreed, through

Court-supervised negotiations, to a timetable for OA to process the priorities CREW identified

with respect to its TRO/PI. *See* Minute Entries, May 30, 2007; June 4, 2007 Order, Docket No.

[7]; and June 7, 2007 Order, Docket No. [9].

Pursuant to that timetable, OA made its first response to CREW's FOIA request on June

21, 2007, producing 50 pages of responsive documents and withholding 454 pages of potentially

responsive documents. *See* CREW Mot. to Modify, Docket No. [12], Ex. 1 (6/21/07 Letter from

C. Ehrlich).  In the letter accompanying that response, OA first asserted that it is not an "agency" subject to the FOIA, because it "provides common administrative support and services to components within EOP, including certain administrative support and services in direct support of the President."  *Id.*  OA asserted that it was nevertheless electing to process CREW's FOIA requests "as a matter of administrative discretion."  *Id.*  OA made its second response to CREW's FOIA requests on August 24, 2007, advising CREW that it had located, and was withholding, approximately 3,470 additional potentially responsive pages, and again asserting that it was not an agency subject to the FOIA  *See* OA Opp'n to CREW Mot. for J. on Pleadings, Ex. 5 (8/24/07 Letter from F. Andrew Turley).  OA also denied that it was an agency subject to the FOIA in its Answer to CREW's Complaint, filed on June 25, 2007.  *See* Answer ¶ 7.

After OA's first response, CREW moved to modify the Court's previous scheduling Orders to require OA to provide a *Vaughn* index for withheld documents.  *See* CREW Mot. to Modify, Docket No. [12].  OA opposed that motion, and alerted the Court and CREW that it intended to move to dismiss this action on the grounds that OA is not an agency subject to the FOIA.  OA Mot. at 3; 7/27/07 Joint Status Report, Docket No. [17].  On August 7, 2007, the Court entered an Order setting a briefing schedule for OA's motion and holding in abeyance CREW's motion to modify pending resolution of OA's motion.  *See* Order, Docket No. [18].  OA subsequently filed its motion for judgment on the pleadings and, as noted above, on February 11, 2008, this Court issued an Order denying that motion without prejudice and "out of an abundance of caution," allowing the parties to conduct "*very limited* discovery–which might be considered jurisdictional in nature."  *See* Order, Feb. 11, 2008, Docket No. [33] at 1.  Specifically, the Court instructed that, in light of the considerations set forth in the relevant D.C.

4

Circuit precedent, the parties' discovery would be limited to "the manner in which OA carries out the authority delegated to it in its charter documents and any functions that OA in fact carries out beyond those specifically delineated in its charter documents." *Id.* at 6.

In connection with that discovery, "OA produced to [CREW] over 1,300 pages of documents, and made OA's then Director, Alan R. Swendiman, available for deposition." OA MTD at 7. Also, pursuant to Court Order, OA produced to CREW one document relating to OA's implementation of the Presidential Records Act, *see id.* (citing Docket No. [42]), and submitted the declaration of OA's General Counsel, M. Elizabeth Medaglia, which responded to factual questions the Court posed during a March 28, 2008 telephone conference, *id.  See* OA Opp'n to CREW Mot. to Compel, Ex. 1 (hereinafter "Medaglia Decl.").[1]

B.    *OA's Establishment and Functions*

The Office of Administration was established as a unit within the EOP by President James Carter's Reorganization Plan No. 1 of 1977.  OA MTD at 2; Reorganization Plan No. 1 of 1977 (hereinafter "Reorganization Plan"), § 2, 42 Fed. Reg. 56101, 91 Stat. 1633.  Under the Reorganization Plan, OA "shall be headed by the President," and "shall provide components of the [EOP] with such administrative services as the President shall from time to time direct."

---

[1] CREW attempts to challenge Ms. Medaglia's Declaration by stating that she "was not subject to cross-examination by plaintiff and defendant's submission of [Ms. Medaglia's] declaration contravenes this Court's Order of February 11, 2008, denying defendant's request 'to provide a declaration as to OA's functions and authority in lieu of engaging in discovery.'" CREW Opp'n at 6-7 (quoting Order, Feb. 11, 2008, Docket No. [33]).  However, OA did not submit Ms. Medaglia's Declaration in lieu of discovery.  Instead, OA submitted Ms. Medaglia's Declaration in order to provide answers to certain questions posed by the Court during a March 28, 2008 telephone conference (necessitated by a motion to compel filed by CREW), and specifically in response to this Court's March 30, 2008 Order requiring it to do so.  *See* Order, March 30, 2008, Docket No. [41].

Reorganization Plan § 2. The Reorganization Plan further provides that there "shall be a Director of [OA]," who "shall be appointed by the President and shall serve as chief administrative officer of [OA]." *Id.* In his message to Congress accompanying the Reorganization Plan, President Carter explained that his proposed reorganization, including the creation of OA, "was based on the premise that the EOP exists to serve the President and should be structured to meet his needs." OA MTD, Ex. 1 at 3. In particular, President Carter explained that establishing the centralized OA would create a "focus for monitoring the efficiency and responsibility of administrative services," as well as a "base for an effective EOP budget/planning system through which the President can manage an integrated EOP rather than a collection of disparate units." *Id.* at 8.

President Carter set forth OA's specific duties and responsibilities in Executive Order No. 12028, 42 Fed. Reg. 62895 (Dec. 12, 1977), *as amended by* Executive Order No. 12122, 44 Fed. Reg. 11197 (Feb. 26, 1979).[2] Pursuant to Executive Order No. 12028, OA "shall provide common administrative support and services to all units within [EOP], except for such services provided primarily in direct support of the President," and "shall, upon request, assist the White House Office in performing its role of providing those administrative services which are primarily in direct support of the President." *Id.* § 3(a). Executive Order No. 12028 continues to

---

[2] Executive Order No. 12122 amended only section 4 of Executive Order No. 12028, by deleting the reference to OA employing personnel, "subject to such direction that the President may provide or require," in section 4(a) and adding a new subsection, 4(c), which governs the OA Director's authority to appoint and fix the pay of employees. *See* Exec. Order No. 12028, § 4(a), Exec. Order No. 12122 § 4(c). Executive Order No. 12122 also added subsection (b), designating the OA Director "to perform the functions of the President under Section 107(b) of Title 3 of the United States Code, "in order to provide limited employment authority for [OA]." *Id.* § 4(b).

state that OA shall provide "all types of administrative support and services that may be used by, or useful to, units within [EOP]," including, but not limited to, "personnel management services, including equal employment opportunity programs . . . financial management services . . . data processing . . . library, records, and information services . . . office services and operations, including: mail, messenger, printing and duplication, graphics, word processing, procurement, and supply services." *Id.* § 3(b).  In addition, Executive Order No. 12028 transferred and reassigned to OA the "primary responsibility for performing all administrative support and service functions of units within [EOP] . . . except to the extent that those functions are vested by law in the head of such a unit, other than the President" or "are performed by the White House Office primarily in direct support of the President." *Id.* § 5.

The President's appointment of the Director of OA is not subject to Congressional approval.  OA MTD at 24.  As set forth in Executive Order No. 12028, the Director of OA "report[s] to the President," currently through the Deputy Assistant to the President for Management and Administration.  Exec. Order No. 12028, § 2;  OA MTD at 4, Ex. 2 (Mar. 13, 2008 Tr. of Swendiman Dep.) (hereinafter "Swendiman Tr.").  The Director of OA also carries the additional title of Special Assistant to the President.  Swendiman Tr. at 6.  The Director is "responsible for ensuring that [OA] provides units within the [EOP] common administrative support and services."  Exec. Order No. 12028, § 2.  In particular, pursuant to Executive Order No. 12122, the Director "organize[s] [OA], contract[s] for supplies and services, and do[es] all other things that the President, as head of [OA], might do." Exec. Order No. 12122, § 4(a). However, the OA Director is "not accountable for the program and management responsibilities of units within the [EOP]," to which OA provides administrative services, rather "the head of

7

each unit [] remain[s] responsible for those functions." *Id.* § 4(d).  Further, the Director preforms

his duties "[s]ubject to such direction and approval as the President may provide or require." *Id.*

§ 4(a).

