**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————
CITIZENS FOR RESPONSIBILITY AND ) 
ETHICS IN WASHINGTON, )
 )
 Plaintiff, )
 )
 v. ) Civil No. 07-0964 (CKK)
 )
OFFICE OF ADMINISTRATION, )
 )
 Defendant. )
———————————————————)

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION
FOR STAY PENDING APPEAL**

**STATEMENT**

Defendant Office of Administration's ("OA") opposition to plaintiff's motion for a stay

pending appeal substitutes heated rhetoric[1] and speculation for legal authority, logic and facts.

Mischaracterizing the relief CREW seeks as a "mandatory injunction" that would alter the status

quo, OA argues that the Court must deny the stay to avoid interference with the rights and

protections that the Presidential Records Act ("PRA") affords a departed president.  OA's

arguments, however, cannot be reconciled with the actual stay CREW is seeking -- a stay that

serves a limited purpose for a limited time by ensuring CREW's ability to obtain full relief

should it prevail on its appeal.  It is CREW, not OA, that is threatened with a fatal change in the

status quo should the Court deny its requested relief.

---

[1] For example OA accuses CREW of making "patently frivolous" allegations and "outlandish" assertions.  See Defendant's Opposition to Plaintiff's Motion for Stay Pending Appeal (D's Oppos."), p. 10.

### 1. CREW Seeks A Prohibitive, Not Mandatory Injunction To Preserve The Status Quo.

Pivotal to OA's opposition is its mischaracterization of the relief CREW seeks as a mandatory injunction that would change the status quo. According to OA, the status quo is that which has been in effect since August 2007, specifically that OA is not an agency. D's Oppos. at 3-4.[2] OA argues further that the requested stay, by prohibiting OA from transferring to the National Archives and Records Administration ("NARA") at the close of this administration all records potentially responsive to CREW's two FOIA requests, will somehow change this status quo by changing OA's status as a PRA entity. Id. at 3.

This argument, illogical in the extreme, cannot be reconciled with the actual relief CREW seeks and ignores an unassailable fact: whether considered to be an agency subject to the Freedom of Information Act ("FOIA"), or a non-agency subject to the PRA, OA continues to have possession and control over the records CREW is requesting, a status that has not changed since either the filing of this lawsuit or the issuance of the Court's order. This is the status quo that is threatened with a potentially irreparable change on January 20, 2009, when -- absent a prohibitive order from this Court -- the requested records will be transferred to non-party NARA by operation of the PRA. And this is the status quo that CREW seeks to preserve through its stay motion.

Because the relief CREW seeks will preserve, not alter, the status quo it cannot properly

---

[2] OA cites no support for its novel argument that the status quo for purposes of a stay should be measured by reference to a post-filing event of defendant's choosing, here the date on which OA decided it was no longer an agency. See D's Oppos. at 3. The far more logical and accepted frame of reference is the status of the parties when this lawsuit was filed in May 2007, a time at which OA had accepted CREW's FOIA requests for processing. In any event, on each of those dates OA was exercising full possession and control over the requested records.

be characterized as a "mandatory injunction. Injunctions are considered to be mandatory rather than prohibitive when they "alter, rather than preserve, the status quo by commanding some positive act . . ." Columbia Hosp. for Woman Found., Inc. v. The Bank of Tokyo-Mitsubishi, Ltd., 15 F.Supp.2d 1, 9 (D.D.C. 1997), aff'd, 1998 U.S. App. LEXIS 7871 (D.C. Cir. Apr. 17, 1998); see also Mylan Pharm., Inc. v. Shalala, 81 F.Supp.2d 30, 36 (D.D.C. 2000). So, for example, an injunction that essentially gives the plaintiff the ultimate relief it is seeking by mandating an affirmative act by the defendant is a mandatory injunction. Judicial Watch, Inc. v. Dep't of Commerce, 501 F.Supp.2d 83, 91 (D.D.C. 2007). By contrast, an injunction that restrains a party from acting affirmatively to change the status quo is a prohibitory injunction. Phillip v. Fairfield Univ., 118 F.3d 131, 134 (2d Cir. 1997).

Here CREW seeks injunctive relief that would prevent OA from destroying, otherwise disposing of or transferring any potentially responsive records that are currently in its custody and control pending the outcome of CREW's appeal. Such relief would impose no additional right or obligation on OA or change the status quo in any way. Indeed, as OA points out in its brief, OA has already been subject to a preservation order mandating this precise relief. See D's Oppos. at 7-8.

Moreover, OA has also been subject to preservation obligations imposed by both the FOIA and the Federal Rules of Civil Procedure. Every party has the duty to institute a litigation hold to preserve relevant documents it "knew or reasonably should have known" were relevant to litigation, Shepherd v. Am. Broadcasting Co., Inc., 62 F.3d 1469, 1481 (D.C. Cir. 1995), and "a good argument can be made that, as the enforcer of the laws, the United States should take this duty more seriously than any other litigant." United Med. Supply Co., Inc. v. U.S., 77 Fed.

Cl. 257, 274 (Fed. Cl. 2007). Included within this preservation obligation is the duty to temporarily suspend any routine document retention and destruction policy that could result in the loss of records at issue if left unchecked. Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 218 (S.D.N.Y. 2003); see also Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc., 244 F.R.D. 614 (D. Colo. 2007) (continued expunging of departed employees' hard drives pursuant to routine destruction policy violated duty to preserve). This responsibility applies with particular force in FOIA litigation, which has as its very subject the duty to provide access to the records at issue. Thus the status quo that CREW seeks to maintain is the obligation OA has had since the outset of this litigation to segregate and preserve all relevant records.

CREW's requested stay also seeks to maintain the status quo by preventing OA from transferring to NARA, and out of its possession and control, all responsive records. It is not as, OA suggests, an effort to change anything about OA's status.[3] Rather, the relief is requested to ensure CREW's continued access to the records it seeks should it prevail on its appeal. Without a stay, CREW may be denied access to the records for at least five years and most likely, a considerably longer period of time. Yet the records are the very "res" of this lawsuit and their immediate access the very relief CREW is requesting should it prevail on its appeal. Thus, CREW seeks a stay to preserve its ability to obtain full relief should it prevail -- a stay that preserves, not alters, the status quo.

### 2. CREW Will Suffer Irreparable Injury Absent The Preservation Of The Status Quo Through The Requested Stay.

Conspicuously absent from the record before the Court is any written assurance from OA

---

[3] See D's Oppos. at 3 (CREW . . . is asking the Court to change the status quo that OA is a PRA entity.").

that it will preserve all potentially responsive records pending the outcome of CREW's appeal.

OA expressly declined CREW's request that it make such a written commitment for submission

to the Court, and now argues that an email its counsel sent CREW is a sufficient substitute.  D's

Oppos. at 6-8.  As CREW explained in its opening brief, this so-called "assurance," made not by

OA but its counsel with no explanation of its basis, is not an adequate substitute for a Court

order mandating preservation.

 Earlier in this case, even with a declaration from OA's Deputy General Counsel F.

Andrew Turley attesting under oath that OA would continue to preserve the documents it had

located so far in response to CREW's FOIA requests, this Court concluded that a preservation

order was necessary and appropriate.  See Order of January 25, 2008, p. 4 (Document 32)

(ordering OA to "preserve all records . . . potentially responsive to CREW's April 16, 2007 and

April 18, 2007 FOIA requests.").  The current record, lacking even the most minimal of

declarations or other written assurances from OA, presents an even stronger basis for the

requested stay, which likewise would operate as a preservation order.

 While conceding that absent such an order CREW will have no way to judicially enforce

the preservation obligations to which it is subject, OA insists that an order is nevertheless

unnecessary unless and until CREW is able to offer direct proof of "wrongdoing" by the White

House.  D's Oppos. at 8.  Neither CREW nor the public should have to shoulder the risk of

additional missing documents, particularly where a preservation order will impose no burden on

OA.

 Moreover, the concern is not simply that either the President or OA will intentionally

destroy documents in contravention of the PRA, although CREW submits that such a risk is

present.  Absent a court order there is a very real risk that OA will not take sufficient care to prevent the unwitting destruction of responsive records, particularly those that have not yet been identified and segregated.  In this regard, it must be remembered that OA has not completed its processing of CREW's two FOIA requests, meaning that it has not yet identified and segregated all responsive records.  Nor is it enough for OA to argue that the Court must presume it will comply with its obligations under the PRA.  Because OA has not yet completed processing the requests, there is no way for OA or the Court to know if there is a complete overlap between the universe of responsive records and those records OA would consider itself obligated to preserve under the PRA.

Thus, this case mirrors the situation before the court in CREW v. EOP, where the White House argued similarly that a preservation order was unnecessary and similarly "balk[ed] at entering into any stipulation that would in effect serve as the premise of an order requiring it to do so."  Report and Recommendation, October 19, 2007, p. 2 (Exhibit 2 to Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion For Stay Pending Appeal (P's Mem.").  There, as here, "without such an order, destruction of [the requested records] would be without consequence."  Id.  Under these circumstances, the court in CREW v. EOP granted CREW's request for a prohibitive injunction because the mere "threat of such obliteration is a text book example of irreparable harm."  Id. at 3.  This Court should follow suit and grant the requested stay.

OA also attempts to place on CREW an equally unwarranted burden of proving that absent a stay, the Archivist will also "violate the law."  D's Oppos. at 8.  But contrary to OA's characterization, the requested stay is not premised on a concern "that the Archivist will

affirmatively "refuse to return OA's records to OA . . ." Id.  Rather, it is based on the fact that

NARA is not a party to this litigation and therefore not subject to any Court order directing it to

return the records.[4]  Moreover, there is simply no precedent for OA's rank speculation that if

CREW prevails on appeal the records at issue will magically "revert back to OA . . ."  D's

Oppos. at 9.  While CREW does not question that NARA will continue to preserve any records

entrusted to it under the PRA, that does not answer the question of how and when CREW will be

granted access to the records it has already requested from OA under the FOIA.  Delay in access

to records under the FOIA constitutes irreparable harm, particularly where OA filed this lawsuit

to vindicate its right to expedited processing based on the uncontested "urgency to inform the

public concerning actual or alleged Federal Government activity."  5 U.S.C. §

552(a)(60(D)(v)(II).  See Electronic Privacy Info. Ctr. v. U.S. Dep't of Justice, 416 F.Supp.2d

30, 41 (D.D.C. 2006).

        OA also takes issue with CREW's concern that in NARA's hands the records will not be

easily identifiable, suggesting this is a matter of mere speculation.  D's Oppos. at 10-11.  To the

contrary, CREW's concern is grounded in past practices and the fact that to date even OA has

not identified all responsive documents.

        NARA's experience with the records of President Bill Clinton provides ample cause for

concern.  News reports place the volume of President Clinton's presidential records at 80 million

---

        [4] While OA also argues that a stay is unnecessary because under the PRA presidential
records are available "'pursuant to subpoena or other judicial process . . .,'" D's Oppos. at 10,
quoting 44 U.S.C. § 2205(2)(A), this is of little comfort to CREW given that it is trying to
protect against a situation where the PRA does *not* apply.  A victory for CREW on appeal will
mean that the requested records are subject to the FOIA and the Federal Records Act, not the
PRA.  Thus, in that circumstance the PRA's provisions would be inapplicable.

documents and 20 million emails.  See Peter Nicholas, Clinton Records Locked Up, *Los Angeles Times*, August 14, 2007 (attached as Exhibit 1).  A NARA official confirmed that as of December 2007, NARA had not finished even cataloging all the records in the Clinton Library and could say only that NARA had "a pretty good idea of what we have," based on the "folder-title list" of each box.  Sharon Fawcett, Inside the Clinton Archives, *National Journal*, December 17, 2007 (attached as Exhibit 2).  Looming large is a very valid concern that the several thousands of pages of responsive documents CREW seeks will get "lost in the shuffle" among the millions and millions of pages of Bush administration documents NARA will receive on January 20, 2009.

Finally on this point, OA argues that there is precedent for transferring presidential records subject to litigation to NARA at the close of an administration, citing Alexander v. FBI, Civil Action Nos. 96-2123/97-1288.  D's Oppos. at 11-12.  Alexander, however, presented a very different issue and, even more significantly, it highlights the ways in which the record before this Court lacks requisite assurances from the White House.

In Alexander, the court was addressing the anticipated transfer of certain electronic records at the end of the Clinton administration that all parties agreed were subject to the PRA.[5] OA was in the process of supervising the restoration of emails that had not been captured in the White House's electronic record keeping system, a process that would not be completed by the close of the Clinton Administration.  Accordingly, OA was seeking continued access to the backup tapes of the missing emails and certain related documents to complete the restoration

---

[5] Also at issue were email records from agency components of the Executive Office of the President.  See Transcript of Proceedings, January 12, 2001, p. 3 ("Alexander Trans.") (attached as Exhibit 3).

project once the records were transferred to NARA.

Judge Royce C. Lamberth, presiding over the Alexander case, granted OA's request, but only after receiving a memorandum of understanding ("MOU") between NARA and the Executive Office of the President as well as declarations from Charles Easley, then OA Associate Director for Security (attached as Exhibit 4). Mr. Easley attested to the steps he would take to ensure the security and integrity of the materials at issue prior to and after their transfer. Alexander v. FBI, Declaration of Charles Easley, January 11, 2001. Those measures included "a tape-by-tape inventory of the backup tapes with the NARA representative," after the transfer occurred. Id. at ¶ 5. Likewise the MOU spelled out OA's continuing responsibilities and NARA's newly assumed responsibilities for the records transferred pursuant to the PRA.

Moreover, in authorizing the transfer of the records to NARA under the PRA, Judge Lamberth made clear who at NARA was to receive custody of the records and directed that individual to provide the court with an affidavit "describing in detail the steps he has taken and is taking to ensure the integrity of these materials." Alexander v. FBI, Order of January 19, 2001 (attached as Exhibit 5). In addition, Judge Lamberth expressed his intention to "personally inspect and oversee this process." Id.

Here, by stark contrast, neither OA nor NARA has provided the Court with any written assurances or details about how, if the records responsive to CREW's request are transferred to NARA on January 20, 2009, the integrity and preservation of those records will be ensured. Indeed, OA has refused to provide CREW with even the most minimal of written assurances, and asks the Court to simply trust that it will all work out in the end. But absent a comparable memorandum of understanding and declarations from appropriate government officials, such

9

trust is misplaced.[6]

### 3. The Requested Stay Would Not Harm OA And Would Further The Interests Of The Public.

In contrast to the distinct, predictable and irreparable harm CREW faces absent the requested relief, a stay that continues the status quo would cause OA no harm whatsoever. OA's only response is to manufacture a claim of harm to the president from what OA alleges would be "a serious intrusion on the President's management and control of his records during his term in office." D's Oppos. at 13. The requested relief has no such effect.