OA's Fiscal Year 2009 Budget describes its mission as "to provide enterprise-level

administrative services to the [EOP] and the Office of the Vice President."  OA MTD, Ex. 3 (FY

2009 Budget) at OA-3.  According to OA's most recent Budget submission, OA is organized

along the following lines:

• Office of the Director, which includes the Office of the General Counsel and the Equal Employment Opportunity Office;

• Office of the Chief Operating Officer, which "manages human resources, library, office supply, receiving and warehousing, duplicating, facilities management, telecommunications, and mail/messenger functions;"

• Office of the Chief Financial Officer, which "directs, manages, and provides policy guidance and oversight of financial management activities and operations [for EOP components], including travel support;"

• Office of Security and Emergency Preparedness, which "is responsible for oversight of EOP security, emergency preparedness, and continuity of operations programs," and "serves as a liaison with the United States Secret Service;"

• Office of the Chief Facilities Management Officer, which "oversees services and space allocations within EOP buildings, and also serves as a liaison with the General Services Administration ["GSA"];"

• Office of the Chief Procurement and Contract Management Officer, which "oversees the issuance of contracts and purchase orders on behalf of EOP components;" and

• Office of the Chief Information Officer, which "delivers strategic and operational technology leadership to EOP components supported by OA."

*Id.*  OA currently has a staff of more than 200 employees.  *Id.* at OA-4.

In exercising the authority delegated to it under its charter documents, OA carries out a

variety of functions that lead it to interact with entities (including Executive Branch agencies)

outside of EOP.  Specifically, as authorized in Executive Order No. 12028, OA contracts with non-EOP agencies for a variety of services to be performed for OA and for other EOP components.  *See* OA MTD at 19.  In doing so, OA "sometimes uses procurement organizations within the federal government (such as GSA; GovWorks, a component of the Department of the Interior; and NASA SEWP, a component of the National Air and Space Administration) to procure supplies and services on behalf of the EOP."  *Id.*; CREW Opp'n at 19-20 (describing OA contract with GovWorks).  OA also enters into reimbursable agreements with various federal agencies to outsource certain administrative services.  OA MTD at 19; CREW Opp'n at 20.  In particular, the parties' briefs describe the following contracts between OA and other federal agencies, each of which serves to provide EOP components with administrative services:

•      A reimbursable services agreement with GSA for GSA's improvement of the White House Press Office, *see* OA MTD at 19, CREW Opp'n at 20;

•      An interagency agreement with the Department of Health and Human Services ("HHS"), Division of Payroll Management that provides for HHS to process and manage grants awarded by the Office of National Drug Control Policy, an EOP component.  OA MTD at 19, CREW Opp'n at 21;

•      A contract with the Bureau of Public Debt, Administrative Resource Center ("ARC"), which provides for the ARC to handle OA's payroll and certain financial management systems, OA MTD at 19; and

•      Contracts for OA to reimburse federal agencies when they incur expenses (on the EOP's behalf) in connection with the President's or the First Lady's attendance at events sponsored by those agencies, *id.* at 20, CREW Opp'n at 20.

CREW stresses the fact that many of OA's contracts with non-EOP agencies are described as "interagency agreements" under the authority of the Economy Act, 31 U.S.C. § 1535.  *See* CREW Opp'n at 21.  The Court will address the legal significance of this fact in the Discussion section below.

In addition to contracting with various federal agencies for those agencies to provide supplies and services *to* EOP components, OA has entered into interagency agreements with several non-EOP entities (including the Navy, the Secret Service, the Harry S. Truman Scholarship Foundation, the White House Fellows, the President's Commission on White House Fellowships, the White House Communications Agency, and the General Services Administration) which obligate OA to provide specific services *for* those entities, namely voice systems operation and maintenance on the White House complex.  CREW Opp'n at 20, Exs. 8-9, OA MTD at 19, OA Reply at 5 n.4.  As OA explains, OA assumes these obligations "because of those entities' presence [on the White House complex] to support the EOP."  OA MTD at 19; *see also* Swendiman Tr. at 90:3-91:21 ("[O]ftentimes the service that we're providing is actually for the benefit of OA in order for us to service – service the President and White House Management Administration.").

Beyond contracting with various non-EOP entities, the record shows that OA interacts with such entities in a few additional ways.  Specifically, OA procures temporary or intermittent experts, consultants, and detailees from various federal agencies, and the OA Director may be personally involved in the process of procuring detailees.  OA MTD at 17, CREW Opp'n at 22 (citing CREW Ex. 14, letter from A. Swendiman requesting detailee), Swendiman Tr. at 77:14-79:20.  However, OA Director Swendiman testified during his deposition that all details are subject to approval by the detailee's supervisor.  *Id.* at 79:3-13, 116:12-117:2.  CREW notes that "in at least one instance OA posted a job vacancy for a detailee" that included a Reasonable Accommodation Policy Statement pursuant to the Americans With Disabilities Act, which stated that "Federal agencies must provide reasonable accommodation to applications with disabilities

10

where appropriate . . . ." CREW Opp'n at 22 (citing CREW Ex. 15 at p.4). Again, the Court will address the legal significance of this fact in the Discussion section below.

Finally, OA interacts with the National Archives and Records Administration ("NARA") in connection with the record preservation/management functions OA performs for itself and other EOP components. OA MTD at 20.

C.    *OA's Past Functioning Under the FOIA*

In 1978, shortly after the establishment of OA, President Carter's Associate Counsel addressed a memorandum to the Deputy White House Counsel, in which he concluded–based on the District of Columbia Circuit's opinion in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) and the legislative history surrounding the 1974 Amendment to the FOIA–that because "OA performs functions for other offices within the EOP and there are no identifiable units within the OA which function solely to serve the President," "it is reasonable to conclude that [OA] is an 'agency' subject to the Act." CREW Mot. to Suppl. Opp'n to OA Mot. for J. on Pleadings (hereinafter "CREW Suppl."), Ex. A (6/28/78 Mem. from P. Apodaca to M. McKenna) at 2 (hereinafter the "1978 Memorandum"). Consistent with the 1978 Memorandum, OA published its first FOIA regulations in 1980, providing that "all records by [OA] are available to the public," and continued to publish FOIA regulations through the commencement of this action. CREW Opp'n at 24 (citing 5 C.F.R. § 2502.16).

According to the Declaration of OA's General Counsel, M. Elizabeth Medaglia, the issue of whether OA was an agency subject to the FOIA surfaced in 1995, following the district court's decision in *Armstrong v. EOP*, 877 F. Supp. 690 (D.D.C. 1995), which found (in a decision that was later reversed, discussed below) that the National Security Council's ("NSC") was an

"agency" under the FOIA.  Medaglia Decl. ¶ 5.  Since then, Ms. Medaglia avers, the issue has

been discussed from time to time within the Executive Branch.  *Id.*  In 2000, OA raised the

prospect that it was not an agency subject to the FOIA in a brief filed in a Privacy Act case, *Barr*

*v. EOP*, Civ. A. No. 99-1695 (JLG).  *See* OA MTD at 25 n.6, Ex. 6 (OA Mem. in Support of

Partial Summ. J. Mot.) at 26 n.8.  Specifically, OA noted that no court had found OA to be "an

'agency' within the meaning of the FOIA," and stated that

> Given the fact that the Executive Order creating [OA] expressly provides that the
> Director of [OA] is "not accountable for the program and management
> responsibilities of units within the [EOP]," Exec. Order No. 12028, 42 Fed. Reg.
> 62895 (Dec. 12, 1977), *as amended* by Exec. Order No. 12122, 44 Fed. Reg.
> 11197 (Feb. 26, 1979), at ¶ 4(d), there is reason to doubt that [OA] has the type of
> "substantial independent authority" that is a necessary precondition for an entity
> within the [EOP] to be deemed an "agency."