First, the requested stay does not affect in any way the president's management and control of his records while in office. OA already claims that, absent a stay, it will still preserve all potentially responsive records. As for the requested prohibition on transferring the records at issue to NARA at the close of this administration, by definition it would not affect the president's "management and control of his records *during his term in office*." Id. (emphasis added).

Equally unavailing is OA's suggestion that a stay mandating continued preservation and retention would somehow upset the PRA's "carefully constructed scheme" in a way that would "raise serious constitutional questions." D's Oppos. at 13. To the contrary, the requested relief leaves the PRA's scheme intact with one de minimis exception: the records would remain at the

---

[6] CREW has indicated to OA's appellate counsel CREW's willingness to accept a similar memorandum of understanding involving NARA and OA that would spell out their respective rights and obligations and give CREW sufficient assurances that it could gain immediate access to the responsive documents should it prevail on its appeal. To date, OA has not acted on CREW's proposal.

OA for the very limited time it takes to resolve CREW's appeal.[7]  Of course, if CREW prevails

on its appeal, the president will have no cause to complain as the records will properly remain

with the OA until they are scheduled for transfer to NARA under the Federal Records Act.

    Nor does the requested relief affect President Bush's rights once he leaves office.  First,

contrary to OA's characterization, these are not "his records," D's Oppos. at 14, but rather those

of the American public.  Second, CREW is not requesting that the records be treated as federal

records subject to the custody and control of the incoming president.  CREW seeks not a change

in the records' status, but their venue, i.e., that they remain at OA.  And while OA has not

requested that the Court impose any restrictions on access to these records, the Court is, of

course, free to mandate such restrictions as well as to specify where and how the records are to

be kept once the Bush administration leaves office.[8]  This course, adopted in Alexander, is more

than sufficient to address OA's concerns.

    As for the public interest, OA's arguments are nothing short of insulting.  Not only is any

delay in public access under the PRA so de minimis as to be inconsequential, but it is this

administration, not CREW or the Court, that holds the keys to public access.  OA has been free

from the outset to make a discretionary release of the requested records to the public without

doing any violence to its claim that the records are not subject to the FOIA.  It has declined to do

---

    [7] As discussed *supra*, the anticipated volume of records the Bush administration is likely to transfer to NARA and the years it will likely take NARA to process those records render the limited delay that a stay would occasion -- at most a few months -- of no legitimate consequence. Of note, CREW will be seeking expedition of its appeal, a request OA does not oppose.

    [8] For example, the Court could limit access to the records at issue to only a designated OA official pending the outcome of CREW's appeal and only for the purpose of ensuring their continued maintenance.

so.

Moreover, once in litigation, OA claimed exemptions that strain credibility. As verified by documents that the House Committee on Government Oversight and Reform released (representative sampling attached as Exhibit 6), OA withheld from CREW patently non-exempt documents that contain numerical data, specifically a day-by-day breakdown of the missing emails by EOP component. OA's continued refusal to make these documents public reveals the lie in its latest claim to have the public's interest at heart.

### 4. CREW Has Demonstrated A Sufficient Likelihood Of Success To Justify A Stay.

In arguing that CREW has no likelihood of success, OA ignores completely this Court's acknowledgment that the issue here is a serious and close one not readily or directly resolved by any precedent. OA also ignores its own conduct for the past 30 years, during which it held itself out as an agency subject to the FOIA and acted accordingly. Indeed, OA has acknowledged that it changed its position only after years of internal deliberations and receipt of an opinion from the Department of Justice's Office of Legal Counsel. See Declaration of M. Elizabeth Medaglia, April 18, 2008 (Document 45), ¶¶ 5-8. Clearly this was a difficult legal issue that the White House itself wrestled with for years before ultimately deciding it was no longer an agency.

Likewise, this Court's opinion reflects the difficulty of the legal issue raised, particularly given the absence of any precedent directly on point. Accordingly, it is nothing short of hubris for OA to demean CREW's legal arguments on the merits as "frivolous,"[9] the product only of

---

[9] D's Oppos. at 17.

"artful turning of phrases,"[10] and "irrelevant."[11]  CREW has established a sufficient likelihood of

success on the merits to warrant a stay.

## **CONCLUSION**

For the foregoing reasons and those set forth in CREW's opening brief, CREW

respectfully requests that its motion for a stay pending appeal be granted.

                                                    Respectfully submitted,

                                                    _____/s/_____
                                                    Anne L. Weismann
                                                    (D.C. Bar No. 298190)
                                                    Melanie Sloan
                                                    (D.C. Bar No. 434584)
                                                    Citizens for Responsibility and Ethics
                                                        in Washington
                                                    1400 Eye Street, N.W., Suite 450
                                                    Washington, D.C.  20005
                                                    Telephone:  202-408-5565
                                                    Fax:  202-588-5020

July 1, 2008                                        Attorneys for plaintiff

---

[10] Id. at 16.  While OA was quoting the Court's opinion, it took the phrase out of context to denigrate CREW's merits arguments.

[11] Id. at 17.

13

# EXHIBIT 1

# Los Angeles Times

# Clinton records locked up

By Peter Nicholas
August 14, 2007

little rock, ark. - Sen. Hillary Rodham Clinton cites her experience as a compelling reason voters should make her president, but nearly 2 million pages of documents covering her White House years are locked up in a building here, obscuring a large swath of her record as first lady.

Clinton's calendars, appointment logs and memos are stored at her husband's presidential library, in the custody of federal archivists who do not expect them to be released until after the 2008 presidential election.

A trove of records has been made public detailing the Clinton White House's attempts to remake the nation's healthcare system, following a request from Bill Clinton that those materials be released first. Hillary Clinton led the healthcare effort in 1993 and 1994.

But even in the healthcare documents, at least 1,000 pages involving her work has been censored by archives staff because they include confidential advice and must be kept secret under a federal law called the Presidential Records Act. Political consultants said that if Hillary Clinton's records were made public, rivals would mine them for scraps of information that might rattle her campaign.

"Those files – that's the mother lode of opposition research," said Ray McNally, a Republican political consultant in Sacramento. "Opposition researchers would be very hungry to see what's there." Robert Shrum, senior political strategist in Democratic Sen. John F. Kerry's 2004 presidential campaign, said: "In 2 million pieces of paper, would opposition researchers hope to find one where she wrote a memo saying, 'I wish I'd never gotten involved in healthcare?' Sure. That's what they'd love to find."

At the Clinton library overlooking the Arkansas River, federal archivists clad in protective smocks are sorting through 80 million pages of records and another 20 million e-mails from a Clinton presidency that ended in January 2001. About 2 million of those pages concern the first lady's office.

A staff of 11 spends most of its time answering some 250 requests for documents submitted under the Freedom of Information Act. Requests are fulfilled largely on a first-come, first-served basis. Because the earliest requests involved other Clinton administration activities, the requests for the now-New York senator's records are further back in line, staff members said.

A list of Freedom of Information Act requests that have been completed by the archives staff includes one for a photo of Bill Clinton jogging with a "Yale Whiffenpoof Club insignia" on his clothing; another for various files on UFOs and flying saucers and one for the full name of the pastry chef who made a birthday cake for Chelsea Clinton.

Before documents are released, archives staff must read them and, by law, must redact material that they determine contains classified information, invades a person's privacy, reveals trade secrets, reveals confidential advice from presidential advisors or raises other concerns specified in the records law.

Asked how long it might be before Hillary Clinton's records are released, the library's chief archivist said it could take years.

"We're processing as fast as we can," Melissa Walker said.

Not fast enough, in the view of some who have been waiting. A conservative watchdog group called Judicial Watch filed suit against the National Archives last month, demanding the release of Hillary Clinton's diaries, telephone logs, daily planners and schedules. In the 1990s, the group filed suits against the Clinton administration that led to revelations about fundraising practices, including Democratic campaign donors being tapped for official trade missions. In the most recent suit, Judicial Watch said it had submitted its request more than a year ago and had received nothing, save for confirmation that the library possessed "a substantial volume" of such papers.

Staffing pressures have prevented the National Archives from keeping up with an expanding workload. In 2002, the agency employed 334 archivists. This year, the number is down to 301. That 10% drop came during a period when the National Archives assumed jurisdiction over two more presidential libraries: those of Clinton and Richard Nixon.

"If we have fewer trained personnel, we are unable to do as many preservation projects as we might like, and we're less able to serve the public in ways we would like to," said Susan Cooper, a spokeswoman for the National Archives.

But advocates for open records said that had it made savvier use of technology, the Clinton library could be moving more quickly. Computers can sort through e-mail to flag classified documents, as distinguished from material that can be speedily released, said Thomas S. Blanton, director of the National Security Archive, a research institute at George Washington University.

"There's no reason why a load of a few hundred FOIA requests should absorb 11 full-time people perpetually," Blanton said, referring to requests made under the Freedom of Information Act.

What records that have been made public offer tantalizing details about Hillary Clinton's White House years. One memo reveals details about the "war room" for the healthcare

plan. Aides wrote of the need for secrecy, but also presented Hillary Clinton with arguments she could make that the process of drawing up a healthcare plan was "the most open in the history of the federal government."

A 1993 memo discussed a plan to create reports on members of Congress, tracking their positions on healthcare. The files would log when members met with Hillary Clinton, how they voted on key bills, and – under a category called "influence" – whom they consulted for advice. One 1994 memo offers a historical curiosity: It draws Clinton's attention to a rising Republican politician, Mitt Romney, who is now a leading contender for the Republican presidential nomination.

In the memo, Clinton's aides discussed a trip to Boston, where the then-first lady was to appear at a fundraising event for Sen. Edward M. Kennedy (D-Mass). Kennedy was then running for reelection against Romney.

"Romney, a millionaire business consultant with no political experience, is a Mormon," the memo reads. "His religion is a delicate issue, which Kennedy himself has not raised but other Democrats have."

At other presidential libraries – which in some cases have had decades to process the material – some first lady records are now open to the public.

About 75,000 pages of Rosalynn Carter's records are publicly available, including scheduling and social office files. Both the Ronald Reagan and George H.W. Bush libraries also said that some records covering former first ladies Nancy Reagan and Barbara Bush were open.

The healthcare papers that have been released contain gaps when it comes to the part played by Hillary Clinton. A number of records involving her have been kept secret because they include confidential advice between presidential aides. Among the withheld documents are memos about meetings between Hillary Clinton and Democratic Sens. Christopher J. Dodd and Joseph R. Biden Jr. – now her rivals for the Democratic presidential nomination.

Other records kept from public view include a 1993 memo to the first lady entitled "positioning ourselves on healthcare," and another from that year called "public portrayal of the Medicare program."

peter.nicholas@latimes.com

**EXHIBIT 2**

**NationalJournal.com**

Q&A: SHARON FAWCETT
## Inside The Clinton Archives

© National Journal Group Inc.
Monday, Dec. 17, 2007

> "These are the most important records... of the government. And yet we can't provide sufficient staff to process presidential records in as timely a manner as everyone would like."



— *Sharon Fawcett*

Are **Bill** and **Hillary Rodham Clinton** locking away records from their years in the White House while Sen. Clinton seeks the presidency, or are they eager for speedy release of materials from the William J. Clinton Presidential Library in Little Rock, Ark. -- as they have argued in recent weeks?

*National Journal*'s <u>Alexis Simendinger</u> asked expert **Sharon Fawcett**, assistant archivist for presidential libraries at the National Archives and Records Administration. The following is a complete transcript of the Nov. 30 interview about President Clinton's instructions to the Archives, how the former first lady's records are handled, and how presidential records have been treated under the law ever since **President Nixon** left office. For previous Insider Interviews, <u>click here</u>.

---

**Q: There are journalists, bloggers and political commentators -- even Karl Rove, President Bush's former White House political adviser -- who recently have suggested that President Clinton's actions tied to his records and those of his wife have been secretive or unusual. Right or wrong?**
**Fawcett:** This matter has provoked a lot of questioning, but the National Archives believes there has been some misunderstanding about where we are in processing the Clinton records. No one is doing anything extraordinary or outside of the realm of what their statutory rights are. And another thing to remember is that executive privilege is a constitutional right, and not just a statutory right. The <u>Presidential Records Act</u> is a statutory right, but executive privilege is a constitutional right.

It's really been useful to have this discussion about the opening of presidential records and to call attention to the major issues, and the complexity of reviewing and opening these files. These are the most important records, the highest policy records of the government. And yet we can't provide sufficient staff to process presidential records in as

timely a manner as everyone would like to see them processed. I'm hoping that through all of this discussion, we are able to raise the awareness of the need for more resources for the National Archives in order to open these and other very important historical materials.

The statute, the Presidential Records Act, allows the president to impose certain restrictions on his records during the first 12 years after he leaves office.

Interestingly, he has to impose that restriction while he is still in office. If he neglects to send the Archivist a letter saying, "I wish to exercise my rights under the Presidential Records Act to impose these six categories of restrictions on my records for the first 12 years I'm out of office," he doesn't have the right. He has to do it while he's in office. So, normally presidents, usually in their first couple of months they're in office, will send a letter to the Archivist so designating that, and naming his or her representative.

**Q: And the National Archives seeks that letter [PDF] from the president?**

**Fawcett:** We meet with the incoming administration, with their general counsel's office, and we brief them on the Presidential Records Act, and we do let them know that this is something they need to pay attention to.

**Q: By law enacted after the clash over President Nixon's papers, who owns the records created by a president and his White House?**

**Fawcett:** The records that represent the constitutional and statutory roles of the president belong to the government, and the Archivist of the United States takes legal custody of those records at 12 noon on January 20 of the inaugural year.

**Q: President Clinton left office in early 2001, and by early 2005, it appears that he began to release some of his documents to the public, as the law allows. Is that right?**

**Fawcett:** In November 2002, President Clinton sent a second letter [PDF] to the Archivist which provided guidance to the NARA staff on the processing of his records -- a letter we requested -- specifically outlining what "easing of the restrictions" categories the president would be interested in applying to his records. I mean, they came to us and they were fairly open about what they wanted to open, and he listed several categories in the letter.

And those categories have widely been interpreted to mean he was closing everything, for example, related to Mrs. Clinton, his communications with Mrs. Clinton. What he really said was that he would want to consider some material for withholding, but he wanted to see it first. It didn't mean he was closing it outright. But he did not want us to open anything regarding his communications with Mrs. Clinton -- and several other categories of information, including, for example, communications with former presidents -- without first being aware of it, seeing it, and giving it a pass. He encouraged NARA staff

to consult with his designated representative on questions and concerns with respect to these categories.