OA MTD, Ex. 6 at 26 n.8.  However, the *Barr* court did not ultimately address the question of

whether OA is an agency subject to the FOIA, nor has any other court before or after that case.

According to Ms. Medaglia, in April 2006, the White House Counsel's Office requested

the advice of the Office of Legal Counsel ("OLC") of the Department of Justice regarding OA's

status under the FOIA, and a deliberative process regarding that question ensued from April 2006

through August 2007.  *Id.* ¶ 6.  That process "involved written and oral communications between

and among the Department of Justice, OA, and the White House Counsel's Office, including

preliminary legal advice from OLC on the issue."  *Id.*  According to Ms. Medaglia, the final

decision that OA was not an agency subject to, and therefore would no longer comply with, the

FOIA was made on August 21, 2007, as a result of the deliberative process, and after OLC

formally memorialized its legal advice in a memorandum to the White House Counsel's Office.

*Id.* ¶¶ 6, 8-9.  OA first publicly took the position that it is not an agency subject to the FOIA in its

12

Motion for Judgment on the Pleadings filed in this case on August 21, 2007.

Ms. Medaglia avers that on several occasions during the period in which the deliberative process was ongoing, "although not consistently, OA included language in its FOIA responses advising the requesters that OA was processing their requests as a matter of administrative discretion." *Id.* ¶ 7. According to Ms. Medaglia, "[s]ome of these written responses were sent prior to OA's receipt of CREW's FOIA requests in April 2007." *Id.* Ms. Medaglia avers that OA ceased processing FOIA requests on July 27, 2007, and that "[b]etween that date and September 12, 2007, OA retained pending FOIA requests due to the status of the deliberative process. On September 12, 2007, OA began responding to requesters by advising them that OA is not subject to FOIA and returning their requests. Since September 12, 2007, OA has consistently responded to requests this way." Medaglia Decl. ¶ 10.

Notwithstanding the Executive Branch's internal debate regarding OA's legal status under the FOIA, however, it appears that until a final decision was reached on that issue in August 2007, OA considered itself an agency subject to the FOIA and operated as such. *See* OA Reply at 14 ("OA originally viewed itself as subject to FOIA and acted accordingly. Upon review of OA's status, however, it was determined that OA does not fall within the definition of 'agency' under FOIA."). To wit, the White House website maintains copies of OA's annual FOIA reports dating back to 1996, *see* www.whitehouse.gov/oa/foia/readroom.html, and through August 2007 listed OA among the EOP components subject to the FOIA, as differentiated from those components not subject to the FOIA, *see* CREW Opp'n at 24, Ex. 4 (copy of

www.whitehouse.gov/oa/foia/ handbook.html as of August 31, 2007).[3]

Consistent with OA's pre-August 2007 belief that it was an agency pursuant to the FOIA, OA also complied with the Federal Records Act through August 2007, based on case law holding that "coverage of the FRA is coextensive with the definition of 'agency' in the FOIA." Medaglia Decl. ¶ 11 (quoting *Armstrong v. EOP*, 90 F.3d 553, 556 (D.C. Cir. 1996)). Ms. Medaglia avers that, "[o]nce the final decision was reached that OA is not subject to, and will no longer comply with, FOIA, OA began implementation of its [Presidential Records Act ("PRA")] status." *Id.* ¶ 12. That implementation began with an August 31, 2007 memorandum that OA distributed "to its personnel regarding their recordkeeping obligations" under the PRA. *Id.* ¶ 13.

As CREW notes, on May 6, 2007, Paul Wester, Jr., Director of the Modern Records Programs at NARA, wrote to then-OA Director Swendiman "concerning the possible loss of Federal records of the federal agency components of the EOP that are required to be maintained on the White House email system." CREW Opp'n at 23-25, Ex. 16 (5/6/07 Letter from Wester to Swendiman). In that letter, Mr. Wester requested, in the event that OA Director Swendiman concluded that "Federal records were alienated without proper authorization," that Mr. Swendiman "furnish [NARA] with a report as required and described under 36 CFR 1228.104." *Id.* at Ex. 16. CREW stresses that the regulation Mr. Wester cites in his letter imposes obligations on "[t]he head of a Federal agency." CREW Opp'n at 24-35. However, this fact is

---

[3] The EOP components previously listed as subject to the FOIA included: OA; Council on Environmental Quality; Office of Management and Budget; Office of National Drug Control Policy; Office of Science and Technology Policy; and Office of the United States Trade Representative. *See* OA Opp'n, Ex. 3. The EOP components listed as not subject to the FOIA included: White House Office; Office of the Vice President; Council of Economic Advisers; National Security Council; Office of Policy Development; and President's Foreign Intelligence Advisory Board. *Id.*

unremarkable because it is uncontested that, as of May 2007, OA still operated as an agency subject to the FRA, such that Mr. Wester's May 6, 2007 letter would address Mr. Swendiman as the head of an agency complying with the FRA.

Finally, as to other recordkeeping obligations, CREW stresses that Mr. Swendiman testified during his deposition that OA has not changed its Privacy Act regulations since determining that OA is not an agency subject to the FOIA, even though that determination means that OA is likewise not subject to the Privacy Act, *see* 5 U.S.C. § 552a(a)(1) (cross-referencing the definition of agency in the FOIA, 5 U.S.C. § 552(f)(1)).  CREW Opp'n at 24-25 (citing Swendiman Tr. at 58).  Similarly, CREW stresses Mr. Swendiman's testimony that OA currently has Touhy regulations in place, which set forth OA's procedures for responding for requests for records and agency testimony in litigation to which OA is not a party, and notes that OA's Touhy regulations reference the FOIA as their authority.  OA MTD at 25 (citing Swendiman Tr. at 59, *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), and 5 U.S.C. § 2502.30).  Again, the legal implications of these facts will be addressed in the Discussion section below.

## II: LEGAL STANDARD

OA brings its Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks jurisdiction to entertain CREW's claims pursuant to the FOIA because OA is not an "agency" subject to that statute.  As the Court explained in its February 11, 2008 Order allowing the parties to engage in limited discovery, "[a]lthough the D.C. Circuit has held that the issue of an EOP component's agency status under FOIA goes to whether the plaintiff has stated a claim upon which relief can be granted, *see* [*Sweetland v. Waters*, 60 F.3d 852, 855 (D.C. Cir. 1995)], under Supreme Court precedent, the issue at least arguably goes to

15

the Court's jurisdiction to hear a FOIA case." Docket No. [33] at 4.[4]  Specifically, in  *Kissinger*

*v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980), the Supreme Court

stressed that "federal jurisdiction [under the FOIA] is dependent on showing that an agency has

(1) 'improperly' (2) 'withheld' (3) 'agency records.'" *Id.* at 150.   Further, in *Department of*

*Justice v. Tax Analysts*, 492 U.S. 136 (1989), the Supreme Court expressly stated that "[u]nless

each of these criteria is met, a district court lacks jurisdiction to devise remedies . . . ."  *Id.* at

142.  In light of this precedent–and the jurisdictional posture of the discovery in this case–Rule

12(b)(1) appears to be the proper authority for OA's Motion to Dismiss.  *See Wang v. EOP*, Civ.

A. No. 07-0891, 2008 WL 180189 (D.D.C. Jan. 18, 2008) (dismissing FOIA action seeking

documents from the White House Press Office for lack of jurisdiction because it is not an agency

subject to the FOIA).  However, if OA is correct that it is not, as a matter of law, an agency

subject to the FOIA, then by definition CREW's Complaint under the FOIA fails to state a claim

upon which relief could be granted and must also be dismissed pursuant to Federal Rule of Civil

Procedure 12(b)(6).  *Cf. Sweetland*, 60 F.3d at 855.