**Q: When you say "easing of the confidential advice category," that is under President Clinton's own say-so, right?**

**Fawcett:** That's under his own say-so.

**Q: Whom did President Clinton designate as his representative?**

**Fawcett:** He designated the first lady and attorney **Bruce Lindsey** as his representatives.

**Q: Do people misunderstand the law that the president is following?**

**Fawcett:** The restriction category [to close some records] specifically at issue in this case is from the Presidential Records Act, is a category that we at the National Archives call "P5 confidential advice." It allows for the restriction of confidential advice between the president and his advisers, or between his advisers, for a period of time not to exceed 12 years after the president leaves office.

One of the reasons why President Bush revised and issued a new executive order [in 2001] on presidential records, is that at the end of the 12-year period of the [**Ronald**] **Reagan** records -- Reagan is the first president to have completed a 12-year period -- there was no longer an applicable FoIA exemption. Because once presidential records move out of the 12-year-Presidential-Records-Act restriction period, they can be restricted under the FoIA exemptions, and those apply to all executive agency governmental records, except for the FoIA exemption on the "deliberative process." Congress, in the Presidential Records Act, specifically exempted the presidential records from that provision of the FoIA. So, that provision could no longer apply to presidential records, which means that the only way a president can withhold material of a confidential nature -- not security classified, but of a confidential-advice nature -- is to claim executive privilege. And that's the whole heart of why the executive order was revised by President Bush.

Now, there are provisions in the executive order that made other changes that many groups found objectionable, but the major reason for issuing the executive order was because of the loss of that confidential-advice exemption, and the need to expand the time in order to review for privilege claims.

**Q: Has President Clinton indicated to the archivists that there are any requests received at his library that he is particularly sensitive about?**

**Fawcett:** Only what's in his [1994] letter. That is the only communication we have regarding that.

**Q: The only other communications on this topic that you know about are the ones President Clinton has made publicly?**

**Fawcett:** Right.

**Q: During Senator Clinton's presidential campaign, have either President Clinton or Mrs. Clinton tried to contact the Archives, or through anyone else, to clarify anything having to do with the records, or to issue new instructions?**

**Fawcett:** Well, one of the things that President Clinton noted is that sometimes the Archives may be issuing notice [for records clearance]. This is a hypothetical example: 25,000 pages and the [Clinton] representative has finished reviewing 20,000 pages. And they've wanted to go forward with the pages that have been completed: "Let's notice those 20,000 pages, let's get that out there. And we'll continue to work on the remaining pages."

That put a little bit of an administrative burden on NARA to separate that out, but we understood the need to get the material out there, and we immediately changed our processes so that we could notify incrementally, as records came through the formal review processes. That's been in the last few months.

**Q: When President Clinton told the Archives he wanted to see the communications with Mrs. Clinton before he considered releasing them, was he going the extra mile? In other words, are all communications between a president and his or her spouse considered personal?**

**Fawcett:** In the National Archives, while many family communications are personal, the first lady [or first spouse] has a role. And when a first lady is representing the government in that role, we would consider the communications between her and the president to be governmental.

Now, if there are communication exchanges between the president and first lady about whether she should consider running for the Senate, those would be personal. If they talked about a health-care task force, she was playing a governmental role and representing the president in that role and those communications would be official.

**Q: What other records of a president are considered personal?**

**Fawcett:** The personal records are materials that are personal to the president's private life -- financial information; information about his family, his children; also, political information -- information about his role as head of the political party. Information about his campaign is considered political, and therefore personal, and not governmental.

**Q: Did President Clinton and Mrs. Clinton issue any special instructions to release political records, since political records can be held back as personal?**

**Fawcett:** The Presidential Records Act suggests that those records should be separated. In reality, it's very difficult to separate the records because events are complex. For example, a presidential trip to a disaster area is partly constitutional and statutory, because the president is inspecting a disaster, but perhaps on the way to or from he went to a fundraising dinner, and that part of the trip was political.

So it is very hard to keep the files completely separate. That ends up being a responsibility of the Archives to work through with the president's representative when we start reviewing. And, in fact, if there is a document and it includes both political and presidential material, that document is in fact presidential, although the political material may be closed under the privacy restriction. That's when we would redact. But we would consider that [as a whole] to be a governmental record. We are not going to start cutting up records and say, "Here, you get page one, and we get page two."

**Q: Is there anything the Clintons have done of note to expand the open holdings of the Clinton library?**

**Fawcett:** I would say this: In the five-year period before the records were open to FoIA, certainly the president was interested in what the Archives could do about systematic review, and even requested that we review materials. And we agreed together that we should try to systematic-review many of the domestic policy files. So the Clinton library has done some systematic review of the domestic policy files because the president, through his representative, requested that we consider doing that. They were very interested in processing and opening the domestic policy files.

**Q: When President Clinton says, as he has in several interviews recently, that he wants to get more records out as soon as possible about Senator Clinton and her contributions as first lady, can he wave a wand and tell the Archives to dump the information out?**

**Fawcett:** To an extent. He could waive all of his interests in reviewing the records, if he chose, but it would not automatically result in the dumping of this information out there for everyone to see. The Archives still has to conduct a review for other restrictive categories: for national security, for third-party privacy information. These records will be highly sought after when they come out, so we need to go through and redact phone numbers and Social Security numbers, and other information that could be damaging to a person's personal privacy, so those are the kinds of things that slow down the process.

[For example,] we are in the current process of reviewing Mrs. Clinton's schedules [as first lady]. If her schedules indicate information about the Secret Service, we redact that information because it's critical and substantive to the protection of president. So that's the kind of information that we go through page by page and look at.

It would make the process slightly faster to not be concerned about a [presidential] representative's review of this material, however, it doesn't mean that he can wave the

wand and automatically, the National Archives will open all this material. And you have to remember, too, that he [President Clinton] has a statutory right to review this material.

**Q: Some people believe that because there has been increased interest in Senator Clinton's records as first lady, prompted by her presidential campaign, those document requests should leap to the head of the line for expedited processing and release by the Archives. Is there a specified way in which the Archives must process requests for presidential records?**

**Fawcett:** The law specifies that people can file a <u>Freedom of Information Act</u> request for presidential records. And in the administration of FoIA, it's "first in and first out."

However, we have been permitted through court actions over the litigation about FoIA requests in general, not just FoIAs involving presidential records, to make the process more efficient. And one of the efficiencies in the process is to develop different queues. So you might have a complex queue, where the records come from many sources. You have a simple queue, where the record is one file; it's a few pages.

If you just had one long queue, if somebody had a request for 3 million pages, and you had a request for five pages, and you were behind the 3-million-page requester, it would be a long time before you would get your request. So, by having different queues, and the [Archives] staff rotating across the queues when they picked the next case to process, they are able to answer more of these simple requests and can turn some of them around fairly quickly.

We have several different queues at the [Clinton] library. There's a queue for classified records. There's a queue for audio-visual records. There's a complex queue where there's more than 10,000 pages.

**Q: Where are Mrs. Clinton's health care task force records, and have any of those records been processed and released?**

**Fawcett:** The records are at the Clinton presidential library in Little Rock, Ark. About 500,000 pages were processed and released while the president was still in office -- I think they were released in 1994 -- in response to litigation in the early part of the Administration. These are records that directly related to the task force. There are many other records at the presidential library that relate to health care reform, that are outside of the purview of that task force, and those are not open, but there are FoIA requests pending for those records.

**Q: If the Little Rock library gets a request for documents that the archivists know were released while the president was in office, but the researcher is not aware of that, what does the library do?**

**Fawcett:** We just let the researcher know that. They would have to go to the library in Little Rock to review those records or order copies at their expense.

**Q: To clarify, a former first lady does not have executive privilege rights?**

**Fawcett:** No, that's right. Some people think it is Senator Clinton who is claiming executive privilege. She has no claim of executive privilege over these records. It is her husband who would have the claim of executive privilege over any of these records. And actually, since we are within the 12-year period, he wouldn't need to assert executive privilege. He would just close them as confidential advice, if he chose.

**Q: Has President Clinton done that?**

**Fawcett:** We have many things closed in library in that category. As of last February there were about 28,000 pages closed in all categories of restrictions, including confidential advice.

**Q: President Clinton has total control over that, within the 12-year window under the law?**

**Fawcett:** Right, although I would say sometimes the Archives makes the first cut of that and then provides the material to them to look at.

**Q: Have there been occasions when the Archives made the first cut and thought it was "confidential advice," and the president reviewed it and said, "Oh, no, put this out"?**

**Fawcett:** Oh, that happens with all the presidents. It goes both ways. You know, reviewing is not a science, it's an art form. And one day an archivist may feel a lot more conservative than on another day. You have to use your judgment, and you have different archivists.

**Q: How do the archivists treat first lady's records?**

**Fawcett:** It's interesting because of how that has evolved, because there is no constitutional role for the first lady, or any governmental role -- but we all know that the first lady travels and represents the president, performs at official functions, plans official social events. And all those functions have come to be regarded as official governmental records.

It is interesting that we have a FoIA for her schedules [at the Clinton library]. Her schedules will be, in part, her representation of the government as the first lady, her travel with president in an official capacity, but other parts of her schedule will be completely personal, being a mom, a wife. She might have lunch with her daughter on her schedule. She could be getting her hair done, or she could be attending a school concert for her daughter -- that sort of thing. Those are not presidential events. I doubt that those [schedule] materials [of a personal nature] will be open.

Eventually, and it's too soon after President Clinton left office for this to have happened yet, but eventually presidents are usually willing to deed over to the National Archives those personal records that we've had to redact. So, many of them may eventually be opened under guidelines set for review of personal records.

It's very much like the records found in libraries where presidents deeded all their materials to us, that is, presidents before Reagan.

**Q: Can you describe the FoIA requests pending at the library related to Mrs. Clinton?**

**Fawcett:** There are about 30 or so pending requests for records related to Hillary Clinton. Some of them are for one or two pages, or one document, or a photograph. Others are requests for extensive numbers of materials, including several requests for records related to health care.

**Q: How long do you think it will take for archivists there to complete the process of reviewing those records and have President Clinton review them, etc.?**

**Fawcett:** I think we are talking about 3 million or more pages, a substantial number of pages, so undoubtedly those will not be completed before the Democratic convention [next August]. There may be some that are done. We will process incrementally to open as much as we can. I'm not sure what's next in the queue to come up; I do not know that.

I know what's being processed now at the library are her schedules, about 10,000 pages of her schedules. That was in response to a FoIA request, and it is anticipated that the Archives will complete our part of the process in January.

**Q: When did the FoIA request for Mrs. Clinton's schedules come in, to give everyone an idea how long the Archives process takes?**

**Fawcett:** The records at the Clinton library became available to FoIA on January 20, 2006. And I think early on in the process there were FoIA requests submitted for her schedules. It was fairly early, in the first few months [of 2006]. Since the archivists are processing it now, I must say, it must be one of the early ones to come in.

**Q: How long will it take to process and release a majority of the Clinton materials?**

**Fawcett:** We have approximately 70 million pages of textual material.

**Q: And e-mails?**

**Fawcett:** We're guessing 48 million pages, and we're basing that on an average of three pages per message, because of attachments. So, that leaves us with 118 million pages.

We are working on ways to make our process for processing these records at the Clinton library a little more efficient, and next year, we hope to process 200,000 pages.

**Q: And how many pages have you processed so far?**

**Fawcett:** About 100,000 pages under FoIA [Freedom of Information Act]. Now, there's more than that open. I think we have around a million pages open in the Clinton library.

So, just doing the math on it, you'll see there's a huge time lag. Now, as the records age, the process becomes a little more efficient. At the Reagan library, NARA archivists are now processing about a million pages a year. But not all of those are presidential records; some of them are other donated collections. So, the process does get more efficient, especially as you emerge from the periods of time that are covered by the Presidential Records Act of 1978 -- that 12-year period after a president leaves office, when certain restrictions apply.

**Q: And why does the processing move faster after that time?**

**Fawcett:** Some of the categories [exceptions for certain documents included in the 1978 law] -- the "confidential advice" category -- no longer applies. In the case of President Clinton, while there has been considerable easing of the confidential advice category, it still requires consultation with the president or his representative to clear documents for public release.

**Q: If President Clinton says, "This is what I want out," does the sitting president, President Bush, have the authority to review the materials?**

**Fawcett:** He can apply his own level of scrutiny. The [Bush] White House has indicated that any request that has gone through the former president's review -- I think they are immediately passing on it. But they certainly have the right by law to review it. That is part of the statute and the [2001 Bush] executive order. There certainly hasn't been a claim of executive privilege by the White House over any Clinton records.

**Q: President Bush's 2001 executive order, which Congress is now considering revoking with legislation, permits sitting presidents and previous presidents or their heirs to weigh in on records release. Can you explain what President Bush ordered?**

**Fawcett:** What the new executive order did that was different than the previous [Reagan-era] executive order is that it removed the discretion of the Archivist to make a call when there was a difference between the former president's view and the incumbent president on opening records.

[Previously], if the former president wanted to close something -- wanted to claim executive privilege -- and the current president did not uphold the claim of executive privilege, it would be the Archivist's call to make a decision. This meant that if the former president wanted to dispute that call, he would have to litigate it.

What the new executive order did was remove that discretion from the Archivist. And essentially Bush said in that executive order that, barring the most unusual of circumstances, he would uphold a former president's claim of privilege, which put the litigation responsibility onto the researcher, or the requester. That meant that if someone wanted to dispute the claim of executive privilege and take it to court, it would be the responsibility of the requester. And the Archivist was removed from that equation.

Now, just to close the loop, if the former president wanted to open something, and the incumbent president claimed privilege -- this is under both executive orders -- it would remain closed, because the incumbent's claim of privilege trumps everyone else's claim. Now, we never put any of that to the test because at the end of 12-year period [in the Presidential Records Act] there was a hiatus on the opening of records, as the Bush administration held up everything until they issued the new executive order.

**Q: Congress is trying to legislate away that Bush executive order?**

**Fawcett:** Right, but that has been ongoing for several years now. There is legislation before Congress that would basically terminate the requirements of the Bush executive order and go back to the requirements of the first one.

**Q: Under existing law and practice, when the 12-year clock to open President Clinton's records tolls -- and if his wife is elected president in 2008 and then re-elected -- his records would be opened in the first year of her second term in 2013, and both the former president and the incumbent president, related by marriage, could hold sway over release of some materials. Does this system really work?**

**Fawcett:** [Laughs.] It's very similar to the situation in which President Bush became responsible for the records of the end of his father's 12-year term. The Presidential Records Act sets this up, and as it turns out, I don't think the Presidential Records Act ever anticipated that relatives would be responsible. But certainly, either a member of the same party or a member of the opposite party could be in power. As I said, I doubt that the framers of the Presidential Records Act anticipated that there would be sons and spouses running for president.

We just follow the law.