        In addressing a motion to dismiss pursuant to Rule 12(b)(1), a court may "consider the

complaint supplemented by undisputed facts evidenced in the record, or the complaint

supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coalition for*

*Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted).  *See*

*also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005)

---

[4] OA asserts that it "continues to believe under D.C. Circuit precedent that the issue of its 'agency' status under FOIA can be decided on the pleadings alone," but nevertheless brings its Motion to Dismiss pursuant to Rule 12(b)(1), apparently so that it can cite "to factual evidence developed during discovery as further support [for its claim] that OA is not a FOIA agency as a matter of law."  OA MTD at 9 n.3.

("[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").  "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005).  In spite of the favorable inferences that a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Envtl. Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

## III:  DISCUSSION

The FOIA requires "agenc[ies]" to "make available to the public" various specified types of information.  5 U.S.C. § 552(a).  Congress originally defined an agency, for purposes of the FOIA, as "'each authority of the Government of the United States,' subject to certain enumerated exceptions not relevant here." *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 557 (D.C. Cir. 1996) (quoting Administrative Procedure Act, 5 U.S.C. § 551(1)).  In its 1971 opinion in *Soucie*, the D.C. Circuit addressed the question of whether the Office of Science and Technology ("OST," now the Office of Science and Technology Policy), an EOP component, was an agency subject to the FOIA.  *See* 448 F.2d 1067.  The D.C. Circuit interpreted the original definition of "agency" under the FOIA to include "any administrative unit with substantial independent authority in the exercise of specific functions," *id.* at 1073, and concluded that the OST was an agency because its "sole function was [not] to advise and assist the President," *id.* at 1075.

In 1974, Congress amended the FOIA definition of agency to cover any "establishment in

17

the executive branch of the Government (including the Executive Office of the President), or any

independent regulatory agency." 5 U.S.C. § 552(f). This definition "was not, however, meant to

cover 'the President's immediate personal staff or units in the Executive Office whose sole

function is to advise and assist the President.'" *Armstrong*, 90 F.3d at 558 (quoting H.R. Rep.

No. 93-1380, at 14 (1974) (Conf. Rep.)). Indeed, Congress intended to codify the D.C. Circuit's

decision in *Soucie*. *Id.* ("That the Congress intended to codify *Soucie* is clear enough.") (citing

*Meyer v. Bush*, 981 F.2d 1288, 1291 (D.C. Cir. 1993)). *Soucie*, however, offers two possible

tests for determining whether an EOP component is an agency subject to the FOIA: (1) whether

the entity exercises "substantial independent authority," and (2) whether the entity's "sole

function is to advise and assist the President." *Soucie*, 448 F.2d at 1073, 1075; *see also*

*Armstrong*, 90 F.3d at 558. Following the 1974 Amendments to the FOIA, as discussed in

greater detail below, the D.C. Circuit considered these two factors in determining whether a

variety of EOP components were agencies subject to the FOIA.

     In 1993, the D.C. Circuit issued its opinion in *Meyer v. Bush*, 981 F.2d 1288, which

"managed to harmonize" the two *Soucie* criteria "by using a three-factor test to determine the

status under FOIA of a unit in the Executive Office of the President." *Armstrong*, 90 F.3d at 558.

Specifically, the *Meyer* court determined that, in "apply[ing] *Soucie* to those who help the

President supervise others in the executive branch . . . it is necessary to focus on three

interrelated factors . . . [(1)] how close operationally the group is to the President, [(2)] what the

nature of its delegation from the President is, and [(3)] whether it has a self-contained structure."

981 F.2d at 1293.

     OA argues that the Court should not apply the *Meyer* test in determining whether OA is

an agency subject to the FOIA "because, as the D.C. Circuit explained, the test is relevant to determining whether those who both advise the President *and supervise others in the Executive Branch* exercise 'substantial independent authority' and hence should be deemed an agency subject to the FOIA."  OA MTD at 21 (quoting *Armstrong*, 90 F.3d at 558 (emphasis in OA MTD) and citing *Meyer*, 981 F.2d at 1293 ("when we apply *Soucie* to those who help the President *supervise others in the executive branch*, we think it necessary to focus on three interrelated factors.") (emphasis in OA MTD)).  OA is correct that there is no evidence in the record to demonstrate that OA supervises others in the Executive Branch.[5]  OA is also correct that the D.C. Circuit did not apply the *Meyer* test in *Sweetland*, decided two years after *Meyer*, when it concluded that the staff of the Executive Residence is not an agency subject to the FOIA.  *See Sweetland*, 60 F.3d at 854.

CREW, however, asserts that "the three-factor <u>Meyer</u> test is simply a way to determine whether a particular entity within the EOP is not an agency because it has 'characteristics and functions . . . similar to those of the President's immediate personal staff.'" CREW Opp'n at 14 (quoting *Meyer*, 981 F.3d at 1293).  In this respect, CREW is correct that the D.C. Circuit has described the *Meyer* test as "designed succinctly to capture the court's prior learning on the subject whether a unit within the [EOP] is an agency covered by the FOIA." *Armstrong*, 90 F.3d

---

[5] CREW asserts that "the record is far from clear on this issue, particularly given the limitations this Court imposed on discovery."  CREW Opp'n at 14.  However, OA did not specifically request to take discovery into whether OA supervises others in the Executive Branch, nor did it ever offer any suggestion that such a possibility existed.  *See* CREW Opp'n to OA Mot. for J. on Pleadings, Docket No. [23] at 18-19.  Moreover, CREW appears to concede that OA does not supervise others in the Executive Branch when it states "[t]o be sure, OA is unlike entities such as the [Council on Environmental Quality] and OST that the courts have determined are agencies based on the fact that they exercise independent authority over other, non-EOP agencies."  CREW Opp'n at 19.

at 558-59. That prior learning, in turn, is comprised of the limited body of D.C. Circuit case law considering whether various entities within the EOP are agencies subject to the FOIA, which appears to focus in large part on whether an EOP component has substantial independent authority over others in the Executive Branch. *See* OA MTD at 3.

As such, the D.C. Circuit precedent does not clearly resolve the question of whether the *Meyer* test is applicable to OA, notwithstanding the fact that OA does not appear to supervise others in the Executive Branch. Therefore, in attempting to determine whether OA is an entity subject to the FOIA, then, the Court proceeds along two lines. First, the Court evaluates the two factors identified in *Soucie*: (1) whether OA exercises "substantial independent authority," and (2) whether OA's "sole function is to advise and assist the President." *Soucie*, 448 F.2d at 1073, 1075. After doing so, the Court applies the three-factor *Meyer* test. Ultimately, the Court concludes that OA is not an agency subject to the FOIA under either rubric, because OA lacks the type of substantial independent authority that the D.C. Circuit has found indicative of agency status for other EOP components when applying the *Soucie* criteria, and because the nature of OA's delegated authority is dissimilar to that of other EOP units that have been found to be agencies subject to the FOIA.

    A.       *OA Is Not An Agency Based On the Factors Identified In* Soucie

           1.      *Precedent Addressing EOP Components' Agency Status Under FOIA*

Prior to its 1993 opinion in *Meyer*, the D.C. Circuit's consideration of whether various EOP components were agencies pursuant to the FOIA focused on the two factors identified in *Soucie*: (1) whether the entity exercises "substantial independent authority," and (2) whether the entity's "sole function is to advise and assist the President." *Soucie*, 448 F.2d at 1073, 1075. In

*Soucie* itself, the D.C. Circuit concluded that OST was an agency because, in addition to advising

and assisting the President, it had "the independent function of evaluating federal [scientific]

programs." *Id.* at 1075. The D.C. Circuit also stressed that OST inherited that function from the

National Science Foundation, to which Congress had delegated "some of its own broad power of

inquiry," and that "[w]hen the responsibility for program evaluation was transferred to the OST,

both the executive branch and members of Congress contemplated that Congress would retain

control over information on federal programs accumulated by the OST, despite any confidential

relation between the Director of the OST and the President. . . ." *Id.* As D.C. Circuit cases since

*Soucie* have described that case, OST "was subject to FOIA because it had independent authority

to evaluate federal scientific programs, initiate and support research, and award scholarships."