**Q: Has the Archives recommended any changes related to the fact that it has encountered this situation, with relatives responsible for presidential records?**

**Fawcett:** In terms of checks and balances? If we restored the first executive order and gave the Archivist back his discretionary authority to mitigate between the incumbent and the former presidents on claims of executive privilege, that [change] would certainly assist. There has been a lot of concern about Bush's executive order, which gave the continuing right of executive privilege to family members of deceased presidents. That's also been a major point of concern.

The issue of executive privilege was litigated in regard to the Nixon papers, and the Supreme Court found that former presidents had a right of executive privilege. But the Supreme Court recognized that the privilege diminished over time.

You look at the Presidential Records Act, and this one modification to consider in the future is, how long is it necessary to continue noticing a White House? We still notice [notify for records review] the White House when we want to open records that go beyond the 12-year period. So we're noticing on Reagan records. Will we still be noticing on Reagan records in the year 2030, in the year 2050, in the year 2080? That's a question that needs to be addressed.

**Q: When would you have the clock stop on notification?**

**Fawcett:** There's always a tension in that. And I think if you have the clock stop too soon, it's difficult for people to let go. I think you have to come up with a time where you can really have the clock stop. It's like the executive order on declassification -- 25 years is really not enough time. The fact is that 25 years ago, some of the same leaders were in power that are still in power, and that makes declassification difficult.

So if you put a long enough time frame on it, then you can get out of questioning this. So maybe you could say 50 years is enough time, or maybe 40 years is enough time. It's unlikely that people who were prominent in an administration 40 years ago, or 50 years would still be prominent today, so there's no reason to keep noticing and worrying about executive privilege claims.

**Q: What kind of manpower and resources does the National Archives have at the Clinton library?**

**Fawcett:** We have 10 archivists there. Sixty-five percent of their time is spent processing FoIAs. Somebody might say, "What's the other 35 percent spent on?" There are special-access requests, there's reference -- there are other duties that archivists have. There's preparing catalog entries. But 65 percent of their time is spent processing the actual FoIA requests. That's the searching, pulling the records, administering the queues, and reviewing the records.

**Q: Would it speed things up if President Clinton broadened the manpower his designated representative has available to review records processed by the Archives?**

**Fawcett:** If there were more people on President Clinton's staff looking at what we're proposing to open, it would be of incremental help. The big delay is really how long it takes the Archives to process this material.

We get a request; it's for a broad subject, like health care reform. That requires going through thousands of files to pluck out those files from 36,000 boxes that relate to health care. And then arranging those files, and reviewing them, and removing the personal

information and the other restricted information, preparing withdrawal sheets, preparing notifications and submitting them for review.

In addition, there's the search of the electronic mail, and the electronic mail system is not a system that we can review online. We have to do searches, using [advanced] search terms just like people do when they search the Internet, and we get many, many hits on these things. You have to look at your hits and figure out how you narrow the search terms to get to the specifics you want. And then, if there are attachments, there is a process. In order for the archivists to read the attachments, they have to put them through a very complex process called dehexification -- don't ask me to explain it, I just know it's complicated and takes time -- in order for the archivists to even view the attachment on the screen. Then they have to print all that to paper, put it in a file, and prepare that for processing. There was e-mail in previous administrations, but not to the extent of this e-mail. President Clinton took office in 1993 and it helps to understand the magnitude of the e-mail if people think about when they first started using e-mail.

**Q: Do all the presidential libraries have similar Archives staffing, or do you put more archivists on the new libraries?**

**Fawcett:** From about President Johnson on, they all have about the same number. Some of them have one or two more; some have one or two less, and it's between eight to 10 archivists at each of these presidential libraries.

**Q: Considering demand, what would ideal staffing look like to be as rapidly responsive to requests as some people might like?**

**Fawcett:** Well, in an ideal world, I would probably look at having five or six more archivists in a presidential library processing records under the Presidential Records Act. And one of the things that we would attempt to do is far more systematic processing. Systematic processing is much more efficient than FoIA. If we can identify those areas where there is the most research interest, we could put a portion of our staff to systematically reviewing those files. In other words, they pull a box off a shelf and start processing that box. They're not pulling individual files from all over the library.

I would try to do the processing more comprehensively. If you think of an intersecting line, the FoIA requests would eventually start to intersect with the records that have already been systematically processed, so they would be open and available. That would mean there would be a continuing decline in what people would have to FoIA, and the staff could get the records out in a more timely fashion.

We are making some modifications to our system in that we take a look at our FoIA requests, and we attempt to bundle them, so that if we have a number of FoIA requests on a specific related subject, we will bring them together.

For example, say we had a lot of requests on Afghanistan, but they cover different aspects of Afghanistan, we'd probably try to identify the majority of files that would

cover that subject and let researchers know that we're processing that systematically, and then process it that way and notify all the FoIA requesters at the same time when the material is done. They are likely to get the material much more quickly that way. But again, it depends on the subject interest of the FoIAs, and FoIAs really come in based on what's happening. You know, Hillary Clinton is running for president, so we have FoIA requests asking for her records.

**Q: To clarify, the reason the Archives processes material based on FoIA requests is because the process is specified in the law that way?**

**Fawcett:** Right. We have to be responsive to FoIAs.

It will be very hard to ever peddle back against doing FoIA, and I wouldn't even advocate that we not have FoIA for presidential records, because that enables people to request what is of most interest.

It's a resource question. And it's really more about a meeting of minds among the media, the historians and the others who request these records to say, "Let's let the Archives process records in this area, or this area. Let's advise the Archives about the most important records to process." And then, if we have sufficient resources and we could still meet our FoIA obligations, we could do more of the systematic processing. I think we could make a lot of people much happier about the situation in the libraries.

We should do both, and I think that's what we have to be able to do, and if we do both, then the idea is that we are addressing systematically the records of most concern without turning off the ability of people to file individual FoIA requests.

I think what would then happen is that new FoIA requests would be very specific. They would be requests for a specific document or a specific file, as opposed to these massive requests for great quantities of information.

**Q: Has the Archives finished cataloging the records in the Clinton library to know what's there?**

**Fawcett:** We have a pretty good idea of what we have. Most of the boxes have a folder-title list. Sometimes they're a little general, like "correspondence," and you wonder what the correspondence is about. But if you know who the aide is -- that this was the legislative affairs person -- you have a pretty good idea of the type of thing that might be in that box. There are always finer levels of control that we can give to the records, but we have a fairly good knowledge of where to go and look for material.

And because archivists are treasure hunters, once you find a file, it often leads you to other files. So, you might not know everything when you begin the search, but after you examine some files, you recognize, "Oh, you know, so-and-so was also working on this area. I should go check and see what's in his boxes," and then look at that folder-title list and see if anything jumps out at you that might have been too general in your initial

search. But now that you know for sure he was working in that area, you decide to go and check.

**Q: Do you discover that some White House officials are particularly efficient record-keepers and others are spottier?**

**Fawcett:** If they sent the records to the White House Office of Records Management, we really have fairly good control over those. It's the records that they might have kept in their office, strewn across the top of their desk or in their file drawers that may be more problematic for us to sort through. But the ones they box up and send to the White House Office of Records Management have been inventoried. And you know what is a real controlling factor for doing that? The offices in the White House are extraordinarily small. The officials can't keep much in their offices. So they tend to send their records to WHORM, and then the records management people make lists, and those are the lists we inherit.

**Q: What about the other libraries covered by the Presidential Records Act? What's open so far?**

**Fawcett:** At the Reagan library, we have 8 million pages open, out of the 43 million pages. And at the George H.W. Bush library, we have about 5.5 million open, out of not quite 34 million pages of records. At the deed-of-gift libraries, some of the older ones, it is nearly 100 percent. Mainly at Ford, Eisenhower, Kennedy, and Johnson, we're completing the review of classified files that we're working on releasing. The Ford library is about 70 percent open. Carter is somewhat less.

**EXHIBIT 3**

1

1          UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2

3    CARA ALEXANDER, ET AL.          :
            PLAINTIFFS,              :
4                                    :
      VS.                           :        C. A. NO. 96-2123
5                                    :        C. A. NO. 97-1288
      F.B.I., ET AL.                :
6            DEFENDANTS,             :
                                    :
7                                        WASHINGTON, D. C.
                                          JANUARY 12, 2001
8

9                  TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE THOMAS P. JACKSON
10

11   FOR THE PLAINTIFFS:              LARRY KLAYMAN, ESQ.

12

13   FOR THE DEFENDANT:               HENRY AZAR, ESQ.
                                       JAMES GILLIGAN, ESQ.
                                       ELIZABETH SHAPIRO, ESQ.
14                                     DAVID ANDERSON, ESQ.

15   FOR H. R. CLINTON:               DAVID FORKNER, ESQ.

16

17   COURT REPORTER:                  PHYLLIS MERANA
                                       6816 U. S. COURTHOUSE
                                       3RD & CONSTITUTION AVE., N.W.
18                                     WASHINGTON, D. C.  20001

19

20

21

22

23

24

25

```
1                       P-R-O-C-E-E-D-I-N-G-S

2            THE DEPUTY CLERK:  IN THE MATTER OF ALEXANDER

3   VERSUS F.B.I AND GRIMLEY VERSUS F.B.I., CIVIL ACTIONS

4   96-2123 AND 97-1288.

5            MR. KLAYMAN FOR THE PLAINTIFFS.

6            MS. SHAPIRO, MR. GILLIGAN, MR. AZAR AND

7   MR. ANDERSON FOR THE DEFENDANTS.

8            MR. FORKNER FOR THE DEFENDANT H. R. CLINTON.

9            THE COURT:  I HAVE A FEW QUESTIONS I WANTED TO ASK

10  SO WE CAN SET A HEARING ON THIS FOR NEXT WEEK.  LET ME SEE

11  IF THE GOVERNMENT CAN FIRST GIVE ME AN OVERALL THUMBNAIL

12  SKETCH OF WHAT IT IS YOU'RE DOING HERE.

13           MR. GILLIGAN: YOUR HONOR, MR. AZAR WILL BE THE

14  PERSON ADDRESSING THE QUESTION YOU HAVE ABOUT THE M.O.U.

15           THE COURT:  OKAY.

16           MR. AZAR: GOOD MORNING, YOUR HONOR.

17           THE COURT:  MAYBE YOU CAN START WITH EXPLAINING

18  FOOTNOTE 7 TO ME AND TELL ME WHAT THE LEGAL IMPACT OF THE

19  TRANSFER TO THE ARCHIVES IS IN TERMS OF THIS CASE.

20           MR. AZAR:  YOUR HONOR, FRANKLY, MY KNOWLEDGE OF

21  THE FEDERAL RECORDS ACT IS PRETTY LIMITED.  IN TERMS OF THE

22  MEMORANDUM OF UNDERSTANDING AND THE SEARCHES OF THE VARIOUS

23  DATABASES, WITH RESPECT TO FEDERAL RECORDS, THOSE SEARCHES

24  WOULD CONTINUE TO BE DONE BY O.A., THE OFFICE OF

25  ADMINISTRATION, BECAUSE THERE IS NO IMMEDIATE DEADLINE FOR
```

1    TRANSFER OF THOSE AS OF JANUARY 20TH, 2001.

2          THE COURT:  BUT ALL OF THE E-MAIL MATERIAL WE'RE

3    TALKING ABOUT HERE ARE PRESIDENTIAL RECORDS.  I GUESS NOT

4    ALL OF IT, BECAUSE PART OF IT IS FROM OTHER COMPONENTS,

5    O.M.B. AND OTHER PLACES.

6          MR. AZAR:  THAT'S CORRECT, YOUR HONOR.

7          THE COURT:  SO IT'S MIXED.

8          MR. AZAR:  IT IS MIXED.

9          THE COURT:  SO I DON'T UNDERSTAND.  IF O.A. IS

10   GOING TO DO THE SEARCH FOR FEDERAL RECORDS, AND THE ARCHIVES

11   DOES IT FOR PRESIDENTIAL RECORDS, HOW DOES THAT WORK INTO

12   THIS?

13         MR. AZAR:  YOUR HONOR -- AND I AM CERTAINLY NOT A

14   TECHNICAL PERSON, BUT I THINK THE ANSWER HAS SOMETHING TO DO

15   WITH BUCKETS.  THAT IS, THE VARIOUS COMPONENTS OF E.O.P.

16   HAVE THEIR E-MAIL -- WITH RESPECT TO SEARCHES IN ARMS, THEY

17   ARE SEPARATED INTO BUCKETS, AND THE VARIOUS BUCKETS ARE

18   LISTED ON PAGE 3 OF THE M.O.U. IN A FOOTNOTE.

19         AND SO IF THERE WERE A SEARCH -- A SUBPOENA, AN

20   ORDER, OR A CONGRESSIONAL WHATEVER, THAT WAS BY SUBJECT

21   MATTER, THAT WOULD REQUIRE THE SEARCHING OF BOTH FEDERAL

22   RECORDS BUCKETS AND PRESIDENTIAL RECORDS BUCKETS, THE

23   DIVISION OF LABOR ON THAT WOULD BE BETWEEN O.A., ON THE ONE

24   HAND, AND THE ARCHIVES ON THE OTHER.

25         THE COURT:  IN TERMS OF A REQUEST FOR A SEARCH BY

**EXHIBIT 4**

# MEMORANDUM OF UNDERSTANDING

## BETWEEN THE NATIONAL ARCHIVES AND RECORDS ADMINISTRATION AND THE EXECUTIVE OFFICE OF THE PRESIDENT

### CONCERNING

### THE CONTINUATION AND COMPLETION, AFTER JANUARY 20, 2001, OF THE TAPE RESTORATION, 'MULTI HOST,' AND REFORMATTING PROJECTS FOR CLINTON-GORE ADMINISTRATION ELECTRONIC MAIL RECORDS ASSOCIATED WITH THE AUTOMATIC RECORDS MANAGEMENT SYSTEM

### DATED JANUARY 11, 2001

---

### I.    Purpose

The purpose of this Memorandum of Understanding ("MOU") is to ensure that (1) after 12:00 noon January 20, 2001, the National Archives and Records Administration ("NARA") shall have sole legal custody of all Clinton-Gore Administration electronic mail records that are governed by the Presidential Records Act ("PRA"), 44 U.S.C. 2201, and  (2) following the end of the Administration authorized personnel from the Executive Office of the President ("EOP"), Office of Administration ("OA") complete the ongoing restoration and reformatting projects described below concerning e-mail records associated with the Automatic Records Management System ("ARMS") beginning in July 1994 through the end of the Administration.

E-mail records governed by the Federal Records Act ("FRA") that are subject to this MOU shall be transferred to NARA, following completion of the projects described below, in accordance with the existing records schedule, covering EOP/OA OASIS ALL-IN-1 and other VAX Cluster Applications, job number N1-429-95-2.