*Sweetland*, 60 F.3d at 854 (citing *Soucie*, 448 F.2d at 1075; *Rushforth v. Council of Economic*

*Advisers*, 762 F.2d 1038, 1041 (D.C. Cir. 1985)).

Following *Soucie*'s lead, "every one of the EOP units that [the D.C. Circuit has] found to

be subject to FOIA has wielded substantial authority independently of the President." *Sweetland*,

60 F.3d at 854 (citing *Meyer*, 981 F.2d at 1292). Specifically, the D.C. Circuit has confirmed

that the Council on Environmental Quality ("CEQ") is an agency because various Executive

Orders have authorized it to, *inter alia*, "issue guidelines to federal agencies," "coordinate federal

programs related to environmental quality," "issue regulations to federal agencies for

implementing all of the procedural provisions of [the National Environmental Policy Act]," and

oversee certain activities of other federal agencies. *Pacific Legal Foundation v. Council on*

*Envtl. Quality*, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980). Similarly, the D.C. Circuit has found

that the Office of Management and Budget is an agency subject to the FOIA because "in addition

to its multitudinous other management, coordination, and administrative functions," it "has a statutory duty [to Congress] to prepare the Budget." *Sierra Club v. Andrus*, 581 F.2d 985, 902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1978).[6]

In contrast, the D.C. Circuit has repeatedly found that EOP components are not agencies pursuant to the FOIA where they lack substantial independent authority and serve only to assist and advise the President. For instance, in *Rushforth*, the D.C. Circuit stressed that, in contrast to OST and CEQ, each of the Council of Economic Advisers' ("CEA") "enumerated statutory duties is directed at providing [] advice and assistance to the President," and that "CEA has no regulatory power . . . [i]t cannot fund projects . . . nor can it issue regulations." 762 F.2d at 1042-43. The D.C. Circuit later summarized the distinction between CEQ and CEA by explaining that, unlike CEQ, "CEA had no [] power to issue formal, legally, authoritative commands to persons outside the executive branch." *Meyer*, 981 F.2d at 1292 (citing *Rushforth*, 762 F.2d at 1043). In *Meyer*, the D.C. Circuit considered the President's *ad hoc* Task Force on Regulatory Relief, which was established through an Executive Order that gave the OMB Director (as Executive Director of the Task Force) authority, among other things:

> (1) to designate regulations as major rules; (2) to require agencies to seek additional information in connection with a regulation; (3) to require interagency consultation designed to reduce conflicting regulations; (4) to develop procedures for estimating the annual social costs and benefits of regulations; and (5) to prepare recommendations to the President for changes in agency statutes.

---

[6] The D.C. Circuit also stressed that Congress specifically "signified the importance of OMB's power and function, over and above its role as presidential advisor, when it provided . . . for Senate confirmation of the Director and Deputy Director of OMB." *Id.* As noted above, the President's appointment of the OA Director is not subject to Senate confirmation. OA MTD at 24.

*Id.* at 1290 (citing Exec. Order No. 12291, § 6). Nevertheless, the D.C. Circuit concluded that the Task Force was not an agency for purposes of the FOIA because "Executive Order 12,291 did not authorize . . . the Task Force, *qua* Task Force, to give directions to the executive branch. Instead, the OMB Director took up that responsibility under the Executive Order," such that "whatever significant authority the President delegated he gave to the Director of OMB." *Id.* at 1294. "In sum," the D.C. Circuit concluded, "the Task Force was not a body with 'substantial independent authority' to direct executive branch officials;" "[a]s such, the Task Force fell within the *Soucie* test as an entity 'whose sole function is to advise and assist' the President." *Id.* at 1297-98.

In *Sweetland*, the D.C. Circuit determined that the staff of the Executive Residence was not an agency subject to the FOIA–and, as noted above, did so without applying the three-part test developed in *Meyer*–explaining that the "staff of the Executive Residence exercises none of the independent authority that we found to be critical in holding other entities that serve the President to be agencies subject to FOIA." 60 F.3d at 854. Although the Executive Residence staff has "specific obligations . . . with respect to the public property and furniture in the White House," it performs those obligations "under the direction of the President" or "with the approval of the President." *Id.* at 854-55 (quoting 3 U.S.C. §§ 105(b)(1), 109, 110). As such the D.C. Circuit found that the staff "is exclusively dedicated to assisting the President in maintaining his home and carrying out his various ceremonial duties. The staff does not oversee and coordinate federal programs . . . or promulgate binding regulations. . . . In short, neither Congress nor the President has delegated independent authority to these employees." *Id.*

Finally, in *Armstrong* the D.C. Circuit concluded that NSC is not an agency under the

23

FOIA because there was no showing that the NSC "exercises meaningful non-advisory authority." 90 F.3d at 565.  The plaintiff in *Armstrong* successfully demonstrated that NSC had various forms of authority, including the authority to "coordinate the policies and functions of other departments and agencies regarding national security matters[,]" and "make recommendations to the President."  *Id.* at 560.  However, the *Armstrong* plaintiff did not show "that the NSC plays a substantive role apart from that of the President, as opposed to a coordinating role on behalf of the President," and the D.C. Circuit found that the NSC "staff exercises no substantial authority either to make or to implement policy."  *Id.* at 561, 565.[7]

2.    *Application of the Soucie Factors to OA*

As the D.C. Circuit noted in *Armstrong*, "the specific evidence bearing upon [the] question [of whether an EOP component is an agency pursuant to the FOIA] varies with the entity in question."  *Id.* at 558-59.  To that end, the Court's discussion above reveals that OA–with its administrative rather than substantive responsibilities–is not easily compared to the majority of the EOP entities previously considered by the D.C. Circuit.  Perhaps the most comparable entity is the Executive Residence staff which, like OA, is charged with performing tasks of a non-substantive nature.  *See Sweetland*, 60 F.3d at 854 ("The Executive Residence staff . . .  employees accomplish general housekeeping, prepare and serve meals, greet visitors, and provide services as required in support of official and ceremonial functions . . . maintain[]

---

[7] The D.C. Circuit also affirmed, without significant analysis, that the White House Counsel's Office, falling as it does within the Office of the President, is not an agency subject to the FOIA.  *National Security Archive v. Archivist of the United States*, 909 F.2d 541, 545 (D.C. Cir. 1990).  Similarly, Judge James Robertson recently concluded in *Wang* that the White House Press Office is not an agency subject to the FOIA because it "lacks independent regulatory authority or governmental function.  Its role is to help the President communicate effectively with the media (or not), and to advise him on questions of public relations."  2008 WL 180189 at *1.

and make[] repairs, minor modifications, and improvements to the 132 rooms and the mechanical systems . . .").  Even the Executive Residence staff, however, is not directly comparable to OA as its responsibilities are of a different character and it employs roughly 70 employees, *id.*, while OA employs over 200 employees.

In the absence of a direct comparator, then, the Court is required to draw upon the principles elucidated by the D.C. Circuit's previous opinions in discerning the side of the "agency" line on which OA falls.  The Court therefore first considers the instruction that the FOIA definition of "agency" was not "meant to cover 'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Armstrong*, 90 F.3d at 558 (quoting H.R. Rep. No. 93-1380, at 14 (1974) (Conf. Rep.)). Following the model of the cases discussed above, OA's function may be discerned from its charter documents as well as the responsibilities OA actually undertakes, if they in fact extend beyond the responsibilities delineated in OA's charter documents.