### II.    The Projects

Copies of all Clinton presidential and federal and Gore vice presidential e-mail records that are associated with the ARMS and TRP databases and the multi-host anomaly will be transferred from the New Executive Office Building to a facility located in reasonable proximity to the Archives II complex at 11710 Beltsville Road, Calverton, MD ("the Facility") by OA on or before January 20, 2001. OA shall provide the Facility and hire staff to maintain physical and environmental security at the Facility.

OA shall complete the two restoration projects and the related reformatting project described below and shall be responsible for ensuring that sufficient funding exists or is obtained to complete each project, except to the extent that NARA is funding Project C, as described below.

1

OA will transfer copies of all tapes, software, equipment and necessary personnel associated with these projects to the Facility. OA shall administer all of the contracts governing each project until its completion. OA shall provide NARA with reports as requested by NARA on each project. NARA shall at all times have access to the presidential and vice presidential records maintained at the Facility.

## Project A – the Tape Restoration Project ("TRP")

The TRP involves the restoration of certain e-mail records from back-up tapes and the extraction of that data into a searchable database. Funding for the project totals $13.2 million, including $8.4 million in supplemental funding, and is available through September 2002. The project is and will continue to be performed by contractors retained by OA. The TRP is being undertaken on equipment that is separate and apart from the computer systems dedicated by OA for use in supporting the incumbent President.

The software and the hardware development for the TRP effort is complete and these systems are fully operational. 4319 tapes in the possession of the EOP have been copied, which is all of the relevant tapes with two minor exceptions. 136 tapes could not be adequately copied on the equipment OA possesses. OA is negotiating with outside vendors to copy these tapes. In addition, law enforcement organizations have 53 tapes in their possession. To date, the EOP has not been able to obtain an agreement with the law enforcement organizations for the return of these 53 original tapes or the provision of tape copies prior to January 20, 2001. If and when copies are obtained of the 136 and 53 tapes, respectively, they will be processed in accordance with the Projects. Prior to January 20, 2001, OA will provide NARA an inventory of these two groups of tapes. If legible copies of these tapes are not received by the end of the Projects, OA will be deemed to have completed the Projects regardless. If legible copies of these two groups of tapes or the original 53 tapes are received after the end of the Projects, then either OA, through its contractors, at OA's expense, will copy and process those tapes, or OA will make available to NARA the equipment, software, and documentation to copy and process the tapes, at NARA's expense, consistent with all applicable law. OA will place the TRP records into ARMS, segregated into appropriate agency buckets. The interim TRP database will be searchable and de-duplicated against itself. After the data extraction is complete, these records will be reformatted and placed on tapes for NARA, as covered in Project C.

## Project B – the 'Multi-Host' Project

The multi-host project involves the restoration of certain e-mail data for the period April 1 through May 31, 2000 from back-up tapes. This e-mail data, plus other e-mail data currently stored on the ARMS3 server for the period June 1 through September 30, 2000, will be streamed through a reconfigured Lotus Notes/ARMS interface. This effort will remediate a problem that affected email from approximately April to September 30, 2000, during which time approximately 1% of e-mail entering ARMS was defective due to an anomaly in the Lotus Notes/ARMS interface, and will result in a complete data set containing only correct emails for that period of time. Streaming the data through a reconfigured interface will separate

2

presidential and federal records into the appropriate buckets utilized by ARMS for records management purposes. The reconfigured Lotus Notes/ARMS interface was placed into operation on October 1, 2000, and has processed e-mail records after that date without any detected incident.

All software and hardware associated with the Lotus Notes/ARMS interface as well as all equipment necessary to perform the multi-host repair will be moved to the Facility by OA.

### Project C – Tape Reformatting Project

The ARMS system currently archives e-mail records generated or received by ARMS-managed accounts during the Clinton-Gore Administration beginning July 1994 through the end of the Administration, subject to various anomalies. These records are stored in agency buckets that serve to separate presidential or vice presidential records from federal records.[1] OA will move the data in ARMS, along with the hardware and software associated with supporting and searching ARMS, to the Facility. The equipment will include the ARMS software, as well as nodes of the existing VAX computer that provide the ARMS platform.

This project involves the reformatting of e-mails in the ARMS system, including those records that had been subject to the multi-host anomaly, and those records restored as a part of the TRP, in accordance with the Memorandum of Understanding Between the National Archives and Records Administration and the Executive Office of the President, Office of Administration ARMS-NARA Tape Reformatting Project for Clinton Administration, Post July 14, 1994, signed on October 6 & 8, 1999. ("1999 Tape Reformatting MOU"), attachment A.

OA will send to NARA tapes of reformatted e-mail drawn from the ARMS database and the TRP database on a rolling basis as reformatting is completed, as specified by the 1999 Tape Reformatting MOU. NARA will enter these tapes into a database of Clinton-Gore Administration records. The records from the TRP database will be de-duplicated against all other TRP records, although they will not be de-duplicated against the ARMS records. Therefore, prior to the creation of the record database or the streaming of the TRP database into ARMS, requests for Clinton Administration e-mail records from the "Mail 2" and "Letter D" timeframes, as well as requests for OVP e-mail records prior to May 2000, will require searches of both the TRP database and the ARMS database.

At the time the tape reformatting project is completed and validated by NARA using NARA's established electronic records preservation procedures, OA will remove all remaining personnel and equipment and shut down the Facility.

---

[1] The presidential and vice presidential record buckets are those for the White House Office, the Office of the Vice President, the Council of Economic Advisors, the National Security Council, the Office of Policy Development and the President's Foreign Intelligence Advisory Board. The federal records buckets include the Council on Environmental Quality, the Office of Administration, the Office of Management and Budget, the Office of National Drug Control Policy, the Office of Science and Technology Policy, and the Office of United States Trade Representative.

3

## III.   Records Subject to the MOU

There are three distinct records categories of ARMS-related e-mail records subject to portions of this MOU, all created by the Clinton-Gore Administration EOP after July 14, 1994: (1) records of President Clinton and the EOP offices that create presidential records, which are governed by the PRA; (2) records of Vice President Gore and his staff, which are also governed by the PRA; and (3) records of EOP offices that create federal records, which are governed by the Federal Records Act ("FRA"), 44 U.S.C. chapters 21, 29, 31 and 33.

### A.  Legal Custody of PRA Records

On January 20, 2001, legal custody of all presidential and vice presidential record e-mail messages shall transfer to the Archivist of the United States. OA will transfer copies of all tapes, plus software, equipment and necessary personnel associated with these Projects to the Facility on or before that date. The originals of all other electronic media not associated with the above Projects shall be transferred to other NARA facilities. Any access to PRA records by OA staff, OA contractors, or any other party shall be controlled exclusively by NARA and shall be governed by the PRA, NARA regulations, and Executive Order 12667. These records shall remain Clinton presidential and Gore vice presidential records after noon, January 20, 2001, notwithstanding their physical location or the limited access to them as described above.

In order to restrict access to Clinton presidential and Gore vice presidential record e-mail effectively, NARA agrees that only pre-authorized OA and OA contractor personnel may enter the OA-leased premises at the Facility. All personnel entering the Facility shall sign a log book upon entry and exit. The log book shall be sent to NARA weekly and maintained by NARA. In addition, the ARMS and the TRP databases will be password protected so that only password holders can read the message text in these databases.

NARA shall be responsible for responding to requests for documents or information and conducting searches of the Clinton presidential and Gore vice presidential e-mail records in response to requests and subpoenas pursuant to the PRA that are made by investigative bodies or other requesting parties. NARA shall be responsible for developing search terms and search strings to be used in conducting a search of these records. NARA and EOP personnel have met to begin to learn how to formulate search strategies and regarding the status of searches pending at the time of transition and any searches reasonably expected to be made into those records, so as to assist NARA in staff planning. Members of the Counsel's Office will furnish NARA with the most up-to-date documentation they possess of subpoenas served on the EOP during this Administration and for which e-mail searches must still be performed, and any correspondence or other documents relevant to those searches.

NARA personnel will formulate search terms for searches on the TRP database and enter the search terms directly into the computer accessing those records. NARA personnel will formulate the search terms and search strings of the ARMS database and will be responsible for entering the search terms directly into the computer accessing those records. OA will provide at NARA's option reasonable and necessary training on the ARMS database and associated VAX Computer

system on a reimbursable basis. Based on NARA's current knowledge of the VAX computer system upon which ARMS database is run, NARA is presently not able to conduct searches on the ARMS database. However, NARA will pursue ways as expeditiously as possible to acquire the ability to conduct such searches, but NARA does not know how long this will take. The search results will be copied to a CD (or more if necessary) and given directly to NARA personnel. Access to search results are controlled by NARA and governed by the PRA, NARA regulations, and E.O. 12667.

## B.  Legal Custody of Federal Records

In contrast to the presidential records discussed above, all federal records associated with the Projects shall remain under the legal custody and control of OA. Access to such federal records, including e-mails and backup tapes associated with the Projects, shall be controlled by OA and shall be governed by the FRA, NARA regulations and governing records schedules.

OA shall be responsible for responding to and conducting searches of all federal record e-mails, including requests under the Freedom of Information Act, congressional requests, subpoenas and other authorized requests until the restoration and reformatting of those records has been completed under Section II, above, and such records are formally accessioned into NARA by means of a fully effectuated SF 258, in accordance with 36 C.F.R. section 1228, subpart L.

## C.  Transfer of Original Electronic Media Associated With the Above Projects

As soon as possible, and no later than January 20, 2001, OA shall transfer to NARA a complete set of the original electronic media in its possession that back up information used in completing the above-listed Projects, including the 136 tapes that have not yet been copied, and with the exception of the 53 tapes retained by law enforcement agencies. OA shall produce disaster recovery back-up tapes of the ARMS and TRP databases as they exist at that time. These back-up tapes shall be sent directly to NARA, along with sufficient documentation for OA to accomplish a full and complete restoration. An inventory of all such transferred backup tapes and e-mail files shall be provided to NARA along with the electronic materials. These backup tapes and copies are being transferred to NARA solely for security storage pending completion of the Projects. When the presidential, vice presidential and federal record e-mail databases are completed and reformatted, NARA will consider these backup tapes and copies for disposal in accordance with the PRA and the FRA.

_[signature]_

On Behalf of the
National Archives and Records Administration

_[signature: date]_ 7/__/200
Date

_[signature]_

On Behalf of President Clinton

01 / 11 / 01
Date

_[signature]_

On Behalf of Vice President Gore

1 - 11 - 01
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CARA LESLIE ALEXANDER, et al.,           )
                                         )
                Plaintiffs,              )
                                         )   Civil Action Nos. 96-
         v.                              )   2123/97-1288
                                         )   (RCL) (Consolidated)
                                         )
FEDERAL BUREAU OF INVESTIGATION,         )
et al.,                                  )
                                         )
                Defendants.              )

DECLARATION OF CHARLES EASLEY

     I, Charles C. Easley, for my declaration pursuant to

28 U.S.C. § 1746, depose and state as follows:

     1.   I am the Associate Director for Security, Office of

Administration (OA), within the Executive Office of the President

(EOP).  As such I function as the EOP Security Officer.  I have

held this position since October 1986.  I have previously

submitted declarations in this litigation, including on March 16,

April 3, and November 7, 2000.  The matters attested to herein

are based on my personal knowledge, and on information that I

have acquired in the course of performing my duties as the

Associate Director for Security and the EOP Security Officer.

     2.   As stated in my earlier declarations, I have assumed

responsibility for the safekeeping of the following items, which

have been placed in the custody of my office, and which may be

generally described as: (1) backup tapes of e-mails that may not

have entered into the Automated Records Management System (ARMS)



DEFENDANT'S
EXHIBIT
4

either because of configuration errors or because they were sent
to or from the Office of Vice President (OVP); (2) backup tapes
containing archived hard-drive files of many departed EOP
employees (sometimes called reallocation tapes); (3) a "Zip Disk"
of what I have been informed to be copies of e-mails, sorted on
the personal shared drive ("F" drive) of Robert Haas that,
according to Mr. Haas, constitute the results of an e-mail search
he performed in the Summer of 1998, as well as numerous
electronic copies thereof; (4) printouts of e-mails to and from
Monica Lewinsky believed to be the results of the search that Mr.
Haas performed; and (5) 27 backup tapes from the Quorum database.

3.   My November 7 declaration stated that on October 26 I
had assumed responsibility for the security and safekeeping of 27
backup tapes from the Quorum database.  The Security Office
since that time has received and assumed responsibility for an
additional 23 backup tapes from the Quorum system.  On November
21, 15 backup tapes were transferred to the Security Office by a
Northrup-Grumman contract employee.  On December 15, an
additional 8 tapes were transferred to the custody of my security
personnel by an attorney in the White House Counsel's Office, who
I understand received them from an employee of the Office of
Correspondence.

4.   Items (1)-(3) and (5) set forth in paragraph two above,
plus the additional 23 Quorum backup tapes, reside in Room SB-234
of the New Executive Office Building (NEOB), subject to the

security conditions that I described in my March 16 and April 3 declarations. With respect to item (4), I provided the set of e-mail printouts that I received on March 31, 2000, to White House Counsel for the purpose of producing it to the Office of the Independent Counsel. However, I have three sets of copies of those printouts, which reside in a secure alarmed, vaulted area of my office, Room 4104 NEOB. Only I and four Security Specialists working for me are able to gain access to these copies.

5.   These materials will remain in my custody until they are transferred to the Archives II complex of the National Archives and Records Administration (NARA) on or about January 20, 2001. The following security measures will be taken to ensure the secure transfer of these materials. First, I will review the detailed inventory of the electronic materials being transferred from EOP to Archives II to ensure that the materials discussed above are on the inventory. Second, I will personally oversee the transfer of these materials from OA to Archives. Third, I will insist that NARA name an individual to take responsibility for receiving these materials. Fourth, I will

3

perform a tape-by-tape inventory of the backup tapes with the NARA representative. Fifth, the NARA representative and I will sign for the transfer and receipt of these materials.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 11, 2001.

CHARLES C. EASLEY

4

TOTAL P.05

**EXHIBIT 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CARA LESLIE ALEXANDER, et al.,          )
                                        )
              Plaintiffs,               )
                                        )
      v.                                )     Civil Action Nos. 96-2123/97-1288
                                        )     (RCL) (Consolidated)
                                        )
FEDERAL BUREAU OF INVESTIGATION,        )
et al.,                                 )
                                        )
              Defendants.               )
_____)

**FILED**

JAN 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### ORDER

Defendant Executive Office of the President (EOP) is hereby authorized pursuant to the Presidential Records Act, 44 U.S.C. §§ 2201-07, to release to the custody of the National Archives and Records Administration (NARA), the following items described in the March 16, 2000, April 3, 2000, November 7, 2000, and January 11, 2000 declarations of Charles Easley in this action, and which have been kept in Mr. Easley's custody:

1. Backup tapes of e-mails that may not have entered into the Automated Records Management System (ARMS) either because of configuration errors or because they were sent to or from the Office of the Vice President;

2. Backup tapes containing archived hard-drive files of departed EOP employees (reallocation tapes);

3. The Zip Disk containing e-mails of a search that Mr. Haas performed during

1998 that had been stored on the personal shared drive of Robert Haas, as well as any and

all copies of the contents of the Zip Disk;

4. Printouts of e-mails to and from Monica Lewinsky believed to be the result of

Mr. Haas's search; and

5. 50 backup tapes from the Quorum database.