OA's charter documents make clear that OA was established in order to assist and advise the President by "combin[ing] administrative support operations into a Central Administrative Unit in EOP," and create a "base for an effective EOP budget/planning system through which the President can manage an integrated EOP rather than a collection of disparate units."  OA MTD, Ex. 1 (President Carter's Message to Congress) at 3, 8.  Indeed, President Carter explained to Congress that his proposed reorganization, including the creation of OA, "was based on the premise that the EOP exists to serve the President and should be structured to meet his needs," i.e., to assist the President.  OA MTD, Ex. 1 at 3.  The Reorganization Plan establishing OA provided that OA would be "headed by the President," and would "provide components of the

25

[EOP] with such administrative services as the President shall from time to time direct."
Reorganization Plan § 2. Consistent with that Reorganization Plan, Executive Order No. 12028
authorizes OA to provide "all types of administrative support and services that may be used by,
or useful to, units within [EOP]." Exec. Order No. 12028 § 3(b). (b). OA's charter documents
thus authorize OA to provide a broad range of administrative services to EOP components, and
to do so in the President's stead. They do not, however, invest OA with any authority beyond
providing administrative services to the components within EOP. Rather, Executive Order No.
12122 specifically provides that the OA Director "shall not be accountable for the program and
management responsibilities of units within the [EOP]: the head of each unit shall remain
responsible for those functions." Exec. Order 12122 § 4(d).

    CREW makes much of the fact that, pursuant to Executive Order No. 12028, the
provision of administrative services in direct support of the President is largely reserved for the
White House Office. *See* CREW Opp'n at 17 n.16, 22; Exec. Order 12028 § 3(a) (OA "shall
provide common administrative support and services to all units within [EOP], except for such
services provided primarily in direct support of the President"). CREW is correct that OA's
charter documents do not generally authorize OA to provide administrative services in direct
support of the President, but this distinction does not establish that OA performs functions
beyond advising and assisting the President. Instead, OA's charter documents and President
Carter's message to Congress make clear that OA's function is to support, i.e., assist, the
President *indirectly* by providing efficient, centralized administrative services to the components
within EOP. Further, as OA notes, Executive Order No. 12028 specifically authorizes OA to
provide direct support to the President upon request of the White House Office, Exec. Order No.

12018 § 3(a), and OA has, in fact, provided such direct support to the President.  *See* OA Reply

at 11 ("the Fiscal Year 2008 Budget Request illustrates some of the administrative services that

OA provides the White House Office"); OA Mot. for J. on Pleadings, Ex. 1 (OA FY 2008

Budget) at OA 4-5 (requesting that funds be shifted from the White House Office to OA for

handling of employee transportation subsidies, burn bag pick up services, and payment of

employee Flexible Spending Account administrative fees).

As OA's charter documents do not invest OA with functions beyond assisting and

advising the President through the provision of unified administrative services to the various

EOP components, the next question is whether OA's actual functions demonstrate that it also

exercises "substantial independent authority."  CREW's first assertion in that respect is that

through the relevant Executive Orders, "the President has effected a broad delegation of authority

over the OA to its Director."  CREW Opp'n at 16 (citing *Armstrong v. EOP*, No. 96-1242 (S. Ct.

1996), Brief for the Resp. in Opp'n, p. 18 n.5).  As noted above, the Reorganization Plan

provides that there "shall be a Director of [OA]," who "shall be appointed by the President and

shall serve as chief administrative officer of [OA]."  Reorganization Plan § 2.  Executive Orders

12028 and 12122 further specify the OA Director's duties, authorizing the Director to "organize

[OA], contract for supplies and services, and do all other things that the President, as head of

[OA], might do."  Exec. Order No. 12122, § 4(a); *see also* Exec. Order No. 12028 § 4.

Executive Orders 12028 and 12122 also explicitly provide that the OA Director "shall report to

the President," Exec. Order No. 12028 § 2, and shall perform his duties "[s]ubject to such

direction and approval as the President may provide or require," Exec. Order 12122 § 4(a).

Moreover, as discussed above, OA Director Swendiman testified during his deposition that he

reported to the President through the Deputy Assistant to the President for Management and Administration. *See* Swendiman Tr. at 9.

Nevertheless, CREW argues that "the use of the word 'may' [in Executive Order No. 12122] denotes that, in the absence of [] direction or approval [from the President], the director is free to act." *Id.* CREW further asserts that "[b]eyond its chartering documents, OA's actual functions demonstrates that it exercises substantial independence both within and outside of the EOP in providing administrative support and services." *Id.* at 16-17. As OA correctly notes, though, CREW's argument in this respect is inexact. Throughout its Opposition, CREW alternatively argues that OA exercises "substantial independence," "sufficient independence," and "significant independence." CREW Opp'n at 15-17. Pursuant to D.C. Circuit precedent, however, the relevant standard is whether OA exercises "substantial independent *authority*." *Soucie*, 448 F.2d at 1073 (emphasis added). CREW's artful turning of phrases does not alter the showing that it is required to make in order to establish that OA is an agency subject to the FOIA. Instead, CREW's argument regarding the breadth of the President's delegation to the OA Director is irrelevant in the absence of evidence that that delegation carries with it the type of independent authority that the D.C. Circuit has found sufficient to make other EOP components agencies subject to the FOIA.

The Court turns, then, to the record evidence regarding OA's actual functions. As discussed above, OA–and more specifically its Director–is authorized to provide a variety of administrative services to EOP components, and to do so by "contract[ing] for supplies and services," and performing certain functions relating to the compensation of OA employees. Exec. Order No. 12028 § 3; Exec. Order No. 12122 § 4. In practice, OA performs these

functions by contracting for various non-EOP agencies to provide services to OA and other EOP

components, as well as by contracting to provide services, in certain instances, to non-EOP

entities that are present on the White House Complex.  OA also interacts with various non-EOP

entities in limited, non-contractual, ways including in procuring detailees and experts from

various federal agencies, and working with NARA in connection with OA's record

preservation/management functions.

These activities certainly demonstrate that OA has substantial operations, as does the fact

that OA employs over 200 individuals and is organized along seven different organizational

lines.  OA MTD, Ex. 3 (FY 2009 Budget) at OA-3-4.  OA's activities also confirm that it is

actively carrying out the functions that have been delegated to it, primarily by contracting with

non-EOP entities for the provision of supplies and services to the EOP.  Nevertheless, the Court

concludes that these activities do not establish that OA exercises "substantial independent

authority."  Significantly, OA "does not oversee and coordinate federal programs, as does the

Office of Science and Technology, or promulgate binding regulations, as does the Council on

Environmental Quality."  *Sweetland*, 60 F.3d at 854.  Nor does OA, like the Office of

Management and Budget, have statutory duties to report to Congress.  *Sierra Club*, 581 F.2d at

902.  Instead, OA performs a variety of administrative functions for EOP components, and the

OA Director is specifically relieved of substantive responsibility for those units.  *See* Exec. Order

No. 12122 § 4(d).  Further, the record is devoid of evidence that OA has "'substantial

independent authority' to direct executive branch officials," "possess[es] any delegated

regulatory authority to supervise agencies," or has the "power to issue formal, legally

authoritative commands to entities or persons within or outside the executive branch."  *Meyer*,

29

981 F.2d at 1292, 1293, 1297.

As such, the Court concludes that, because OA serves solely to assist and advise the President, and does not exercise substantial independent authority, it is not an agency subject to the FOIA pursuant to the factors set forth in *Soucie*.

      *B.*      *OA Is Not An Agency Under the* Meyer *Test*

The Court is compelled to reach the same conclusion–that OA is not an agency subject to the FOIA–when it applies the three-factor test set forth in *Meyer*. Again, those factors are "[(1)] how close operationally the group is to the President, [(2)] what the nature of its delegation from the President is, and [(3)] whether it has a self-contained structure." 981 F.2d at 1293. The D.C. Circuit has instructed that the "three factors are not necessarily to be weighed equally; rather, each factor warrants consideration insofar as it is illuminating in the particular case." *Armstrong*, 90 F.3d at 558. As discussed below, the Court finds that OA has a self-contained structure and that it is not as close to the President operationally as other EOP components that have been found not to be agencies. Nevertheless, in keeping with the D.C. Circuit's instruction on applying the *Meyer* factors, the Court finds that the nature of OA's delegation of authority from the President dispositively establishes that it is not an agency subject to the FOIA.