*Dr. Bruce Ambacher of*

Upon EOP's transfer of these materials to NARA, Charles Easley is relieved of

any further responsibility for any of the above items. *Dr. Ambacher shall, within*

*days of this date, submit an affidavit describing in detail*

*the steps he has taken and is taking to ensure the integrity*

SO ORDERED. *of these materials.* ✳

_____
Royce C. Lamberth
United States District Judge

*Royce C. Lamberth*    1/19/0

✳ *The court will personally inspect and oversee this process, so there is no need at this time for appointment of a Special Master. The court has no reason not to trust that the career professional archivists who have these materials will allow any tampering or misuse. RCL*

Copies to:

James J. Gilligan, Esq.
Elizabeth J. Shapiro, Esq.
U.S. Department of Justice
P.O. Box 883
Washington, D.C. 20044

Paul B. Gaffney, Esq.
Williams & Connolly
725 12th Street, N.W.
Washington, D.C. 20005

Larry Klayman, Esq.
General Counsel
Judicial Watch, Inc.
501 School Street, S.W.
Suite 725
Washington, D.C. 20024

# EXHIBIT 6

# EOP Exchange Environment - All Components
## Summary - Messages per Day

(DRAFT) EOP-OA-OCIO - For Official Use Only

Low Threshold: 30%
High Threshold: 300%

| | WHO | OVP | OPD | NSC | PFIAB | CEA | CEQ | OMB | ONDCP | OSTP | USTR | OA | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Days with Zero Msg: | 12 | 16 | 11 | 47 | 20 | 103 | 81 | 59 | 20 | 15 | 73 | 16 | 473 |
| Total Days with Low Msg: | 28 | 30 | 7 | 9 | 14 | 29 | 5 | 10 | 24 | 39 | 10 | 24 | 229 |

### Actual Message Count

| Date | Day | Day Type | WHO | OVP | OPD | NSC | PFIAB | CEA | CEQ | OMB | ONDCP | OSTP | USTR | OA | Issue Files | Actual Msg Count Total | Predicted Msg Count Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01-Jan-03 | Wed | FH | 864 | | | | | | | | | | | 1,125 | 0 | 1,989 | 1,989 |
| 02-Jan-03 | Thu | WD | 10,542 | | | | | | | | | | | 8,583 | 0 | 19,125 | 19,125 |
| 03-Jan-03 | Fri | WD | 8,004 | | | | | | | | | | | 6,987 | 0 | 14,991 | 19,125 |
| 04-Jan-03 | Sat | WE | 1,470 | | | | | | | | | | | 1,173 | 0 | 2,643 | 1,989 |
| 05-Jan-03 | Sun | WE | 1,572 | | | | | | | | | | | 966 | 0 | 2,538 | 2,316 |
| 06-Jan-03 | Mon | WD | 1,566 | | | | | | | | | | | 8,805 | 0 | 10,371 | 17,058 |
| 07-Jan-03 | Tue | WD | 7,824 | | | | | | | | | | | 9,441 | 0 | 17,265 | 14,829 |
| 08-Jan-03 | Wed | WD | 12,280 | | | | | | | | | | | 11,241 | 0 | 23,521 | 15,438 |
| 09-Jan-03 | Thu | WD | 12,640 | | | | | | | | | | | 10,635 | 0 | 23,275 | 17,055 |
| 10-Jan-03 | Fri | WD | 14,680 | | | | | | | | | | | 1,915 | 0 | 16,595 | 18,091 |
| 11-Jan-03 | Sat | WE | 1,168 | | | | | | | | | | | 1,935 | 0 | 3,103 | 2,390 |
| 12-Jan-03 | Sun | WE | 2,292 | | | | | | | | | | | 2,148 | 0 | 4,440 | 2,085 |
| 13-Jan-03 | Mon | WD | 15,912 | | | | | | | | | | | 2,148 | 0 | 18,060 | 17,878 |
| 14-Jan-03 | Tue | WD | 17,460 | | | | | | | | | | | 9,897 | 0 | 27,357 | 17,900 |
| 15-Jan-03 | Wed | WD | 9,306 | | | | | | | | | | | 10,914 | 0 | 20,220 | 18,961 |
| 16-Jan-03 | Thu | WD | 8,650 | | | | | | | | | | | 10,539 | 5 | 20,189 | 19,078 |
| 17-Jan-03 | Fri | WD | 14,364 | | | | | | | | | | | 10,905 | 0 | 25,269 | 19,179 |
| 18-Jan-03 | Sat | WE | 990 | | | | | | | | | | | 1,868 | 0 | 2,858 | 2,126 |
| 19-Jan-03 | Sun | WE | 1,464 | | | | | | | | | | | 1,720 | 0 | 3,184 | 2,248 |
| 20-Jan-03 | Mon | FH | 3,496 | | | | | | | | | | | 2,814 | 0 | 6,310 | 2,382 |
| 21-Jan-03 | Tue | WD | 21,027 | | | | | | | | | | | 13,908 | 0 | 34,935 | 19,687 |
| 22-Jan-03 | Wed | WD | 13,115 | | | | | | | | | | | 15,172 | 0 | 28,287 | 20,869 |
| 23-Jan-03 | Thu | WD | 21,093 | | | | | | | | | | | 24,599 | 0 | 45,692 | 21,390 |
| 24-Jan-03 | Fri | WD | 17,268 | | | | | | | | | | | 46,888 | 0 | 64,156 | 24,416 |
| 25-Jan-03 | Sat | WE | 1,842 | | | | | | | | | | | 1,716 | 0 | 3,558 | 2,873 |
| 26-Jan-03 | Sun | WE | 3,117 | | | | | | | | | | | 1,428 | 0 | 4,545 | 2,949 |
| 27-Jan-03 | Mon | WD | 16,108 | | | | | | | | | | | 10,788 | 0 | 26,896 | 26,900 |
| 28-Jan-03 | Tue | WD | 17,870 | | | | | | | | | | | 11,493 | 0 | 29,363 | 26,841 |
| 29-Jan-03 | Wed | WD | 18,550 | | | | | | | | | | | 11,937 | 0 | 30,487 | 26,981 |
| 30-Jan-03 | Thu | WD | 19,490 | | | | | | | | | | | 13,412 | 0 | 32,902 | 27,166 |
| 31-Jan-03 | Fri | WD | 16,678 | | | | | | | | | | | 13,304 | 0 | 29,982 | 27,891 |

WCQB40K-00002-C

(DRAFT) EOP-OA-OCIO - For Official Use Only

| Date | Day | Day Type | WHO | OVP | OPD | NSC | PFIAB | CEA | CEQ | OMB | ONDCP | OSTP | USTR | OA | Issue Files | Actual Msg Count Total | Predicted Msg Count Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01-Feb-03 | Sat | WE | 4,584 | | | | | | | | | | | 2,524 | 0 | 7,108 | 3,233 |
| 02-Feb-03 | Sun | WE | 2,092 | | | | | | | | | | | 1,984 | 0 | 4,076 | 3,729 |
| 03-Feb-03 | Mon | WD | 18,374 | | | | | | | | | | | 15,316 | 0 | 33,690 | 28,680 |
| 04-Feb-03 | Tue | WD | 16,876 | | | | | | | | | | | 15,036 | 0 | 31,912 | 29,907 |
| 05-Feb-03 | Wed | WD | 16,156 | | | | | | | | | | | 14,400 | 0 | 32,556 | 30,678 |
| 06-Feb-03 | Thu | WD | 16,970 | | | | | | | | | | | 15,160 | 0 | 32,130 | 31,153 |
| 07-Feb-03 | Fri | WD | 15,164 | | | | | | | | | | | 10,840 | 0 | 26,004 | 31,620 |
| 08-Feb-03 | Sat | WE | 1,334 | | | | | | | | | | | 1,724 | 0 | 3,058 | 3,900 |
| 09-Feb-03 | Sun | WE | 1,178 | | | | | | | | | | | 1,648 | 0 | 2,826 | 4,110 |
| 10-Feb-03 | Mon | WD | 16,878 | | | | | | | | | | | 13,428 | 0 | 30,306 | 32,115 |
| 11-Feb-03 | Tue | WD | 18,530 | | | | | | | | | | | 15,580 | 0 | 34,110 | 32,759 |
| 12-Feb-03 | Wed | WD | 18,886 | | | | | | | | | | | 13,872 | 0 | 32,858 | 33,115 |
| 13-Feb-03 | Thu | WD | 17,374 | | | | | | | | | | | 7,742 | 2 | 25,116 | 33,780 |
| 14-Feb-03 | Fri | WD | 13,630 | | | | | | | | | | | 6,998 | 64 | 20,628 | 34,039 |
| 15-Feb-03 | Sat | WE | 1,096 | | | | | | | | | | | 1,469 | 0 | 2,565 | 4,169 |
| 16-Feb-03 | Sun | WE | 1,106 | | | | | | | | | | | 740 | 0 | 1,846 | 4,137 |
| 17-Feb-03 | Mon | FH | 2,282 | | | | | | | | | | | 1,036 | 0 | 3,328 | 3,988 |
| 18-Feb-03 | Tue | WD | 8,934 | | | | | | | | | | | 2,324 | 0 | 11,258 | 33,785 |
| 19-Feb-03 | Wed | WD | 17,110 | | | | | | | | | | | 6,840 | 0 | 23,950 | 32,549 |
| 20-Feb-03 | Thu | WD | 16,088 | | | | | | | | | | | 7,702 | 38 | 23,790 | 32,320 |
| 21-Feb-03 | Fri | WD | 14,620 | | | | | | | | | | | 6,928 | 5 | 21,548 | 30,058 |
| 22-Feb-03 | Sat | WE | 1,516 | | | | | | | | | | | 1,052 | 0 | 2,568 | 3,657 |
| 23-Feb-03 | Sun | WE | 1,610 | | | | | | | | | | | 910 | 0 | 2,520 | 3,547 |
| 24-Feb-03 | Mon | WD | 20,962 | | | | | | | | | | | 7,572 | 0 | 28,534 | 27,816 |
| 25-Feb-03 | Tue | WD | 19,556 | | | | | | | | | | | 7,942 | 9 | 27,498 | 27,954 |
| 26-Feb-03 | Wed | WD | 19,420 | | | | | | | | | | | 7,682 | 27 | 27,102 | 27,856 |
| 27-Feb-03 | Thu | WD | 19,102 | | | | | | | | | | | 8,196 | 0 | 27,298 | 27,678 |
| 28-Feb-03 | Fri | WD | 16,973 | | | | | | | | | | | 6,896 | 2 | 23,869 | 27,383 |
| 01-Mar-03 | Sat | WE | 1,314 | | | | | | | | | | | 842 | 0 | 2,156 | 3,322 |
| 02-Mar-03 | Sun | WE | 1,604 | | | | | | | | | | | 686 | 0 | 2,290 | 2,771 |
| 03-Mar-03 | Mon | WD | 19,289 | | | | | | | | | | | 8,752 | 0 | 28,041 | 27,061 |
| 04-Mar-03 | Tue | WD | 19,949 | | | | | | | | | | | 8,250 | 1 | 28,199 | 26,764 |
| 05-Mar-03 | Wed | WD | 19,300 | | | | | | | | | | | 7,610 | 60 | 26,910 | 26,568 |
| 06-Mar-03 | Thu | WD | 18,780 | | | | | | | | | | | 7,580 | 75 | 26,340 | 26,271 |
| 07-Mar-03 | Fri | WD | 16,197 | | | | | | | | | | | 6,528 | 2 | 22,725 | 25,946 |
| 08-Mar-03 | Sat | WE | 1,366 | | | | | | | | | | | 972 | 0 | 2,338 | 2,573 |
| 09-Mar-03 | Sun | WE | 1,106 | | | | | | | | | | | 758 | 0 | 1,864 | 2,493 |
| 10-Mar-03 | Mon | WD | 19,250 | | | | | | | | | | | 7,406 | 2 | 26,656 | 25,794 |
| 11-Mar-03 | Tue | WD | 18,826 | | | | | | | | | | | 7,190 | 0 | 26,016 | 25,602 |
| 12-Mar-03 | Wed | WD | 19,276 | | | | | | | | | | | 7,168 | 4 | 26,444 | 25,176 |
| 13-Mar-03 | Thu | WD | 18,618 | | | | | | | | | | | 7,304 | 0 | 25,922 | 24,838 |
| 14-Mar-03 | Fri | WD | 16,494 | | | | | | | | | | | 6,806 | 0 | 23,300 | 24,880 |
| 15-Mar-03 | Sat | WE | 1,382 | | | | | | | | | | | 900 | 0 | 2,282 | 2,386 |
| 16-Mar-03 | Sun | WE | 1,596 | | | | | | | | | | | 834 | 0 | 2,430 | 2,355 |
| 17-Mar-03 | Mon | WD | 19,974 | | | | | | | | | | | 7,750 | 0 | 27,724 | 25,021 |
| 18-Mar-03 | Tue | WD | 20,076 | | | | | | | | | | | 7,822 | 0 | 27,898 | 25,156 |