      *1.*      *OA Has a Self-Contained Structure*

OA has never contested that it "has 'a self-contained structure' such that it would be in a position to exercise independent authority if so delegated." OA MTD at 22 (quoting *Armstrong*, 90 F.3d at 559). Nor could OA rightly contest that fact: OA has as staff of over 200 employees, organized along the lines of seven offices, each of which has its own defined functions. *Id.* at 22, Ex. 3 (FY 2009 Budget) at OA-3-4; Swendiman Tr. at 9-10. As OA correctly notes, however,

30

the D.C. Circuit has explained that "while a definite structure may be a prerequisite to qualify as an establishment within the executive branch . . . not every establishment is an agency under the FOIA." *Armstrong*, 90 F.3d at 558 (internal quotation and citation omitted). The Court therefore continues to evaluate the other two *Meyer* factors, which are probative of whether OA is, in fact, an agency.

### 2.    *OA's Operational Proximity to the President*

OA argues that its "proximity to the President confirms that it is more like the President's immediate personal staff." OA MTD at 23. The record evidence, however, fails to substantiate this assertion. As the *Meyer* court explained it, "[p]roximity to the President" refers to "continuing interaction." 981 F.2d at 1293. Proximity is significant because "[t]he closer an entity is to the President, the more it is like the White House staff, which solely advises and assists the President, and the less it is like an agency to which substantial independent authority has been delegated." *Armstrong*, 90 F.3d at 558.

OA's argument that it is operationally close to the President focuses on the facts that it is "headed by the President," *see* Reorganization Plan § 2, and that the Director of OA carries the additional title of Special Assistant to the President, *see* Swendiman Tr. at 6. OA argues that, as a result, it is analogous to the NSC, which the D.C. Circuit found not to be an agency in *Armstrong* based primarily on its proximity to the President. *See* 90 F.3d at 560, 565 ("the overwhelming fact [is] that the President is the head of the NSC"). OA is, of course, correct that it is nominally "headed by the President," that the OA Director (who is a Special Assistant to the President) reports to the President through the Deputy Assistant to the President for Management and Administration, and that the OA Director is "subject to such direction or approval as the

31

President may provide or require." *See* Exec. Order. Nos. 12028 § 2 and 12122 § 4(a); Swendiman Tr. at 9, 11. On a purely organizational level, then, OA is proximate to the President.

However, in *Armstrong*, the D.C. Circuit focused on the "intimate organizational and operating relationship between the President and the NSC," stressing that the "President chairs the statutory Council, and his National Security Adviser, working in close contact with and under the direct supervision of the President, controls the NSC staff." 90 F.3d at 560. Similarly, in *Meyer*, the D.C. Circuit noted that the OMB Director, who served as Executive Director of the Task Force, "*reports directly* to the President," and concluded that as a result, "it is rather hard to imagine that the OMB Director . . . would acquiesce in a Task Force decision that was thought not to represent directly and precisely the president's opinion." 981 F.2d at 1295 (emphasis in original). The record in this case simply does not demonstrate that a comparable "intimate organizational and operating relationship" exists between the OA Director and the President. The Court therefore concludes that while OA is organizationally close to the President as a matter of form, in substance it appears to lack the same type of operational proximity to the President as the NSC and the President's Task Force on Regulatory Relief.

       3.     *The Nature of OA's Delegated Authority is Dispositive of Its Agency Status*

OA's self-contained structure thus weighs in favor of OA being deemed an agency, and OA's operational proximity to the President can be described as in equipoise. Nevertheless, the Court finds that the third *Meyer* factor–the nature of OA's delegated authority–conclusively establishes that OA is not an agency subject to the FOIA. Only *Meyer* itself and *Armstrong*

appear to have substantively considered the third *Meyer* factor in evaluating whether an EOP

component is an agency subject to the FOIA. Further, the D.C. Circuit's evaluation of the nature

of the EOP component's delegated authority in each of those cases appears to focus on the *Soucie*

factors. *See Meyer*, 981 F.2d at 1293-1298; *Armstrong*, 560-565. This Court has already

considered those factors above with respect to OA, and determined that OA has not been

delegated–nor does it actually exercise–the type of substantial independent authority that the

D.C. Circuit has found sufficient to make an EOP component an agency under the FOIA. The

Court will not repeat that discussion, but it suffices to say that OA is correct in asserting that it

"has no program or policy responsibilities, nor does it have any power to issue formal, legally

authoritative commands to entities or persons outside the EOP." OA MTD at 24. Rather, the

record demonstrates that OA performs a variety of administrative functions for EOP components,

and thus provides a "base for an effective EOP budget/planning system through which the

President can manage an integrated EOP rather than a collection of disparate units." OA MTD,

Ex. 1 (President's Message to Congress) at 3, 8.

   In sum, the nature of OA's delegated authority is entirely dissimilar to that of the other

EOP components that the D.C. Circuit has found to be agencies subject to the FOIA. OA "does

not oversee and coordinate federal programs, as does [OST], or promulgate binding regulations,

as does the [CEQ]." *Sweetland*, 60 F.3d at 854. Rather, much like the Executive Residence

staff, which is "exclusively dedicated to assisting the President in maintaining his home and

carrying out his various ceremonial duties," *id.*, OA is exclusively dedicated to assisting the

President in providing uniform and efficient administrative services to the various components of

the EOP. Further, when the nature of OA's delegated authority is considered along with the fact

that OA is, at least as a matter of formal organization, proximate to the President, the Court is compelled to conclude that OA is not an agency subject to the FOIA under the test set forth in *Meyer*.

      C.     *OA's Past Functioning Under the FOIA and Other Statutes Is Not Dispositive of Its Agency Status*

          1.     *OA's Past Functioning Under the FOIA*

Having concluded that OA is not an agency subject to the FOIA under either the *Soucie* factors or the *Meyer* test, the Court addresses another argument forcefully pressed by CREW, but not directly relevant to either of those analyses: that OA should be considered an agency pursuant to the FOIA because "in its actual functioning OA has held itself out publicly as an agency." CREW Opp'n at 23-27. As discussed above, the record is clear that OA generally held itself out to the public as an agency subject to the FOIA, and operated as such, from 1980 (when it first published FOIA regulations) until August 2007. The noted exceptions to this generalization are OA's footnote in its February 2000 brief in *Barr v. EOP* questioning OA's agency status under the FOIA, s*ee* OA MTD, Ex. 6 at 26 n.8, and OA's notice to some FOIA requesters, during the period of its April 2006 to August 2007 deliberative process, that it "was processing their requests as a matter of administrative discretion," Medaglia Decl. ¶ 7. Notwithstanding these exceptions, however, OA admits that it "originally viewed itself as subject to FOIA and acted accordingly." OA Reply at 14. OA also admits that, consistent with its operation as an agency subject to the FOIA, OA operated as an agency subject to the FRA rather than the PRA through at least August 2007. Medaglia Decl. ¶¶ 11-13.