(DRAFT) EOP-OA-OCIO - For Official Use Only

| Date | Day | Day Type | WHO | OVP | OPD | NSC | PFIAB | CEA | CEO | OMB | ONDCP | OSTP | USTR | OA | Issue Files | Actual Msg Count Total | Predicted Msg Count Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19-Mar-03 | Wed | WD | 19,730 | | | | | | | | | | | 8,260 | 9 | 27,990 | 25,988 |
| 20-Mar-03 | Thu | WD | 20,050 | | | | | | | | | | | 8,418 | 1 | 28,468 | 26,190 |
| 21-Mar-03 | Fri | WD | 16,184 | | | | | | | | | | | 7,510 | 1 | 23,694 | 26,424 |
| 22-Mar-03 | Sat | WE | 2,182 | | | | | | | | | | | 944 | 0 | 3,126 | 2,306 |
| 23-Mar-03 | Sun | WE | 2,664 | | | | | | | | | | | 786 | 0 | 3,450 | 2,376 |
| 24-Mar-03 | Mon | WD | 19,832 | | | | | | | | | | | 7,208 | 0 | 27,040 | 26,531 |
| 25-Mar-03 | Tue | WD | 19,376 | | | | | | | | | | | 8,068 | 8 | 27,444 | 26,457 |
| 26-Mar-03 | Wed | WD | 17,016 | | | | | | | | | | | 8,208 | 0 | 25,224 | 26,454 |
| 27-Mar-03 | Thu | WD | 18,208 | | | | | | | | | | | 7,358 | 0 | 25,566 | 26,360 |
| 28-Mar-03 | Fri | WD | 16,628 | | | | | | | | | | | 6,860 | 0 | 23,488 | 26,274 |
| 29-Mar-03 | Sat | WE | 1,366 | | | | | | | | | | | 1,016 | 0 | 2,382 | 2,492 |
| 30-Mar-03 | Sun | WE | 1,704 | | | | | | | | | | | 1,006 | 0 | 2,710 | 2,520 |
| 31-Mar-03 | Mon | WD | 18,902 | | | | | | | | | | | 7,396 | 0 | 26,298 | 26,254 |
| 01-Apr-03 | Tue | WD | 20,302 | | | | | | | | | | | 7,854 | 2 | 28,156 | 26,167 |
| 02-Apr-03 | Wed | WD | 20,126 | | | | | | | | | | | 7,586 | 0 | 27,712 | 26,165 |
| 03-Apr-03 | Thu | WD | 18,904 | | | | | | | | | | | 7,586 | 0 | 26,490 | 26,205 |
| 04-Apr-03 | Fri | WD | 17,632 | | | | | | | | | | | 7,682 | 0 | 25,314 | 26,213 |
| 05-Apr-03 | Sat | WE | 1,540 | | | | | | | | | | | 892 | 0 | 2,432 | 2,573 |
| 06-Apr-03 | Sun | WE | 2,322 | | | | | | | | | | | 902 | 0 | 3,224 | 2,585 |
| 07-Apr-03 | Mon | WD | 18,134 | | | | | | | | | | | 7,146 | 0 | 25,280 | 26,342 |
| 08-Apr-03 | Tue | WD | 19,292 | | | | | | | | | | | 7,784 | 3 | 27,076 | 26,273 |
| 09-Apr-03 | Wed | WD | 21,700 | | | | | | | | | | | 8,450 | 0 | 30,150 | 26,326 |
| 10-Apr-03 | Thu | WD | 20,660 | | | | | | | | | | | 8,572 | 0 | 29,232 | 26,512 |
| 11-Apr-03 | Fri | WD | 17,988 | | | | | | | | | | | 7,462 | 0 | 25,450 | 26,677 |
| 12-Apr-03 | Sat | WE | 1,686 | | | | | | | | | | | 1,142 | 0 | 2,828 | 2,755 |
| 13-Apr-03 | Sun | WE | 1,550 | | | | | | | | | | | 868 | 0 | 2,418 | 2,823 |
| 14-Apr-03 | Mon | WD | 20,296 | | | | | | | | | | | 7,658 | 0 | 27,954 | 26,785 |
| 15-Apr-03 | Tue | WD | 23,819 | | | | | | | | | | | 8,090 | 0 | 31,909 | 26,796 |
| 16-Apr-03 | Wed | WD | 25,353 | | | | | | | | | | | 7,894 | 2 | 33,247 | 26,997 |
| 17-Apr-03 | Thu | WD | 22,845 | | | | | | | | | | | 7,636 | 0 | 30,481 | 27,260 |
| 18-Apr-03 | Fri | WD | 13,569 | | | | | | | | | | | 6,020 | 1 | 19,589 | 27,360 |
| 19-Apr-03 | Sat | WE | 1,527 | | | | | | | | | | | 906 | 0 | 2,433 | 2,821 |
| 20-Apr-03 | Sun | WE | 1,236 | | | | | | | | | | | 698 | 0 | 1,934 | 2,735 |
| 21-Apr-03 | Mon | WD | 23,166 | | | | | | | | | | | 7,626 | 2 | 30,792 | 27,155 |
| 22-Apr-03 | Tue | WD | 20,697 | | | | | | | | | | | 8,780 | 0 | 29,477 | 27,343 |
| 23-Apr-03 | Wed | WD | 21,341 | | | | | | | | | | | 8,370 | 1 | 29,711 | 27,444 |
| 24-Apr-03 | Thu | WD | 17,860 | | | | | | | | | | | 8,656 | 25 | 26,516 | 27,669 |
| 25-Apr-03 | Fri | WD | 18,352 | | | | | | | | | | | 7,906 | 1 | 26,258 | 27,716 |
| 26-Apr-03 | Sat | WE | 1,438 | | | | | | | | | | | 1,074 | 0 | 2,512 | 2,545 |
| 27-Apr-03 | Sun | WE | 1,620 | | | | | | | | | | | 862 | 0 | 2,482 | 2,561 |
| 28-Apr-03 | Mon | WD | 24,251 | | | | | | | | | | | 7,598 | 0 | 31,849 | 27,855 |
| 29-Apr-03 | Tue | WD | 24,704 | | | | | | | | | | | 8,996 | 3 | 33,700 | 28,132 |
| 30-Apr-03 | Wed | WD | 23,554 | | | | | | | | | | | 8,218 | 2,097 | 31,772 | 28,409 |
| 01-May-03 | Thu | WD | 18,970 | | | | | | | | | | | 8,618 | 8,550 | 27,588 | 28,612 |
| 02-May-03 | Fri | WD | 16,348 | | | | | | | | | | | 7,602 | 7,602 | 23,950 | 28,667 |
| 03-May-03 | Sat | WE | 1,506 | | | | | | | | | | | 916 | 916 | 2,422 | 2,533 |

2/6/2006 - 4:13 PM - Page 3 of 23

(DRAFT) EOP-OA-OCIO - For Official Use Only

| Date | Day | Day Type | WHO | OVP | OPD | NSC | PFIAB | CEA | CEO | OMB | ONDCP | OSTP | USTR | OA | Issue Files | Actual Msg Count Total | Predicted Msg Count Total |
|------|-----|----------|-----|-----|-----|-----|-------|-----|-----|-----|-------|------|------|-----|-------------|------------------------|----------------------------|
| 04-May-03 | Sun | WE | 1,344 | | | | | | | | | | | 966 | 966 | 2,310 | 2,532 |
| 05-May-03 | Mon | WD | 22,794 | 724 | | | | | | | | | | 8,602 | 9,326 | 32,120 | 28,599 |
| 06-May-03 | Tue | WD | 24,492 | 1,053 | | | | | | | | | | 9,122 | 10,182 | 34,667 | 28,941 |
| 07-May-03 | Wed | WD | 22,132 | 1,310 | | | | | | | | | | 8,472 | 9,782 | 31,914 | 29,321 |
| 08-May-03 | Thu | WD | 23,744 | 2,060 | | | | | | | | | | 15,904 | 17,974 | 41,708 | 29,409 |
| 09-May-03 | Fri | WD | 18,564 | 1,962 | | | | | | | | | | 9,130 | 11,091 | 29,646 | 30,033 |
| 10-May-03 | Sat | WE | 1,890 | 110 | | | | | | | | | | 1,156 | 1,266 | 3,156 | 2,417 |
| 11-May-03 | Sun | WE | 1,672 | 120 | | | | | | | | | | 988 | 1,108 | 2,780 | 2,458 |
| 12-May-03 | Mon | WD | 22,364 | 3,188 | | | | | | | | | | 8,268 | 11,469 | 33,820 | 30,243 |
| 13-May-03 | Tue | WD | 22,978 | 3,124 | | | | | | | | | | 8,846 | 11,976 | 34,948 | 30,536 |
| 14-May-03 | Wed | WD | 23,482 | 2,864 | | | | | | | | | | 8,028 | 10,894 | 34,384 | 30,688 |
| 15-May-03 | Thu | WD | 20,986 | 2,434 | | | | | | | | | | 7,576 | 10,028 | 30,996 | 30,745 |
| 16-May-03 | Fri | WD | 19,280 | 2,578 | | | | | | | | | | 9,421 | 12,003 | 31,279 | 30,770 |
| 17-May-03 | Sat | WE | 1,970 | 264 | | | | | | | | | | 1,437 | 1,705 | 3,671 | 2,504 |
| 18-May-03 | Sun | WE | 1,722 | 256 | | | | | | | | | | 1,533 | 1,789 | 3,511 | 2,658 |
| 19-May-03 | Mon | WD | 22,954 | 3,308 | | | | | | | | | | 11,405 | 14,717 | 37,667 | 31,355 |
| 20-May-03 | Tue | WD | 22,050 | 3,132 | | | | | | | | | | 12,787 | 15,929 | 37,969 | 31,699 |
| 21-May-03 | Wed | WD | 20,304 | 2,794 | | | | | | | | | | 12,678 | 15,479 | 35,776 | 32,123 |
| 22-May-03 | Thu | WD | 20,724 | 2,840 | | | | | | | | | | 13,362 | 16,202 | 36,926 | 32,427 |
| 23-May-03 | Fri | WD | 16,414 | 2,244 | | | | | | | | | | 11,085 | 13,333 | 29,743 | 32,947 |
| 24-May-03 | Sat | WE | 1,178 | 222 | | | | | | | | | | 1,500 | 1,722 | 2,900 | 2,856 |
| 25-May-03 | Sun | WE | 1,134 | 130 | | | | | | | | | | 1,329 | 1,461 | 2,593 | 2,904 |
| 26-May-03 | Mon | FH | 3,272 | 230 | | | | | | | | | | 2,028 | 2,258 | 5,530 | 2,918 |
| 27-May-03 | Tue | WD | 20,865 | 2,760 | | | | | | | | | | 10,379 | 13,141 | 34,004 | 33,188 |
| 28-May-03 | Wed | WD | 20,608 | 2,788 | | | | | | | | | | 8,880 | 11,672 | 32,276 | 33,204 |
| 29-May-03 | Thu | WD | 20,242 | 3,276 | | | | | | | | | | 8,320 | 11,640 | 31,838 | 33,231 |
| 30-May-03 | Fri | WD | 13,884 | 3,132 | | | | | | | | | | 7,462 | 10,642 | 24,578 | 33,454 |
| 31-May-03 | Sat | WE | 1,322 | 360 | | | | | | | | | | 1,128 | 1,488 | 2,810 | 3,208 |
| 01-Jun-03 | Sun | WE | 1,826 | 388 | | | | | | | | | | 1,092 | 1,480 | 3,306 | 3,251 |
| 02-Jun-03 | Mon | WD | 17,903 | 4,996 | | | | | | | | | | 8,394 | 13,468 | 33,487 | 33,487 |
| 03-Jun-03 | Tue | WD | 20,254 | 6,026 | | | | | | | | | | 8,148 | 14,282 | 34,428 | 33,444 |
| 04-Jun-03 | Wed | WD | 19,880 | 5,056 | | | | | | | | | | 8,848 | 14,043 | 33,784 | 33,431 |
| 05-Jun-03 | Thu | WD | 19,878 | 4,958 | | | | | | | | | | 8,690 | 13,812 | 33,526 | 33,530 |
| 06-Jun-03 | Fri | WD | 17,756 | 4,750 | | | | | | | | | | 8,446 | 13,328 | 30,952 | 33,099 |
| 07-Jun-03 | Sat | WE | 1,317 | 322 | | | | | | | | | | 1,126 | 1,460 | 2,765 | 3,362 |
| 08-Jun-03 | Sun | WE | 1,571 | 424 | | | | | | | | | | 1,234 | 1,658 | 3,229 | 3,318 |
| 09-Jun-03 | Mon | WD | 23,782 | 5,854 | | | | | | | | | | 9,504 | 15,008 | 38,640 | 33,168 |
| 10-Jun-03 | Tue | WD | 23,334 | 6,746 | | | | | | | | | | 10,422 | 17,447 | 40,502 | 33,421 |
| 11-Jun-03 | Wed | WD | 23,314 | 6,428 | | | | | | | | | | 12,632 | 19,154 | 42,374 | 33,714 |
| 12-Jun-03 | Thu | WD | 22,162 | 5,840 | | | | | | | | | | 12,631 | 18,767 | 40,733 | 34,134 |
| 13-Jun-03 | Fri | WD | 17,348 | 5,248 | | | | | | | | | | 11,685 | 17,141 | 34,281 | 34,647 |
| 14-Jun-03 | Sat | WE | 1,288 | 306 | | | | | | | | | | 1,467 | 1,783 | 3,061 | 3,368 |
| 15-Jun-03 | Sun | WE | 1,664 | 346 | | | | | | | | | | 1,476 | 1,830 | 3,486 | 3,301 |
| 16-Jun-03 | Mon | WD | 21,998 | 5,962 | | | | | | | | | | 12,699 | 18,811 | 40,659 | 34,805 |
| 17-Jun-03 | Tue | WD | 24,217 | 5,970 | | | | | | | | | | 13,720 | 19,828 | 43,907 | 34,962 |
| 18-Jun-03 | Wed | WD | 23,025 | 6,330 | | | | | | | | | | 14,331 | 20,862 | 43,686 | 35,275 |