Nevertheless, in *Armstrong* the D.C. Circuit unequivocally determined that "[t]he NSC's

34

prior references to itself as an agency are not probative on the question before the court-whether

the NSC is indeed an agency within the meaning of the FOIA." 90 F.3d at 566. CREW attempts

to distinguish *Armstrong* from the instant case, focusing on the fact that in that case, "the NSC's

behavior ha[d] been inconsistent-both logically and factually." *Id.* CREW is correct that in

*Armstrong*, the NSC "voluntarily subjected certain of its records to the FOIA and the FRA," but

"even as the NSC was treating some of its institutional records as though they were subject to the

FOIA and the FRA, it was declining to treat other records in that way." *Id.* CREW is similarly

correct that, from a public standpoint, OA's consistently operated as an agency subject to the

FOIA until August 2007. Nevertheless, the situation in this case is not unlike that in *Armstrong*,

in which the NSC complied with the FOIA based upon a 1978 legal opinion that was later

reversed. *Id.* at 557. Indeed, as the D.C. Circuit explained in a previous *Armstrong* opinion, "the

NSC [had] routinely conceded its status as an 'agency' subject to the FOIA in litigation regarding

specific FOIA requests to the NSC," and in *Kissinger*, the "Supreme Court . . . assumed, without

deciding the issue, that the NSC is a FOIA agency." *Armstrong v. EOP*, 1 F.3d 1274, 1296 (D.C.

Cir. 1993). In the instant case, as CREW stresses, OA has not meaningfully contested its agency

status in previous litigation and at least two courts have assumed, without deciding the issue, that

OA is an agency subject to the FOIA. *See Nat'l Sec. Archive*, 909 F.2d 541; *Goldgar v. OA*, 26

F.3d 32 (5th Cir. 1994).

    In light of the similarities between this case and *Armstrong*, then, the Court is guided by

the D.C. Circuit's conclusion in that case, and concludes that OA's past functioning under the

FOIA and the FRA is not "probative on the question before the court." 90 F.3d at 566. "[Q]uite

simply, the Government's position on that question has changed over the years," and, in any

event, OA's own assessment of its status under the FOIA and the FRA is not dispositive of the

"legal question here in dispute" and "should not be taken to establish as a matter of law, that

[OA] is subject to those statutes." *Id.* In short, while OA's past functioning under the FOIA and

the FRA is undisputed, it is also insufficient by itself to establish that OA is, as a matter of law,

an agency subject to the FOIA. Rather, the Court has considered that very question and, for the

reasons discussed extensively above, finds that it is not an agency subject to the FOIA.

### 2.     *OA's Continued Functioning Under Other Federal Statutes*

As set forth in the Background section above, in addition to stressing OA's past

compliance with the FOIA and the FRA, CREW stresses that OA continues to enter into

interagency agreements with executive branch agencies under the authority of the Economy Act,

to comply with federal anti-discrimination laws, and to have Privacy Act and Touhy regulations

in place. None of these facts, however, establishes that OA is an agency under the auspices of

the FOIA. Simply put, if the NSC's prior compliance with the FOIA was not "probative" of its

actual legal status under that very statute in *Armstrong*, it is hard to see how OA's compliance

with *other* federal statutes could be dispositive of its legal status under the FOIA in this case.

Moreover, although OA does not directly explain why it currently maintains Privacy Act

and Touhy regulations, it is entirely possible that they are mere vestiges of OA's prior

compliance with the FOIA, particularly as OA only began advising FOIA requesters that they

would not process their requests seven months ago. *See* Medaglia Decl. ¶ 10. In contrast, OA

*does* directly address its reliance on the Economy Act and its compliance with federal anti-

discrimination laws, and convincingly argues that OA's functioning under those statutes is

irrelevant to its agency status under the FOIA because those statutes have different operative

36

definitions.  *See* OA MTD at 26-28, OA Reply at 12-13.  Specifically, the Economy Act defines

the term "agency" to mean "a department, agency, or instrumentality of the United States

Government."  31 U.S.C. § 101.[8]  For its part, Title 3 of the U.S. Code expands the protections of

the federal anti-discrimination laws to employees of EOP components by prohibiting

discriminatory practices by a "unit of the executive branch, including [EOP], *see* 3 U.S.C. § 411,

and defines an "employing office" under Title 3 as "each office, agency, or other component of

[EOP]" as well as "the Executive Residence at the White House," *id.* § 401.[9]  The Court agrees

with OA that because neither the Economy Act nor the federal anti-discrimination laws involve

the FOIA definition of "agency" (as interpreted by the D.C. Circuit precedent discussed above),

OA's compliance with those statutes does not bear upon its legal status under the FOIA.

Most significantly, while CREW stresses OA's references to itself as an "agency"

pursuant to the Economy Act and the federal anti-discrimination laws, nothing about OA's past

and current functioning under those statutes suggests that OA in fact exercises substantial

independent authority or functions beyond advising and assisting the President.  As such, the

Court easily concludes that OA's compliance with or operation under those various statutes is not

probative of, and certainly not dispositive of, OA's agency status under the FOIA.

---

[8] OA also notes that Executive Order No. 12028 explicitly requires it to provide "[a]dministrative support and services . . . to all units within the [EOP] in a manner consistent with available funds and other resources, or in accord with Section 7 of the Act of May 21, 1920 (41 Stat. 612), as amended (31 U.S.C. 686, referred to as the Economy Act)."  OA MTD at 27 (citing Exec. Order No. 12028 § 3(c)).  While the parties dispute the significance of this reference, *see id.*; CREW Opp'n at 21, the Court declines to read anything into it given the fact that the Economy Act's definition of "agency" is different than that included in the FOIA.

[9] As discussed above, the D.C. Circuit determined in *Sweetland* that the Executive Residence staff is not an agency, and did so without considering the Executive Residence staff's status under the federal anti-discrimination laws.  *See generally* 60 F.3d 852.

D.     *CREW's Argument That OA Has Attempted to Change Its Status Is Misplaced*

Finally, the Court addresses CREW's final attempt to obtain access to the documents at issue in its FOIA request: its argument that "even if OA were able to transform itself into a non-agency . . . the records CREW is seeking would still be subject to mandatory disclosure under the FOIA . . . [because] all of the documents CREW seeks were created well within a period of time that OA was an agency subject to the FOIA." CREW Opp'n at 31-33. This argument reveals a fundamental misunderstanding of the nature of OA's argument. OA is not, as CREW suggests, "attempt[ing] to change its status by unilateral administrative fiat." *Id.* Rather, OA asserts that it "originally viewed itself as subject to the FOIA and acted accordingly," but "[u]pon further review . . . it was determined that OA does not fall within the definition of 'agency' under FOIA." OA Reply at 14. In essence, OA argues that it was *never* subject to the FOIA and that its prior conclusion that it was subject to that statute was in error.

Thus, while CREW is correct that there is no "evidence of a substantive change in OA's functioning," CREW Opp'n at 31, such evidence is by no means required because OA does not argue that its functions have recently changed and rendered it no longer an agency under the FOIA. Instead, as in *Armstrong*, an EOP component that previously considered itself an agency subject to the FOIA–and therefore operated as such–has determined upon further reflection that it is not subject to that statute. The Court has now reviewed the record evidence of OA's delegated authority and actual functioning, considered the legal significance of that authority and functioning under the relevant D.C. Circuit case law, and reached the conclusion that OA is not (and has never been), as a matter of law, an agency subject to the FOIA. As such, the Court must find that OA was never under a FOIA obligation to provide CREW with the documents it

38

requested.  In addition, the Court must agree with OA that the Court lacks subject matter

jurisdiction over CREW's FOIA action and that, by definition, CREW's Complaint under the

FOIA fails to state a claim upon which relief may be granted.

## IV:  CONCLUSION

For the foregoing reasons, the Court shall GRANT OA's [47] Motion to Dismiss.  As the

Court's conclusion that OA is not an agency subject to the FOIA obviates OA's obligation to

comply with CREW's FOIA request, the Court shall DENY as moot CREW's [12] motion to

modify this Court's scheduling orders, which was previously held-in-abeyance, and which seeks

further information as to the documents withheld by OA in its responses to CREW's FOIA

request.  Finally, the Court shall DISMISS this case in its entirety.

Date:   June 16, 2008

                                      _/s/_____
                                      COLLEEN KOLLAR-KOTELLY
                                      United States District Judge