HOGR6OA-000005 - C

(DRAFT) EOP-OA-OCIO – For Official Use Only

| Date | Day | Day Type | WHO | OVP | OPD | NSC | PFIAB | CEA | CEQ | OMB | ONDCP | OSTP | USTR | OA | Issue Files | Actual Msg Count Total | Predicted Msg Count Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19-Jun-03 | Thu | WD | 22,011 | 6,366 | | | | | | | | | | 9,467 | 16,122 | 37,844 | 35,691 |
| 20-Jun-03 | Fri | WD | 19,983 | 5,360 | | | | | | | | | | 7,394 | 13,015 | 32,717 | 35,739 |
| 21-Jun-03 | Sat | WE | 1,516 | 364 | | | | | | | | | | 876 | 1,248 | 2,756 | 3,298 |
| 22-Jun-03 | Sun | WE | 1,734 | 410 | | | | | | | | | | 1,002 | 1,426 | 3,146 | 3,282 |
| 23-Jun-03 | Mon | WD | 24,628 | 7,082 | | | | | | | | | | 8,142 | 15,484 | 39,852 | 35,896 |
| 24-Jun-03 | Tue | WD | 23,616 | 7,014 | | | | | | | | | | 8,648 | 15,938 | 39,278 | 36,094 |
| 25-Jun-03 | Wed | WD | 25,446 | 7,102 | | | | | | | | | | 9,308 | 16,600 | 41,856 | 36,357 |
| 26-Jun-03 | Thu | WD | 23,834 | 7,080 | | | | | | | | | | 9,598 | 16,830 | 40,512 | 36,836 |
| 27-Jun-03 | Fri | WD | 17,918 | 5,976 | | | | | | | | | | 8,518 | 14,844 | 32,412 | 37,270 |
| 28-Jun-03 | Sat | WE | 1,544 | 494 | | | | | | | | | | 1,210 | 1,598 | 2,900 | 3,070 |
| 29-Jun-03 | Sun | WE | 1,326 | 364 | | | | | | | | | | 1,328 | 1,828 | 3,366 | 3,081 |
| 30-Jun-03 | Mon | WD | 20,718 | 6,556 | | | | | | | | | | 26,862 | 33,843 | 54,136 | 37,662 |
| 01-Jul-03 | Tue | WD | 21,652 | 6,014 | | | | | | | | | | 28,324 | 34,562 | 55,990 | 38,804 |
| 02-Jul-03 | Wed | WD | 20,716 | 6,254 | | | | | | | | | | 9,280 | 15,956 | 36,260 | 39,882 |
| 03-Jul-03 | Thu | FH | 16,418 | 4,846 | | | | | | | | | | 7,566 | 13,255 | 28,830 | 40,006 |
| 04-Jul-03 | Fri | FH | 2,118 | 494 | | | | | | | | | | 1,372 | 1,912 | 3,884 | 3,089 |
| 05-Jul-03 | Sat | WE | 1,368 | 276 | | | | | | | | | | 1,098 | 1,418 | 2,742 | 3,188 |
| 06-Jul-03 | Sun | WE | 1,838 | 452 | | | | | | | | | | 1,178 | 1,714 | 3,468 | 3,186 |
| 07-Jul-03 | Mon | WD | 20,754 | 6,952 | | | | | | | | | | 7,402 | 15,132 | 35,108 | 40,235 |
| 08-Jul-03 | Tue | WD | 20,610 | 6,980 | | | | | | | | | | 9,738 | 17,145 | 37,328 | 40,049 |
| 09-Jul-03 | Wed | WD | 20,604 | 6,766 | | | | | | | | | | 8,996 | 16,277 | 36,386 | 39,882 |
| 10-Jul-03 | Thu | WD | 18,990 | 6,448 | | | | | | | | | | 8,728 | 15,640 | 34,166 | 40,006 |
| 11-Jul-03 | Fri | WD | 18,534 | 5,798 | | | | | | | | | | 7,904 | 14,431 | 32,236 | 39,566 |
| 12-Jul-03 | Sat | WE | 2,403 | 488 | | | | | | | | | | 1,740 | 2,294 | 4,631 | 3,212 |
| 13-Jul-03 | Sun | WE | 2,982 | 364 | | | | | | | | | | 1,648 | 2,082 | 4,994 | 3,387 |
| 14-Jul-03 | Mon | WD | 39,459 | 6,978 | | | | | | | | | | 11,468 | 19,063 | 57,905 | 39,113 |
| 15-Jul-03 | Tue | WD | 35,275 | 7,724 | | | | | | | | | | 9,650 | 17,858 | 52,649 | 40,020 |
| 16-Jul-03 | Wed | WD | 28,294 | 7,154 | | | | | | | | | | 10,386 | 17,896 | 43,834 | 40,481 |
| 17-Jul-03 | Thu | WD | 25,936 | 7,042 | | | | | | | | | | 9,428 | 17,014 | 42,406 | 40,488 |
| 18-Jul-03 | Fri | WD | 33,483 | 6,358 | | | | | | | | | | 8,764 | 15,546 | 48,605 | 40,728 |
| 19-Jul-03 | Sat | WE | 2,541 | 440 | | | | | | | | | | 1,232 | 1,674 | 4,213 | 3,554 |
| 20-Jul-03 | Sun | WE | 2,712 | 630 | | | | | | | | | | 1,174 | 1,811 | 4,516 | 3,716 |
| 21-Jul-03 | Mon | WD | 32,250 | 8,408 | | | | | | | | | | 8,776 | 17,463 | 49,434 | 41,565 |
| 22-Jul-03 | Tue | WD | 34,625 | 7,414 | | | | | | | | | | 10,264 | 17,962 | 52,303 | 42,069 |
| 23-Jul-03 | Wed | WD | 36,146 | 7,670 | | | | | | | | | | 9,510 | 17,494 | 53,336 | 42,765 |
| 24-Jul-03 | Thu | WD | 34,658 | 7,428 | | | | | | | | | 128 | 8,458 | 16,277 | 50,544 | 43,358 |
| 25-Jul-03 | Fri | WD | 31,666 | 6,102 | | | | | | | | | 4 | 7,410 | 13,770 | 45,306 | 43,886 |
| 26-Jul-03 | Sat | WE | 1,898 | 414 | | | | | | | | | 16 | 1,026 | 1,467 | 3,342 | 3,868 |
| 27-Jul-03 | Sun | WE | 2,578 | 516 | | | | | | | | | 170 | 814 | 1,366 | 3,924 | 3,917 |
| 28-Jul-03 | Mon | WD | 37,272 | 7,420 | | | | | | | | | 564 | 7,992 | 15,611 | 52,854 | 44,565 |
| 29-Jul-03 | Tue | WD | 39,627 | 7,058 | | | | | | | | | 902 | 8,302 | 15,831 | 55,551 | 44,497 |
| 30-Jul-03 | Wed | WD | 38,739 | 7,446 | | | | | | 355 | | | | 9,070 | 16,705 | 56,157 | 44,474 |
| 31-Jul-03 | Thu | WD | 36,488 | 6,800 | | | | | | 314 | | 1,626 | | 9,192 | 16,887 | 54,461 | 45,541 |
| 01-Aug-03 | Fri | WD | 29,742 | 6,010 | | | | | | | | 1,406 | | 7,652 | 14,461 | 45,124 | 46,875 |
| 02-Aug-03 | Sat | WE | 1,998 | 448 | | | | | | 37 | | 156 | | 990 | 1,527 | 3,629 | 3,983 |
| 03-Aug-03 | Sun | WE | 2,247 | 500 | | | | | | 31 | | 80 | | 1,104 | 1,683 | 3,962 | 4,082 |

HDGRWOA - 000000

(DRAFT) EOP-OA-OCIO - For Official Use Only

| Date | Day | Day Type | WHO | OVP | OPD | NSC | PRIAB | CEA | CEQ | OMB | ONDCP | OSTP | USTR | OA | Issue Files | Actual Msg Count Total | Predicted Msg Count Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04-Aug-03 | Mon | WD | 28,578 | 5,572 | | | | | | 336 | | 1,390 | | 7,964 | 14,494 | 43,840 | 46,788 |
| 05-Aug-03 | Tue | WD | 30,704 | 5,884 | | | | | | 444 | | 1,838 | | 8,593 | 15,661 | 47,583 | 47,220 |
| 06-Aug-03 | Wed | WD | 32,040 | 5,694 | | | | | | 382 | | 1,800 | | 8,528 | 15,240 | 48,442 | 47,732 |
| 07-Aug-03 | Thu | WD | 32,696 | 5,598 | | | | | | 350 | | 2,154 | | 8,881 | 15,389 | 49,679 | 48,335 |
| 08-Aug-03 | Fri | WD | 27,068 | 4,080 | | | | | | 330 | 163 | 1,994 | | 7,854 | 12,968 | 41,489 | 49,111 |
| 09-Aug-03 | Sat | WE | 2,898 | 464 | | | | | | 14 | 36 | 68 | | 1,590 | 2,187 | 5,070 | 4,151 |
| 10-Aug-03 | Sun | WE | 3,300 | 706 | | | | | | 33 | 24 | | | 1,569 | 2,389 | 5,634 | 4,206 |
| 11-Aug-03 | Mon | WD | 32,680 | 5,726 | | | | | | 501 | 264 | 16 | | 8,752 | 16,971 | 47,939 | 49,574 |
| 12-Aug-03 | Tue | WD | 36,201 | 4,900 | | | | | | 553 | 222 | 6 | | 9,360 | 15,811 | 51,242 | 49,075 |
| 13-Aug-03 | Wed | WD | 33,510 | 4,588 | | | | | | 569 | 270 | 6 | | 13,867 | 20,036 | 52,810 | 49,005 |
| 14-Aug-03 | Thu | WD | 34,068 | 4,568 | | | | | | 453 | 319 | 6 | | 23,036 | 28,969 | 62,450 | 48,454 |
| 15-Aug-03 | Fri | WD | 28,972 | 4,894 | | | | | | 407 | 192 | 12 | | 19,774 | 25,804 | 54,251 | 50,456 |
| 16-Aug-03 | Sat | WE | 3,542 | 492 | | | | | | 28 | 19 | 12 | | 5,294 | 5,889 | 9,371 | 4,286 |
| 17-Aug-03 | Sun | WE | 3,679 | 552 | | | | | | 45 | 11 | | | 6,144 | 6,837 | 10,433 | 4,831 |
| 18-Aug-03 | Mon | WD | 33,540 | 5,412 | | | | | | 431 | 406 | 16 | | 21,584 | 24,628 | 61,391 | 50,738 |
| 19-Aug-03 | Tue | WD | 34,887 | 4,904 | | | | | | 732 | 685 | 8 | | 19,568 | 16,998 | 60,764 | 51,336 |
| 20-Aug-03 | Wed | WD | 33,519 | 4,474 | | | | | | 529 | 1,109 | 2 | | 19,532 | 16,722 | 59,175 | 51,759 |
| 21-Aug-03 | Thu | WD | 25,901 | 4,702 | | | | | | 351 | 1,076 | 2 | | 17,184 | 17,095 | 49,216 | 52,052 |
| 22-Aug-03 | Fri | WD | 14,396 | 3,730 | | | | | | 460 | 1,157 | 26 | | 16,493 | 22,531 | 36,282 | 61,985 |
| 23-Aug-03 | Sat | WE | 1,689 | 480 | | | | | | 26 | 139 | 2 | | 1,736 | 2,473 | 4,072 | 5,671 |
| 24-Aug-03 | Sun | WE | 2,793 | 560 | | | | | | 24 | 134 | 2 | | 1,792 | 2,611 | 5,305 | 5,762 |
| 25-Aug-03 | Mon | WD | 33,311 | 4,468 | | | | | | 465 | 1,411 | 14 | | 16,293 | 23,467 | 55,962 | 51,533 |
| 26-Aug-03 | Tue | WD | 27,805 | 4,506 | | | | | | 244 | 1,768 | 6 | | 22,306 | 29,275 | 56,635 | 51,688 |
| 27-Aug-03 | Wed | WD | 28,006 | 4,632 | | | | | | 285 | 2,000 | 6 | | 21,325 | 29,397 | 56,919 | 51,533 |
| 28-Aug-03 | Thu | WD | 31,650 | 2,388 | | | | 976 | | 298 | 2,101 | 12 | | 18,141 | 22,628 | 55,567 | 51,743 |
| 29-Aug-03 | Fri | WD | 27,820 | 1,760 | | | | 828 | | 231 | 180 | 6 | | 24,670 | 29,397 | 55,495 | 51,781 |
| 30-Aug-03 | Sat | WE | 2,708 | 171 | | | | 45 | | 17 | | 4 | | 1,802 | 296 | 4,748 | 5,935 |
| 31-Aug-03 | Sun | FH | 2,330 | 216 | | | | 155 | | 16 | | 6 | | 758 | 281 | 3,481 | 6,074 |
| 01-Sep-03 | Mon | WD | 6,286 | 910 | | | | 90 | | 52 | | | | 1,382 | 754 | 8,073 | 6,014 |
| 02-Sep-03 | Tue | WD | 28,640 | 3,110 | | | | 931 | | 256 | 7 | 18 | | 6,279 | 4,605 | 39,239 | 52,803 |
| 03-Sep-03 | Wed | WD | 37,979 | 8,312 | | | | 1,280 | | 504 | 10 | 20 | | 5,350 | 15,297 | 53,452 | 52,365 |
| 04-Sep-03 | Thu | WD | 6,879 | 6,628 | | | | 1,149 | | 481 | 9 | 20 | | 5,039 | 13,056 | 20,196 | 52,628 |
| 05-Sep-03 | Fri | WD | 36,521 | 6,052 | | | | 1,121 | | 586 | | | | 7,384 | 8,793 | 51,645 | 51,077 |
| 06-Sep-03 | Sat | WE | 5,202 | 568 | | | | 81 | | 54 | 97 | 126 | | 1,270 | 1,000 | 7,996 | 6,245 |
| 07-Sep-03 | Sun | WE | 6,556 | 588 | | | | 81 | | 95 | 280 | 456 | | 1,138 | 1,621 | 9,194 | 6,502 |
| 08-Sep-03 | Mon | WD | 44,190 | 6,966 | | | | 1,010 | 378 | 495 | 2,759 | 3,814 | | 10,212 | 18,826 | 69,820 | 51,611 |
| 09-Sep-03 | Tue | WD | 26,590 | 6,768 | | | | 1,137 | 1,222 | 534 | 2,840 | 3,904 | | 10,529 | 21,959 | 53,624 | 51,763 |
| 10-Sep-03 | Wed | WD | 60,493 | 7,286 | | | | 1,353 | 2,033 | 583 | 2,868 | 4,022 | | 17,883 | 18,573 | 86,481 | 52,888 |
| 11-Sep-03 | Thu | WD | 49,649 | 772 | | | | 1,099 | 2,550 | 648 | 2,773 | 3,630 | | 16,212 | 12,101 | 77,333 | 54,660 |
| 12-Sep-03 | Fri | WD | 45,914 | | | | | 1,218 | 2,504 | 637 | 2,828 | 3,794 | | 15,979 | 11,081 | 72,874 | 55,444 |
| 13-Sep-03 | Sat | WE | 3,609 | 460 | | | | 56 | 382 | 51 | 254 | 468 | | 1,406 | 1,633 | 6,666 | 6,897 |
| 14-Sep-03 | Sun | WE | 4,416 | 590 | | | | 88 | 260 | 70 | 219 | 338 | | 1,304 | 1,651 | 7,285 | 6,597 |
| 15-Sep-03 | Mon | WD | 53,042 | 7,218 | | | | 1,232 | 3,150 | 925 | 3,024 | 3,778 | | 12,878 | 20,439 | 85,248 | 56,424 |
| 16-Sep-03 | Tue | WD | 5,318 | 7,014 | | | | 1,021 | 2,888 | 968 | 2,935 | 3,462 | | 14,204 | 18,353 | 37,830 | 57,679 |
| 17-Sep-03 | Wed | WD | 12,922 | 6,752 | | | | 1,359 | 2,472 | 999 | 3,348 | 4,066 | | 11,182 | 30,663 | 43,100 | 56,472 |
| 18-Sep-03 | Thu | WD | 15,729 | 2,640 | | | | 250 | 658 | 425 | 901 | 1,186 | | 3,984 | 21,903 | 25,773 | 55,626 |